|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) ) | Case No. 18-04177-TOM11 |
| Debtors. | ) ) ) | (Joint Administration Requested) |

**DECLARATION OF KEVIN NYSTROM,
CHIEF RESTRUCTURING OFFICER OF MISSION COAL COMPANY, LLC,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Kevin Nystrom, Chief Restructuring Officer of Mission Coal Company, LLC ("Mission Coal"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby declare under penalty of perjury:

**Qualifications**

1.      I am a Managing Director of Zolfo Cooper, LLC, a New Jersey limited liability company, an affiliate of Zolfo Cooper Management, LLC (either "Zolfo Cooper") and, as of August 22, 2018, have served serve as Chief Restructuring Officer to the Debtors. In my capacity as Chief Restructuring Officer, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am a graduate of the University of South Dakota with a degree in business administration. I have over 20 years of diversified business experience in restructuring, financial management, and accounting. I have extensive experience in the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

development of reorganization plans, creditor negotiations, business plan preparation and long-term forecasting, developing and implementing cost reduction programs, and financial management of public and privately held companies. I have advised companies, boards, investors, and lender groups and served in interim management roles and led assignments in numerous industries. I served as the Chief Operating Officer of Hawaiian Telcom, the Chief Restructuring Officer of The Dolan Company, Barnes Bay Development, and American Home Mortgage, and the Chief Executive Officer of Boomerang Tube.

2. To effectuate a restructuring, on the date hereof (the "Commencement Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Northern District of Alabama (the "Court"). To minimize the adverse effects on their business, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Pleadings"). The First Day Pleadings seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession. I am familiar with the contents of each First Day Pleading and believe that the relief sought in each First Day Pleading is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful chapter 11 process for the Debtors, and best serves the Debtors' estates and creditors' interests. The facts set forth in each First Day Pleading are incorporated herein by reference.

3. Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and/or advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and/or restructuring initiatives, and my opinions based upon my experience and knowledge. I am over 18 years of age and authorized to submit this declaration on behalf of the

2

Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

4.  To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Pleadings, I have organized this declaration as follows:

- **Part I** provides a general overview of Mission Coal's corporate history and operations;

- **Part II** provides an overview of the Debtors' prepetition capital structure and other liabilities;

- **Part III** describes the circumstances leading to these chapter 11 cases;

- **Part IV** discusses the Debtors' exploration of restructuring alternatives in advance of the Commencement Date; and

- **Part V** sets forth the evidentiary basis for the relief requested in each of the First Day Pleadings.

## Preliminary Statement

5.  Mission Coal was formed on January 31, 2018 through a reorganization that combined and consolidated the operations of Seneca Coal Resources, LLC and its wholly-owned subsidiaries ("Seneca") and Seminole Coal Resources, LLC and its wholly-owned subsidiaries ("Seminole").  Mission Coal is engaged in the business of extracting, processing, and marketing metallurgical coal—and, to a lesser extent, thermal coal—from deep and surface mines.[2]  Mission Coal is headquartered in Kingsport, Tennessee and, at the time of its founding, had operating assets which included two deep mines and one surface mine in West Virginia and one deep mine located in Alabama.  Through these three distinct active mining operations, Mission Coal was able to

---

2    Metallurgical or "met coal" refers to the various grades of coal with suitable carbonation properties to make coke in the steelmaking process.  This is in contrast to thermal coal, which is used to produce electricity, steam, or both.  For the year ended December 31, 2017, met coal accounted for 96% of the Debtors' total coal sales revenue.

3

access qualities of coal with volatility in the low-, mid-, and high-vol ranges, which allows the Debtors to develop relationships with a diverse customer base. Mission Coal's traditional end customers include steel and coke producers, industrial customers, and electric utilities, and is uniquely positioned within the coal industry because of its primary focus on met, rather than thermal, coal. Today, Mission Coal is a leading producer of met coal assets in the United States.

6.     Over the past several years, market forces in the industry have affected a number of coal companies, many of which have filed for chapter 11. It was through the opportunities presented by the marketing of these distressed coal assets that mining venture ERP Environmental Fund ("ERP"), a former corporate affiliate of Seneca and Seminole, came to acquire the high-potential operating assets at Seneca and Seminole that were eventually organized as Mission Coal. Due to market forces and their former owners' liquidity concerns, many of these acquired assets had been either idled for a period of time or otherwise fell into disrepair, requiring enormous upfront capital infusions, including necessary equipment repairs and infrastructural investment, that resulted in higher than usual capital and operating expenditures for the young company. As of the Commencement Date, the Debtors have spent approximately $28 million upgrading these mining complexes, and despite favorable market forces and commodity pricing, internal and external factors have prevented the Debtors from maximizing the value of their mining operations. Although Mission Coal's executives previously targeted a total of 6.5 million short tons in production in 2018, adverse mining conditions, combined with rail and port disruptions, forced the Debtors to revise their annual target to 4.5 million short tons, with only approximately 2.1 million short tons produced as of September 2018. This diminished production and sales volume has severely limited the Debtors' liquidity and has prevented them from implementing their operational upgrade program, including fully performing the necessary maintenance on their mining operations.

4

7.     Notably, the Debtors are a party to two collective bargaining agreements (collectively, the "CBAs") with the United Mine Workers of America (the "UMWA").  In particular, Pinnacle Mining Company, LLC and the UMWA are party to a CBA dated April 27, 2018, and Oak Grove Resources, LLC and the UMWA are party to a CBA dated April 27, 2019. As a result of these CBAs, Mission Coal maintains significant legacy liabilities, including liabilities related to these CBAs, the UMWA Multi-Employer Pension Plans (as defined below), and other post-employment benefits ("OPEB").  Mission Coal also maintains certain environmental and regulatory liabilities stemming from surface mining and disturbance and air quality control.  As of the Commencement Date, Mission Coal estimates that it has approximately $18.2 million in black lung benefit obligations as well as withdrawal liability reported by the UMWA from the Multi-Employer Pension Plans.  Beyond these employment-related liabilities, the Debtors also estimate that they have over $30 million in the aggregate of asset retirement obligations at Seneca and Seminole.

