# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE STALKING HORSE PURCHASE AGREEMENT, (II) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS, (III) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH RESPECT TO THE SALE, (IV) SCHEDULING BID DEADLINES AND AN AUCTION, (V) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (VI) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (VII) GRANTING RELATED RELIEF

Mission Coal Company, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),[2] respectfully state the following in support of this motion (this "Motion"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Kevin Nystrom, Chief Restructuring Officer of Mission Coal Company, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 21] (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on October 14, 2018 (the "Commencement Date"), and fully incorporated herein by reference.

## Introduction

1.      The Debtors commenced these chapter 11 cases to facilitate the consensual sale of substantially all of their assets through a plan of reorganization that will maximize value for the benefit of all stakeholders.  With that goal in mind, the Debtors seek to expeditiously establish Court-approved bidding procedures for a sale of substantially of their assets.[3]

2.      To that end, the Debtors' debtor in possession financing facility (the "DIP Facility") provides for various case milestones that pave a clear path forward for these chapter 11 cases.  In particular, the DIP milestones provide that:  (a) by November 27, 2018, the Debtors file this Motion (which date has been extended to December 5, 2018); (b) by December 17, 2018, the Debtors file the Plan; (c) by December 19, 2018, the Debtors obtain entry of the Order approving this Motion; (d) by January 21, 2019, bids for all or certain of the Debtors' assets are due; (e) by February 27, 2019, the Debtors will hold an Auction; and (f) by April 12, 2019, the Debtors will have effectuated the Sale.

3.      The DIP Lenders have agreed to provide the Stalking Horse Bid to set the floor price for certain of the Debtors' assets, in the form of a credit bid by the DIP Lenders pursuant to the terms of the Stalking Horse Purchase Agreement.  The Debtors have determined, in the exercise of their business judgment, that the best way to maximize the value of their assets for all stakeholders is to market-test the Stalking Horse Bid through an auction process and to expeditiously sell the assets to the highest or otherwise best bidder (or bidders).

4.      To implement the marketing and sale process and thereby maximize value for all stakeholders, the Debtors submit this Motion, seeking for the Court to (a) approve the Bidding

---

[3]  **The Debtors anticipate filing a disclosure statement (the "Disclosure Statement"), a chapter 11 plan (the "Plan"), and a motion for approval of the Disclosure Statement on December 17, 2019, which will set forth the contemporaneous Plan confirmation schedule and will propose that the approval of the Sale occur in connection with approval of the Plan at the confirmation hearing.**

Procedures for the sale of substantially all of the Debtors' assets, (b) set dates and deadlines in connection therewith (including a bid deadline, the date of the auction, and the hearing dates and objection deadlines relating to the Sale), (c) approve the form and manner of notice of each of the foregoing, (d) approve procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale and (e) grant related relief. The Debtors also seek authority to enter into the Stalking Horse Purchase Agreement with the Stalking Horse Bidder, which importantly, does not provide for a break-up fee or expense reimbursement and will serve as a competitive baseline bid for the auction for the Debtors' assets.

5.     Time is of the essence. The Debtors face important milestones and deadlines under the DIP Facility that, absent extension, could lead either to the Debtors having to cease operations or incur significant expense to refinance the DIP Facility. At the same time, the Debtors seek to minimize the time and expense in chapter 11, and ensure sufficient liquidity to fund their chapter 11 process. The Sale would resolve these chapter 11 cases, cut off the expense of bankruptcy, and permit the Debtors to distribute the value generated by the sale of assets to their stakeholders. The Debtors hope and expect to continue discussions with creditors regarding their sale and restructuring efforts and obtain substantial consensus regarding the chapter 11 process quickly.

6.     The Debtors believe that an expeditious Sale process will maximize the ultimate value realized by its stakeholders. Moreover, the Debtors believe that the Bidding Procedures, entry into the Stalking Horse Purchase Agreement, and the related relief requested in this Motion are in the best interests of the Debtors' estates and their stakeholders. Accordingly, the Debtors respectfully request that the Court grant this Motion.

**Relief Requested**

7.     The Debtors hereby seek entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit A**:

3

a.  authorizing the Debtors to enter into that certain Asset Purchase Agreement attached to the Bidding Procedures Order as **Exhibit 1** (the "Stalking Horse Purchase Agreement");[4]

b.  approving the proposed bidding procedures attached as **Exhibit 2** to the Order (the "Bidding Procedures") in connection with a sale (the "Sale") of all, substantially all, or any combination of the Debtors' assets (collectively, the "Assets") free and clear of all claims, liens, and encumbrances;

c.  scheduling (x) an auction in connection with the Sale (the "Auction"), (y) hearing dates in connection with approval of the Sale (the "Sale Hearing"); and (z) the objection deadline for the Sale Hearing (collectively, the "Sale Schedule");

d.  approving the form and manner of notice of the Auction and Sale Hearing, attached to the Bidding Procedures Order as **Exhibit 3** (the "Sale Notice");

e.  approving procedures (the "Assumption Procedures") for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "Assigned Contracts"), and approving the form and manner of notice thereof, attached as **Exhibit 4** to the Bidding Procedures Order (the "Cure Notice"); and

f.  granting any related relief.

### Jurisdiction and Venue

8.      The United States Bankruptcy Court for the Northern District of Alabama (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *General Order of Reference* from the United States District Court for the Northern District of Alabama, dated July 16, 1984, as amended July 17, 1984.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to

---

[4]  At the time of the filing of this Motion, the Stalking Horse Purchase Agreement has not yet been finalized and the terms described herein are subject to material revision in connection with the ongoing negotiations regarding the Stalking Horse Purchase Agreement.  A current draft of the Stalking Horse Purchase Agreement as proposed by the Debtors is attached to the proposed Order as Exhibit 1.  The Stalking Horse Bidder has not consented to certain items as reflected in the Stalking Horse Purchase Agreement, and all of the Debtors and the Stalking Horse Bidder's respective rights are hereby reserved in full.

Case 18-04177-TOM11    Doc 393    Filed 12/05/18    Entered 12/05/18 14:18:46    Desc
Main Document      Page 4 of 164

the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 3016, 3017, 3020, and 6004.

## Background

11.     The Debtors are engaged in the mining and production of metallurgical coal, also known as "met" coal, which is a critical component of the steelmaking process. Established through a series of acquisitions, the Debtors are among the leading producers of met coal in the United States. The Debtors are headquartered in Kingsport, Tennessee and operate subterranean, surface, and longwall mining complexes in West Virginia and Alabama.

12.     On the Commencement Date, each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 63]. On October 25, 2018, the Bankruptcy Administrator for the Northern District of Alabama appointed the official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code [Docket No. 147].

## I.    Summary of Key Terms of the Stalking Horse Purchase Agreement.[5]

       13.    The pertinent terms of the Stalking Horse Purchase Agreement are summarized in the following table.[6]

| Term | Summary Description |
|---|---|
| **Purchase Price** | Credit Bid: $145,000,000.00<br><br>Funding of Wind-Down and Other Chapter 11 Expenses: Prior to the hearing approving the Sale in March, the Company will come to agreement with the Stalking Horse Bidder on the amounts of various escrow accounts necessary to fund professional fees, pre-closing payroll obligations and chapter 11 administrative expenses and wind-down costs. |
| **Bid Protections** | Breakup Fee: None<br><br>Expenses Reimbursement: None |
| **Acquired Assets** | Generally, Buyer is purchasing all assets related to the operations of Maple Eagle (West Virginia) and Oak Grove (Alabama) mining facilities.<br><br>Buyer is going to acquire certain assets of Pinnacle and has the right between signing and closing to determine what assets of Pinnacle and Seminole Alabama that it will acquire.<br><br>Specific assets that Buyer is acquiring include:<br><br>• Inventory and Equipment<br><br>• Assumed Contracts (for which it will pay cure costs)<br><br>• Owned and leased real property<br><br>• Coal reserves related to the acquired mines<br><br>• Cash, including cash collateral used to secure surety bonds associated with acquired assets, and Accounts Receivable<br><br>• Certain Avoidance Actions against trade creditors<br><br>• Insurance Policies<br><br>• Proceeds from the sale of any Excluded Assets other than Avoidance Actions up to a permitted amount |

---

[5]    Capitalized terms used in this section but not defined herein shall have the meanings ascribed to them in the Stalking Horse Purchase Agreement.

[6]    The following summary is provided for convenience purposes only.

6

| Term | Summary Description |
|---|---|
| | • Claims of the Company against third parties |
| **Excluded Assets** | Buyer will not be acquiring certain assets, namely assets under benefit plans, employee records and files, tax returns, the North River Mine and Kellerman Mine, and any entities (subsidiaries). |
| **Assumed Liabilities** | Buyer will assume certain liabilities of the business, including liabilities for:<br><br>• Reclamation under transferred permits<br><br>• Reclamation at Pinnacle (unless another buyer purchases and assumes that)<br><br>• Assumed contracts and any cure costs associated with them<br><br>• Outstanding trade payables in accordance with the DIP Budget<br><br>• Transfer Taxes<br><br>• Accrued and unpaid real property taxes |
| **Excluded Liabilities** | The Buyer will not be assuming numerous liabilities, including liabilities for workers compensation, certain employee related liabilities, including under the Black Lung Act and Collective Bargaining Agreements |
| **Sale of Assets Free and Clear of Interests** | On the Closing Date, the Acquired Assets will be transferred to Buyer free and clear of all obligations, Liabilities and Encumbrances (including all successor liability and any successorship obligations under any Collective Bargaining Agreement, and/or with respect to any Benefit Plan), other than the Permitted Encumbrances and the Assumed Liabilities (Section 7.9). |
| **Closing Conditions** | The APA is conditioned on the UMWA waiving the successor clause in the CBA or the Bankruptcy Court approved the rejection of the CBA.<br><br>In addition, the APA contains usual and customary conditions to closing relating to the truth of representations and warranties, performance of covenants, receipt of Regulatory Approvals (e.g., HSR), no Material Adverse Effect having occurred and the Bankruptcy Court entering the Sale Order. |
| **Termination Events** | The APA may be terminated (Section 11.1) at any time prior to the Closing only by:<br><br>• Mutual written consent<br><br>• Written notice from either party if (i) a Governmental Authority issues a final ruling or order prohibiting the transaction, (ii) the Closing does not occur on or prior to April 12, 2018, (iii) Buyer is not determined by the Sellers to be the Successful Bidder or Backup Bidder at the end of the auction or (iv) the Bankruptcy Court dismisses any of the cases or converts the cases into chapter 7 cases<br><br>• Written notice from Buyer (i) upon the occurrence of any termination event set forth in the Final DIP Order, (ii) the termination of the DIP Credit Agreement, (iii) if any Seller seeks to have the Bankruptcy |

7

| Term | Summary Description |
|---|---|
| | Court take an action as described in (b)(iv) above or (v) the occurrence of a Material Adverse Effect<br><br>• Written notice from a Party if the other Party fails to perform its obligations under the APA or commits a breach which cannot be cured within ten days |
| **Covenants** | The APA includes covenants made or agreed to by the Parties typical and customary for transactions of this nature, including covenants relating to:<br><br>• Buyer and its Representatives receiving reasonable access to the Sellers' personnel, properties, books, Permits, Contracts, records and reports. It cannot do Phase IIs, however can complete a review of Reclamation reports<br><br>• The Sellers maintaining operations in the ordinary course and seeking approvals for certain material actions<br><br>• The Sellers delivering to Buyer any modifications or corrections with respect to the scheduled list of surety bonds and/or Permits<br><br>• Various filing dates and procedural requirements in connection with Bankruptcy Court matters |

## II.  **The Bidding Procedures**.

14.     The Debtors' entry into the Stalking Horse Purchase Agreement is designed to incentivize potential bidders and thereby maximize the potential value of their assets for the benefit of the Debtors' estates and their various stakeholders.   The Debtors request approval and authorization of the Stalking Horse Purchase Agreement, subject only to higher or otherwise better offers in accordance with the procedures set forth in the Bidding Procedures attached as **Schedule 2** to the Order.

15.     The proposed Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing auction process for the Debtors' assets, consistent with the timeline of these chapter 11 cases, to confirm that the bid represented by the Stalking Horse Purchase Agreement (the "Stalking Horse Bid," and the bidder thereunder, the "Stalking Horse Bidder") is the best offer, or promptly identify the alternative bid that is higher or otherwise better.

8

16.     The Bidding Procedures will provide potential bidders with ample notice and time to conduct thorough due diligence to submit binding bids in advance of the Bid Deadline.  Indeed, the Debtors and their advisors have already commenced a marketing process to test the market value of their assets, providing numerous parties with the diligence necessary to make an offer.  In creating the Bidding Procedures, the Debtors are seeking to balance their interests in consummating the Sale on a timeline that ensures the Stalking Horse Bidder's willingness to provide a floor offer while at the same time preserving the opportunity to attract the highest or otherwise best offer.  The Bidding Procedures are designed to encourage all prospective bidders to put their best bid forward, bring finality to the Debtors' chapter 11 process, and create a path towards the highest or otherwise best available recoveries to the Debtors' stakeholders.

17.     Because the Bidding Procedures are attached as **Exhibit 2** to the proposed Bidding Procedures Order, they are not restated fully herein.  Generally speaking, however, the Bidding Procedures establish, among other things:[7]

- the Debtors will serve the Bidding Procedures Order (setting forth the Sale Schedule), Bidding Procedures, and Sale Notice on all relevant notice parties as soon as practicable after entry of the Bidding Procedures Order;

- the availability of, access to, and conduct during due diligence by "Potential Bidders";

- the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger the Auction and participate in the Auction;

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the starting bid for the Auction;

- the conditions for having the Auction and procedures for conducting the Auction, if any; and

---

[7]   The following summary is provided for convenience purposes only.  To the extent any of the terms described below are inconsistent with the Bidding Procedures, the Bidding Procedures control in all respects.

9

- various other matters relating to the sale process generally, including the designation of the Back-Up Bid (as defined in the Bidding Procedures), return of any good faith deposits, and certain reservations of rights.

18. Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all Qualified Bids made at or prior to the Auction, and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

**III. Proposed Sale Schedule**.

19. The Debtors are seeking approval of the Bidding Procedures and the Sale Schedule to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids on a timeline that would allow the Debtors to consummate a sale of the Assets. A defined path toward effectuating the Sale will drive the sale process in an expeditious and efficient manner and is designed to encourage all prospective bidders to put their best bids forward at the outset of these chapter 11 cases in order to provide the highest or otherwise best available recoveries to the Debtors' stakeholders without unduly prejudicing, these chapter 11 estates.

20. To further ensure that the Debtors' proposed Auction and sales process maximizes value for the benefit of the Debtors' estates, the Debtors will use the time following entry of the Bidding Procedures to continue the process, initiated shortly after the Commencement Date, to actively market their Assets. Subject to the Court's availability, the key dates and deadlines the Debtors seek to establish pursuant to this Order are as follows, provided that the Debtors may amend the Sale Schedule, in consultation with the Consultation Parties[8] and subject to the terms of the DIP Facility (as amended and restated), from time to time, as necessary:

---

8 "Consultation Parties" means the following parties: (a) the DIP Lenders (as defined in the Final DIP Order) and their counsel and financial advisors, including Akin Gump Strauss Hauer & Feld LLP and Houlihan Lokey;

10

a.   **Bid Deadline**: **January 21, 2019, at 4:00 p.m. (prevailing Central Time)** is the deadline by which all <u>Qualified Bids</u> must be ***actually*** ***received*** by the parties specified in the Bidding Procedures (the "<u>Bid Deadline</u>").

b.   **Auction**: The Auction, if necessary, will be held on **February 27, 2019, at 10:00 a.m. (prevailing Central Time)** at the offices of counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022.

c.   **Sale Objection Deadline**: The deadline by which all objections to the Sale (including to any Successful Bids or any Assigned Contract Objection (as defined below)) must be filed with the Court and served so as to be ***actually received*** by the appropriate notice parties (the "<u>Sale Objection Deadline</u>"), is **Wednesday, March 6, 2019, at 4:00 p.m. (prevailing Central Time)**. The deadline by which responses to objections to the Sale must be filed is **Friday, March 15, 2019 at 4:00 p.m. (prevailing Central Time)**.

d.   **Sale Hearing**: The hearing approving the Sale to the Successful Bidder shall take place before the Court on **Wednesday, March 20, 2019, at 10:00 a.m. (prevailing Central Time)**.

21.   Upon entry of the Order, the Debtors will notify parties of these dates in connection with their forthcoming motion for approval of the Disclosure Statement.

## IV.   Notice of Auction.

22.   On or within three business days after entry of the Order, the Debtors will cause the Sale Notice, substantially in the form attached as **<u>Exhibit 3</u>** to the Order, to be served on the following parties or their respective counsel, if known: (a) the Office of the Bankruptcy Administrator for the Northern District of Alabama; (b) counsel to the Committee; (c) counsel to the agent under the Debtors' proposed debtor in possession credit agreement; (d) counsel to the agent under the Debtors' prepetition first-lien credit agreement; (e) counsel to the lenders under

---

(b) counsel and financial advisors to the official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "<u>Committee</u>"); and (c) counsel and financial advisors to WPP LLC, by NRP (Operating) LLC, its sole member ("<u>NRP</u>") to the extent provided for in the *Agreed Order and Settlement Agreement Related to Motion to Assume Oak Grove Coal Mining Lease* [Docket No. 299]. Notwithstanding the foregoing, a party shall not be a Consultation Party if such party is a bidder at the Auction; *provided, however,* if any such Consultation Party notifies the Debtors in writing that it irrevocably forfeits its rights to be a bidder, the foregoing restriction shall no longer apply with respect to such Consultation Party upon the Debtors' receipt of such notice.

the Debtors' debtor in possession credit agreement and prepetition first-lien credit agreement; (f) counsel to Mission Coal Funding, LLC, in its capacity as the lender under the Debtors' prepetition second-lien credit agreement; (g) the United States Attorney's Office for the Northern District of Alabama; (h) the Internal Revenue Service; (i) the Environmental Protection Agency; (j) the office of the attorneys general for the states in which the Debtors operate; (k) the Securities and Exchange Commission; (l) the Pension Benefit Guarantee Corporation; (m) the United Mine Workers of America; (n) the United Mine Workers of America Pension Plan; (o) counsel to the Stalking Horse Bidder; (p) all parties who have expressed a written interest in some or all of the Assets; (q) all known holders of liens, encumbrances, and other claims secured by the Assets; (r) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (s) any party that has requested notice pursuant to Bankruptcy Rule 2002.

23. In addition, within five business days of entry of the Order, the Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, once in the *USA Today (National Edition)* to provide notice to any other potential interested parties.

24. The Debtors submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, including the date, time, and place of the Auction (if one is held) and the Bidding Procedures and the dates and deadlines related thereto. Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and that the Court determine that no other or further notice of the Auction is required.

## V. Summary of the Assumption and Assignment Procedures.

25. The Debtors propose the Assumption Procedures set forth below for notifying the Contract Counterparties to executory contracts and unexpired leases of proposed cure amounts in the event the Debtors decide to assume and assign such contracts or leases in connection with the Sale.

12

### A. Notice of Assumption and Assignment.

26.     On or before January 14, 2019 (the "<u>Assumption and Assignment Service Date</u>"), the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery the Cure Notice annexed as **<u>Exhibit 4</u>** to the Bidding Procedures Order on all executory contract and unexpired lease Contract Counterparties (other than any Debtor) and, include as **<u>Exhibit A</u>** to the Cure Notice, a list (the "<u>Assigned Contracts Schedule</u>") that specifies: (a) each of the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (*i.e.*, the Assigned Contracts), including the name of the Contract Counterparty to each such contract, and whether or not the underlying agreement would be considered an executory contract or unexpired lease under applicable nonbankruptcy law; (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Assigned Contract (the "<u>Cure Costs</u>"); and (c) the deadline by which any Contract Counterparty to an Assigned Contract may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto. The Debtors shall serve, via first class mail, a customized version of the Cure Notice, without the Assigned Contracts Schedule, which will include: (w) instructions (the "<u>Omni Instructions</u>") regarding how to view the Assigned Contracts Schedule on the Debtors' case website (the "<u>Case Website</u>"); (x) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Assigned Contracts and rights thereunder; (y) Cure Costs, if any; and (z) the procedures for objecting thereto ((x)-(z) collectively, the "<u>Necessary Notice Information</u>"), on each Contract Counterparty to the Assigned Contracts. The Debtors shall serve on all parties that requested notice pursuant to Bankruptcy Rule 2002, via ECF, a modified version of the Cure Notice that contains the Omni Instructions and Necessary Notice Information. Pursuant to the Bidding Procedures Order, service

13

as set forth herein shall be deemed proper, due, timely, good, and sufficient notice and no other or further notice will be necessary.

27.     A Contract Counterparty listed on the Assigned Contract Schedule may file an objection (an "Assigned Contract Objection") only if such objection is to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any.   All Assigned Contract Objections must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served and ***actually received*** no later than the Sale Objection Deadline (the "Cure Objection Deadline").

28.     If a Contract Counterparty files an Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the Stalking Horse Bidder or other Successful Bidder has designated in writing that it wishes to take assignment of such Assigned Contract, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, such objection will be resolved at the Sale Hearing or such later date as determined by the Court.  To the extent that any Assigned Contract Objection cannot be resolved by the parties, such Assigned Contract shall be assumed and assigned only upon satisfactory resolution of the Assigned Contract Objection, to be determined in the Stalking Horse Bidder's or other Successful Bidder's discretion. To the extent an Assigned Contract Objection remains unresolved, the Assigned Contract may be conditionally assumed and assigned, subject to the consent of the Stalking Horse Bidder or other Successful Bidder, pending a resolution of the Assigned Contract Objection after notice and a hearing.  If an Assigned Contract Objection is not satisfactorily resolved, the Stalking Horse

14

Bidder or other Successful Bidder may determine that such Assigned Contract should be rejected and not assigned, in which case the Stalking Horse Bidder or other Successful Bidder will not be responsible for any Cure Costs in respect of such contract.

**B.      Supplemental Cure Notice.**

29.      If (i) the Debtors discover contracts inadvertently omitted from the Assigned Contracts Schedule, (ii) the Successful Bidder identifies other executory contracts or unexpired leases that it desires to assume and assign in connection with the Sale, or (iii) the previously state Cure Cost associated with any assigned Contract requires modification, the Debtors may, in accordance with the Stalking Horse Purchase Agreement or as otherwise agreed by the Debtors and the Successful Bidder, at any time after the Assumption and Assignment Service Date: (a) supplement the Assigned Contracts Schedule with previously omitted Assigned Contracts; (b) remove any Assigned Contracts from the list of executory contracts and unexpired leases ultimately selected as Assigned Contracts that the Successful Bidder proposes be assumed and assigned to it in connection with the Sale or add to such list; and/or (c) modify the previously stated Cure Costs associated with any Assigned Contract.

30.      In the event that the Debtors exercise any of the rights reserved above, the Debtors shall promptly serve a supplemental notice of assumption and assignment by electronic transmission, hand delivery, or overnight mail on the Contract Counterparty, and its attorney, if known, at the last known address available to the Debtors (a "Supplemental Cure Notice").  Each Supplemental Cure Notice shall include the same information with respect to listed Assigned Contracts as would have been included in the Notice of Assumption and Assignment (a "Supplemental Assigned Contracts Schedule").

31.      Any Contract Counterparty that receives a Supplemental Cure Notice may file an objection (a "Supplemental Assigned Contract  Objection") only if such objection is to the

15

proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any. All Supplemental Assigned Contract Objections must: (a) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (b) include appropriate documentation in support thereof; and (c) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is the later of (i) the Sale Objection Deadline and (ii) 14 days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice (the "Supplemental Assigned Contract Objection Deadline").

32.     If a Contract Counterparty files a Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court (a "Supplemental Assigned Contract Hearing") to determine the Cure Costs, if any, and approve the assumption of the relevant Assigned Contracts. If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Costs and approving the assumption and assignment of any Assigned Contract listed on a Supplemental Cure Notice.

C.     **Additional Notice of Assumption and Assignment Procedures.**

33.     If a Contract Counterparty does not file and serve an Assigned Contract Objection or Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (a) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Assigned Contract or any other document, and (b) the Contract Counterparty will be deemed to have consented to the assumption and assignment of the Assigned Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption and assignment of such Assigned Contract and rights thereunder,

16

including the Cure Costs, if any, and from asserting any other claims related to such Assigned Contract against the Debtors or the Successful Bidder, or the property of any of them.

34.     Any objections to the Successful Bidder's proposed form of adequate assurance of future performance must be filed no later than the later of the Sale Objection Deadline or Supplemental Assigned Contract Objection Deadline, as applicable, and such objections will be resolved at the Sale Hearing or Supplemental Assigned Contract Hearing, as applicable.  The Debtors may, with the consent of the Successful Bidder, adjourn the resolution of any such objection to a later hearing.

35.     For the avoidance of doubt, the inclusion of an Assigned Contract on the Assigned Contracts Schedule or Supplemental Assigned Contracts Schedule shall not obligate the Debtors to assume any such Assigned Contract or obligate the Stalking Horse Bidder or a Successful Bidder to take assignment of any such Assigned Contract.  The Stalking Horse Bidder or other Successful bidder shall determine whether to take assignment of any Assigned Contracts pursuant to the terms of the Stalking Horse Purchase agreement or other asset purchase agreement, as applicable.

## Basis for Relief

I.     **The Stalking Horse Purchase Agreement and Bidding Procedures Are Fair, Designed to Maximize the Value Received for the Assets, and Are Consistent with the Debtors' Reasonable Business Judgment**.

36.     Bankruptcy Code section 363(b) provides that "[t]he [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification.'") (internal citations omitted); *see also In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996)

17

(explaining that courts usually defer to the trustee's "legitimate business justification" with respect to the "disposition of assets of the estate"); *In re Integrated Res., Inc.*, 147 B.R. 650, 656–57 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

37.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

38.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See, e.g., In re Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

39.     The Debtors have carefully evaluated a number of qualitative and quantitative factors in designing a process that they believe will maximize the value of their estates, produce

18

maximum recoveries, and result in a successful restructuring of their estates. This process includes both entry into the Stalking Horse Purchase Agreement and approval of the Bidding Procedures, which are designed to promote active bidding from seriously interested parties and to elicit the highest or otherwise best offers available for substantially all of the Debtors' assets. The Debtors are confident that the Bidding Procedures will allow the Debtors to solicit additional offers and conduct the sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the assets and who can demonstrate the ability take on the assets, obligations, and liabilities being transferred. In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

40.     In addition, the Bidding Procedures provide Potential Bidders that may have otherwise applicable rights of first refusal (and similar rights) a fair opportunity to effectively exercise those rights by participating in the marketing and sale process. Accordingly, the Debtors should be deemed to have complied with or satisfied any such provisions by conducting a sale pursuant to the Bidding Procedures. *See In re Farmland Indus., Inc.*, 284 B.R. 111, 119-20 (Bankr. W.D. Mo. 2002) (relying on the fact that the first refusal right holder did not receive notice of the auction to reopen the auction to the highest bidder and the right holder); *but see In re Mr. Grocer*, 77 B.R. 349, 352 (Bankr. D.N.H. 1987) (holding that rights of first refusal are *per se* unenforceable under section 365(f) of the Bankruptcy Code).

41.     At the same time, the Bidding Procedures provide the Debtors with an opportunity to consider competing bids and select the highest or otherwise best offers for the completion of the sale. As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable at or above market.

19

42.     The Debtors submit that the Stalking Horse Purchase Agreement and the Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved in this district. *See, e.g.*, *In re Walter Energy, Inc.*, No. 15-02741-TOM11 (TOM) (Bankr. N.D. Ala. Nov. 25, 2015) (approving similar bidding procedures); *In re BFW Liquidation, LLC, f/k/a Bruno's Supermarkets, LLC*, No. 09-00634 (TOM) (Bankr. N.D. Ala. Mar. 27, 2009); *In re Bill Heard Enters., Inc.*, No. 08-83029-JAC-11 (JAC) (Bankr. N.D. Ala. Oct. 15, 2008) (same).  Similar relief is commonly granted by bankruptcy courts in other Districts.  *See, e.g., In re Westmoreland Coal Company*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (providing for similar bidding procedures); *In re Patriot Coal Corporation*, No. 15-32450-KLP (Bankr. E.D. Va. Jun. 25, 2015) (providing for similar bidding procedures); *In re EMAS CHIYODA Subsea Ltd..*, No. 17-31146 (MI) (Bankr. S.D. Tex. Apr. 24, 2017) (providing for similar bidding procedures); *In re Vanguard Nat. Res.*, LLC, No. 17-30560 (MI) (Bankr. S.D. Tex. Apr. 13, 2017) (same).

43.     Accordingly, for all of the foregoing reasons, the Debtors believe that the Stalking Horse Purchase Agreement and the Bidding Procedures:  (a) will encourage robust bidding for the Assets; (b) are consistent with other procedures previously approved by courts in this District; and (c) are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings and should be approved.

## II.     The Form and Manner of the Sale Notice Should Be Approved.

44.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any

objections to the relief requested therein. The Debtors seek approval of the Sale Notice as proper notice of the Auction. The Debtors submit that notice of this Motion and the related hearing to consider entry of the Order, coupled with service of the Sale Notice, as provided for herein, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

### III. The Assets May Be Sold Free and Clear of Liens, Claims, Interests and Encumbrances under Bankruptcy Code Section 363(f).

45.     Bankruptcy Code section 363(f) authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances provided that one of the following conditions is met:

i.      applicable non-bankruptcy law permits sale of such property free and clear of such interests;

ii.     such entity consents;

iii.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

iv.     such interest is in bona fide dispute; or

v.      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1) - (5).

46.     As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary for a debtor to meet one of the five conditions of section 363(f). *See id.*; *Mich. Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) written in disjunctive; holding that court may approve sale "free and clear" provided

Case 18-04177-TOM11    Doc 393    Filed 12/05/18    Entered 12/05/18 14:18:46    Desc
Main Document    Page 21 of 164

at least one of the subsections of section 363(f) is met); *In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D.Ill. 2005); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of §363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

47.     The Debtors anticipate that the Sale will satisfy one of the five requirements set forth under section 363(f) of the Bankruptcy Code, either because there are proceeds sufficient to cover such liens or interests, the affected parties consent to the Sale of the applicable Assets or some other bases exist under section 363(f) of the Bankruptcy Code to warrant the sale of the applicable Assets free and clear of such liens or interests. Accordingly, the Debtors anticipate that one or more prongs of section 363(f) of the Bankruptcy Code will be satisfied with respect to parties that assert liens on or interests in the Assets.

**IV.     Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code**.

48.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value. *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district court and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)").

22

49.     In this district, absent cause for restricting credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim.  *See, e.g.*, *In re Walter Energy, Inc.*, No. 15-02741-TOM11 (TOM) (Bankr. N.D. Ala. Nov. 25, 2015) (order approving bid procedures which authorized parties with secured claims to credit bid); *In re BFW Liquidation, LLC, f/k/a Bruno's Supermarkets, LLC*, No. 09-00634 (TOM) (Bankr. N.D. Ala. Mar. 27, 2009) (same); *In re Bill Heard Enters., Inc.*, No. 08-83029-JAC-11 (JAC) (Bankr. N.D. Ala. Oct. 15, 2008) (same).  Similar relief is commonly granted by bankruptcy courts in other Districts.  *See, e.g., In re Offshore Fabricators, LLC*, No. 17-35623 (MI) (Bankr. S.D. Tex. Nov. 9, 2017) (order approving bid procedures which authorized parties with secured claims to credit bid); *In re Bennu Titan LLC (f/k/a ATP Titan LLC)*, No. 17-30497 (DRJ) (Bankr. S.D. Tex. Aug. 17, 2017) (same).

50.     Accordingly, the DIP Lenders, the DIP Agent, and other validly secured creditors should be entitled to credit bid some or all of the claims secured by their collateral in accordance with the Bidding Procedures, pursuant to section 363(k) of the Bankruptcy Code.

## V.     The Assumption and Assignment Procedures Should Be Approved.

51.     To facilitate and effectuate the Sale, the Debtors are seeking approval of the Assumption and Assignment Procedures.  The Assumption and Assignment Procedures are reasonable and necessary to properly notify parties of potential assumptions and/or assignments and provide the contract and lease counterparties with sufficient time to determine the accuracy of the proposed cure amount and whether the Debtors have provided adequate assurance of future performance.

52.     The Debtors believe that they can and will demonstrate at the Sale Hearing that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder will be satisfied.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder or Successful

23

Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts), including as it relates to such Qualified Bidder's willingness, and ability to perform under the Assigned Contracts assigned to the Successful Bidder. Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts. The Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts as set forth in the definitive agreement of the Successful Bidder.

53. Accordingly, the Debtors submit that the Assumption and Assignment Procedures should be approved as reasonable and necessary measures to adequately notify parties in interest and conducting the proposed sale process in a fair, efficient, and proper manner.

<u>**Notice**</u>

54. The Debtors will provide notice of this Motion to: (a) the Office of the Bankruptcy Administrator for the Northern District of Alabama; (b) counsel to the Committee; (c) counsel to the agent under the Debtors' proposed debtor in possession credit agreement; (d) counsel to the agent under the Debtors' prepetition first-lien credit agreement; (e) counsel to the lenders under the Debtors' debtor in possession credit agreement and prepetition first-lien credit agreement; (f) counsel to Mission Coal Funding, LLC, in its capacity as the lender under the Debtors' prepetition second-lien credit agreement; (g) the United States Attorney's Office for the Northern District of Alabama; (h) the Internal Revenue Service; (i) the Environmental Protection Agency; (j) the office of the attorneys general for the states in which the Debtors operate; (k) the Securities and Exchange Commission; (l) the Pension Benefit Guarantee Corporation; (m) the United Mine Workers of America; (n) the United Mine Workers of America Pension Plan; (o) counsel to the

24

Stalking Horse Bidder; (p) all parties who have expressed a written interest in some or all of the Assets; (q) all known holders of liens, encumbrances, and other claims secured by the Assets; (r) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (s) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice is required.

[*Remainder of page intentionally left blank.*]

Case 18-04177-TOM11    Doc 393    Filed 12/05/18    Entered 12/05/18 14:18:46    Desc
Main Document      Page 25 of 164

WHEREFORE, the Debtors respectfully request that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Birmingham, Alabama
Dated: December 5, 2018

*/s/ Daniel D. Sparks*

Daniel D. Sparks
Bill D. Bensinger
**CHRISTIAN & SMALL LLP**
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Telephone:    (205) 795-6588
Facsimile:    (205) 328-7234
Email:         ddsparks@csattorneys.com
                bdbensinger@csattorneys.com

- and -

James H.M. Sprayregen, P.C.
Brad Weiland (admitted *pro hac vice*)
Melissa N. Koss (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:         james.sprayregen@kirkland.com
                brad.weiland@kirkland.com
                melissa.koss@kirkland.com

- and -

Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:         stephen.hessler@kirkland.com
                ciara.foster@kirkland.com

*Co-Counsel to the Debtors*

**Exhibit A**

**Proposed Order**

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. __** |

**ORDER (I) AUTHORIZING THE DEBTORS
TO ENTER INTO AND PERFORM UNDER THE STALKING
HORSE PURCHASE AGREEMENT, (II) APPROVING BIDDING
PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS,
(III) SCHEDULING HEARINGS AND OBJECTION DEADLINES
WITH RESPECT TO THE SALE, (IV) SCHEDULING BID DEADLINES
AND AN AUCTION, (V) APPROVING THE FORM AND MANNER OF NOTICE
THEREOF, (VI) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT
PROCEDURES, AND (VII) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "<u>Motion</u>")[2] of the above captioned debtors and debtors in possession (the "<u>Debtors</u>") for the entry of an order (this "<u>Order</u>"): (a) authorizing the Debtors to enter into that certain Asset Purchase Agreement attached hereto as **Exhibit 1** (the "<u>Stalking Horse Purchase Agreement</u>"); (b) approving the proposed bidding procedures attached as **Exhibit 2** to this Order (the "<u>Bidding Procedures</u>"); (c) scheduling an auction; (d) approving the form and manner of notice thereof; (e) scheduling dates and deadlines in connection with the sale (the "<u>Sale</u>") of all, substantially all, or any combination of the Debtors'

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion or the Bidding Procedures, as applicable.

