# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| **MISSION COAL COMPANY, LLC**, *et al.*,[1] | **Case No. 18-04177-TOM11** |
| Debtors. | **(Jointly Administered)** |
|  | **Re: Docket No. 354** |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS' (A) KEY EMPLOYEE INCENTIVE PLAN AND (B) KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF

The Official Committee of Unsecured Creditors (the "Committee") of Mission Coal Company, LLC ("Mission Coal") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), by and through its proposed counsel, hereby submits this objection (this "Objection") with respect to the *Debtors' Motion for Entry of an Order (I) Approving The Debtors' (A) Key Employee Incentive Plan and (B) Key Employee Retention Plan and (II) Granting Related Relief* (the "Motion," Docket No. 354), and respectfully represents as follows:

### PRELIMINARY STATEMENT[2]

1.  The Committee objects to the proposed KEIP Bonuses because they are unnecessary and duplicative of prepetition bonuses that were paid to these same executives on

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2] Capitalized terms used but not defined herein shall have the respective meanings ascribed to them in the Interim Order.

-1-

the eve of bankruptcy.[3]  In fact, just two days before the Petition Date, the Debtors paid $1.492 million in bonuses to three of the Debtors' top executives, two of which the Debtors now seek approval to pay KEIP Bonuses.  These payments left the Debtors with approximately $55,000 in their bank accounts on the Petition Date.

2.	On the heels of these prepetition payments, the Debtors now seek approval to pay an additional $281,875 (the "KEIP Bonus" or "KEIP Bonuses") under a Key Employee Incentive Plan ("KEIP") to two (2) of the Debtors' senior executives (the "KEIP Participants") – the General Counsel and Vice President of Human Resources, Gary Broadbent ("Broadbent") and the Vice President – Accounting, Alan Jones ("Jones").  The KEIP Participants would be paid upon achieving either (a) the sale milestones under the DIP Facility or (b) an optimal sale price in connection with the sale of substantially all of the Debtors' assets.  The KEIP Bonuses vary depending upon the two metrics above with the KEIP Participants being entitled to the greater of (a) 100% of the target bonus payment if the sale milestone metric is met, or (b) 90-110% of the target bonus payment depending on the ultimate sale price.  In the case of the sale price metric, the KEIP Bonus will be earned upon obtaining a purchase price of up to $180 million, $205 million, or $220 million as follows:

| KEIP Bonus Payout | DIP Milestones Met (100% payout) | | Sale ≥$180m (90% payout) | | Sale ≥$205m (100% payout) | | Sale ≥$220m (110% payout) | |
|---|---|---|---|---|---|---|---|---|
| Gary Broadbent | $ | 162,500 | $ | 146,250 | $ | 162,500 | $ | 178,750 |
| Alan Jones | $ | 93,750 | $ | 84,375 | $ | 93,750 | $ | 103,125 |
| Total | $ | 256,250 | $ | 230,625 | $ | 256,250 | $ | 281,875 |

The Debtors propose to pay the KEIP Bonuses out of sales proceeds at the Debtors' planned emergence and are conditioned on the KEIP Participant's employment through such date.

---

[3]	The Committee does **not** object to the proposed KERP to be provided to certain corporate and mining employees.

-2-

3.        The KEIP is nothing more than a "stay and pay plan."  The KEIP Participants are entitled to the full bonus if the Debtors (i) comply with the sale milestones and/or (ii) achieve sufficient sales proceeds that will pay off the DIP Facility, but provide no recovery to other creditors of the Debtors.

4.        The Motion, however, contains only conclusory statements that are both vague and unsupported by evidence.  The Debtors have not demonstrated that the KEIP Bonuses will encourage greater effort or reward increased productivity.  In fact, the KEIP participants stand to benefit handsomely by the Debtors consummating a sale that pays off only the DIP Loans (leaving no recoveries for other creditors of the Debtors).  At the same time, all of the upside from competitive bidding under the proposed sale price metric inures only to the benefit of the Debtors' secured lenders, not unsecured creditors.

## OBJECTION

5.        The proposed KEIP does not properly incentivize the Debtors' executives to achieve significant value-enhancing performance during the pendency of these Chapter 11 Cases. Moreover, the proposal to reward two executives who each received payments of $365,000 a mere two days before the Petition Date is unseemly, at best.

