UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | Case No. 18-04177-TOM11 |
| Debtors. | (Jointly Administered) |
| | Re: Docket No. 354 |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE STALKING HORSE PURCHASE AGREEMENT, (II) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS, (III) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH RESPECT TO THE SALE, (IV) SCHEDULING BID DEADLINES AND AN AUCTION, (V) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (VI) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (VII) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of Mission Coal Company, LLC ("Mission Coal") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), by and through its proposed counsel, hereby submits this objection (this "Objection") with respect to the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Enter Into and Perform Under the Stalking Horse Purchase Agreement, (II) Approving Bidding Procedures for the Sale of the Debtors' Assets, (III) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (IV) Scheduling Bid Deadlines and an Auction, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Assumption and Assignment Procedures, and (VII)*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

*Granting Related Relief* [Docket No. 393] (the "<u>Bidding Procedures Motion</u>" or the "<u>Motion</u>"), and respectfully represents as follows:

## PRELIMINARY STATEMENT[2]

1. While the Committee supports a fair and competitive auction process intended to encourage all prospective bidders to put their best bid forward, protect jobs and promised employee and retiree benefits, and maximize value for all constituents—simply put, this is not that process.

2. The DIP Lenders have agreed to provide the Stalking Horse Bid, purportedly to set the floor price for certain of the Debtors' assets, in the form of a $145 million Credit Bid, plus the unknown value of the Assumed Liabilities and the funding of three (3) Escrow Accounts for certain wind-down costs, professional fees, and payroll expenses pursuant to the terms of the Stalking Horse Purchase Agreement. However, due to the significant uncertainties surrounding the Bidding Procedures and the Stalking Horse Purchase Agreement, the Motion, if granted as drafted, will work to discourage competitive bidding, hinder the ability to maximize value to the estates for the benefit of the Debtors' creditors, and is likely to create a Sale process primarily for the benefit the Debtors' secured lenders without any guarantee of administrative solvency for these cases. The key defects identified by the Committee include:

- <u>Failure to Provide Administrative Solvency</u>: The Motion indicates the Debtors and DIP Lenders will negotiate the Escrow Accounts *in advance of the Sale Hearing*, with no guaranteed minimum to ensure such accounts will contain sufficient funds to cover all administrative expenses of these Debtors' cases. A credible stalking horse bid would address administrative solvency in advance of the Bid Deadline, not the Sale Hearing.

- <u>Unreasonable Conditions Precedent</u>: The conditionality in connection with the Stalking Horse Bid (including the CBA rejection, the funding of the Escrow

---

[2] Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed to them below. Capitalized terms used but not defined in this Objection shall have the meanings ascribed to them in the Bidding Procedures Motion and related exhibits.

-2-

Accounts, and the fact that the Motion itself points to several remaining unresolved issues as between the Stalking Horse Bidder and the Debtors) belies the notion that the DIP Lender's bid could serve the traditional purpose of a stalking horse bid—that is, to serve as a catalyst for other bids and to act as the definitive transaction in the event no other bidders surface. In addition, including the rejection of the CBAs as a condition to closing impermissibly dictates the outcome of the 1113/1114 process and discourages other bidders potentially interested in preserving the obligations owed to the UMWA Employees, the Debtors' retirees, and other stakeholders.

- <u>Not Possible to Calculate Minimum Overbid</u>: As a result of the Unspecified Consideration set forth in the Stalking Horse Bid, combined with the Stalking Horse Bidder's ability to credit bid up to an additional $60 million at its discretion, it is nearly impossible for potential bidders to calculate an acceptable Minimum Overbid to submit to the Debtors for consideration as a "higher or otherwise better" bid.

- <u>Outright Exclusion of Employee Obligations Chills Bidding</u>. The Stalking Horse Purchase Agreement makes clear that the Debtors/Sellers do not perceive the assumption of the CBAs and other employee and retiree related obligations as a valuable component of the Purchase Price. This sends a clear message that threatens morale and discourages potential bidders—including purchasers that have assumed similar obligations in previous transactions, or simply, those not otherwise unconditionally averse to assuming these types of obligations, from participating in the bidding process.