8.     As of the Commencement Date, the Debtors' capital structure is as follows: Mission Coal has approximately $175 million in funded debt, consisting of approximately $104 million outstanding under a first lien secured term loan and approximately $71 million outstanding under a second lien secured term loan.

9.     In addition to the expenditures discussed above, the Debtors continue to be adversely impacted by their significant debt burden, operational challenges, and increasingly constrained liquidity.  To help evaluate their ongoing challenges, in August 2018 the Debtors retained Kirkland & Ellis LLP ("Kirkland") as restructuring counsel, Zolfo as restructuring advisor, and Jefferies LLC ("Jefferies") as investment banker and financial advisor to assist with the development of possible restructuring alternatives, as described in further detail below.

5

10.     The Debtors have engaged and continue to engage with their key stakeholders with the goal of facilitating a value-maximizing transaction.  In the early stages of these cases, the Debtors aim to conclude negotiations with all key stakeholders, propose a chapter 11 plan with the support of as many of their other stakeholders and creditors as possible, and comply with milestones provided in their debtor-in-possession financing to expeditiously and efficiently execute a sale of Mission Coal's assets.  The Debtors believe that effecting an asset sale through an expedient chapter 11 process will maximize ultimate realized value for its stakeholders.  Accordingly, the sale of all or substantially all of the Debtors' assets is the primary focused outcome of this chapter 11 process.

## Part I
## Corporate History and Operations

## I.     Mission Coal's Corporate History.

11.     As mentioned above, the corporate reorganization that led to Mission Coal's creation was born out of the ongoing transformation in the coal industry.  ERP purchased the Seneca and Seminole asset packages over the course of late 2015 and early 2016, when met coal prices were in decline.[3]  More specifically, in December 2015, ERP purchased the Oak Grove and Pinnacle mines from Cliffs Natural Resources, which eventually became the Seneca assets, at a steep discount. In a second round of acquisitions, through a purchase pursuant to a 363 sale in February of 2016 out of Walter Energy's bankruptcy estate, ERP purchased the asset package that now is functionally Seminole, which included the Maple and Gauley Eagle properties in West Virginia, with no consideration paid beyond the assumption of liabilities.  In January 2018, Mission Coal, which encompassed the Seminole and Seneca assets, began to be run as a standalone

---

[3]     At the time of the acquisition, met coal prices were at approximately one third of the level they had been three years prior.

company.  With substantial unmined reserves, a promising met coal market dawning and readily actionable investments available to realize the potential of the Debtors' mines, Mission Coal was positioned to become a profitable, efficient entity.

12.     Unfortunately, the market forces that allowed for the sale of these assets at such a discount also drove them into disrepair.  At the time of their acquisition, several of these assets were either idled for a period—including Seneca being subject to Cliffs Natural Resources' "Harvest Plan" of strict operational downsizing —or were otherwise in need of substantial deferred maintenance.  Due to certain operational issues, compounded by challenges and delays in obtaining additional capital investment to reach the potential of these mines, the Debtors' find themselves in a precarious financial situation and will require an influx of new money to effectively surmount the hurdles to become a successful company. With such investment, the Debtors believe that its mines would have the ability to generate significant cash flow and capitalize on favorable pricing conditions in the met coal market.

## II.  Mission Coal's Business Operations.

13.  The map below shows the locations of the Debtors' key mining assets:



## A.  Oak Grove Mining Complex.

14.  Oak Grove Mining Complex ("Oak Grove"), is located in Bessemer, Alabama. Oak Grove commenced mining operations in 1975 and, until 2003, was owned and operated by US Steel. In 2007, Cliffs Natural Resources acquired Oak Grove and owned it until Seneca's acquisition of the property in December 2015.

15.  Oak Gove mines in the Blue Creek seam in Alabama, and the mine is unique in producing a high quality, mid-volume coal with low sulfur and low ash. When sold, this product takes no discount from the Australian benchmark. As of late September 2018, there are an estimated 26,277,522 clean recoverable tons at Oak Grove.

16.  Oak Grove contains longwall mining equipment as well as a recently built preparation plant and a thermal dryer. The offices at the Oak Grove Mining Complex are state-

8

of-the-art, and contain a large service elevator that allows for robust underground access and provides for easy transport of even massive pieces of equipment. The mine is approximately 1,000 feet deep and home to 360 unionized employees.

11.     Although Oak Grove is a relatively old coal mine, the vast majority of the infrastructure repairs needed have already been undertaken. As of the Commencement Date, Oak Grove's overland conveyor and preparation plant are still in repair. While Oak Grove would benefit from additional continuous mining equipment and further expansion, Oak Grove nonetheless remains a promising mine with much potential, as it has both large reserves and high capacity.

**A.      Pinnacle Mining Complex.**

12.     The Pinnacle Mining Complex ("Pinnacle") is located in West Virginia. Pinnacle was originally opened in 1969 and was owned and operated by US Steel until 2003, after which it was sold to Cliffs Natural Resources. Seneca acquired Pinnacle from Cliffs Natural Resources on December 22, 2015. The complex at Pinnacle contains an impoundment, a mine with thirteen miles of belt line, a predominantly union work force, and comparatively difficult mining conditions. Pinnacle contains an estimated 38,617,378 clean recoverable tons of reserves of which 9,035,817 are inactive.

13.     The coal historically produced at Pinnacle is low vol coal and is considered to be of a lesser quality than the coal produced at its sister mines. On average, coal from Pinnacle will take a 12 to 15 percent discount to the Australian benchmark. The product extracted from Pinnacle has certain expansion characteristics that some steel companies are adverse to because it can pressurize the walls of a coke battery. As a result, Pinnacle's profitability is particularly vulnerable to price fluctuation in the market.

9

17.     Unfortunately, Pinnacle has faced serious geological and operational challenges that adversely affected its productivity.  Although Pinnacle contains state-of-the-art equipment, it relies on a plow that requires flat mining conditions with a thick seam,[4] whereas conditions at the mine are undulating, with seam displacements and faults.  Exacerbating this problem is the fact that the mine now spans beneath an area creek known as Indian Creek, causing further operational issues.  As a result, in the months prior to the Commencement Date, mining conditions at Pinnacle became problematic and were e in steep decline.  The Debtors estimated that the costs to bring the mine back to full production would have required a substantial amount in additional investment, likely in the multi-million dollar range.