KE 57537527

assets (the "Assets"); (f) approving the form and manner of notice thereof; (g) approving procedures for assuming and assigning the Debtors' executory contracts and unexpired leases (the "Assumption Procedures"); and (h) granting related relief; all as more fully set forth in the Motion; and upon the First Day Declaration; and this court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order; and this court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this court having found that it may enter a final order consistent with Article III of the United States Constitution; and this court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before this court (the "Hearing"); and this court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this court; and after due deliberation and sufficient cause appearing therefor, THE COURT FINDS THAT:

A.     The findings of fact and conclusions of law herein constitute the court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

2

B.     <u>Jurisdiction and Venue</u>.  This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue in this court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory bases for the relief requested in the Motion are sections 105 and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 3016, 3017, 3020, and 6004.

D.     <u>Notice of the Bidding Procedures Motion</u>.  Notice of the Motion, the Hearing, and the proposed entry of this Order was adequate and sufficient under the circumstances of these chapter 11 cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.  Notice of the Motion has been given to:  (a) the Office of the Bankruptcy Administrator for the Northern District of Alabama; (b) counsel to the Committee; (c) counsel to the agent under the Debtors' debtor-in-possession credit agreement; (d) counsel to the agent under the Debtors' prepetition first-lien credit agreement; (e) counsel to the lenders under the Debtors' debtor-in-possession credit agreement and prepetition first-lien credit agreement; (f) counsel to Mission Coal Funding, LLC, in its capacity as the lender under the Debtors' prepetition second-lien credit agreement; (g) the United States Attorney's Office for the Northern District of Alabama; (h) the Internal Revenue Service; (i) the Environmental Protection Agency; (j) the office of the attorneys general for the states in which the Debtors operate; (k) the Securities and Exchange Commission; (l) the Pension Benefit Guarantee Corporation; (m) the United Mine Workers of America; (n) the United Mine Workers of America Pension Plan; (o) counsel to the Stalking Horse Bidder; (p) all parties who have expressed a written interest in some or all of the Assets; (q) all known holders of liens, encumbrances, and other claims secured by the Assets; (r) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (s) the counterparties to any executory contract or unexpired lease to which a Debtor is a party (the

3

"Contract Counterparties"); (t) all known creditors of the Debtors; and (u) any party that has requested notice pursuant to Bankruptcy Rule 2002. Accordingly, no further notice of the Motion, the Hearing, or this Order is necessary or required.

        E.      The Debtors have articulated good and sufficient reasons for this Court to: (a) authorize the Debtors to enter into the Stalking Horse Purchase Agreement attached hereto as **Exhibit 1**; (b) approve the Bidding Procedures attached hereto as **Exhibit 2**; (c) schedule the Bid Deadline, the Auction, the Sale Objection Deadline, and the Sale Hearing; and (d) approve the form of the Sale Notice attached hereto as **Exhibit 3**; (e) approve the Assumption Procedures and the form and manner of notice of the Cure Notice attached hereto as **Exhibit 4**; and (f) grant related relief.

        F.      <u>Stalking Horse Purchase Agreement</u>. The Debtors have demonstrated and proven to the satisfaction of this Court that their entering into the Asset Purchase Agreement (the "<u>Stalking Horse Purchase Agreement</u>") with New Coal Acquisition Co., LLC (including its assignees or designees, the "<u>Stalking Horse Bidder</u>") and performance thereunder is in the best interests of the Debtors, their creditors, and their estates, and that performance under the Stalking Horse Purchase Agreement represents a prudent exercise of the Debtors' sound business judgment. The Debtors have articulated good, sufficient, and sound business justifications and compelling circumstances for the entry into and performance under the Stalking Horse Purchase Agreement in that, among other things, the Stalking Horse Bid constitutes the highest or otherwise best restructuring proposal that the Debtors have received to date and the approval of the Stalking Horse Purchase Agreement is a necessary and constructive step toward the consummation of a sale of all, substantially all, or any combination of the Debtors' assets, and the Stalking Horse Purchase Agreement allows the Debtors to solicit the highest or otherwise best bid for their assets through the Bidding Procedures.

G.     The Stalking Horse Purchase Agreement was negotiated by the parties at arm's-length and in good faith by the Debtors and the Stalking Horse Bidder. Furthermore, the Stalking Horse Purchase Agreement will serve as a minimum or floor bid on which the Debtors, their creditors, suppliers, vendors, and other bidders may rely. The Stalking Horse Bidder is providing a material benefit to the Debtors and their creditors by increasing the likelihood that, given the circumstances, the best possible price for the Debtors' assets will be received. Accordingly, the Debtors entry into the Stalking Horse Purchase Agreement is reasonable and appropriate, and represents the best method for maximizing value for the benefit of the Debtors' estates.

H.     <u>Bidding Procedures</u>. The Bidding Procedures are reasonable and appropriate and represent the best available method for maximizing value for the benefit of the Debtors' estates.

I.     The Bidding Procedures were negotiated at arm's length, in good faith, and without collusion. The Bidding Procedures balance the Debtors' interests in emerging expeditiously from the chapter 11 cases while preserving the opportunity to attract value-maximizing proposals beneficial to the Debtors' estates, their creditors, and other parties in interest.

J.     <u>The Sale Notice</u>. The Sale Notice, substantially in the form attached hereto as **Exhibit 3**, and incorporated herein by reference as if fully set forth in this Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction.

K.     <u>The Cure Notice</u>. The Cure Notice, substantially in the form attached hereto as **Exhibit 4**, and incorporated herein by reference as if fully set forth in this Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Assumption and Assignment Procedures.

5

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as provided herein.

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the court at the hearing on the Motion or by stipulation filed with the court, are overruled.

3.      The Debtors' entry into and performance under the Stalking Horse Purchase Agreement, substantially in the form attached hereto as **Exhibit 1**, is hereby approved, and the Stalking Horse Purchase Agreement is binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the Debtors' estates; *provided* that consummation of the Sale to the Stalking Horse Bidder or any other Successful Bidder shall remain subject to entry of a Court order approving the Sale to the Stalking Horse Bidder or any other Successful Bidder.

**I.      Important Dates and Deadlines.**

4.      The following dates and deadlines are hereby approved (and may be amended from time to time by the Debtors in consultation with the Consultation Parties by filing an appropriate notice on the Court's docket and posting such notice on the website of Omni).[3]

5.      Unless extended by the Debtors, with the consent of the DIP Lenders and in consultation with the other Consultation Parties, the deadline by which all bids for the Assets must

---

[3]     "Consultation Parties" means the following parties:  (a) the DIP Lenders (as defined in the Final DIP Order) and their counsel and financial advisors, including Akin Gump Strauss Hauer & Feld LLP and Houlihan Lokey; (b) the DIP Agent (as defined in the Final DIP Order) and their counsel; (c) counsel and financial advisors to the official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "Committee"); and (d) counsel and financial advisors to WPP LLC, by NRP (Operating) LLC, its sole member ("NRP") to the extent provided for in the *Agreed Order and Settlement Agreement Related to Motion to Assume Oak Grove Coal Mining Lease* [Docket No. 299].  Notwithstanding the foregoing, a party shall not be a Consultation Party if such party is a bidder at the Auction; *provided*, *however*, if any such Consultation Party notifies the Debtors in writing that it irrevocably forfeits its rights to be a bidder, the foregoing restriction shall no longer apply with respect to such Consultation Party upon the Debtors' receipt of such notice.

be *actually received* by the parties specified in the Bidding Procedures is **Monday, January 21, 2019, at 4:00 p.m., prevailing Central Time**.

6.     The date and time of the Auction, if needed, is **Wednesday, February 27, 2019, at 10:00 a.m., prevailing Central Time**, which time may be extended by the Debtors, with the consent of the DIP Lenders and in consultation with the other Consultation Parties, upon written notice filed with the Court, to be held at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022. The Debtors shall send written notice of the date, time, and place of the Auction to Qualified Bidders no later than two (2) business days before such Auction, and shall post notice of the same no later than two (2) business days before such Auction on the website of the Debtors' notice and claims agent, Omni Management Group ("Omni") at https://omnimgt.com/sblite/missioncoal/.

7.     The deadline to object to approval of the Sale (the "Sale Objection Deadline") is set for **Wednesday, March 6, 2019, at 4:00 p.m., prevailing Central Time**. The deadline by which responses to any objections to approval of the Sale must be filed is **Friday, March 15, 2019** at 4:00 p.m., prevailing Central Time.

8.     The hearing to consider approval of the Sale (the "Sale Hearing") will take place on **Wednesday, March 20, 2019, at 10:00 a.m., prevailing Central Time**.

9.     Notwithstanding the foregoing, the Court's approval of the foregoing schedule is without prejudice to all parties' rights to object to the approval of any sale contemplated under this Order at the Sale Hearing on any grounds.

## II.     The Stalking Horse Purchase Agreement.

10.    The administrative agent under the Debtors' debtor in possession financing facility, at the direction of the lenders thereunder (collectively, the "DIP Lender") including their respective

7

assignees or designees (including the Stalking Horse Bidder) shall be deemed a Qualified Bidder, and the bid of the Stalking Horse Bidder contemplated by the Stalking Horse Purchase Agreement (the "Stalking Horse Bid") shall be deemed a Qualified Bid. The Stalking Horse Bidder is not required to make a Good Faith Deposit. Subject to the terms of the DIP Order, no person or entity shall be entitled to any expense reimbursement, break-up fee, "topping," termination, or other similar fee or payment in connection with any Sale.

## III.    The Bidding Procedures.

11.    The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all bids relating to the proposed sale of the Assets. Any party desiring to bid on one or more individual Assets or all or substantially all of the Assets shall comply with the Bidding Procedures and this Order. The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

12.    Each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale, as set forth in the Bidding Procedures.

13.    Any Qualified Bidder who has a valid and perfected lien on any Assets of the Debtors' estates (a "Secured Creditor") and the right and power to credit bid claims secured by such liens, shall have the right to credit bid all or a portion of such Secured Creditor's secured claims within the meaning of section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid its secured claim only with respect to the collateral by which such Secured Creditor is secured; *provided*, *further*, that a Secured Creditor shall not be entitled to any Bid Protections; *provided, further*, that the Stalking Horse Bidder shall have the

8

right (including as part of any applicable Overbid) to credit bid all or a portion of the value of the secured portion of its claims for the Assets pursuant to Bankruptcy Code section 363(k), including any secured claims on account of its adequate protection liens, which amount shall be no less than approximately $203,340,782, plus all accrued and unpaid interest (the "DIP Claim Amount"). Notwithstanding the foregoing, nothing shall affect any rights of parties in interest, if any, with respect to challenging whether any Qualified Bidder has a valid secured claim and such bidder's right to credit bid if the Court determines that such bidder does not have a valid secured claim. For the avoidance of doubt, the Stalking Horse Bidder shall be considered a Qualified Bidder with respect to its right to acquire all or any of the Assets by credit bid.

14. The Debtors may, in consultation with the Consultation Parties: (a) determine which Qualified Bid or combination of Qualified Bids is the highest or otherwise best offer for each Asset or Assets; (b) reject at any time before entry of an Order of the court approving the Successful Bid, any bid that, in the discretion of the Debtors, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors; and (c) at or before the conclusion of the Auction, may impose such other terms and conditions upon Qualified Bidders as the Debtors determine, in consultation with the Consultation Parties, to be in the best interests of the Debtors' estates in these cases.

15. The Debtors are deemed to have complied with all contractual rights of first refusals, or similar contractual purchasing rights, regarding the Assets. The Bidding Procedures and the notice thereof provide all parties in interest with notice of, and the opportunity to participate in, any potential Sale and/or Auction.

9

## IV.    Notice Procedures.

16.    The form of Sale Notice substantially in the form attached hereto as **Exhibit 3** is approved.

17.    On or before three business days after the entry of this Order, the Debtors shall serve the Bidding Procedures Order and Bidding Procedures by first-class mail or courier service upon: (a) the Office of the Bankruptcy Administrator for the Northern District of Alabama; (b) counsel to the Committee; (c) counsel to the agent under the Debtors' proposed debtor-in-possession credit agreement; (d) counsel to the agent under the Debtors' prepetition first-lien credit agreement; (e) counsel to the lenders under the Debtors' debtor-in-possession credit agreement and prepetition first-lien credit agreement; (f) counsel to Mission Coal Funding, LLC, in its capacity as the lender under the Debtors' prepetition second-lien credit agreement; (g) the United States Attorney's Office for the Northern District of Alabama; (h) the Internal Revenue Service; (i) the Environmental Protection Agency; (j) the office of the attorneys general for the states in which the Debtors operate; (k) the Securities and Exchange Commission; (l) the Pension Benefit Guarantee Corporation; (m) the United Mine Workers of America; (n) the United Mine Workers of America Pension Plan; (o) counsel to the Stalking Horse Bidder; (p) all parties who have expressed a written interest in some or all of the Assets; (q) all known holders of liens, encumbrances, and other claims secured by the Assets; (r) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (s) the counterparties to any executory contract or unexpired lease to which a Debtor is a party (the "Contract Counterparties"); (t) all known creditors of the Debtors; and (u) any party that has requested notice pursuant to Bankruptcy Rule 2002.

10

## V.     The Assumption Procedures.

18.     The Assumption and Assignment Procedures set forth in the Bidding Procedures Motion regarding the assumption and assignment of the Assigned Contracts proposed to be assumed by the Debtors and assigned to a Successful Bidder are approved.

A.     **Cure Notice**. On or before January 14, 2019, with the Consent of the Stalking Horse Bidder (such consent not to be unreasonably withheld or conditioned) and subject to consultation with the Consultation Parties, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice annexed as **Exhibit 4** to this Order on all Contract Counterparties, and post the Cure Notice to the Case Website (https://omnimgt.com/sblite/missioncoal/).

B.     **Content of Cure Notice**. The Cure Notice shall notify the applicable Contract Counterparties that the Assigned Contracts may be subject to assumption and assignment in connection with a proposed sale transaction, and contain the following information: (i) a list of the Assigned Contracts; (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimates of the Cure Costs; and (iv) the deadline by which any Contract Counterparty to an Assigned Contract may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto; *provided* that service of a Cure Notice does not constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid.

C.     **Customized Cure Notice**. The Debtors shall serve on all Contract Counterparties, via first class mail or electronic mail, a customized version of the Cure Notice, without the Assigned Contracts Schedule, which will include:   (a) the Omni Instructions; (b) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Assigned Contracts and rights thereunder; (c) Cure Costs, if any; and (d) the Necessary Notice Information.  The Debtors shall serve on the Rule 2002 Notice List, via first class mail or electronic mail, a modified version of the Cure Notice that contains the Omni Instructions and Necessary Notice Information.  Service as set forth herein shall be deemed proper, due, timely, good, and sufficient notice and no other or further notice is necessary.

D.     **Objections**. Objections, if any, to a Cure Notice must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these

11

chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served so as to be **actually received** by counsel to the Debtors prior to **March 6, 2019, at 4:00 p.m. (prevailing Central Time)**; *provided* that the Debtors, subject to consultation with the Consultation Parties, may modify the Cure Objection Deadline by filing a notice of such modification on the Court's docket.

E.  **Effects of Filing an Objection to a Cure Notice**.  A properly filed and served objection to a Cure Notice will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Assigned Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the objection, but will not constitute an objection to the remaining relief requested in the Sale to the Successful Bidder.

F.  **Dispute Resolution**.  Any objection to the proposed assumption and assignment of an Assigned Contract, or Cure Costs, that remain unresolved as of the Sale Hearing, shall be heard at the Sale Hearing (or at such later date as may be fixed by the Court).  Upon entry of an order by the Court resolving such Assigned Contract Objection, the assignment, if approved by the Court, shall be deemed effective as of the later of either (i) the date such Contract Counterparty receives the Cure Notice, or (ii) the Effective Date. To the extent that any Assigned Contract Objection cannot be resolved by the parties, such Assigned Contract shall be assumed and assigned only upon satisfactory resolution of the Assigned Contract Objection, to be determined in the Stalking Horse Bidder's or other Successful Bidder's reasonable discretion.  To the extent an Assigned Contract Objection remains unresolved, the Assigned Contract may be conditionally assumed and assigned, subject to the consent of the Stalking Horse Bidder or other Successful Bidder, pending a resolution of the Assigned Contract Objection after notice and a hearing.  If an Assigned Contract Objection is not satisfactorily resolved, the Stalking Horse Bidder or other Successful Bidder may determine that such Assigned Contract should be rejected and not assigned, in which case the Stalking Horse Bidder or other Successful Bidder will not be responsible for any Cure Costs in respect of such contract.

G.  **Supplemental Cure Notice**.  The Debtors reserve the right, with the consent of the Successful Bidder(s) and subject to consultation with the Consultation Parties, at any time after the Assumption and Assignment Service Date, to: (a) supplement the Assigned Contract Schedule attached to the Cure Notice with previously omitted Assigned Contracts in accordance with the definitive agreement for a Sale; (b) remove any Assigned Contracts from the list of executory contracts and unexpired leases ultimately selected as Assigned Contracts that a Successful Bidder

12

proposes be assumed and assigned to it in connection with a Sale or add to such list; and/or (c) modify the previously stated Cure Cost associated with any Assigned Contracts (a "Supplemental Assigned Contracts Schedule"). In the event that the Debtors exercise any of the rights reserved above, the Debtors will promptly provide the Consultation Parties with notice and an opportunity to object to any such actions, and thereafter will serve a Supplemental Cure Notice by electronic transmission, hand delivery, or overnight mail on the applicable Contract Counterparty, and its attorney, if known, to each impacted Assigned Contract at the last known address available to the Debtors. Each Supplemental Cure Notice will include the same information with respect to listed Assigned Contracts as was included in the Cure Notice. Any Assigned Contract Counterparty listed on a Supplemental Cure Notice may file a Supplemental Assigned Contract Objection only if such objection is to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any. All Supplemental Assigned Contract Objections must: (a) state with specificity the legal and factual basis thereof as well as what Cure Costs the objecting party believes are required, if any; (b) include appropriate documentation in support of the objection; and (c) be filed and served on the Objection Recipients no later than 4:00 p.m. (prevailing Central Time) on the date that is the later of (i) the Sale Objection Deadline and (ii) fourteen days from the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice (the "Supplemental Assigned Contract Objection Deadline").

H.  **Supplemental Hearing**. If a Contract Counterparty files a Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors will seek a Supplemental Assigned Contract Hearing to determine the Cure Costs, if any, and approve the assumption of the relevant Assigned Contracts. If there is no such objection, then the Debtors will obtain entry of an order, including by filing a certification of no objection, fixing the Cure Costs and approving the assumption of any Assigned Contract listed on a Supplemental Cure Notice.

19.    If a Contract Counterparty does not file and serve an Assigned Contract Objection or Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (a) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Assigned Contract or any other document, and (b) the Contract Counterparty will be deemed to have consented to the assumption

13

and assignment of the Assigned Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption and assignment of such Assigned Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Assigned Contract against the Debtors or the Successful Bidder, or the property of any of them.

20.     Any objections to the Successful Bidder's proposed form of adequate assurance of future performance must be filed no later than the later of the Sale Hearing or Supplemental Assigned Contract Objection Deadline, as applicable, and such objections will be resolved at the Sale Hearing or Supplemental Assigned Contract Hearing, as applicable. The Debtors may adjourn the resolution of any such objection to a later hearing.

21.     The inclusion of an Assigned Contract on the Assigned Contract Schedule, Supplemental Assigned Contract Schedule, and/or in a Supplemental Cure Notice will not: (a) obligate the Debtors to assume any Assigned Contract listed thereon or obligate the Successful Bidder to take assignment of such Assigned Contract; or (b) constitute any admission or agreement of the Debtors that such Assigned Contract is an executory contract or unexpired lease. Only those Assigned Contracts that are included on a schedule of assumed and assigned contracts attached to the definitive sale agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such agreement) will be assumed and assigned to the Successful Bidder.

22.     Solely in respect of the procedures for assuming and assigning, or rejecting, Executory Contracts or Unexpired Leases, in the event of any inconsistencies between this Order, the Bidding Procedures Motion, or the Bidding Procedures, this Order shall govern in all respects.

14

## VI.     Miscellaneous.

23.     Notwithstanding anything to the contrary in the Motion or this Order, the relief set forth herein shall be subject to the terms, conditions, limitations, and requirements of the *Final Order (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364(c)(1), 364(c)(2), 363(c)(3), 364(d)(1) and 364(e), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c)* (together with any approved budget (including any permitted variances) in connection therewith, the "Final DIP Order"), and to the extent there is any inconsistency between the terms of the Final DIP Order and any action taken or proposed to be taken under this Order, the terms of the Final DIP Order (together with any approved budget (including any permitted variances) in connection therewith) shall control.

24.     The failure to include or reference a particular provision of the Bidding Procedures specifically in this Order shall not diminish or impair the effectiveness or enforceability of such provision.

25.     Nothing in this Order shall preclude (a) the Debtors from considering, negotiating and filing, (b) any party in interest from proposing to and negotiating with the Debtors, or (c) any party in interest from seeking relief to file, in each case, a plan of reorganization in lieu of or in connection with a sale of less than substantially all of the Debtors' assets.

26.     In the event of any inconsistency between this Order and the Motion and/or the Bidding Procedures, this Order shall govern in all respects.

15

27. Notwithstanding anything to the contrary in the Bidding Procedures, any exclusivity, "no shop," or other provision in any Bid that purports to limit the Debtors' ability to market the Assets shall be null and void.

28. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

29. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

30. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

31. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: _____, 2018
Birmingham, Alabama

THE HONORABLE TAMARA O. MITCHELL
UNITED STATES BANKRUPTCY JUDGE

16

## **Exhibit 1**

**Stalking Horse Purchase Agreement**

ASSET PURCHASE AGREEMENT

DATED AS OF DECEMBER 5, 2018

BY AND AMONG

NEW COAL ACQUISITION CO, LLC, AS BUYER

AND

MISSION COAL COMPANY, LLC,

AND

CERTAIN SUBSIDIARIES OF MISSION COAL COMPANY, LLC, AS THE SELLERS

# TABLE OF CONTENTS

## ARTICLE 1

### DEFINITIONS

1.1     Definitions...................................................................................................2
1.2     Other Definitions and Interpretive Matters.........................................................16

## ARTICLE 2

### PURCHASE AND SALE

2.1     Purchase and Sale ........................................................................................18
2.2     Excluded Assets ...........................................................................................21
2.3     Assumed Liabilities ......................................................................................22
2.4     Excluded Liabilities ......................................................................................24
2.5     Assignment and Assumption of Contracts...........................................................26
2.6     Further Assurances........................................................................................28

## ARTICLE 3

### PURCHASE PRICE

3.1     Consideration ..............................................................................................29
3.2     Allocation of Purchase Price...........................................................................29
3.3     Limitation on Buyer Liability .........................................................................30
3.4     Withholding ................................................................................................30

## ARTICLE 4

### CLOSING AND DELIVERIES

4.1     Closing Date................................................................................................30
4.2     Buyer's Deliveries ........................................................................................31
4.3     Sellers' Deliveries........................................................................................32
4.4     Buyer Designees ..........................................................................................33

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF THE SELLERS

5.1     Organization and Good Standing......................................................................34
5.2     Authority; Validity; Consents .........................................................................34
5.3     No Conflict.................................................................................................35
5.4     Real Property ..............................................................................................35
5.5     Environmental and Health and Safety Matters .....................................................36

i

| 5.6 | Title to Acquired Assets | 38 |
|---|---|---|
| 5.7 | Taxes | 38 |
| 5.8 | Legal Proceedings | 39 |
| 5.9 | Compliance with Legal Requirements; Permits | 39 |
| 5.10 | Labor Matters | 41 |
| 5.11 | Employee Benefits | 42 |
| 5.12 | Sellers' Intellectual Property | 43 |
| 5.13 | Contracts | 43 |
| 5.14 | Insurance | 44 |
| 5.15 | Brokers or Finders | 44 |
| 5.16 | Affiliate Interests | 44 |
| 5.17 | Bank Accounts | 45 |
| 5.18 | Undue Influence | 45 |
| 5.19 | Financial Statements | 45 |
| 5.20 | Absence of Certain Changes | 45 |
| 5.21 | Mining | 46 |
| 5.22 | MSHA; OSHA | 47 |
| 5.23 | Coal Act; Black Lung Act | 47 |
| 5.24 | Warranties Exclusive | 48 |

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

| 6.1 | Organization and Good Standing | 48 |
|---|---|---|
| 6.2 | Authority; Validity; Consents | 49 |
| 6.3 | No Conflict | 49 |
| 6.4 | Brokers or Finders | 49 |
| 6.5 | Legal Proceedings | 50 |
| 6.6 | Qualification | 50 |
| 6.7 | No Other Representations or Warranties; Condition of the Business; Buyer's Reliance | 50 |
| 6.8 | Information | 50 |

## ARTICLE 7

### ACTIONS PRIOR TO THE CLOSING DATE

| 7.1 | Access and Reports; Confidentiality | 51 |
|---|---|---|
| 7.2 | Operations Prior to the Closing Date | 52 |
| 7.3 | Regulatory Matters; Cooperation | 53 |
| 7.4 | Tax Cooperation | 55 |
| 7.5 | Bankruptcy Court Matters | 55 |
| 7.6 | Updates | 56 |
| 7.7 | Surety Bonds; Permits | 57 |
| 7.8 | Fiduciary Obligations | 65 |
| 7.9 | Sale Free and Clear | 65 |

Case 18-04177-TOM11    Doc 393    Filed 12/05/18    Entered 12/05/18 14:18:46    Desc
Main Document     Page 47 of 164

7.10         Determination of Amounts for Certain Escrows and Escrow Amounts ...............66

**ARTICLE 8**
**ADDITIONAL AGREEMENTS**

8.1         Taxes ...............................................................................................................67
8.2         Bulk Sales .........................................................................................................68
8.3         Payments Received ...........................................................................................68
8.4         Assumed Contracts: Adequate Assurance and Performance ...............................69
8.5         Employee Matters .............................................................................................69
8.6         Post-Closing Books and Records and Personnel ................................................70
8.7         Casualty Loss ....................................................................................................70
8.8         Change of Name ................................................................................................71
8.9         No Successor Liability .......................................................................................71

**ARTICLE 9**

**CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE**

9.1         Accuracy of Representations ............................................................................72
9.2         Sellers' Performance .........................................................................................72
9.3         No Order ...........................................................................................................72
9.4         Governmental Authorizations ...........................................................................73
9.5         Sellers' Deliveries ............................................................................................73
9.6         Sale Order .........................................................................................................73
9.7         Assumed Contracts ...........................................................................................73
9.8         Material Adverse Effect ....................................................................................73
9.9         UMWA ..............................................................................................................73

**ARTICLE 10**

**CONDITIONS PRECEDENT TO THE OBLIGATIONS OF THE SELLERS TO CLOSE**

10.1       Accuracy of Representations ............................................................................74
10.2       Buyer's Performance .........................................................................................74
10.3       No Order ...........................................................................................................74
10.4       Governmental Authorizations ...........................................................................74
10.5       Sale Order .........................................................................................................75
10.6       Buyer's Deliveries ............................................................................................75

**ARTICLE 11**

**TERMINATION**

11.1       Termination Events ...........................................................................................75
11.2       Effect of Termination ........................................................................................77

Case 18-04177-TOM11    Doc 393    Filed 12/05/18    Entered 12/05/18 14:18:46    Desc
Main Document    Page 48 of 164

# ARTICLE 12

## GENERAL PROVISIONS

| 12.1 | Survival | 77 |
|------|----------|----|
| 12.2 | Confidentiality | 77 |
| 12.3 | Public Announcements | 78 |
| 12.4 | Notices | 78 |
| 12.5 | Waiver | 80 |
| 12.6 | Entire Agreement; Amendment | 80 |
| 12.7 | Assignment | 81 |
| 12.8 | Severability | 81 |
| 12.9 | Expenses | 81 |
| 12.10 | Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver | 81 |
| 12.11 | Counterparts | 82 |
| 12.12 | Parties in Interest; No Third Party Beneficiaries; No Amendment | 82 |
| 12.13 | Remedies | 83 |
| 12.14 | Specific Performance | 83 |

iv

**EXHIBITS**

Exhibit A            Bidding Procedures
Exhibit B            Bidding Procedures Order

v

ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of December [●], 2018 (the "Execution Date"), is made and entered into by and among New Coal Acquisition Co, LLC, a Delaware limited liability company ("Buyer"), Mission Coal Company, LLC, a Delaware limited liability company (the "Company"), and the Additional Sellers (as defined below) (together with the Company, the "Sellers" and each entity individually a "Seller"). Capitalized terms used herein and not otherwise defined herein have the meanings set forth in Article 1.

RECITALS

**WHEREAS**, the Sellers are engaged in the business of mining, processing, marketing and selling coal through certain mining complexes;

**WHEREAS**, on October 14, 2018, the Sellers filed voluntary petitions (the "Bankruptcy Cases") under chapter 11 of Title 11 §§101-1330 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court");

**WHEREAS**, in accordance with the Bidding Procedures and subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, the Sellers desire to sell to Buyer all of the Acquired Assets and to assign to Buyer all of the Assumed Liabilities, Buyer desires to purchase from the Sellers all of the Acquired Assets and assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated hereby, upon the terms and conditions hereinafter set forth;

**WHEREAS**, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Buyer pursuant to the Sale Order, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 4001, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, the Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

**WHEREAS**, the board of managers (or similar governing body) of each Seller has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and each has approved the same.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

1

# ARTICLE 1

## DEFINITIONS

1.1     Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"Accounts Receivable" means, with respect to each Seller, specifically excluding any Excluded Asset (including the Pinnacle Business), all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that has not been billed, chattel paper, notes and other rights to payment, including those consisting of all accounts receivable in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"Accrued Payroll" means all wages and other related obligations that have accrued since the end of the last payroll period immediately prior to the Closing Date.

"Acquired Assets" has the meaning set forth in Section 2.1.

"Action" means any action, suit, petition, plea, charge, claim, demand, hearing, inquiry, arbitration, complaint, grievance, summons, litigation, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, inquest, audit, examination, investigation or similar matter by or before any Governmental Authority.

"Additional Sellers" means:

  (i)     Beard Pinnacle, LLC, an Oklahoma limited liability company; and

  (ii)    Oak Grove Land Company, LLC, Oak Grove Resources, LLC, Pinnacle Land Company, LLC, Pinnacle Mining Company, LLC, Seminole Alabama Mining Complex, LLC, Seminole Coal Resources, LLC, Seminole West Virginia Mining Complex, LLC, Seneca Coal Resources, LLC, and Seneca North American Coal LLC, each a Delaware limited liability company.

"Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Exchange Act.

"Agreement" has the meaning set forth in the introductory paragraph.

"Alabama Contract Mining Agreement" has the meaning set forth in Section 7.7(a)(iv).

"Alabama Mining License" has the meaning set forth in Section 7.7(a)(ii)(1).

"Alabama Mining Permits" has the meaning set forth in Section 7.7(a)(iii)(1).

"Allocation" has the meaning set forth in Section 3.2.

2

"Alternative Transaction" means (i) the filing of a plan of reorganization contemplating the sale or retention of all or any portion of the Acquired Assets that is inconsistent with the terms of this Agreement or (ii) a sale, lease or other disposition directly or indirectly by merger, consolidation, tender offer, share exchange or otherwise to one or more third parties of all or substantially all of the Acquired Assets, in each case excluding the transactions contemplated hereby.

"Antitrust Law" means, collectively, the HSR Act, Title 15 of the United States Code §§ 1-7, (the Sherman Act), Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, (the Clayton Act), the Federal Trade Commission Act (15 U.S.C.§ 41 et seq.) and the rules and regulations promulgated thereunder and any other Legal Requirements that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, as such of the foregoing are enacted and in effect as of the date hereof.

"Applicant Violator System" has the meaning set forth in Section 5.9(g).

"Apportioned Taxes" has the meaning set forth in Section 8.1(b).

"Assumed Contracts" has the meaning set forth in Section 2.5(a)(i).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumption Agreement" means an Assignment and Assumption Agreement in customary form reasonably acceptable to the Parties.

"Available Contracts" has the meaning set forth in Section 2.5(a)(i).

"Avoidance Action" means any claim, right or cause of action of any Seller arising under Chapter 5 of the Bankruptcy Code and any analogous state law claims relating to the Acquired Assets or the Business.

"Backup Bidder" has the meaning set forth in the Bidding Procedures.

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Benefit Plan" and "Benefit Plans" have the meanings set forth in Section 5.11(a).

"Bid Deadline" has the meaning set forth in Section 7.5(b).

"Bidding Procedures" means bid procedures in substantially the form attached hereto as Exhibit A (with other changes approved by Buyer and the Sellers), as the same may be modified and then approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"Bidding Procedures Motion" means the motion filed by the Sellers pursuant to, inter alia, Sections 363 and 365 of the Bankruptcy Code to obtain the Bidding Procedures Order and approve the transactions contemplated hereby.

"Bidding Procedures Order" means an Order of the Bankruptcy Court in substantially the form attached hereto as Exhibit B (with other changes approved by Buyer and the Sellers), as the same may be modified and approved by the Bankruptcy Court.

"Bill of Sale" means a Bill of Sale in customary form reasonably acceptable to the Parties.

"Black Lung Act" means the Federal Coal Mine Safety and Health Act of 1969, the Black Lung Benefits Act of 1972, the MSHA, the Black Lung Benefits Reform Act of 1977, or and the Black Lung Benefits Amendments of 1981.

"Black Lung Assumed Liabilities" means any Black Lung Liability relating to any Buyer Employee now existing or hereafter arising.

"Black Lung Liability" means any liability or benefit obligations related to black lung claims and benefits under the Black Lung Act, and liabilities and benefits related to pneumoconiosis, silicosis, exposure to isocyanates or other lung disease arising under any federal or state law.

"Business" means the business and operations of the Sellers (wherever such business and operations are situated or conducted) related to the Acquired Assets, including (i) the business and operations related to metallurgical coal, exploration and extraction and related operations at the Maple Eagle (West Virginia) and Oak Grove (Alabama) mining facilities and (ii) the selling, marketing, purchasing and blending of coal and related operations related to the Acquired Assets, in each case of the foregoing clauses (i) and (ii), other than with respect to such business and operations to the extent they relate to any Excluded Assets or Excluded Liabilities.

"Business Day" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required, unable to or authorized to close.

"Buyer" has the meaning set forth in the introductory paragraph and shall also include any Buyer Designee.

"Buyer Designee" has the meaning set forth in Section 4.4.

"Buyer Employees" has the meaning set forth in Section 8.5(a).

"Cash Consideration" means an amount equal to the sum of (i) cash equal to $50,000, of which $50,000 shall be allocated as consideration for the Avoidance Actions included in the Acquired Assets, plus (ii) the Wind-Down Escrow Amount plus (iii) the Payroll Escrow Amount plus (iv) the Estate Retained Professional Fees Escrow Amount, which amounts shall be negotiated between Buyer and the Sellers in accordance with Section 7.10.

"Claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, against any Seller.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Closing Required Permits" means all Governmental Authorizations (including Permits) (i) held by the Sellers with respect to or that relate to the Business and (ii) necessary for the operation and conduct of the Business and Acquired Assets.

"Coal Act" means the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701, et seq.

"Coal Reserves" means any and all of the coal located upon or within the Owned Real Property or Leased Real Property to the extent owned by the Sellers, but excluding, for the avoidance of doubt, any such coal at the Pinnacle Business.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"Code" means the Internal Revenue Code of 1986.

"Collective Bargaining Agreement" has the meaning set forth in Section 5.10(a).

"Company" has the meaning set forth in the introductory paragraph.

"Confidential Information" has the meaning set forth in Section 12.2.

"Contract" means any legally binding agreement, contract, obligation, promise, undertaking, lease (including Leases, Lessor Leases and Occupancy Agreements), sublease, purchase order, arrangement, license, commitment, insurance policy or other binding arrangement or understanding (in each case whether written or oral), and any amendments, modifications or supplements thereto.

"Copyrights" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"Credit Bid and Release" has the meaning set forth in Section 3.1(c).

"Cure Costs" means all monetary liabilities, including pre-petition monetary liabilities, of the Sellers that must be paid or otherwise satisfied to cure all of the Sellers' monetary defaults under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order.

"Cure Notice" means, with respect to each Available Contract, the notice submitted by the Sellers to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order setting forth, among other things, the Cure Cost amount with respect thereto as calculated by the Sellers.

"Data Room" means that certain SecureDocs virtual data room maintained under the name "Mustang" by or on behalf of the Company in connection with the Bankruptcy Cases at https://advantage.securedocs.com/.

"Deeds" means (i) unless otherwise provided in a Schedule to this Agreement with respect to conveyance of a particular parcel of Real Property, special (or limited) warranty deeds, or jurisdictional equivalents, as the case may be, in recordable form for the appropriate jurisdiction, reasonably acceptable to Buyer, transferring title to the Real Property other than Leased Real Property and Improvements thereon (subject only to Permitted Encumbrances), and (ii) if expressly provided in a Schedule to this Agreement with respect to conveyance of a particular parcel of Real Property, the type of deed or other instrument so specified.

"Determination Date" has the meaning set forth in Section 2.5(a)(i).

"DIP Credit Agreement" means that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement dated as of October 16, 2018, by and among the Company, as

borrower, the guarantors from time to time party thereto, the DIP Lenders and Wilmington Savings Fund Society, FSB, as administrative agent, as restated, amended and restated, supplemented, waived and/or otherwise modified prior to the date hereof.

"DIP Documents" has the meaning set forth in the Final DIP Order.

"DIP Lenders" has the meaning set forth in the Final DIP Order.

"Disclosure Schedules" means the Disclosure Schedules attached hereto, dated as of the date hereof, delivered or made available by the Sellers to Buyer in connection with the execution of this Agreement, as the same may be supplemented and amended pursuant to Section 7.6.

"Disclosure Statement" means a Disclosure Statement for the Plan of Reorganization, in form and substance acceptable to the Required Lenders.

"Documents" means all of the documents that are used in, held for use in, or that are related to the Business.

"Employees" means all of the employees of the Sellers on the Execution Date, as well as any additional persons who become employees of the Sellers in the Ordinary Course of Business of the Sellers during the period from the Execution Date through and including the Closing Date.

"Encumbrance" means any "interest", as that term is used in Section 363(f) of the Bankruptcy Code, charge, lien, Claim, right, demand, mortgage, lease, debt, losses, damage, demand, fine, judgment, penalty, liability, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, rights of others, easement, restrictive covenant, right of way, preemptive right, conditional sale, servitude, conditional sale agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition or otherwise), encroachment, encumbrance, third party interest or other restriction or limitation of any kind, whether imposed by Contract, Legal Requirement, equity or otherwise.

"Environmental, Health and Safety Laws" means any and all Legal Requirements concerning or relating to (a) public health and safety (to the extent relating to Release of or exposure to Hazardous Substances), (b) worker/occupational health and safety (to the extent relating to Release of or exposure to Hazardous Substances), (c) land use, zoning, odor or noise, or (d) pollution or protection of the environment, including those relating to (i) the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, storage, disposal, distribution, importing, labeling, testing, processing, discharge, Release, threatened Release, control, or cleanup involving Hazardous Substances, (ii) SMCRA (including its implementing regulations and any state analogs), (iii) MSHA, (iv) human health as affected by hazardous or toxic substances, (v) acid mine drainage, and (vi) mining operations and activities to the extent relating to Reclamation.

"Environmental Permit" means any and all permits, licenses, approvals, consents, waivers, franchises, filings, accreditations, registrations, certifications, notifications, exemptions, clearances and any other authorization required under any applicable Environmental, Health and Safety Law (including those required under any applicable Environmental, Health and Safety Laws for the construction, maintenance and operation of any coal mine or related processing

6

facilities or Reclamation and restoration of land, water and any current, abandoned or former mines, and of any other environment affected by such mines, as required pursuant to any applicable Environmental, Health and Safety Law).

"Equipment" means all furniture, fixtures, equipment, computers, machinery, vehicles, apparatus, appliances, implements, telephone systems, signage, supplies and all other tangible personal property of every kind and description, and Improvements and tooling used, or held for use, in connection with the operation of the Business, wherever located, including communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any Person, trade or business that would be considered a single employer with any Seller or any Subsidiary of any Seller under Sections 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA or would be under "common control" with any Seller or any Subsidiary of any Seller within the meaning of Section 4001(a)(14) of ERISA. Any former ERISA Affiliate shall continue to be considered an ERISA Affiliate within the meaning of this definition with respect to the period such entity was an ERISA Affiliate and with respect to Liabilities arising during such period (but, for the avoidance of doubt, not after such period) for which such Person could be liable under the Code or ERISA.

"Escrow Proposal" has the meaning set forth in Section 7.10(a).

"Estate Retained Professional Fee Claims" means any administrative claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals in connection with the Bankruptcy Cases through and including the Closing Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Estate Retained Professional Fee Claim.

"Estate Retained Professional Fees Escrow Account" means an escrow account established pursuant an escrow agreement in form and substance satisfactory to the Sellers and Buyer, which shall be funded at Closing by Buyer with a portion of the Cash Consideration equal to the Estate Retained Professional Fees Escrow Amount.

["Estate Retained Professional Fees Escrow Amount" means the reasonable estimate of the aggregate amount of (i) Estate Retained Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services to the Sellers or a statutory committee of unsecured creditors in the Bankruptcy Cases prior to and as of the Closing Date, and (ii) the fees and expenses associated with the administration of the Estate Retained Professional Fees Escrow Account, in each case as determined between Buyer and the Sellers in accordance with Section 7.10.][1]

---

[1]  **NTD**: Subject to further discussion, all rights of Buyer and Sellers are reserved.  Above reflects Seller's position; Buyer's position is:  "means an amount negotiated between Buyer and the Sellers in accordance with Section 7.10 to fund (i) Estate Retained Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services to the Sellers or a statutory committee of

7

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Section 2.5(a)(i).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Execution Date" has the meaning set forth in the introductory paragraph.

"Extended Contract Period" has the meaning set forth in Section 2.5(a)(i).

"FASB 410" has the meaning set forth in Section 5.20(a).

"FCPA" has the meaning set forth in Section 5.18.

"Final DIP Order" means the Final Order (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(A), 361, 362, 363, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. §363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364 and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and 4001(C) [Docket No. 300].

"Final Order" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Buyer) and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Action or Order shall have become final in accordance with Bankruptcy Rule 8002; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"First Lien Credit Documents" has the meaning set forth in the Final DIP Order.

"FLSA" means Fair Labor Standards Act and any state or local laws governing wages, hours, and/or overtime pay.

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied.

"Gas Well" means any coal bed methane gas well operated by any Seller.

"Governmental Authority" means any United States federal, state or local or any foreign government, multi-national organization, quasi-governmental authority, or other similar

---

unsecured creditors in the Bankruptcy Cases prior to and as of the Closing Date, and (ii) the fees and expenses associated with the administration of the Estate Retained Professional Fees Escrow Account."

recognized governmental authority or regulatory or administrative authority, agency or commission or any court, tribunal or judicial body having jurisdiction.

"Governmental Authorization" means any approval, consent, license, Permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"Hazardous Substance" means any "pollutant," "contaminant," "hazardous waste," "hazardous material" or "hazardous substance" under any Environmental, Health and Safety Laws or any other substance, pollutant, contaminant, waste or related material, or combination thereof, whether solid, liquid, or gaseous in nature, subject to regulation, investigation, remediation, control or corrective action under any Environmental, Health and Safety Laws, in each case due to its toxic, hazardous, dangerous or deleterious properties or characteristics.

"Hearing" means the hearing to consider approval of the transactions contemplated hereby.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, and the rules and regulations promulgated thereunder.

"Improvements" means the buildings, structures, fixtures, systems, facilities, easements, rights-of-way, privileges, improvements, PP&E, licenses, hereditaments, appurtenances and all other rights and benefits appurtenant to the Owned Real Property or Leased Real Property.

"Indebtedness" means, at any time and with respect to any Person: (a) all indebtedness of such Person for borrowed money; (b) all indebtedness of such Person for the deferred purchase price of property or services (other than Trade Payables, other expense accruals and deferred compensation items arising in the Ordinary Course of Business); (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (e) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, to the extent required to be so recorded; (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities; (g) all Indebtedness of others referred to in clauses (a) through (f) above guaranteed directly or indirectly by such Person; and (h) all Indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Encumbrance upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Intellectual Property" means all intellectual property, including all Copyrights, Patents, Trademarks and Trade Secrets, owned, used or licensed by the Sellers and used or held for use in the Business or the Acquired Assets.

"Inventory" has the meaning set forth in Section 2.1(a).

9

"IRS" has the meaning set forth in Section 5.11(b).

"Knowledge" means, with respect to any matter in question, in the case of the Sellers, the actual knowledge of any of the individuals listed on Schedule 1.1(a) after due inquiry.

"Lease" has the meaning set forth in the definition of "Leased Real Property."

"Lease Assignments" means one or more assignment and assumption agreements to assign to Buyer any Leases that are to be assumed by Buyer pursuant to this Agreement, in customary form and reasonably acceptable to the Parties.

"Leased Real Property" means, specifically excluding any Excluded Asset (including the Pinnacle Business), the interests in the real property and real property let, leased or subleased by the Sellers, as tenant, subtenant, lessee or sublessee, or in which a Seller has been granted a possessory interest or right to use or occupy all or any portion of the same including as the same are evidenced by any and all mining leases, coal leases, coal mining leases, underground coal mining and gob gas leases, coal land leases, coal degasification leases, use agreements or other occupancy agreements and all short form leases, memoranda and amendments relating to the foregoing together with, in each case to the extent let, leased, used or occupied by the Sellers in connection with the Business or the Acquired Assets, any and all underground and surface coal reserves, mineral rights, oil and gas rights and interests, mining rights, surface rights, water rights, rights of way unrecouped minimum, advance or pre-paid production royalties, all buildings and other structures, facilities or Improvements located thereon, all fixtures, systems, Equipment and items of personal property of the Sellers attached or appurtenant thereto, and all easements, licenses, rights and appurtenances relating to the foregoing (and any present or future rights, title and interests arising from or related to the foregoing) (each such lease a "Lease," and collectively, the "Leases").

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, or multinational law (statutory, common or otherwise), constitution, treaty, convention, ordinance, equitable principle, code, rule, regulation or Order enacted, adopted, promulgated, issued or applied by any Governmental Authority or other similar authority, including for the avoidance of doubt MSHA, OSHA, and any Mining Law.

"Lessor Leases" has the meaning set forth in Section 5.4(b).

"Liability" means a Claim or Encumbrance of any kind or nature whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Material Adverse Effect" means any change, event, state of facts or occurrence that individually or in the aggregate (taking into account all other such changes, events, states of fact or occurrences) has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (a) the Acquired Assets or the assets, properties, prospects, financial condition or results of operations of the Business (excluding the Excluded Assets and the Excluded Liabilities), in each case taken as a whole or (b) the ability of the Sellers to consummate the transactions contemplated hereby or to perform any of their obligations under this Agreement, but excluding any change or effect to the extent that it results from or arises out of (i) any reasonably anticipated effects of the filing, commencement or prosecution of the Bankruptcy Cases; (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the transactions contemplated hereby; (iii) changes in Legal

10

Requirements or accounting regulations (including GAAP); (iv) any specific action required to be taken (or omitted) hereby or taken (or omitted) at the written request of Buyer; (v) general or technological changes in the industries in which the Sellers compete; (vi) any failure of the Business to achieve external or internal forecasts or financial projections; (vii) any breach of this Agreement by Buyer; (viii) any changes in financial or securities markets or any change or effect of economic or political conditions (including acts of terrorism, hostilities, sabotage, military actions or war, or any material worsening of such acts of terrorism, hostilities, sabotage, military actions or war); or (ix) acts of nature (including earthquakes, storms, severe weather, fires, floods and natural catastrophes) in each case of clauses (iii), (v) and (viii) to the extent that such conditions do not disproportionately affect the Sellers, taken as a whole, as compared to other companies that are principally engaged in the same Business as the Sellers.

"Material Contract" means any Contract pursuant to which (i) any Seller enters into a new, or a renewal of an existing, obligation or agreement having a term greater than or equal to one (1) year (as renewed, as applicable) or (ii) any Seller may be obligated to incur potential aggregate Liabilities greater than or equal to $100,000 per annum.

"Mining" has the meaning set forth in the definition of Mining Law.

"Mining Financial Assurances" has the meaning set forth in Section 5.20(a).

"Mining Law" means all Legal Requirements relating to the exploration, extraction, processing, storage and transportation of coal and non-coal minerals and to the Reclamation of lands used for such activities (collectively referred to as "Mining"), including (i) SMRCA and (ii) MSHA.

"Mining Permits" means all applicable Permits related to Mining or otherwise required by Mining Law.

"MSHA" means the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § § 801 et. seq., and state analogs.

"Multiemployer Plan" means a "multiemployer plan," within the meaning of Section 4001(a)(3) of ERISA.

"Neutral Accountant" shall mean a national independent accounting firm selected by the Sellers and reasonably acceptable to Buyer.

"Obligations" means all of the Sellers' respective obligations arising out of the DIP Documents and the First Lien Credit Documents for principal, interest, fees, costs, expenses, prepayment premium, indemnification obligations, charges and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the DIP Documents and the First Lien Credit Documents.

"Occupancy Agreements" has the meaning set forth in Section 5.4(d).

"Order" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority or an arbitrator, mediator or other judicially sanctioned Person or body.

11

Case 18-04177-TOM11    Doc 393    Filed 12/05/18    Entered 12/05/18 14:18:46    Desc
Main Document    Page 61 of 164

"Ordinary Course of Business" means, with respect to any Person, the ordinary and usual course of normal day-to-day operations of such Person and its business, consistent with its past practice.

"OSHA" means the Occupational Safety and Health Act and state analogs.

"Outside Date" has the meaning set forth in Section 11.1(b)(ii).

"Owned Real Property" means, specifically excluding any Excluded Asset (including the Pinnacle Business), all real property owned by any Seller, and all right, title and interest of such Seller therein, together with all of such Seller's right, title and interest in and to the following: (i) all buildings, structures, systems, hereditaments and Improvements located on such real property owned by such Seller, (ii) all Improvements, fixtures, systems, mine infrastructure, preparation plant structures and Improvements, loadout structures and Improvements, storage facilities, rail sidings, machinery, apparatus, equipment and items of personal property affixed to such real property owned by such Seller, (iii) all rights of way, easements, if any, in or upon such real property owned by such Seller, licenses and all rights-of-way, beneficial easements, licenses, and other rights, privileges and appurtenances belonging or in any way pertaining to such real property interests owned by such Seller (including the right, title and interest of such Seller in and to any Coal Reserves, mineral rights, underground and surface coal and mining rights, royalty rights, support rights and waivers, subsidence rights, water and water rights relating or appurtenant to such real property owned by such Seller), (iv) all strips and gores and any land lying in the bed of any public road, highway or other access way, open or proposed, adjoining such real property owned by such Seller, and (v) any leases out to third parties affecting such real property owned by such Seller, subject to any consents as may be required.

"Party" or "Parties" means, individually or collectively, as applicable, Buyer and the Sellers.

"Patents" means United States and foreign patents and patent applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosures related thereto.

"Payroll Escrow Account" means an escrow account established pursuant an escrow agreement in form and substance satisfactory to the Sellers and Buyer, which shall be funded at Closing by Buyer with a portion of the Cash Consideration equal to the Payroll Escrow Amount.

"Payroll Escrow Amount" means an amount negotiated between Buyer and the Sellers in accordance with Section 7.10 to fund (i) Accrued Payroll and payroll taxes related thereto, (ii) amounts due and owing under the key employee incentive program sought in the Seller's Motion for Entry of an Order (I) Approving the Debtors' (A) Key Employee Incentive Plan and (B) Key Employee Retention Plan and (II) Granting Related Relief, filed by the Sellers with the Bankruptcy Court on November 28, 2018 [Docket No. 354], and payroll taxes related thereto, to the extent such motion is approved by the Bankruptcy Court, and (iii) the fees and expenses associated with the administration of the Payroll Escrow Account.

"Permits" means any and all permits (including Environmental Permits and Mining Permits), licenses, approvals, consents, waivers, franchises, filings, accreditations, registrations, certifications, certificates of occupancy, easements, rights of way, notifications,

exemptions, clearances, and authorizations, together with all modifications, renewals, amendments, supplements and extensions thereof and applications therefor, of or from any Governmental Authority or issued or granted pursuant to any Legal Requirements, as amended, supplemented and modified through the Execution Date, that are necessary or required for the Sellers to own the Acquired Assets or operate the Business.

"Permitted Encumbrances" means Encumbrances specifically permitted by the Sale Order.

"Permitted Proceeds Amount" means an amount equal to the difference between (i) the sum of (a) the Cash Consideration plus (b) aggregate amount outstanding under the DIP Documents and the First Lien Credit Documents less (ii) the sum of (x) the Credit Bid and Release amount plus (y) $50,000.[2]

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group (as defined in Section 13(d)(3) of the Exchange Act,) or Governmental Authority.

"Petition Date" means October 14, 2018.

"Pinnacle Business" means the business and operations of the Sellers associated with the Pinnacle Mining Complex (as defined in the DIP Credit Agreement).

"Plan of Reorganization" means a chapter 11 plan of reorganization of the Sellers filed with the Bankruptcy Court that provides for the payment in full in cash of the Obligations (as defined in the Final DIP Order) or treatment that is otherwise acceptable to the Required Lenders, in each case in form and substance acceptable to the Required Lenders.

"Post-Closing Tax Period" has the meaning set forth in Section 8.1.

"Pre-Closing Tax Period" has the meaning set forth in Section 8.1.

"Pre-Paid Expenses" means any of the Sellers' rights with respect to all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, pre-paid expenses, prepayments, rights under warranties or guarantees, vendor rebates and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent) except that professional fee retainers and pre-paid deposits related thereto shall not be included in the definition of "Pre-Paid Expenses".

"Previously Omitted Contract" has the meaning set forth in Section 2.5(b)(i).

"Previously Omitted Contract Designation" has the meaning set forth in Section 2.5(b)(i).

"Previously Omitted Contract Notice" has the meaning set forth in Section 2.5(b)(ii).

---

[2] NTD: To equal portion of Cash Consideration allocated Avoidance Actions.

13

"Proceeding" means any Action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Professional" means any Person retained by the Sellers or a statutory committee of unsecured creditors in the Bankruptcy Cases pursuant to an Order of the Bankruptcy Court under Section 327, 363 or 1103 of the Bankruptcy Code.

"Purchase Price" has the meaning set forth in Section 3.1.

"Qualified Bid" has the meaning set forth in the Bidding Procedures.

"Real Property" and "Real Properties" means the Owned Real Property and the Leased Real Property.

"Reclamation" means reclamation, revegetation, recontouring, abatement, control, remediation, clean-up or prevention of adverse effects of mining activities.

"Release" means (a) any releasing, spilling, discharging, disposing, leaking, pumping, injecting, pouring, depositing, dispersing, emitting, leaching or migrating into the indoor or outdoor environment, including ambient air, surface water, groundwater and surface or subsurface strata, or into or out of any property, including the migration of Hazardous Substances through or in the air, soil, surface water, groundwater, surface or subsurface strata or property and (b) the abandonment or discarding of barrels, tanks, containers or receptacles, whether or not sealed or closed, containing Hazardous Substances.

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Required Lenders" has the meaning set forth in the DIP Credit Agreement.

["Sale Order" means an order of the Bankruptcy Court, in form reasonable satisfactory to Buyer and the Sellers, approving the consummation of the transactions contemplated hereby.][3]

"Sellers" has the meaning set forth in the introductory paragraph.

"SMCRA" means the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§1201 et seq.

"Straddle Period" has the meaning set forth in Section 8.1(b).

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

"Successful Bid" has the meaning set forth in the Bidding Procedures.

"Successful Bidder" has the meaning set forth in the Bidding Procedures.

---

[3] **NTD**: Subject to further discussion, all rights of Buyer and Sellers are reserved. Above reflects Seller's position; Buyer's position is: "means an order of the Bankruptcy Court, in form satisfactory to Buyer and the Sellers, approving the consummation of the transactions contemplated hereby, either (i) outside of a plan of reorganization pursuant to Section 363 of the Bankruptcy Code or (ii) pursuant to a plan of reorganization."

14

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, unclaimed property, escheat, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any liability for any items described in clause (i) payable by reason of contract, transferee liability or operation of law (including Treasury Regulation Section 1.1502-6) or otherwise.

"Tax Records" means all Tax Returns, schedules and work papers, and all material records and other documents relating to Tax matters.

"Tax Refund" means any Tax refund, credit or similar benefit (including any interest paid or credited with respect thereto).

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Taxing Authority" means any Governmental Authority having jurisdiction over the assessment, determination, collection or other imposition of any Taxes.

"Trade Payables" means accounts payable obligations of the Sellers incurred at any time, solely to the extent that such obligations relate to the Acquired Assets.

"Trade Secrets" means trade secrets and other confidential and proprietary information and know-how.

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names, Internet domain names and any other similar designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

"Transaction Documents" means this Agreement, the Assumption Agreement, the Bill of Sale, the Transition Services Agreement, Lease Assignments, the escrow agreement(s) contemplated by Section 4.2, and any other agreements, instruments or documents entered into at the Closing pursuant to this Agreement.

"Transfer Taxes" has the meaning set forth in Section 8.1(a).

"Transferred Permits" has the meaning set forth in Section 2.1(h).

"Transition Services Agreement" means a transition services agreement pursuant to which the parties shall provide certain services to one another after the Closing and otherwise on terms mutually acceptable to the Sellers and Buyer.

15

"Treasury Regulations" means the Treasury regulations promulgated under the Code.

"UMWA" means the United Mine Workers of America.

"UMWA Collective Bargaining Agreements" means all Collective Bargaining Agreements between the UMWA and any Seller.

"Unaudited Financial Statements" has the meaning set forth in Section 5.19.

"Union" and "Unions" have the meanings set forth in Section 5.10(a).

"Waiver" means a written waiver in form and substance acceptable to Buyer and the Sellers signed by Buyer at the Closing waiving on behalf of Buyer certain potential and existing Avoidance Actions and any other causes of action available to the Sellers or their estates as set forth in Sections 2.1(o) and 2.1(p) and other Persons as set forth therein.

"WARN Act" has the meaning set forth in Section 5.10(d).

"West Virginia Contract Mining Agreement" has the meaning set forth in Section 7.7(b)(iii).

"West Virginia Mining License" has the meaning set forth in Section 7.7(b)(i)(1).

"West Virginia Mining Permits" has the meaning set forth in Section 7.7(b)(ii)(1).

"Wind-Down Budget" means a budget for the reasonable activities and expenses to be incurred in winding down the Bankruptcy Cases, which budget, activities, and reasonable expenses shall be agreed to by the Sellers and Buyer, which shall be determined as set forth in Section 7.10.

"Wind-Down Escrow Account" means an escrow account established pursuant an escrow agreement in form and substance satisfactory to the Sellers and Buyer, which shall be funded at Closing by Buyer with a portion of the Cash Consideration equal to the Wind-Down Escrow Amount.

"Wind-Down Escrow Amount" means an amount negotiated between Buyer and the Sellers in accordance with Section 7.10 to fund (i) the payment of allowed priority and administrative expense claims, (ii) the costs to wind-down the Bankruptcy Cases in accordance with the Wind-Down Budget and (iii) the fees and expenses associated with the administration of the Wind-Down Escrow Account.

1.2    Other Definitions and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Contracts, Agreements and Orders. Any reference in this Agreement to any contract, license, agreement or order means such contract, license, agreement

16

or order as amended, supplemented or modified from time to time in accordance with the terms thereof.

(iii) <u>Day</u>. Any reference in this Agreement to "days" (but not Business Days) means to calendar days.

(iv) <u>Dollars</u>. Any reference in this Agreement to "$" means United States dollars.

(v) <u>Exhibits and Schedules</u>. All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

(vi) <u>Gender and Number</u>. Any reference in this Agreement to gender includes all genders, and any singular term shall be deemed to include the plural, and any plural term the singular.

(vii) <u>Headings</u>. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section," "Article" or "Schedule" are to the corresponding Section, Article or Schedule of this Agreement unless otherwise specified.

(viii) <u>Herein</u>. Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear.

(ix) <u>Including</u>. The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x) <u>Law</u>. Any reference to any law in this Agreement means such law as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time.

(xi) <u>Other</u>. The words "to the extent" shall be interpreted to mean "to the extent (but only to the extent)".

(xii) <u>Person</u>. Any reference to a Person shall include such Person's successors and permitted assigns.

(xiii) <u>Made Available</u>. Any reference in this Agreement to "made available" shall mean that such documents or information referenced shall have been provided in the Data Room prior to the Execution Date or shall have been provided to Buyer or its Representatives prior to the Execution Date.

(b) <u>No Strict Construction</u>. Buyer, on the one hand, and the Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and the Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limiting the foregoing, no rule of strict

Case 18-04177-TOM11    Doc 393    Filed 12/05/18    Entered 12/05/18 14:18:46    Desc
Main Document    Page 67 of 164

construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

# ARTICLE 2

## PURCHASE AND SALE

2.1     Purchase and Sale.

Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, the Sellers shall unconditionally sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer and/or a Buyer Designee, and Buyer shall purchase, acquire and accept from the Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances), all of the Sellers' direct or indirect right, title and interest in, to or under the following properties, rights, claims and assets (in each case, except for and to the extent related to the Excluded Assets or the Excluded Liabilities, as applicable) of every kind and description, wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased, licensed, used or held for use, in or relating to the Business, whether or not reflected on the books and records of the Sellers, as the same shall exist on the Closing Date (collectively, the "Acquired Assets"):

(a)     all inventory of any kind or nature, merchandise and goods, related to the Business or the Acquired Assets and maintained, held or stored by or for the Sellers on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same, including all coal inventory located upon or within the Sellers' Owned Real Property or Leased Real Property or belonging to the Sellers, disposables and consumables used, or held for use, in connection with the Business, including any goods in transit ("Inventory");

(b)     all Equipment used in the Business or located on the Real Property, including (i) any software installed on computers, to the extent such software licenses are assignable and (ii) those specific assets set forth on Schedule 2.1(b);

(c)     subject to Section 2.5, all Assumed Contracts, except to the extent primarily used in connection with the Excluded Assets;

(d)     all (i) Owned Real Property, (ii) Leased Real Property (and any agreement and rights related thereto or under the applicable Lease to the extent that such agreement or Lease is an Assumed Contract), (iii) the Lessor Leases (to the extent that a Lessor Lease is an Assumed Contract) and (iv) Occupancy Agreements (to the extent that an Occupancy Agreement is an Assumed Contract), in each case, together with all interests in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(e)     all Coal Reserves to the extent of the Sellers' interest in such Coal Reserves;

(f)     all rights to subside lands associated with mining operations and all rights to the waiver of and release from subsidence liability and indemnity rights under any and

18

all conveyances, representations and instruments or agreements of any kind and nature applicable to the Sellers' coal mining activities and interests;

(g)     except to the extent prohibited by law, any rights of the Sellers to the warranties and licenses received from manufacturers or Sellers of the Equipment, Improvements or any component thereof;

(h)     subject to Sections 2.5(c) and 7.7(c) and obtaining the consents set forth on Schedule 5.2, all Permits (including Environmental Permits and Mining Permits) held by the Sellers that relate to the Business or the Acquired Assets, to the extent assignable, including those designated as "Transferred Permits" on Schedule 2.1(h) (the "Transferred Permits"); provided, that Schedule 2.1(h) and the definition of "Transferred Permits" shall be deemed updated and amended to exclude, without further action by any Party, any Permit that relates to an Excluded Asset;

(i)     all rights of the Sellers to use haul roads, utility easements and other rights of way and easements used in the operation of the Business;

(j)     all Intellectual Property;

(k)     all Accounts Receivable;

(l)     all Pre-Paid Expenses;

(m)     all goodwill, customer and referral relationships, other intangible property and all privileges, relating to, arising from or associated with any of the Acquired Assets (including the Intellectual Property), the Assumed Liabilities and/or the Business, in each case arising after the Closing;

(n)     to the extent permitted by Legal Requirements and not subject to attorney-client privilege or other work product privilege, all Documents and other books and records (financial, accounting and other) except to the extent related to the Excluded Assets or the Excluded Liabilities, and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, that are used or useful in, held for use in or intended to be used in, or that arise in any way out of or are related to, the Acquired Assets, the Assumed Liabilities or the Business; provided, that the Sellers shall be permitted to keep copies of all of the foregoing to the extent necessary or required by the Bankruptcy Court or in connection with the Bankruptcy Cases, subject to Section 12.2;

(o)     to the extent listed on Schedule 2.1(o), all claims (other than Avoidance Actions which shall be addressed solely by Section 2.1(p)), interests, rights, rebates, abatements, remedies, recoveries and benefits of the Sellers, and all claims, demands, indemnification rights and causes of action, arising under or relating to any of the Acquired Assets (including Intellectual Property to the extent transferrable or assignable), the Assumed Liabilities or the Business, including those arising out of Assumed Contracts, express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors or others to the extent relating to the operation of the Business or affecting the Equipment, Inventory or other tangible Acquired Assets or ordered by the Sellers prior to the Closing Date (and in any case, any component thereof);

19

(p)     all Avoidance Actions with respect to counterparties to Assumed Contracts and Trade Payables assumed hereunder;

(q)     all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts (to the extent transferrable) and other bank deposits, instruments and investments of the Sellers, including any cash collateral used to secure surety bonds or other transactional assurances, excluding, for the avoidance of doubt, the Cash Consideration and prepaid deposits related to professional fee retainers (to which Buyer will have no claims against, except with respect to revision of amounts remaining in the Estate Retained Professional Fee Escrow Account as contemplated by Section 7.10); provided, however, that cash in an amount necessary and sufficient to cover checks in transit relating to items that were permitted to be paid, but have not been paid, pursuant to the Final DIP Order as of the Closing Date shall not be included;

(r)     all third party directors and officers liability, business interruption, property or casualty insurance proceeds, to the extent receivable by Buyer or the Sellers in respect of the Acquired Assets or the Assumed Liabilities after the Closing Date;

(s)     all rights, but not obligations, under non-disclosure or confidentiality, non-compete, or non-solicitation agreements (in each case, to the extent transferrable) or key employee retention plans or similar arrangements with (or for the benefit of) employees and agents of the Sellers or with third parties (including any such non-disclosure or confidentiality, non-compete, or non-solicitation agreements or any key employee retention plans or similar arrangements entered into in connection with or in contemplation of the auction contemplated by the Bidding Procedures (in each case, to the extent transferrable) to the extent relating to the Acquired Assets or the Business and included as an Assumed Contract);

(t)     all telephone, telex and telephone facsimile numbers and other directory listings;

(u)     all assets, if any, listed on Schedule 2.1(u) (regardless of whether such assets are covered by any of the foregoing);

(v)     all proceeds and products of any and all of the foregoing Acquired Assets;

(w)     all proceeds from the sale of any of the Excluded Assets other than Avoidance Actions up to an amount equal to the Permitted Proceeds Amount (all other proceeds will be an Excluded Asset);

(x)     any Tax Refunds of the Sellers with respect to Apportioned Taxes that are paid by Buyer in accordance with Section 8.1(b);

(y)     any insurance policies of the Sellers (to the extent transferrable and subject to the receipt of any requisite consents) relating to the Acquired Assets or the Assumed Liabilities solely to the extent Buyer has provided written notice to the Sellers prior to the Bid Deadline of its intention to acquire such insurance policies; and

(z)     the assets of the Sellers associated with the Pinnacle Business set forth on Schedule 2.1(z).

20

2.2     Excluded Assets.

Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer, and the Sellers shall retain all right, title and interest to, in and under, and all Liabilities with respect to, the Excluded Assets. For all purposes of and under this Agreement, the term "Excluded Assets" shall consist of all assets that are not Acquired Assets, including the following items, assets and properties (whether or not such assets are otherwise described in Section 2.1):

(a)     the assets, if any, listed on Schedule 2.2(a);

(b)     any and all Collective Bargaining Agreements;

(c)     (i) any Employee personnel files or records and (ii) any and all Benefit Plan, and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

(d)     any shares of capital stock or other equity interest in or issued by any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock of other equity interest in or issued by any Seller, and any shares of capital stock or other equity interest in or issued by any Subsidiary of any Seller (including, for the avoidance of doubt, any foreign Subsidiary) or other entity in which any Seller holds an equity interest, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Subsidiary of any Seller or other entity in which any Seller holds an equity interest, including the capital stock or equity interest set forth on Schedule 2.2(d);

(e)     subject to Section 2.1(n), the limited liability company, partnership and corporate books and records of internal limited liability company, partnership and corporate proceedings, minute books, organizational or governing documents, stock ledgers and other records of the Sellers as they pertain to ownership, organization, qualification to do business or existence of the Sellers; provided, however, that copies of the foregoing items shall be made available by the Sellers to Buyer;

(f)     Documents that the Sellers are required by Legal Requirements to retain;

(g)     any Contract that is not an Assumed Contract;

(h)     all rights under or arising out of insurance policies to the extent not set forth in Section 2.1(r);

(i)     any prepaid deposits related to Professional fee retainers;

(j)     the Cash Consideration;

(k)     any rights, claims or causes of action of the Sellers under this Agreement or any other Transaction Document;

(l)     any deposits, escrows, surety bonds or other financial assurances and any cash or cash equivalents securing any surety bonds or financial assurances, in each case, to the extent relating to the Excluded Assets or Excluded Liabilities and the amounts, deposits and other financial assurances described on Schedule 2.2(l);

21

(m)     cash in an amount necessary and sufficient to cover checks in transit relating to items that were permitted to be paid, but have not been paid, pursuant to the Final DIP Order as of the Closing Date;

(n)     all assets of the Sellers associated with the Pinnacle Business to the extent not set forth on Schedule 2.1(z);

(o)     all Tax Returns of, or filed by, the Sellers or their Affiliates for any Tax that is an Excluded Liability;

(p)     all (1) Avoidance Actions not described in Section 2.1(p) and (2) other causes of action belonging or available to any of the Sellers or their estates against any of the Sellers or other Persons set forth in the Waiver;

(q)     all proceeds received from the sale or liquidation of any Excluded Assets;

(r)     cash and cash equivalents not included as an Acquired Asset pursuant to Section 2.1(q);

(s)     any Tax Refund of the Sellers that is not described in Section 2.1(x); and

(t)     any intercompany receivables between one or more of the Sellers or their Subsidiaries.