6.        The KEIP portion of the Debtors' Motion should be denied because the KEIP is nothing more than a thinly-veiled retention program for insiders that fails comply with strict criteria set forth in section 503(c)(1) of the Bankruptcy Code, is not justified by the facts and circumstances of these cases as required by 503(c)(3) of the Bankruptcy Code, and is not a sound exercise of the Debtors' business judgment under section 363(b) of the Bankruptcy Code.

-3-

**I.     The KEIP Is a Thinly-Veiled Retention Program that Fails to Comply with the Strict Requirements of Section 503(c)(1) of the Bankruptcy Code.**

7.      Congress enacted section 503(c) in 2005 to end abusive compensation practices in bankruptcy cases by placing limits on the payment of retention and incentive bonuses and severance to insiders and others.  See, e.g., In re Hawker Beechcraft, Inc., 479 B.R. 308, 312-13 (Bankr. S.D.N.Y. 2012); In re Global Home Prods., LLC, 369 B.R. 778, 784-85 (Bankr. D. Del. 2007); In re Dana Corp., 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2006) ("Dana II").   The two overriding policies of section 503 of the Bankruptcy Code are to: (i) preserve the value of the estate for the benefit of the debtor's creditors; and (ii) prevent the unjust enrichment of the estate at the expense of the debtor's creditors.  See In re AMR Corp., 490 B.R. 158, 164-65 (Bankr. S.D.N.Y. 2013).

8.      The purpose of section 503(c) is "to limit a debtor's ability to favor powerful insiders economically and at estate expense during a chapter 11 case."  In re Pilgrim's Pride Corp., 401 B.R. 229, 234 (Bankr. N.D. Tex. 2009).  In enacting this provision, Congress sought "to eradicate the notion that executives were entitled to bonuses simply for staying with the [c]ompany through the bankruptcy process."  Global Home Prods., 369 B.R. at 784 (internal quotations omitted).  To achieve that goal, Congress established specific and rigorous evidentiary standards that must be satisfied by a proponent before a bankruptcy court may authorize payments to an insider for the purposes of inducing the insider to remain with the debtor's business.  In re Dana Corp., 351 B.R. 96, 100 (Bankr. S.D.N.Y. 2006) ("Dana I").

9.      Courts do not determine whether section 503(c)(1) applies to a post-petition compensation plan based upon the label the debtor places on the plan.  Rather, when determining whether a compensation program is subject to section 503(c)(1) of the Bankruptcy Code, courts

-4-

consider circumstances under which particular proposals are made, along with the structure of the compensation package.  See In re Mesa Air Grp., Case No. 10-10018 (MG), 2010 WL 3810899, at *2 (Bankr. S.D.N.Y. Sept. 24, 2010); see also Dana I, 351 B.R. at 102 n.3 (if a proposed KEIP "walks like a duck (KERP) and quacks like a duck (KERP), it's a duck (KERP).").   Any attempt by a debtor to mischaracterize a retention plan in order to bypass the requirements of section 503(c)(1) should be looked upon with disfavor.  See, e.g., In re Borders Grp., Inc., 453 B.R. 459, 470 (Bankr. S.D.N.Y. 2011).

10.      The KEIP purports to establish "targets" for the sale price before the KEIP Participants become eligible to receive the KEIP Bonuses.  However, these targets are illusory as the lowest threshold requires nothing more than compliance with the sale Milestones, which is accomplished by the Debtors having proposed to designate the DIP Lenders as their stalking horse purchaser and the subsequent passage of time.  Additionally, the other metrics in the proposed KEIP are tied to sale values that provide no return to any creditors in these cases aside from the DIP Lenders, who are also the proposed stalking horse.

11.      The Debtors' own explanation of the KEIP reveals that the plan is not an incentive program designed to reward performance, but rather a retention program for two key insider executives whom already received bonuses of $365,000 each on the eve of bankruptcy. For example, the Debtors state:

Case 18-04177-TOM11   Doc 422   Filed 12/12/18   Entered 12/12/18 13:57:39   Desc
Main Document     Page 5 of 10

a.    "The KEIP is specifically designed to incentivize the Debtors' key employees to achieve value-driving sale process targets that maximize the value to the benefit of all stakeholders. … The relatively modest payments under the KEIP require the KEIP Participants to meet important sales-related goals specifically tailored to their job responsibilities.   The KEIP Participants play critical roles in the day-to-day operations of the Debtors and provide necessary services to allow the Debtors to meet their sales-related targets." (Motion, ¶ 23).

b.    "All payments under the KEIP are not payable until the emergence date and are specifically conditioned upon each KEIP Participant's employment through such date." (Motion, ¶ 20).