- <u>Credit Bids Must be Limited to Amount of Unchallenged Claims</u>: Although the Committee does not, as a general proposition, take issue with the secured creditors' right to credit bid pursuant to section 363(k) of the Bankruptcy Code, any right to credit bid conferred upon the DIP Lenders, the DIP Agent, and/or any other secured creditor must be limited to the amount of such secured creditor's secured claims which are **not** subject to a challenge or a pending challenge deadline.

3. There has been significant interest in the assets that has resulted in a high volume of alternate indications of interest. Given this high level of interest, coupled with the illusory nature of the Stalking Horse Bid itself, it is unclear whether the Stalking Horse Purchase Agreement provides a sufficient floor to encourage a competitive auction process.

4. On the face of the Bidding Procedures and the not-yet-binding Stalking Horse Purchase Agreement, there is far too much uncertainty about whether the proposed transaction will ever close, let alone, whether it sets a meaningful floor that will stimulate the Sale Process or give potential bidders enough clarity to know what it will take to submit a bid that is

-3-

considered "higher or otherwise better." Accordingly, the Bidding Procedures Motion cannot be granted unless modified as set forth herein.

## FACTUAL BACKGROUND

**I.      The Chapter 11 Cases and Prepetition Obligations**

5.      On October 14, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Alabama (the "Court"), commencing their chapter 11 cases (the "Chapter 11 Cases").

6.      On October 25, 2018, the Bankruptcy Administrator for the Northern District of Alabama appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to 11 U.S.C. §1102.  See Docket No. 147.

7.      As of the Petition Date, Mission Coal reported approximately $175 million in funded debt, consisting of (i) approximately $104 million outstanding under a first lien secured term loan pursuant to the Credit Agreement, dated as of January 31, 2018 ("the "First Lien Credit Agreement," and the loans and other obligations outstanding thereunder the "First Lien Obligations"), by and among Mission Coal and the lender parties thereto (the "First Lien Lenders"); and (ii) approximately $71 million outstanding under a second lien secured term loan pursuant to the Amended and Restated Secured Loan Agreement, dated as of January 31, 2018 (the "Second Lien Credit Agreement," and the loans and other obligations outstanding thereunder, the "Second Lien Loans"), by and among certain Debtors as the borrowers, the guarantors party thereto, and Mission Coal Funding, LLC and the lenders from time to time a party thereto (collectively, the "Second Lien Lenders").  See *Declaration of Kevin Nystrom, Chief Restructuring Officer of Mission Coal Company, LLC, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 21] (hereinafter "First Day Declaration") ¶¶ 26, 29.

-4-

8.  The Debtors are also party to two collective bargaining agreements (the "CBAs") with the United Mine Workers of America (the "UMWA"). Mission Coal maintains significant legacy liabilities, including liabilities related to these CBAs and the UMWA 1974 Pension Plan. See First Day Decl. ¶ 7.

9.  On October 15, 2018, the Debtors filed a *Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(A), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c)* [Docket No. 34], seeking authorization to enter into a debtor-in-possession credit agreement to be funded by the First Lien Lenders (the "DIP Lenders").

10. On November 20, 2018, the Court entered the *Final Order (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364 and (IV) Granting Related Relief* (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders") [Docket No. 300]. The Final DIP Order authorized Mission Coal to obtain postpetition financing consisting of a superpriority priming multiple-draw term loan credit facility in the aggregate amount of no less than $201,441,464 (the "DIP Facility"). Final DIP Order ¶ 6(b).

11. The Final DIP Order provides that the stipulations contained in the DIP Orders with respect to the validity, perfection, priority, extent or enforceability of the First Lien

Obligations is binding on the Committee, unless the Committee has duly filed an adversary proceeding challenging the validity, perfection, priority, extent or enforceability of the Prepetition First Liens or the Prepetition First Lien Obligations, or otherwise asserting or prosecuting any avoidance actions or any other claims or defenses against the First Lien Agent or the First Lien Lenders as set forth therein (the "Challenge Rights") by December 24, 2018 (the "First Lien Challenge Deadline"). Final DIP Order ¶ 29(a). The Final DIP Order also provides that if no Challenge Rights are exercised prior to the expiration of the First Lien Challenge Period, the Prepetition First Lien Obligations shall constitute allowed claims, not subject to any claims or defenses. Final DIP Order ¶ 29(a).