18.     Prior to the Commencement Date, the Debtors made the decision to limit their costs and cease production at Pinnacle, leaving the future of this mine in question.  In anticipation of the potential closure of Pinnacle, on August 6, 2018, the Debtors issued conditional notices pursuant to the Worker Adjustment and Retraining Notification Act (the "Warn Act") to approximately 360 employees, notifying them of the potential idling and closure of operations at the Pinnacle mining complex.  As of the Commencement Date, a final date for Pinnacle's closure had not yet been decided, although the Debtors intend to make a final decision prior to October 19, 2018.  The Debtors expect to reduce their workforce further in the event that they close this mine, and would likely reduce further in late November 2018 upon the downsizing of the preparation plant on the property.

14.     Until the mine's most recent setbacks, the Debtors were on track to complete the current panel at Pinnacle by September 30, 2018, at which point they intended to reassess whether

---

4   Pinnacle is also distinct because its mining equipment contains a plow, rather than a shear, on its longwall face. Pinnacle is likely to have the only such active plow in the United States, which mines the longwall with teeth, as opposed to the rotating drum of bits contained on a shear.

10

or not to continue mining operations at this site due to the Debtors' concerns over the future viability of the mine. Although operations are not currently active at Pinnacle, the preparation plant contained on the property is nonetheless being used to provide coal washing of already mined inventory and has the potential to provide similar services for small, unaffiliated mines in the area. The preparation plant, as of the Commencement Date, is still functional. The Debtors' current plans regarding Pinnacle's future include shutting off the ventilation and pumping equipment after extracting the mining equipment at the site and to repurposing such equipment at the Oak Grove and Maple Eagle mines.

**B.     Maple Eagle.**

19.     The Debtors maintain active mining operations at the Seminole West Virginia Mining Complex ("Maple Eagle"). Maple Eagle was owned and operated by Walter Energy until 2016. Seminole Coal Resources acquired the asset package that became Maple Eagle in February 2016, and, although it is an older facility, it nonetheless run produces a high quality product. Maple Eagle is located on the Eagle Seam, which contains high volume coal with excellent coking characteristics. There are currently 4,891,071 clean recoverable tons of reserves at Maple Eagle. Maple Eagle contains two super-sections with continuous miners that can mine simultaneously. On average, Maple Eagle produces 400,000—800,000 clean tons of coal annually. The Debtors anticipate that a third super-section will soon be operational and have plans to open additional surface mines with high wall miners, which will increase Maple Eagle's production capacity to 1.2 million clean tons.

**III.     The Debtors' Customers.**

20.     The Debtors' customer base principally consists of domestic and international steel producers that purchase the Debtors' met coal and domestic electric utilities and industrial companies that purchase the Debtors' thermal coal. The Debtors market internationally to

11

customers in the Atlantic Basin (particularly in Europe, the United Kingdom, and Brazil), and export sales made up approximately 55 percent of the Debtors' coal sale revenue in 2017. The Debtors have a very concentrated customer base, as their ten largest customers accounted for 77 percent of the Debtors' coal sale revenue in 2017.

21.     Under a coal sale and agency agreement, the Debtors primarily market and sell their product through their affiliation with a third-party broker, Robindale Energy Services, Inc. ("Robindale"), rather than directly to their end customers. Pursuant this arrangement, which began in 2017, Robindale takes title to and resells the Debtors' coal to end customers. At the time Robindale takes title, it remits 50% of the sale price to the Debtors. After arranging for sales with the end customer, the proceeds from these coal sales are remitted from the customer to Robindale before the remaining 50 percent is remitted to the Debtors, which typically happens within seven days of Robindale's collection of the funds. Further, the Debtors are party to a wash coal purchase agreement at the Pinnacle preparation plant, which provides additional liquidity.

**IV.     The Debtors' Employees.**

22.     Between their operation facilities and home office, the Debtors employ approximately 1,075 individuals on a full- or part-time basis, although this number would be reduced upon the idling of the Pinnacle mine. These employees include miners, engineers, truck drivers, mechanics, electricians, administrative support staff, managers, directors, and executives. The Debtors provide their employees with health and welfare benefit plans, including medical, prescription drug, dental, and vision plans. The Debtors also contribute to plans established for certain retirees who retired before October 1, 1994 under the Coal Industry Retiree Health Benefits Act of 1992, 26 U.S.C. § 9701 *et seq.* (the "Coal Act"). Like other coal companies, the Debtors also incur costs and make award payments in accordance with the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 901–45 (the "Black Lung Act").

12

23.     Separately, the Debtors are subject to other workers' compensation laws in the states in which they operate.  The Debtors maintain workers' compensation coverage through a third-party insurance provider.  The Debtors incur significant premiums due to these obligations, and may be required to contribute additional premiums in the future depending on the number and amount of forthcoming claims.  The Debtors intend to, and pursuant to the First Day Pleadings are seeking authority to, continue making all payments to their current employees and all payments with respect to government regulations, including workers' compensation program, among others.

**Part II**
**Corporate and Capital Structure.**

**I.      The Debtors' Organizational Structure.**

24.     The following chart illustrates the Debtors' basic organizational structure in summary form.  The Debtors' full organization structure is set forth in **Exhibit A**.



## II.     Capital Structure.

25.     As of the Commencement Date, the Debtors have approximately $175 million in total funded debt obligations.  The following table depicts the Debtors' prepetition capital structure:

| Debt | Approx. Principal Amount Outstanding ($mm) (inclusive of PIK) |
|---|---|
| First Lien Credit Agreement | $104 |
| Second Lien Credit Agreement | $71 |

## C.     First Lien Credit Agreement.

26.     The Debtors have approximately $104,000,000 (including PIK interest) outstanding under the Credit Agreement, dated as of January 31, 2018 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "First Lien Credit Agreement," and the loans and other obligations outstanding thereunder, the "First Lien Loans"), by and among Mission Coal, as borrower, the guarantors party thereto, Delaware Trust Company, as Administrative Agent (in such capacity, the "First Lien Agent"), and the other lender parties thereto (the "First Lien Lenders").