2.3     Assumed Liabilities.

Subject to entry of the Sale Order, upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer and/or each relevant Buyer Designee shall, effective at the time of the Closing, assume and agree to discharge and perform when due, the Liabilities of the Sellers (and only those Liabilities of the Sellers) which are enumerated in this Section 2.3 (the "Assumed Liabilities"). Except to the extent that any of the following are specified in Section 2.4, the following Liabilities of the Sellers (and only the following Liabilities) shall constitute, without duplication, the Assumed Liabilities:

(a)     all Liabilities under the Assumed Contracts;

(b)     all Cure Costs;

(c)     outstanding Trade Payables related to the Acquired Assets incurred in the Ordinary Course of Business after the Petition Date and during the Bankruptcy Cases to the extent consistent with the Budget (as defined in the Final DIP Order);

(d)     Liabilities arising out of the ownership or operation of the Business or Acquired Assets for periods following the Closing Date, including with respect to: (i) workers' compensation liabilities or occupational health claims relating to any Buyer Employee arising out of an event that occurs after the Closing Date; (ii) any and all Black Lung Assumed Liabilities; and (iii) the Release of, or exposure of any Person to, any Hazardous Substances first occurring after the Closing Date;

(e)     Transfer Taxes;

(f)     all Taxes with respect to the Acquired Assets attributable to any Post-Closing Tax Period as defined in Section 8.1(b);

22

(g)     all Liabilities of the Sellers as a result of any action taken by the Sellers at Buyer's or its Affiliates' request pursuant to Sections 7.7(a)(iv), 7.7(a)(v) and 7.7(a)(vi) and Sections 7.7(b)(iii), 7.7(b)(iv) and 7.7(b)(v);

(h)     all Liabilities of the Sellers with respect to the Transferred Permits or otherwise arising out of or relating to the Transferred Permits, including: (i) all Liabilities for Reclamation and, if applicable, post-mining and post-Gas Well operation Liabilities; (ii) compliance with performance obligations or standards under the Transferred Permits and associated Legal Requirements; and (iii) obligations to replace and/or increase bonds or other financial assurance instruments associated with the Transferred Permits, excluding, in each of the preceding cases (i)-(iii), any civil or administrative fines or penalties or criminal sanctions imposed by any Governmental Authority for which Sellers or any of their Affiliates have received a written notice of violation or notice of claim (or other written notice of similar legal intent or meaning) on or prior to the Closing Date;

(i)     all Liabilities to the extent arising out of or relating to compliance with Environmental, Health and Safety Laws, Mining Law, MSHA, OSHA and any mine or Gas Well operating or safety compliance matters, related to the Acquired Assets or the acquired Gas Wells, but excluding any civil or administrative fines or penalties or criminal sanctions imposed by any Governmental Authority for which Sellers or any of their Affiliates have received a written notice of violation or notice of claim (or other written notice of similar legal intent or meaning) on or prior to the Closing Date;

(j)     regulatory violations and obligations on or in relation to the Transferred Permits first arising post-Closing (except, however, for any violations or obligations arising from any action or inaction taken by any Seller or an Affiliate of any Seller with respect to Transferred Permits that are not transferred as of the Closing Date);

(k)     if, and only to the extent, the Sellers are unable to sell the Excluded Assets utilized in the Pinnacle Business to a third party purchaser, Liabilities for Reclamation with respect to the existing Permits issued to the Sellers for the Pinnacle Business, to the extent that such Liabilities are not funded by the issuers of the Sellers' surety bonds; provided, however, that such unfunded Reclamation Liabilities may be satisfied through the performance of Reclamation by Buyer, the provision by Buyer of Reclamation services from a third party, and/or the payment by Buyer for Reclamation, as determined by Buyer in its sole and absolute discretion;

(l)     accrued but unpaid Liabilities of the Sellers with respect to Real Property Taxes assessed with respect to the Acquired Assets, solely to the extent necessary to transfer the Acquired Assets free and clear of any statutory senior priority lien on such Acquired Assets;

(m)     all Liabilities or other obligations with respect to the WARN Act arising, accruing, or as a result of actions taken following the Closing Date; and

(n)     subject to Section 8.1, all Liabilities with respect to Taxes imposed on the Business or the Acquired Assets that are attributable to any Post-Closing Tax Period.

The assumption by Buyer of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

Case 18-04177-TOM11    Doc 393    Filed 12/05/18    Entered 12/05/18 14:18:46    Desc
Main Document    Page 73 of 164

2.4     Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of, or Liability against, the Sellers, the Sellers' Subsidiaries, the Business or the Acquired Assets, of any kind or nature, whether absolute, accrued, contingent or otherwise, whether due or to become due and whether or not assets, and whether or not known or unknown or currently existing or hereafter arising or matured or unmatured, direct or indirect, and however arising, other than the Assumed Liabilities, and the Sellers shall be solely and exclusively liable with respect to all Liabilities of the Sellers, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include each of the following Liabilities of the Sellers and the Sellers' Subsidiaries other than the Assumed Liabilities:

(a)     (i) all Liabilities with respect to (x) any Taxes imposed on or with respect to the Business or the Acquired Assets that are attributable to any Pre-Closing Tax Period as determined pursuant to Section 8.1, or (y) any Taxes related to the Excluded Assets and (ii) all Liabilities for Taxes of any Seller or its stockholders or members, including any Liability of any Seller for the Taxes of any other Person under Section 1.1502-6 of the U.S. Treasury regulations (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise;

(b)     all Liabilities with respect to Actions and Proceedings pending before the Closing Date or to the extent against or giving rise to Liability against the Business or the Acquired Assets prior to the Closing Date, even if instituted after the Closing Date;

(c)     all Liabilities to any owner or former owner of capital stock or warrants, holder of Indebtedness for borrowed money, or current or former officer or director of any Seller or Subsidiary of any Seller;

(d)     all Liabilities with respect to any Excluded Asset, including (i) any Benefit Plan, (ii) Contracts that are not Assumed Contracts, (iii) any and all Collective Bargaining Agreements, and (iv) Liabilities or other obligations in respect of any compensation or benefit plans, agreements, policies, practices, programs and arrangements of any ERISA Affiliate, including any Benefit Plan;

(e)     all Liabilities under any futures contracts, options on futures, swap agreements or forward sale agreements;

(f)     drafts or checks outstanding at the Closing to the extent cash is retained by the Sellers pursuant to Section 2.2(r);

(g)     other than the Estate Retained Professional Fees Escrow Amount, any and all Liabilities for: (i) costs and expenses incurred or owed in connection with the administration of the Bankruptcy Cases (including all Estate Retained Professional Fee Claims); and (ii) all costs and expenses incurred in connection with the negotiation, execution and consummation of the transactions contemplated hereby;

(h)     except as set forth in Section 2.3(d), all workers' compensation claims and occupational health claims related to the Acquired Assets, including and with respect to Buyer Employees and former employees of the Sellers who worked or who were employed at the Acquired Assets;

24

(i)        any Liability or other obligations of the Sellers, any of their Subsidiaries or any ERISA Affiliate (or any predecessor of any of the foregoing) arising under, relating to or with respect to any multiple employer pension plan, single employer pension plan or Multiemployer Plan and any Liability or other obligations of any ERISA Affiliate arising under, relating to or with respect to any compensation or benefits agreement, arrangement, plan, policy, practice or program, including any Benefit Plan;

(j)        all Liabilities with respect to Employees, or former Employees, or both (or their representatives or beneficiaries, contractors or consultants of any Seller, and employees, contractors or consultants of any ERISA Affiliate, for any action or inaction of any Seller (or any predecessor of any Seller)) occurring prior to or on the Closing Date, including with respect to vacation, payroll, sick leave, unemployment benefits, retirement benefits, pension benefits, employee stock option, equity compensation, employee stock purchase, or profit sharing plans, health care and other welfare plans, policies, programs, agreements, arrangements, practices or benefits (including COBRA or the Coal Act), or any other employee plans, policies, programs, practices, agreements, arrangements or benefits or other compensation of any kind to any employee, including under any Benefit Plans of any Subsidiary or ERISA Affiliate, and Liabilities or other obligations of the Sellers and their predecessors pursuant to the WARN Act to the extent arising or accruing prior to or on the Closing Date;

(k)        except as set forth in Section 2.3(d), all Liabilities arising under the Black Lung Act and workers' compensation Liabilities related to the Acquired Assets, including and with respect to Buyer Employees and former employees of the Sellers who worked or who were employed at the Acquired Assets, including, but not limited to, any such Liabilities arising under the Black Lung Act and workers' compensation Liabilities of any Seller or any Seller's predecessors;

(l)        any and all Liabilities or other obligations to any current or former Employee, consultant or contractor or any spouse, dependent and/or any beneficiary thereof, relating to any Benefit Plan and any and all Liabilities or other obligations relating to any benefits or compensation agreement, arrangement, plan, policy, practice or program of any ERISA Affiliate, including any Benefit Plans;

(m)        any and all Liabilities or other obligations arising under any employment or consulting agreement, Collective Bargaining Agreement or arrangement, or severance, retention or termination agreement, plan, policy, practice, program or arrangement with any employee, consultant or contractor (or its representatives) of any Seller;

(n)        other Liabilities relating to the conduct of the Business or to the Acquired Assets (and the use thereof) arising or accruing at any time on or prior to the Closing; and

(o)        all Liabilities (other than Assumed Liabilities) accruing, arising out of, or relating to any federal, state or local investigations of, or Claims or actions against, any Seller or any Employee, agents, vendors or representatives of any Seller, to the extent arising out of actions taken prior to the Closing.

2.5     Assignment and Assumption of Contracts.

(a)

(i)     Schedule 2.5(a) sets forth a list of all executory Contracts (including all supply agreements, joint venture agreements, operating and joint operating agreements, participation agreements, exploration agreements (including minerals and coalbed gas exploration agreements), Leases and Lessor Leases and Occupancy Agreements) relating to the Business, the Acquired Assets or the Assumed Liabilities to which one or more of the Sellers are party (the "Available Contracts"), which Schedule 2.5(a) may be updated from time to time to add or remove any Contracts inadvertently included or excluded from such schedule. On or before January 28, 2019 (the "Determination Date"), Buyer shall designate in writing which Available Contracts from Schedule 2.5(a) Buyer wishes to "Assume" (the "Assumed Contracts"), which Assumed Contracts shall be deemed assumed and effective as of the Closing Date. All Contracts of the Sellers that are listed on Schedule 2.5(a) and which Buyer does not designate in writing for assumption shall not be considered an Assumed Contract or Acquired Asset and shall automatically be deemed "Excluded Contracts" and, for the avoidance of doubt, Buyer shall not be responsible for any related Cure Costs of any Excluded Contracts; provided, that if an Available Contract is subject to a cure dispute or other dispute as to the assumption or assignment of such Available Contract that has not been resolved to the mutual satisfaction of Buyer and the Sellers prior to the Determination Date, then the Determination Date shall be extended (but only with respect to such Available Contract) to no later than the earlier of (A) the date on which such dispute has been resolved to the mutual satisfaction of the Sellers and Buyer, (B) sixty (60) days after the Closing Date, (C) the date on which such Available Contract is deemed rejected by operation of 11 U.S.C. § 365(d)(4) and (D) the date required by the Bankruptcy Court and set forth in either the Bidding Procedures Order or the Sale Order (the "Extended Contract Period"). If such Available Contract is not expressly assumed by Buyer in writing by the end of such Extended Contract Period, such Available Contract shall be automatically deemed an Excluded Contract. Buyer shall be responsible for any obligations or Liabilities arising during any Extended Contract Period relating to any Available Contract that has not been assumed or rejected as of the termination date as provided in this Section 2.5(a)(i). For the avoidance of doubt, except as set forth in Section 2.3, and other than as provided in the preceding sentence, (x) Buyer shall not assume or otherwise have any Liability with respect to any Excluded Contract and (y) each Collective Bargaining Agreement to which any Seller is bound or party to shall be an Excluded Contract.

(ii)     In addition to the payment of Cure Costs by Buyer, each of the Sellers and Buyer, as applicable, shall use commercially reasonable efforts to assign, or cause to be assigned, the Assumed Contracts to Buyer, or to the applicable Buyer Designee, including taking all actions required by the Bankruptcy Court to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code. Buyer shall use commercially reasonable efforts to comply with all of the requirements of Section 365 of the Bankruptcy Code necessary to permit such assumption and assignment.

(iii)     At the Closing, (x) the Sellers shall, pursuant to the Sale Order and the Assumption Agreement, assign, or cause to be assigned, to Buyer or the applicable Buyer Designee (the consideration for which is included in the Purchase Price) each of the Assumed Contracts that is capable of being assigned and (y) Buyer shall pay promptly all Cure Costs (if

26

any) in connection with such assignment (as agreed to among Buyer and the Sellers or as determined by the Bankruptcy Court) and assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Sale Order and the Assumption Agreement.

(b)      Previously Omitted Contracts.

(i)      If prior to or following the Closing, it is discovered that a Contract should have been listed on Schedule 2.5(a) but was not listed on Schedule 2.5(a) and has not been rejected by the Sellers (any such Contract, a "Previously Omitted Contract"), the Sellers shall, promptly following the discovery thereof and on a coordinated basis, notify Buyer in writing of such Previously Omitted Contract and all estimates of Cure Costs (if any) for such Previously Omitted Contract. Buyer shall thereafter deliver written notice to the Sellers, no later than five (5) Business Days following notification of such Previously Omitted Contract from the Sellers, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "Previously Omitted Contract Designation"). A Previously Omitted Contract designated in accordance with this Section 2.5(b)(i) as "Rejected," or with respect to which Buyer fails to timely deliver a Previously Omitted Contract Designation, shall be an Excluded Contract.

(ii)      If Buyer designates a Previously Omitted Contract as "Assumed" in accordance with Section 2.5(b)(i), the Sellers shall serve a notice (the "Previously Omitted Contract Notice") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and the Sellers' intention to assign such Previously Omitted Contract in accordance with this Section 2.5. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with ten (10) Business Days to object, in writing to the Sellers and Buyer, to the Cure Costs or the assumption of its Contract. If the counterparties, the Sellers and Buyer are unable to reach a consensual resolution with respect to the objection, the Sellers shall seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption. If no objection is served on the Sellers and Buyer, the Sellers shall obtain an order of the Bankruptcy Court fixing the Cure Costs and approving the assumption of the Previously Omitted Contract. Buyer shall be responsible for all Cure Costs relating to such "Assumed" Previously Omitted Contracts and for any obligations or Liabilities relating to such "Assumed" Previously Omitted Contracts arising during the Extended Contract Period.

(c)      Non-Assignment of Contracts and Permits. Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Contract or any Permit, if, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would in any way materially adversely affect any rights of Buyer, as the assignee or transferee, or constitute a violation of a Legal Requirement or a breach of such Contract or Permit (as the case may be). If, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code and the commercially reasonable efforts of the Sellers, such consent or approval is required but not obtained with respect to an Assumed Contract or a Permit, neither the Sellers nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor (but subject to Buyer's termination right set forth in Section 11.1) shall the Closing be delayed in respect of the Assumed Contracts or the Permits; provided, however, if the Closing occurs, then, with respect to any Assumed Contract or Permit for which consent or approval is required but not obtained,

27

from and after the Closing, for a period of no more than four (4) months, the Sellers shall reasonably cooperate, without further consideration, with Buyer in any reasonable arrangement Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Assumed Contract or applicable Permit, including enforcement for the benefit of Buyer of any and all rights of the Sellers against any party to the applicable Assumed Contract or applicable Permit arising out of the breach or cancellation thereof by such party; provided, however, to the extent that any such arrangement has been made to provide Buyer with the benefits of, or under, the applicable Assumed Contract or applicable Permit, from and after the Closing, Buyer shall be responsible for, and shall promptly pay and perform all payment and other obligations under such Assumed Contract or Permit (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Assumed Contract or Permit had been assigned or transferred at the Closing with respect to Assumed Contracts and Permits, and at such applicable later date specified in this Section 2.5(c) with respect to any additional Assumed Contracts. Any assignment to Buyer of any Assumed Contract or Permit that shall, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained.

2.6     Further Assurances.

(a)     Except as otherwise provided herein and subject to the terms and conditions of this Agreement, the Bankruptcy Code and any orders of the Bankruptcy Court, from and after the Execution Date, the Sellers and Buyer shall use commercially reasonable efforts to take, or cause to be taken, all reasonable actions and to do, or cause to be done, all things necessary or desirable under applicable Legal Requirements to consummate the transactions contemplated hereby, including (i) preparing and filing as promptly as practicable with any Governmental Authority or other third party all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents and (ii) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other third party that are necessary, proper or advisable to consummate the transactions contemplated hereby, in each case, after giving effect to the Sale Order.

(b)     At and after the Closing, and without further consideration therefor, the Sellers shall execute and deliver to Buyer such further instruments and certificates as shall be necessary or desirable, and Buyer will reimburse the Sellers for any out-of-pocket expenses incurred by the Sellers in connection with actions taken by the Sellers (i) to vest, perfect or confirm ownership (of record or otherwise) in Buyer and/or one or more Buyer Designees, the Sellers' right, title or interest in, to or under any or all of the Acquired Assets and Business, including the Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances) or (ii) to otherwise effectuate the purposes and intent of this Agreement and the other Transaction Documents or for aiding, assisting, collecting and reducing to possession any of the Acquired Assets and exercising rights with respect thereto. From and after the Closing Date, Buyer will reimburse the Sellers for any out-of-pocket expenses incurred by the Sellers in connection with actions taken by the Sellers and each of the Parties shall take, or cause to be taken, and cooperate with the other Parties to take, or cause to be taken, all reasonable actions, do or cause to be done all things as may be reasonably requested by Buyer in order to vest,

28

perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer or one of more Buyer Designees or otherwise to carry out this Agreement, and shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances, and as may be required to consummate the transactions contemplated hereby, it being specifically understood and agreed that, notwithstanding anything to the contrary herein, no Seller shall have any obligation to (A) record or pay any recording fees and Taxes in connection with the foregoing (except to the extent Buyer agrees to reimburse the Sellers for any out-of-pocket expenses incurred by the Sellers in connection with such recordation or payment), or (B) pay any title insurance fee or premium in connection with any title insurance commitment or policy Buyer may obtain, in each case, including any related costs and expenses (except to the extent Buyer agrees to reimburse the Sellers for any out-of-pocket expenses incurred by the Sellers in connection with such commitment or policy).

## ARTICLE 3

### PURCHASE PRICE

3.1     Consideration.

The aggregate consideration (the "Purchase Price") for the purchase, sale, assignment and conveyance of the Sellers' right, title and interest in, to and under the Acquired Assets shall consist of:

(a)     the Cash Consideration; plus

(b)     the assumption by Buyer or a Buyer Designee, as applicable, of the Assumed Liabilities from the Sellers, including the assumption of the obligation to pay to the applicable counterparties of the applicable Assumed Contracts the Cure Costs payable by Buyer under Section 2.5; plus

(c)     the release of the Sellers that are borrowers or guarantors under the DIP Documents and the First Lien Credit Documents of all or a portion of the Obligations arising under, or otherwise relating to the DIP Documents and the First Lien Credit Documents, in an aggregate amount equal to $145,000,000 (the "Credit Bid and Release") under Section 363(k) of the Bankruptcy Code.

At the option of Buyer, the Sellers shall retain a designated amount of unrestricted cash that would otherwise be included in the Acquired Assets, and such cash so retained shall reduce, on a dollar for dollar basis, the cash amounts that would otherwise be required to be included in the Purchase Price pursuant to this Section 3.1.

3.2     Allocation of Purchase Price.

The sum of the Purchase Price and the amount of the Assumed Liabilities (to the extent properly taken into account under the Code) shall be allocated among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "Allocation"). The Allocation shall be delivered by Buyer to the Sellers within sixty (60) days after the Closing Date. The Sellers will have the right to raise reasonable objections to the Allocation within thirty (30) days after Buyer's delivery thereof, in which event

29

Buyer and the Sellers will negotiate in good faith to resolve such dispute. If Buyer and the Sellers cannot resolve such dispute within fifteen (15) days after the Sellers notify Buyer of such objections, such dispute with respect to the Allocation shall be resolved promptly by the Neutral Accountant, the costs of which shall be shared in equal amounts by Buyer, on the one hand, and the Sellers, on the other hand. The decision of the Neutral Accountant in respect of the Allocation shall be final and binding upon Buyer and the Sellers. Unless otherwise required by law, the IRS or any other taxing authority, the allocation of the Purchase Price pursuant to the Allocation shall be final and binding on the Parties, and the Parties shall follow the Allocation for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not take any position inconsistent therewith. If the IRS or any other taxation authority proposes a different allocation, the Sellers or Buyer, as the case may be, shall promptly notify the other party of such proposed allocation. The Sellers or Buyer, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this <u>Section 3.2</u>. Except as otherwise required by any Legal Requirement or pursuant to a "determination" under Section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by <u>Article 2</u> of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this <u>Section 3.2</u>; and (ii) neither Party (nor any of their Affiliates) will take any position inconsistent with this <u>Section 3.2</u> in any Tax Return, in any refund claim, in any litigation or otherwise. Notwithstanding the allocation of the Purchase Price set forth in the Allocation, nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any plan or reorganization or liquidation that may be proposed.

3.3     <u>Limitation on Buyer Liability</u>.

For the avoidance of doubt, except for amounts deposited at Closing pursuant to <u>Section 4.2</u> or as otherwise expressly provided in this Agreement, Buyer shall have no liability with respect to the Estate Retained Professional Fees Escrow Account, the Estate Retained Professional Fees Escrow Amount (and any other Estate Retained Professional Fee Claims), the Payroll Escrow Account and the Payroll Escrow Amount.

3.4     <u>Withholding</u>.

Buyer shall be entitled to deduct and withhold from the Purchase Price otherwise payable pursuant to this Agreement to the Sellers such amounts as Buyer is required to deduct and withhold under applicable Legal Requirements. To the extent that amounts are so deducted and withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to the Sellers.

**ARTICLE 4**

**CLOSING AND DELIVERIES**

4.1     <u>Closing Date</u>.

Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities (other than those pertaining to Previously Omitted Contracts pursuant to <u>Section 2.5(b)</u> and Assumed Contracts subject to a

30

cure dispute pursuant to Section 2.5(a)(i)) contemplated hereby (the "Closing") shall take place at the offices of Kirkland & Ellis LLP, 601 Lexington, Avenue, New York, NY 10022, no later than two (2) Business Days following the date on which all the conditions set forth in Article 9 and Article 10 have been satisfied or (if permissible) waived by the Party entitled to waive such condition (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or on such other date and time as the Sellers and Buyer may mutually agree in writing. The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date." Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of 12:01 a.m. (New York time) on the Closing Date.

    4.2    Buyer's Deliveries.

    Subject to satisfaction or (if permissible) waiver of the conditions set forth in Article 9 and Article 10, at the Closing, Buyer shall deliver (or cause one or more of its Affiliates or Buyer Designees to deliver) to the Sellers:

    (a)    the Bills of Sale, Lease Assignments, the Assumption Agreement and each other Transaction Document to which Buyer or a Buyer Designee is a party, duly executed by Buyer and/or Buyer Designees, as applicable;

    (b)    solely to the extent necessary at such time for Buyer and/or Buyer Designees to operate the Business in accordance with applicable Law following the Closing, the Alabama Contract Mining Agreement and/or the West Virginia Contract Mining Agreement, duly executed by Buyer and/or Buyer Designees, as applicable;

    (c)    the Transition Services Agreement, duly executed by Buyer and/or Buyer Designees, as applicable;

    (d)    the Waiver, duly executed by Buyer and/or Buyer Designees, as applicable;

    (e)    the certificates of Buyer to be received by the Sellers pursuant to Sections 10.1 and 10.2;

    (f)    a payoff letter, release letter or other similar document, duly executed by Buyer and the other applicable parties, regarding the Credit Bid and Release;

    (g)    evidence, in form and substance reasonably acceptable to the Sellers, of receipt of the Alabama Mining License and the West Virginia Mining License;

    (h)    the Cash Consideration in cash by wire transfer of immediately available funds as follows:

    (i)    the Estate Retained Professional Fees Escrow Amount to be funded into the Estate Retained Professional Fees Escrow Account;

    (ii)    the Payroll Escrow Amount to be funded into the Payroll Escrow Account;

    (iii)    the Wind-Down Escrow Amount to be funded into the Wind-Down Escrow Account; and

(iv)  the remainder of the Cash Consideration by wire transfer of immediately available funds to an account or accounts designated by the Sellers no later than three (3) Business Days prior to the Closing; and

(i)  such other documents as the Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated hereby.

4.3  Sellers' Deliveries.

At the Closing, the Sellers shall deliver to Buyer:

(a)  the Bills of Sale, Deeds, Lease Assignments and the Assumption Agreement, the Transition Services Agreement, and each other Transaction Document to which any Seller is a party, duly executed by the applicable Sellers; provided, that in the event one or more of the Deeds and/or motor vehicle titles is not delivered by the Sellers to Buyer on or before the Closing Date, the Sellers shall deliver such Deeds and/or motor vehicle titles to Buyer as promptly as reasonably practicable following the Closing Date; provided, further, that, for the avoidance of doubt, the failure of the Sellers to deliver any Deeds and/or motor vehicle titles to Buyer on or before the Closing Date shall not be deemed a failure to satisfy this delivery obligation;

(b)  solely to the extent necessary at such time for Buyer and/or Buyer Designees to operate the Business in accordance with applicable Law following the Closing and any Seller is a party, the Alabama Contract Mining Agreement and/or the West Virginia Contract Mining Agreement, duly executed by the applicable Sellers;

(c)  instruments of assignment of the Patents and Trademarks and other Intellectual Property that are owned by the Sellers and included in the Acquired Assets, if any, duly executed by the applicable the Sellers, in form for recordation with the appropriate Governmental Authorities, in customary form and reasonably acceptable to Buyer;

(d)  with respect to the Real Property included in the Acquired Assets, possession of such Real Property, together with copies (and originals in the Sellers' possession) of all instruments, Leases and agreements evidencing the Sellers' interest in the same, and any existing surveys, legal descriptions and title policies concerning such Real Property that are in the possession of the Sellers which shall be deemed to be delivered to the extent located at any of the Real Property;

(e)  a certified copy of the Sale Order;

(f)  the certificates of the Sellers to be received by Buyer pursuant to Sections 9.1 and 9.2;

(g)  certificates executed by each Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(h)  releases and termination statements sufficient for Buyer to receive the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances);

32

(i)     such other bills of sale, Deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all of the right, title and interest of the Sellers in, to or under any or all the Acquired Assets, including all Owned Real Property, subject only to Permitted Encumbrances and Assumed Liabilities;

(j)     such ordinary and customary documents (including any factually accurate affidavits) as may be required by any title company or title insurance underwriter to enable Buyer to acquire, at Buyer's sole election and Buyer's sole cost and expense, one or more owner policies of title insurance issued by such title company covering any or all of the Real Property included in the Acquired Assets in form and substance reasonably acceptable to Buyer; and

(k)     such other documents as Buyer may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated hereby.

4.4     Buyer Designees.

At least ten (10) days prior to the Hearing, Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 4.4, one or more Affiliates of Buyer to (i) purchase specified Acquired Assets; (ii) assume specified Assumed Liabilities; and/or (iii) employ Buyer Employees, in each case, as of the Closing Date (any Person that shall be properly designated by Buyer in accordance with this clause, a "Buyer Designee"); it being understood and agreed, however, that any such right of Buyer to designate a Buyer Designee is conditioned upon (x) such Buyer Designee being able to perform the applicable covenants under this Agreement and, as applicable, any other transaction agreement to which Buyer is party and demonstrate satisfaction of the requirements of Section 365 of the Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance with respect to the Acquired Assets and Assumed Liabilities, (y) any such designation not creating any Liability (including any Liability relating to Taxes other than Taxes for which Buyer is liable pursuant to Section 2.3(e)) for the Sellers or their Affiliates that would not have existed had Buyer purchased the Acquired Assets, assumed the Assumed Liabilities and/or employed Buyer Employees, and which Liability is not fully reimbursed by or on behalf of Buyer and (z) such designation not being reasonably expected to cause a delay, or prevent or hinder the consummation of the transactions contemplated hereby. As soon as reasonably practicable and in no event later than ten (10) days prior to the Hearing, Buyer shall make any such designations of Buyer Designees by way of a written notice to be delivered to the Sellers, and Buyer Designees shall deliver a signed counterpart to this Agreement or joinder agreement to this Agreement and each other Transaction Document to which Buyer is party. No such designation shall relieve Buyer of any of its obligations hereunder and any breach hereof by a Buyer Designee shall be deemed a breach by Buyer. Buyer and Buyer Designees shall be jointly and severally liable for any obligations of Buyer and such Buyer Designees hereunder. For the avoidance of doubt, and notwithstanding anything to the contrary herein, all Buyer Designees appointed in accordance with this Section 4.4 shall be included in the definition of "Buyer" for all purposes under this Agreement and all such Buyer Designees shall be deemed to have made all of the representations and warranties of Buyer set forth in this Agreement.

33

# ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers hereby jointly and severally represent and warrant to Buyer as follows, except as disclosed in the Disclosure Schedules:

5.1     <u>Organization and Good Standing</u>.

Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Subject to the applicable provisions of the Bankruptcy Code, each Seller has all requisite corporate or limited liability company power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted. The Sellers are duly qualified or licensed to do business and are in good standing in each jurisdiction where the character of their Business or the nature of their properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

5.2     <u>Authority; Validity; Consents</u>.

Each Seller has, subject to entry of the Sale Order, the requisite corporate or limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which such Seller is a party and to consummate the transactions contemplated hereby and thereby, and, subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and such other Transaction Documents by such Seller and the consummation by such Seller of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate or limited liability company action on the part of the Sellers. Subject to entry of the Sale Order, this Agreement has been duly and validly executed and delivered by each Seller and each other Transaction Document required to be executed and delivered by a Seller at the Closing will be duly and validly executed and delivered by such Seller at the Closing. Subject to entry of the Sale Order, this Agreement and the other Transaction Documents constitute, with respect to each Seller that is party thereto, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to entry of the Sale Order, and assuming the accuracy of the representations and warranties set forth in <u>Article 6</u>, except (a) as required to comply with the HSR Act and the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business, (b) for entry of the Sale Order, (c) for notices, filings and consents required in connection with the Bankruptcy Cases, including the requirements of the Bidding Procedures Order, and (d) for the notices, filings and consents set forth on <u>Schedule 5.2</u>, the Sellers are not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any Governmental Authority in connection with the execution and delivery of this Agreement and the other Transaction Documents to which a Seller is a Party or the consummation or performance of any of the transactions contemplated hereby and thereby.

Case 18-04177-TOM11     Doc 393     Filed 12/05/18     Entered 12/05/18 14:18:46     Desc
Main Document          Page 84 of 164

5.3    No Conflict.

Except as a result of the Bankruptcy Cases, neither the execution and delivery by any Seller of this Agreement or any other Transaction Document to which it is (or will be) a party nor after giving effect to the Sale Order and the Bidding Procedures Order, the consummation of the transactions contemplated hereby or thereby nor, after giving effect to the Sale Order and the Bidding Procedures Order, compliance by it with any of the provisions hereof or thereof will (a) conflict with or result in a violation of (i) any provision of the certificate of incorporation or bylaws (or other organizational or governing documents) of such Seller or (ii) any material Order binding upon such Seller or by which the Business or any Acquired Assets are subject or bound, (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under any license, Permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority, or (c) result in the creation of any Encumbrance (other than a Permitted Encumbrance) upon the properties or assets of such Seller being sold or transferred hereunder except, in the case of clauses (a) and (b), as would not, individually or in the aggregate, have a Material Adverse Effect.

5.4    Real Property.

(a)    Owned Real Property. Schedule 5.4(a) sets forth an accurate and complete list of the Owned Real Property. Except for Permitted Encumbrances and except as set forth on Schedule 5.4(a)(i), the Sellers have good and marketable title in the Owned Real Property set forth on Schedule 5.4(a). Except for the Lessor Leases, none of the Owned Real Property is subject to any lease or grant to any third-party of any right to the use, purchase, occupancy or enjoyment of such Owned Real Property or any material portion thereof required to conduct the Business. Except for Permitted Encumbrances and the applicable terms of Permits held by the Sellers and their Affiliates, the Owned Real Property is not subject to any Encumbrances (other than liens that will be removed pursuant to the Sale Order), which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business of the Sellers. There are no pending or, to the Sellers' Knowledge, threatened condemnation proceedings relating to any of the Owned Real Property except those which do not materially impair or restrict the current use of the Owned Real Property subject thereto. Other than as set forth on Schedule 5.4(a)(ii) hereto, there are no outstanding options or rights of first refusal to purchase any of the Owned Real Property or any interest therein.

(b)    Lessor Leases. Schedule 5.4(b) lists, as of the Execution Date, all material unexpired leases, subleases, licenses, sublicenses, occupancy or other agreements whereby any Seller leases, subleases, licenses or grants an interest in any Owned Real Property or Leased Real Property to a third party (the "Lessor Leases"). The Sellers have made available, to the extent that they are in the Sellers' possession or control, true, complete and correct copies of the Lessor Leases to Buyer, including any amendments thereto through the date hereof. Other than as set forth on Schedule 5.4(b) or as a result of the Bankruptcy Cases, the Sellers are not in material breach of or in default under the Lessor Leases and, to the Sellers' Knowledge, no party to any Lessor Lease has given the Sellers written notice of or, to the Sellers' Knowledge, made a claim with respect to any material breach or material default by the Sellers thereunder (other than as a result of the Bankruptcy Cases).

35

(c)     Leased Real Property. Schedule 5.4(c) contains a list of all Leased Real Property leased by the Sellers and used or held for use in the operation of the Business. The Sellers have made available, to the extent that they are in the Sellers' possession or control, true and complete copies of all Leases to Buyer. Other than as a result of the Bankruptcy Cases, the Sellers are not in breach of any material term or in "default" under any Lease and, to the Sellers' Knowledge, no party to any Lease has given the Sellers written notice of or made a claim with respect to any breach or default thereunder. To the Sellers' Knowledge, there are no conditions that currently exist or with the passage of time will result in a default or breach of any material term by any party to a Lease. To the Sellers' Knowledge, none of the Leased Real Property is subject to any sublease or grant to any Person of any right to the use, occupancy or enjoyment of the Leased Real Property or any portion thereof that would materially impair the use of the Leased Real Property in the operation of the Business. To the Sellers' Knowledge, the Leased Real Property is not subject to any Encumbrances (other than Permitted Encumbrances) that were placed on the Leased Real Property through the action or inaction of the Sellers and materially impact the Business' use of the Leased Real Property. To the Sellers' Knowledge, the Leased Real Property is not subject to any use restrictions, exceptions, reservations or limitations which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business. To the Sellers' Knowledge, there are no pending or threatened condemnation or other proceedings or claims relating to any of the Leased Real Property. To the Sellers' Knowledge, the Leases will continue to be legal, valid, binding, enforceable and in full force and effect on the same material terms immediately following the consummation of the transactions contemplated hereby. Schedule 5.4(c) designates the Permits relating to the Sellers' operations on the Leased Real Property set forth on such schedule.