12.    The lack of actually incentivizing thresholds makes clear that the sole purpose of the KEIP is to induce the KEIP Participants to remain employed by the Debtors, rendering the KEIP no more than a disguised KERP.  As a KERP, the KEIP is subject to the stringent requirements of section 503(c)(1) not 503(c)(3) or the business judgment rule as suggested by the Debtors.

13.    Having determined that the KEIP is a retention based plan for insiders, the next step is to determine whether the Debtors have satisfied the strict statutory requirements of section 503(c)(1) of the Bankruptcy Code.  In arguing their position that the KEIP does not violate 503(c)(1) of the Bankruptcy Code, the Debtors rely heavily on the standard set forth in Dana II, and adopted by the District of Delaware in Global Home Products.  Unlike the KEIP, both Dana II and Global Home Products mirrored existing prepetition compensation plans and were "primarily incentivizing and only coincidentally retentive because Debtors employed virtually identical plans prepetition and was retention was not the motive." Global Home Prods., 369 B.R. at 786.  The KEIP proposed in these Chapter 11 Cases does not mirror any prepetition transaction-oriented incentive plan, because the Debtors had none (unsurprisingly, as the Debtors simply gave these two executives substantial bonus payments on the eve of bankruptcy without the payment being tied to any cognizable metric).

-6-

14.     For a retentive payment to an insider to be permissible, a debtor must demonstrate that (A) the insider has a bona fide job offer from another business at the same pay or higher, (B) the insider's services are essential to the survival of the business, **and** (C) the amount of the insider's bonus does not exceed 10 times the average similar bonus paid to non-management employees in the current calendar year or, if no such bonus has been paid, 25% of the insider's retention bonus in the prior calendar year.  11 U.S.C. § 503(c)(1)(A)-(C).

15.     The Debtors have not even attempted to establish that any of the elements of the statute have been met and, therefore, the proposed KEIP does not satisfy section 503(c)(1) of the Bankruptcy Code.  Among other things, there is no evidence that the KEIP Bonuses are essential to the retention of the KEIP Participants, that any KEIP Participant has a superior bona fide job offer at the same or greater rate of compensation, or that the services of each participant are essential to the survival of the business.  Moreover, there is no evidence that the proposed KEIP Bonuses fall within the compensation parameters set forth in section 503(c)(1)(C)(i) or (ii).  Thus, the KEIP Bonuses are impermissible under section 503(c)(1).

**II.     The Debtors Have Failed to Establish that the KEIP Constitutes a Sound Exercise of Business Judgment or is Justified by the Facts of this Case as Required by Section 503(c)(3) of the Bankruptcy Code.**

16.     To the extent the KEIP is not a KERP, and thus is subject to section 503(c)(3), the KEIP should be denied because the decision to pay the KEIP Bonuses is not justified by the Debtors' exercise of sound business judgment under Bankruptcy Code section 363(b) nor are the proposed payments "justified by the facts and circumstances of the case" as required by Bankruptcy Code section 503(c)(3).  The Debtors argue that section 503(c)(3) is met because the "Bonus Plans' metrics are appropriately tailored to meet the Debtors' need … (b) for driving the

Case 18-04177-TOM11    Doc 422    Filed 12/12/18    Entered 12/12/18 13:57:39    Desc
Main Document    Page 7 of 10

KEIP Participants to meet sale process goals that are designed to maximize value for the benefit of all creditors and the Debtor's estates.

17. Courts since Dana II have increasingly distanced section 503(c)(3) from the deferential business judgment rule of section 363(b)(1), with judges playing a more critical role in reviewing bonus programs. See, e.g., In re Pilgrim's Pride, 401 B.R. at 236-37 ("[T]he test of section 503(c)(3) should not be equated to the business judgment rule as applied under section 363(b)(1)" because this would make section 503(c)(3) redundant.). In place of the business judgment rule, transfers of estate assets or creation of administrative obligations outside the ordinary course of business must be "justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). The Pilgrim's Pride court further noted that "the conditioning of approval of covered transfers and obligations upon their being 'justified by the facts and circumstances of the case'" suggests that "Congress intended the court to play a more critical role in assessing transactions" falling within the ambit of section 503(c)(3). Id. at 237 (internal citations omitted). Unlike the business judgment test, under which courts defer to debtors' business judgment, in a section 503(c)(3) analysis, "even if a good business reason can be articulated for a transaction, the court must still determine that the proposed transfer or obligation is justified in the case before it." Id.