12. On December 7, 2018, the Committee notified the DIP Lenders that it intends to challenge the prepayment premium portion of the First Lien Obligations, absent an agreement between the parties that is beneficial to the Debtors' estates. The Committee also reserved all rights to assert additional grounds to challenge the First Lien Obligations in advance of the First Lien Challenge Deadline.

**II.  The Bidding Procedures Motion**

13. On December 6, 2018, the Debtors filed the Bidding Procedures Motion, which seeks entry of an order (the "Proposed Order") (i) authorizing the Debtors to enter into that certain Asset Purchase Agreement attached to the Proposed Order as Exhibit 1 (the "Stalking Horse Purchase Agreement" or the "Agreement"); (ii) approving the proposed bidding procedures attached as Exhibit 2 to the Proposed Order (the "Bidding Procedures") in connection with a sale (the "Sale") of all, substantially all, or any combination of the Debtors' assets (collectively, the "Assets") free and clear of all claims, liens, and encumbrances; (iii) scheduling an auction in connection with the Sale (the "Auction"), hearing dates in connection with approval of the Sale (the "Sale Hearing"); and the objection deadline for the Sale Hearing; (iv)

-6-

approving the form and manner of notice of the Auction and Sale Hearing, attached to the Proposed Order as Exhibit 3; (v) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale, and approving the form and manner of notice thereof, attached as Exhibit 4 to the Proposed Order; and (vi) granting related relief.

### A. The Stalking Horse Purchase Agreement

14. Under the Stalking Horse Purchase Agreement, the Debtors' First Lien Lenders/DIP Lenders have agreed to serve as the stalking horse bidder (the "Stalking Horse Bidder" or "New Coal Acquisition Co., LLC"), and to provide a credit bid in the amount of $145 million (the "Credit Bid"), in addition to the funding of three (3) escrow accounts to cover wind-down and other chapter 11 expenses ("Unspecified Consideration"), and the assumption of the assumed liabilities set forth in section 2.3 of the Stalking Horse Purchase Agreement (the "Assumed Liabilities," and together with the Credit Bid and the Unspecified Consideration, the "Purchase Price" or "Stalking Horse Bid"). See APA[3] § 3.1. The Unspecified Consideration is an amount equal to the sum of the following components:

(i) **Avoidance Action Consideration**. Cash equal to $50,000, of which $50,000 shall be allocated as consideration for the Avoidance Actions included in the Acquired Assets;

(ii) **Wind-Down Escrow Amount.** The amount of allowed priority and administrative expense claims, the costs to wind-down the Chapter 11 Cases in accordance with the wind-down budget to be provided by the Debtors (the "Wind-Down Budget"), and the fees and expenses associated with the administration of the Wind-Down Escrow Account;

(iii) **Payroll Escrow Amount.** Accrued Payroll and related payroll taxes, court-approved payments pursuant to the key employee incentive program ("KEIP Payments") sought in the Debtors' employee bonus motion ("KEIP/KERP

---

[3] For ease of reference, citations to the Stalking Horse Purchase Agreement will reference such document as simply the "APA".

Motion") [Docket No. 354] and related payroll taxes, and the fees and expenses associated with the administration of the Payroll Escrow Account; and

(iv) **Estate Retained Professional Fees Escrow Amount**. The reasonable estimate of the aggregate amount of Estate Retained Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred or will incur in rendering services to the Debtors or the Committee, and the fees and expenses associated with the administration of the Estate Retained Professional Fees Escrow Account.

15. The Stalking Horse Purchase Agreement does not provide any information on the costs necessary to fund the Wind-Down, Payroll, and Estate Retained Professional Fees Escrow Accounts (the "Escrow Accounts").[4] Instead, the Agreement contemplates that prior to the Sale Hearing—or, under the proposed schedule, March 20, 2019—the Debtors will come to agreement with the Stalking Horse Bidder on the amounts of the three (3) Escrow Accounts. See APA § 7.10.