27.     The First Lien Loans bear interest at a rate of 15 percent cash interest, 4.5 percent PIK interest and 5 percent default interest, totaling 24.5 percent interest per annum.  The First Lien Loans are secured by liens on substantially all of the Debtors' assets and are senior in priority to the liens securing the Second Lien Loans (as defined below).

28.     Additionally, section 8.02 of the First Lien Credit Agreement includes a prepayment premium (the "Prepayment Premium"), permitting the Mission Coal to repay the First Lien Loans before the scheduled maturity date.  The First Lien Credit Agreement provides that Mission Coal may repay all or any portion of the First Lien Credit Agreement at any time prior to the maturity date at a price equal to 100 percent of the principal amount plus the Prepayment

14

Premium (together, the <u>Make-Whole Amount</u>"). The Prepayment Premium is equal to the interest that would have accrued on the First Lien Loans from the date of repayment through the maturity date.

15. The Debtors used approximately $28 million of the First Lien Loan proceeds for operational upgrades. The Debtors used remaining amounts to refinance the Debtors' previous facilities, including, in part, the Second Lien Loans and amounts owed to Bay Point Advisors ("<u>Bay Point</u>") related to a planned sale-leaseback transaction with respect to Mission Coal's longwall mining shields.

**D.    Second Lien Credit Agreement.**

29. As of the Commencement Date, the Debtors have approximately $71,691,874 million outstanding under the Amended and Restated Secured Loan Agreement, dated as of January 31, 2018 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "<u>Second Lien Credit Agreement</u>"), and the loans and other obligations outstanding thereunder, the "<u>Second Lien Loans</u>"), by and among Mission Coal, Seminole Coal Resources, LLC, Seneca Coal Resources, LLC, collectively as the borrowers, the guarantors party thereto, and Mission Coal Funding, LLC and the lenders from time to time a party thereto (collectively, the "<u>Second Lien Lenders</u>").

30. The Second Lien Loans bear interest at a rate of 20 percent per annum which is currently PIK interest. The Second Lien Loans are secured by liens that are junior in priority to the liens securing the First Lien Loans on substantially all of the Debtors' assets. The Second Lien Loans contain a Second Lien Credit Agreement Prepayment Premium in the event of a voluntary or mandatory repayment, redemption, prepayment, an acceleration of the Loan in an amount equal to the present value of the sum of all required payments of interest (including for the avoidance of

15

doubt, PIK Interest) on the Loan being repaid, prepaid, redeemed, that have become or are declared accelerated.

## III.     Additional Obligations.

### A.     Collective Bargaining Agreements.

31.     The following chart sets forth the Debtors' active CBAs and their respective expiration dates with the UMWA:

| Mine/Entity | Union | Expiration Date |
|:---:|:---:|:---:|
| Pinnacle | UMWA | April 2023 |
| Oak Grove | UMWA | April 2023 |

### B.     Employee Benefit Obligations.

32.     The Debtors have ongoing pension and OPEB obligations, consisting of a multi-employer pension plan maintained pursuant to the the CBAs.  Under this arrangement, certain of Seneca's subsidiaries are required to make contributions to the United Mine Workers of America 1974 Pension Plan at contractually-determined rates (the "Multi-Employer Pension Plan").  As of the Commencement Date, the Debtors estimate the present value of their retiring medical obligations to be approximately $61.1 million.  Additionally, certain of Seneca's subsidiaries are additionally obligated to make contributions to the 1993 Benefit Plan and Trust, which provides medical and other benefits to certain retired members of the UMWA and, in some instances, their spouses and dependents.  Benefits, eligibility, and cost-sharing provisions vary by plan documents and CBAs.  As communicated by the UMWA, the Debtors would face withdrawal liability at both Pinnacle and Oak Grove.

33.     The Debtors also sponsor defined benefit pension plans to qualified full-time employees to assist in providing for retirement (collectively, the "Defined Benefit Pension Plans").  The Defined Benefit Pension Plans offer retirement benefits to employees and provide a fixed level

16

of benefits upon retirement.  The Debtors make matching and/or discretionary contributions to these plans.

**C.  Workers' Compensation and Black Lung Act Obligations.**

34.  As required by federal and state law, the Debtors provide benefits to employees for awards related to workers' compensation and pneumoconiosis (more commonly known as black lung disease).  Pursuant to the Black Lung Act, coal miners who suffer from pneumoconiosis and their dependents may file disability claims with the U.S. Department of Labor (the "<u>DOL</u>"), which then investigates the claims and assigns liability to make benefit award payments for those claims to a "responsible operator" (likely the miner's most recent employer or a successor of the employer) (the "<u>Black Lung Act Claims</u>").

35.  Black Lung Act Claims include claims for the payment of (a) disability benefit awards to workers who suffer from black lung disease and (b) excise taxes to fund the Black Lung Disability Trust Fund (the "<u>Black Lung Fund</u>").  If a responsible coal operator fails to pay a benefit award, the Black Lung Fund will pay the award and the DOL can (i) assert liens (with the same priority as tax claims) against the assets of the responsible operator and (ii) exercise subrogation rights of the underlying claimant.  In addition, the Black Lung Act requires a coal operator either to secure its payment obligations by posting collateral or to obtain insurance for its payment obligations.  A coal operator's directors and officers may also be held personally liable for unpaid benefits.

36.  The Debtors are insured for federal and state workers' compensation and black lung benefits for employees by a third-party insurance provider.  In addition, the Debtors assumed obligations with respect to certain self-insured periods of subsidiaries of Seneca as part of its acquisition.

17

D.    **Asset Retirement Obligations.**

37.    Like other coal companies, the Debtors have asset retirement obligations that are related to mine reclamation and closure costs.  Reclamation obligations primarily represent the fair value of future anticipated costs to restore surface land to levels equal to or greater than pre-mining conditions, as required by the federal Surface Mining Control and Reclamation Act as well as certain state laws.