(d)     Occupancy Agreements. Schedule 5.4(d) contains a list of easements, licenses, use agreements and other occupancy agreements, including agreements which relate to the production, sharing, sale, purchase, exchange or possession of coal, relating to real property and mineral interests granted by third parties to the Sellers that are used or expected to be used in the operation of the Business (the "Occupancy Agreements"). The Sellers have made available true and complete copies of all Occupancy Agreements to Buyer. To the Sellers' Knowledge, the Sellers are not in breach of or in default under the Occupancy Agreements and no party to any Occupancy Agreement has given the Sellers written notice of or made a claim with respect to any material breach or default thereunder, nor are the Sellers aware of any condition that currently exists or with the passage of time will result in a default or breach by any party to an Occupancy Agreement.

5.5     Environmental and Health and Safety Matters.

Except as set forth on Schedule 5.5:

(a)     The Sellers have at all times during the past three (3) years complied and are in compliance in all material respects with all applicable Environmental, Health and Safety Laws with respect to the Business and the Acquired Assets;

(b)     The Sellers have not received any written or, to the Sellers' Knowledge, oral notice or report regarding any actual or alleged material violation, non-compliance, liability or potential liability regarding Hazardous Substances or Environmental, Health and Safety Laws with regard to any of the Acquired Assets or the Business, or any prior

36

business for which the Sellers have retained liability under any Contract, in each case the subject matter of which remains unresolved;

(c)     The Real Properties do not contain, and, to the Sellers' Knowledge, have not previously contained, any Hazardous Substances in amounts or concentrations which (i) constitute a material violation of, or (ii) could reasonably be expected to give rise to material liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, under any applicable Environmental, Health and Safety Laws;

(d)     With respect to the Business and the Acquired Assets, no Seller or, to the Sellers' Knowledge, any other Person to the extent reasonably expected to give rise to material liability of any Seller, has treated, recycled, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or Released any Hazardous Substances, or owned or operated any property or facility contaminated by any Hazardous Substance, in a manner that has given or could reasonably be expected to give rise to material liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, under any applicable Environmental, Health and Safety Laws, excluding matters that have been fully resolved;

(e)     No Action is pending or, to the Sellers' Knowledge, threatened under any Environmental, Health and Safety Laws against the Sellers or with respect to the Real Properties or the Business, nor are there any Orders outstanding under any Environmental, Health and Safety Law with respect to the Acquired Assets or the Business;

(f)     The Sellers (i) hold all Environmental Permits (each of which is in full force and effect and is not subject to appeal, except as is being contested in good faith by the Sellers by appropriate proceedings diligently conducted) required for any of their current operations or for the current ownership, operation or use of the Acquired Assets, including all Environmental Permits required for the current coal mining-related operations of the Sellers or, to the extent currently required, any pending construction or expansion related thereto; (ii) are, and have for the last three (3) years been, in material compliance with all such Environmental Permits, except as is being contested in good faith by the Sellers by appropriate proceedings diligently conducted; and (iii) have not received any written notice that the Environmental Permits will not be renewed;

(g)     None of the Real Properties have any associated direct or indirect acid mine drainage which (i) to the Sellers' Knowledge constitutes a material violation of, or (ii) could reasonably be expected to give rise to material liability under, any applicable Environmental, Health and Safety Law;

(h)     With respect to the Business and the Acquired Assets, the Sellers have not contractually assumed any material liabilities, including any material obligation for corrective or remedial action, of any other Person relating to Environmental, Health and Safety Laws;

(i)     To the Sellers' Knowledge, none of the Acquired Assets contains underground storage tanks, above-ground storage tanks, transformers or other equipment containing PCBs, underground injection wells, septic tanks or waste disposal pits (to the extent such tanks or pits constitute Acquired Assets), in each case that has given or could reasonably be

37

expected to give rise to material liability under any applicable Environmental, Health and Safety Law; and

(j)     The Sellers have made available or provided Buyer with copies of all material environmental assessments, audits (including compliance audits), evaluations, studies, and tests in their possession relating to the Business, the Owned Real Property or the Leased Real Property.

### 5.6     Title to Acquired Assets.

The Sellers have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and upon entry of the Sale Order, the Sellers will thereby transfer to Buyer and Buyer will (subject to Section 2.5(c)) be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good, valid and marketable title to, or, in the case of property leased or licensed by the Sellers, a valid leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Encumbrances, except for (a) the Assumed Liabilities and (b) Permitted Encumbrances. No Acquired Asset is subject to any agreement, written or oral, for its sale or use by any Person other than the Sellers, other than as expressly contemplated under the Leases or the Lessor Leases.

### 5.7     Taxes.

(a)     The Sellers have each timely filed all income Tax and other material Tax Returns required to be filed with the appropriate Governmental Authorities (taking into account any extension of time to file granted to the Sellers). All such Tax Returns are correct and complete in all material respects and were prepared in substantial compliance with all applicable law, all material Taxes, including those relating to the Business and/or the Acquired Assets, that are due and payable, whether or not shown to be payable on such Tax Returns, have been or will be timely paid before the Closing, except for any unpaid Taxes which are specified in Section 8.1 to be paid at the Closing or expressly assumed by Buyer herein and paid after the Closing. No examination of any such Tax Return of the Sellers is currently in progress by any Taxing Authority and no Seller has received notice of any contemplated examination of any such Tax Return and no material adjustment has been proposed in writing with respect to any such Tax Returns for the last three (3) years by any Taxing Authority.

(b)     The Sellers have not received written notice of any material Tax deficiency outstanding, proposed or assessed against or allocable to the Sellers and have not executed any waiver of any statute of limitations in respect of Taxes nor agreed to any extension of time with respect to a Tax assessment or deficiency with respect to the Acquired Assets. There are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other actions for or relating to any Liability for Taxes. There is no dispute or claim concerning any Tax liability of the Sellers claimed or raised by any Taxing Authority in writing.

(c)     The Sellers are not in default under, nor to the Sellers' Knowledge does there exist any condition which, with the giving of notice or passage of time would constitute a default by the Sellers under, any agreement with any Governmental Authority that provides for or results in a reduction, rebate or exemption from Taxes or any other form of Tax incentive applicable to the Business, except for such defaults or conditions which would not, individually or in the aggregate, have a Material Adverse Effect.

38

(d)     Each Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party and all IRS Forms W-2 and Forms 1099 (or any other applicable form) required with respect thereto have been properly and timely distributed.

(e)     No Seller is a party to any Tax allocation or sharing agreement. No Seller (i) has been a member of an affiliated group filing a consolidated federal income Tax Return or (ii) has any liability for the Taxes of any Person (other than a Seller) under Treas. Reg. §1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract, or otherwise.

(f)     No Seller is or has been a party to any "listed transaction," as defined in Section 6707A(c)(2) of the Code and Treas. Reg. §1.6011-4(b)(2).

(g)     There are no Encumbrances (other than Permitted Encumbrances) on the Acquired Assets that arose in connection with any failure to pay any Tax.

(h)     No claim has been made in writing by any Governmental Authority in a jurisdiction where the Sellers do not file Tax Returns that the Sellers are or may be subject to taxation by that jurisdiction.

(i)     No power of attorney with respect to Taxes has been executed or filed with any Taxing Authority by or on behalf of any of the Sellers that will remain in effect after the Closing Date.

5.8     Legal Proceedings.

Except for the Bankruptcy Cases (and proceedings related thereto), there is no material Proceeding or Order pending, outstanding or, to the Sellers' Knowledge, threatened against or related to the Acquired Assets, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor, to the Sellers' Knowledge, are there any investigations relating to the Acquired Assets pending or, to the Sellers' Knowledge, threatened by or before any arbitrator or any Governmental Authority, which, if determined adversely, would be material to the Acquired Assets, taken as a whole.

5.9     Compliance with Legal Requirements; Permits.

(a)     Other than with respect to Permits required under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which Permits are addressed in Section 5.5, the Sellers hold all of the material Permits necessary for the current operation and conduct of the Business and the Acquired Assets in compliance with Legal Requirements, the absence of which would be immaterial to the operation of the Business or the Acquired Assets from and after the Closing.

(b)     Schedule 5.09(b) sets forth a true and complete list of (A) all Permits (including Environmental Permits and Mining Permits) held by the Sellers or any of their Affiliates in the operation of the Business and Acquired Assets in the State of Alabama, together with a description of the permitted property, facility or operation, together with a true and complete list of all pending applications for additional Permits, renewals of existing Permits, or amendments to existing Permits held by the Sellers, which have been submitted to any Governmental Authority or other entity by any Seller or any of its Subsidiaries applicable to the

39

operation of the Business and Acquired Assets in Alabama, and (B) the applicable surety bonds (or other financial assurances) and the amount of the surety bonds (or other financial assurances) under such Permits, in each case, as amended, supplemented and modified through the Execution Date.

(c)     Schedule 5.09(c) sets forth a true and complete list of (A) all Permits (including Environmental Permits and Mining Permits) held by the Sellers or any of their Affiliates in the operation of the Business and Acquired Assets in the State of West Virginia, together with a description of the permitted property, facility or operation, together with a true and complete list of all pending applications for additional Permits, renewals of existing Permits, or amendments to existing Permits held by the Sellers, which have been submitted to any Governmental Authority or other entity by any Seller or any of its Subsidiaries applicable to the operation of the Business and Acquired Assets in West Virginia, and (B) the applicable surety bonds (or other financial assurances) and the amount of the surety bonds (or other financial assurances) under such Permits, in each case, as amended, supplemented and modified through the Execution Date.

(d)     The Permits set forth on Schedule 2.1(h) are all of the Permits held by the Sellers necessary for the current operation and conduct of the Business and the Acquired Assets, the absence of which would be reasonably expected to adversely affect the operation of the Business or the Acquired Assets from and after the Closing. Other than with respect to Permits required under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which Permits are addressed in Section 5.5, all such Permits are final, unappealed, valid, in good standing and in full force and effect and no Seller is in default under or in violation of any such Permit, except where such default, or failure to be final, unappealed, valid, in good standing and in full force and effect would not reasonably be expected to be material to the Business.

(e)     Other than with respect to notices issued under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which matters are addressed in Section 5.5, the Sellers have conducted the Business for the past twelve (12) months and currently own and operate the Acquired Assets in accordance, in all material respects, with all Legal Requirements, Orders and Permits applicable to the Sellers and the Acquired Assets during such period, and the Business is in compliance in all material respects with all applicable Legal Requirements, Orders and Permits (including any anti-bribery Legal Requirements) and has obtained all approvals necessary for owning and operating its assets and has made all necessary filings with all Governmental Authorities having jurisdiction necessary for owning and operating the Acquired Assets, and there are no Orders outstanding under any Mining Law or MSHA with respect to the Real Properties or the Business.

(f)     Other than with respect to notices issued under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which matters are addressed in Section 5.5, neither the Sellers, nor to the Sellers' Knowledge, any of their Representatives have received, within the past twelve (12) months, any written notice or other communication from any Governmental Authority that alleges that the Business is not in compliance with any Legal Requirement, Order or Permit applicable to the Business or the operations or properties of the Business or the Acquired Assets or that threatens or states the intention on the part of any issuing authority to revoke, cancel, suspend or modify any Permit necessary for the current operation and conduct of the Business and the Acquired Assets (except

40

with respect to regular periodic expirations and renewals thereof). The Sellers are in material compliance with the Permits. No suspension, revocation or cancellation of any of the Permits is threatened or to the Knowledge of the Sellers contemplated, except with respect to regular periodic expirations and renewals thereof, which renewals no Seller or any Subsidiary of such Seller has reason to believe will not be granted.

(g)     Except as would not be material to the Business or the Acquired Assets or to the transfer of any Transferred Permit: (i) no Seller has had any Permits that are necessary for the operation and conduct of the Business and the Acquired Assets appealed, denied, revoked, restricted or suspended during the past twelve (12) months; (ii) no Seller is currently a party to any Proceeding involving the possible appeal, denial, revocation, restriction or suspension of any Permits that are necessary for the current operation and conduct of the Business and the Acquired Assets or any of the privileges granted thereunder (except where the obligation to hold such a Permit is being contested in good faith by appropriate proceedings diligently conducted or is excused by the Bankruptcy Court); and (iii) no Seller, nor any officer or director of any Seller, nor to the Sellers' Knowledge any other Person listed on or connected to a Permit is "permit blocked" on the Applicant Violator System established pursuant to the SMCRA (or any applicable state system) (the "Applicant Violator System") by any Governmental Authority.

5.10    Labor Matters.

(a)     None of the Sellers are party to or subject to any collective bargaining agreements, works council agreements, labor union contracts, trade union agreements, and other agreements (each a "Collective Bargaining Agreement") with any union, works council, or labor organization (each a "Union" and collectively "Unions").

(b)     (i) In the past three (3) years, no Union or group of Employees or former Employees has (A) to the Sellers' Knowledge, sought to organize any employees for purposes of collective bargaining, (B) made a demand for recognition or certification as an employee representative for purposes of collective bargaining, (C) sought to bargain collectively with any of the Sellers, or (D) filed a petition for recognition with any Governmental Authority; (ii) as of this date, no Collective Bargaining Agreement is being negotiated by any of the Sellers; and (iii) in the past three (3) years there have been no actual or, to Sellers' Knowledge, threatened strikes, lockouts, material slowdowns or work stoppages, boycotts, handbilling, picketing, walkouts, demonstrations, leafleting, sit-ins, sick-outs, or other forms of organized labor disruption with respect to any of the Sellers.

(c)     Schedule 5.10(c) sets forth a true, complete and accurate list of the name, title, employment status, leave status, union affiliation (if any), wage rate and place of employment of all Employees.

(d)     (i) Within the past three (3) years, the Sellers have not failed to provide advance notice of layoffs or terminations as required by the Worker Adjustment and Retraining Notification Act of 1988, and including any similar state or local Legal Requirement (the "WARN Act"), or any applicable Legal Requirements for employees outside the United States, regarding the termination or layoff of employees or have incurred any material liability or material obligation under such Legal Requirements; (ii) within the past three (3) years, the Sellers have been in material compliance with all applicable Legal Requirements relating to labor and employment, including but not limited to all Legal Requirements relating to

41

employment practices; the hiring, promotion, assignment, and termination of employees; discrimination; sexual harassment; equal employment opportunities; disability; labor relations; wages and hours; FLSA, classification of independent contractors, hours of work; payment of wages; immigration; workers' compensation; employee benefits; background and credit checks, working conditions; occupational safety and health; family and medical leave; data privacy and data protection; or employee terminations; (iii) except pursuant to procedures established in connection with the Bankruptcy Cases, there are no pending or, to the Sellers' Knowledge, threatened, lawsuits, grievances, unfair labor practice charges, arbitrations, charges, investigations, hearings, actions, claims, or proceedings (including any administrative investigations, charges, claims, actions, or proceedings), against the Sellers brought by or on behalf of any applicant for employment, any current or former Employee, representative, agents, consultant, independent contractor, subcontractor, or leased employee, volunteer, or "temp" of the Sellers, or any group or class of the foregoing, any Governmental Authority, any person alleging to be a current or former Employee, or any group or class of the foregoing, alleging violation of any labor or employment Legal Requirements, breach of any Collective Bargaining Agreement, breach of any express or implied contract of employment, wrongful termination of employment, or any other discriminatory, wrongful, or tortious conduct in connection with the employment relationship; (iv) to Sellers' Knowledge, no Employee of any Seller has in the past three (3) years been or is being investigated in connection with any misconduct, nor subject to any disciplinary action in connection with such misconduct, that could reasonably be expected to cause any material damage to the reputation or business of the Sellers or the Employees; (v) to the Sellers' Knowledge, no employee of any Seller has in the past three (3) years engaged in any conduct or cover-up of such conduct, or aided or assisted any other person or entity to engage in any conduct that could cause or has caused any material damage to the reputation or business of the Sellers or its Employees, including but not limited to any conduct constituting sexual misconduct, harassment (including sexual harassment), or discrimination; and (vi) each of the Employees has all work permits, immigration permits, visas, or other authorizations required by Legal Requirements for such Employee given the duties and nature of such employee's employment.

  5.11 <u>Employee Benefits</u>.

    (a) <u>Schedule 5.11(a)</u> sets forth a true and complete list of each material Benefit Plan. For purposes of this Agreement, "<u>Benefit Plan</u>" shall mean any "employee benefit plan" within the meaning of Section 3(3) of ERISA (including any Multiemployer Plan) and any plan, program, policy, practice, arrangement, Contract or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, compensation, benefit, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change in control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller(s) is the owner, the beneficiary, or both), Section 125 of the Code "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, policy, practice, arrangement, Contract or agreement, whether written or oral, including any other employee benefit plan, agreement, program, policy, arrangement, Contract or practice, including any payroll practice, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated hereby or

otherwise), in each case, (x) under which any current or former officer, director, employee, leased employee or consultant (or any of their respective beneficiaries) of any of the Sellers or any of their Subsidiaries has any present or future right to benefits, (y) which any of the Sellers or any of their Subsidiaries is a party to or any of the Sellers or any of their Subsidiaries sponsors, maintains, contributes to, or has any obligation to sponsor, maintain or contribute to, or (z) pursuant to, under or with respect to which any of the Sellers or any of their Subsidiaries has or has any direct or indirect Liability, whether contingent or otherwise, including by reason of their affiliation with any ERISA Affiliate.

(b)      (i) Each Benefit Plan has been established, operated and administered in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other Legal Requirements; (ii) with respect to each Benefit Plan, all reports, returns, notices and other documentation that are required to have been filed with or furnished to the Internal Revenue Service (the "IRS"), the United States Department of Labor or any other Governmental Authority, or to the participants or beneficiaries of such Benefit Plan have been filed or furnished on a timely basis in all material respects; and (iii) each Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Code is so qualified and has received a favorable determination letter from the IRS or may rely on a favorable opinion letter issued by the IRS.

5.12    Sellers' Intellectual Property.

(a)      Schedule 5.12(a) sets forth a true and complete list of all U.S. and foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; and (iii) registered Copyrights and pending applications for Copyrights, in each case which are owned by a Seller as of the Execution Date and which are material to the Acquired Assets. Except as set forth on Schedule 5.12(a), the Sellers are the sole owners of all of the applications and registrations set forth on Schedule 5.12(a), and all such applications and registrations are in effect and subsisting.

(b)      Except as disclosed on Schedule 5.12(b), and except as would not, individually or in the aggregate, have a Material Adverse Effect, to the Sellers' Knowledge, (i) the conduct of the Business by the Sellers as currently conducted (including the products and services currently sold or provided by the Sellers) does not infringe or otherwise violate any Person's intellectual property rights, and no such claims are pending or threatened in writing against the Sellers, and (ii) no Person is infringing or otherwise violating any Intellectual Property owned by the Sellers, and no such claims are pending or threatened in writing against any Person by the Sellers.

(c)      To the Sellers' Knowledge, the Acquired Assets and any rights provided to Buyer pursuant to the Transaction Documents include all material third party intellectual property rights licensed to the Sellers that are required to conduct the Business in a substantially similar manner as it is presently being conducted by the Sellers, except such intellectual property rights as exist under the Excluded Contracts.

5.13    Contracts.

Schedule 5.13 sets forth a complete list, as of the date hereof, of all Material Contracts relating to the Business (including Leases, Lessor Leases and Occupancy Agreements) to which any Seller is a party and the Cure Costs with respect thereto. Except as set forth on

43

Schedule 5.13, no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract. Each Contract is in full force and effect and is a valid and binding obligation of each Seller party thereto in accordance with its terms and conditions, in each case except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, (y) as set forth on Schedule 5.13 and (z) as would not, individually or in the aggregate, have a Material Adverse Effect. Except as arising as a consequence of the Bankruptcy Cases, upon entry of the Sale Order and payment of the Cure Costs, (i) no Seller will be in breach or default of its obligations under any Assumed Contract, (ii) no condition exists that with notice or lapse of time or both would constitute a default by any Seller under any Assumed Contract and (iii) to the Sellers' Knowledge, no other party to any Assumed Contract is in breach or default thereunder, except in the case of clauses (i), (ii) and (iii) for any breaches or defaults that would not, individually or in the aggregate, have a Material Adverse Effect. The Cure Cost amounts calculated by the Sellers and specified in the Cure Notices submitted by the Sellers with respect to each of the Assumed Contracts and each Contract listed or described on Schedule 5.13 to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order are, to the Sellers' Knowledge, true and correct.

5.14    Insurance.

Schedule 5.14 sets forth a true and complete list of all insurance policies held by the Sellers covering the property, assets, Employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage, but excluding any policies relating to any Benefit Plan that are set forth on Schedule 5.11(a)). Such policies are in full force and effect (subject to periodic renewals thereof). Except as set forth on Schedule 5.14, the Sellers have paid all premiums on such policies due and payable prior to the Execution Date, or, if not yet due, have properly accrued for such payables. Since the Petition Date, to the Sellers' Knowledge, the Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.

5.15    Brokers or Finders.

The Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

5.16    Affiliate Interests.

Other than travel advances entered into in the Ordinary Course of Business of the Sellers, all Contracts between any Seller and any Affiliate of any Seller (but not including another Seller) are listed on Schedule 5.16. Other than employment arrangements, compensation benefits and travel advances entered into in the Ordinary Course of Business of the Sellers, to the Sellers' Knowledge, no such Affiliate of any Seller has any direct or indirect interest in, or controls or is a director, officer, employee or partner of, or consultant to, or lender to or borrower from or has the right to participate in the profits of, (i) any Person which does business with any Seller or is competitive with the Business in any material respect, or (ii) any material property,

44

asset or right which is used by any Seller. All Indebtedness of any such Affiliate to any Seller, and all Indebtedness of any Seller to any such Affiliate of any Seller, is listed on Schedule 5.16.

5.17    Bank Accounts.

Schedule 5.17 sets forth a complete list of all bank accounts (including any deposit accounts, securities accounts and any sub-accounts) of the Sellers related to the Business.

5.18    Undue Influence.

In connection with the operation of the Business, no Seller or, to the Sellers' Knowledge, any director, officer, agent, employee or Affiliate of the Sellers, has taken any action, directly or indirectly, with respect to the Business that would result in a violation of the Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder (the "FCPA"). The Sellers, and, to the Sellers' Knowledge, their Affiliates, have conducted the Business in compliance with the FCPA in all material respects and maintain procedures which are reasonably expected to ensure compliance therewith.

5.19    Financial Statements.

The Sellers have made available to Buyer the unaudited consolidated balance sheet and cash flow statement of the Company and its Subsidiaries as of September 30, 2018, and the related unaudited consolidated statement of comprehensive income for the 9-months ended September 30, 2018 (the "Unaudited Financial Statements"). The Unaudited Financial Statements have been prepared in accordance with GAAP consistently applied in accordance with the Sellers' past practice except for the absence of footnotes and customary year-end adjustments. The Unaudited Financial Statements (i) are true, correct and complete in all material respects, (ii) are in accordance in all material respects with the books and records of the Sellers, and (iii) fairly present in all material respects the financial position of the Sellers at the dates specified and the results of their operations for the period covered. The copies of the Unaudited Financial Statements delivered to Buyer are true, correct and complete copies.

5.20    Absence of Certain Changes.

(a)    Since January 1, 2018, there has not been a Material Adverse Effect.

(b)    Except as set forth on Schedule 5.20(b), or as expressly contemplated hereby or the Final DIP Order or any other orders entered in the Bankruptcy Cases from and after the Petition Date through the date hereof, the Sellers have not:

(i)    except for executory contracts and unexpired leases rejected by the Sellers with the prior written consent of Buyer, terminated, modified or amended any Available Contract that is a Material Contract other than due to the expiration of the term or automatic renewals, in each case, in accordance with the terms of any such Available Contract that is a Material Contract;

(ii)    (A) purchased or otherwise acquired any material properties or assets (tangible or intangible) or sold, leased, transferred or otherwise disposed of any material Acquired Assets, except for purchases of materials and sales of coal, coke and surplus equipment Inventory in the Ordinary Course of Business, (B) permitted, allowed or suffered any of the

45

Acquired Assets to be subjected to any Encumbrance (other than Permitted Encumbrances), or (C) removed any (non-surplus) Equipment or other material assets (other than Inventory) from the Real Property other than in the Ordinary Course of Business; provided, that any such action with respect to any asset previously identified in the Disclosure Statement as an asset held for sale shall be considered Ordinary Course of Business;

(iii)     suffered any material damage or destruction to or loss of any material assets or properties whether or not covered by insurance;

(iv)     hired any Employees having base or guaranteed compensation in excess of $200,000 annually or terminated any such Employee (other than for "cause");

(v)     (A) increased the annual rate of base salary or any target bonus opportunity of any Employee whose annual rate of base salary prior to such increase was in excess of $200,000; (B) paid any bonus, benefit, or other direct or indirect incentive compensation (other than any such payments authorized pursuant to any first or second day orders in the Bankruptcy Case); (C) awarded any equity or equity-based compensation awards (whether phantom or equity) with respect to the equity of the Company or its Affiliates; (D) modified, amended or terminated any Benefit Plan; (E) entered into or modified any employment, compensation, severance, non-competition, or similar contract (or amended any such contract) to which any Seller is a party; or (F) adopted any new severance pay, termination pay, deferred compensation, bonus, or other employee benefit plan, agreement, program, practice, arrangement or policy with respect to Employees that would be a Benefit Plan if it existed on the Execution Date (including any employment agreement, severance agreement, change in control agreement, or transaction or retention bonus agreements), except, in the case of each of clauses (A) through (F), (i) to the extent permitted by any order of the Bankruptcy Court or as required by applicable Legal Requirements (including to avoid the imposition of Taxes or to conform to the requirements of Tax qualification); (ii) pursuant to the terms of any Benefit Plan, as in effect on the date hereof; or (iii) for immaterial changes to Benefit Plans available to all employees generally (other than changes that materially increase the amount, or accelerate the timing, of the payment of benefits);

(vi)     changed in any material respect the Sellers' accounting methods, principles or practices other than required by changes in GAAP;

(vii)     allowed any material Permit held by any Seller to terminate, expire or lapse;

(viii)     except to the extent consistent with the Budget, incurred any Indebtedness or paid, discharged or satisfied any claims, liabilities or obligations, other than the payment, discharge or satisfaction in the Ordinary Course of Business of Liabilities incurred in the Ordinary Course of Business; or

(ix)     agreed or committed in writing to do any of the foregoing.

5.21     Mining.

(a)     The Sellers have, in the amounts and forms required pursuant to applicable Mining Laws and MSHA, obtained all performance bonds and surety bonds, or otherwise provided any financial assurance as (i) required under the applicable Mining Permits or Mining Laws and MSHA for Reclamation of land, water or other natural resources at any

46

current mines, (ii) required pursuant to any applicable Mining Permit or Mining Laws and MSHA to mitigate any actual or potential environmental impact of such mines, or (iii) otherwise obtained in the Ordinary Course of Business of the Sellers (collectively, "Mining Financial Assurances"), except for such Mining Financial Assurances that do not exceed $1,000,000 in the aggregate. Schedule 5.21(a) sets forth a list of all such Mining Financial Assurances maintained by the Sellers.  The Sellers have posted or otherwise provided all Mining Financial Assurances that have been requested in writing by the applicable Governmental Authorities in respect of any applicable Permits and Legal Requirements having to do with Reclamation in connection with the Sellers' mining operations as currently conducted, subject to the discretion of any applicable Governmental Authority to require additional or supplemental Mining Financial Assurances from time to time

(b)      To the Sellers' Knowledge, all Reclamation performed by or on behalf of any Seller has been performed in a manner in compliance in all material respects with all Legal Requirements and meets in all material respects the requirements of the applicable Mining Permit and any associated mine Reclamation requirements of any applicable Governmental Authority. The liability for mine closing and Reclamation obligations recorded on the most recent balance sheet of the Sellers provided to Buyer has been properly accrued in accordance with the requirements of Financial Accounting Standards Board Codification Topic 410, Asset Retirement and Environmental Obligations, formerly known as Financial Accounting Standard No. 143 ("FASB 410"), and the amount of such liability is equal to or in excess of the amount of such obligations, determined on the basis of the Sellers' actual historic Reclamation and closure costs and currently planned mine life and escalated for inflation, in accordance with FASB 410 and applicable Legal Requirements.  All Mining Financial Assurances have been approved as adequate by the required Governmental Authority to complete Reclamation in accordance with all applicable Permits and Legal Requirements.

5.22    MSHA; OSHA.

For the past eighteen (18) months, except for fully paid, discharged and settled citations and notices of violation by MSHA or other Governmental Authority, the Sellers, with respect to the Business and Acquired Assets, have conducted their respective business and operations, and their respective assets have been maintained, in compliance in all material respects with MSHA or OSHA, as applicable. There are no investigations pending or, to the Sellers' Knowledge, threatened by any Governmental Authority or other third Person that would result in the imposition of any material Liability on any Seller pursuant to MSHA or OSHA. The Sellers do not owe any material assessments, penalties, fines, liens, charges, surcharges, nor are there any other material amounts due or owing pursuant to MSHA or OSHA, and there have been no imminent danger orders, unwarrantable failure orders, failure to abate orders, or cessation orders, notices of a pattern of violations, or material assessments, under MSHA or OSHA during the previous eighteen (18) months with respect to the Business. Schedule 5.22 sets forth all reports of any MSHA or OSHA audits with respect to the Business performed within the previous eighteen (18) months by any Person (including the Seller).

5.23    Coal Act; Black Lung Act.

(a)      The Sellers, with respect to the Business and Acquired Assets, and their "related persons" (as defined in the Coal Act) are in compliance in all material respects with

47

the Coal Act and any regulations promulgated thereunder except which compliance is being contested in good faith by appropriate proceedings diligently conducted or excused by the Bankruptcy Court or the Bankruptcy Code, and none of the Sellers or their "related persons" (as defined in the Coal Act) has any Liability under the Coal Act, except as disclosed in the Unaudited Financial Statements or which would not, individually or in the aggregate, have a Material Adverse Effect, or with respect to premiums or other material payments required thereunder which have been paid when due, or which Liability is being contested in good faith by appropriate proceedings diligently conducted or the current payment of which is excused by the Bankruptcy Court or the Bankruptcy Code.

(b)  The Sellers are in compliance in all material respects with the Black Lung Act except which compliance is being contested in good faith by appropriate proceedings diligently conducted or excused by the Bankruptcy Court or the Bankruptcy Code, and the Sellers have not incurred any Black Lung Liability or assumed any other Black Lung Liability, except as disclosed in the Unaudited Financial Statements or which would not, individually or in the aggregate, have a Material Adverse Effect, or with respect to premiums, contributions or other material payments required thereunder which have been paid when due or which Black Lung Liability is being contested in good faith by appropriate proceedings diligently conducted or the current payment of which is excused by the Bankruptcy Court.

5.24    <u>Warranties Exclusive</u>.

EXCEPT AS EXPRESSLY SET FORTH IN THIS <u>ARTICLE 5</u> (AS MODIFIED BY THE DISCLOSURE SCHEDULES) OR IN THE BILL OF SALE AND THE ASSUMPTION AGREEMENT, THE SELLERS MAKE NO REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THEIR ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR THE BUSINESS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. NEITHER THE SELLERS NOR ANY OTHER PERSON, DIRECTLY OR INDIRECTLY, HAS MADE OR IS MAKING, ANY REPRESENTATION OR WARRANTY, WHETHER WRITTEN OR ORAL, REGARDING THE PRO-FORMA FINANCIAL INFORMATION, FINANCIAL PROJECTIONS OR OTHER FORWARD-LOOKING STATEMENTS OF THE SELLERS.

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Sellers as follows:

6.1    <u>Organization and Good Standing</u>.

Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

48

6.2     Authority; Validity; Consents.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the other Transaction Documents by Buyer and the consummation by Buyer of the transactions contemplated herein and therein have been duly and validly authorized by all requisite limited liability company or corporate actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Except as required to comply with the HSR Act or as set forth on Schedule 6.2, Buyer is not or will be required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, registrations, declarations or filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, materially affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.3     No Conflict.

Neither the execution and delivery by Buyer of this Agreement or the Transaction Documents to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof (a) conflict with or result in a violation of (i) any provision of the organizational documents of Buyer or (ii) any judgment, order, writ, injunction, decree, statute, law, ordinance, rule or regulation in any material respect binding upon Buyer or (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under, (A) any note, bond, mortgage, indenture, deed of trust, contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect and that, in each case, is material to the business of Buyer, or (B) any material license, permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority.

6.4     Brokers or Finders.

Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated hereby for which any Seller (or any affiliate of any Seller) is or will become liable, and Buyer shall hold harmless and indemnify the Sellers and their Affiliates from any claims with respect to any such fees or commissions.

49

6.5     Legal Proceedings.

There is no Proceeding or Order pending against, or to Buyer's Knowledge, threatened against or affecting, Buyer before any arbitrator or any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated hereby and the other Transaction Documents or which would or would reasonably be expected to impair Buyer's ability to consummate the transactions contemplated hereby and the other Transaction Documents.

6.6     Qualification.

(a)     To Buyer's Knowledge, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and/or its Affiliates not to qualify as a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)     As of the Closing, Buyer and/or each relevant Buyer Designee, as applicable, will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts.

(c)     As of the Closing, Buyer and/or each relevant Buyer Designee, as applicable, (i) will be eligible to take transfer of, or obtain a replacement for, the Transferred Permits (ii) will not be listed or "permit blocked" on the Applicant Violator System and/or (iii) will not have been denied any application for any Mining Permit or other Governmental Authorization, other than any denial for violations that may reasonably be expected to be cured by the time of such transfer or obtaining of Permits as contemplated by Section 7.7.

6.7     No Other Representations or Warranties; Condition of the Business; Buyer's Reliance.

Buyer acknowledges that neither the Sellers nor any other Person is making, and Buyer is not relying on, any representations or warranties whatsoever, statutory, expressed or implied, written or oral, at law or in equity, beyond those expressly made by the Sellers in Article 5 hereof (as modified by the Disclosure Schedules). Buyer acknowledges that, except as expressly set forth in this Article 6 (as modified by the Disclosure Schedules), neither the Sellers nor any other Person has, directly or indirectly, made any representation or warranty, statutory, expressed or implied, written or oral, at law or in equity, as to the accuracy or completeness of any information that the Sellers furnished or made available to Buyer and its Representatives in respect of the Business, and the Sellers' operations, assets, stock, Liabilities, condition (financial or otherwise) or prospects. Buyer acknowledges that neither the Sellers nor any other Person, directly or indirectly, has made, and Buyer has not relied on, any representation or warranty, whether written or oral, regarding the pro-forma financial information, financial projections or other forward-looking statements of the Sellers, and Buyer will make no claim with respect thereto. Buyer acknowledges that the Acquired Assets are being transferred on an "AS IS, WHERE IS" basis.

6.8     Information.

Buyer has conducted such investigations of the Sellers, the Acquired Assets and the Assumed Liabilities as it deems necessary and appropriate in connection with the execution and delivery of this Agreement and the other Transaction Documents to which Buyer is a party and the consummation of the transaction contemplated hereby and thereby. None of the Sellers or any other Person (including any officer, director, member or partner of the Sellers or any of

50

their respective Affiliates) shall have or be subject to any liability to Buyer, or any other Person, resulting from Buyer's use of any information, documents or material made available to Buyer in any "data rooms," management presentations, due diligence or in any other form in expectation of the transactions contemplated hereby or by the other Transaction Documents.

# ARTICLE 7

## ACTIONS PRIOR TO THE CLOSING DATE

7.1     <u>Access and Reports; Confidentiality</u>.