18. If the facts and circumstances of these Chapter 11 Cases justify anything with respect to the KEIP, they justify its outright denial. Here the KEIP should be denied because the evidence overwhelmingly demonstrates that the low performance thresholds established for such program virtually guarantee that both KEIP Participants will be fully compensated while unsecured creditors of the Debtors will receive nothing. The implementation of a plan that awards bonuses based on meeting the Sale Milestones or awards bonuses on the proposed sale

-8-

price thresholds simply does not reward meaningful results that benefit all creditors of the Debtors' estates. It rewards compliance with the terms of the DIP Facility and maintaining the status quo. Simply stated, establishing reachable targets that would trigger 90-110% payout of the KEIP Bonuses to insiders is not justified by the facts and circumstances of this case.

19.     Moreover, while the KEIP Bonuses may look reasonable on their face, when combined with the prepetition bonuses paid to the KEIP Participants two days prior to the bankruptcy filing, the KEIP Bonuses exceed 100% of the base salaries of both KEIP Participants. When combined with the prepetition bonus payments, the KEIP Bonuses (assuming 100% KEIP Bonus payout) would be approximately 162% and 183% of the annual salary for Broadbent and Jones, respectively, as set forth in more detail below.

| | | | | KEIP Payout + Prefiling Bonus | | | Percent of Salary | | | Percent of Sale Proceeds | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Participant | Salary | Bonus Paid Prior to Filing | Stalking Horse Bid | Low 90% | Mid 100% | High 110% | Low 90% | Mid 100% | High 110% | Low 90% | Mid 100% | High 110% |
| Gary Broadbent | $325,000 | $ 365,000 | $ 145,000,000 | $ 511,250 | $ 527,500 | $ 543,750 | 157% | 162% | 167% | 0.35% | 0.36% | 0.38% |
| Alan Jones | $250,000 | $ 365,000 | $ 145,000,000 | $ 449,375 | $ 458,750 | $ 468,125 | 180% | 183% | 187% | 0.31% | 0.32% | 0.32% |
| Average | | | | $ 480,313 | $ 493,125 | $ 505,938 | 169% | 173% | 177% | 0.33% | 0.34% | 0.35% |

20.     The Debtors chose to make substantial prepetition payments to the KEIP Participants, effectively draining their bank accounts and leaving the Debtors unable to pay their employees. To now permit the Debtors to proceed with the KEIP which permits excessive "double-dipping" by senior executives is clearly contrary to the Debtors' sound business judgment and is not justified by the facts and circumstances of these cases.

## RESERVATION OF RIGHTS

21.     The Committee reserves the right to raise additional issues with the Debtors' Motion and the proposed order at the hearing on the same.

## CONCLUSION

22.     For the foregoing reasons, the Committee respectfully requests that the Court

deny approval of the KEIP Bonuses.


Dated: December 12, 2018                    **BAKER DONELSON BEARMAN CALDWELL**
                                            **& BERKOWITZ, P.C.**


                                             /s/ *Rita L. Hullett*_____
                                            Rita L. Hullett, Esq.
                                            1400 Wells Fargo Tower
                                            420 20th Street N
                                            Birmingham, AL  35203
                                            Telephone: (205) 276-9807
                                            Email: rhullett@bakerdonelson.com

                                            -and-

                                            **LOWENSTEIN SANDLER LLP**
                                            Jeffrey Cohen, Esq. (*admitted Pro Hac Vice)*
                                            Jennifer Kimble, Esq. (ASB-9593-E62K)
                                            1251 Avenue of the Americas
                                            New York, NY  10020
                                            Telephone: (212) 262-6700
                                            Email: jcohen@lowenstein.com
                                                    jkimble@lowenstein.com

                                            -and –

                                            Mary Seymour, Esq. (*admitted Pro Hac Vice)*
                                            One Lowenstein Drive
                                            Roseland, New Jersey 07068
                                            Email: mseymour@lowenstein.com

                                            *Proposed Counsel for the Official Committee of*
                                            *Unsecured Creditors*

-10-