16. The Motion provides that the Stalking Horse Bidder will acquire all assets (the "Acquired Assets") related to the operations of the Maple Eagle mining facility in West Virginia and the Oak Grove mining facility in Alabama. With respect to the Pinnacle assets, the Stalking Horse Bidder has the right, between signing the Agreement and closing, to determine which assets it will acquire. The Stalking Horse Bidder will not be acquiring certain assets, namely, any CBAs, any assets under benefit plans, employee records or files, tax returns, the North River Mine, or the Kellerman Mine (the "Excluded Assets"). See APA § 2.2.

17. The Stalking Horse Bidder's Assumed Liabilities include liabilities for, among other things, (a) reclamation under transferred permits; (b) reclamation at Pinnacle (unless purchased and assumed by another buyer); (c) assumed contracts and any cure costs associated with them; (d) outstanding trade payables in accordance with the DIP Budget; (e) transfer taxes;

---

[4] Debtors' counsel has indicated that the Debtors intend to file a declaration in support of the Motion that provides estimates of the amounts necessary to fund the Escrow Accounts. The Committee has not seen or had the opportunity to review the declaration prior to filing this Objection and reserves all rights. The Committee understands that the DIP Lenders have not agreed to such amounts.

-8-

Case 18-04177-TOM11    Doc 437    Filed 12/14/18    Entered 12/14/18 16:29:59    Desc
Main Document    Page 8 of 20

and (f) accrued and unpaid real property taxes. The Agreement provides that the Stalking Horse Bidder will not be assuming certain liabilities, including workers compensation and certain employee related liabilities, including those arising under the Black Lung Act and the UMWA CBAs. See APA § 2.3. In fact, the Stalking Horse Purchase Agreement provides that any Successful Bidder's (defined below) obligation to consummate the Sale is conditioned on, among other things, either the UMWA's agreement to waive or remove the successor clause in the CBAs, or the rejection of the CBAs pursuant to a successful Bankruptcy Code section 1113(c) motion (a "CBA Rejection Motion"). See APA § 9.9.

### B. The Bidding Procedures

18. At a minimum, each bid (a "Bid") seeking to acquire all of the Debtors' assets that are the subject of the Stalking Horse Bid must have a Purchase Price that has a monetary value equal to or greater than the Purchase Price (i.e., the Credit Bid, the Assumed Liabilities, and the Unspecified Consideration), plus $1 million in cash or cash equivalents (collectively, the "Minimum Overbid"). See Bidding Procedures ¶ 5(d). "Each Bid must clearly set forth the purchase price to be paid for the applicable asset package, including and identifying separately any cash and non-cash components, which non-cash components shall be limited only to credit bids and assumed liabilities." See Bidding Procedures ¶ 5(c).

19. The Proposed Order provides that any secured creditor with a valid and perfected lien on the Debtors' assets shall have the right to credit bid all or a portion of its secured claims under section 363(k) of the Bankruptcy Code. The Proposed Order also provides the Stalking Horse Bidder with an approximate $60 million cushion that allows it to increase its Credit Bid if faced with a competing Bid. See Proposed Order ¶ 13 (the Stalking Horse Bidder has the right, including as part of any overbid, "to credit bid all or a portion of the value of the

-9-

secured portion of its claims for the Assets pursuant to Bankruptcy Code section 363(k), including any secured claims on account of its adequate protection liens, which amount shall be no less than approximately $203,340,782, plus all accrued and unpaid interest").

20. The key dates and deadlines the Debtors seek to establish in the Motion are as follows: (a) a bid deadline of January 21, 2019, at 4:00 p.m. (CT) (the "<u>Bid Deadline</u>"); (b) an Auction date of February 27, 2019, at 10:00 a.m. (CT); (c) a sale objection deadline of March 6, 2019, at 4:00 p.m. (CT) (the "<u>Sale Objection Deadline</u>"); and (d) a Sale Hearing date of March 20, 2019, at 10:00 a.m. (CT) for the Court to consider approval of the Sale to the successful bidder (the "<u>Successful Bidder</u>").

21. Importantly, the Motion indicates that the Debtors and the Stalking Horse Bidder have not reached an agreement on various substantial provisions in the Bidding Procedures and Stalking Horse Agreement. <u>See</u> Mot. ¶ 7(a) n.4.