38.    The Debtors' asset retirement obligations primarily consist of spending estimates for surface land reclamation and support facilities at both their surface and underground mines in accordance with applicable reclamation laws in the United States, as defined by each mining permit.  Asset retirement obligations are determined for each mine using various estimates and assumptions, including, among other items, estimates of disturbed acreage as determined from engineering data, estimates of future costs to reclaim the disturbed acreage and the timing of these cash flows, discounted using a credit-adjusted, risk-free rate. The Debtors' asset retirement obligations as of September 30, 2018 were approximately $20.7 million, including amounts classified as a current liability, of which $36,495,000 in outstanding surety bonds are secured by $5,875,000 in aggregate collateral.

E.    **Legal Proceedings.**

39.    The Debtors are subject to a limited number of legal proceedings in both state and federal court.  While some of this litigation is still at the early stages and outcomes are uncertain, other of these legal proceedings have progressed to such a stage that the damages or ranges of possible loss are more easily estimated.  The Debtors will incur costs not only based on the eventual outcome of these proceedings, but also through legal and administrative costs incurred throughout the course of these proceedings.  An profile of the more significant proceedings is summarized below.

1. **Cliffs and Bluestone Litigation Settlements.**

40.     The Debtors were involved in vigorously contested litigation with Cliffs Natural Resources stemming from allegations of fraudulent transfer and breaches of responsibilities flowing from the Seneca asset purchase (the "Cliffs Litigation").[5] Although the Debtors prevailed in their motion to dismiss from federal court, the case was refiled in state court in Delaware. The monetary amount and liabilities were in dispute.

41.     In addition, Bluestone Coal Corporation filed an action against Seneca related to the 2015 flooding and closing of its Double Bonus Mine in West Virginia (the "Bluestone Litigation").[6] A mediation among the parties took place in June 2018 in Charleston with full insurance provider participation. A trial was scheduled for November 13, 2018, but has been moved by agreement of the parties.

42.     In an effort to curb increasing litigation costs and uncertainty related to possible outcomes, Mission Coal entered into settlements, which resulted in significant costs savings for the Debtors throughout both 2018 and 2019. The Bluestone litigation was settled by all the parties, following a mediation before a judge and all the insurance carriers. Certain attorneys recently filed a motion on October 14, 2018 to enforce a portion of the settlement. Pursuant to these settlement terms, however, the Debtors are still subject to cash payments that will be paid out in installments over 2018 and 2019, and Mission Coal must transfer its ownership interest in a coal seam at the Pinnacle mine to Bluestone.

2. **The Alabama Dust Actions.**

---

[5]     *Cliffs Natural Resources Inc., et al. v. Seneca Coal Resources, LLC, et al.*, 17-567- GAM (D.C. DE).

[6]     *Bluestone Coal Corporation, and Double-Bonus Mining Company v. Pinnacle Mining Company, LLC, and Target Drilling, Inc.*, 2:16-cv-06098 (D.C. WVA).

Case 18-04177-TOM11    Doc 21    Filed 10/15/18    Entered 10/15/18 10:50:51    Desc Main
Document    Page 19 of 36

43.     In 2004, an action was commenced against Oak Grove prior to Mission Coal's founding.[7] This case, originally filed against Cliffs Natural Resources as defendant, involved 650 plaintiffs' health, nearby homes, and property.  Mission Coal inherited this legacy liability in the Seneca acquisition.  Seneca agreed to settle the case in 2017 for a system of structured payments, which are scheduled to be paid in 2018 and 2019.  Defaulting on this settlement will result in the dissolution of the easements that were painstakingly obtained from 300+ plaintiffs that exposes the company to allowing them to refile

44.     Another action involving 107 plaintiffs was brought in 2017 involving coal dust emissions.[8] Discovery in this matter is ongoing and both litigation costs and possible outcomes are yet to be determined at this time.

### Part III
### Circumstances Leading to Chapter 11

**I.     Adverse Market Conditions.**

45.     The Debtors are subject to the same fluctuating market conditions as other companies operating in the coal industry.  Although the met coal market is not currently in decline, over the past five year period, the coal industry has been in turmoil.  Coal mining businesses across the United States and around the world experienced pressure from the downward spiral in commodity prices, and the fate of many of these companies is yet to be determined.  Even in the currently favorable met coal market,  there still exist several  requirements to maintain a coal mining business, including an inventory of economic sites to mine, a consistent mining program

---

[7]     *Joann Waid et al v. United States Steel Mining Co. et al.*, 68-CV-2004-001234-00, Circuit Court of Jefferson County, Alabama; *Jane Alexander v. Cliffs North American Coal LLC et al.*, 68-CV-2010-000054.00, Circuit Court of Jefferson County, Alabama; *Violet Brown et al v. Cliffs North American Coal, LLC, et al.*, 68-CV-2011-900376.00.

[8]      *Linda Weekly, et al. v. Seneca North American Coal, LLC*, 68-cv-2017-900131 (Circuit Court of Jefferson County, Alabama).

to offset the natural declines in production that occur almost immediately, a relatively consistent outlook for commodity prices, and compliance with restrictive federal and state regulations on coal producers.

46.     Federal and state regulatory authorities impose significant obligations on the coal mining industry with respect to employee health and safety, permitting and licensing requirements, environmental protection, the reclamation and restoration of mining properties after mining has been completed, and the effect of mining on surface and groundwater quality.   The costs of compliance, particularly the decades of liabilities the Debtors assumed in their purchase of Seneca, have further contributed to the Debtors' financial difficulties.   Other regulations, such as those governing reclamation and mine safety, most notably those administered by the Mine Safety Health Administration, have imposed even more direct costs on the Debtors.

47.     As noted above, the Debtors are not alone in their difficult position.   Other similarly situated companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings.   But unlike many of their peers in the coal industry, the Debtors simply have not had enough time to establish solid relationships or a firm reputation, and the adverse market conditions have hit this newcomer to the field particularly harshly.

48.     Practically speaking, the fact that so many coal companies have gone through the bankruptcy process prior to the Debtors has diminished their bargaining power with their vendors. Many vendors who are major industry players have been stakeholders in other bankruptcies over the past several years, and acting out of self-protection, have imposed stringent terms on the Debtors.   The Debtors have generally lost most credit terms from key vendors.   This results in a constrained market and a near holding pattern for Mission Coal, who is frequently subject to

disadvantageous business terms and unable to substitute its vendors' services with less expensive alternative providers.