(a)     During the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of <u>Article 11</u> or entry into an agreement with respect to an Alternative Transaction, the Sellers shall (i) afford Buyer and its Representatives reasonable access, upon reasonable notice, to its personnel, properties, books, Permits, Contracts and records, and furnish promptly to Buyer all available information concerning the Acquired Assets, the Business, properties, any Benefit Plans and personnel as may be reasonably requested in connection with the transactions contemplated hereby; (ii) furnish to Buyer such financial and operating data and other information relating to the Sellers, the Business and the Acquired Assets as may be reasonably requested; (iii) permit Buyer to make such reasonable inspections and, at Buyer's sole cost and expense, copies thereof as Buyer may require and (iv) instruct the executive officers and senior business managers, employees, counsel, auditors and financing advisors of the Sellers to reasonably cooperate with Buyer and its Representatives regarding the same; <u>provided</u>, that any such access shall be conducted consistent with and not in violation of the Bidding Procedures Order and in a manner not to unreasonably interfere with the Business. All requests for information made pursuant to this <u>Section 7.1</u> shall be directed to Kevin Nystrom, AlixPartners, 1114 Avenue of the Americas, 41st Floor, New York or other person as designated by such person or the Sellers. Notwithstanding the foregoing, (A) Buyer and its Representatives shall not have access to personnel records of the Sellers relating to individual performance or evaluation records, medical histories or other information which in the Sellers' good faith opinion is sensitive or the disclosure of which could subject a Seller to risk of liability and (B) Buyer and its Representatives shall not conduct or cause to be conducted any sampling, testing or otherwise surface or subsurface invasive investigation of the air, soil, surface water, groundwater, building materials or other environmental media related to the Real Property, the Acquired Assets or the Business, [including in connection with determining or confirming the amount of any Reclamation Liabilities associated with the Acquired Assets, except with the prior written consent of the Sellers (not to be unreasonably withheld).][4] No investigation pursuant to this <u>Section 7.1</u> or by Buyer or its Representatives at any time prior to or following the date hereof shall affect or be deemed to modify any representation or warranty made by the Sellers herein.

(b)     Notwithstanding the foregoing, but subject in all respects to the Bidding Procedures Order, this <u>Section 7.1</u> shall not require the Sellers to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation

---

[4]     **NTD**: Subject to further discussion, all rights of Buyer and Sellers are reserved. Above reflects Seller's position; Buyer's position is: "…, except with the prior written consent of the Sellers or in connection with determining or confirming the amount of any Reclamation Liabilities associated with the Acquired Assets."

Case 18-04177-TOM11     Doc 393     Filed 12/05/18     Entered 12/05/18 14:18:46     Desc
Main Document     Page 101 of 164

with counsel, which may be in-house counsel) of the Company, is reasonably likely to result in any violation of any Legal Requirement or any Contract to which the Company or any Seller is a party or cause any privilege (including attorney-client privilege) or work product protection that the Sellers would be entitled to assert to be undermined or waived with respect to such information or (ii) if the Company or any Seller, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto; provided, that, in the case of clause (i), the Parties shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Legal Requirement or Contract or be reasonably likely to cause such privilege or work product protection to be undermined with respect to such information or (B) could reasonably (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives of Buyer could be provided access to such information.

(c)     Buyer shall, and shall use its best efforts to cause its Affiliates and Representatives to, hold all confidential documents and information concerning the Business furnished to Buyer or its Affiliates in connection with the transactions contemplated hereby and the other Transaction Documents in accordance with the confidentiality provisions of the DIP Credit Agreement.

7.2     <u>Operations Prior to the Closing Date</u>.

The Sellers covenant and agree that, except (v) as expressly contemplated hereby, (w) as disclosed on <u>Schedule 7.2(a)</u>, (x) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), (y) as otherwise required by Legal Requirements, or (z) in the Ordinary Course of Business, after the Execution Date and prior to the Closing Date:

(a)     The Sellers shall:

(i)     carry on the Business in the Ordinary Course of Business of the Sellers and use commercially reasonable efforts to maintain, preserve and protect the Acquired Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business of the Sellers;

(ii)     maintain their books, accounts and records in the Ordinary Course of Business of the Sellers;

(iii)     use commercially reasonable efforts to pay all post-petition Trade Payables and collect all Accounts Receivable after the Petition Date (consistent with the Budget); provided, that paying such Trade Payables or collecting such Accounts Receivable is in the Ordinary Course of Business of the Sellers (or otherwise consistent with the Budget);

(iv)     use commercially reasonable efforts to (A) retain employees who are in good standing and are necessary to conduct the Business as it is currently being conducted and (B) maintain their relationships with and preserve for the Business the goodwill of their key suppliers and customers;

(v) (A) comply in all material respects with all Legal Requirements applicable to them or having jurisdiction over the Business or any Acquired Asset, (B) use commercially reasonable efforts to comply in all material respects with contractual obligations applicable to or binding upon them pursuant to any Material Contracts (other than those obligations the compliance with which is excused during the Bankruptcy Cases) and (C) use commercially reasonable efforts to maintain in full force and effect all Permits and comply with the terms of each such Permit;

(vi) cause any of their current directors and officers liability, property or casualty insurance policies with respect to the Business or any of the other Acquired Assets not to be canceled or terminated or any of the coverage thereunder to lapse unless, simultaneously with such termination, cancellation or lapse, replacement, policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect;

(vii) maintain, preserve and protect in full force and effect the existence of all material Intellectual Property owned by the Sellers and included in the Acquired Assets; and

(viii) except with respect to an Alternative Transaction, use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of the Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation.

(b)     The Sellers shall not:

(i)     take any action enumerated in <u>Section 5.20(b)</u>, except as set forth on <u>Schedule 7.2(b)</u>;

(ii)     assume, reject or assign any Material Contract other than pursuant to <u>Section 2.5</u>; or

(iii)     enter into or renew any Material Contract (other than automatic renewals of Material Contracts in the Ordinary Course of business in accordance with the terms thereof as in effect on the Execution Date) without the consent of Buyer and the approval of the Bankruptcy Court in accordance with Section 363(b) of the Bankruptcy Code.

7.3     <u>Regulatory Matters; Cooperation</u>.

(a)     Subject to <u>Section 7.3(c)</u>, as soon as reasonably practicable (and, in any event, within five (5) Business Days, or a later date as agreed by the Parties) following entry of the Bidding Procedures Order, the Sellers, on the one hand, and Buyer, on the other hand, shall each prepare and file, or cause to be prepared and filed, any notifications required to be filed under the HSR Act with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice, and request early termination of the waiting period under the HSR Act. Buyer, on the one hand, and the Sellers, on the other hand, shall promptly respond to any requests for additional information or documentary materials in connection with such filings and shall take all other actions necessary to cause the waiting periods under the HSR Act to terminate or expire at the earliest practicable date after the date of

53

filing. Buyer shall be responsible for payment of the applicable filing fee under the HSR Act, and each Party shall be responsible for any other payment of its own respective costs and expenses incurred by such Party (including attorneys' fees and other legal fees and expenses) associated with the preparation of its portion of any antitrust filings.

(b)     The Sellers, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to obtain (and Buyer shall cause its Subsidiaries to use commercially reasonable efforts to obtain), at the earliest practicable date, all necessary Governmental Authorizations and all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and take all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority. In addition to such actions and the actions to be taken under Section 7.3(a), the Sellers, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to take (and Buyer shall cause its Subsidiaries to use commercially reasonable efforts to obtain), or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using reasonable best efforts to accomplish the following: (i) taking all reasonable acts necessary to cause the conditions precedent set forth in Article 9 and Article 10 to be satisfied, (ii) defending of any Proceedings challenging this Agreement or the consummation of the transactions contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed, (iii) taking all acts reasonably necessary in connection with meeting with any Governmental Authority regarding the transferring of the Transferred Permits, and (iv) executing and delivering any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(c)     The Sellers, on the one hand, and Buyer, on the other hand, (i) shall promptly inform each other of any material communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto. In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to restrictions under any Legal Requirements, each of Buyer, on the one hand, and the Sellers, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Business) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or

submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

(d)     Subject to the terms and conditions of this Agreement, Buyer shall and shall cause its Subsidiaries to, take any and all steps reasonably necessary to avoid or eliminate impediments under any Antitrust Law that may be asserted by any Governmental Authority with respect to the transactions contemplated hereby so as to enable the Closing to occur as soon as reasonably possible, including, proposing, negotiating, committing to and effecting, by consent decree or otherwise, the sale, divestiture or disposition of such assets or businesses of Buyer or any of its Subsidiaries as may be required in order to avoid the entry, or to effect the dissolution, of any injunction, temporary restraining order or other order in any suit or proceeding, which would otherwise have the effect of preventing, delaying or restricting the consumption of the transactions contemplated hereby; provided, that (i) the Sellers shall not take any such action without the prior written consent of Buyer and (ii) Buyer shall not be obligated to take any such action if such action would have a Material Adverse Effect on the Business or the Acquired Assets, taken as a whole

7.4     Tax Cooperation.

Prior to the Closing, the Sellers and Buyer agree to furnish or cause to be furnished to the other, upon request, as promptly as practicable, information and assistance relating to the Acquired Assets, including access to books and records (including any Tax Records), as is reasonably necessary in connection with (a) the preparation or filing of any Tax Return by Buyer or the Sellers, (b) the making of any Tax election by Buyer or the Sellers, (c) Buyer or the Sellers' claim for any Tax Refund, (d) the determination of liability for Taxes, and (e) any audit, examination or other proceeding in respect of Taxes related to the Acquired Assets. Sellers and their respective Affiliates shall (i) abide by all record retention agreements entered into with any Taxing Authority, and (ii) give Buyer thirty (30) days' written notice prior to transferring, destroying or discarding any Tax Records and, if Buyer so requests, shall allow Buyer to take possession of such Tax Records.

7.5     Bankruptcy Court Matters.

(a)     Bidding Procedures Hearing and Bidding Procedures Order. On or prior to December 5, 2018 (or such later date as agreed in writing by all of the Parties hereto), the Sellers shall have filed with the Bankruptcy Court a motion for entry of an order (i) authorizing the Sellers' entry into this Agreement as the "stalking horse" purchase agreement for the Acquired Assets, and (ii) approving the Bidding Procedures. On or prior to December 19, 2018 (or such later date as agreed in writing by all of the Parties hereto), the Bankruptcy Court shall have (x) held a hearing to consider approval of the Bidding Procedures and (y) entered the Bidding Procedures Order, in each case in form and substance acceptable to the Sellers and Buyer.

(b)     Qualified Bids. On or prior to January 21, 2019 (or such later date as agreed in writing by all of the Parties hereto) (the "Bid Deadline"), any and all Qualified Bids shall have been submitted pursuant to the Bidding Procedures Order.

(c)     Auction. On or prior to February 27, 2019 (or such later date as agreed in writing by all of the Parties hereto), the Sellers shall have commenced the auction

Case 18-04177-TOM11    Doc 393    Filed 12/05/18    Entered 12/05/18 14:18:46    Desc
Main Document    Page 105 of 164

contemplated by the Bidding Procedures, if any Qualified Bid is submitted prior to the Bid Deadline.

(d)    <u>Sale Order</u>. On or prior to March 22, 2019 (or such later date as agreed in writing by all of the Parties hereto), the Bankruptcy Court shall have entered the Sale Order in form and substance acceptable to the Sellers and Buyer, in each case solely to the extent Buyer is the Successful Bidder or the Backup Bidder.

(e)    <u>Contracts</u>. The Sellers shall serve on all non-Seller counterparties to all of their Available Contracts a Cure Notice stating that the Sellers are or may be seeking the assumption and assignment of such Available Contracts and shall notify such non-Seller counterparties of the deadline for objecting to the Cure Costs, if any, which deadline shall not be less than ten (10) Business Days prior to the Hearing or as otherwise provided in the Bidding Procedures Order.

(f)    <u>Bankruptcy Filings</u>. From and after the Execution Date and until the Closing Date, the Sellers shall deliver to Buyer, at least two (2) Business Days in advance of the Sellers' filing or submission thereof, drafts of any and all material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement for Buyer's prior review and comment, including any Tax motions, and such filings shall be acceptable to Buyer in its reasonable discretion to the extent they relate to the Acquired Assets, any Assumed Liabilities or any of Buyer's obligations hereunder. The Sellers agree to diligently prosecute the entry of the Bidding Procedures Order and the Sale Order as provided herein. In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed, the Sellers shall use their best efforts to defend such appeal. The Sellers shall comply with all notice requirements (i) of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bidding Procedures Order or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

    7.6    <u>Updates</u>.

(a)    <u>Seller Supplements and Amendments</u>.  Solely with respect to any notice to, or the making of any registration, declaration or filing with or the obtaining of any consent, waiver or approval from, any Governmental Authority, the Sellers may supplement or amend Schedule 5.2 at any time until the date that is five (5) Business Days prior to the auction contemplated by the Bidding Procedures without regard to the penultimate sentence of this Section 7.6(a).  Until the Closing Date, the Sellers shall as promptly as reasonably practicable deliver any new schedules or supplement or amend the Disclosure Schedules with respect to any matter that, if existing, occurring or known at the Execution Date, would have been required to be set forth or described in the Disclosure Schedules. Any such supplement or amendment shall be deemed to modify the Disclosure Schedules for purposes of this Agreement except to the extent the matters set forth in such supplement or amendment are material to the Acquired Assets or the Business. Notwithstanding anything in this <u>Section 7.6(a)</u> to the contrary, in no event will the Sellers be permitted to supplement or amend any Disclosure Schedules other than Disclosure Schedules required under <u>Article 5</u> without the prior written consent of Buyer and any such supplements or amendments will not be deemed to modify any Schedules other than the Disclosure Schedules required under <u>Article 5</u>.

(b)    <u>Buyer Supplements</u>. Solely with respect to any notice to, or the making of any registration, declaration or filing with or the obtaining of any consent, waiver or approval from, any Governmental Authority, Buyer may supplement or amend Schedule 6.2 at any time until the date that is five (5) Business Days prior to the auction contemplated by the Bidding Procedures. [At any time prior to the date that is five (5) Business Days prior to the auction contemplated by the Bidding Procedures, Buyer may amend, by written notice to the Sellers, (i) Schedule **Error! Reference source not found.** with respect to assets of the Pinnacle Business or (ii) Schedule 2.1(v) with respect to assets of Seminole Alabama Mining Complex, LLC.][5]

7.7    Surety Bonds; Permits.

(a)    Business and Acquired Assets in Alabama.

(i)    Sellers shall, as promptly as practicable, deliver to Buyer any updates, modifications or corrections with respect to the information set forth on Schedule 5.9(b).

(ii)    Promptly after the Execution Date and by no later than the date required by Legal Requirements or the appropriate Governmental Authority:

(1)    Buyer shall file an application with the Alabama Surface Mining Commission for a license to engage in coal mining operations in the State of Alabama ("Alabama Mining License"), in a format and manner acceptable to the Alabama Surface Mining Commission, along with all applicable fees, and shall have obtained such Alabama Mining License, and continue to hold the same, on and as of the Closing Date and thereafter until the transfer to Buyer of all of the Alabama Mining Permits (as hereinafter defined) is completed;

(2)    Buyer shall use commercially reasonable efforts to provide, not later than the Bid Deadline, evidence of appropriate financial commitments, in form, manner and amount acceptable to the Sellers and the Alabama Surface Mining Commission, for replacement surety bonds or other financial assurances necessary to allow the transfer of the Alabama Mining Permits from the Sellers to Buyer, and in any event, Buyer shall provide such evidence at or before the Closing; and

(3)    Buyer shall use commercially reasonable efforts to provide, no later than the Bid Deadline, evidence of appropriate financial commitments, in form,

---

[5]    **NTD**: Subject to further discussion, all rights of Buyer and Sellers are reserved.  Above reflects Seller's position; Buyer's position is:  "Buyer may supplement or amend any of the Schedules referenced in Article 2 at any time until the date that is five (5) Business Days prior to the auction contemplated by the Bidding Procedures in its sole discretion; provided, however, the Buyer shall not amend or supplement (i) Schedule 2.1(u) without the prior written consent of the Sellers (such consent not to be unreasonably withheld, conditioned or delayed), (ii) any such Schedules if the effect of such change is to cause prepaid deposits related to Professional fee retainers, the Cash Consideration (or any related escrow account) or any additional Avoidance Actions, to be an Acquired Asset, or (iii) any such Schedules if the effect of such change is to cause any Cure Costs, Liabilities under Assumed contracts, Transfer Taxes or any Taxes imposed on the Business or the Acquired Assets and attributable to any Post Closing Tax Period to be an Excluded Liability."

57

manner and amount acceptable to the Sellers and the Alabama Oil and Gas Board, for replacement surety bonds or other financial assurances necessary to allow the transfer of the Permits for the Gas Wells from the Sellers to Buyer, and in any event, Buyer shall provide such evidence at or before the Closing.

(iii) As promptly as reasonably practicable after the Execution Date and by no later than the date required by Legal Requirements or the appropriate Governmental Authority:

(1) Buyer and the Sellers (if applicable) shall file an application for a transfer of all Transferred Permits to engage in mining operations at particular locations in the State of Alabama with the Alabama Surface Mining Commission (the "Alabama Mining Permits"), in a format and manner acceptable to the Alabama Surface Mining Commission, along with all applicable fees and shall publish notice of such applications in accordance with the applicable Legal Requirements;

(2) Buyer and the Sellers (if applicable) shall file with the Alabama Department of Environmental Management an application for a transfer of Transferred Permits issued to the Sellers by the Alabama Department of Environmental Management, in a format and manner acceptable to the Alabama Department of Environmental Management, along with all applicable fees;

(3) Buyer and the Sellers (if applicable) shall file with the Jefferson County Department of Health an application for a transfer of any Transferred Permits relating to the emission of pollutants into the air, in a format and manner acceptable to the Jefferson County Department of Health, along with all applicable fees;

(4) Buyer and the Sellers (if applicable) shall file with the Alabama Department of Environmental Management an application for a transfer of any Transferred Permits relating to the emission of pollutants into the air, in a format and manner acceptable to the Alabama Department of Environmental Management, along with all applicable fees;

(5) Buyer and the Sellers (if applicable) shall file with the Alabama Oil and Gas Board written notification of the execution of this Agreement for Buyer to become the new operator for any applicable well or wells, and all associated facilities and equipment, in a format and manner acceptable to the Alabama Oil and Gas Board, along with all applicable fees;

(6) If applicable, Buyer and the Sellers (if applicable) shall file with the Federal Explosives Licensing Center an application for each applicable Federal Explosives license or Permits, in a format and manner acceptable to the Federal Explosives Licensing Center, along with all applicable fees; and

(7) The Sellers, on one hand, and Buyer, on the other hand, shall use commercially reasonable efforts to properly file all documents or applications required to transfer, to amend, or to acquire all other Transferred Permits necessary for the operation and conduct of the Business or Acquired Assets in Alabama, and Buyer and the Sellers

58

shall reasonably cooperate in all actions necessary to seek and obtain approval for the transfer thereof.

(iv)    Buyer and the Sellers shall, and shall cause their Subsidiaries to, (A) take all actions and do, or cause to be done, all things required under the applicable Legal Requirements with the appropriate Governmental Authority to put in place, to transfer, to amend, or to acquire all Transferred Permits that are necessary for the operation and conduct of the Business or Acquired Assets in Alabama by or on the Closing Date, unless the applicable Legal Requirements regarding such a Permit require certain actions to be taken upon or after the Closing, and, in that event, Buyer, at Buyer's sole cost and expense from and after the Closing, shall take, or cause its Subsidiaries to take, all actions and do, or cause to be done, all things necessary or desirable under the applicable Legal Requirements with the appropriate Governmental Authority which can only be taken or done after the Closing to put in place, to transfer, to amend, or to acquire such remaining Permits as promptly as reasonably practicable after the Closing; and (B) take all actions and do, or cause to be done, all things necessary or desirable under the applicable Legal Requirements to put in place with the Alabama Surface Mining Commission as promptly as commercially reasonably possible after the Closing, financial assurances necessary to transfer the Alabama Mining Permits from the Sellers and to Buyer and to obtain the release to the Sellers of the financial assurances previously placed by the Sellers with respect thereto. The Sellers agree to provide, at Buyer's sole cost and expense from and after the Closing, any reasonable cooperation as reasonably requested by Buyer to bring about the transfer of the Alabama Mining Permits or the issuance of new such permits to Buyer, as applicable. From and after the Closing, Buyer shall use commercially reasonable efforts to pursue the transfer of the Alabama Mining Permits or issuances of new Alabama Mining Permits to Buyer as promptly as possible, and Buyer, assuming Buyer has received the Alabama Mining License as of such time, shall operate under the Alabama Mining Permits as the designated operator and contract miner until the Alabama Mining Permits are transferred or new Permits are issued to Buyer, which contract mining operation shall be pursuant to the terms of a contract mining agreement in form mutually agreeable to Buyer and the Sellers and executed and delivered by the Parties at the Closing (the "Alabama Contract Mining Agreement"), which shall, at a minimum, (X) provide that Buyer shall indemnify and hold harmless the Sellers and their respective Affiliates from any and all Liabilities arising out of or resulting from Buyer's operations under the Sellers' applicable Alabama Mining Permits, (Y) prohibit the Sellers (or any Affiliates of the Sellers) from undertaking any operations under the applicable Alabama Mining Permits except to the extent such operations are required by, or otherwise necessary to comply with, Legal Requirements, and (Z) provide that the Sellers shall indemnify and hold harmless Buyer and its respective Affiliates from any and all Liabilities arising out of any actions taken by any Seller (or an Affiliate of Seller) with respect to any Alabama Mining Permit during the time in which the Alabama Contract Mining Agreement is in effect. To the fullest extent allowed by and in accordance with the applicable Legal Requirements, the Sellers grant Buyer the exclusive right to conduct, at the sole cost and expense of Buyer, mining operations following the Closing on the Real Property under the Alabama Mining Permits, pursuant to and on the terms and conditions of the Alabama Contract Mining Agreement, as the designated operator until such time as the Alabama Mining Permits are transferred to, or new Permits are issued to, Buyer, and Buyer shall indemnify and hold harmless the Sellers and their respective Affiliates from any and all Liabilities arising out of or resulting from Buyer's operations under the Sellers' applicable Alabama Mining Permits. The Sellers shall use commercially reasonable

efforts to maintain the Alabama Mining Permits prior to transfer thereof to Buyer and shall have (and Buyer grants) all rights of entry onto the Real Property that are reasonably necessary therefor. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless the Sellers and/or their respective Affiliates from any and all Liabilities incurred by the Sellers and/or their respective Affiliates as a result of any action taken by the Sellers at Buyer's or its Affiliates' request pursuant to this <u>Section 7.7(a)(iv)</u>.

    (v)  As promptly as practicable after the Closing (or such earlier time as may be permitted by the Alabama Oil and Gas Board), Buyer and the Sellers shall execute and deliver to the Alabama Oil and Gas Board one or more applications to change operator (Form OGB 1E) and such other forms that may be necessary or required by the Alabama Oil and Gas Board to change the operator of the Gas Wells to Buyer or a Buyer Designee, and Buyer shall post replacement surety bonds or other financial assurances necessary to allow the transfer of the applicable Permits for the Gas Wells from the Sellers to Buyer or Buyer Designee. If required by the Alabama Oil and Gas Board, the Sellers shall leave in place any bonds or other financial assurances in connection with the applicable Permits for the Gas Wells, subject to the provisions of <u>Section 7.7(a)(vii)</u> below, until the transfer of the applicable Permits for the Gas Wells from the Sellers to Buyer or Buyer Designee. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless the Sellers and/or their respective Affiliates from any and all Liabilities incurred by the Sellers and/or their respective Affiliates as a result of any action taken by the Sellers at Buyer's or its Affiliates' request pursuant to this <u>Section 7.7(a)(v)</u>. Because the Alabama Oil and Gas Board cannot change the operator of the Gas Wells prior to the Closing, after the Closing, until such time that the transfer of the applicable Permits for the Gas Wells to Buyer or a Buyer Designee is complete, Buyer (or Buyer's Designee) may operate the Gas Wells under the Permits held in the applicable Seller's name. Buyer (or Buyer's Designee) will operate the Gas Wells in compliance, in all material respects, with applicable Legal Requirements and the applicable Permits. The Sellers shall use commercially reasonable efforts to maintain the Gas Well Permits prior to transfer thereof to Buyer. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless the Sellers and/or their respective Affiliates from any and all Liabilities incurred by the Sellers and/or their respective Affiliates as a result of (A) any action taken by the Sellers at Buyer's or its Affiliates' request pursuant to this <u>Section 7.7(a)(v)</u>, or (B) Buyer's operations or other actions taken with respect to the Permits for the Alabama Gas Wells after the Closing. If requested by Buyer (or required by the Alabama Oil and Gas Board), Buyer and the Sellers will enter into a Transition Services Agreement to permit Buyer to operate the Gas Wells until such time that the Permits for the Gas Wells are transferred to Buyer (or Buyer's Designee).

    (vi)  The Sellers shall use commercially reasonable efforts (at Buyer's sole cost and expense from and after the Closing) to cause any surety bonds (or other financial assurances) in place as of the Closing with respect to applicable Transferred Permits to remain in place and to maintain current levels of surety bond coverage with respect to their Permits that are not Transferred Permits until such time as the final approval for the transfer of such applicable Transferred Permits to Buyer is received, in each case to the extent required under applicable Legal Requirements. At all times from and after the Closing and prior to the transfer to Buyer of the Alabama Mining Permits and any other Permits not acquired by Buyer before the Closing Date (including the Permits relating to the Gas Wells in Alabama), Buyer

60

shall, and shall cause its Subsidiaries to, at Buyer's sole cost and expense comply with all of the applicable Legal Requirements governing, and all conditions and requirements of, or pertaining to, any such Permits. Buyer shall promptly deliver to the Sellers written notice of any incidents, violations or occurrences, which the Sellers shall have the right, but not the obligation, to cure (including right of entry onto the applicable Real Property), and Buyer shall promptly reimburse the Sellers for the reasonable costs of any such cure. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless the Sellers and/or their Affiliates from any and all Liabilities incurred by the Sellers and/or their Affiliates as a result of any action taken by the Sellers at Buyer's or its Affiliates' request pursuant to this Section 7.7(a)(vi).

(vii)     Notwithstanding anything in this Agreement to the contrary, from and after the Closing, Buyer shall, at its sole cost and expense, (x) until such time as Buyer has posted replacement surety bonds or other required financial assurances, pay or reimburse the Sellers (within five (5) Business Days of receipt of notice from the Sellers' Representative, which such notice shall contain the applicable surety bond numbers and corresponding premium amounts, or other appropriate references as to other forms of financial assurance) for the cost of any premiums that become due after the Closing Date with respect to such surety bonds or the cost of other financial assurances, (y) post any addition to the principal amount of any such surety bond or other financial assurance required by the Alabama Surface Mining Commission, the Alabama Oil and Gas Board or any Governmental Authority after the Closing Date as a result of any action taken by Buyer with respect to the Business and Acquired Assets in Alabama and (z) Buyer shall reimburse the Sellers for all out-of-pocket costs and expenses incurred by the Sellers in connection with any action taken by the Sellers at the request of Buyer.

(viii)     Until such time as the Alabama Mining Permits are transferred to Buyer, Buyer shall, and shall cause its Subsidiaries to, take all reasonable and necessary actions such that Buyer will not have been denied, or be made subject to denial of, any application for any Permit or other Governmental Authorization due to application of the Applicant Violator System established pursuant to the SMCRA or any similar applicable state system.

(ix)     From and after the date hereof, Buyer shall not engage in mining operations with respect to any of the Acquired Assets in Alabama that requires an Alabama Mining License unless and until it obtains an Alabama Mining License. Buyer shall reimburse, indemnify and hold harmless the Sellers and/or their respective Affiliates from any and all Liabilities incurred by the Sellers and/or their respective Affiliates resulting from or arising out of Buyer's failure to obtain the Alabama Mining License as contemplated by this Section 7.7(a) prior to conducting any mining operations following the Closing on the applicable Real Property.

(b)     Business and Acquired Assets in West Virginia.

(i)     Promptly after the Execution Date and by no later than the date required by Legal Requirements or the appropriate Governmental Authority:

(1)     Buyer shall file an application with the West Virginia Surface Mine Board for a license to engage in coal mining operations in the

61

State of West Virginia ("West Virginia Mining License"), in a format and manner acceptable to the West Virginia Surface Mine Board, along with all applicable fees, and shall have obtained such West Virginia Mining License, and continue to hold the same, on and as of the Closing Date and thereafter until the transfer to Buyer of all of the West Virginia Mining Permits (as hereinafter defined) is completed;

(2)    Buyer shall use commercially reasonable efforts to provide, not later than the Bid Deadline, evidence of appropriate financial commitments, in form, manner and amount acceptable to the Sellers and the West Virginia Surface Mine Board, for replacement surety bonds or other financial assurances necessary to allow the transfer of the West Virginia Mining Permits from the Sellers to Buyer, and in any event, Buyer shall provide such evidence at or before the Closing; and

(3)    Buyer shall use commercially reasonable efforts to provide, no later than the Bid Deadline, evidence of appropriate financial commitments, in form, manner and amount acceptable to the Sellers and the West Virginia Department of Environmental Protection, for replacement surety bonds or other financial assurances necessary to allow the transfer of the Permits for the Gas Wells from the Sellers to Buyer, and in any event, Buyer shall provide such evidence at or before the Closing.

(ii)    As promptly as reasonably practicable after the Execution Date and by no later than the date required by Legal Requirements or the appropriate Governmental Authority:

(1)    Buyer and the Sellers (if applicable) shall file an application for a transfer of all Transferred Permits to engage in mining operations at particular locations in the State of West Virginia with the West Virginia Surface Mine Board (the "West Virginia Mining Permits"), in a format and manner acceptable to the West Virginia Surface Mine Board, along with all applicable fees and shall publish notice of such applications in accordance with the applicable Legal Requirements;

(2)    Buyer and the Sellers (if applicable) shall file with the West Virginia Department of Environmental Protection an application for a transfer of Transferred Permits issued to the Sellers by the West Virginia Department of Environmental Protection, in a format and manner acceptable to the West Virginia Department of Environmental Protection, along with all applicable fees;

(3)    Buyer and the Sellers (if applicable) shall file with the Montgomery County Department of Health an application for a transfer of any Transferred Permits relating to the emission of pollutants into the air, in a format and manner acceptable to the Montgomery County Department of Health, along with all applicable fees;

(4)    Buyer and the Sellers (if applicable) shall file with the West Virginia Department of Environmental Protection an application for a transfer of any Transferred Permits relating to the emission of pollutants into the air, in a format

62

and manner acceptable to the West Virginia Department of Environmental Protection, along with all applicable fees;

(5) Buyer and the Sellers (if applicable) shall file with the West Virginia Department of Environmental Protection of West Virginia written notification of the execution of this Agreement for Buyer to become the new operator for any applicable well or wells, and all associated facilities and equipment, in a format and manner acceptable to the West Virginia Department of Environmental Protection, along with all applicable fees;

(6) Buyer and the Sellers (if applicable) shall file with the Federal Explosives Licensing Center an application for each applicable Federal Explosives license or Permits, in a format and manner acceptable to the Federal Explosives Licensing Center, along with all applicable fees; and

(7) The Sellers, on the one hand, and Buyer, on the other hand, shall use commercially reasonable efforts to properly file all documents or applications required to transfer, to amend, or to acquire all other Transferred Permits necessary for the operation and conduct of the Business or Acquired Assets in West Virginia, and Buyer and the Sellers shall reasonably cooperate in all actions necessary to seek and obtain approval for the transfer thereof.

(iii) Buyer and the Sellers shall, and shall cause their Subsidiaries to, (A) take all actions and do, or cause to be done, all things necessary or desirable under the applicable Legal Requirements with the appropriate Governmental Authority to put in place, to transfer, to amend, or to acquire all Transferred Permits that are necessary for the operation and conduct of the Business or Acquired Assets in West Virginia by or on the Closing Date, unless the applicable Legal Requirements regarding such a Permit require certain actions to be taken upon or after the Closing, and, in that event, Buyer, at Buyer's sole cost and expense from and after the Closing, shall take, or cause its Subsidiaries to take, all actions and do, or cause to be done, all things necessary or desirable under the applicable Legal Requirements with the appropriate Governmental Authority which can only be taken or done after the Closing to put in place, to transfer, to amend, or to acquire such remaining Permits as promptly as reasonably practicable after the Closing; and (B) take all actions and do, or cause to be done, all things necessary or desirable under the applicable Legal Requirements to put in place with the West Virginia Surface Mine Board as promptly as commercially reasonably possible after the Closing, financial assurances necessary to transfer the West Virginia Mining Permits from the Sellers and to Buyer and to obtain the release to the Sellers of the financial assurances previously placed by the Sellers with respect thereto. The Sellers agree to provide, at Buyer's sole cost and expense from and after the Closing, any reasonable cooperation as reasonably requested by Buyer to bring about the transfer of the West Virginia Mining Permits or the issuance of new such permits to Buyer, as applicable. From and after the Closing, Buyer shall use commercially reasonable efforts to pursue the transfer of the West Virginia Mining Permits or issuances of new West Virginia Mining Permits to Buyer as promptly as possible, and Buyer shall operate under the West Virginia Mining Permits as the designated operator and contract miner until the West Virginia Mining Permits are transferred or new Permits are issued to Buyer, which contract mining operation shall be pursuant to the terms of a contract mining agreement in form mutually

agreeable to Buyer and the Sellers and executed and delivered by the Parties at the Closing (the "West Virginia Contract Mining Agreement"). To the fullest extent allowed by and in accordance with the applicable Legal Requirements, the Sellers grant Buyer the right to conduct, at the sole cost and expense of Buyer, mining operations following the Closing on the Real Property under the West Virginia Mining Permits, pursuant to and on the terms and conditions of the West Virginia Contract Mining Agreement, as the designated operator until such time as the West Virginia Mining Permits are transferred to, or new Permits are issued to, Buyer. The Sellers shall take all steps that are reasonably necessary to maintain the West Virginia Mining Permits prior to transfer thereof to Buyer and shall have (and Buyer grants) all rights of entry onto the Real Property that are reasonably necessary therefor. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless the Sellers and/or their Affiliates from any and all Liabilities incurred by the Sellers and/or their Affiliates as a result of any action taken by the Sellers at Buyer's or its Affiliates' request pursuant to this Section 7.7(b)(iii).

(iv)     As promptly as practicable after the Closing (or such earlier time as may be permitted by the West Virginia Department of Environmental Protection), Buyer shall execute and deliver to the West Virginia Department of Environmental Protection one or more applications to change operator and such other forms that may be necessary or required by the West Virginia Department of Environmental Protection to change the operator of the Gas Wells to Buyer or Buyer Designee, and Buyer shall post replacement surety bonds or other financial assurances necessary to allow the transfer of the applicable Permits for the Gas Wells from the Sellers to Buyer or Buyer Designee. If required by the West Virginia Department of Environmental Protection, the Sellers shall leave in place any bonds or other financial assurances in connection with the applicable Permits for the Gas Wells, subject to the provisions of Section 7.7(b)(vi) below, until the transfer of the applicable Permits for the Gas Wells from the Sellers to Buyer or Buyer Designee. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless the Sellers and/or their Affiliates from any and all Liabilities incurred by the Sellers and/or their Affiliates as a result of any action taken by the Sellers at Buyer's or its Affiliates' request pursuant to this Section 7.7(b)(iv).