## **OBJECTION**

**I. THE STALKING HORSE PURCHASE AGREEMENT IS NOT DESIGNED TO MAXIMIZE VALUE TO THE ESTATES OR PROVIDE FOR ADMINISTRATIVE SOLVENCY.**

22. As stated above, the Stalking Horse Bid fails to provide sufficient funds to ensure the administrative solvency of these cases. A consequence of the parties failing to agree on the amounts of the proposed Escrow Accounts in advance of the Bid Deadline has the potential to leave these estates unable to pay all of their administrative claims. Despite such a completely unacceptable outcome from the estates' and Committee's perspectives, the DIP Lenders could walk away with the assets having used the chapter 11 forum and the provision of DIP financing exclusively for their own benefit and to the detriment of all other creditors and interest holders.

-10-

Case 18-04177-TOM11    Doc 437    Filed 12/14/18    Entered 12/14/18 16:29:59    Desc
Main Document    Page 10 of 20

### A. The Stalking Horse Bid Fails to Set an Easily Identifiable Floor, and as a Result, May Chill Bidding.

23. The Stalking Horse Bid is comprised of a Credit Bid in the amount of $145 million, in addition to the assumption of Assumed Liabilities and funding of the Escrow Accounts. The Minimum Overbid provision requires that each Bid must have a monetary value equal or greater than the Purchase Price (i.e., the Credit Bid, the Assumed Liabilities, and the Unspecified Consideration), plus $1 million in cash or cash equivalents. See Bidding Procedures ¶ 5(d). Additionally, each Bid must "*clearly* set forth the purchase price to be paid for the applicable asset package, including and identifying separately any cash and non-cash components . . . ." See Bidding Procedures ¶ 5(c). Because no estimates or minimums are provided for the Escrow Accounts, it makes it nearly impossible for potential bidders to understand or identify the bidding floor and calculate their Minimum Overbid.

24. In order for bidding procedures to encourage participation, minimum bid and bidding increments must be reasonable. See, e.g., In re Hupp Indus., 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992) (finding minimum bid increment bearing no relation to purchase price "arbitrary and unreasonably high"); 3 COLLIER ON BANKRUPTCY ¶ 363.02[8] (16th ed. 2012) (noting that "a disproportionate bid increment would be more likely to chill bidding" than it would be to promote a fair and equitable bidding process).

25. Allowing the Stalking Horse Bidder to hold off on negotiating the funding amounts of the Escrow Accounts until **after it becomes the Successful Bidder** (and thus, has no further competition and significant leverage) leaves too much uncertainty for all involved in the Sale process and will discourage other bidders from coming to the table. Lastly, allowing the DIP Lenders to maintain a $60 million Credit Bid cushion does precisely the opposite of what a stalking horse bid is intended to do – it will deter other bidders from increasing their bids

knowing that they can be so easily outbid without additional cash or consideration being added to the Stalking Horse Bid.

26. Courts may approve only those bidding procedures that foster, and will not chill, bidder participation in the sales process. In re President Casinos, Inc., 314 B.R. 786, 786 (Bankr. E.D. Mo. 2004) ("Structured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interests."). Courts must not approve bidding procedures that "undermine principles of fair play," because "unless the bidding process remains fair and equitable, competitors will refrain from the type of full participation that is needed to assure bids for the highest reasonable value." In re Jon. J. Peterson, Inc., 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009). Here, the Stalking Horse Purchase Agreement will chill and discourage competitive bids and undermine the paramount goal of maximizing the value of the estate. Accordingly, to encourage a fair and open Sale process, the Debtors must be required to finalize the calculation with respect to the Unspecified Consideration in advance of the Bid Deadline and require those amounts be included in the Stalking Horse Bid to ensure administrative solvency. In addition, the DIP Lenders should be required to credit bid the full amount of their claim now and not "keep in their pocket" a self-determined advantage card to be used at the auction.

### B. The Credit Bid Must Be Subject to the Committee's Challenge Rights.

27. In the Stalking Horse Purchase Agreement and the Bidding Procedures Motion, the Debtors assert that the DIP Lenders, the DIP Agent, and other validly secured creditors should be entitled to credit bid some or all of the claims secured by their collateral, pursuant to section 363(k) of the Bankruptcy Code.