## II. Difficult Mining Conditions and Deferred Maintenance.

49.     As mentioned previously, the asset packages that the Debtors purchased in late 2015 and early 2016 had potential, but had largely fallen into disrepair due to a severe slump in the market.   As a result, the mining equipment had largely deteriorated, and the day-to-day maintenance that could maximize efficiency was deferred as a cost-saving measure.   Exacerbating this problem, a 2017 roof collapse at Oak Grove further impeded expected progress and production at that mine and reduced cash flow available for capital investment.   As a result, the Debtors have not been able to reach their full production value and, in their formative years, have continually suffered from a lack of liquidity.

50.     In the spring of 2018, the mines hit another obstacle when the Norfolk Southern railroad was underperforming due to bad weather and freezing conditions.   Despite assurances that the railroads would catch up through the addition of additional crews, service remained shallow throughout 2018, thus limiting sales for the Debtors on yet another front.   As a result, the mines accumulated larger than normal inventories, which grew to a peak of approximately 700,000 clean tons of coal on the ground in the spring of 2018, amounting to approximately $70 million dollars of value that the Debtors have been unable to monetize.

## III. Acquisition and Expansion Efforts.

51.     The series of acquisitions that led to the Debtors' founding took place within a relatively short timeframe, and greatly increased the Debtors' obligations.   Further, developing a fully-formed back office brought with it numerous upfront and recurring costs.   However, the Company's operating performance has left the Debtors significantly overleveraged.

## IV. Coal Industry Liabilities.

Case 18-04177-TOM11     Doc 21     Filed 10/15/18     Entered 10/15/18 10:50:51     Desc Main
Document     Page 22 of 36

52.     As discussed above, the Debtors have significant obligations to make payments pursuant to the Coal Act and the Black Lung Act.  Under the Black Lung Benefits Revenue Act of 1977 and the Black Lung Benefits Reform Act of 1977, as amended in 1981, each coal mine operator must pay federal black lung benefits to eligible current and former employee claimants and also make payments to a trust fund for the payment of benefits and medical expenses to eligible claimants who last worked in the coal industry prior to January 1, 1973.  Mission Coal recorded $1,700,000 of expenses related to this excise tax in 2017.  With the implementation of the Patient Protection and Affordable Care Act in 2010 and the amendment of federal black lung regulations, the number of claimants who are awarded federal black lung benefits has increased and will likely continue to increase, as will the amounts of those awards.  Mission Coal's payment obligations for federal black lung benefits are secured by insurance coverage by a high deductible insurance program.

53.     When coupled with the external pricing pressure, increased regulation, and other costs associated with Mission Coal's business, these liabilities have hindered the Debtors' ability to operate competitively in the current market environment.

## Part IV
## Exploration of Restructuring Alternatives

I.     **Financing to Provide Additional Capital.**

54.     In early 2018, in order to provide additional capital for their business, the Debtors pursued a financing which sought to modify their debt load, including their Second Lien Loans, and refinance certain other existing debt.  Even in light of the renegotiations and alleviations this financing provided, for the above discussed reasons, the Debtors nonetheless quickly found themselves in need of additional capital.

II.     **Bay Point Sale-Leaseback.**

Case 18-04177-TOM11    Doc 21    Filed 10/15/18    Entered 10/15/18 10:50:51    Desc Main
Document      Page 23 of 36

55.     The company completed a sale-leaseback transaction with Bay Point in May 2018, which involved Bay Point buying six longwall shields and leasing them back to the Debtors. This transaction would should have ultimately pumped $16 million into Mission Coal.  However, $4 million of the proceeds were never received, as certain contingencies were not met to release this final amount of fee proceeds.

## III.    Operational Initiatives.

56.     In the face of looming financial difficulties, the Debtors' took proactive steps to lessen the burden of their liabilities, including, among other things, reduction in workforce in the months preceding the Commencement Date and temporarily halting mining operations at the Pinnacle mine.  Further, the Debtors were underperforming due to inadequate funding, availability of capital, and the above-discussed inventory transportation issues.  As a result, despite the Debtors' efforts to reduce operating and capital expenditures, the Debtors' interest burden and balance sheet, particularly in light of the necessary repairs, remained unsustainable.

## IV.    Pursuit of Long-Term Forbearance.

57.     In the weeks prior to the Commencement Date, the Debtors successfully negotiated a covenant waiver with the First Lien Lenders, pursuant to which the First Lien Lenders agreed to forbear from exercising remedies with respect to various events of default under the First Lien Credit Agreement through September 15, 2018 to allow the Debtors the flexibility to explore restructuring options.  On September 14, 2018, the Company and First Lien Lenders entered into a further amended forbearance agreement through September 30, 2018. The most promising alternative to an in-court chapter 11 process was a long term forbearance proposal that would extend a forbearance through March 31, 2019 and have invested $34 million into Mission Coal to strengthen liquidity, catch up on any outstanding payments, and allow the Debtors to commit to more planned expansion of their operational assets.  After several productive rounds of negotiation

24

Case 18-04177-TOM11    Doc 21    Filed 10/15/18    Entered 10/15/18 10:50:51    Desc Main
Document    Page 24 of 36

and discussion, however, this additional funding could not be secured, and the Debtors' dire liquidity situation became too much for the lenders and Mission Coal to bear, making the long-term forbearance no longer viable.

## V. Appointment of Independent Directors.

58.     Prior to the Commencement Date, the Debtors appointed two independent board members— Tony Horton and David Heiman —to the board of directors of Mission Coal.  Each of Mr. Horton and Mr. Heiman have significant restructuring experience, particularly in the energy sector.  Mr. Horton previously served as the Executive Vice President, Chief Financial Officer, and Chief Risk Officer at Energy Future Holdings, where he was the senior executive involved in the company's restructuring efforts.  Mr. Horton is also a current independent director at EXCO Resources, where he leads the Strategic and Restructuring Committee and is Chair of the Audit Committee.  Mr. Heiman previously served as a partner in Jones Day's  Business Restructuring practice group and is a past chair of the American College of Bankruptcy.