(v)     The Sellers shall use commercially reasonable efforts (at Buyer's sole cost and expense from and after the Closing) to cause any surety bonds (or other financial assurances) in place as of the Closing with respect to applicable Transferred Permits to remain in place and to maintain current levels of surety bond coverage with respect to their Permits that are not Transferred Permits until such time as the final approval for the transfer of such applicable Transferred Permits to Buyer is received, in each case to the extent required by applicable Legal Requirements. At all times from and after the Closing and prior to the transfer to Buyer of the West Virginia Mining Permits and any other Permits not acquired by Buyer before the Closing Date (including the Permits relating to the Gas Wells in West Virginia), Buyer shall, and shall cause its Subsidiaries to, at Buyer's sole cost and expense comply with all of the applicable Legal Requirements governing, and all conditions and requirements of, or pertaining to, any such Permits. Buyer shall promptly deliver to the Sellers written notice of any incidents, violations or occurrences, which the Sellers shall have the right, but not the obligation, to cure (including right of entry onto the applicable Real Property), and Buyer shall promptly reimburse the Sellers for the reasonable costs of any such cure. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless the Sellers and/or

their Affiliates from any and all Liabilities incurred by the Sellers and/or their Affiliates as a result of any action taken by the Sellers at Buyer's or its Affiliates' request pursuant to this Section 7.7(b)(v).

(vi)     Notwithstanding anything in this Agreement to the contrary, from and after the Closing, Buyer shall, at its sole cost and expense, (x) until such time as Buyer has posted replacement surety bonds or other required financial assurances, pay or reimburse the Sellers (within five (5) Business Days of receipt of notice from the Sellers' Representative, which such notice shall contain the applicable surety bond numbers and corresponding premium amounts, or other appropriate references as to other forms of financial assurance) for the cost of any premiums that become due after the Closing Date with respect to such surety bonds or the cost of other financial assurances, and (y) post any addition to the principal amount of any such surety bond or other financial assurance required by the West Virginia Surface Mine Board, the West Virginia Department of Environmental Protection or any Governmental Authority after the Closing Date as a result of any action taken by Buyer with respect to the Business and Acquired Assets in West Virginia. Until such time as the West Virginia Mining Permits are transferred to Buyer, Buyer shall, and shall cause its Subsidiaries to, take all reasonable and necessary actions such that Buyer will not have been denied, or be made subject to denial of, any application for any Permit or other Governmental Authorization due to application of the Applicant Violator System established pursuant to the SMCRA or any similar applicable state system.

(vii)    From and after the date hereof, Buyer shall not engage in mining operations with respect to any of the Acquired Assets in West Virginia that requires a West Virginia Mining License unless and until it obtains a West Virginia Mining License. Buyer shall reimburse, indemnify and hold harmless the Sellers and/or their respective Affiliates from any and all Liabilities incurred by the Sellers and/or their respective Affiliates resulting from or arising out of Buyer's failure to obtain the West Virginia Mining License as contemplated by this Section 7.7(a) prior to conducting any mining operations following the Closing on the applicable Real Property.

(c)     All fees, bonds or financial assurances required to be paid or provided in connection with the actions to be taken under this Section 7.7 shall be paid or provided by Buyer. Notwithstanding the foregoing, or anything to the contrary herein, Buyer shall not be required to pay any such fees, bonds or financial assurances incurred by the Sellers in excess of $10,000 unless approved by Buyer in advance.

7.8     Fiduciary Obligations. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective governing bodies, directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations.

7.9     Sale Free and Clear. The Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances (including, for the avoidance of doubt, all successor liability, including, any successorship obligations under any Collective Bargaining Agreement, and/or with respect to any Benefit Plan) of, against or created by the Sellers or their bankruptcy estate, shall be fully released from and with respect to the Acquired

Case 18-04177-TOM11     Doc 393     Filed 12/05/18     Entered 12/05/18 14:18:46     Desc
Main Document     Page 115 of 164

Assets. On the Closing Date, the Acquired Assets shall be transferred to Buyer and/or one or more Buyer Designees, as applicable, free and clear of all obligations, Liabilities and Encumbrances (including, for the avoidance of doubt, all successor liability, including any successorship obligations under any Collective Bargaining Agreement, and/or with respect to any Benefit Plan), other than the Permitted Encumbrances and the Assumed Liabilities.

7.10    Determination of Amounts for Certain Escrows and Escrow Amounts.

(a)    No later than fourteen (14) days prior to the Hearing, the Sellers shall deliver to Buyer (the "Escrow Proposal") (i) a proposed Wind-Down Budget and (ii) its calculation of the amounts necessary to fund the costs and expenses described in the definitions of Wind-Down Escrow Amount, the Payroll Escrow Account and the Estate Retained Professional Fees Escrow Amount in full.

(b)    Following receipt of the Escrow Proposal, the Sellers and the Buyer shall negotiate in good faith regarding the Wind-Down Escrow Amount, the Payroll Escrow Amount and the Estate Retained Professional Fees Escrow Amount.

(c)    The Sellers and Buyer shall cooperate in good faith to negotiate with any potential escrow agent on the terms of any escrow agreement contemplated by this Agreement. The fees and expenses arising out the administration of any resulting escrow arrangements shall be borne solely by such accounts.

(d)    The Wind-Down Escrow Account shall be used solely to fund (i) fees and expenses associated with the administration of the Wind-Down Escrow Account, (ii) the payment of allowed priority and administrative expense claims, and (iii) the estimated costs to wind-down the Bankruptcy Cases in accordance with the Wind-Down Budget. Any funds remaining in the Wind-Down Escrow Account after payment of the expenses described in this Section 7.10(d) shall be transferred to Buyer.

(e)    The Payroll Escrow Account shall be used solely to fund (i) fees and expenses associated with the administration of the Payroll Escrow Account, (ii) payment of amounts referenced in the definition of "Payroll Escrow Amount" and (iii) Accrued Payroll to the extent not assumed by Buyer or paid at Closing, and payroll taxes related thereto. Any funds remaining in the Payroll Escrow Account after payment of the expenses described in this Section 7.10(e) shall be transferred to Buyer promptly, and in any event, not later than the sixty (60) calendar days after the Closing Date.

(f)    The Estate Retained Professional Fees Escrow Account shall be used solely to fund (i) fees and expenses associated with the administration of the Estate Retained Professional Fees Escrow Account, (ii) Estate Retained Professional Fee Claims and (iii) the fees and expenses of the Bankruptcy Administrator (as defined in the Final DIP Order), in the case of clauses (ii) and (iii), that are estimated as of the Closing Date. Any funds remaining in the Estate Retained Professional Fees Escrow Account after payment of the expenses described in this Section 7.10(f) shall be transferred to Buyer promptly, and in any event, not later than the twenty (20) calendar days after the Bankruptcy Court shall have issued a Final Order in respect of the last remaining Professional fee application.

Case 18-04177-TOM11    Doc 393    Filed 12/05/18    Entered 12/05/18 14:18:46    Desc
Main Document    Page 116 of 164

## ARTICLE 8
### ADDITIONAL AGREEMENTS

8.1 <u>Taxes</u>.

(a) Any transfer, real estate property transfer, documentary, sales, use, stamp, registration, value added, and other such taxes and fees (including any penalties and interest) incurred in connection with the transactions contemplated hereby and not exempted by Section 1146(c) of the Bankruptcy Code ("<u>Transfer Taxes</u>") shall be borne by Buyer. The Sellers and Buyer shall cooperate to (i) mitigate and/or eliminate the amount of Transfer Taxes resulting from the transactions contemplated herein and (ii) timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Buyer shall be responsible for preparing and filing all necessary Tax Returns or other documents with respect to Transfer Taxes; <u>provided, however</u>, that in the event any such Tax Return requires execution by the other Party, the Party responsible for preparing the Tax Return shall deliver it to the other Party not less than ten (10) days before the due date thereof, and the other Party shall promptly execute such Tax Return and return it to the Party responsible for filing it.

(b) All Liability for any ad valorem Taxes (including, for the avoidance of doubt, real or personal property Taxes) and unmined mineral Taxes (the "<u>Apportioned Taxes</u>") with respect to the Acquired Assets for a Tax period or year, or portion thereof, that ends on or before the Closing Date (a "<u>Pre-Closing Tax Period</u>") shall be borne by the Sellers. All Liability for any Apportioned Taxes with respect to the Acquired Assets for a Tax period or year, or portion thereof, that begins after the Closing Date (a "<u>Post-Closing Tax Period</u>") shall be borne by Buyer. The total amount of Apportioned Taxes allocable to the Pre-Closing Tax Period of any Tax period or year commencing on or before, and ending after, the Closing Date (a "<u>Straddle Period</u>") shall be the product of (i) such Tax for the entirety of such Straddle Period, multiplied by (ii) a fraction, the numerator of which is the number of days for such Straddle Period included in the Pre-Closing Tax Period and the denominator of which is the total number of days in such Straddle Period, and the balance of Apportioned Taxes shall be allocable to the Post-Closing Tax Period. At the Closing, Apportioned Taxes with respect to each Acquired Asset for the applicable Straddle Period shall be prorated in accordance with the foregoing provisions based on the Tax assessment for such Acquired Asset for such Straddle Period, if available, or if otherwise, based on the Apportioned Taxes paid with respect to such Acquired Asset during the preceding Tax year. With respect to any not yet delinquent Apportioned Taxes relating to a Straddle Period or Pre-Closing Tax Period, Buyer will assume responsibility for the actual payment of all such Taxes to the applicable Governmental Authority. With respect to any Apportioned Taxes relating to a Straddle Period or Pre-Closing Tax Period that are delinquent as of the Closing Date, the amount of which is known and not subject to dispute, Buyer shall either pay the delinquent amount of such Taxes directly to the applicable Governmental Authority at the Closing or, at Buyer's option, to such title company as designated by Buyer at the Closing, for further payment by it to the applicable Governmental Authority. In the event that Buyer or any Seller makes any payment of Apportioned Taxes for which it is entitled to reimbursement under this <u>Section 8.1(b)</u>, the applicable party shall make such reimbursement no later than 10 days after the presentation of a statement setting forth the amount of the reimbursement to which the party presenting the statement is entitled along with such supporting evidence as is reasonably necessary to calculate the reimbursement amount. Any

67

amounts which may become payable from any Seller to Buyer pursuant to Section 8.1 shall constitute a super priority administrative expense of the Sellers under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

(c)     Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Acquired Assets (including access to books and records and Tax Returns and related working papers dated before the Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state or local business tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Acquired Assets are located; provided, however, that neither Buyer nor any Seller shall be required to disclose the contents of its income Tax Returns to any Person other than the Parties. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(c) shall be borne by the Party requesting it.

(d)     Any Tax Refund of the Sellers (as described in Section 2.1(x)) that is attributable to Buyer's payment of Apportioned Taxes pursuant to Section 8.1(b) shall be promptly paid to Buyer.

8.2     Bulk Sales.

The Sale Order shall provide either that (i) the Sellers have complied with the requirements of any Legal Requirement relating to bulk sales and transfer or (ii) compliance with the Legal Requirements relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

8.3     Payments Received.

The Sellers, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts.

8.4    Assumed Contracts: Adequate Assurance and Performance. Buyer shall, and shall cause its Affiliates to, use commercially reasonable efforts to provide adequate assurance of the future performance by Buyer of each Assumed Contract as required under Section 365 of the Bankruptcy Code. Buyer and the Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and the Sellers' Representatives available to testify before the Bankruptcy Court.

8.5    Employee Matters.

(a)    Employees. Prior to the Closing Date, Buyer shall set initial terms and conditions of employment, including wages, benefits, job duties and responsibilities and work assignment. Buyer shall determine which Employees, if any, to offer employment to, in its sole discretion. Only Employees who are offered and accept such offers of employment with Buyer based on the initial terms and conditions set by Buyer and further then actually commence employment with Buyer will become "Buyer Employees" after the Closing. The Sellers shall terminate, or shall cause to be terminated, on or prior to the Closing Date, the employment of all Employees who are offered and accept offers of employment with Buyer pursuant to this Section 8.5(a). Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on Buyer any obligation to retain any Buyer Employee in its employment for any amount of time or on any terms and conditions of employment. Except as described in the remaining sentences of this Section 8.5, the employment of each such Buyer Employee with Buyer will commence immediately after the Closing Date. In the case of any individual who is offered employment by Buyer and accepts such offer, but who is absent from active employment and receiving short-term disability or workers' compensation benefits, the employment of any such individual with Buyer would commence upon his or her return to active work, and such individual would become a Buyer Employee as of such date. Except as otherwise required by Legal Requirement, specified in this Agreement, or otherwise agreed in writing by Buyer, Buyer shall not be obligated to provide any severance, separation pay, or other payments, rights or benefits, including any key employee retention payments, to any Employee on account of any termination of such Employee's employment before the Closing, and such payments, rights and/or benefits (if any) shall remain obligations of the Sellers.

(b)    Access to Information. After the Execution Date, the Sellers shall provide Buyer and its Affiliates with reasonable access to the Employees and with information, including employee records and Benefit Plan data, reasonably requested by Buyer and such Affiliates, except as otherwise prohibited by Legal Requirements.

(c)    Payroll Taxes. For purposes of payroll taxes with respect to Buyer Employees, the Sellers shall treat the transactions contemplated hereby, as a transaction described in Treasury Regulation Sections 31.3121(a)(1)-1(b)(2) and 31.3306(b)(1)-(b)(2) (i.e., Buyer shall be treated as a successor for payroll tax purposes); and as such, the Sellers and Buyer shall report on a predecessor/successor basis as set forth under the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320.

69

(d)    No Third Party Beneficiaries; Employment Status. All provisions contained in this Agreement with respect to employee benefit plans or compensation of Buyer Employees are included for the sole benefit of the respective Parties. Nothing contained herein (i) shall confer upon any former, current or future employee of the Sellers or Buyer or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future Employee to be other than terminable at will or (iii) shall confer any third party beneficiary rights upon any Buyer Employee or any dependent or beneficiary thereof or any heirs or assigns thereof.

(e)    WARN Act. With respect to Buyer Employees, Buyer will have full responsibility under the WARN Act relating to any act or omission of Buyer after the Closing Date. With respect to the Employees, the Sellers will have full responsibility under the WARN Act relating to any act or omission on or prior to the Closing Date, including responsibility for any WARN Act Liabilities that result from Employees' separation of employment from the Sellers and/or Employees not becoming Buyer Employees pursuant to this Section 8.5. Unless otherwise agreed to by the Sellers and Buyer, the Sellers agree to issue all WARN Acts notices, in a form acceptable to Buyer, no later than sixty (60) days prior to the Closing Date, to the Employees and all other parties required to receive notice under the WARN Acts.

(f)    Collective Bargaining Agreements. Buyer does not accept or assume any Collective Bargaining Agreements to which any Seller is a party to or subject to, and expressly declines to be bound by or accept the terms of any such Collective Bargaining Agreements. Buyer is not and shall not be obligated to, and does not, accept or adopt any wage rates, employee benefits, employee policies, or any other terms and conditions of employment.

8.6    Post-Closing Books and Records and Personnel.

From and after the Closing Date for a period of one (1) year, each party shall provide the other Parties (and their respective Representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, to the assets, books, records, systems and other property and any employees of the other Parties so as to enable Buyer and the Sellers to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions, and to enable the Sellers to wind down the Business. During such one (1) year period, each Party (and their respective Representatives) shall be permitted to make copies of any books and records described in this Section 8.6, subject to the confidentiality requirements set forth in Sections 7.1 and 12.2. If any Party desires to dispose of any such books and records, such Party shall, thirty (30) days prior to such disposal, provide the other Party with a reasonable opportunity to remove or copy such records to be disposed of at the removing Party's expense. Buyer shall retain such books and records for a period of six (6) years following the Closing.

8.7    Casualty Loss.

Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is condemned or taken by eminent domain, or

70

is damaged or destroyed by fire, flood or other casualty, the Sellers shall notify Buyer promptly in writing of such fact, and (a) in the case of condemnation or taking, the Sellers shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing, and (b) in the case of fire, flood or other casualty, the Sellers shall assign the insurance proceeds therefrom to Buyer at the Closing. Notwithstanding the foregoing, the provisions of this Section 8.7 shall not in any way modify Buyer's other rights under this Agreement, including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect.

8.8     Change of Name.

Promptly following the Closing, each Seller shall, and shall cause its direct and indirect Subsidiaries to, discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Seneca," "Seminole," "Maple Eagle" and/or "Oak Grove" without the prior written consent of Buyer, and each Seller shall cause the names of the Sellers in the caption of the Bankruptcy Cases to be changed to the new names of each Seller as provided in the last sentence of this Section 8.8; provided, however, that each Seller and each of its direct and indirect Subsidiaries may use its current name (and any other trade name or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) included on any business cards, stationery and other similar materials following the Closing for a period of up to one hundred eighty (180) days solely for purposes of winding down the affairs of each Seller and the Pinnacle Business, provided that when utilizing such materials, other than in incidental respects, each Seller and each of its direct and indirect Subsidiaries shall use commercially reasonable efforts to indicate its new name and reference its current name (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct Subsidiaries) as "formally known as" or similar designation. From and after the Closing, except as otherwise set forth in this Agreement (including this Section 8.8), each Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, "d/b/a" names or any mark that is confusingly similar to the Intellectual Property rights utilized by the Sellers and the Sellers' Subsidiaries in the conduct of the Business or any Acquired Asset, which rights shall be included in the Acquired Assets purchased hereunder. Immediately following the Closing, the Sellers shall file, and shall cause their respective direct and indirect Subsidiaries to file, all necessary organizational amendments with the applicable Secretary of State of each such entity's jurisdiction of formation and in each State in which each such Seller is qualified to do business and with the Bankruptcy Court to effectuate the foregoing.

8.9     No Successor Liability.

The Parties intend that, except as included in the Assumed Liabilities, upon the Closing, Buyer shall not be deemed to: (a) be the successor of or successor employer (as described under any applicable Legal Requirement) to the Sellers, including, with respect to any Collective Bargaining Agreements and any Benefit Plans, under the Coal Act, and any common law successor liability in relation to the UMWA 1974 Pension Plan, including with respect to withdrawal liability, (b) have, *de facto*, or otherwise, merged with or into the Sellers, (c) be a mere continuation or substantial continuation of the Sellers or the enterprise(s) of the Sellers, or (d) be liable for any acts or omissions of the Sellers in the conduct of the Business or arising

under or related to the Acquired Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Buyer shall not be liable for any Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) against any Seller or any of its predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, or whether fixed or contingent, whether now existing or hereafter arising, with respect to the Business, the Acquired Assets or any Liabilities of the Sellers arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this Section 8.9 shall be reflected in the Sale Order.

## ARTICLE 9

### CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Buyer, in its sole and absolute discretion:

9.1     Accuracy of Representations.

The representations and warranties of the Sellers set forth in this Agreement shall be true and correct in all material respects (except that (i) Section 5.20(a) and (ii) those representations and warranties which are qualified as Material Adverse Effect shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date); provided, however, that in the event of a breach of a representation or warranty other than a representation or warranty qualified by Material Adverse Effect, the condition set forth in this Section 9.1 shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a Material Adverse Effect. Buyer shall have received a certificate of the Sellers to such effect signed by a duly authorized officer of each Seller.

9.2     Sellers' Performance.

The covenants and agreements that the Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects and Buyer shall have received a certificate of the Sellers to such effect signed by a duly authorized officer of each Seller.

9.3     No Order.

No Governmental Authority shall have enacted, issued, promulgated, decreed or entered any Final Order from and after the Execution Date, which is in effect and has the effect of prohibiting (or delaying beyond the Outside Date) the consummation of or imposing material modifications on the transactions contemplated hereby.

9.4     <u>Governmental Authorizations</u>.

(a)     To the extent that the HSR Act is applicable, any waiting period (and any extension thereof) under the HSR Act and the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business contemplated hereby shall have expired or shall have been terminated.

(b)     Subject to <u>Section 2.5</u>, all of the Closing Required Permits shall (i) have been transferred to, or obtained by, Buyer or (ii) with respect to any Transferred Permits that have not been transferred at or prior to the Closing, Buyer shall have the right to conduct, pursuant to <u>Section 7.7</u>, mining operations following the Closing on the applicable Real Property.

9.5     <u>Sellers' Deliveries</u>.

Each of the deliveries required to be made to Buyer pursuant to <u>Section 4.3(a)-(g)</u> shall have been so delivered.

9.6     <u>Sale Order</u>.

The Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to the Sellers and Buyer, and the Sale Order shall have become a Final Order.

9.7     <u>Assumed Contracts</u>.

The Bankruptcy Court shall have approved and authorized, other than with respect to Cure Costs, the assumption and assignment of each Assumed Contract, except as would not have a material effect on the Business from and after the Closing.

9.8     <u>Material Adverse Effect</u>.

Since the Execution Date, no Material Adverse Effect shall have occurred.

9.9     <u>UMWA</u>.

(a) The UMWA shall have agreed to waive or remove the successor clause in the UMWA Collective Bargaining Agreements, or (b) the Bankruptcy Court shall have granted a motion acceptable to Buyer filed by the applicable Seller pursuant to Section 1113(c) of the Bankruptcy Code authorizing the applicable Seller to reject the UMWA Collective Bargaining Agreements.

9.10     <u>Escrow Amounts</u>.

No later than five (5) Business Days prior to the Hearing, the Sellers and Buyer shall have agreed to the amounts of the Estate Retained Professional Fees Escrow Amount, the Payroll Escrow Amount and the Wind Down Escrow Amount.

9.11     [<u>Frustration of Conditions</u>.

Notwithstanding anything to the contrary herein, Buyer may not rely on the failure of any condition set forth in this <u>Article 9</u> to be satisfied to excuse it from its obligation to

73

effect the transactions contemplated hereby if such failure was caused by Buyer's breach of its obligations under this Agreement.][6]

# ARTICLE 10

## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF THE SELLERS TO CLOSE

The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by the Sellers, in their sole and absolute discretion:

### 10.1    Accuracy of Representations.

The representations and warranties of Buyer set forth in Article 6 of this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as to Material Adverse Effect shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date); provided, however, that in the event of a breach of a representation or warranty, the condition set forth in this Section 10.1 shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereby. The Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer of Buyer.

### 10.2    Buyer's Performance.

The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects, and the Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer of Buyer.

### 10.3    No Order.

No Governmental Authority shall have enacted, issued, promulgated, decreed, or entered any Final Order from and after the Execution Date, which is in effect and has the effect of prohibiting (or delaying beyond the Outside Date) the consummation of the transactions contemplated hereby.

### 10.4    Governmental Authorizations.

To the extent that the HSR Act is applicable, any waiting period (and any extension thereof) under the HSR Act and the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business contemplated hereby shall have expired or shall have been terminated.

---

[6]    **NTD**: Subject to further discussion, all rights of Buyer and Sellers are reserved.  Above reflects Seller's position; Buyer's position is to remove this provision.

10.5     Sale Order.

The Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to the Sellers and Buyer, and the Sale Order shall have become a Final Order.

10.6     Buyer's Deliveries.

Each of the deliveries required to be made to the Sellers pursuant to Section 4.2(a)-(h) shall have been so delivered.

10.7     Escrow Amounts.

No later than five (5) Business Days prior to the Hearing, the Sellers and Buyer shall have agreed to the amounts of the Estate Retained Professional Fees Escrow Amount, the Payroll Escrow Amount and the Wind Down Escrow Amount.

10.8     [Frustration of Conditions.

Notwithstanding anything to the contrary herein, the Sellers may not rely on the failure of any condition set forth in this Article 10 to be satisfied to excuse the Sellers from their obligation to effect the transactions contemplated hereby if such failure was caused by the Sellers' breach of their obligations under this Agreement.][7]


# ARTICLE 11

## TERMINATION

11.1     Termination Events.

Notwithstanding anything to the contrary, this Agreement may be terminated at any time prior to the Closing only as follows:

(a)      by mutual written consent of the Sellers and Buyer;

(b)      by written notice from either the Sellers or Buyer:

(i)      if a Governmental Authority issues a final, non-appealable ruling or Order permanently restraining, enjoining or otherwise prohibiting consummation of the transactions contemplated hereby where such ruling or Order was not requested, encouraged or supported by any of the Sellers or Buyer; provided, that the right to terminate this Agreement under this Section 11.1(b)(i) shall not be available to any Party whose willful failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date;

(ii)      if the Closing shall not have occurred on or prior to April 12, 2018 (the "Outside Date"); provided, that the terminating party under this Section 11.1(b)(ii) is not (at such time of termination) in breach of any representation, warranty, covenant or other

---

[7]      **NTD**: Subject to further discussion, all rights of Buyer and Sellers are reserved.  Above reflects Seller's position; Buyer's position is to remove this provision.

agreement in this Agreement so as to cause any conditions to the Closing not to be satisfied and shall not have been the proximate cause of the failure of the Closing to occur on or prior to the Outside Date;

(iii)    if at the end of the auction contemplated by the Bidding Procedures, Buyer is not determined by the Sellers to be either the (A) Successful Bidder or (B) Backup Bidder; provided, that in the event Buyer is determined to be the Backup Bidder with respect to the Acquired Assets, then, this Agreement will terminate automatically without further action by any Party upon the earlier to occur of (X) the closing of a Successful Bid and (Y) the date that is sixty (60) days after the date of the sale hearing contemplated by the Bidding Procedures;

(iv)    if the Bankruptcy Court shall have entered an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by the Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases;

(v)    upon the final, non-appealable ruling or denial of the Governmental Authorizations described in Sections 9.4 and 10.4.

(c)    by written notice from Buyer:

(i)    upon the occurrence of any Termination Event (as defined in the Final DIP Order);

(ii)    the termination of the DIP Credit Agreement;

(iii)    other than as contemplated by the Bidding Procedures Motion or Bidding Procedures Order, if any Seller seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by the Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases, or if a trustee in the Bankruptcy Cases or a responsible officer or an examiner with enlarged powers is appointed (other than a fee examiner) relating to the operation of the Sellers' businesses pursuant to Section 1104 of the Bankruptcy Code, or such an order of dismissal, conversion or appointment is entered and is not reversed or vacated within fourteen (14) days after the entry thereof;

(iv)    in the event of any breach of, or failure to perform, by any Seller of any of their agreements, covenants, representations or warranties contained herein, which breach or failure to perform (A) would result in the Sellers being unable to satisfy a condition set forth in Article 9 by the then-applicable Outside Date and (B) cannot be cured within ten (10) Business Days after Buyer notifies the Sellers of such breach in writing; provided, that Buyer shall not have a right of termination pursuant to this Section 11.1(c)(iv) if it is then in breach of any of its material agreements, covenants, representations or warranties contained herein or in the Sale Order;

(v)    if, for any reason, Buyer (other than as a result of its own breach of this Agreement) is unable, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid in payment of all or any portion of the Purchase Price as set forth in Section 3.1 (other than the Assumed Liabilities and the cash portion of the Purchase Price); provided, that the inability to credit bid post-petition interest payable under Section 506(b) of the Bankruptcy Code

76

or any other amount not in excess of $1,000,000 shall not give rise to a termination right under this Section 11.1(c)(v); or

(vi)  a Material Adverse Effect occurs and is continuing; or

(d)  by written notice from the Sellers in the event of any breach of, or failure to perform, by Buyer of any of its agreements, covenants, representations or warranties contained herein, which breach or failure to perform (A) would result in Buyer being unable to satisfy a condition set forth in Section 10.1 or Section 10.3 by the then-applicable Outside Date and (B) cannot be cured within ten (10) Business Days after such Seller notifies Buyer of such breach in writing; provided, that the Sellers shall not have a right of termination pursuant to this Section 11.1(d) if any Seller is then in breach of any of such Seller's agreements, covenants, representations or warranties contained herein or in the Sale Order.

Each condition set forth in this Section 11.1, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in this Section 11.1 are applicable, the applicable party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

11.2  Effect of Termination.

In the event of termination of this Agreement by Buyer or the Sellers pursuant to this Article 11, this Agreement shall become null and void and have no effect and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party except (i) nothing herein shall relieve any Party from Liability for any breach of this Agreement occurring prior to such termination and (ii) the provisions of Section 7.1(a) (Access and Reports; Confidentiality), Section 12.9 (Expenses), Section 12.10 (Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver) and this Section 11.2 (and, to the extent applicable to the interpretation or enforcement of such provisions, Article 1 and Article 12), shall expressly survive the termination of this Agreement.

# ARTICLE 12

## GENERAL PROVISIONS

12.1  Survival.

All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach thereof.

12.2  Confidentiality.

Following the Closing, the Sellers agree not to disclose any confidential or non-public information concerning the Acquired Assets or the business affairs of Buyer or the

Assumed Liabilities ("Confidential Information") except disclosure of Confidential Information that (a) was or is lawfully obtained from a source that, to the knowledge of such Seller, was not under an obligation of confidentiality to Buyer with respect to such information, (b) is independently developed by such Seller without violating any of its obligations under this Agreement, (c) is or becomes available to the public without any breach by the Sellers of the terms of this Agreement, (d) is or may be necessary to wind down any of the Sellers' estates, or in connection with the enforcement of the rights of, or the defense of any Proceeding against or involving, any Seller provided that the Confidential Information is afforded confidential treatment, (e) relates to any Excluded Assets and/or Excluded Liabilities, (f) is or may be necessary in connection with the Bankruptcy Cases provided that the Confidential Information is afforded confidential treatment or (g) is disclosed to a bidder in connection with an Alternative Transaction; provided, that the bidder in such Alternative Transaction agrees for the benefit of Buyer to maintain the confidentiality of the Confidential Information. Notwithstanding the foregoing, a Seller may disclose Confidential Information if such Seller believes (after consultation with counsel) it is legally required to make such disclosure in order to comply with applicable law, regulation, rule or legal, judicial or administrative process (including any rule, regulation or policy statement of (i) any self-regulatory organization of which a party is a member) or (ii) in connection with the Bankruptcy Cases. If a Seller or any of its Representatives becomes required (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) or it becomes necessary in connection with the Bankruptcy Cases to disclose any of the Confidential Information, such Seller or Representative shall use reasonable efforts to provide Buyer with prompt notice, to the extent allowed by law, rule and regulation, of such requirement. Each Seller agrees to disclose only that portion of the Confidential Information which it believes it is necessary or required to disclose and to use commercially reasonable efforts to obtain confidential treatment of such Confidential Information.

12.3    Public Announcements.

Except as required in the Bankruptcy Cases, prior to the Closing, unless otherwise required by applicable Legal Requirement or by obligations of Buyer or the Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Buyer, on the one hand, and the Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed). From and after the Closing, the Parties may make public statements with respect to this Agreement or the transactions contemplated hereby so long as such announcements do not disclose the specific terms or conditions of this Agreement except where such terms and conditions have already been disclosed as required by Legal Requirement; provided, that the issuing party shall use its commercially reasonable efforts to consult with the other party with respect to the text thereof to the extent practicable.

12.4    Notices.

All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been

78

duly given if delivered personally or sent by overnight courier or electronic mail, or facsimile transmission:

(i)        If to the Sellers, then to:

        Mission Coal Company, Inc.
        7 Sheridan Square, Suite 300
        Kingsport, Tennessee 37660
        Attn: Gary Broadbent
        Facsimile: 423-212-2980
        Email: gary.broadbent@missioncoal.com

with a copy (which shall not constitute notice) to:

        Christian & Small LLP
        505 North 20th Street, Suite 1800
        Birmingham, Alabama 35203
        Attn:   Daniel D. Sparks
                Bill D. Bensinger
        Facsimile: 205-328-7234
        Email: ddsparks@csattorneys.com
                bdbensinger@csattorneys.com

and

        Kirkland & Ellis LLP
        Kirkland & Ellis International, LLP
        300 North LaSalle
        Chicago, Illinois 60654
        Attn:   Melissa N. Koss
        Facsimile: 312-862-2200
        Email: melissa.koss@kirkland.com

and

        Kirkland & Ellis LLP
        Kirkland & Ellis International, LLP
        601 Lexington Avenue
        New York, New York 10022
        Attn:   Stephen E. Hessler, P.C.
                Ciara Foster
        Facsimile: 212-446-4900
        Email: stephen.hessler@kirkland.com
                ciara.foster@kirkland.com

and

        Kirkland & Ellis LLP

79

Kirkland & Ellis International, LLP
901 Main Street
Dallas, Texas 75202
Attn: Michael Considine, P.C.
Facsimile: 214-972-1771
Email: MPConsidine@kirkland.com

(ii) If to Buyer:

New Coal Acquisition Co, LLC
[●]

with a copy (which shall not constitute notice) to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn:   Arik Preis
          Lisa Beckerman
          Allison Miller
          Jason Rubin
Facsimile: 212-872-1002
Email: apreis@akingump.com
          lbeckerman@akingump.com
          amiller@akingump.com
          jrubin@akingump.com

or to such other person or address as any party shall specify by notice in writing to the other party. All such notices, requests, demands, waivers and communications shall be deemed to have been received on the date on which so personally-delivered or faxed or delivered by overnight courier.

12.5    Waiver.

Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by Legal Requirements, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

12.6    Entire Agreement; Amendment.

This Agreement (including the Disclosure Schedules and the Exhibits), the Sale Order, the Bidding Procedures Order and the other Transaction Documents supersede all prior

80

agreements between Buyer, on the one hand, and the Sellers, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and the Sellers, on the other hand, with respect to their subject matter. This Agreement may not be amended, modified or supplements except by a written agreement executed by each of the Parties.

12.7    Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of all of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party) and any assignment in contravention of this Section 12.7 shall be null and void ab initio; provided, however, that, subject to compliance with Section 4.4, Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Buyer Designees without the prior consent of the Sellers; provided, that no such assignment shall relieve Buyer from its liabilities or obligations hereunder; provided, further, that the Sellers shall be permitted to assign their rights hereunder in part to one or more Successful Bidders or to the acquirer of any Excluded Assets or Excluded Liabilities with the prior written consent of Buyer; provided, that no such assignment shall relieve the Sellers from their liabilities or obligations hereunder, other than with respect to such Excluded Assets or Excluded Liabilities.

12.8    Severability.

The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

12.9    Expenses.

Except as otherwise expressly provided in this Agreement or in the DIP Credit Agreement, whether or not the transactions contemplated hereby are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby. Any and all fees required by (i) any Governmental Authority or any Person to obtain or for the transfer of a Permit or (ii) incurred in connection with complying with any Antitrust Law, shall be the sole responsibility of Buyer.

12.10    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state

Case 18-04177-TOM11    Doc 393    Filed 12/05/18    Entered 12/05/18 14:18:46    Desc
Main Document    Page 131 of 164

without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b)     Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding; provided, however, that, if the Bankruptcy Cases have been closed pursuant to Section 350(a) of the Bankruptcy Code, all Actions and Proceedings arising out of or relating to this Agreement shall be heard and determined in a New York state court or a federal court sitting in the Borough of Manhattan, New York, New York, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding. The Parties consent to service of process by mail (in accordance with Section 12.4) or any other manner permitted by law.

(c)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF THE SELLERS, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

12.11   Counterparts.

This Agreement and any amendment hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument. Notwithstanding anything to the contrary in Section 12.4, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

12.12   Parties in Interest; No Third Party Beneficiaries; No Amendment.

This Agreement and the other Transaction Documents shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Except with respect to the parties released and/or exculpated pursuant to the Waiver, this Agreement and the other Transaction Documents are for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind. Notwithstanding anything to the contrary, nothing in this Agreement shall constitute an amendment to any Benefit Plan.