28. Although the Proposed Order seemingly provides a reservation with respect to the rights of parties in interest to exercise challenge rights, (see Proposed Order ¶ 13 ("Notwithstanding the foregoing, nothing shall affect any rights of parties in interest, if any, with respect to challenging whether any Qualified Bidder has a valid secured claim and such bidder's right to credit bid if the Court determines that such bidder does not have a valid secured claim")), this language improperly places the burden of proof on those seeking to exercise challenge rights.

29. Where a lender's liens have not been proven valid, courts have prevented or conditioned the lender's ability to credit bid or put in place certain protections that safeguard the debtor's unsecured creditors. See e.g., In re Free Lance-Star Publ'g Co., 512 B.R. 798, 806 (Bankr. E.D. Va. 2014) (capping lender's credit bid in light of questionable liens); In re Akard St. Fuels, L.P., No. 3:01–CV–1927, 2001 WL 1568332 (N.D. Tex. Dec. 4, 2001) (denying lender's ability to credit bid and allowing sale free and clear of all liens under section 363(f)(4) where lender's liens were subject to a challenge and lender was "capable of bidding cash at the auction and later recovering the cash if it proved its liens"); In re McMullan, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) ("At any such sale, NBC shall not be entitled to offset bid any of its claimed liens or security interests under [section 363(k)] because the validity of its liens and security interests are unresolved"); In re Miami Gen. Hosp., Inc., 81 B.R. 682 (S.D. Fla. 1988) (permitting lender's credit bid but preserving the right of the trustee to file an adversary proceeding or otherwise object to the extent, validity and priority of the lender's liens).

30. Accordingly, the language in paragraph 13 of the Proposed Order should be revised to reflect that any secured lender's right to credit bid is limited to the amount of such

-13-

Case 18-04177-TOM11    Doc 437    Filed 12/14/18    Entered 12/14/18 16:29:59    Desc
Main Document    Page 13 of 20

secured creditor's secured claims which are *not* subject to a challenge or a pending challenge deadline.

### C. The Stalking Horse Purchase Agreement Impermissibly Dictates the Outcome of any Section 1113/1114 Process.

31. The Stalking Horse Agreement provides that on the closing date of the Sale, the Acquired Assets will be transferred to the Successful Bidder free and clear of all obligations, including all successor liability and any successorship obligations under any CBAs, and/or the UMWA 1974 Pension Fund. See APA § 7.9. Moreover, the closing is conditioned on either the UMWA's agreement to waive or remove the successor clause in the CBAs, or the approval of a CBA Rejection Motion filed by the Debtors. See APA § 9.9. In addition to the fact that the Stalking Horse Purchase Agreement, as drafted, remains subject to substantial execution risk due to the uncertainty of whether the Debtors/DIP Lenders are able to reject the CBAs, such a condition impermissibly dictates the outcome of any section 1113/1114 process.

32. The Stalking Horse Purchase Agreement dictates the outcome of that process by declaring upfront that it refuses to assume a collective bargaining agreement or related employee or retiree obligations. In American Flint Glass Workers Union v. Anchor Resolution Corporation, 197 F.3d 76, 81-82 (3d Cir. 1999), the Third Circuit held that a debtor could not alter its obligations under a CBA though a partial assumption and assignment to a purchaser because that would be "an attempt to effect an alteration of the CBA" and therefore the debtor "was required to comply with the procedures set out in Code § 1113." To do otherwise, the court held, would permit the debtor and a purchaser through Section 363 "to misuse the Code in an effort to avoid the collective bargaining process that Congress deemed essential to the balance between labor and reorganizing debtors that it struck in Section 1113." Id.; see also In re Maxwell Newspapers, 981 F.2d 85, 89 (2d Cir. 1992) ("[a] debtor may sell the assets of the

business unencumbered by a collective bargaining agreement if that agreement has been rejected pursuant to § 1113") (emphasis added); In re Stein Henry Co., Inc., No. 91-15491S, 1992 WL 122902, at *2 (Bankr. E.D. Pa. June 1, 1992) (refusing to confirm plan which would result in asset sale without satisfaction of CBA's successorship clause because "[o]nly through the medium of 11 U.S.C. § 1113(f) can a collective bargaining agreement be terminated or modified in any way" and "[r]ights provided in the agreement as to successor-entities must be preserved unless there is, unlike here, compliance with the procedures of 11 U.S.C. §1113"); In re Agripac, Inc., No. 699-60001-frall, Slip Op. at 12 (Bankr. D. Or. April 2, 1999) (concluding that "[f]ailure to include in Sale Agreement a successor clause as required by the CBA is a breach of the Collective Bargaining Agreement which may result in a substantial claim against the estate" and holding that the sale could not proceed absent compliance with section 1113).[5]