59.     Since their appointment, Mr. Horton and Mr. Heiman have played a key role in advising the Debtors' board of directors on operational and financial matters.  In addition, and in connection with the Debtors' restructuring initiatives, Mr. Horton and Mr. Heiman have been tasked with, among other things, leading a postpetition independent investigation into certain potentially valuable causes of action.

## VI. Proposed DIP Financing.

60.     In connection with a chapter 11 filing, the Debtors, with the assistance of Jefferies, initiated two parallel processes for identifying sources of capital on the best available terms: (a) negotiations with the Debtors' existing funded debt stakeholders and (b) a marketing process with potential alternatives sources of capital from parties outside the Debtors' existing capital structure.  Specifically, In order to evaluate alternatives to the proposed DIP facility, Jefferies

25

solicited interest from twenty parties that routinely provide DIP financing, of which nine entered into non-disclosure agreements and were provided an opportunity to perform due diligence.

61.     All of the lenders contacted by Jefferies expressed concern about providing, and were ultimately unwilling to provide, debtor-in-possession financing because, among other things, the Debtors' recent financial performance had deteriorated, and the Prepetition Secured Parties hold liens on substantially all of the Debtors' assets, leaving no unencumbered collateral available to be pledged to a third party lender. Additionally, these potential lenders informed Jefferies that in these circumstances they were not willing to pursue a nonconsensual priming DIP against the Prepetition Secured Parties.

62.     Absent postpetition financing, the Debtors would be unable to continue to operate. Accordingly, the Debtors endeavored to negotiate acceptable debtor-in-possession financing terms with their First Lien Lenders. As of the filing of this declaration, the Debtors continue to negotiate certain open items with respect to the proposed DIP facility. The Debtors hope and expect to finalize the terms of a proposed postpetition financing facility with the First Lien Lenders. If an agreement is reached, the debtor-in-possession financing is anticipated to provide approximately $50 million in new money funding, subject to certain terms and conditions including a "roll-up" of the First Lien Lenders' prepetition claims and required milestones related to approval of the debtor-in-possession financing, labor negotiations and the resolution of the Debtors' existing labor agreements and retiree benefits, a marketing process, and the confirmation of a chapter 11 plan. The Debtors will continue to negotiate these open issues in advance of the hearing on their First Day Pleadings

**Part V**
**Evidentiary Support for First Day Pleadings.**

**I.      First Day Pleadings.**

Case 18-04177-TOM11    Doc 21    Filed 10/15/18    Entered 10/15/18 10:50:51    Desc Main
Document    Page 26 of 36

63. Contemporaneously, the Debtors have sought relief through a number of First Day Pleadings that they believe are necessary to enable it to efficiently administer their estates with minimal disruption and loss of value during these chapter 11 cases.

64. These First Day Pleadings seek authority to, among other things, honor employee-related wages and benefit obligations and ensure the continuation of the Debtors' cash management systems and other business operations without interruption. I believe that the relief requested in the First Day Pleadings is necessary to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

65. Several of these pleadings request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 20 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm . . ." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

66. I am familiar with the contents and substance of each First Day Pleadings (including the exhibits thereto), and the statements and facts set forth in each of the First Day Pleadings are true and correct to the best of my knowledge. I believe that the relief sought in each First Day Pleadings: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity to maximize value in these chapter 11 cases; and (c) best serves the interests of the Debtors' stakeholders.

27

## II.   Proposed DIP Financing.

67.   In August 22, 2018, the Debtors retained Zolfo.  Part of the responsibilities of Zolfo is to provide assistance in connection with the Debtors' evaluation of their cash management system, financial forecasting, and contingency planning.  From early in Zolfo Cooper's retention, I worked closely with the Debtors' management and other advisors to assist the management in the evaluation of the Debtors' liquidity and cash needs, including in the event of a chapter 11 filing.

68.   If--as they hope--the Debtors are able to reach agreement on the terms of a debtor-in-possession financing facility, the Debtors will seek entry of interim and final orders approving such facility, consensual use of cash collateral, and provision of adequate protection to their prepetition secured parties.  As of the Commencement Date, the Debtors have an immediate need to access liquidity, and absent postpetition financing, will not be able to continue operations.

## A.   The Debtors' Immediate Liquidity Needs.

69.   The Debtors are in need of an immediate capital infusion.  The Debtors lack sufficient funds to operate their enterprise and continue paying their debts as they come due.  As of the Petition Date, the Debtors' total cash balance is approximately $55,000, and they do not have readily available sources of additional financing, other than the potential proposed postpetition financing the Debtors continue to negotiate with their First Lien Lenders.

70.   Since being retained on August 22, 2018, Zolfo has assisted the Debtors in evaluating their liquidity position and potential financing needs.  Zolfo worked closely with the Debtors, their management, and their other advisors to evaluate the Debtors' cash requirements for their business.  As part of Zolfo's evaluation of the Debtors' liquidity position, Zolfo reviewed, analyzed and assisted in the development of the Debtors' 13-week cash flow forecast, and reviewed and analyzed the Debtors' long-term cash flow forecasts.  These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a

28

number of factors, including the effect of the chapter 11 filing on the operations of the business, fees and interest expenses associated with the proposed DIP facility, professional fees, and required operational payments.

71.     Further, absent funds available from the proposed DIP facility, access to the cash collateral, and the cooperation of key business partners at this critical early stage, the Debtors could face a value-destructive interruption to their business and lose support from important stakeholders on whom the Debtors' business depends—which, in turn, would hinder the Debtors' ability to maximize the value of their estates—and be forced to curtail their operations significantly and to the detriment of the Debtors, their estates, and their creditors.

72.     A significant portion of the Debtors' assets include assets on which the Prepetition Secured Parties have liens.  The Debtors also rely on the encumbered cash generated from their operations to fund working capital, capital expenditures, and for other general corporate purposes. During the start of these chapter 11 cases, I believe the Debtors will need this generated cash to satisfy payroll, pay suppliers, meet overhead, pay expenses, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' businesses. The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their businesses during the pendency of these cases.