Case 18-04177-TOM11     Doc 393     Filed 12/05/18     Entered 12/05/18 14:18:46     Desc
Main Document     Page 132 of 164

12.13   Remedies.

Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit the Sellers or Buyer in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

12.14   Specific Performance.

Each Party recognizes that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by them in accordance with the terms hereof or were otherwise breached, and that monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries. Accordingly, a non-breaching Party shall be entitled, in addition to any other remedies that may be available, to injunctive relief to specifically enforce the terms and provisions of this Agreement. If any Action or Proceeding is brought by the non-breaching Party or Parties to enforce any of the terms or provisions of this Agreement pursuant to this Section 12.14, the Party in breach shall waive the defense that there is an adequate remedy at law. Each Party agrees to waive any requirement for the security or posting of any bond in connection with any Action or Proceeding seeking specific performance of such terms or provisions and that the only permitted objection that it may raise in response to any action for specific performance of such terms or provisions is that it contests the existence of a breach or threatened breach of such provisions. The rights set forth in this Section 12.14 shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

*[Signature pages follow.]*

**IN WITNESS WHEREOF,** the Parties have caused this Asset Purchase Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

**<u>SELLERS</u>**:

MISSION COAL COMPANY, LLC

By:_____
Name:
Title:

BEARD PINNACLE, LLC

By: _____
Name:
Title:

OAK GROVE LAND COMPANY, LLC

By: _____
Name:
Title:

OAK GROVE RESOURCES, LLC

By: _____
Name:
Title:

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

PINNACLE LAND COMPANY, LLC


By: _____
Name:
Title:



PINNACLE MINING COMPANY, LLC


By: _____
Name:
Title:



SEMINOLE ALABAMA MINING COMPLEX, LLC


By:_____
Name:
Title:



SEMINOLE COAL RESOURCES, LLC


By:_____
Name:
Title:



SEMINOLE WEST VIRGINIA MINING COMPLEX,
LLC


By:_____
Name:
Title:


[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

SENECA COAL RESOURCES, LLC

By:_____
Name:
Title:

SENECA NORTH AMERICAN COAL LLC

By:_____
Name:
Title:

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**<u>BUYER</u>**:

NEW COAL ACQUISITION CO, LLC

By: _____
Name:
Title:

**Exhibit 2**

**Bidding Procedures**

3

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF MISSION COAL COMPANY AND CERTAIN DEBTOR AFFILIATES

On [●], 2018, the United States Bankruptcy Court for the Northern District of Alabama (the "Court") entered the *Order Establishing Bidding Procedures Relating to the Sale of All or a Portion of the Debtors' Assets* [Docket No. ___] (the "Bidding Procedures Order"),[2] by which the Court approved the following procedures. These Bidding Procedures set forth the process by which the Debtors are authorized, in consultation with the Consultation Parties,[3] to conduct an auction (the "Auction"), if any, for the sale (the "Sale") of all, substantially all, or any combination of the Debtors' assets (the "Assets").

New Coal Acquisition Co., LLC (including its assignees or designees, the "Stalking Horse Bidder") submitted a bid (the "Stalking Horse Bid") for certain of the Debtors' assets to set a floor for the Sale. Having announced and received Bankruptcy Court approval of the Stalking Horse Bid, the Debtors will now conduct a round of open bidding intended to obtain the highest or otherwise best bid for all, substantially all, or any combination of the Assets, culminating in an Auction for such Assets if competing bids are received.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

[3] "Consultation Parties" means the following parties: (a) the DIP Lenders (as defined in the Final DIP Order) and their counsel and financial advisors, including Akin Gump Strauss Hauer & Feld LLP and Houlihan Lokey; (b) the DIP Agent (as defined in the Final DIP Order) and their counsel; (c) counsel and financial advisors to the official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "Committee"); and (d) counsel and financial advisors to WPP LLC, by NRP (Operating) LLC, its sole member ("NRP") to the extent provided for in the *Agreed Order and Settlement Agreement Related to Motion to Assume Oak Grove Coal Mining Lease* [Docket No. 299]. Notwithstanding the foregoing, a party shall not be a Consultation Party if such party is a bidder at the Auction; *provided*, *however*, if any such Consultation Party notifies the Debtors in writing that it irrevocably forfeits its rights to be a bidder, the foregoing restriction shall no longer apply with respect to such Consultation Party upon the Debtors' receipt of such notice.

> **Copies of the Bidding Procedures Order or other documents related thereto are available upon request to Omni Management Group by calling 888-585-6494 or visiting the Debtors' restructuring website at (https://omnimgt.com/sblite/missioncoal/).**

To the extent that these Bidding Procedures require the Debtors to consult with any Consultation Party in connection with making a determination or taking any action, or in connection with any other matter related to these Bidding Procedures or at the Auction, of any, the Debtors shall do so in a regular and timely manner prior to making such determination or taking any such action.

### Key Dates

These Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Debtors and to submit competing bids for the Assets. The Debtors shall assist interested parties in conducting their respective due diligence investigations and shall accept Bids until **January 21, 2019 at 4:00 p.m. (prevailing Central time)** (the "Bid Deadline").

The key dates for the sale process are as follows:[4]

| | |
|---|---|
| January 21, 2019 at 4:00 p.m. (prevailing Central time) | Bid Deadline - Due Date for Bids and Deposits |
| January 25, 2019 at 4:00 p.m. (prevailing Central time) | Debtors to determine which Bids are Qualified Bids and notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder. |
| February 25, 2019 at 4:00 p.m. (prevailing Central time) | Debtors to provide the Stalking Horse Bidder and each Qualified Bidder a schedule setting forth (i) the highest or otherwise best fully binding offer for the Assets and/or (ii) the highest or otherwise best fully binding offer(s) for all or any portion of the Assets. |
| February 27, 2019 at 10:00 a.m. (prevailing Central time) | Auction (if necessary), which will be held at Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022. |
| March [20], 2019 at 10:00 a.m. (prevailing Central time) | Sale Hearing, which will be held at the United States Bankruptcy Court for the Northern District of Alabama, Southern Division, 1800 Fifth Avenue, North Birmingham, Alabama 35203 |

---

[4]   These dates are subject to extension or adjournment as provided for herein.

Unless otherwise approved by the Bankruptcy Court, no modification, extension, waiver or addition to these Bidding Procedures shall be inconsistent with the Stalking Horse Agreement, the Bidding Procedures Order or any other Order of the Bankruptcy Court, unless otherwise ordered by the Bankruptcy Court or with the prior consent of the DIP Lenders.

1.      **Submissions to the Debtors.**

These Bidding Procedures set forth the terms by which prospective bidders, if any, may qualify for and participate in an Auction, thereby competing to make the highest or otherwise best offer or combination of offers for all, substantially all, or any combination of the Assets, which in the aggregate will make the highest or otherwise best offer to purchase the Assets. The Assets will be offered for sale in one or more combinations, and as a whole, through an Auction. The Debtors, in consultation with the Consultation Parties, may consider bids from multiple bidders (including multiple bids submitted by the same bidder) for the Assets in any combination. The Stalking Horse Purchase Agreement and Stalking Horse Bid referenced herein provide for the Stalking Horse Bidder's acquisition of certain of the Debtors' assets, subject to the terms and conditions thereof.

2.      **Potential Bidders.**

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity (other than the Stalking Horse Bidder) interested in consummating a Sale (a "<u>Potential Bidder</u>") must deliver or have previously delivered to the Debtors:

> (i)      an executed confidentiality agreement on terms acceptable to the Debtors (a "<u>Confidentiality Agreement</u>"), to the extent not already executed;

> (ii)     in a form acceptable to the Debtors and their advisors, in consultation with the Consultation Parties: (x) evidence of the financial capability to consummate the Sale, and (y) a written commitment from the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the Sale); and

> (iii)    any other evidence the Debtors, in consultation with the Consultation Parties, may reasonably request to evaluate the buyer.

3.      **Due Diligence.**

Only Potential Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors. **No Potential Bidder will be permitted to conduct any due diligence that includes confidential information without entering into a Confidentiality Agreement with the Debtors.** The Debtors will provide to each Potential Bidder that satisfies the foregoing commercially reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any Potential Bidder to the Debtors' electronic data room. For all Potential Bidders, the due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

3

The Debtors shall not furnish any confidential information relating to the Assets, liabilities of the Debtors, or the Sale to any person except to a Potential Bidder or to such Potential Bidder's duly authorized representatives to the extent provided in the applicable Confidentiality Agreement. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided that* the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

The Debtors also reserve the right to, in consultation with the Consultation Parties, withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder.

**All due diligence requests must be directed to** Jefferies LLC, 520 Madison Avenue, New York, New York 10022, Attn: Leon Szlezinger (lszlezinger@jefferies.com), Dan Chu (dan.chu@jefferies.com), Seth Herman (sherman@jefferies.com), and Johnston Suter (jsuter@jefferies.com).

(a)     **Communications with Potential Bidders.**

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive communications related to the Sale between and amongst Potential Bidders shall exclusively be through the Debtors and the Debtors' advisors. Communications between and amongst Potential Bidders is expressly prohibited unless the Debtors expressly consent in writing to such communication.

(b)     **Due Diligence from Potential Bidders.**

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors, regarding the ability of the Potential Bidder to consummate the Sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Consultation Parties, to determine that such bidder is no longer a Potential Bidder or that a bid made by such Potential Bidder is not a Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable

4

confidentiality agreement, the Debtors and the Debtors' advisors may disclose confidential information: (i) with the prior written consent of such bidder; (ii) to the applicable bidder; (iii) in accordance with these Bidding Procedures, including to any Consultation Party; and (iv) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

4. **Qualified Bidders.**

(a) A "<u>Qualified Bidder</u>" is a Potential Bidder (A) who demonstrates the financial capability to consummate the Sale (as determined by the Debtors in consultation with the Consultation Parties), (B) whose Bid is a Qualified Bid (as defined herein), and (C) that the Debtors, in consultation with the Consultation Parties, determine should be considered a Qualified Bidder. Within three business days after the Bid Deadline, the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder. The Stalking Horse Bidder shall be deemed a Qualified Bidder for all purposes under these Bidding Procedures and at all times.

(b) If any Potential Bidder is determined by the Debtors, in consultation with the Consultation Parties, not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit and all accumulated interest thereon on or within five business days after the Bid Deadline.

(c) For the avoidance of doubt, the Debtors expressly reserve the right to notify a Potential Bidder that its bid is not a Qualifying Bid (a "<u>Non-Qualifying Bid</u>") and permit a Potential Bidder to revise or supplement a Non-Qualifying Bid to make it a Qualified Bid. Notwithstanding the foregoing, other than as may be provided in the Stalking Horse Bid, Bidders shall be prohibited from including in their Bid a proposed use of any cash component of the Purchase Price that would be received by the Debtors if such Bidder were the Successful Bidder.

(d) Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, if any, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Except as otherwise set forth in the Stalking Horse Agreement, without the written consent of the Debtors, in consultation with the Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase their consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction, if any, as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

5

5.      **Bid Requirements.**

A proposal, solicitation, or offer (each, a "Bid") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (the "Bid Requirements") as determined by the Debtors, in their reasonable business judgment and after consultation with the Consultation Parties, shall constitute a "Qualified Bid").

**(a)** **Assets.** Each Bid must clearly state which Assets that the Qualified Bidder is agreeing to purchase and assume. With respect to a bid for some, but not all, of the Assets, the allocation of value in U.S. dollars that the Potential Bidder associates with each mine (or group of mines if such bid is conditioned upon the purchase of all mines in such group), including a description of any significant assumptions on which such valuation is based.

**(b)** **Assumption of Obligations.** Each Bid must clearly state which liabilities and obligations of the Debtors the Qualified Bidder is agreeing to assume.

**(c)** **Purchase Price.** Each Bid must clearly set forth the purchase price to be paid for the applicable asset package, including and identifying separately any cash and non-cash components, which non-cash components shall be limited only to credit-bids and assumed liabilities (the "Purchase Price").

**(d)** **Minimum Bid.**

(i)      At a minimum, each Bid seeking to acquire all of the Debtors' assets that are the subject of the Stalking Horse Bid must have a Purchase Price that in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, has a monetary value equal or greater than the aggregate Assumed Liabilities, Credit Bid and Release contemplated by the Stalking Horse Bid, plus $1 million in cash or cash equivalents (collectively, the "Minimum Overbid"); or

(ii)     At a minimum, each Bid seeking to acquire individual assets or combinations of assets that are less than all of the Debtors' assets (each a "Partial Bid") must have a Purchase Price that in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, has a value, individually or in conjunction with one or more other Bids, that satisfies the criteria for being a Qualified Bid (as defined below). Any Partial Bid must include an allocation of the Purchase Price with respect to the applicable mines such Partial Bid seeks to acquire and state whether the Bidder is willing to purchase any of the Assets included in the Bid individually, and if so, the Bid must state the price the Bidder would pay for each such Asset.

**(e)** **Markup of the Stalking Horse Purchase Agreement.** Each Bid must be accompanied by an executed purchase agreement as well as a redline of such agreement marked to reflect the amendments and modifications made to the form of the Stalking Horse Purchase Agreement provided by the Debtors to Potential

6

Bidders, which amendments and modifications may include amendments or modifications to the agreement which provide for the closing of a sale (i) outside of a plan of reorganization pursuant to section 363 of the Bankruptcy Code or (ii) pursuant to a plan of reorganization. Each such purchase agreement must provide a representation that the Qualified Bidder will (i) make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), if applicable, and (ii) submit and pay the fees associated with all necessary filings under the HSR Act as soon as reasonably practicable; *provided*, *however*, that the timing and likelihood of receiving HSR Act approval will be a consideration in determining the highest or otherwise best Bid.

(f)    **Deposit.**  Each Bid, other than the Stalking Horse Bid, must be accompanied by a cash deposit in the amount equal to 10 percent of the aggregate cash Purchase Price of the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit").

(g)    **Employee Obligations.**  Each Bid must expressly propose a treatment of the Debtors' prepetition collective bargaining agreements (the "CBAs") and post-employment benefits (collectively, the "Employee Obligations").

(h)    **Qualified Bid Documents.**  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid, and a copy of the Asset Purchase Agreement clearly marked to show all changes requested by the Qualified Bidder, including those related to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid (the "Qualified Bid Documents").

(i)    **Committed Financing.**  To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors in consultation with the Consultation Parties, that demonstrates that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with the Consultation Parties.

(j)    **Contingencies; No Financing or Diligence Outs.**  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing

of specified conditions, which shall be acceptable to the Debtors in their business judgment, after consultation with the Consultation Parties.

(k) **Identity.** Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Qualified Bidder if such Qualified Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation. Each Bid must also fully disclose whether any current or former officer, director or equity holder of the Debtors, or any entity affiliated with any current or former officer, director or equity holder of the Debtors, will be bidding or otherwise participating in connection with such Bid. Under no circumstances shall any undisclosed insiders, principals, equity holders, or financial backers be associated with any Bid (including any Overbid at the Auction). Each Bid must also include contact information for the specific persons and counsel whom Jefferies and Kirkland & Ellis LLP should contact regarding such Bid. All information disclosed pursuant to this paragraph shall be made available by the Debtors to the Consultation Parties promptly upon the Debtors' receipt thereof but in any event no later than one business day following the Bid Deadline.

(l) **Demonstrated Financial Capacity.** A Qualified Bidder must have, in the Debtors' business judgment, after consultation with the Consultation Parties, the necessary financial capacity to consummate the proposed transactions required by its Bid.

(m) **Adequate Assurance of Future Performance.** Each Bid must (i) identify the executory contracts and unexpired leases to be assumed and assigned in connection with the proposed Sale, (ii) provide for the payment of all cure costs related to such executory contracts and unexpired leases by the Qualified Bidder and (iii) demonstrate, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, that the Qualified Bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases.

(n) **Time Frame for Closing.** A Bid by a Qualified Bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors, after consultation with the Consultation Parties, which time frame shall include a closing by no later than April 12, 2019.

(o) **Binding and Irrevocable.** A Qualified Bidder's Bid for a particular asset package shall be irrevocable unless and until the Debtors accept a higher Bid for such asset package and such Qualified Bidder is not selected as the Backup Bidder for such asset package.

(p) **Expenses; Disclaimer of Fees.** Each Bid (other than a Stalking Horse Bid, solely

8

to the extent set forth in the Stalking Horse Agreement) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder, solely to the extent set forth in the Stalking Horse Agreement) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction, if any, or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

(q) **Authorization.** Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors, in consultation with the Consultation Parties) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

(r) **As-Is, Where-Is.** Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Asset Purchase Agreement.

(s) **Adherence to Bid Procedures.** By submitting its Bid, each Qualified Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction, if any.

(t) **Transfer of Mining Permits/Assumption of Reclamation Obligations.** Each Bid must (i) provide that the Bidder will: (a) take transfer of or obtain permits for the mining operations to be acquired; (b) assume all associated reclamation obligations with respect to the mines subject to the Bid to the extent required under applicable nonbankruptcy law; and (c) obtain assignment of or replace the reclamation surety bonds associated with such permits, and (ii) provide evidence of: (a) the Bidder's ability to satisfy the conditions set forth in clause (i) of this paragraph (including verification that the Bidder is not, and will not be as of the time of the transfer, "permit blocked" under the federal Surface Mining Control and Reclamation Act by application of the federal Applicant Violator System); and (b) the Bidder's financial resources necessary to obtain assignment of or replace the reclamation surety bonds associated with such permits, which evidence may include a letter from a surety company confirming that the Bidder is a "qualified buyer" (as such term is used in the surety industry).

9

(u) **Government Approvals.** Each Bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sale, together with evidence satisfactory to the Debtors, after consultation with the Consultation Parties, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals;

(v) **Government Approvals Timeframe.** Each Bid must set forth an estimated timeframe for obtaining any required internal, governmental, licensing, regulatory or other approvals or consents for consummating any proposed Sale.

(w) **Consent to Jurisdiction.** The Qualified Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, if any, the construction and enforcement of these Bidding Procedures, the Sale documents, and the Closing, as applicable.

(x) **Bid Deadline.** Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before **4:00 p.m. (prevailing Central Time) on January 21, 2019** by:

(i) **Debtors.** Mission Coal Company, LLC, 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660, Attn: Gary M. Broadbent.

(ii) **Debtors' Counsel**. Counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Stephen E. Hessler, P.C. (stephen.hessler@kirkland.com) and Ciara Foster (ciara.foster@kirkland.com) and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Melissa N. Koss (melissa.koss@kirkland.com).

(iii) **Debtors' Co-Counsel**. Co-Counsel to the Debtors, Christian & Small LLP 505 North 20th Street, Suite 1800, Birmingham, Alabama 35203, Attn: Daniel D. Sparks (ddsparks@csattorneys.com) and Bill D. Bensinger (bdbensinger@csattorneys.com).

(iv) **Debtors' Financial Advisors**. Financial advisors to the Debtors, Jefferies LLC, 520 Madison Avenue, New York, New York 10022, Attn: Leon Szlezinger (lszlezinger@jefferies.com), Dan Chu (dan.chu@jefferies.com), Seth Herman (sherman@jefferies.com), and Johnston Suter (jsuter@jefferies.com) and AlixPartners, 1114 Avenue of the Americas, 41st Floor, New York, NY 10036, Attn: Kevin Nystrom (knystrom@alixpartners.com) and Bret Fernandes (BFernandes@alixpartners.com).

**6.  Right to Credit Bid.**

At the Auction, if any, any Qualified Bidder, including a Stalking Horse Bidder, who has

10

a valid and perfected lien on any assets of the Debtors' estates (a "<u>Secured Creditor</u>") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code. Notwithstanding anything herein to the contrary, the Stalking Horse Bidder shall: (a) have the right (including as part of any applicable Overbid) to credit bid all or a portion of the value of the secured portion of its claims for the assets pursuant to section 363(k) of the Bankruptcy Code, including any secured claims on account of its adequate protection liens, which amount shall be no less than approximately $203,340,782, plus all accrued and unpaid interest (the "<u>DIP Claim Amount</u>"); *provided*, that nothing herein shall impact any parties' rights with respect to either (i) challenges to the liens or claims of the Stalking Horse Bidder or any Secured Creditor or (ii) assertions under section 506(c) of the Bankruptcy Code or the effects that such challenges or assertions have, if any, on the ability of any Secured Creditor (other than the Stalking Horse Bidder) to credit bid. For the avoidance of doubt, the Stalking Horse Bidder shall be considered a Qualified Bidder with respect to its right to acquire all or any of the Assets by credit bid.

7. **Auction.**

The Debtors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' judgment, after consultation with the Consultation Parties, the highest or otherwise best Qualified Bid or combination of Qualified Bids for the Assets (the "<u>Baseline Bid</u>"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidders at or prior to the Auction. When determining the highest or otherwise best Qualified Bid and selecting the winning bidder, as compared to other Qualified Bids, the Debtors may, in consultation with the Consultation Parties, consider the following factors in addition to any other factors that the Debtors deem appropriate: (a) the number, type, and nature of any changes to the Asset Purchase Agreement or Stalking Horse Agreement, if any, requested by the Qualified Bidder, including the type and amount of Assets sought and obligations to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; (e) the tax consequences of such Qualified Bid; and (f) the Employee Obligations (collectively, the "<u>Bid Assessment Criteria</u>"). For the avoidance of doubt, when determining the highest or otherwise best Qualified Bid, one dollar of the DIP Claim Amount shall be equal in all respects to one dollar of cash that may be bid by another Qualified Bidder.

If no Qualified Bids other than the Stalking Horse Bid are received by the Bid Deadline, then the Debtors may cancel the Auction, and may decide, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, to designate the Stalking Horse Bid as the Successful Bid, and pursue entry of the order approving a Sale of the Debtors' assets to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement.

The Auction, if any, shall take place at **10:00 a.m. (prevailing Central Time) on Monday, February 27, 2019**, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or such later date and time as selected by the Debtors after consultation with the Consultation Parties, and subject to the consent of the DIP Lenders. The Auction, if any, shall be conducted in a timely fashion according to the following procedures:

11

**(a)** **The Debtors Shall Conduct the Auction.**

The Debtors and their professionals shall direct and preside over the Auction, if any, in consultation with the Consultation Parties. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid for each asset package. The Debtors explicitly reserve the right, in their business judgment and after consultation with the Consultation parties, to exercise their discretion in conducting the Auction, including determining whether assets are to be auctioned separately, together, or any combination thereof, and whether to adjourn the Auction to facilitate separate discussions between Qualified Bidders, the Debtors, and the Consultation Parties, as applicable. The Debtors shall maintain a written transcript of the Auction and all Bids made and announced at the Auction, if any, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only Qualified Bidders and their legal and financial advisors, including the Stalking Horse Bidder, and the members and advisors of the Committee, shall be entitled to attend the Auction, if any, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to bid at the Auction, if any.

**(b)** **Terms of Overbids.**

"Overbid" means any bid made at the Auction, if any, by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each applicable Overbid must comply with the following conditions:

(i) **Minimum Overbid Increments.** The initial Overbid for all of the Debtors' assets shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than $1 million, and successive Overbids higher than the previous bid, as Debtors shall, in consultation with the Consultation Parties, announce at the Auction (the "Minimum Overbid Increment").

The Debtors reserve the right, in consultation with the Consultation Parties, to announce reductions or increases in the Minimum Overbid Increment at any time during the Auction, if any. Additional consideration in excess of the amount set forth in the respective Baseline Bid may include: (a) cash and/or noncash consideration; *provided, however*, that the value for such noncash consideration shall be determined by the Debtors in their reasonable business judgment, in consultation with the Consultation Parties; and (b) in the case of a Bid by a Secured Creditor, a credit bid of up to the full amount of the such secured creditors' allowed secured claim including, for the avoidance of doubt, a Bid by the DIP Lenders up to the full amount of the DIP Claim Amount; *provided, however*, that nothing herein shall impact any parties' rights with respect to either (a) challenges to the liens or claims of a Secured Creditor, or (b) solely with respect to Secured Creditors other than the Stalking Horse Bidder, assertions under section

12

506(c) of the Bankruptcy Code or the effects that such challenges or assertions have, if any, on the ability of the any Secured Creditor to credit bid, in each case, subject to the terms of the Final DIP Order.

(ii)  **Conclusion of Each Overbid Round**.  Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, after consultation with the Consultation Parties, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors.

(iii)  **Overbid Alterations**.  An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment after consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures.

(iv)  **Announcing Highest Bid**.  Subsequent to each Overbid Round Deadline, the Debtors, shall announce for each asset package whether the Debtors have identified in the initial applicable Overbid round, an Overbid as being higher or otherwise better than the Initial Minimum Overbid for such asset package, or in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid for a given asset package (for each asset package, the "Prevailing Highest Bid").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

(c)  **Consideration of Overbids.**

The Debtors reserve the right, in their reasonable business judgment and after consultation with the Consultation Parties, to adjourn the Auction, if any, one or more times to, among other things:  (i) facilitate discussions between and amongst the Debtors, the Qualified Bidders and the Consultation Parties, as appropriate; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Debtors and the Consultation Parties with such additional evidence as the Debtors, in their reasonable business judgment, after consultation with the Consultation Parties, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.

(d)  **Closing the Auction.**

(i)  The Auction, if any, shall continue until there is one or more Bids for the Assets that the Debtors determine, in their reasonable business judgment, after consultation with the Consultation Parties, to be the highest or otherwise best Bid or Bids for all Assets, taken as a whole.  Each such Bid

13

shall be declared the "<u>Successful Bid</u>" for such asset package and such Qualified Bidder, the "<u>Successful Bidder</u>" for such asset package, at which point the Auction will be closed. The Auction, if any, shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid(s) is conditioned upon approval by the Court of the Successful Bid(s).

(ii)     A Successful Bidder shall, within one business day after the conclusion of the Auction, submit to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid. The Successful Bid may not be assigned to any party without the consent of the Debtors after consulting with the Consultation Parties.

(iii)     For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Debtors from exercising their respective fiduciary duties under applicable law.

(iv)     The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, if any, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

(v)     As soon as reasonably practicable after closing the Auction, if any, and in any event not less than one business day following closing the Auction, the Debtors shall cause a notice of Successful Bid and Successful Bidder, and the Qualified Bid Documents for each Successful Bid and Backup Bid, to be filed with the Court.

**(e)     No Collusion; Good-Faith *Bona Fide* Offer.**

Each Qualified Bidder participating at the Auction, if any, will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

**8.     Backup Bidder.**

(a)     Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted for all or any portion of the Assets, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for such Asset(s), as determined by the Debtors in the exercise of their reasonable business judgment, after consultation with the Consultation Parties (the "<u>Backup Bid</u>"), shall be required to serve as a backup bidder (the "<u>Backup Bidder</u>") for such Asset(s), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

(b)     The identity of the Backup Bidder and the amount and material terms of the Backup

14

Bid shall be announced by the Debtors at the conclusion of the Auction, if any, at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the closing of the transaction with the applicable Successful Bidder. The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder.

(c)     If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

All Qualified Bids (other than each Successful Bid and Backup Bid) shall be deemed rejected by the Debtors on and as of the date of approval of each Successful Bid and Backup Bid by the Bankruptcy Court. The Debtors, on their behalf and on behalf of each of their respective estates, specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures

**9.      Reservation of Rights.**

The Debtors reserve their rights to modify these Bidding Procedures, in their reasonable business judgment, after consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, if any, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction, at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) modifying the Bidding Procedures and/or adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; (e) waiving, or imposing additional, terms and conditions set forth herein with respect to Potential Bidders and (f) rejecting any or all bids or Bids; *provided, however*, that any modification, extension, waiver, or addition to the Bidding Procedures shall not be inconsistent with the Stalking Horse Agreement, the Bidding Procedures Order, or any other Order of the Bankruptcy Court, unless otherwise ordered by the Bankruptcy Court or with the prior consent of the DIP Lenders.

**10.     Approval of Sale Transactions.**

A hearing to consider approval of the Sale of certain of the Assets to the Successful Bidders (the "Sale Hearing") is currently scheduled to take place on or before at **10:00 a.m. (prevailing Central Time) on Friday, March 20, 2019**, before the Honorable Tamara O. Mitchell, at the Court, 1800 Fifth Avenue North, Birmingham, Alabama 35203.

**The Sale Hearing may be continued to a later date by the Debtors, after consultation with the Consultation Parties, by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).**

At the Sale Hearing, the Debtors, in consultation with the Consultation Parties, shall present the Successful Bids to the Court for approval.

## 11.    Return of Deposits

The Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Bankruptcy Court or as expressly provided below. The Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than five business days after the Sale Hearing. The Deposit of each Backup Bidder, if any, shall be returned to such Backup Bidder no later than three business days after the closing of the transaction with the relevant Successful Bidder for the assets bid upon by such Backup Bidder. Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If a Successful Bidder timely closes on its winning transaction, its Deposit shall be credited towards the applicable purchase price(s). If a Successful Bidder (or Backup Bidder, if applicable) fails to consummate a sale transaction because of a breach or failure to perform on the part of such Successful Bidder (or Backup Bidder, if applicable), the Debtors will not have any obligation to return the Deposit deposited by such Successful Bidder (or Backup Bidder, if applicable), and such Deposit shall irrevocably become property of the Debtors.

## 13.    Fiduciary Out.

Nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any of the Debtors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law; *provided, however*, that the Debtors shall provide the Consultation Parties with advance written notice of such action or inaction within two business days prior to taking such action or inaction.

16

**Exhibit 3**

**Sale Notice**

4

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF AUCTION FOR THE SALE OF THE DEBTORS' ASSETS

    **PLEASE TAKE NOTICE** that on [●], 2018, the United States Bankruptcy Court for the Northern District of Alabama (the "Court") entered the *Order (I) Authorizing the Debtors to Enter Into and Perform Under the Stalking Horse Purchase Agreement, (II) Approving Bidding Procedures for the Sale of the Debtors' Assets, (III) Scheduling Hearings and Objection Deadlines with Respect to the Sale (IV) Scheduling Bid Deadlines and an Auction, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Assumption and Assignment Procedures, and (VII) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order"),[2] authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to conduct an auction (the "Auction") to select the party or parties to purchase the Debtors' assets. The Auction will be governed by the bidding procedures approved pursuant to the Bidding Procedures Order (attached to the Bidding Procedures Order as Exhibit 2, the "Bidding Procedures").

---

Copies of the Bidding Procedures Order, the Bidding Procedures, or other documents related thereto are available upon request to Omni Management Group by calling **888-585-6494** (United States and Canada) and **818-906-8300** (International) or visiting the Debtors' restructuring website at https://www.omnimgt.com/missioncoal/.

---

    **PLEASE TAKE FURTHER NOTICE** that the Bid Deadline is **Monday, January 21, 2019**, at 4:00 p.m. (prevailing Central Time), and that any person or entity who wishes to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.

participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that the Debtors intend to conduct the Auction, at which they will consider proposals submitted to the Debtors and their professionals, by and pursuant to the Bidding Procedures as set forth in the Bidding Procedures Order, on **Wednesday, February 27, 2019, at 10:00 a.m. (prevailing Central Time)**, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to modify the Bidding Procedures, in their reasonable business judgment in accordance with the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that **Wednesday, March 20, 2019** at 10:00 a.m. (prevailing Central Time) or as soon thereafter as the Debtors may be heard, shall be the date and time for the hearing at which the Court will consider approval of the Sale (the "Sale Hearing").

[*Remainder of page intentionally left blank*]

2

Birmingham, Alabama
Dated: December 5, 2018

/s/ Daniel D. Sparks
Daniel D. Sparks
Bill D. Bensinger
**CHRISTIAN & SMALL LLP**
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Telephone:     (205) 795-6588
Facsimile:     (205) 328-7234
Email:          ddsparks@csattorneys.com
                    bdbensinger@csattorneys.com

- and -

James H.M. Sprayregen, P.C.
Brad Weiland (admitted *pro hac vice*)
Melissa N. Koss (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          james.sprayregen@kirkland.com
                    brad.weiland@kirkland.com
                    melissa.koss@kirkland.com

- and -

Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          stephen.hessler@kirkland.com
                    ciara.foster@kirkland.com

*Co-Counsel to the Debtors*

3

**Exhibit 4**

**Cure Notice**

5

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE TO CONTRACT PARTIES TO POTENTIALLY
## ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES

---

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN
EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE
OF THE DEBTORS AS SET FORTH ON EXHIBIT A ATTACHED HERETO.**

---

**PLEASE TAKE NOTICE** that on [ ], 2018, the United States Bankruptcy Court for the Northern District of Alabama (the "Court") entered the *Order (I) Authorizing the Debtors to Enter Into and Perform Under the Stalking Horse Purchase Agreement, (II) Approving Bidding Procedures for the Sale of the Debtors' Assets, (III) Scheduling Hearings and Objection Deadlines with respect to the Sale, (IV) Scheduling Bid Deadlines and an Auction, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Assumption and Assignment Procedures, and (VII) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order"),[2] authorizing the Debtors[3] to conduct an auction (the "Auction") to select the party to purchase the Debtors' assets. The Auction will be governed by the bidding procedures approved pursuant to the Bidding Procedures Order (attached to the Bidding Procedures Order as Exhibit 2, the "Bidding Procedures").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume and assign to the Successful Bidder certain

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

[3]    This relief granted in the Bidding Procedures Order is solely limited to the Debtors.

of the Assigned Contracts listed on the Assigned Contracts Schedule, attached hereto as **Exhibit A**, to which you are a counterparty, upon approval of the Sale. The Assigned Contracts Schedule can also be viewed on the Debtors' Case Website (https://www.omnimgt.com/missioncoal/). The Debtors have conducted a review of their books and records and have determined that the cure amount for unpaid monetary obligations under such Assigned Contracts is as set forth on **Exhibit A** attached hereto (the "**Cure Costs**").

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Costs, object to a proposed assignment to the Successful Bidder of any Assigned Contract, or object to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Assigned Contract, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the correct cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served and **actually received no later than [March 6, 2019, at 4:00 p.m.] (prevailing Central Time)** (the "**Cure Objection Deadline**") by the Court and the following parties: (a) counsel for the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn.: Melissa Koss and 601 Lexington Avenue, New York, New York 10022, Attn: Ciara Foster; (b) counsel for the DIP Lenders, Akin Gump Strauss Hauer & Feld LLP, Attn.: Lisa Beckerman and Arik Preis; (c) counsel for the Official Committee of Unsecured Creditors, Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020, Attn.: Jennifer Kimble and Jeffrey Cohen; and (d) the Bankruptcy Administrator for the Northern District of Alabama.

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Costs(s), (b) the proposed assignment and assumption of any Assigned Contract, or (c) adequate assurance of the Successful Bidder's ability to perform is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Costs as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional cure amount under the proposed assigned Assigned Contract, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale.

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption and assignment of an Assigned Contract or related Cure Costs in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date as may be fixed by the Court.

**PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Assigned Contract on the Cure Notice does not require or guarantee that such Assigned Contract will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Executory Contracts and/or Unexpired Leases are reserved. Moreover, the Debtors explicitly reserve their rights, in their

2

reasonable discretion, to seek to reject or assume each Assigned Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Assigned Contract as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Assigned Contracts or the validity, priority, or amount of any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Assigned Contract against the Debtors that may arise under such Assigned Contract.

*[Remainder of page intentionally left blank]*

3

Birmingham, Alabama
Dated:  December 5, 2018

/s/ Daniel D. Sparks

Daniel D. Sparks
Bill D. Bensinger
**CHRISTIAN & SMALL LLP**
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Telephone:     (205) 795-6588
Facsimile:      (205) 328-7234
Email:           ddsparks@csattorneys.com
                      bdbensinger@csattorneys.com

- and -

James H.M. Sprayregen, P.C.
Brad Weiland (admitted *pro hac vice*)
Melissa N. Koss (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           james.sprayregen@kirkland.com
                      brad.weiland@kirkland.com
                      melissa.koss@kirkland.com

- and -

Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           stephen.hessler@kirkland.com
                      ciara.foster@kirkland.com

*Co-Counsel to the Debtors*

4