33. As Judge Bernstein concluded in the Journal Register case in the Southern District of New York, a debtor may not utilize section 363 to bypass the requirements of section 1113 in relation to a labor contract's successor clause:

> The collective bargaining agreement continues to bind the debtor post-petition, and a debtor cannot reject a collective bargaining agreement except in accordance with Bankruptcy Code § 1113. Generally speaking, a rejection represents a decision not to perform a burdensome executory contract. A debtor cannot bypass § 1113 and obtain a de facto rejection of its collective bargaining agreement simply by refusing to perform it. Although the obligation to comply with the successor clause is only one duty among many under a collective bargaining agreement, a debtor's intentional breach of a material provision of the collective bargaining agreement is tantamount to a rejection, or alternatively, a unilateral alteration of its provisions in violation of Bankruptcy Code § 1113(f). Thus, as a general proposition, a sale under Bankruptcy Code § 363 cannot circumvent the condition imposed under a successor clause absent compliance with § 1113.

In re Journal Register Co., 488 B.R. 835, 840 (Bankr. S.D.N.Y. 2013).

---

[5] A true and correct copy of Agripac is attached hereto as **Exhibit A**.

34. The Committee understands that one decision in the Southern District of West Virginia, In re The Lady H Coal Co., Inc., 193 B.R. 233 (Bankr. S.D. W.Va. 1996), aff'd 199 B.R. 595 (S.D.W. Va. 1996), aff'd on other grounds, In re Leckie Smokeless Coal Co., 99 F.3d 573 (4th Cir. 1996), permitted a free and clear sale under section 363 of the Bankruptcy Code without satisfying the requirements of section 1113 and 1114 of the Bankruptcy Code. However, the Committee respectfully submits that the Lady H decision, not binding here, was decided prior to the Third Circuit's decision in Anchor Resolution as well as the Journal Register decision discussed above, and simply ignores the fundamental requirements of section 1113. Accordingly, the Committee submits that the Court should not allow the Debtors to impermissibly sidestep the statutory requirements of section 1113 of the Bankruptcy Code.

### D. The Bidding Procedures Should Encourage Assumption of the Debtors' Employee Obligations.

35. The Stalking Horse Purchase Agreement makes it clear that the Stalking Horse Bidder has no intention of assuming the pension plan, CBAs, and other employee and retiree obligations (the "Employee Obligations"). However, outright rejection of the Employee Obligations may not benefit the Debtors' estates and their creditors. In particular, the assumption of these obligations would not only help to avoid large claims – including potential administrative expense claims for, among other things, withdrawal liability with respect to the pension plan and postpetition damage claims for breach of the Debtors' CBAs – but importantly protects an already financially stretched workforce and struggling retirees. Conversely, assumption of the Employee Obligations would work to improve employee morale and efficiency. A bid that includes assumption of Employee Obligations, even with a lower aggregate dollar amount, may be the highest and best bid at the Auction.

-16-

36. Importantly, to maximize value for the Debtors' estates, no added value should be taken off the table from the outset. Bankruptcy courts possess broad flexibility and discretion in determining which of several bidders should be considered the successful bidder at a sale under Section 363(b), particularly where the bids are complicated and where the determination as to which is the highest bid may not be entirely clear. See In re Fin. News Network, Inc., 980 F.2d 165, 169-70 (2d Cir. 1992) (finding that where creditors were split as to which offer presented the best terms, the bankruptcy court properly acted in its discretion in accepting a late amendment to one of the bids).