73.     The Debtors, with the assistance of their advisors and through negotiations with the proposed DIP lenders, developed proposed DIP financing to be provided by their prepetition first-lien secured lenders.  I believe that the proposed DIP financing establishes that the Debtors will have adequate liquidity during this period if allowed to utilize the cash collateral and access the proposed DIP facility.

74.     Failure to obtain access to the proposed DIP facility and the cash collateral would result in immediate and irreparable harm to the Debtors and their stakeholders, and would diminish

29

the value of the Debtors' estates. Without the approval of the proposed DIP facility and use of the cash collateral, the Debtors will be unable to continue to operate in the ordinary course and preserve and maximize the value of their assets for the benefit of all parties in interest.

75. Accordingly, based on the foregoing, I respectfully submit that the Court should approve immediate access to the proposed DIP facility and the cash collateral.

**B.      Need for Interim Relief.**

76. The Debtors' businesses are cash intensive, with significant daily costs required to continue operations and satisfy obligations to vendors and employees. As such, and due to their current limited liquidity, the Debtors require immediate access to postpetition financing and the use of cash collateral to operate their businesses, preserve value, and to avoid irreparable harm pending the Final Hearing. Absent funds available from the proposed DIP facility, access to cash collateral, and the cooperation of key business partners at this critical early stage, the Debtors could face a value-destructive interruption to their businesses, lose support from important stakeholders on whom the Debtors' businesses depend, and face a major hindrance to their ability to maximize the value of their estates.

77. Without access to the proposed DIP financing, the Debtors likely would need to liquidate in the near term, to the serious detriment of their stakeholders and employees. In addition, without the proposed DIP facility, the Debtors would still be burdened with an unsustainable capital structure and would be unable to enter into these chapter 11 cases with the support of its key creditor constituencies.

78. Finally, the Debtors continue to negotiate the terms of potential postpetition financing in efforts to ensure it is obtained on the most favorable terms available, presents the best option to fund the Debtors' chapter 11 process. These negotiations have been conducted and

continue in good faith and at arm's length, all in hopes of obtaining financing that will allow the Debtors to maximize the value of their estates for the benefit of all parties in interest.

## III.    Critical Vendors.

79.    In the ordinary course of their business, the Debtors engage a limited number of providers for certain critical services, equipment inventory, and other materials the Debtors depend upon to ensure mine safety and provide top-quality end product to their customers. The Debtors obtain such services, equipment, or parts from a limited number of highly specialized vendors, service providers, and other businesses (collectively, the "Critical Vendors," and, their claims, the "Critical Vendors Claims")—often on an order-by-order basis and without long-term contracts—replacement of which likely would be impossible or would result in substantially higher costs for the Debtors.

80.    Moreover, the Debtors rely on timely and frequent delivery of these equipment, supplies, and services, and any interruption in this supply—however brief—would disrupt the Debtors' operations, impact their revenue, and their ability to safely operate and produce coal, likely causing irreparable harm to their businesses, reputation, goodwill, employees, customer base, and market share. Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims.

81.    The Critical Vendors generally fall into the following categories:

- Equipment Suppliers. The Debtors purchase and or rent equipment from a variety of equipment manufacturers and third parties (collectively, the "Equipment Suppliers"). The Equipment Suppliers provide the Debtors with various types of highly specific and technical pieces of equipment, including shearers, dozers, loaders, belt scales, slope belts rip detection system, among others (collectively, the "Equipment") on trade terms that create considerable liquidity for the Debtors' business. Given the unique and highly technical nature of the Equipment, much of which is proprietary and cannot be replaced by another supplier, that the Debtors rent to their customers, the Equipment Suppliers cannot be easily replaced or substituted by alternative vendors. Indeed, the Equipment Suppliers are the sole source of certain pieces of Equipment. Furthermore, wear and tear on the Equipment creates suboptimal performance over time, forcing the Debtors to

31

continually stock, maintain, or replace the most in-demand parts and components. As such, the Debtors are wholly reliant on procuring Equipment from the Equipment Suppliers.

- Material Suppliers. The Debtors also rely on a core group of material suppliers (collectively, the "<u>Material Suppliers</u>") for various materials that enable the Debtors to maintain the functionality of their business operations. Given the highly regulated nature of the business operations, any given material can generally only be procured from limited Material Suppliers, often the manufacturer. Without a steady stream of materials, the Debtors will not be able to keep the business operations functional, putting a stop to their operations.

- Repair and Service Providers. Although the Debtors perform their own routine maintenance and repair work on their Equipment, the Debtors also rely heavily on other essential vendors (the "<u>Repair and Service Providers</u>") for more extensive repair and maintenance services that the Debtors are unable to perform in a cost-efficient manner or do not have the technical expertise to administer. These providers are critical to the safety of personnel and offer services such as IT infrastructure, mine rescue, and fire suppression. From time to time, the Repair and Service Providers also supply the Debtors with a limited quantity of replacement parts largely related to their repair services. Without the Repair and Service Providers, the Debtors will not be able to keep some of their most highly sought-after Equipment in good working order.

82. The Debtors' operations depend on close coordination and integration between the Debtors, their customers, and their suppliers. Given the highly technical nature of the equipment used by the Debtors' vendors, an adequate supply of equipment and timely services from the vendors to the Debtors is vital to continue and maintain efficient operations. I believe that having the authority to pay the Critical Vendor Claims as described herein is critical to the Debtors' chapter 11 process.

83. The Debtors intend to pay the Critical Vendor Claims only to the extent necessary to preserve their business. The Debtors have designated a core group of executives, and advisors who have experience in the Debtors' business and in the reorganization process to review, assess, and potentially recommend any payment on account of the Critical Vendor Claims. In return for paying the Critical Vendor Claims, the Debtors will use commercially reasonable efforts to condition payment of Critical Vendor Claims upon each claimant's agreement to continue

32

supplying goods and/or services on terms that were in place in the 120 days prior to the Commencement Date or are otherwise acceptable in light of customary industry practices ("the <u>Customary Trade Terms</u>").

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: October 15, 2018
Birmingham, Alabama

*/s/ Kevin Nystrom*
Name: Kevin Nystrom
Title:   Chief Restructuring Officer

## Exhibit A

### Organizational Structure

# Mission Coal Company, LLC