37. Thus, bankruptcy courts correctly "consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." In re Lionel Corp., 772 F.2d 1063, 1071 (2d Cir. 1983). Further, "the law allows the bankruptcy court to entertain higher and better offers, which means that the bankruptcy court may not focus solely on price." In re United Healthcare, Civil Action No. 97–1159, 1997 WL 176574, at *5 (D.N.J. March 26, 1997); cf. In re After Six, Inc., 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993) (noting that a bankruptcy court could appropriately award a bid for the debtor's assets to a lower dollar bidder, when the lower dollar bid contained other non-economic "societal" attributes).

38. The Stalking Horse Purchase Agreement, as drafted, makes clear that the Debtors/Sellers do not perceive the assumption of the CBAs and other employee and retiree related obligations as a valuable component of the Purchase Price. This sends a clear message that discourages potential bidders—including purchasers that have assumed similar obligations in previous transactions, or simply, those not otherwise unconditionally averse to assuming these types of obligations, from participating in the bidding process. Accordingly, the Bidding

Procedures should not establish a Minimum Overbid with a cash requirement, but provide that the winning Bid for the Debtors' assets contain the greatest total consideration to the Debtors, including any Employee Obligations assumed by the purchaser.

### E. The DIP Lenders Cannot Serve as a Consultation Party While Actively Bidding.

39. In the Proposed Order, "Consultation Parties" is defined to include, among others, the DIP Lenders and their counsel and financial advisors, and the DIP Agent and its counsel. The Motion, however, identifies the Administrative Agent as the Stalking Horse Bidder. To the extent anyone may interpret this to mean the DIP Lenders and their advisors may continue to participate as Consultation Parties while the Administrative Agent under the same facility acts as the bidder, that notion should be dispelled now.

### F. Additional Modifications to the Bidding Procedures Are Necessary.

40. In addition to the points addressed above, there are several modifications and/or points of clarification that are necessary ensure the Bidding Procedures are fair:

- The Proposed Order must clarify that the Stalking Horse Bidder is not excused from serving as a Backup Bidder.
- The Committee has not received sufficient information from the Debtors regarding the assumed contracts and the rights of first refusal to make an informed evaluation of this provision.
- The Debtors' obligation to provide due diligence should not end on the Bid Deadline. Parties who submitted bids will have continued diligence requests, regardless of whether their bid is conditioned on such information.

### RESERVATION OF RIGHTS

41. The Committee reserves the right to raise additional issues with the Motion and the Proposed Order at the hearing on the same, and to present evidence and/or rely on evidence that may be presented by others at the hearing on the Bidding Procedures Motion and/or at any

-18-

Case 18-04177-TOM11    Doc 437    Filed 12/14/18    Entered 12/14/18 16:29:59    Desc
Main Document    Page 18 of 20

sale hearing(s). Specifically, since the Debtors and DIP Lenders have yet to agree on a Stalking Horse Purchase Agreement, any such additional objections may be substantive.

42. Additionally, because the identity of the Successful Bidder(s) and the ultimate terms of any winning bid(s) are not presently before the Court, the Committee reserves the right to object to any proposed sale(s) at the appropriate time. For the avoidance of doubt, to the extent the Court deems any issues, including, without limitation, concerning the Successful Bidder, the final terms of any asset purchase agreement(s) with respect to the Assets, successor liability, and similar claims against non-debtor third party buyers are premature and not ripe for judicial decision, the Committee reserves its rights to object to any sales or sale order(s) at the appropriate time.

## CONCLUSION

43. For the foregoing reasons, the Committee respectfully requests that the Court deny the Bidding Procedures Motion in its current form.

Dated: December 14, 2018

**BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, P.C.**

 /s/ *Rita Hullett*
Rita Hullett, Esq.
1400 Wells Fargo Tower
420 20th Street N
Birmingham, AL  35203
Telephone: (205) 276-9807
Email: rhullett@bakerdonelson.com

-and-

**LOWENSTEIN SANDLER LLP**
Jeffrey Cohen, Esq.
Jennifer Kimble, Esq.
1251 Avenue of the Americas
New York, NY 10020

-19-

Telephone: (212) 262-6700
Email: jcohen@lowenstein.com
jkimble@lowenstein.com

-and –

Mary Seymour, Esq.
Nicole Fulfree, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
Email: mseymour@lowenstein.com
nfulfree@lowenstein.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*