**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF**
**MISSION COAL COMPANY, LLC AND CERTAIN OF ITS DEBTOR AFFILIATES**

Daniel D. Sparks
Bill D. Bensinger
**CHRISTIAN & SMALL LLP**
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Telephone:     (205) 795-6588
Facsimile:     (205) 328-7234
Email:          ddsparks@csattorneys.com
                 bdbensinger@csattorneys.com

- and -

James H.M. Sprayregen, P.C.
Brad Weiland (admitted *pro hac vice*)
Melissa N. Koss (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          james.sprayregen@kirkland.com
                 brad.weiland@kirkland.com
                 melissa.koss@kirkland.com

*Co-Counsel to the Debtors*

Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          stephen.hessler@kirkland.com
                 ciara.foster@kirkland.com

*Co-Counsel to the Debtors*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102).  The location of the Debtors' service address is:  7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF MISSION COAL COMPANY, LLC AND CERTAIN OF ITS DEBTOR AFFILIATES.[2] NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED HEREIN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE COURT'S APPROVAL OF THE PLAN OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

THE DEBTORS ARE CURRENTLY RUNNING A SALE PROCESS FOR THEIR ASSETS AND PREFER THAT THE SALE TRANSACTION BE APPROVED AND CONSUMMATED THROUGH THE PLAN. THE DIP LENDERS PREFER THAT THE SALE TRANSACTION BE APPROVED AND CONSUMMATED THROUGH A SEPARATE SALE ORDER PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND NOT REQUIRE CONSUMMATION OF THE PLAN IN ORDER TO CLOSE ON THE SALE. THE DEBTORS' SOLICITATION OF VOTES FOR THE PLAN SHALL NOT PREJUDICE ANY PARTY'S RIGHTS WITH RESPECT THERETO AND DOES NOT CONSTITUTE A DETERMINATION BY THE COURT WITH RESPECT TO HOW THE SALE TRANSACTION SHALL BE CONSUMMATED.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT OR THIRD-PARTY ADVISORS EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as may be amended, supplemented or modified from time to time, the "Plan"), attached hereto as **Exhibit A**.

2

REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. THE WIND DOWN FINANCIAL PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE COURT, AND THE PLAN EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

# TABLE OF CONTENTS

Page

**ARTICLE I. INTRODUCTION**......................................................................................................1
- A. The Plan .......................................................................................................................1
- B. The Plan Structure........................................................................................................2
- C. The Sale Transaction....................................................................................................3

**ARTICLE II. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT**.................7
- A. What is Chapter 11?.....................................................................................................7
- B. Why are the Debtors sending me this Disclosure Statement?......................................8
- C. Might the Debtors seek approval of and consummate the Sale pursuant to an order pursuant to section 363 of the Bankruptcy Code as opposed to pursuant to the Plan? ...................8
- D. Am I entitled to vote on the Plan?................................................................................8
- E. What will I receive from the Debtors if the Plan is Consummated? .............................8
- F. What will I receive from the Debtors if I hold an Allowed Administrative Claim or an Allowed Priority Tax Claim?.........................................................................................9
- G. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Plan Effective Date," and "Consummation?"...........................................................................................................9
- H. What are the sources of cash and other consideration required to fund the Plan? ...........9
- I. Will there be releases and exculpation granted to parties in interest as part of the Plan? ..............10
- J. What is the deadline to vote on the Plan? ...................................................................10
- K. How do I vote for or against the Plan?.......................................................................10
- L. Why is the Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur? ................................................................................................................10
- M. What is the purpose of the Confirmation Hearing?.....................................................10
- N. What is the Effect of the Plan on the Debtors' Asset Retirement Obligations Under Environmental Laws? ..................................................................................................11
- O. What is the effect of the Plan on the Debtors' ongoing business? ..............................11
- P. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ..................................................................................................................11
- Q. Do the Debtors recommend voting in favor of the Plan?............................................11

**ARTICLE III. BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES**............11
- A. Corporate History........................................................................................................11
- B. The Debtors' Capital Structure ...................................................................................14

**ARTICLE IV. EVENTS LEADING UP TO THE CHAPTER 11 CASES**..........................................16
- A. Adverse Market Conditions ........................................................................................16
- B. Acquisition and Expansion Efforts .............................................................................17
- C. Coal Industry Liabilities.............................................................................................17
- D. The Debtors' Proactive Approach to Addressing Liquidity Constraints.....................17

**ARTICLE V. ADMINISTRATION OF THE CHAPTER 11 CASES**................................................18
- A. First Day Pleadings and Other Case Matters ..............................................................18
- B. Employment and Compensation of Advisors..............................................................20
- C. Appointment of Official Committee............................................................................20
- D. Ongoing Internal Independent Director and Committee Led Investigations................21
- E. Summary of Claims Process, Bar Date and Claims Filed ...........................................21
- F. Exclusivity ..................................................................................................................21
- G. Postpetition Marketing, Bidding, and Auction Process ..............................................22
- H. Section 1113 and 1114 Process...................................................................................22

**ARTICLE VI. SUMMARY OF THE PLAN**.............................................................................22

| | | |
|---|---|---|
| A. | General Settlement of Claims and Interests | 23 |
| B. | Proposed Creditor Recoveries | 23 |
| C. | The Sale Transaction | 24 |
| D. | Restructuring Transactions | 24 |
| E. | The Plan Administrator | 25 |
| F. | Corporate Action | 25 |
| G. | Recoveries to Certain Holders of Claims and Interests | 26 |
| H. | Release, Injunction, and Related Provisions | 26 |

**ARTICLE VII. VOTING AND CONFIRMATION** .......................................................................**29**

| | | |
|---|---|---|
| *A.* | *Classes Entitled to Vote on the Plan* | 29 |
| *B.* | *Votes Required for Acceptance by a Class* | 29 |
| *C.* | *Certain Factors to Be Considered Prior to Voting* | 29 |
| *D.* | *Classes Not Entitled to Vote on the Plan* | 30 |
| *E.* | *Solicitation Procedures* | 30 |
| *F.* | *Voting Procedures* | 31 |
| *G.* | *Confirmation Objection Deadline* | 32 |
| H. | Confirmation Hearing | 33 |
| I. | Confirmation Standards | 33 |
| J. | Acceptance by Impaired Classes | 35 |
| K. | Confirmation Without Acceptance by All Impaired Classes | 36 |

**ARTICLE VIII. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING.**...................**37**

| | | |
|---|---|---|
| A. | Risk Factors and Considerations Regarding the Debtors' Business and Operations | 37 |
| B. | Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims Under the Plan. | 39 |
| C. | Certain Bankruptcy Law Considerations | 40 |
| D. | Disclosure Statement Disclaimer | 43 |
| E. | Liquidation Under Chapter 7. | 44 |

**ARTICLE IX. MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ...................**44**

| | | |
|---|---|---|
| *A.* | *Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Holders of Allowed Class 9 Interests* | 45 |
| B. | Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 3 DIP Facility Claims. | 46 |
| *C.* | *Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 4 Second Lien Secured Claims.* | 47 |
| *D.* | *Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 5 General Unsecured Claims.* | 47 |
| *D.* | *Character of Gain or Loss.* | 47 |
| *E.* | *Market Discount.* | 47 |
| *F.* | *Accrued Interest.* | 48 |
| *G.* | *Limitation on Use of Capital Losses* | 48 |
| *H.* | *Information Reporting and Backup Withholding* | 49 |

**ARTICLE X. RECOMMENDATION OF THE DEBTORS** ...............................................................**49**

Case 18-04177-TOM11    Doc 523    Filed 01/02/19    Entered 01/02/19 17:48:01    Desc
Main Document      Page 5 of 107

**EXHIBITS**

**EXHIBIT A**  Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates

**EXHIBIT B**  Wind-down Financial Projections [To be filed in advance of the Disclosure Statement Hearing]

Case 18-04177-TOM11  Doc 523  Filed 01/02/19  Entered 01/02/19 17:48:01  Desc
Main Document  Page 6 of 107

# ARTICLE I.
## INTRODUCTION[3]

The Debtors submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes to accept or reject the Plan.[4]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE PLAN, IF CONSUMMATED, WILL EFFECTUATE THE TERMS OF THE SALE TRANSACTION.**

**EACH OF THE DEBTORS' BOARDS OF MANAGERS OR SOLE MEMBERS HAS APPROVED THE PLAN AND BELIEVES THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES. AS SUCH, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ACCEPT THE PLAN BY RETURNING THEIR BALLOTS (EACH, A "BALLOT") SO AS TO BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT (AS DEFINED HEREIN) NO LATER THAN MARCH 11, 2019, AT 4:00 P.M. (PREVAILING CENTRAL TIME).  ASSUMING THE REQUISITE ACCEPTANCES TO THE PLAN ARE OBTAINED, THE DEBTORS WILL SEEK THE COURT'S APPROVAL OF THE PLAN AT THE CONFIRMATION HEARING ON MARCH 20, 2019, AT 10:00 A.M., PREVAILING CENTRAL TIME.**

**THE DEBTORS BELIEVE THAT THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO HOLDERS OF CLAIMS.  ACCORDINGLY, THE DEBTORS BELIEVE THAT THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

A.      *The Plan*

As more fully described below, the Debtors filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code on the Commencement Date.  The purpose of a chapter 11 bankruptcy case is to resolve the affairs of a debtor and distribute the proceeds of the debtor's estate pursuant to a confirmed chapter 11 plan.  To that end, the Debtors filed the Plan, the terms of which are more fully described herein.  The Plan contemplates a transfer of the Acquired Assets to the Successful Bidder, whose bid for the Acquired Assets will be selected as the highest or otherwise best bid at the Debtors' Auction.  The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and to distribute all property of the Debtors' Estates that is or becomes available for distribution, in each case, generally in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Debtors' Estates, and therefore the Debtors seek to confirm the Plan.

Generally speaking, the Plan:

---

[3]    If the Plan is not confirmed or the Plan Effective Date does not occur, the Debtors reserve all of their rights regarding the Disclosure Statement and the Plan and any statement set forth in the Disclosure Statement and the Plan, as applicable. Furthermore, if the Plan is not confirmed or the Plan Effective Date does not occur, nothing in the Disclosure Statement or the Plan shall be deemed an admission by the Debtors, and the Debtors reserve all such rights regarding the Disclosure Statement and the Plan and any statement set forth in the Disclosure Statement and the Plan, including, without limitation, all rights with respect to the consummation of the Sale Transaction contemplated herein.

[4]    The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

Case 18-04177-TOM11    Doc 523    Filed 01/02/19    Entered 01/02/19 17:48:01    Desc
Main Document      Page 7 of 107

(a) provides for 100 percent recoveries for Holders of DIP Facility Claims (or treatment otherwise acceptable to the Required Lenders), Allowed Administrative Claims, Priority Tax Claims, Estate Retained Professional Fee Claims, Other Priority Claims and Other Secured Claims;

(b) provides for the distribution of the General Unsecured Claims Amount (if any) to Allowed Holders of General Unsecured Claims;[5]

(c) provides for consummation of the Sale Transaction; and

(d) designates a Plan Administrator to (i) wind down the Debtors' businesses and affairs; and (ii) pay and reconcile Claims as provided therein; and (iii) administer the Plan in an effective and efficient manner.

The Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Plan classifies Holders of Claims and Interests according to the type of the Holder's Claim or Interest, as more fully described below. Holders of Claims in Class 3 (DIP Facility Claims), Class 4 (Second Lien Secured Claims) and Class 5 (General Unsecured Claims) are entitled to vote to accept or reject the Plan.

B.     *The Plan Structure*

The Plan proposes to fund creditor recoveries from the Sale Transaction Proceeds, the Estate Retained Professional Fees Escrow Amount, the Wind-Down Escrow Amount, the General Unsecured Claims Amount (if any), the Debtors' rights under the Sale Transaction Documentation, payments made directly by the Successful Bidder on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Successful Bidder pursuant to sections 365 or 1123 of the Bankruptcy Code, and/or all Causes of Action not previously settled, released, or exculpated under the Plan. The Debtors will market their assets pursuant to the terms of the Bidding Procedures Order and will hold the Auction to the extent Qualified Bids for the Debtors' assets are submitted in accordance with the Bidding Procedures. The Debtors intend to consummate the Sale Transaction with the bidder that provides the highest or otherwise best offer as contemplated under the Bidding Procedures Order, the Sale Transaction Documentation and the Plan.

Pursuant to the Plan, the Debtors or the Plan Administrator shall pay or provide for payments of Claims as follows:

- Holders of Other Priority Claims will be paid in full on the Plan Effective Date (or as soon thereafter as such Other Priority Claims become due and Allowed in the ordinary course);

- Holders of Other Secured Claims (including all Secured Tax Claims), will receive, at the election of the Debtors:

     (i)      payment in full in Cash;

     (ii)     the collateral securing such Other Secured Claims;

     (iii)    reinstatement of such Other Secured Claims, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such Other Secured Claims to demand or to receive payment prior to the stated maturity of

---

[5]     The source for the General Unsecured Claims Amount (if any) is to be determined, provided that this amount shall not come from the proceeds of the DIP Collateral (as defined in the Final DIP Order).

2

<span>such Other Secured Claim from and after the occurrence of default; or</span>

(iv)     such other treatment rendering such Other Secured Claims Unimpaired.

- Each Holder of DIP Facility Claims will receive either (i) payment in full in Cash of the Obligations (which amount shall include the full roll-up of the Prepetition First Lien Obligations Amount, including the Prepayment Premium, plus the First Lien Accrued Adequate Protection Payments) (each as defined in the DIP Documents to the extent not defined herein) or (ii) treatment that is otherwise acceptable to the Required Lenders;

- Each Holder of Second Lien Secured Claims will receive its Pro Rata share, based on the Allowed amount of its Second Lien Secured Claim, of the remaining amount of the Sale Transaction Proceeds, solely to the extent the DIP Facility Claims are paid in full in Cash;

- Each Holder of General Unsecured Claims will receive (i) its Pro Rata share of the General Unsecured Claims Amount (if any) (as provided in Article IV.H of the Plan) and (ii) the remaining amount of the Sale Transaction Proceeds, solely to the extent the DIP Facility Claims and, to the extent Allowed, the Second Lien Secured Claims are paid in full in Cash;

- Each Intercompany Claim will, at the election of the Debtors, be reinstated or canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect;

- Intercompany Interests will, at the election of the Debtors, be reinstated or canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect;

- Section 510(b) Claims will be canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim;

- Interests will be canceled, released, and extinguished, and will be of no further force or effect. Each Holder of an Interest will not receive any distribution on account of such Interest.

The Debtors believe that the Plan is in the best interest of the Estates and urge Holders of Claims in Class 3 (DIP Facility Claims), Class 4 (Second Lien Secured Claims), and Class 5 (General Unsecured Claims) to vote to accept the Plan.

*C.*    *The Sale Transaction*

The Plan contemplates the sale of substantially all of the assets of the Debtors (the "Sale Transaction") in accordance with the terms and conditions set forth in the Sale Transaction Documentation, by and among the Debtors and the Successful Bidder. Generally, the Sale Transaction contemplates that:

(a)     the Debtors shall, among other things, transfer the Acquired Assets, including all Transferred Causes of Action held by the Debtors, to the Successful Bidder free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than the Assumed Liabilities) pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code, the Plan and the Confirmation Order; and

(b)     the Successful Bidder shall acquire all Assumed Liabilities, including payment of all Cure Costs that are required to be paid (if any) pursuant to any Executory Contracts or Unexpired

3

Leases that are assumed by the Debtors and assigned to the Successful Bidder pursuant to the Sale Transaction Documentation and the Plan.

A description of the Acquired Assets can be found on Schedule 1 of the Plan. The Acquired Assets are generally comprised of the following assets and interests:[6]

all of the Debtors' direct or indirect right, title and interest in, to or under the following properties, rights, claims and assets (in each case, except for and to the extent related to the Excluded Assets or the Excluded Liabilities, as applicable) of every kind and description, wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased, licensed, used or held for use, in or relating to the Debtors' business, whether or not reflected on the books and records of the Debtors, as the same shall exist on the Closing Date:

(a)     all Inventory;

(b)     all Equipment used in the Debtors' business or located on the real property, including (i) any software installed on computers, to the extent such software licenses are assignable and (ii) those specific assets set forth in the Sale Transaction Documentation;

(c)     all Assumed Contracts, except to the extent primarily used in connection with the Excluded Assets and subject to the Sale Transaction Documentation;

(d)     all (i) Owned Real Property, (ii) Leased Real Property (and any agreement and rights related thereto or under the applicable Lease to the extent that such agreement or Lease is an Assumed Contract), (iii) the Lessor Leases (to the extent that a Lessor Lease is an Assumed Contract) and (iv) Occupancy Agreements (to the extent that an Occupancy Agreement is an Assumed Contract), in each case, together with all interests in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(e)     all coal reserves to the extent of the Debtors' interest (but excluding coal reserves at the Pinnacle Business);

(f)     all rights to subside lands associated with mining operations and all rights to the waiver of and release from subsidence liability and indemnity rights under any and all conveyances, representations and instruments or agreements of any kind and nature applicable to the Debtors' coal mining activities and interests;

(g)     all rights of the Debtors to the warranties and licenses received from manufacturers or sellers of the Equipment, Improvements or any component thereof, except to the extent prohibited by law;

(h)     all Transferred Permits;

(i)     all Intellectual Property, Accounts Receivable, and Pre-Paid Expenses;

(j)     all goodwill, customer and referral relationships, other intangible property and all privileges, relating to, arising from or associated with any of the Acquired Assets

---

[6]   Capitalized terms used in the section but not defined herein shall have the meanings ascribed to them in the Opening Bidder's Proposed Agreement (as defined in the Bidding Procedures Order). For the avoidance of doubt, the description of the Acquired Assets set forth herein is for informational purposes only, as the Opening Bidder's Proposed Agreement contemplates approval and consummation of the Sale pursuant to an order pursuant to section 363 of the Bankruptcy Code (as opposed to approval and consummation of the Sale pursuant to the Plan). However, the Debtors anticipate that another Successful Bidder will seek to acquire substantially similar assets.

4

(including the Intellectual Property), the Assumed Liabilities and/or the Debtors' business, in each case arising after the Closing;

(k)     all Documents and other books and records (financial, accounting and other) except to the extent related to the Excluded Assets or the Excluded Liabilities, and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, that are used or useful in, held for use in or intended to be used in, or that arise in any way out of or are related to, the Acquired Assets, the Assumed Liabilities or the Debtors' business but only to the extent permitted by Legal Requirements and not subject to attorney-client privilege or other work product privilege;

(l)     all interests, rights, rebates, abatements, remedies, recoveries and benefits of the Debtors, and all claims, demands, indemnification rights and causes of action, arising under or relating to any of the Acquired Assets (including Intellectual Property to the extent transferrable or assignable), the Assumed Liabilities or the Debtors' business, including those arising out of Assumed Contracts, express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors or others to the extent relating to the operation of the Debtors' business or affecting the Equipment, Inventory or other tangible Acquired Assets or ordered by the Debtors prior to the Closing Date (and in any case, any component thereof) to the extent set forth in the Sale Transaction Documentation;

(m)     all Avoidance Actions;

(n)     all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts (to the extent transferrable) and other bank deposits, instruments and investments of the Debtors, including any cash collateral used to secure

5

surety bonds or other transactional assurances, excluding, for the avoidance of doubt, the Cash Consideration and prepaid deposits related to professional fee retainers;

(o)     all third party directors and officers liability, business interruption, property or casualty insurance proceeds, to the extent receivable by the Successful Bidder or the Debtors in respect of the Acquired Assets or the Assumed Liabilities after the Closing Date;

(p)     all telephone, telex and telephone facsimile numbers and other directory listings;

(q)     all assets, if any, listed in the Sale Transaction Documentation;

(r)     all proceeds and products of any of the Acquired Assets;

(s)     all proceeds from the sale of any of the Excluded Assets other than Avoidance Actions up to an amount equal to the Permitted Proceeds Amount;

(t)     any Tax Refunds of the Debtors with respect to Apportioned Taxes that are paid by the Successful Bidder;

(u)     any insurance policies of the Debtors relating to the Acquired Assets or the Assumed Liabilities solely to the extent Successful Bidder has provided written notice to the Debtors prior to the Bid Deadline of its intention to acquire such insurance policies; and

(v)     the assets of the Debtors associated with the Pinnacle Business that are set forth in the Sale Transaction Documentation.

A description of the Assumed Liabilities can be found on Schedule 2 of the Plan. The Assumed Liabilities are generally comprised of the following assets and interests:

(a)     all Liabilities under the Assumed Contracts;

(b)     all Cure Costs;

(c)     outstanding Trade Payables related to the Acquired Assets incurred in the Ordinary Course of Business after the Commencement Date and during the Chapter 11 Cases to the extent consistent with the Budget (as defined in the Final DIP Order);

(d)     Liabilities arising out of the ownership or operation of the Business or Acquired Assets for periods following the Closing Date, including with respect to: (i) workers' compensation liabilities or occupational health claims relating to any Buyer Employee arising out of an event that occurs after the Closing Date; (ii) any and all Black Lung Assumed Liabilities; and (iii) the Release of, or exposure of any Person to, any Hazardous Substances first occurring after the Closing Date;

(e)     Transfer Taxes;

(f)     all Liabilities with respect to Taxes imposed on the Business or the Acquired Assets that are attributable to any Post-Closing Tax Period;

(g)     all Liabilities of the Debtors as a result of any action taken by the Debtors at Buyer's or its Affiliates' request as set forth in the Successful Bidder's asset purchase agreement;

(h)     all Liabilities of the Debtors with respect to the Transferred Permits or otherwise arising out of or relating to the Transferred Permits, including: (i) all Liabilities for Reclamation and, if applicable, post-mining and post-Gas Well operation Liabilities; (ii) compliance with

6

performance obligations or standards under the Transferred Permits and associated Legal Requirements; and (iii) obligations to replace and/or increase bonds or other financial assurance instruments associated with the Transferred Permits, excluding, in each of the preceding cases (i)-(iii), any civil or administrative fines or penalties or criminal sanctions imposed by any Governmental Authority for which Debtors or any of their Affiliates have received a written notice of violation or notice of claim (or other written notice of similar legal intent or meaning) on or prior to the Closing Date;

(i)    all Liabilities to the extent arising out of or relating to compliance with Environmental, Health and Safety Laws, Mining Law, MSHA, OSHA and any mine or Gas Well operating or safety compliance matters, related to the Acquired Assets or the acquired Gas Wells, but excluding any civil or administrative fines or penalties or criminal sanctions imposed by any Governmental Authority for which Debtors or any of their Affiliates have received a written notice of violation or notice of claim (or other written notice of similar legal intent or meaning) on or prior to the Closing Date;

(j)    regulatory violations and obligations on or in relation to the Transferred Permits first arising post-Closing (except, however, for any violations or obligations arising from any action or inaction taken by any Debtor or an Affiliate of any Debtor with respect to Transferred Permits that are not transferred as of the Closing Date);

(k)    if, and only to the extent, the Debtors are unable to sell the Excluded Assets utilized in the Pinnacle Business to a third party purchaser, Liabilities for Reclamation with respect to the existing Permits issued to the Debtors for the Pinnacle Business, to the extent that such Liabilities are not funded by the issuers of the Debtors ' surety bonds; provided, however, that such unfunded Reclamation Liabilities may be satisfied through the performance of Reclamation by Buyer, the provision by Buyer of Reclamation services from a third party, and/or the payment by Buyer for Reclamation, as determined by Buyer in its sole and absolute discretion;

(l)    accrued but unpaid Liabilities of the Debtors with respect to Real Property Taxes assessed with respect to the Acquired Assets, solely to the extent necessary to transfer the Acquired Assets free and clear of any statutory senior priority lien on such Acquired Assets; and

(m)    all Liabilities or other obligations with respect to the WARN Act arising, accruing, or as a result of actions taken following the Closing Date.

## ARTICLE II.
## QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT

A.    *What is Chapter 11?*

Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

7

*B.     Why are the Debtors sending me this Disclosure Statement?*

The Debtors are seeking to obtain Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  The Plan contemplates a sale of the Debtors' assets to the Successful Bidder, and this Disclosure Statement is being submitted to provide information about this transaction and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

*C.     Might the Debtors seek approval of and consummate the Sale Transaction pursuant to an order pursuant to section 363 of the Bankruptcy Code as opposed to pursuant to the Plan?*

In the event that the Successful Bidder requires that the Sale Transaction be consummated through a 363 sale, the Debtors shall work in good faith with the Successful Bidder to schedule a hearing for approval of such Sale Transaction and entry of such Sale Order (as defined in the Bidding Procedures Order) as soon as reasonably practicable after the conclusion of the Auction.  Notwithstanding the forgoing, nothing shall require the Debtors to consummate the Sale Transaction with the Required Lenders pursuant to a Sale Order and (i) the Debtors reserve all of their rights to argue that any Sale Transaction with the Required Lenders must be approved and consummated pursuant to a chapter 11 plan of reorganization and (b) the Required Lenders reserve all of their rights to argue that any Sale Transaction with the Debtors must be approved and consummated pursuant to section 363 of the Bankruptcy Code and not require consummation of a chapter 11 plan of reorganization in order to close the Sale Transaction.

*D.     Am I entitled to vote on the Plan?*

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold (if any).  Each category of Holders of Claims or Interests in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code is referred to as a "Class."  Each Class's respective voting status is set forth below:

1.     *Summary of Classification*

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | DIP Facility Claims | Impaired/ Unimpaired | Entitled to Vote |
| Class 4 | Second Lien Secured Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 7 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

*E.     What will I receive from the Debtors if the Plan is Consummated?*

The following table provides a summary of the anticipated recovery to Holders of Allowed Claims and

8

Interests under the Plan. Any estimates of Claims in this Disclosure Statement may vary from the final amounts Allowed by the Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

| Class | Claim/Interest | Estimated Allowed Amount | Anticipated Recovery |
|---|---|---|---|
| 1 | Other Priority Claims | $0 | 100% |
| 2 | Other Secured Claims[7] | $[●] | 100% |
| 3 | DIP Facility Claims | $[$209,229,024][8] | [●]-[●]% |
| 4 | Second Lien Secured Claims | $[●] | [●]% |
| 5 | General Unsecured Claims | $[●]-[●] | [●]-[●]% |
| 6 | Intercompany Claims | N/A | $[●] |
| 7 | Intercompany Interests | N/A | $[●] |
| 8 | Section 510(b) Claims | N/A | $[●] |
| 9 | Interests | N/A | $[●] |

F.    *What will I receive from the Debtors if I hold an Allowed Administrative Claim or an Allowed Priority Tax Claim?*

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Administrative Claims and the Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. The Administrative Claims and Priority Tax Claims will be satisfied as set forth in Article II of the Plan.

G.    *If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Plan Effective Date," and "Consummation?"*

"Confirmation" of the Plan refers to approval of the Plan by the Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Plan Effective Date"—or as soon as practicable thereafter, as specified in the Plan. "Consummation" means the occurrence of the Plan Effective Date.

H.    *What are the sources of cash and other consideration required to fund the Plan?*

The Plan will be funded by the following sources of cash and consideration: the Sale Transaction Proceeds, the Estate Retained Professional Fees Escrow Amount, the Wind-Down Escrow Amount, the General Unsecured Claims Amount, the Debtors' rights under the Sale Transaction Documentation, payments made directly by the Successful Bidder on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of

---

[7]    The projected amount of Allowed Other Secured Claims set forth herein assumes that the value of the collateral securing such obligations is sufficient in amount to satisfy such Allowed Other Secured Claims in full.

[8]    Such amount is calculated as of January 2, 2019.

Cure Costs made by the Successful Bidder pursuant to sections 365 or 1123 of the Bankruptcy Code, and/or all Causes of Action not previously settled, released, or exculpated under the Plan, if any, shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided in the Plan.

I.      *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, the Plan contemplates releases and exculpation of the Debtors and other parties in interest as set forth in Article IX of the Plan. However, the Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The releases and exculpation set forth in the Plan are subject to the conclusion of that investigation and determination with respect to any potential Estate Claims or Causes of Action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims pending completion of the investigation. Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that will be released pursuant to the Plan will be discharged pursuant to the Plan, and all Entities that are subject to exculpation pursuant to the Plan, will be permanently enjoined, from and after the Plan Effective Date, from taking certain actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties.

J.      *What is the deadline to vote on the Plan?*

The Voting Deadline is **March 11, 2019, at 4:00 p.m., prevailing Central Time**.

K.      *How do I vote for or against the Plan?*

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, you must submit your ballot in accordance with the instructions provided in **Article VII.F.2** of this Disclosure Statement. **BALLOTS SENT BY FACSIMILE TRANSMISSION ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

L.      *Why is the Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur?*

Section 1128 of the Bankruptcy Code requires the Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

The Court has scheduled the Confirmation Hearing for **March 20, 2019, at 10:00 a.m., prevailing Central Time**. The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed with the Court and served so as to be *actually received* by the appropriate notice parties by **March 11, 2019, at 4:00 p.m. (prevailing Central Time)**.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the *Birmingham News*, *Alabama Messenger*, *Kingsport Times-News*, *Charleston Gazette-Mail*, and *USA Today* (national edition).

M.      *What is the purpose of the Confirmation Hearing?*

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under the chapter 11 plan, any person acquiring property under the chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of the chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

*N.*     *What is the Effect of the Plan on the Debtors' Asset Retirement Obligations Under Environmental Laws?*

Following the Plan Effective Date, asset retirement obligations (including reclamation and similar obligations) of the Debtors shall be assumed by the Buyer to the extent set forth in the Sale Transaction Documentation.

*O.*     *What is the effect of the Plan on the Debtors' ongoing business?*

Upon consummation of the Plan and the Sale Transaction, it is anticipated that substantially all of the Debtors' assets will be transferred to the Successful Bidder, or subject to Wind-Down by the Plan Administrator in accordance with Wind-Down Budget.

*P.*     *Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?*

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent, Omni Management Group:

> *By Hand Delivery or Overnight Mail at*:
>
> Omni Management Group
> Re: Mission Coal Company, LLC, et al.
> 5955 DeSoto Ave., Suite 100
> Woodland Hills, CA 91367
>
> *By electronic mail at*
> missioncoal@omnimgt.com
>
> *By telephone at*:
> 888-585-6494 (U.S.)
> 818-906-8300 (International)

Copies of the Plan, this Disclosure Statement and any other publicly filed documents in the chapter 11 cases are available upon written request to the Debtors' Notice and Claims Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Notice and Claims Agent at www.omnimgt.com/missioncoal (free of charge) or the Court's website at https://ecf.alnb.uscourts.gov (for a fee).

*Q.*     *Do the Debtors recommend voting in favor of the Plan?*

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a sale of substantially all of the Debtors' assets to the Successful Bidder, is in the best interest of all Holders of Claims, and that other alternatives fail to realize or recognize the value inherent under the Plan.

## ARTICLE III.
## BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES

*A.*     *Corporate History*

1.     *Formation and Business*

Mission Coal Company, LLC ("Mission Coal") was formed on January 31, 2018 through a reorganization that combined and consolidated the operations of Seneca Coal Resources, LLC and its wholly-owned subsidiaries ("Seneca") and Seminole Coal Resources, LLC and its wholly-owned subsidiaries ("Seminole").

11

Headquartered in Kingsport, Tennessee, Mission Coal is engaged in the business of extracting, processing, and marketing metallurgical coal—and, to a lesser extent, thermal coal—from deep and surface mines.[9] Mission Coal's traditional end customers include steel and coke producers, industrial customers, and electric utilities, and is uniquely positioned within the coal industry because of its primary focus on met, rather than thermal, coal. Today, Mission Coal is a leading producer of met coal assets in the United States.

2. *Mining Operations*

The Debtors' operating assets are comprised of two deep mines and one surface mine in West Virginia and one deep mine located in Alabama. Through these distinct active mining operations, Mission Coal was able to access qualities of coal with volatility in the low-, mid-, and high-vol ranges, which allows the Debtors to develop relationships with a diverse customer base.

The Debtors control approximately 318 million tons of proven and probable coal reserves. During the year ended December 31, 2017, the Debtors produced approximately 3.4 million tons of coal. The Debtors' mines include:

- <u>Oak Grove Mining Complex</u>. The Oak Grove Mining Complex ("<u>Oak Grove</u>") is located in Bessemer, Alabama. Oak Grove commenced mining operations in 1975 and, until 2003, was owned and operated by US Steel. In 2007, Cliffs Natural Resources acquired Oak Grove and owned it until Seneca's acquisition of the property in December 2015. Oak Grove mines in the Blue Creek seam in Alabama, and the mine is unique in producing a high quality, mid-volume coal with low sulfur and low ash. When sold, this product takes no discount from the Australian benchmark. As of late September 2018, there are an estimated [26,277,522] clean recoverable tons at Oak Grove. The mine is approximately 1,000 feet deep and home to [360] unionized workers.

- <u>Maple Eagle</u>. The Debtors maintain active mining operations at the Seminole West Virginia Mining Complex ("<u>Maple Eagle</u>"). Maple Eagle was owned and operated by Walter Energy until 2016. Seminole Coal Resources acquired the asset package that became Maple Eagle in February 2016, and, although it is an older facility, it nonetheless produces a high quality product. Maple Eagle is located on the Eagle Seam, which contains high volume coal with excellent coking characteristics. There are currently 4,891,071 clean recoverable tons of reserves at Maple Eagle. Maple Eagle contains two super-sections with continuous miners that can mine simultaneously. On average, Maple Eagle produces 400,000—800,000 clean tons of coal annually. The Debtors anticipate that a third super-section will soon be operational and have plans to open additional surface mines with high wall miners, which will increase Maple Eagle's production capacity to 1.2 million clean tons.

- <u>Pinnacle Mining Complex</u>. The Pinnacle Mining Complex ("<u>Pinnacle</u>") is located in West Virginia. Pinnacle was originally opened in 1969 and was owned by US Steel until 2003, after which it was sold to Cliffs Natural Resources. Seneca acquired Pinnacle from Cliffs Natural Resources on December 22, 2015. The complex at Pinnacle contains an impoundment, a mine with thirteen miles of belt line, a predominately union work force, and comparatively difficult mining conditions. Pinnacle contains an estimated [38,617,378] clean recoverable tons of reserves of which [9,035,817] are inactive. The coal historically produced at Pinnacle is low vol coal and is considered to be of a lesser quality than the coal produced at its sister mines. On average, coal from Pinnacle will take a 12 to 15 percent discount to the Australian benchmark. The last day that Pinnacle produced coal was October 4, 2018 and the operations at the preparation plant were idled on December 8, 2018.

---

[9] Metallurgical or "met coal" refers to the various grades of coal with suitable carbonation properties to make coke in the steelmaking process. This is in contrast to thermal coal, which is used to produce electricity, steam, or both. For the year that ended December 31, 2017, met coal accounted for 96% of the Debtors' total coal sales revenue.

3. *Management*

The Debtors' current management team is composed of highly capable professionals with substantial industry experience. Information regarding Mission Coal Company, LLC's executive officers is as follows:

*Mike Zervos.* Mike Zervos currently serves as Chief Executive Officer and President of Mission Coal Company. He joined the Company in November 2016 after previously serving as Chief Executive Officer and President at United Coal Company (since April 2005). Prior to his time at United Coal Company, he formed Global Energy Management, LLC to pursue coal mining acquisition opportunities in Central Appalachia. He received his Bachelor of Science and M.B.A. from West Virginia University.

*Alan Jones.* Alan Jones is the Vice President of Accounting of Mission Coal Company. He joined Mission Coal Company in 2017 after previously serving as Senior Vice President of Technical Accounting at Contura Energy. Prior to working at Contura, he spent seven years at Alpha Natural Resources where he served as Chief Accounting Officer. Before transitioning to the coal industry, he spent sixteen years at Ernst and Young in Assurance & Advisory Business Services department. He received his Bachelor of Science in Accounting from Virginia Commonwealth University School of Business.

*Gary Broadbent.* Gary Broadbent is the General Counsel, Vice President of Human Resources, and Secretary of Mission Coal Company. He joined Mission Coal Company after previously serving at Murray Energy Corporation for eight years, occupying a number of roles including Senior Corporate Counsel and Director of Investor and Media Relations. He received his Bachelor's degree from Kent State University, and both his J.D. and M.B.A. from Case Western Reserve University.

4. *Customers*

The Debtors' customer base principally consists of domestic and international steel producers that purchase the Debtors' met coal and domestic electric utilities and industrial companies that purchase the Debtors' thermal coal. The Debtors market internationally to customers in the Atlantic Basin (particularly in Europe, the United Kingdom, and Brazil), and export sales made up approximately 55 percent of the Debtors' coal sale revenue in 2017. The Debtors have a very concentrated customer base, as their ten largest customers accounted for 77 percent of the Debtors' coal sale revenue in 2017.

Under a coal sale and agency agreement, the Debtors primarily market and sell their product through their affiliation with a third-party broker, Robindale Energy Services, Inc. ("Robindale"), rather than directly to their end customers. Pursuant to this arrangement, which began in 2017, Robindale takes title to and resells the Debtors' coal to end customers. At the time Robindale takes title, it remits 50% of the sale price to the Debtors. After arranging for sales with the end customer, the proceeds from these coal sales are remitted from the customer to Robindale before the remaining 50% is remitted to the Debtors, which typically happens within seven days of Robindale's collection of the funds. Further, the Debtors are party to a wash coal purchase agreement at the Pinnacle preparation plant, which provides additional liquidity.

5. *Competition*

The North American coal industry is intensely competitive. In addition to competition from other coal producers, the Debtors compete with producers of alternative fuels used for electrical power generation, such as nuclear energy, natural gas, hydropower, petroleum, solar, and wind. Costs and other factors such as safety, environmental, and regulatory considerations related to alternative fuels affect the overall demand for coal as a fuel. Political dynamics in the United States have additionally resulted in a volatile and unpredictable coal market.

Certain of the Debtors' mines produce coal for export customers and have contracts with railway and port entities for delivery. The Debtors' export customers may purchase coal from the Debtors or from other producers around the world with similar coal quality, access to ports, and more economical shipping to the customer, as some of the Debtors' competitors are located closer to the customers' facilities.

6. *Employees*

Between their operation facilities and home office, the Debtors currently employ approximately 779 individuals on a full- or part-time basis, although this number will be reduced by approximately 43 employees upon the idling of the Pinnacle mine. Of the 779 employees currently employed by the Debtors, 366 are non-union employees and 413 are union employees represented by the UMWA. The Debtors' employees include miners, engineers, truck drivers, mechanics, electricians, administrative support staff, managers, directors, and executives. The Debtors provide their employees with health and welfare benefit plans, including medical, prescription drug, dental, and vision plans. The Debtors also contribute to plans established for certain retirees who retired before October 1, 1994 under the Coal Industry Retiree Health Benefits Act of 1992, 26 U.S.C. § 9701 *et seq.* (the "Coal Act"). Like other coal companies, the Debtors also incur costs and make award payments in accordance with the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 901-45 (the "Black Lung Act").

Separately, the Debtors are subject to other workers' compensation laws in the states in which they operate. The Debtors maintain high-deductible workers' compensation coverage through Rockwood Casualty Insurance Company. The Debtors incur significant premiums due to these obligations, and may be required to contribute additional premiums in the future depending on the number and amount of forthcoming claims. The Debtors intend to, and have received authority to, continue making all payments to their current employees and all payments with respect to government regulations, including workers' compensation programs, among others.

B. *The Debtors' Capital Structure*

1. *The Debtors' Capital Structure*

As described in greater detail below, as of the Commencement Date, the Debtors have approximately $175 million in total funded debt obligations. The obligations consist of approximately $104 million of First Lien Credit Agreement (as described below) and $71 million of Second Lien Credit Agreement (as described below).

(a)    DIP Credit Agreement

Reference is made to the Credit Agreement, dated as of January 31, 2018 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "First Lien Credit Agreement," and the loans and other obligations outstanding thereunder, the "First Lien Loans"), by and among Mission Coal, as borrower, the guarantors party thereto, Delaware Trust Company, as Administrative Agent (in such capacity, the "First Lien Agent"), and the other lenders parties thereto (the "First Lien Lenders").

The First Lien Credit Agreement includes a Prepayment Premium (as defined in the Final DIP Order) that permits Mission Coal to repay the First Lien Loans before the scheduled maturity date. Mission Coal may repay all or any portion of the First Lien Credit Agreement at any time prior to the maturity date at a price equal to 100% of the principal amount, plus the Prepayment Premium. The Prepayment Premium is calculated as set forth in the First Lien Credit Agreement and as of the Commencement Date was $42,177,072.

Pursuant to that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement (the "DIP Credit Agreement") by and among Mission Coal, the guarantors party thereto, and the DIP Lenders, the DIP Lenders provided the Debtors with a DIP Facility in the aggregate amount of no less than $209,229,024, as of January 2, 2019, which includes, (i) the aggregate principal amount of up to $54.5 million in respect of new money term loan commitments and (ii) a roll-up of the entire amount outstanding under the First Lien Credit Agreement, including the Prepayment Premium (collectively, the "Prepetition First Lien Obligations"), plus all accrued interest thereon. $50 million of the Prepetition First Lien Obligations were rolled-up upon entry of the Interim DIP Order[10] and the remainder was rolled-up upon entry of the Final DIP Order.

---

[10]    "Interim DIP Order" means the *Interim Order (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(A), 361, 362, 363, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1), and 364(E), (II) Authorizing the Debtors' Use of Cash*

As of the Commencement Date, the Debtors have approximately $71,691,874 outstanding under the Amended and Restated Secured Loan Agreement, dated as of January 31, 2018 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "Second Lien Credit Agreement"), and the loans and other obligations outstanding thereunder, the "Second Lien Loans"), by and among Mission Coal, Seminole Coal Resources, LLC, Seneca Coal Resources, LLC, collectively as the borrowers, the guarantors party thereto, and Mission Coal Funding, LLC (collectively, the "Second Lien Lender").

The Second Lien Loans bear interest at a rate of 20 percent per annum, which is currently PIK interest.  The Second Lien Loans are secured by liens that are junior in priority to the liens securing the First Lien Loans on substantially all of the Debtors' assets.  The Second Lien Loans contain a Second Lien Credit Agreement Prepayment Premium in the event of a voluntary or mandatory repayment, redemption, prepayment, an acceleration of the Loan in an amount equal to the present value of the sum of all required payments of interest (including, for the avoidance of doubt, PIK interest) on the Loan being repaid, prepaid, redeemed, that have become or are declared accelerated.

2.     *Other Non-Financial Obligations*

Like other coal companies, the Debtors have contractual and statutory obligations relating to their current and retired employees, as well as asset retirement and reclamation obligations.

(a)     Employee Benefit Obligations

The Debtors have ongoing pension and OPEB obligations, consisting of a multi-employer pension plan maintained pursuant to the CBAs.  Under this arrangement, certain of Seneca's subsidiaries are required to make contributions to the United Mine Workers of America 1974 Pension Plan at contractually determined rates (the "1974 Pension Plan").  As of the Commencement Date, the Debtors estimate the present value of their retiree medical obligations to be approximately $61.1 million.  As communicated by the 1974 Pension Plan to the Debtors, if the Debtors were to fully withdraw from the 1974 Pension Plan, they would face potential withdrawal liability at both Pinnacle and Oak Grove of approximately $977.3 million in the aggregate.[11]  Additionally, certain of Seneca's subsidiaries are obligated to make contributions to the 1993 Benefit Plan and Trust, which provides medical and other benefits to certain retired members of the UMWA and, in some instances, their spouses and dependents.  Benefits, eligibility, and cost-sharing provisions vary by plan documents and CBAs.

(b)     Workers' Compensation and Black Lung Act Obligations

As required by federal and state law, the Debtors provide benefits to employees for awards related to workers' compensation and pneumoconiosis (more commonly known as black lung disease).  Pursuant to the Black Lung Act, coal miners who suffer from pneumoconiosis and their dependents may file disability claims with the U.S. Department of Labor (the "DOL"), which then investigates the claims and assigns liability to make benefit award payments for those claims to a "responsible operator" (likely the miner's most recent employer or a successor of the employer) (the "Black Lung Act Claims").

Black Lung Act Claims include claims for the payment of (a) disability benefit awards to workers who suffer from black lung disease and (b) excise taxes to fund the Black Lung Disability Trust Fund (the "Black Lung Fund").  If a responsible coal operator fails to pay a benefit award, the Black Lung Fund will pay the award and the DOL can (i) assert liens (with the same priority as tax claims) against the assets of the responsible operator and (ii) exercise subrogation rights of the underlying claimant.  In addition, the Black Lung Act requires a coal operator either to secure

---

*Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and 4001(C)* [Docket No. 64].

[11]  The amount of estimated withdrawal liability for the 1974 Pension Plan set forth herein is current as of July 2018 as provided in letters received from the 1974 Pension Plan, dated June 7, 2018.

its payment obligations by posting collateral or to obtain insurance for its payment obligations. A coal operator's directors and officers may also be held personally liable for unpaid benefits.

The Debtors are insured for federal and state workers' compensation and black lung benefits for employees by a third-party insurance provider. In addition, the Debtors assumed obligations with respect to certain self-insured periods of subsidiaries of Seneca as part of its acquisition.

(c)     Asset Retirement Obligations

Like other coal companies, the Debtors have asset retirement obligations that are related to mine reclamation and closure costs. Reclamation obligations primarily represent the fair value of future anticipated costs to restore surface land to levels equal to or greater than pre-mining conditions, as required by the federal Surface Mining Control and Reclamation Act as well as certain state laws.

The Debtors' asset retirement obligations primarily consist of spending estimates for surface land reclamation and support facilities at both their surface and underground mines in accordance with applicable reclamation laws in the United States, as defined by each mining permit. Asset retirement obligations are determined for each mine using various estimates and assumptions, including, among other items, estimates of disturbed acreage as determined from engineering data, estimates of future costs to reclaim the disturbed acreage and the timing of these cash flows, discounted using a credit-adjusted, risk-free rate. The Debtors' asset retirement obligations as of September 30, 2018 were approximately $[20.7 million, including amounts classified as a current liability, of which $36,495,000 in outstanding surety bonds are secured by $5,475,702 in aggregate collateral.][12]

## ARTICLE IV.
## EVENTS LEADING UP TO THE CHAPTER 11 CASES

A.     *Adverse Market Conditions*

The Debtors are subject to the same fluctuating market conditions as other companies operating in the coal industry. Although the met coal market is not currently in decline, over the past five-year period, the coal industry has been in turmoil. Coal mining businesses across the United States and around the world experienced pressure from the downward spiral in commodity prices, and the fate of many of these companies is yet to be determined. Even in the currently favorable met coal market, there still exist several requirements to maintain a coal mining business, including an inventory of economic sites to mine, a consistent mining program to offset the natural declines in production that occur almost immediately, a relatively consistent outlook for commodity prices, and compliance with restrictive federal and state regulations on coal producers.

Federal and state regulatory authorities impose significant obligations on the coal mining industry with respect to employee health and safety, permitting and licensing requirements, environmental protection, the reclamation and restoration of mining properties after mining has been completed, and the effect of mining on surface and groundwater quality. The costs of compliance, particularly the decades of liabilities the Debtors assumed in their purchase of Seneca, have further contributed to the Debtors' financial difficulties. Other regulations, such as those governing reclamation and mine safety, most notably those administered by the Mine Safety Health Administration, have imposed even more direct costs on the Debtors.

As noted above, the Debtors are not alone in their difficult position. Other similarly situated companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings. But unlike many of their peers in the coal industry, the Debtors simply have not had enough time to establish solid relationships or a firm reputation, and the adverse market conditions have hit this newcomer to the field particularly harshly.

---

[12]   The facts and figures provided herein are reflective of the Debtors' books and records and such facts and figures may not be reflective of current obligations as of the date hereof.

16

Practically speaking, the fact that so many coal companies have gone through the bankruptcy process prior to the Debtors has diminished their bargaining power with their vendors. Many vendors who are major industry players have been stakeholders in other bankruptcies over the past several years, and acting out of self-protection, have imposed stringent terms on the Debtors. The Debtors have generally lost most credit terms from key vendors. This results in a constrained market and a near holding pattern for Mission Coal, who is frequently subject to disadvantageous business terms and unable to substitute its vendors' services with less expensive alternative providers.

### B. Acquisition and Expansion Efforts

The series of acquisitions that led to the Debtors' founding took place within a relatively short timeframe, and greatly increased the Debtors' obligations. The legacy liabilities under the Existing CBAs (as defined herein), including Debtors' obligations to contribute to both the Multi-Employer Pension Plan and the 1993 Benefit Plan and Trust with respect to employee pensions and retiree medical and other benefits, respectively, contributed to the Debtors' financial state in a significant way. Further, developing a fully-formed back office brought with it numerous upfront and recurring costs. However, the Company's operating performance has left the Debtors significantly overleveraged.

### C. Coal Industry Liabilities

Under the Black Lung Benefits Revenue Act of 1977 and the Black Lung Benefits Reform Act of 1977, as amended in 1981, each coal mine operator must pay federal black lung benefits to eligible current and former employee claimants and also make payments to a trust fund for the payment of benefits and medical expenses to eligible claimants who last worked in the coal industry prior to January 1, 1973. Mission Coal recorded $1,700,000 of expenses related to this excise tax in 2017. With the implementation of the Patient Protection and Affordable Care Act in 2010 and the amendment of federal black lung regulations, the number of claimants who are awarded federal black lung benefits has increased and will likely continue to increase, as will the amounts of those awards. Mission Coal's payment obligations for federal black lung benefits are secured by insurance coverage by a high deductible insurance program.

When coupled with the external pricing pressure, increased regulation, and other costs associated with the Debtors' business, these liabilities have hindered the Debtors' ability to operate competitively in the current market environment.

### D. The Debtors' Proactive Approach to Addressing Liquidity Constraints

In early 2018, in order to provide additional capital for their business, the Debtors pursued a financing that sought to modify their debt load, including their Second Lien Loans, and refinance certain other existing debt. Even in light of the renegotiations and alleviations this financing provided, for the above-discussed reasons, the Debtors nonetheless quickly found themselves in need of additional capital.

In the face of looming financial difficulties, the Debtors took proactive steps to lessen the burden of their liabilities, including, among other things, reduction in workforce in the months preceding the Commencement Date and temporarily halting mining operations at the Pinnacle mine. Further, the Debtors were underperforming due to inadequate funding, availability of capital, and the above-discussed inventory transportation issues. As a result, despite the Debtors' efforts to reduce operating and capital expenditures, the Debtors' interest burden and balance sheet, particularly in light of the necessary repairs, remained unsustainable.

Mission Coal completed a sale-leaseback transaction with Bay Point in May 2018, which involved Bay Point buying six longwall shields and leasing them back to the Debtors. This transaction should have ultimately injected $16 million into Mission Coal. However, $4 million of the proceeds were never received, as certain contingencies were not met to release this final amount of fee proceeds.

In the weeks prior to the Commencement Date, the Debtors successfully negotiated a covenant waiver with the First Lien Lenders, pursuant to which the First Lien Lenders agreed to forbear from exercising remedies with respect to various events of default under the First Lien Credit Agreement through September 15, 2018 to allow the

17

Debtors the flexibility to explore restructuring options. On September 14, 2018, the Company and the First Lien Lenders entered into a further amended forbearance agreement through September 30, 2018. The most promising alternative to an in-court chapter 11 process was a long-term forbearance proposal that would have (i) extended a forbearance through March 31, 2019 and (ii) invested $34 million into Mission Coal to strengthen liquidity, catch up on any outstanding payments, and allow the Debtors to commit to more planned expansion of their operational assets. After several productive rounds of negotiation and discussion, however, this additional funding could not be secured, and the Debtors' dire liquidity situation became too much for the lenders and Mission Coal to bear, making the long-term forbearance no longer viable.

Prior to the Commencement Date, the Debtors appointed two independent board members— Tony Horton and David Heiman —to the board of directors of Mission Coal. Each of Mr. Horton and Mr. Heiman have significant restructuring experience, particularly in the energy sector. Mr. Horton previously served as the Executive Vice President, Chief Financial Officer, and Chief Risk Officer at Energy Future Holdings ("EFH"), where he was the senior executive involved in EFH's restructuring efforts. Mr. Horton is also a current independent director at EXCO Resources, where he leads the Strategic and Restructuring Committee and is Chair of the Audit Committee. Mr. Heiman previously served as a partner in Jones Day's Business Restructuring practice group and is a past chair of the American College of Bankruptcy.

Since their appointment, Mr. Horton and Mr. Heiman have played a key role in advising the Debtors' board of directors on operational and financial matters. In addition, and in connection with the Debtors' restructuring initiatives, Mr. Horton and Mr. Heiman have been tasked with, among other things, leading a postpetition independent investigation into certain potentially valuable causes of action.

## ARTICLE V.
## ADMINISTRATION OF THE CHAPTER 11 CASES

A.    *First Day Pleadings and Other Case Matters*

On the Commencement Date, or shortly thereafter, in addition to the voluntary petitions for relief filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also filed a number of first day motions and applications (collectively, the "First Day Pleadings") with the Court. On October 16 and November 19, 2018, the Court entered orders granting interim and final relief, respectively, to, among other things: (a) prevent interruptions to the Debtors' businesses; (b) ease the strain on the Debtors' relationships with certain essential constituents; (c) allow the Debtors to retain certain advisors necessary to assist the Debtors with the administration of the chapter 11 cases; and (d) allow the Debtors to have access to postpetition financing and cash collateral (each, a "First Day Order").

1.    *Administrative Motions*

To facilitate a smooth and efficient administration of the chapter 11 cases, the Debtors filed First Day Pleadings seeking orders authorizing the joint administration of the Debtors' chapter 11 cases, and establishing certain notice, case management and administrative procedures.

2.    *Operational Relief*

The Debtors filed certain motions and applications requesting various types of "first day" and "second day" relief. The relief granted enabled the Debtors to preserve value and efficiently administer the chapter 11 cases, including, among other things, orders authorizing the Debtors to:

- continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms, and continue to perform intercompany transactions;

- pay certain prepetition taxes and fees;

- pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, honor the terms of their premium financing agreement and pay premiums thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business;

- pay employees' wage claims and related obligations in the ordinary course of business and continue certain employee benefit programs;

- make payment on account of prepetition claims of certain shippers, lienholders, 503(b)(9) claimants, and critical vendors;

- establish procedures for utilities to request adequate assurance, pursuant to which the utilities were prohibited from discontinuing service except in certain circumstances; and

- continue making payments to their surety bond provider in accordance with their prepetition bonding arrangements.

3. *Debtor-In-Possession Financing*

In connection with filing for chapter 11, the Debtors, with the assistance of Jefferies LLC ("Jefferies"), initiated two parallel processes for identifying sources of capital on the best available terms: (a) negotiations with the Debtors' existing funded debt stakeholders and (b) a marketing process with potential alternative sources of capital from parties outside the Debtors' existing capital structure. Specifically, in order to evaluate alternatives to the ultimately Court-approved DIP Financing, Jefferies solicited interest from twenty parties that routinely provide DIP facilities, of which nine entered into non-disclosure agreements and were provided an opportunity to perform due diligence.

All of the lenders contacted by Jefferies expressed concern about providing, and were ultimately unwilling to provide, debtor-in-possession financing because, among other things, the Debtors' recent financial performance had deteriorated, and the Prepetition Secured Parties hold liens on substantially all of the Debtors' assets, leaving no unencumbered collateral available to be pledged to a third party lender. Additionally, these potential lenders informed Jefferies that in these circumstances they were not willing to pursue a nonconsensual priming DIP against the Prepetition Secured Parties.

Absent postpetition financing, the Debtors would be unable to continue to operate. Accordingly, the Debtors endeavored to negotiate acceptable debtor-in-possession financing terms with their First Lien Lenders. The Court approved DIP Financing that provides $54,500,000 in new money funding, subject to certain terms and conditions including a "roll-up" of the First Lien Lenders' prepetition claims and required milestones related to the progression labor negotiations and the resolution of the Debtors' existing labor agreements and retiree benefits, a marketing process, and the confirmation of the chapter 11 plan described herein.

4. *Oak Grove Coal Mining Lease*

Prior to the Commencement Date, WPP LLC, by NRP (Operating) LLC, its sole member ("NRP") and certain of the Debtors were a party to a series of agreements relating to the mining of coal at Oak Grove (collectively, the "Oak Grove Coal Mining Lease"). As set forth in the DIP Objection, NRP asserted that the Oak Grove Coal Mining Lease terminated prior to the Commencement Date.[13] As set forth in the Assumption Motion, the Debtors asserted that the Oak Grove Coal Mining Lease had not terminated prepetition and sought to, among other things, assume the Oak

---

[13] The "DIP Objection" means the *Objection to the Interim Order and Motion for Entry of a Final Order (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(E), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c)* [Docket No. 172].

Grove Coal Mining Lease.[14]  After good-faith and arm's length negotiations between the Debtors, NRP, and the DIP Lenders, the parties entered into an *Agreed Order and Settlement Agreement Related to Motion to Assume Oak Grove Coal Mining Lease* [Docket No. 299] (the <u>Agreed Order and Settlement Agreement</u>") pursuant to which the Oak Grove Coal Mining Lease was reinstated and assumed by the Debtors, and the parties agreed to enter into an amended and restated coal mining lease (the "<u>2018 Lease</u>").  The Agreed Order and Settlement Agreement also provided the Debtors with the option to explore assignment of the Pinnacle lease.  The 2018 Lease was executed by the parties thereto on December 10, 2018, with an effective date of November 20, 2018.

5. *Automatic Stay*

The filing of the Debtors' bankruptcy petitions on the Commencement Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions against the Debtors' and their Estates, the enforcement of Liens, Claims, encumbrances, and interests against property of the Debtors, and both the commencement and the continuation of prepetition litigation against the Debtors.  With certain limited exceptions and/or modifications as permitted by order of the Court, the automatic stay remains in effect until the Plan Effective Date.

B. *Employment and Compensation of Advisors*

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the chapter 11 cases, the Debtors sought and the Court authorized the retention and employment of the following advisors:  (a) on October 16, 2018, Omni Management Group as Notice and Claims Agent to the Debtors [Docket No. 66]; (b) on November 28, 2018, Kirkland & Ellis LLP as counsel to the Debtors [Docket No. 349]; (c) on November 28, 2018, Christian & Small LLP as co-counsel to the Debtors [Docket No. 348]; (d) on November 30, 2018, Jefferies as investment banker and financial advisor to the Debtors [Docket No. 364]; and (e) on November 30, 2018, Zolfo Cooper, LLC as restructuring advisor to the Debtors [Docket No. 363].  Further, on November 28, 2018, the Debtors filed a motion seeking approval of procedures for the interim compensation and reimbursement of expenses of retained Professionals in the chapter 11 cases [Docket No. 353].  Finally, on November 28, 2018, Ernst & Young LLP as valuation and tax advisory services provider for the Debtors [Docket No. 356], and on December 20, 2018, the Bankruptcy Administrator for the Northern District of Alabama filed a motion to appoint a Fee Examiner [Docket No. 486].

C. *Appointment of Official Committee*

On October 25, 2018, the Bankruptcy Administrator for the Northern District of Alabama filed the *Appointment of Unsecured Creditors Committee* [Docket No. 147], notifying parties in interest that the Bankruptcy Administrator had appointed a statutory committee of unsecured creditors (the "<u>Committee</u>") in the chapter 11 cases. The Committee is currently composed of the following members:  United Central Industrial Supply Company, LLC, Pense Bros. Drilling Co., Inc., Coal Specialty Funding, LLC, the UMWA 1974 Pension Plan, the UMWA, Cleveland-Cliffs Inc. f.k.a. Cliffs Natural Resources, Inc., Tracy Burton (Plaintiff in Linda Weekly, et al vs. Seneca North American Coal, LLC, White Armature Works, Inc., and Webster, et al vs. Oak Grove et al.  The Committee has retained Lowenstein Sandler LLP and Baker, Donelson, Bearman, Caldwell & Berkowitz, PC as its legal counsel and Berkeley Research Group, LLC ("<u>BRG</u>") as its financial advisor.

Since the formation of the Committee, the Debtors have consulted with the Committee concerning the administration of the chapter 11 cases, and the Committee has been an active participant in the chapter 11 cases. The Debtors have kept the Committee informed of, and have conferred with the Committee on, matters relating to the Debtors' business operations and have sought the concurrence of the Committee to the extent that its constituency would be affected by proposed actions or transactions outside of the ordinary course of the Debtors' businesses.

---

[14]  The "<u>Assumption Motion</u>" means *Debtors' Motion for Entry of an Order Authorizing and Approving the Debtors' Assumption of the Oak Grove Coal Mining Lease* [Docket No. 228].

The Committee has participated actively with the Debtors' management and professional advisors in reviewing the Debtors' business plans and operations.

D.     *Ongoing Internal Independent Director and Committee Led Investigations*

After commencing the chapter 11 cases, the Debtors' board of directors appointed two independent members, Tony Horton and David Heiman, and authorized them to conduct and oversee a postpetition independent investigation (the "Independent Investigation") into any potential claims and causes of action belonging to the Debtors' estates. Kirkland & Ellis LLP, as counsel to the Debtors in the chapter 11 cases, and AlixPartners, as financial advisors to the Debtors in the chapter 11 cases, are assisting Mr. Horton and Mr. Heiman with the Independent Investigation. The Independent Investigation is an iterative process and is ongoing, and the Debtors reserve all rights, in the reasonable exercise of their business judgment, to pursue, prosecute, settle, release, abandon, or otherwise resolve any potential claims or causes of action that are identified in connection with the Independent Investigation. For the avoidance of doubt, the Debtors' release of the Released Parties are subject to the conclusion of the Independent Investigation and rights are reserved.

The Committee, pursuant to section 1103 of the Bankruptcy Code, is separately conducting a parallel investigation into potential claims and causes of action belonging to the Debtors' estates (the "Committee Investigation"). In the interest of cooperation and to minimize waste of estate resources, the Committee and the Debtors, through their independent directors (collectively the "Investigating Parties"), stipulated to a schedule that will govern the Committee Investigation [Docket No. 275]. The Committee Investigation is also an ongoing, iterative process, and pursuant to the above-referenced stipulation, the Committee has until February 28, 2019 to challenge, or move for standing to challenge, as applicable, the validity, perfection, priority, extent, or enforceability of any prepetition claims of Mission Coal Funding, LLC, and to initiate, or move for standing to initiate, as applicable, any avoidance actions or any other claims, counterclaims, causes of action, objections, contests, or defenses relating to the Debtors' estates.

E.     *Summary of Claims Process, Bar Date and Claims Filed*

On November 16, 2018, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs. Interested parties may review the Schedules and SOFAs and amendments thereto by visiting the Debtors' Case Information Website (located at http://www.omnimgt.com/missioncoal).

On December 20, 2018, the Court entered the Bar Date Order, which establishes procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice"). Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in the Debtors' chapter 11 cases is **January 18, 2019 at 5:00 p.m., prevailing Central Time** (the "Bar Date")[15]; and the last date for governmental units to file Proofs of Claim in the Debtors' chapter 11 cases is **April 12, 2019, at 5:00 p.m. prevailing Central Time**. Pending the Court's approval, the Bar Date Notice was published in the following local and national publications: *Birmingham News*, *Alabama Messenger*, *Kingsport Times-News*, *Charleston Gazette-Mail*, and *USA Today* (national edition).

[Pursuant to the Disclosure Statement Order, the deadline for filing requests for payment of Administrative Claims is (a) with respect to Administrative Claims other than Estate Retained Professional Fee Claims, [the Voting Deadline]; and (b) with respect to Estate Retained Professional Fee Claims, 30 days after the Plan Effective Date.]

F.     *Exclusivity*

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Court enters an order for relief under chapter 11 of the Bankruptcy Code, during which only the debtor may file a chapter 11 plan. If

---

[15] Notwithstanding anything in the Bar Date Order, the professionals of the Prepetition First Lien Parties and the DIP Parties are not required to file Proofs of Claim for any prepetition claims or postpetition claims and/or requests for payment of administrative expense claims in any of these chapter 11 cases with respect to their fees and expenses, which fees and expenses shall be paid pursuant to the Final DIP Order.

the debtor files a chapter 11 plan within such 120-day period, section 1121(c)(3) of the Bankruptcy Code extends the exclusivity period by an additional 60 days to permit the debtor to seek acceptances of such plan. Section 1121(d) of the Bankruptcy Code also permits the Court to extend these exclusivity periods "for cause." On [December 17], 2018, the Debtors' filed their Plan. Without further order of the Court, the Debtors' exclusivity period to file a chapter 11 plan will expire on February 11, 2019, which is 120 days after the Debtors filed for relief under chapter 11 of the Bankruptcy Code.

G.    *Postpetition Marketing, Bidding, and Auction Process*

On December 5, 2018, the Debtors filed the Bidding Procedures Motion, which, among other things, sought to establish (a) dates and deadlines for the submission of bids and the Auction of substantially all assets of the Debtors, and (b) requirements for bids to be "Qualified Bids" that will be considered at the Auction. On December 21, 2019, the Court entered an order approving the Bidding Procedures, which, among other things, establish **February 13, 2019 at 4:00 p.m. (prevailing Central Time)** as the final bid deadline. On **February 27, 2019, at 10:00 a.m. (prevailing Eastern Time)**, to the extent Qualified Bids are received, the Debtors will hold an Auction for all or substantially all of their assets.

As set forth in the Bidding Procedures, the Debtors prefer the Sale Transaction be approved and consummated through the Plan and the DIP Lenders prefer the Sale Transaction be approved and consummated through a separate Sale Order pursuant to Bankruptcy Code section 363 and not require consummation of the Plan in order to close on the Sale Transaction.

H.    *Section 1113 and 1114 Process*

The reduction of the Debtors' legacy labor liabilities continues to be a crucial and necessary step towards the Debtors' successful emergence from these chapter 11 cases. The Debtors are signatories to two collective bargaining agreements (the "Existing CBAs") with the UMWA. The Existing CBAs include costly and burdensome financial obligations with respect to UMWA-represented employees and retirees. Since the commencement of these chapter 11 cases, the Debtors have met in person with the UMWA to discuss the Debtors' need to obtain modifications to certain pension, retiree benefits, and other obligations under the Existing CBAs. Specifically, the Debtors have already begun good faith negotiations with representatives of the UMWA to negotiate modifications to the Existing CBAs, and have presented proposals for new collective bargaining agreements in the hopes of coming to a consensual arrangement that would reduce the financial burden of the Debtors' Existing CBA obligations. Negotiations with the UMWA regarding potential modifications to the Existing CBAs are ongoing.

## ARTICLE VI.
## SUMMARY OF THE PLAN

**THIS <u>ARTICLE VI</u> IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL SUCH TERMS AND PROVISIONS, AND SHOULD <u>NOT</u> BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF (INCLUDING ATTACHMENTS) WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS <u>ARTICLE VI</u> AND THE PLAN (INCLUDING ATTACHMENTS), THE LATTER SHALL GOVERN.**

The Plan provides for the sale of all or substantially all of the Debtors' assets through the Sale Transaction. The key terms of the Plan are as follows:

Case 18-04177-TOM11    Doc 523    Filed 01/02/19    Entered 01/02/19 17:48:01    Desc
Main Document    Page 28 of 107

*A.*     *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Plan Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Distributions made to Holders of Allowed Claims in any Class are intended to be final.

*B.*     *Proposed Creditor Recoveries*

The Plan proposes to fund creditor recoveries from Cash on hand, debt issued or assumed by the Successful Bidder or any of its subsidiaries, the Sale Transaction Proceeds (if any), the General Unsecured Claims Amount, the Debtors' rights under the Sale Transaction Documentation, payments made directly by the Successful Bidder on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Amounts made by the Successful Bidder pursuant to sections 365 or 1123 of the Bankruptcy Code and all Causes of Action not previously settled, released, or exculpated under the Plan. The Debtors will continue to market their assets on a postpetition basis and will hold the Auction to the extent Qualified Bids for the Debtors' assets are submitted in accordance with the Bidding Procedures. The Debtors intend to consummate the Sale Transaction with the bidder that provides the highest or otherwise best offer as contemplated under the Bidding Procedures Order, the Sale Transaction Documentation and the Plan.

Pursuant to the Plan, the Debtors or the Plan Administrator shall pay or provide for payments of Claims as follows:

- Holders of Other Priority Claims will be paid in full on the Plan Effective Date (or as soon thereafter as such Other Priority Claims become due and Allowed in the ordinary course);

- Holders of Other Secured Claims (including all Secured Tax Claims), will receive, at the election of the Debtors:

    (i)      payment in full in Cash;

    (ii)     the collateral securing such Other Secured Claims;

    (iii)    reinstatement of such Other Secured Claims, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such Other Secured Claims to demand or to receive payment prior to the stated maturity of such Other Secured Claim from and after the occurrence of default; or

    (iv)    such other treatment rendering such Other Secured Claims Unimpaired;

- Each Holder of DIP Facility Claims will receive either (i) payment in full in Cash of the Obligations (which amount shall include the full roll-up of the Prepetition First Lien Obligations Amount, including the Prepayment Premium, plus the First Lien Accrued Adequate Protection Payments) (each as defined in the DIP Documents to the extent not defined herein) or (ii) treatment that is otherwise acceptable to the Required Lenders;

- Each holder of Second Lien Secured Claims will receive its Pro Rata share, based on the Allowed amount of its Second Lien Secured Claim, of the remaining amount of the Sale Transaction Proceeds, solely to the extent the DIP Facility Claims are paid in full in Cash;

- Each Holder of General Unsecured Claims will receive (i) its Pro Rata share of the General Unsecured Claims Amount (as provided in Article IV.H. of the Plan) and (ii) the remaining amount of the Sale Transaction Proceeds, solely to the extent the DIP Facility Claims and, to the extent Allowed, the Second Lien Secured Claims are paid in full in Cash;

- Each Intercompany Claim will, at the election of the Debtors, be reinstated or canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect;

- Intercompany Interests will, at the election of the Debtors, be reinstated or canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect;

- Section 510(b) Claims will be canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim;

- Interests will be canceled, released, and extinguished, and will be of no further force or effect. Each Holder of an Interest will not receive any distribution on account of such Interest.

The Debtors believe that the Plan is in the best interest of the Estates and urge Holders of Claims in Class 3 (DIP Facility Claims), Class 4 (Second Lien Secured Claims), and Class 5 (General Unsecured Claims) to vote to accept the Plan.

C.     *The Sale Transaction*

Following the Confirmation Date, as set forth in the Plan, the Debtors shall be authorized to consummate the Sale Transaction to the Successful Bidder pursuant to the terms of the Sale Transaction Documentation, the Plan, and the Confirmation Order. Generally, the Sale Transaction contemplates that:

(a)     the Debtors shall consummate the Sale Transaction by, among other things, transferring the Acquired Assets, including all Transferred Causes of Action held by the Debtors, to the Successful Bidder free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than the Assumed Liabilities) pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code, the Plan and the Confirmation Order;

(b)     upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Sale Transaction Documentation and the Plan, and any documents in connection herewith and therewith, shall be deemed authorized and approved without any requirement of further act or action by the Debtors, the Debtors' shareholders or boards of directors, or any other Entity or Person; and

(c)     the Debtors shall be authorized to execute and deliver, and to consummate the transactions contemplated by, the Sale Transaction Documentation and the Plan, as well as to execute, deliver, file, record, and issue any note, documents, or agreements in connection therewith, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.

D.     *Restructuring Transactions*

Upon the entry of the Confirmation Order, the Debtors, the Plan Administrator, and the Successful Bidder are authorized, without further order of the Bankruptcy Court, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions and the Sale Transaction under or in connection with the Plan, including: (1) the execution and delivery

24

of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) any transaction described in the Description of Transaction Steps; and (6) subject to the occurrence of the Plan Effective Date, the consummation of the transactions contemplated by the Sale Transaction Documentation.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

E.     *The Plan Administrator*

On and after the Plan Effective Date, the Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Plan Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Debtors shall be deemed to have resigned, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Debtors, and shall succeed to the powers of the Debtors' managers, directors, and officers.

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the Retained Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Debtors' Estates appointed pursuant to the Bankruptcy Code § 1123(b)(3)(B).

Among other things, the Plan Administrator shall be responsible for: (1) liquidating, receiving, holding, and investing, supervising, and protecting the Retained Assets; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Wind-Down Escrow Amount, the General Unsecured Claims Amount (if any), and the Sale Transaction Proceeds, if any and to the extent applicable; (3) making distributions from the Wind-Down Escrow Amount, the General Unsecured Claims Amount (if any), and the Sale Transaction Proceeds, if any and to the extent applicable as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying reasonable fees, expenses, debts, charges, and liabilities of the Debtors on and after the Plan Effective Date; (7) administering and paying taxes of the Debtors on and after the Plan Effective Date, including filing tax returns; (8) representing the interests of the Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator's post-Plan Effective Date compensation shall be set forth in the Plan Supplement and paid by the Debtors.

F.     *Corporate Action*

Upon the Plan Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan and the Sale Transaction Documentation (including any action to be undertaken by the Debtors or the Plan Administrator, as applicable) shall be deemed authorized, approved, and, to the extent taken prior to the Plan Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Plan Administrator, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, including the creation of the Successful Bidder, the

25

consummation of the Sale Transaction, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates; *provided, however,* that for the avoidance of doubt, the Successful Bidder may be formed by a person or entity other than the Debtors, as set forth in the Description of Transaction Steps.

[Upon the Plan Effective Date or as soon as reasonably practicable thereafter, after making all distributions provided for under the Plan, the Debtors shall be deemed to have been dissolved and terminated, except as necessary to satisfy their obligations under the Sale Transaction Documentation. The directors, managers, and officers of the Debtors and the Plan Administrator, as applicable, shall be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate in their sole discretion.]

G.    *Recoveries to Certain Holders of Claims and Interests*

The recoveries to holders of Claims and Interests are described in **Article IV.D** of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

H.    *Release, Injunction, and Related Provisions*

The Plan contains certain releases, as described in **Article II.I** of this Disclosure Statement entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"

**The Plan provides that all holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes who abstain from voting, vote to reject the Plan or are deemed to reject the Plan *and* who do not opt-out of the release provisions contained in Article IX of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the Debtors (the "Debtor Releases") and the Released Parties (the "Third Party Releases").**

**By opting-out of the releases set forth in Article IX.C of the Plan you will forgo the benefit of obtaining the releases set forth in Article IX.C of the Plan if you otherwise would be a Released Party thereunder. The releases are an integral element of the Plan.**

The release, exculpation, and injunction provisions that are contained in Article IX of the Plan are copied in pertinent part below.

1.    *Release of Liens*

**Except as otherwise specifically provided in the Plan, the Sale Transaction Documentation or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Plan Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the Sale Transaction Documentation, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert either to (i) the Debtors and their successors and assigns or (ii) the Successful Bidder, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. In addition, the DIP Agent shall execute and deliver all documents reasonably requested by the Debtors or Plan Administrator to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

2.    *Releases by the Debtors*

**[Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Plan Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether**

26

individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of the Sale, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases herein are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases herein; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors asserting any claim released by the releases herein against any of the Released Parties.]

3. *Releases by Holders of Claims and Interests*[16]

[As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of the Sale, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring

---

[16] The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The Releases by Holders of Claims and Interests are subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.]

4. *Exculpation*[17]

[Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of the Sale, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of commercially sensitive confidential information for competitive purposes that causes damages, or ultra vires acts as determined by a Final Order.]

5. *Injunction*

Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account

---

[17]  The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The exculpation set forth in this paragraph is subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

For more detail, see Article IX of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**ARTICLE VII.**
**VOTING AND CONFIRMATION**

On January [4], 2019, the Debtors filed this Disclosure Statement with the Court seeking entry of an order approving the adequacy of this Disclosure Statement and the solicitation procedures and deadlines contemplated herein.

A.       *Classes Entitled to Vote on the Plan*

The following Classes are the only Classes entitled to vote to accept or reject the Plan (the "Voting Classes"):

| Class | Claim | Status |
|-------|-------|--------|
| 3 | DIP Facility Claims | Impaired / Unimpaired |
| 4 | Second Lien Secured Claims | Impaired |
| 5 | General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined herein) or a Ballot. If your Claim is included in the Voting Classes, you should read your Ballot and carefully follow the instructions set forth therein. Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors, or the Notice and Claims Agent on behalf of the Debtors, otherwise provide to you.

B.       *Votes Required for Acceptance by a Class*

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Each Class of Claims entitled to vote on the Plan will have accepted the Plan if: (a) the Holders of at least two-thirds in dollar amount of the Claims actually voting in each Class vote to accept the Plan; and (b) the Holders of more than one-half in number of the Claims actually voting in each Class vote to accept the Plan.

C.       *Certain Factors to Be Considered Prior to Voting*

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan, including that:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

29

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Estate Retained Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of Holders within the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in such Voting Classes.

For a further discussion of risk factors, please refer to **Article VIII** hereof, entitled "Certain Risk Factors to be Considered Before Voting."

D.    *Classes Not Entitled to Vote on the Plan*

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan, or if they will receive no property under the plan, in which case they are deemed to reject the proposed plan. Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 6 | Intercompany Claims | Impaired / Unimpaired | Presumed to Accept or Reject |
| 7 | Intercompany Interests | Impaired / Unimpaired | Presumed to Accept or Reject |
| 8 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 9 | Interests | Impaired | Deemed to Reject |

E.    *Solicitation Procedures*

1.    *Notice and Claims Agent*

The Debtors retained Omni Management Group to act, among other things, as the notice and claims agent in connection with the solicitation of votes to accept or reject the Plan.

2.    *Solicitation Package*

Pursuant to the Disclosure Statement Order, Holders of Claims who are entitled to vote to accept or reject the Plan as of **January 30, 2019** (the "Voting Record Date"), will receive appropriate solicitation materials (the "Solicitation Package"), which will include, in part, the following:

- the appropriate Ballot(s) and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement, including the Plan as an exhibit thereto.

3.    *Distribution of the Solicitation Package and Plan Supplement*

[The Debtors will cause the Notice and Claims Agent to distribute the Solicitation Packages to Holders of Claims in the Voting Classes on or before **the date that is five (5) business days after entry of the Disclosure Statement Order**, which will be at least 28 days before the Voting Deadline (*i.e.*, 4:00 p.m. prevailing Central Time on March 11, 2019).]

The Solicitation Package (except for the Ballots) may also be obtained: (a) from Omni Management Group by (i) visiting www.omnimgt.com/missioncoal; (ii) writing to Omni Management Group, Re: Mission Coal Company, LLC, et al., 5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367; or (b) for a fee via PACER at https://ecf.alnb.uscourts.gov.

At least 7 days prior to the Voting Deadline, the Debtors intend to file the Plan Supplement. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available at www.omnimgt.com/missioncoal. The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement (a) from Omni Management Group by (i) calling the Debtors' restructuring hotline at 888-585-6494 (U.S.) or 818-906-8300 (International); (ii) visiting the Debtors' restructuring website at: www.omnimgt.com/missioncoal; (iii) writing to Omni Management Group, Re: Mission Coal Company, LLC, et al., 5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367; or (b) for a fee via PACER at https://ecf.alnb.uscourts.gov.

As described above, certain Holders of Claims may not be entitled to vote because they are Unimpaired or are otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code. In addition, certain Holders of Claims and Interests may be Impaired but are receiving no distribution under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote. Such Holders will receive only notice of the Confirmation Hearing and a non-voting status notice. The Debtors are only distributing a Solicitation Package, including this Disclosure Statement and a Ballot to be used for voting to accept or reject the Plan, to the Holders of Claims entitled to vote to accept or reject the Plan as of the Voting Record Date.

F.    *Voting Procedures*

If, as of the Voting Record Date, you are a Holder of a Claim in Class 3, 4, or 5—the Voting Classes—you may vote to accept or reject the Plan in accordance with the Solicitation Procedures by completing the Ballot and returning it in the envelope provided. If your Claim or Interest is not included in the Voting Classes you are not entitled to vote and you will not receive a Solicitation Package. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

1.    *Voting Deadline*

The Voting Deadline is **March 11, 2019, at 4:00 p.m., prevailing Central Time**. To be counted as a vote to accept or reject the Plan, a Ballot must be properly executed, completed, and delivered, whether by first class mail, overnight delivery, or personal delivery, so that the Ballot is **actually received** by the Notice and Claims Agent no later than the Voting Deadline.

2.    *Voting Instructions*

As described above, the Debtors have retained Omni Management Group to serve as the Notice and Claims Agent for purposes of the Plan. Omni Management Group is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

31

| BALLOTS |
|---|
| To be counted, all Ballots must be **actually** **received** by Omni Management Group by the Voting Deadline, which is **March 11, 2019, at 4:00 p.m., prevailing Central Time**, at the following address: |

| **If by First Class Mail, Ballots must be sent to:** | **If by Hand Delivery or Overnight Mail, Ballots must be sent to:** |
|---|---|
| c/o Omni Management Group<br>**Re: Mission Coal Company, LLC, et al.**<br>Attn: Voting Department<br>5955 DeSoto Ave., Suite 100<br>Woodland Hills, CA 91367 | c/o Omni Management Group<br>**Re: Mission Coal Company, LLC, et al.**<br>Attn: Voting Department<br>5955 DeSoto Ave., Suite 100<br>Woodland Hills, CA 91367 |

| **If by Email, scanned Ballots must be sent to:** |
|---|
| missioncoal@omnimgt.com |

| If you have any questions on the procedure for voting on the Plan, please call the Debtors' restructuring hotline maintained by Omni Management Group at: 888-585-6494 (U.S.) or 818-906-8300 (International). |

More detailed instructions regarding the procedures for voting on the Plan are contained in the Ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each Ballot; (b) overnight courier; or (c) hand-delivery, so that the Ballots are **actually** **received** by Omni Management Group no later than the Voting Deadline at the return address set forth in the applicable Ballot. Any Ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim in a Voting Class held by such Holder. By signing and returning a Ballot, each Holder of a Claim entitled to vote will certify to the Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked. It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

3.     *Ballots Not Counted*

No Ballot will be counted if, among other things: (i) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (ii) it was transmitted by means other than as specifically set forth in the ballots; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed, and for which the applicable claims bar date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to any party other the Notice and Claims Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan**.

G.     *Confirmation Objection Deadline*

Parties must object to Confirmation of the Plan by **March 11, 2019, at 4:00 p.m., prevailing Central Time** (the "Confirmation Objection Deadline"). All objections to the Plan must be filed with the Court and served on the Debtors and certain other parties in interest so that they are **actually** **received** on or before the Confirmation Objection Deadline.

*H.* *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. The Court has scheduled the Confirmation Hearing for **March 20, 2019, at 10:00 a.m., prevailing Central Time.** The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and solicitation procedures. Any objection to the Plan must (1) be in writing; (2) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Court and served so that it is actually received by the following notice parties set forth in this Disclosure Statement no later than the Confirmation Objection Deadline. Unless an objection to the Plan is timely served and filed, it may not be considered by the Court.

*I.* *Confirmation Standards*

At a Confirmation Hearing, the Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the Plan and incident to the chapter 11 cases, has been or will be disclosed to the Court, and any such payment: (i) made before the confirmation of the Plan is reasonable; or (ii) is subject to the approval of the Court as reasonable, if it is to be fixed after confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Plan Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code. With respect to each Class of Interests, each Holder of an Impaired Interest will have accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Plan Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan will have either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that: (i) Holders of Claims specified in sections 507(a)(2) will receive payment in full, in Cash; (ii) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims payment in

33

full, in Cash; and (iii) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim payment in full, in Cash.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial restructuring of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or restructuring.

- The Debtors have paid or the Plan provides for the payment of the required fees pursuant to 28 U.S.C. § 1930.

1. *Best Interests of Creditors Test—Liquidation Analysis*

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Court must still independently determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such holder with a recovery that has a value at least equal to the value of the recovery that each such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code beginning on what would have been the Plan Effective Date. Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Plan Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under chapter 7 beginning on the Plan Effective Date.

The Debtors believe that the Plan will satisfy the best interests test because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. After accounting for administrative expenses, unsecured creditors (including any secured creditor deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will be liquidated through the Sale Transaction and the Plan effects a liquidation of the Debtors' remaining assets. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to holders of the DIP Facility Claims, Second Lien Secured Claims and Allowed General Unsecured Claims than would a chapter 7 liquidation.[18] Liquidating the Debtors' Estates under the Plan likely provides holders of the DIP Facility Claims, Second Lien Secured Claims, and Allowed General Unsecured Claims with a larger, timelier recovery primarily due to the expectation of materially lower realized sale proceeds in chapter 7.

A chapter 7 liquidation beginning on what would have been the Plan Effective Date would provide less recovery for creditors than the Plan. The delay of the chapter 7 trustee becoming familiar with the assets could easily

---

[18] There is a possibility that there will not be a greater recovery for the Second Lien Secured Claims and Allowed General Unsecured Claims, although this is dependent on the results of the Auction, if one is held.

cause bids already obtained to be lost, and the chapter 7 trustee would not have the technical expertise or knowledge of the Debtors' business (or the Company) that the Debtors had when they proposed to sell their assets pursuant to the Plan. Moreover, the distributable proceeds under a chapter 7 liquidation would be lower because of the chapter 7 trustee's fees and expenses.

Sale proceeds in chapter 7 would likely be significantly lower particularly in light of in light of a potential lack of liquidity in a chapter 7 that would potentially lead to the Company's mines being shutdown, the highly technical nature of the Debtor's assets and the time delay associated with the chapter 7 trustee's learning curve for these assets. In addition to the expected material reduction in sale proceeds, recoveries would be further reduced (in comparison with those provided for under the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' technical assets, and these specific chapter 11 cases, in order to complete the administration of the Debtors' Estates. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

In a chapter 7 liquidation, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the chapter 11 cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case. Moreover, the conversion to chapter 7 would also require entry of a new bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7. See Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries relative to those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in materially reduced sale proceeds, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the chapter 11 cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

2. *Financial Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation or the need for further financial restructuring, unless the plan contemplates such liquidation or restructuring. The Plan provides for the sale of the Debtors' businesses. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

*J.*       *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, which, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan either: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan. Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or to reject a plan. Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of creditors or interests.

Claims in Classes 1 and 2 are Unimpaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan. Holders of Claims in Classes 5, 6, and 7 will be deemed either impaired or unimpaired, and Claims and Interests in Classes 7, 8, and 9 will receive no distribution under the Plan and are, therefore, presumed deemed to have rejected the Plan.

Claims in Classes 3, 4, and 5 are Impaired under the Plan, and as a result, the Holders of Claims in such Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described directly below. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

K.      *Confirmation Without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it or if an impaired class is deemed to reject the plan; *provided* that the plan is accepted by at least one impaired class (without regard to the votes of insiders). Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

1.      *No Unfair Discrimination*

The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent but that such treatment be "fair." In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

2.      *Fair and Equitable Test*

The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class. As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement because there is no Class receiving more than 100 percent of the amount of the Allowed Claims in such Class, and no Class that is junior to a dissenting Class that will receive or retain any property on account of the Claims or Interests in such junior Class.

36

(a) *Secured Claims*

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the Plan Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

(b) *Unsecured Claims*

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that the plan provides either: (i) that each holder of a claim of such class receives or retains on account of such claim property of a value, as of the Plan Effective Date of the plan, equal to the allowed amount of such claim; or (ii) no holder of any claim or any interest that is junior to the claims of such class will receive or retain any property under the plan on account of such junior claim or junior interest.

(c) *Interests*

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that the plan provides that either: (i) each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the Plan Effective Date of the plan, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (ii) that no holder of any interest that is junior to the interests of such class will receive or retain any property under the plan on account of such junior interest.

**ARTICLE VIII.**
**CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING**

Holders of Claims entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A. *Risk Factors and Considerations Regarding the Debtors' Business and Operations*

1. *The Debtors May Not Be Able to Achieve Their Projected Financial Results*

The financial projections set forth in this Disclosure Statement represent the best estimate of the future financial performances of the Debtors based on currently known facts and assumptions about future operations as well as the United States and world economies in general and, specifically, the coal industry. The actual financial results may differ significantly from the projections. If the Debtors do not achieve their projected financial results, then the value of the Debtors debt or equity issued pursuant to the Plan may experience a decline and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. There are numerous factors and assumptions inherent in estimating the quantities and qualities of, and costs to mine, coal reserves, including many factors beyond the Debtors' control, including the following:

37

<ol type="a" start="1">
<li>(a) quality of the coal;</li>
<li>(b) geological and mining conditions;</li>
<li>(c) the percentage of coal ultimately recoverable;</li>
<li>(d) the assumed effects of regulation, including the issuance of required permits, taxes, including severance and excise taxes and royalties, and other payments to governmental agencies;</li>
<li>(e) assumptions concerning the timing for the development of the reserves;</li>
<li>(f) assumptions concerning physical access to the reserves; and</li>
<li>(g) assumptions concerning equipment and productivity, future coal prices, operating costs, including for critical supplies such as fuel, tires and explosives, capital expenditures and development and reclamation costs.</li>
</ol>

As a result, estimates of the quantities and qualities of economically recoverable coal attributable to any particular group of properties, classifications of reserves based on risk of recovery, estimated cost of production, and estimates of future net cash flows expected from these properties as prepared by different engineers, or by the same engineers at different times, may vary materially because of changes in the above factors and assumptions. Actual production recovered from identified reserve areas and properties, and revenues and expenditures associated with the Debtors' mining operations, may vary materially from estimates. Any inaccuracy in the Debtors' estimates related to their reserves could result in decreased profitability from lower than expected revenues and/or higher than expected costs.

2. *If the Assumptions Underlying the Debtors' Estimates of Reclamation and Mine Closure Obligations Are Inaccurate, the Debtors' Costs Could Be Greater Than Anticipated.*

The Debtors base their estimates of reclamation and mine closure liabilities on permit requirements, engineering studies and the Debtors' engineering expertise related to these requirements. The Debtors' management and engineers periodically review these estimates. The estimates can change significantly if actual costs vary from the Debtors' original assumptions or if governmental regulations change significantly. The Debtors are required to record new obligations as liabilities at fair value under generally accepted accounting principles.

3. *The Debtors May Seek Approval of the Sale Pursuant to an Order Pursuant to Section 363 of the Bankruptcy Code.*

In the event that the Successful Bidder requires that the Sale Transaction be consummated through a 363 sale, the Debtors shall work in good faith with the Successful Bidder to schedule a hearing for approval of such Sale Transaction and entry of such Sale Order (as defined in the Bidding Procedures Order) as soon as reasonably practicable after the conclusion of the Auction. Notwithstanding the forgoing, nothing shall require the Debtors to consummate the Sale Transaction with the Required Lenders pursuant to a Sale Order and (i) the Debtors reserve all of their rights to argue that any Sale Transaction with the Required Lenders must be approved and consummated pursuant to a chapter 11 plan of reorganization and (b) the Required Lenders reserve all of their rights to argue that any Sale Transaction with the Debtors must be approved and consummated pursuant to section 363 of the Bankruptcy Code as opposed to pursuant to the Plan and not require consummation of a chapter 11 plan of reorganization in order to close the Sale Transaction. The Debtors might also be required to seek approval and consummation of the Sale Transaction pursuant to a Sale Order, as opposed to pursuant to the Plan, in the event the Sale Transaction Proceeds reasonably expected to be received by the Debtors from the Successful Bidder, or other cash that may be available for distribution on account of Claims, is an amount insufficient to pay in full in Cash the DIP Facility Claims, Administrative Claims, Estate Retained Professional Fee Claims, Priority Tax Claims and Other Priority Claims (to the extent such Claims are not Assumed Liabilities, and except to the extent the holder of any such Claims agrees to alternative treatment otherwise acceptable to such holder).

4. *The Sale Transaction May Not Close.*

The Successful Bidder has agreed to purchase certain of the Debtors' assets and assume certain liabilities through the Sale Transaction and may require that certain conditions be met, including approval of this Disclosure Statement, Confirmation of the Plan, and, if applicable, the closing of the Sale Transaction within the respective time periods specified in the Sale Transaction Documentation and that no event giving rise to termination of the Sale Transaction Documentation has occurred (such events as set forth in the Sale Transaction Documentation).

To the extent the terms or conditions of the Sale Transaction Documentation are not satisfied or modified in the Debtors' and Successful Bidder's sole discretion, or to the extent other events giving rise to termination of the Sale Transaction Documentation occur, the Sale Transaction Documentation may be terminated prior to Confirmation or consummation of the Plan. Such termination could adversely affect creditor recoveries as well as the Debtors' ability to confirm and consummate the Plan.

5. *The Loss of the Services of Key Personnel Could Have a Material Adverse Effect on the Debtors' Business.*

The leadership of the Debtors' executive officers and directors form a critical element of the Debtors' success. The death or disability of any of the Debtors' executive officers or directors, or other extended or permanent loss of their services, or any negative market or industry perception with respect to them or arising from their loss, could have a material adverse effect on the Debtors' businesses. The Debtors' executive officers and other members of senior management have substantial experience and expertise in the Debtors' business that will likely make significant contributions to the Debtors' growth and success. The unexpected loss of services of one or more of these individuals would adversely affect the Debtors.

6. *Acts of Terrorism, War, Natural Disasters, Severe Weather, and Political, Economic, and Military Conditions May Impede the Debtors' Ability to Operate or May Otherwise Negatively Affect Their Financial Results.*

Terrorist attacks and other acts of war or hostility have created many economic and political uncertainties. The Debtors cannot predict the extent to which disruptions in air or other forms of travel as a result of terrorist acts, security alerts or wars, uprisings, or hostilities throughout the world will directly or indirectly affect the Debtors' businesses and operating results, as applicable. In addition, natural and man-made disasters such as major fires, floods, hurricanes, earthquakes, and oil spills could also adversely affect the Debtors' business and operating results, as applicable. Such events could lead to the loss of use of one or more mining facilities for an extended period of time and disrupt the ability to mine or deliver coal to customers.

In most cases, the Debtors have insurance that covers portions of losses from natural disasters, but that insurance remains subject to deductibles and maximum payouts in many cases. Although the Debtors may have insurance coverage for natural disasters, the timing of their receipt of insurance proceeds, if any, is out of their control. Additionally, a natural disaster affecting one or more of the Debtors' properties may affect the level and cost of insurance coverage they can obtain in the future, which may adversely affect the Debtors' financial position.

B. *Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims Under the Plan.*

1. *Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recovery of Some Holders of Allowed Claims.*

The estimate of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan.

2. *The Debtors May Not Be Able to Satisfy the Conditions Precedent to Consummation of the Plan.*

To the extent that the Debtors are unable to satisfy the conditions precedent to Consummation of the Plan, the Debtors may be unable to consummate the Plan and parties may terminate their support, financial or otherwise, for the Plan prior to the Confirmation or Consummation of the Plan. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

3. *The Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in the Voting Classes.*

The Debtors cannot know with certainty, at this time, the number or amount of Claims in the Voting Classes that will ultimately be Allowed and how the amount of Allowed Claims will compare to the estimates provided herein. For example, a number of Proofs of Claim may allege Claims in an unliquidated amount that will require future resolution, making the amount of any Allowed Claim based on such Proof of Claim entirely speculative as of the date of this Disclosure Statement. In addition, the Debtors are continuing to review the Proofs of Claim filed in their chapter 11 cases. As such, the estimated amount of Claims may materially change due to the Debtors' ongoing review. Accordingly, because certain Claims under the Plan will be paid on a Pro Rata basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims in the Voting Classes.

4. *The Debtors Cannot Guaranty Recoveries or the Timing of Such Recoveries.*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims, including Administrative Claims, Priority Tax Claims, and Other Priority Claims, it is possible that the actual amount of such Allowed Claims is materially higher than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guaranty the timing of any recovery on an Allowed Claim.

5. *Certain Tax Implications of the Debtors' Bankruptcy*

Holders of Allowed Claims should carefully review **Article IX** of this Disclosure Statement, "Material United States Federal Income Tax Consequences," in regard to the tax implications of the Plan and the chapter 11 cases.

C. *Certain Bankruptcy Law Considerations*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes:

1. *Parties in Interest May Object to the Plan's Classification of Claims.*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

Furthermore, certain parties in interest, including the Debtors, reserve the right, under the Plan, to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim when such Claim is or may be subject to an objection or is not yet Allowed. Any Holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

40

2. *Failure to Satisfy Vote Requirements.*

In the event that votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

3. *The Debtors May Not Be Able to Secure Confirmation of the Plan.*

The Debtors will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial restructuring unless such liquidation or restructuring is contemplated by the plan; and (iii) the value of distributions to non-accepting Holders of Claims and Interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. According to the Plan, there are various documents that must be in form and substance acceptable to the Debtors, the Required Lenders, and/or the Successful Bidder, and there are certain funding amounts that must also be agreed to by these parties prior to Confirmation. If agreement cannot be reached on these documents or these funding amounts, Confirmation of the Plan may not occur. Further, if the requisite acceptances are not received, the Debtors may seek to accomplish an alternative restructuring and obtain acceptances to an alternative plan of reorganization for the Debtors, or otherwise, that may not have the support of the Holders of Allowed Claims and Allowed Interests and/or may be required to liquidate these Estates under chapter 7 or 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan. Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Court determines that this Disclosure Statement, the Debtors' proposed procedures for the solicitation of Ballots from Holders of Allowed Claims, and the voting results are appropriate, the Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not Confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan. Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4. *Failure to Consummate the Plan.*

As of the date of this Disclosure Statement, there can be no assurance that the conditions to Consummation of the Plan will be satisfied or waived. Accordingly, even if the Plan is confirmed by the Court, there can be no assurance that the Plan will be consummated and the Restructuring Transactions completed.

5. *Nonconsensual Confirmation.*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each

impaired class that has not accepted the plan, the Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

      6.    *Risk of Non-Occurrence of the Plan Effective Date.*

Although the Debtors believe that the Plan Effective Date may occur quickly after the Sale Date, there can be no assurance as to such timing or as to whether such a Plan Effective Date will, in fact, occur.

      7.    *Compliance with the DIP Facility.*

The DIP Facility is scheduled to mature on [April 12], 2019 (the "DIP Maturity Date"). There can be no assurance that the Plan will be confirmed and consummated by the DIP Maturity Date, and there can be no assurance that the DIP Lenders would extend the DIP Maturity Date or forbear from exercising their rights and remedies under the DIP Facility, which may result in the inability of the Debtors to consummate the Plan.

In addition, the DIP Facility contains financial and other covenants regarding, among other things, the Debtors' liquidity and earnings. There can be no assurance that the Debtors will be able to comply with these covenants. If the Debtors fail to comply with such covenants and terms, the Debtors would be required to obtain waivers or forbearance from the lenders under the DIP Facility and, if such waivers or forbearance are not obtained, there could be a material adverse effect on the Debtors' financial condition and the Debtors may not be able to consummate the Plan.

      8.    *Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan.*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Court orders certain Allowed Claims and Allowed Interests to be subordinated to other Allowed Claims and Allowed Interests. The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

      9.    *The Debtors May Lack Sufficient Liquidity to Satisfy Certain Priority and Administrative Claims in Full in Cash.*

It is possible that Allowed Administrative Claims, Priority Tax Claims, Other Priority Claims, Estate Retained Professional Fee Claims and the costs of the wind down may exceed the funding available with respect to such Claims, in which case the Plan will not become effective. Further, in the event the Sale Transaction Proceeds reasonably expected to be received by the Debtors from the Successful Bidder, or other cash that may be available for distribution on account of Claims, is an amount insufficient to pay in full in Cash the DIP Facility Claims, Administrative Claims, Estate Retained Professional Fee Claims, Priority Tax Claims and Other Priority Claims (to the extent such Claims are not Assumed Liabilities, and except to the extent the holder of any such Claims agrees to alternative treatment otherwise acceptable to such holder), the Debtors may not be able to confirm the Plan.

      10.    *Releases, Injunctions, and Exculpations Provisions May Not Be Approved.*

Article IX of the Plan provides for certain releases, injunctions, and exculpations. However, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

11. *The Closing Conditions of the Sale Transaction May Not Be Satisfied.*

It is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction, which would prevent the Debtors from consummating the Plan. If this occurs, the chapter 11 cases may be converted to cases under chapter 7 or dismissed.

D.     *Disclosure Statement Disclaimer*

1. *The Financial Information Contained in this Disclosure Statement Has Not Been Audited.*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained in this Disclosure Statement and attached hereto is without inaccuracies.

2. *Information Contained in this Disclosure Statement Is for Soliciting Votes.*

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3. *This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.*

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

4. *This Disclosure Statement May Contain Forward Looking Statements.*

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

5. *No Admissions Made.*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Consenting Stakeholders, Holders of Allowed Claims, or any other parties in interest.

6. *Failure to Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Plan Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

7. *No Waiver of Right to Object or Right to Recover Transfers and Assets.*

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates are specifically or generally identified in this Disclosure Statement.

8. *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.*

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

9. *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Court.

10. *No Representations Outside this Disclosure Statement Are Authorized.*

No representations concerning or relating to the Debtors, the chapter 11 cases, or the Plan are authorized by the Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors.

E.     *Liquidation Under Chapter 7.*

If no chapter 11 plan can be confirmed, the Debtors' chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation could have on the recoveries of Holders of Claims and the Debtors' liquidation analysis is set forth in **Article VII.I.1** of this Disclosure Statement entitled "Best Interests of Creditors Test— Liquidation Analysis."

**ARTICLE IX.**
**MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors and beneficial owners of Claims (each, a "Holder"). This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion

Case 18-04177-TOM11     Doc 523     Filed 01/02/19     Entered 01/02/19 17:48:01     Desc
Main Document     Page 50 of 107

below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not apply to Holders that are not U.S. Persons (as such term is defined in the Tax Code) and does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below.

The Debtors expect to treat the Sale Transaction as a taxable sale of assets for U.S. federal income tax purposes.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

A.  *Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Holders of Allowed Class 9 Interests*

Immediately prior to the Consummation of the Plan, Mission Coal and Seneca will be treated as partnerships for U.S. federal income tax purposes, and Seminole will be treated as a disregarded entity for U.S. federal income tax purposes (with its assets being treated as owned by Mission Coal for such purposes). Accordingly, the U.S. federal income tax consequences of consummating the Plan will generally not be borne by Mission Coal, Seneca, or Seminole

45

Coal Recourses, LLC, but will be borne by Mission Coal's and Seneca's partners, *i.e.*, the Holders of the Class 9 Interests.

       1.      <u>Taxable Transfer of Assets</u>

       Pursuant to the Sale Transaction, the Debtors will transfer all or substantially all of their assets to the Successful Bidder, whereby the Cash received in such a Sale Transaction will be used to fund the applicable creditor recoveries pursuant to the Plan. Such transfer generally should be treated as a taxable sale or exchange of the assets of the Debtors for U.S. federal income tax purposes.

       Accordingly, the Debtors may recognize gain upon the transfer of certain assets to the Successful Bidder As described above, because Mission Coal and Seneca are partnerships for U.S. federal income tax purposes, such gain or loss will be allocated to the Holders of the Class 9 Interests. The amount of gain or loss allocable to any particular Holder of a Class 9 Interest depends, in part, on when and at what price such Holder paid for its Class 9 Interest and the extent to which it has previously been allocated amortization or depreciation deductions with respect to the transferred assets. The Holders of the Class 9 Interests are urged to consult their tax advisors regarding the allocation of gain and loss and the deductibility of any losses recognized as a result of the transfer of assets (including any other limitations that may be imposed by the tax law based on a holder's individual circumstances).

       2.      <u>COD Income.</u>

       In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("<u>COD Income</u>") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

       Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "<u>Bankruptcy Exception</u>"), or (b), to the extent that the taxpayer is insolvent immediately before the discharge (the "<u>Insolvency Exception</u>"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("<u>NOLs</u>"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

       Under section 108(d)(6) of the Tax Code, when an entity, such as Mission Coal or Seneca, that is taxed as a partnership realizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the partner level rather than at the entity level. Accordingly, the Holders of Allowed Class 9 Interests will be treated as receiving their allocable share, if any, of the COD Income realized by Mission Coal or Seneca.

       The Debtors, and accordingly, the Holders of the Class 9 Interests, expect to realize significant COD Income as a result of the consummation of the Plan. The exact amount of any COD Income that will be realized by the Debtors and the Holders of the Class 9 Interests will not be determinable until the consummation of the Plan.

**B.**    *Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 3 DIP Facility Claims*

       The DIP Lenders shall receive payment in full in Cash of the Obligations, which amount shall include the full roll-up of the Prepetition First Lien Obligations Amount, including the Prepayment Premium, plus the First Lien Accrued Adequate Protection Payments) from the Sale Transaction Proceeds (each as defined in the DIP Documents

to the extent not defined herein). Holders of the DIP Facility Claims will recognize gain or loss equal to the (a) the sum of (i) any Cash received minus (b) the Holder's adjusted tax basis in its DIP Facility Claim.

To the extent that Holders of DIP Facility Claims seek treatment otherwise acceptable to them as provided herein, the tax consequences of such treatment may change.

C. *Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 4 Second Lien Secured Claims.*

Pursuant to the Plan, each Holder of an Allowed Class 4 Second Lien Secured Claim will receive its *pro rata* share, based on the Allowed amount of its Second Lien Secured Claim, of Cash, solely to the extent the DIP Facility Claims are paid in full in cash. Such Holders will recognize gain or loss equal to (i) the sum of any Cash received minus (ii) the Holder's adjusted tax basis in its Second Lien Secured Claim..

D. *Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 5 General Unsecured Claims.*

Pursuant to the Plan, each Holder of an Allowed Class 5 General Unsecured Claim will receive its *pro rata* share of Cash, to the extent the DIP Facility Claims and the Second Lien Secured Claims are paid in full in Cash. Such Holders should recognize gain or loss equal to (a) the sum of any Cash received, minus (b) the Holder's adjusted tax basis in its General Unsecured Claim.

D. *Character of Gain or Loss.*

Where gain or loss is recognized by a Holder of a Claim upon the exchange of its Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, whether the Allowed Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Allowed Claim was acquired at a market discount (discussed below), whether and to what extent the Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. Each Holder of an Allowed Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Claim.

Holders of Allowed Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For corporate Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

E. *Market Discount.*

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount" ("OID") its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of debt constituting its Allowed Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon

47

while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

Section 451 of the IRC (as discussed below) generally would require accrual method Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) to include certain items of income such as market discount no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with market discount is effective for taxable years beginning after December 31, 2018. However, the IRS recently announced in Notice 2018-80 that it intends to issue proposed regulations confirming that taxpayers may continue to defer income—including market discount income—for tax purposes until there is a payment or sale at a gain. Accordingly, although market discount may have to be included in income currently as it accrues for financial accounting purposes, taxpayers may continue to defer the income for tax purposes. Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

F.      *Accrued Interest.*

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary; however, the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the terms of the Plan, distributions in respect of Allowed Claims are allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for Holders.

U.S. federal income tax laws enacted in December 2017 added section 451 of the IRC. Under this new provision, accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) generally would be required to include certain items of income such as OID (but not market discount) no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with OID is effective for taxable years beginning after December 31, 2018. Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

G.      *Limitation on Use of Capital Losses*

A Holder of a Claim who recognizes capital losses as a result of the transactions undertaken pursuant to the Plan will be subject to limits on the use of such capital losses. For a non-corporate Holder, capital losses may be used to offset any capital gains recognized (without regard to holding periods), and also ordinary income recognized to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of such capital losses over such capital gains. A non-corporate Holder may carry over unused capital losses recognized and apply them against future capital gains recognized and a portion of their ordinary income recognized for an unlimited number of years. Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

48

*H.*     *Information Reporting and Backup Withholding*

The Debtors will withhold all amounts required by law to be withheld from distributions or payments. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan. In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE X.
## RECOMMENDATION OF THE DEBTORS

**In the opinion of the Debtors, the Plan is preferable to any potential alternatives described in this Disclosure Statement because the Plan provides for a larger distribution to the Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.**

*[Balance of page intentionally left blank.]*

49

Respectfully submitted,

Dated: [●], 2019

MISSION COAL COMPANY, LLC
on behalf of itself and all other Debtors

/s/
Name: Kevin Nystrom
Title: Chief Restructuring Officer
Company: Mission Coal Company, LLC

**Exhibit A**

**Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates**

**THIS PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS PLAN IS SUBJECT TO CHANGE. THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**JOINT CHAPTER 11 PLAN OF**
**MISSION COAL COMPANY, LLC AND CERTAIN OF ITS DEBTOR AFFILIATES**

Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     stephen.hessler@kirkland.com
     ciara.foster@kirkland.com

-and-

James H.M. Sprayregen, P.C.
Melissa N. Koss (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:     james.sprayregen@kirkland.com
     melissa.koss@kirkland.com

Daniel D. Sparks
Bill D. Bensinger
**CHRISTIAN & SMALL LLP**
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Telephone:     (205) 795-6588
Facsimile:     (205) 328-7234
Email:     ddsparks@csattorneys.com
     bdbensinger@csattorneys.com

*Co-Counsel to the Debtors and Debtors in Possession*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

**TABLE OF CONTENTS**

**CONTENTS**

INTRODUCTION ...........................................................................................................................5

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
      AND GOVERNING LAW.............................................................................................5
A.     Defined Terms. ...................................................................................................5
B.     Rules of Interpretation. ....................................................................................15
C.     Computation of Time. ......................................................................................15
D.     Governing Law. ...............................................................................................16
E.     Reference to Monetary Figures. ......................................................................16
F.     Controlling Document. ....................................................................................16

ARTICLE II ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, DIP FACILITY
      CLAIMS, AND PRIORITY TAX CLAIMS ...........................................................16
A.     Administrative Claims. ....................................................................................16
B.     Professional Compensation. ............................................................................17
C.     Priority Tax Claims. .........................................................................................18
D.     Bankruptcy Administrator. ..............................................................................18

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS............18
A.     Summary of Classification. .............................................................................18
B.     Treatment of Claims and Interests...................................................................19
C.     Special Provision Governing Unimpaired Claims. ..........................................22
D.     Elimination of Vacant Classes. .......................................................................22
E.     Voting Classes; Presumed Acceptance by Non-Voting Classes. .....................22
F.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code................22
G.     Subordinated Claims. ......................................................................................22

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ..........................................23
A.     General Settlement of Claims...........................................................................23
B.     Sources of Plan Consideration. ........................................................................23
C.     Sale Transaction. .............................................................................................23
D.     Vesting of Assets. ............................................................................................24
E.     The General Unsecured Claims Amount. .........................................................25
F.     Wind-Down. ....................................................................................................25
G.     Wind-Down Escrow Amount. ..........................................................................25
H.     Plan Administrator. ..........................................................................................25
I.     Cancellation of Notes, Instruments, Certificates, and Other Documents. .........25
J.     Corporate Action. ............................................................................................26
K.     Dissolution of the Boards of the Debtors. ........................................................26
L.     Release of Liens. .............................................................................................26
M.     Effectuating Documents; Further Transactions. ...............................................27
N.     Exemption from Certain Taxes and Fees. ........................................................27
O.     Causes of Action. ............................................................................................27
P.     Closing the Chapter 11 Cases. .........................................................................27

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .......27
A.     Assumption and Rejection of Executory Contracts and Unexpired Leases. ......27
B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases. .......28
C.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ....28
D.     D&O Policies. ..................................................................................................29
E.     Modifications, Amendments, Supplements, Restatements, or Other Agreements. ...................29

Case 18-04177-TOM11    Doc 523    Filed 01/02/19    Entered 01/02/19 17:48:01    Desc
Main Document    Page 59 of 107

F.     Reservation of Rights. .................................................................................. 29

G.    Nonoccurrence of the Plan Effective Date. ................................................... 30

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS** ........................................ **30**

A.    Timing and Calculation of Amounts to Be Distributed. ................................... 30

B.    Rights and Powers of the Plan Administrator. ............................................... 30

C.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. ........ 31

D.    Compliance with Tax Requirements/Allocations. .......................................... 32

E.    Allocation of Plan Distributions Between Principal and Interest. ..................... 32

F.    Setoffs and Recoupment. ........................................................................... 32

G.    Claims Paid or Payable by Third Parties. .................................................... 32

H.    Indefeasible Distributions. .......................................................................... 33

**ARTICLE VII THE PLAN ADMINISTRATOR** ................................................................ **33**

A.    The Plan Administrator. ............................................................................. 33

B.    Wind-Down. ............................................................................................. 34

C.    Exculpation; Indemnification; Insurance; Liability Limitation. ........................ 34

D.    Tax Returns. ............................................................................................. 35

E.    Dissolution of the Debtors. ......................................................................... 35

**ARTICLE VIII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND**
      **DISPUTED CLAIMS** ............................................................................... **35**

A.    Allowance of Claims and Interests. .............................................................. 35

B.    Claims and Interests Administration Responsibilities. .................................... 35

C.    Estimation of Claims and Interests. .............................................................. 36

D.    Adjustment to Claims or Interests without Objection. ..................................... 36

E.    Time to File Objections to Claims. ............................................................... 36

F.    Disallowance of Claims. ............................................................................. 36

G.    Amendments to Claims. ............................................................................. 36

H.    No Distributions Pending Allowance. ........................................................... 37

I.    Distributions After Allowance. .................................................................... 37

J.    Undeliverable Distribution Reserve. ............................................................ 37

K.    Single Satisfaction of Claims. ..................................................................... 37

**ARTICLE IX SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ......... **38**

A.    Settlement, Compromise, and Release of Claims and Interests. ........................ 38

B.    Discharge of Claims and Termination of Interests. ........................................ 38

C.    Release of Liens. ...................................................................................... 38

D.    Releases by the Debtors. ............................................................................ 39

E.    Releases by Holders of Claims and Interests. ............................................... 39

F.    Exculpation. ............................................................................................. 40

G.    Injunction. ............................................................................................... 41

H.    Recoupment. ............................................................................................ 41

I.    Subordination Rights. ............................................................................... 41

J.    Reimbursement or Contribution. ................................................................. 41

K.    Reservation of the United States. ................................................................. 41

L.    No Successor Liability. .............................................................................. 42

**ARTICLE X CONDITIONS PRECEDENT TO CONFIRMATION AND THE PLAN EFFECTIVE**
      **DATE** ....................................................................................................... **42**

A.    Conditions Precedent to Confirmation. ........................................................ 42

B.    Conditions Precedent to the Plan Effective Date. ........................................... 42

C.    Waiver of Conditions. ............................................................................... 43

D.    Substantial Consummation. ........................................................................ 44

E.    Effect of Non-Occurrence of Conditions to the Plan Effective Date. ................ 44

**ARTICLE XI MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ............................... 44
A.      Modification and Amendments. ................................................................................................ 44
B.      Effect of Confirmation on Modifications. ............................................................................... 44
C.      Revocation or Withdrawal of the Plan. ................................................................................... 44

**ARTICLE XII RETENTION OF JURISDICTION** .............................................................................. 45

**ARTICLE XIII MISCELLANEOUS PROVISIONS** ............................................................................ 47
A.      Immediate Binding Effect. ....................................................................................................... 47
B.      Additional Documents. ............................................................................................................. 47
C.      Dissolution of Statutory Committees. ..................................................................................... 47
D.      Reservation of Rights. .............................................................................................................. 47
E.      Successors and Assigns. ........................................................................................................... 47
F.      Service of Documents. .............................................................................................................. 47
G.      Enforcement of Confirmation Order. ...................................................................................... 48
H.      Term of Injunctions or Stays. .................................................................................................. 48
I.      Entire Agreement. ..................................................................................................................... 48
J.      Exhibits. ..................................................................................................................................... 48
K.      Nonseverability of Plan Provisions. ........................................................................................ 49
L.      Waiver. ....................................................................................................................................... 49

**INTRODUCTION**

Capitalized terms used in this chapter 11 plan shall have the meanings set forth in <u>Article I.A</u>. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. The Debtors seek to consummate the Restructuring Transactions commencing on the Plan Effective Date. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in <u>Article III</u> of the Plan shall be deemed to apply separately with respect to each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan, the Restructuring Transactions, and certain related matters.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

**A.      Defined Terms.**

As used in this Plan, capitalized terms have the meanings and effect as set forth below.

1.      "*Accrued Payroll*" means all wages and other related obligations that have accrued since the end of the last payroll period immediately prior to the Closing Date.

2.      "*Acquired Assets*" has the meaning set forth in the Sale Transaction Documentation (or such other similar term as may be used in the Sale Transaction Documentation).

3.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Commencement Date until and including the Plan Effective Date of preserving the Estates; (b) Allowed Estate Retained Professional Fee Claims; (c) DIP Facility Claims; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

4.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Estate Retained Professional Fee Claims, shall be [the Voting Deadline]; and (b) with respect to Estate Retained Professional Fee Claims, shall be 30 days after the Plan Effective Date.

5.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

6.      "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or such other date as agreed by the Debtors pursuant to the Bar Date Order) or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim a Proof of Claim or request for payment of Administrative Claim is not or shall not be required to be Filed under the Plan, the Bankruptcy Code, the Bar Date Order, or pursuant to a Final Order); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no contrary or superseding Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor. For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall

not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim. "*Allow*" and "*Allowing*" shall have correlative meanings.

7.     "*Assumed Contracts*" means those Executory Contracts and Unexpired Leases that are to be assumed and assigned by the Debtors to the Successful Bidder pursuant to the Plan, as set forth in the Plan Supplement.

8.     "*Assumed Contracts List*" means the list of those Executory Contracts and Unexpired Leases to be assumed by the Debtors or assumed and assigned by the Debtors to the Successful Bidder (*i.e.*, the Assumed Contracts) pursuant to the Plan, as set forth in the Plan Supplement, which (with respect to the Assumed Contracts) shall be in form and substance acceptable to the Successful Bidder, subject to amendment by the Debtors with the consent of the Successful Bidder (with respect to the Assumed Contracts) from time to time in accordance with the Sale Transaction Documentation and this Plan.

9.     "*Assumed Liabilities*" has the meaning set forth in the Sale Transaction Documentation (or such other similar term as may be used in the Sale Transaction Documentation).

10.     "*Auction*" has the meaning set forth in the Bidding Procedures Order.

11.     "*Avoidance Actions*" means any and all causes of action to avoid a transfer of property or an obligation incurred by any of the Debtors arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code or other similar or related state or federal statutes and common law.

12.     "*Bankruptcy Administrator*" means the Bankruptcy Administrator for the Northern District of Alabama.

13.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

14.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Alabama, Southern Division or such other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under 28 U.S.C. § 157, the United States District Court for the Northern District of Alabama.

15.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

16.     "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(B)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(B)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 482], as such order may be amended, supplemented, or modified from time to time.

17.     "*Benefit Plan*" has the meaning set forth in the Sale Transaction Documentation (or such other similar term as may be used in the Sale Transaction Documentation).

18.     "*Bidding Procedures*" means the bidding procedures attached as **Exhibit 1** to the Bidding Procedures Order, as such bidding procedures may be amended from time to time in accordance with its terms.

19.     "*Bidding Procedures Order*" means the *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief* [Docket No. 490], as such order may be amended, supplemented, or modified from time to time.

20.     "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

21.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

22.     "*Causes of Action*" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "*Cause of Action*" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to Claims or Interests; (d) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign law fraudulent transfer or similar claim.

23.     "*Chapter 11 Cases*" means the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court pursuant to the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 63], as such order may be amended, supplemented, or modified from time to time.

24.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

25.     "*Claims Bar Date*" means the applicable bar date by which Proofs of Claim must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

26.     "*Claims Register*" means the official register of Claims against the Debtors maintained by the Clerk of the Bankruptcy Court.

27.     "*Class*" means a category of holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

28.     "*Closing Date*" means the date and time at which the Closing (as defined in the Sale Transaction Documentation) actually occurs.

29.     "*Collateral*" means any property or interest in property of the Estate of any Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to a Final Order ordering the remedy of avoidance of any such Lien, charge, or other encumbrance under the Bankruptcy Code.

30.     "*Collective Bargaining Agreement*" has the meaning set forth in the Sale Transaction Documentation (or such other similar term as may be used in the Sale Transaction Documentation).

31.     "*Commencement Date*" means October 14, 2018, the date on which the Chapter 11 Cases were commenced.

32.     "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to the *Bankruptcy Administrator Report to Court of Appointment of Unsecured Creditors Committee* [Docket No. 147], as may be reconstituted from time to time.

33.     "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

34.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

35.     "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

36.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan and approving the Sale Transaction under section 1129 of the Bankruptcy Code, which order shall be in form and substance reasonably acceptable to the Debtors and the Required Lenders.

37.      "*Consummation*" or "*Consummated*" means the occurrence of the Plan Effective Date.

38.     "*Cure Costs*" means all monetary liabilities, including pre-petition monetary liabilities, of the Debtors that must be paid or otherwise satisfied to cure all of the Debtors' monetary defaults under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment to Successful Bidder as provided hereunder as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order.

39.     "*Cure Notice*" means, with respect to each Available Contract (as defined in the Sale Transaction Documentation), the notice submitted by the Sellers to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order setting forth, among other things, the Cure Cost amount with respect thereto as calculated by the Sellers.

40.     "*D&O Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for directors, members, trustees, officers, and managers' liability.

41.     "*Debtors*" means, collectively, Mission; Beard Pinnacle, LLC; Oak Grove Land Company, LLC; Oak Grove Resources, LLC; Pinnacle Land Company, LLC; Pinnacle Mining Company, LLC; Seminole Alabama Mining Complex, LLC; Seminole Coal Resources, LLC; Seminole West Virginia Mining Complex, LLC; Seneca Coal Resources, LLC; and Seneca North American Coal, LLC, the debtors and debtors in possession in the Chapter 11 Cases.

42.     "*Description of Transaction Steps*" means the description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement, which description shall be in form and substance reasonably acceptable to the Debtors and the Required Lenders.

43.      "*DIP Agent*" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent under the DIP Facility.

44.     "*DIP Documents*" has the meaning set forth in the Final DIP Order.

45.     "*DIP Facility*" has the meaning set forth in the Final DIP Order.

46.     "*DIP Facility Claims*" means any Claims arising under the DIP Facility or the Final DIP Order, including Claims for all principal amounts outstanding, interest (including default interest, if applicable), fees, expenses, costs, and other charges and obligations, which Claims include the full roll up of the Prepetition First Lien Obligations Amount, including the Prepayment Premium, plus the First Lien Accrued Adequate Protection Payments (each as defined in the Final DIP Order), and which Claims as of January 2, 2019 were no less than $209,229,024.

47.     "*DIP Lenders*" means the lenders from time to time party to the DIP Facility.

48.     "*Disclosure Statement*" means the *Disclosure Statement for the Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates*, dated as of [●] [Docket No. [●]]], as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that

8

relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

49.    "*Disclosure Statement Order*" means the order of the Bankruptcy Court approving the Disclosure Statement and solicitation procedures with respect to the Plan [Docket No. [●]], as such order may be amended, supplemented, or modified from time to time, which Order shall be in form and substance reasonably acceptable to the Debtors and the Required Lenders.

50.    "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

51.    "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date, or such other date as designated in a Final Order.

52.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

53.    "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

54.    "*Estate Retained Professional Fees Escrow Account*" means an escrow account established pursuant an escrow agreement in form and substance satisfactory to the Debtors and the Required Lenders, which shall be funded at Closing by the Successful Bidder pursuant to the terms of, and to the extent set forth in, the Sale Transaction Documents in an amount equal to the Estate Retained Professional Fees Escrow Amount.

55.    "*Estate Retained Professional Fees Escrow Amount*" means an amount equal to the sum of (i) Estate Retained Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred in rendering services to the Debtors or the Committee in the Chapter 11 Cases prior to the Confirmation Hearing and in accordance with the Final DIP Order, <u>plus</u> (ii) an amount negotiated between the Required Lenders and the Debtors to fund (a) Estate Retained Professional Fee Claims and other unpaid fees and expenses the Professionals will incur in rendering services to the Debtors or the Committee in the Chapter 11 Cases from the date of the Confirmation Hearing through and as of the Plan Effective Date and in accordance with the Final DIP Order, and (b) the fees and expenses associated with the administration of the Estate Retained Professional Fees Escrow Account; *provided, however*, that in each case all contractual fee arrangements will remain in effect and be accounted for in such negotiated amount, subject to the terms of the Final DIP Order.

56.    "*Estate Retained Professional Fee Claims*" means any administrative claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals in connection with the Chapter 11 Cases through and including the Closing Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Estate Retained Estate Retained Professional Fee Claim.

57.    "*Excluded Assets*" has the meaning set forth in the Sale Transaction Documentation (or such other similar term as may be used in the Sale Transaction Documentation).

58.    "*Excluded Liabilities*" has the meaning set forth in the Sale Transaction Documentation (or such other similar term as may be used in the Sale Transaction Documentation).

59.    ["*Exculpated Party*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Successful Bidder; (c) the DIP Lenders; (d) the DIP Agent; (e) the First Lien Lenders; (f) the First Lien Agent; (g) the Committee and its members; [(h) the Second Lien Lender]; (i) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former

9

equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (j) with respect to each Debtor, each such Debtor's [current and former equity holders, subsidiaries, officers, directors, managers, principals, members,] employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.]

60. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code.

61. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Notice and Claims Agent or the Bankruptcy Court.

62. "*Final DIP Order*" means the *Final Order (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(A), 361 362, 363, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364 and (IV) Granting Related Relief* [Docket No. 300], as such order may be amended, supplemented, or modified from time to time.

63. "*Final Order*" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Action or Order shall have become final in accordance with Bankruptcy Rule 8002; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

64. "*First Lien Agent*" means Delaware Trust Company, in its capacity as administrative agent under the First Lien Credit Agreement, or any of its successors.

65. "*First Lien Credit Agreement*" means that certain Credit Agreement, dated as of January 31, 2018, by and among Mission Coal Company, LLC, as borrower, the guarantors party thereto, the First Lien Agent, and the other lender parties thereto, as may be amended, restated, or otherwise supplemented from time to time.

66. "*First Lien Credit Documents*" has the meaning set forth in the Final DIP Order.

67. "*General Unsecured Claim*" means any unsecured Claim against a Debtor that is not: (a) paid in full prior to the Plan Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a DIP Facility Claim (d) a Second Lien Secured Claim; (e) an Intercompany Claim; (f) a Section 510(b) Claim; (g) an Other Priority Claim; (h) an Other Secured Claim; (i) a Priority Tax Claim; (j) an Estate Retained Professional Fee Claim; or (k) a Secured Tax Claim.

68. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

69. "*General Unsecured Claims Amount*" means [•].[2]

---

[2]    Source for this amount, if any, to be determined, provided that this amount shall not come from the proceeds of the DIP Collateral (as defined in the Final DIP Order).

10

70.　　　"*Holder*" means an Entity holding a Claim against or Interest in a Debtor, as applicable.

71.　　　"*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

72.　　　"*Initial Distribution Date*" means the date on which the Debtors or the Plan Administrator make initial distributions to Holders of Allowed Claims pursuant to the Plan.

73.　　　"*Intercompany Claim*" means any Claim against a Debtor held by another Debtor or an Affiliate of a Debtor.

74.　　　"*Intercompany Interest*" means any Interest in one Debtor held by another Debtor or an Affiliate of a Debtor.

75.　　　"*Interest*" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, including options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement).

76.　　　"*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 480], as such order may be amended, supplemented, or modified from time to time.

77.　　　"*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

78.　　　"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

79.　　　"*Interests*" means the Interests in Mission Coal Company, LLC outstanding immediately prior to the Plan Effective Date.

80.　　　"*Notice and Claims Agent*" means Omni Management Group, the notice, claims, and solicitation agent for the Debtors in the Chapter 11 Cases [Docket No. 66].

81.　　　"*Ordinary Course Professional*" means an Entity (other than a Professional) retained and compensated by the Debtors in accordance with the Ordinary Course Professionals Order.

82.　　　"*Ordinary Course Professionals Order*" means the *Order Authorizing the Retention and Employment of Professionals Utilized in the Ordinary Course of Business* [Docket No. 351], as such order may be amended, supplemented, or modified from time to time.

83.　　　"*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

84.　　　"*Other Secured Claim*" means any Secured Claim against any of the Debtors, other than a DIP Facility Claim or a Second Lien Secured Claim.

85.　　　"*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

86.　　　"*Plan*" means this chapter 11 plan, including all exhibits, supplements (including the Plan Supplement), appendices, and schedules, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof.

11

87.     "*Plan Administrator*" means an individual that shall be the representative of the Debtors on and after the Plan Effective Date and shall have the rights, powers, and duties set forth in this Plan.  The identity and compensation of the Plan Administrator shall be agreed to by the Debtors and the Required Lenders and shall be set forth in the Plan Supplement.

88.     "*Plan Administrator Agreement*" means that certain agreement entered into no later than the Plan Effective Date setting forth, among other things, the Plan Administrator's rights, powers, obligations, and compensation, all of which shall be consistent with the applicable provisions of the Plan.

89.     "*Plan Effective Date*" means, with respect to the Plan, the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Plan Effective Date set forth in Article XB of the Plan have been satisfied or waived in accordance with Article XC of the Plan.

90.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, each of which shall be in form and substance reasonably acceptable to the Required Lenders (to the extent that the Required Lenders are not the Successful Bidder, then only to the extent directly related to effectuating a distribution on account of their Claims) and the Successful Bidder (solely to the extent directly related to the Sale Transaction), substantially final forms of which shall be Filed at least 7 days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court, including:  (a) the Assumed Contracts List; (b) the identity of the Plan Administrator and the compensation of the Plan Administrator; (c) the Wind-Down Budget; (d) the Description of Transaction Steps; (e) the Successful Bidder Documentation; (f) those Transferred Causes of Action that shall be transferred to the Successful Bidder pursuant to the Sale Transaction; and (g) the Plan Administrator Agreement; *provided* that, through the Plan Effective Date, the Plan Supplement, and the exhibits thereto may be amended or modified in accordance with the Plan.

91.     "*Priority Claims*" means, collectively, Administrative Claims, Priority Tax Claims, and Other Priority Claims.

92.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

93.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

94.     "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

95.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

96.     "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

97.     "*Released Party*" means, collectively, and in each case in its capacity as such: (a) the Successful Bidder; (b) the DIP Agent; (c) the DIP Lenders; (d) the First Lien Agent; (e) the First Lien Lenders; [(f) the Second Lien Lender;] (g) each current and former Affiliate of each Entity in clause (a) through (f); (h) with respect to each Entity in clause (a) through (g), each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (i) with respect to each Debtor, each such Debtor's [current and former equity holders, subsidiaries, officers, directors, managers, principals, members,] employees, agents, advisory board members, financial advisors, partners,

12

attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

98.  "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) the Successful Bidder; (b) all holders of Claims and Interests that are deemed to accept the Plan; (c) all Holders of Claims and Interests who vote to accept the Plan; (d) all Holders of Claims or Interests that (i) abstain from voting on the Plan *and* who do not opt out of the releases in the Plan, (ii) vote to reject the Plan *and* who do not opt out of the releases in the Plan, or (iii) are deemed to reject or presumed to accept the Plan *and* who do not opt out of the releases in the Plan; (e) each current and former Affiliate of each Entity in clause (a) through (d); (e) with respect to each Entity in clause (a) through (e) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (g) with respect to each Debtor, each such Debtor's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

99.  "*Restructuring Transactions*" means the transactions described in <u>Article IV</u>.

100.  "*Required Lenders*" has the meaning ascribed to it in the DIP Documents.

101.  "*Sale Transaction*" means the transfer, in one or more transactions, of the Acquired Assets to the Successful Bidder and the assumption by the Successful Bidder of the Assumed Liabilities free and clear of all Liens, Claims, charges, and other encumbrances (other than the Assumed Liabilities) pursuant to section 1123 of the Bankruptcy Code on the terms and conditions set forth in the Sale Transaction Documentation.

102.  "*Sale Transaction Documentation*" means one or more other asset purchase agreements or purchase and sale agreements and related documents (which shall be in form and substance reasonably acceptable to the Debtors and the Required Lenders), pursuant to which the Debtors will effectuate the Sale Transaction.

103.  "*Sale Transaction Proceeds*" means any Cash or Cash equivalents that are proceeds from the Sale Transaction.

104.  "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

105.  "*Second Lien Credit Agreement*" means that certain Amended and Restated Secured Loan Agreement, dated as of January 31, 2018, by and among Mission Coal Company, LLC, Seminole Coal Resources, LLC, Seneca Coal Resources, LLC, collectively as borrowers, the guarantors party thereto, and Mission Coal Funding, LLC, as lender, as may be amended, restated, amended and restated, waived, supplemented, or otherwise modified from time to time.

106.  "*Second Lien Secured Claim*" means any secured Claim on account of the Second Lien Credit Agreement, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations.

107.  "*Section 510(b) Claims*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

108.  "*Secured*" or "*Secured Claim*" means, when referring to a Claim, a Claim that is:  (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code to the extent of the value of such right of setoff.

109.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

110.    "*Securities Act*" means the U.S. Securities Act of 1933.

111.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

112.    "*Subsequent Distribution Date*" means a date following the Initial Distribution Date on which the Plan Administrator in its reasonable discretion elects to make distributions to Holders of certain Allowed Claims pursuant to the Plan.

113.    "*Successful Bidder*" means the Entity or Entities whose bid for some or all of the Debtors' assets is selected by the Debtors and approved by the Bankruptcy Court as the highest and otherwise best bid pursuant to the Bidding Procedures. For the avoidance of doubt the Successful Bidder may be more than one Entity, comprised of one or more bids, and, if applicable, use of the term "Successful Bidder" herein may be read as "Successful Bidders".

114.    "*Successful Bidder Documentation*" means any and all documentation, filings, forms, and other administrative or ministerial actions relating thereto, that are reasonably necessary or desirable with respect to the formation of the Successful Bidder and to effectuate the Sale Transaction, which Successful Bidder Documentation shall be in form and substance acceptable to the Successful Bidder, the Debtors and the Required Lenders, and the organizational documents of the Successful Bidder shall be in form reasonably acceptable to the Debtors and the Required Lenders (it being understood that the Debtors and the Required Lenders shall not have an approval right in any form over the equity and governance terms of the Successful Bidder, which shall be determined in the sole discretion of the Successful Bidder.

115.    "*Transferred Causes of Action*" means any and all Avoidance Actions acquired pursuant to the Sale Transaction Documentation, if at all.

116.    "*Undeliverable Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' requests for information necessary to facilitate such distribution; or (d) taken any other action necessary to facilitate such distribution.

117.    "*Undeliverable Distribution Reserve*" means a segregated account established by the Plan Administrator established in accordance with Article VIII.J.

118.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

119.    "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

120.    "*Voting Deadline*" means 4:00 p.m. (prevailing Central Time) on March 11, 2019.

121.    "*Voting Report*" means the report certifying the methodology for the tabulation of votes and results of voting under the Plan, prepared and filed by the Notice and Claims Agent.

122.    "*Wages Order*" means the *Final Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* [Docket No. 315], as such order may be amended, supplemented, or modified from time to time.

14

123.    "*Wind Down*" means the wind down and dissolution of the Debtors' Estates as set forth in <u>Article VIIB</u>.

124.    "*Wind-Down Escrow Account*" means an escrow account established pursuant an escrow agreement in form and substance satisfactory to the Debtors and the Required Lenders, which shall be funded at Closing by the Successful Bidder pursuant to the terms of, and to the extent set forth in, the Sale Transaction Documentation, in an amount equal to the Wind-Down Escrow Amount.

125.    "*Wind-Down Escrow Amount*" means an amount negotiated between the Required Lenders and the Debtors to fund (i) the payment of allowed priority and administrative expense claims, including, for the avoidance of doubt, the amount required to fund (a) accrued payroll and payroll taxes related thereto, (b) amounts due and owing under the key employee incentive program sought in the Debtors' *Motion for Entry of an Order (I) Approving the Debtors' (A) Key Employee Incentive Plan and (B) Key Employee Retention Plan and (II) Granting Related Relief*, filed by the Debtors with the Bankruptcy Court on November 28, 2018 [Docket No. 354], and payroll taxes related thereto, to the extent approved by the Bankruptcy Court, and (c) the fees and expenses associated with the administration of these amounts, (ii) the costs to wind-down the Bankruptcy Cases in accordance with the Wind-Down Budget and (iii) the fees and expenses associated with the administration of the Wind-Down Escrow Account.

126.    "*Wind-Down Budget*" means a budget for the reasonable activities and expenses to be incurred in winding down the Chapter 11 Cases, which budget, activities, and reasonable expenses shall be in form and substance reasonably acceptable to the Debtors and the Required Lenders.

**B.    Rules of Interpretation.**

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (11) any immaterial effectuating provisions may be interpreted by the Debtors or the Plan Administrator in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control; *provided* that no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any party.

**C.    Computation of Time.**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Plan Effective Date may be taken on or as soon as reasonably practicable after the Plan Effective Date.

15

## D. Governing Law.

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

## E. Reference to Monetary Figures.

All references in the Plan to monetary figures shall refer to the legal tender of the United States, unless otherwise expressly provided.

## F. Controlling Document.

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan, the Disclosure Statement, the Plan Supplement, and the Sale Transaction Documentation, the Sale Transaction Documentation shall control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

**ARTICLE II**
**ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE**
**CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Estate Retained Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

## A. Administrative Claims.

Except with respect to Estate Retained Professional Fee Claims, or as otherwise set forth herein, and except to the extent that a Holder of an Allowed Administrative Claim and, as applicable, the Debtors or the Plan Administrator, agree to less favorable treatment, such Allowed Administrative Claim is an Assumed Liability, or such Holder has been paid by any applicable Debtor prior to the Plan Effective Date, the Debtors or the Plan Administrator shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash, which payment shall be made (x) in the ordinary course of business; or (y) on the later of (i) the Plan Effective Date and (ii) the date on which such Administrative Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter) with a Cash distribution; *provided* that any Allowed Administrative Claim that has been expressly assumed by the Successful Bidder under the Sale Transaction Documentation shall not be an obligation of the Debtors.

Except as otherwise provided by Article IIA or by a Final Order entered by the Bankruptcy Court (including the Bar Date Order) on or prior to the Administrative Claims Bar Date, unless previously Filed, requests for payment of Administrative Claims, other than requests for payment of Estate Retained Professional Fee Claims, must be Filed and served on the Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the motion seeking approval of the Disclosure Statement and the notice of entry of the Disclosure Statement Order. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, the Successful Bidder, or the Plan Administrator, and such Administrative Claims shall be deemed compromised, settled, and released as of the Plan Effective Date.

16

**B.      Professional Compensation.**

**1.      Final Fee Applications and Payment of Estate Retained Professional Fee Claims.**

All final requests for payment of Estate Retained Professional Fee Claims incurred during the period from the Commencement Date through the Plan Effective Date shall be Filed no later than 30 days after the Plan Effective Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Estate Retained Professional Fee Escrow Account up to the full Allowed amount. To the extent that funds held in the Estate Retained Professional Fee Escrow Account are insufficient to satisfy the amount of Estate Retained Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article IIA of the Plan.

**2.      Estate Retained Professional Fee Escrow Amount.**

As soon as possible after Confirmation and not later than the Plan Effective Date, the Debtors shall establish and fund the Estate Retained Professional Fee Escrow Account with Cash equal to the Estate Retained Professional Fee Escrow Amount. The Estate Retained Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates. The amount of Estate Retained Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Estate Retained Professional Fee Escrow Account as soon as reasonably practicable after such Claims are Allowed by a Final Order. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Estate Retained Professional Fee Escrow Account shall promptly be transferred to the Debtors and used in accordance with the Wind-Down Budget.

**3.      Estimation of Fees and Expenses.**

Professionals shall reasonably estimate their unpaid Estate Retained Professional Fee Claims and other unpaid fees and expenses incurred before and as of the Plan Effective Date and shall deliver such estimate to the Debtors [•] days before the Confirmation Date. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.

**4.      Post-Plan Effective Date Fees and Expenses.**

Except as otherwise specifically provided in the Plan, from and after the Plan Effective Date, the Debtors will, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Plan Administrator, subject to the Wind-Down Budget. Upon the Plan Effective Date, any requirement that Professionals and Ordinary Course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order, in seeking retention or compensation for services rendered after such date shall terminate, and the Plan Administrator may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, that such amounts shall be paid from the Wind-Down Escrow Account in accordance with the Wind-Down Budget.

**5.      Substantial Contribution.**

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules, on or before the Voting Deadline.

17

**C.      Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim and, as applicable, the Debtors or the Plan Administrator, agree to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of such Allowed Priority Tax Claim shall receive, at the option of the Debtors or the Plan Administrator, as applicable, either (a) the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Plan Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter), or (b) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Commencement Date; *provided* that any Allowed Priority Tax Claim that has been expressly assumed by the Successful Bidder under the Sale Transaction Documentation shall not be an obligation of the Debtors.  In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.  On the Plan Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization, or approval of any Person.

**D.      Bankruptcy Administrator.**

The Debtors or the Plan Administrator, as applicable, shall timely pay all Bankruptcy Administrator Fees for each quarter under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' businesses, until the entry of a Final Order dismissing or closing the Chapter 11 Cases, or converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  Following Confirmation, the Debtors shall file with the Bankruptcy Court quarterly operating reports in a form reasonably acceptable to the Bankruptcy Administrator.

**ARTICLE III**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

**A.      Summary of Classification.**

This Plan constitutes a separate chapter 11 plan for each Debtor.  Except for the Claims addressed in Article II (or as otherwise set forth herein), all Claims against and Interests in a particular Debtor are placed in Classes for each of the Debtors.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Priority Tax Claims, and Estate Retained Professional Fee Claims as described in Article II.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a) of the Bankruptcy Code.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Plan Effective Date.

18

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | DIP Facility Claims | Impaired/ Unimpaired | Entitled to Vote |
| Class 4 | Second Lien Secured Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 7 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.      Treatment of Claims and Interests.**

Except to the extent that the Debtors and a Holder of an Allowed Claim or Interest, as applicable, agrees to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest. Unless otherwise indicated, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Plan Effective Date (or, if payment is not then due, in accordance with its terms in the ordinary course) or as soon as reasonably practicable thereafter, the timing of which shall be subject to the reasonable discretion of the Debtors.

    **1.      Class 1—Other Priority Claims.**

        (a)      *Classification*:  Class 1 consists of all Other Priority Claims.

        (b)      *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired.

        (c)      *Voting*: Class 1 is Unimpaired under the Plan. Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Other Priority Claim is not entitled to vote to accept or reject the Plan.

    **2.      Class 2—Other Secured Claims.**

        (a)      *Classification*:  Class 2 consists of all Other Secured Claims, including all Secured Tax Claims.

        (b)      *Treatment*: Each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors:

            (i)      payment in full in Cash of such Allowed Other Secured Claim;

            (ii)      the Collateral securing such Allowed Other Secured Claim;

(iii)    Reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; or

        (iv)    such other treatment rendering such Allowed Other Secured Claim Unimpaired.

    (c)    *Voting*: Class 2 is Unimpaired under the Plan. Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan.

**3.    Class 3—DIP Facility Claims.**

    (a)    *Classification*: Class 3 consists of all DIP Facility Claims.

    (b)    *Allowance*: The DIP Facility Claims shall be Allowed in the amount of $209,229,024, as of January 2, 2019, plus interests, fees and other expenses and amounts provided for in the DIP Documents.

    (c)    *Treatment*: Each Holder of an Allowed DIP Facility Claim will receive either (i) payment in full in Cash of the Obligations (which amount shall include the full roll-up of the Prepetition First Lien Obligations Amount, including the Prepayment Premium, plus the First Lien Accrued Adequate Protection Payments) (each as defined in the DIP Documents to the extent not defined herein) or (ii) treatment that is otherwise acceptable to the Required Lenders.

    (d)    *Voting*: Class 3 is Impaired under the Plan. Each Holder of an Allowed DIP Facility Claim is entitled to vote to accept or reject the Plan.

**4.    Class 4—Second Lien Secured Claims.**

    (a)    *Classification*: Class 4 consists of all Second Lien Secured Claims.

    (b)    *Treatment*: Each Holder of an Allowed Second Lien Secured Claim will receive its Pro Rata share, based on the Allowed amount of its Second Lien Secured Claim, of the Sale Transaction Proceeds, solely to the extent the DIP Facility Claims are paid in full in Cash.

    (c)    *Voting*: Class 4 is Impaired under the Plan. Each Holder of an Allowed Second Lien Secured Claim is entitled to vote to accept or reject the Plan.

**5.    Class 5—General Unsecured Claims.**

    (a)    *Classification*: Class 5 consists of all General Unsecured Claims.

    (b)    *Treatment*: Each Holder of an Allowed General Unsecured Claim will receive (i) its Pro Rata share of the General Unsecured Claims Amount as provided in Article IVE (if any), and (ii) the Sale Transaction Proceeds, to the extent the DIP Facility Claims and the Second Lien Secured Claims are paid in full in Cash.[3]

---

[3]    The source for the General Unsecured Claims Amount (if any), is to be determined, provided that this amount shall not come from the proceeds of the DIP Collateral (as defined in the Final DIP Order).

(c)     *Voting*:  Class 5 is Impaired.  Each Holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

**6.    Class 6—Intercompany Claims.**

(a)     *Classification*:  Class 6 consists of all Intercompany Claims.

(b)     *Treatment*:  Each Intercompany Claim will, at the election of the Debtors, be:

     (i)     Reinstated; or

     (ii)     canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect.

(c)     *Voting*:  Class 6 is either:

     (i)     Unimpaired, in which case the Holders of Allowed Intercompany Claims in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; or

     (ii)     Impaired, and not receiving any distribution under the Plan, in which case the Holders of Allowed Intercompany Claims in Class 6 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Therefore, each Holder of an Allowed Intercompany Claim in Class 6 will not be entitled to vote to accept or reject the Plan.

**7.    Class 7—Intercompany Interests.**

(a)     *Classification*:  Class 7 consists of all Intercompany Interests.

(b)     *Treatment*:  Intercompany Interests will, at the election of the Debtors, be:

     (i)     Reinstated; or

     (ii)     canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect.

(c)     *Voting*:  Class 7 is either:

     (i)     Unimpaired, in which case the Holders of Allowed Intercompany Interests in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; or

     (ii)     Impaired, and not receiving any distribution under the Plan, in which case the Holders of Allowed Intercompany Interests in Class 7 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Therefore, each Holder of an Allowed Intercompany Interest in Class 7 will not be entitled to vote to accept or reject the Plan.

**8.    Class 8—Section 510(b) Claims.**

(a)     *Classification:*  Class 8 consists of all Section 510(b) Claims.

Case 18-04177-TOM11    Doc 523    Filed 01/02/19    Entered 01/02/19 17:48:01    Desc
Main Document    Page 78 of 107

<blockquote>
<blockquote>
(b)    *Treatment:*  Section 510(b) Claims will be canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim.

(c)    *Voting:*  Class 8 is Impaired and not receiving any distribution under the Plan.  Each Holder of a Section 510(b) Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.
</blockquote>

**9.  Class 9—Interests.**

<blockquote>
(a)    *Classification:*  Class 9 consists of all Interests.

(b)    *Treatment*:  Interests will be canceled, released, and extinguished, and will be of no further force or effect.  Each Holder of an Interest will not receive any distribution on account of such Interest.

(c)    *Voting*:  Class 9 is Impaired and not receiving any distribution under the Plan.  Each Holder of an Interest is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.
</blockquote>
</blockquote>

**C.  Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect, diminish, or impair the rights of the Debtors with respect to any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**D.  Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**E.  Voting Classes; Presumed Acceptance by Non-Voting Classes.**

If a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

**F.  Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.**

Acceptance of the Plan by Classes 3, 4 or 5 will satisfy section 1129(a)(10) of the Bankruptcy Code. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XI to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**G.  Subordinated Claims.**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed

Claim (except for any DIP Facility Claims) or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

# ARTICLE IV
# MEANS FOR IMPLEMENTATION OF THE PLAN

**A.     General Settlement of Claims.**

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Plan Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Distributions made to Holders of Allowed Claims in any Class are intended to be final.

**B.     Sources of Plan Consideration.**

The Sale Transaction Proceeds, the Estate Retained Professional Fees Escrow Amount, the Wind-Down Escrow Amount, the General Unsecured Claims Amount (if any), the Debtors' rights under the Sale Transaction Documentation, payments made directly by the Successful Bidder on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Successful Bidder pursuant to sections 365 or 1123 of the Bankruptcy Code, and/or all Causes of Action not previously settled, released, or exculpated under the Plan, if any, shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided herein.  Unless otherwise agreed in writing by the Debtors and the Successful Bidder, distributions required by this Plan on account of Allowed Claims that are Assumed Liabilities shall be the sole responsibility of the Successful Bidder to the extent such Claim is Allowed against the Debtors.

**C.     Sale Transaction.**

**1.     Sale Transactions.**

Following the Confirmation Date, the Debtors shall be authorized to consummate the Sale Transaction to the Successful Bidder pursuant to the terms of the Sale Transaction Documentation, the Plan, and the Confirmation Order.

Subject to the terms of the Sale Transaction Documentation, on the Plan Effective Date, the Debtors shall consummate the Sale Transaction by, among other things, transferring the Acquired Assets, including all Transferred Causes of Action held by the Debtors, to the Successful Bidder free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than the Assumed Liabilities) pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code, this Plan and the Confirmation Order.  Upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Sale Transaction Documentation and the Plan, and any documents in connection herewith and therewith, shall be deemed authorized and approved without any requirement of further act or action by the Debtors, the Debtors' shareholders or boards of directors, or any other Entity or Person.  The Debtors are authorized to execute and deliver, and to consummate the transactions contemplated by, the Sale Transaction Documentation and this Plan, as well as to execute, deliver, file, record, and issue any note, documents, or agreements in connection therewith, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.

The transactions contemplated by the Sale Transaction Documentation and this Plan are undertaken by the Debtors and the Successful Bidder without collusion and in good faith, as that term is defined in section 363(m) of the

Case 18-04177-TOM11     Doc 523     Filed 01/02/19     Entered 01/02/19 17:48:01     Desc
Main Document      Page 80 of 107

Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the transactions contemplated thereunder and hereunder shall not affect the validity of such transactions (including the assumption, assignment and/or transfer of any Executory Contract or Unexpired Lease to the Successful Bidder). The Successful Bidder is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

### 2. Restructuring Transactions.

Upon the entry of the Confirmation Order, the Debtors, the Plan Administrator, and the Successful Bidder are authorized, without further order of the Bankruptcy Court, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions and the Sale Transaction under or in connection with the Plan, including: (1) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) any transaction described in the Description of Transaction Steps; and (6) subject to the occurrence of the Plan Effective Date, the consummation of the transactions contemplated by the Sale Transaction Documentation.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

### 3. Payment of Cure Costs and Other Amounts.

At the Plan Effective Date, the Successful Bidder shall pay all Cure Costs that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases that are assumed by the Debtors and assigned to the Successful Bidder pursuant to the Sale Transaction Documentation and this Plan. The Debtors shall not have any obligation to make any payment or other distribution on account of any Cure Costs.

### D. Vesting of Assets.

Except as otherwise provided in the Plan, the Sale Transaction Documentation, or any agreement, instrument, or other document incorporated herein or therein, on the Plan Effective Date: (a) the Acquired Assets shall be preserved and shall vest in the Successful Bidder, free and clear of all Liens, Claims, charges, and other encumbrances (other than the Assumed Liabilities); and (b) the Excluded Assets shall vest in the Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, and other encumbrances. For the avoidance of doubt, all Transferred Causes of Action shall be transferred to the Successful Bidder on the Plan Effective Date, and any Causes of Action held by the Debtors on the Plan Effective Date that are not Transferred Causes of Action shall vest in the Debtors on the Plan Effective Date.

On and after the Plan Effective Date, except as otherwise provided in the Plan and subject in all respects to the Sale Transaction Documentation and the Plan, the Debtors may operate their businesses and use, acquire, or dispose of property and, as applicable, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. For the avoidance of doubt, following the Plan Effective Date, the Successful Bidder may operate its businesses and use, acquire, or dispose of property, including the Acquired Assets, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### E. The General Unsecured Claims Amount

The General Unsecured Claims Amount (if any) shall be used to make distributions on account of Allowed General Unsecured Claims on a Pro Rata basis as set forth in Article III.B.4. If all or any portion of a General Unsecured Claim shall become a Disallowed Claim, then the amount attributable to such Disallowed Claim shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan.

### F. Wind-Down.

On and after the Plan Effective Date, in accordance with the Wind-Down Budget, the Debtors shall (1) continue in existence for purposes of (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible, (b) resolving Disputed Claims as provided hereunder, (c) paying Allowed Claims not assumed by the Successful Bidder as provided hereunder, (d) filing appropriate tax returns, (e) complying with their continuing obligations under the Sale Transaction Documentation (including with respect to the transfer of permits to the Successful Bidder as contemplated therein), and (f) administering the Plan in an efficacious manner; and (2) thereafter liquidate as set forth in the Plan.

### G. Wind-Down Escrow Amount.

On the Plan Effective Date, the Debtors shall retain proceeds from the Wind-Down Escrow Amount in accordance with the terms of the Wind-Down Budget and the Wind-Down Escrow Account. Any remaining amounts in the Wind-Down Account following all required distributions therefrom in accordance with the terms of the Wind-Down Budget shall promptly be transferred to the Debtors in accordance with the terms of the Wind-Down Escrow Account.

### H. Plan Administrator.

On and after the Plan Effective Date, the Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Plan Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Debtors shall be deemed to have resigned, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Debtors, and shall succeed to the powers of the Debtors' managers, directors, and officers. From and after the Plan Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Debtors as further described in Article VII. The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget.

### I. Cancellation of Notes, Instruments, Certificates, and Other Documents.

On the Plan Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of any Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be cancelled and deemed surrendered as to the Debtors and shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; *provided*, however, that notwithstanding anything to the contrary contained herein, any agreement that governs the rights of the DIP Agent shall continue in effect to allow the DIP Agent to (A) enforce its rights, Claims and interests (and those of any predecessor or successor thereto) vis à vis any parties other than the Debtors, (B) receive distributions under the Plan and to distribute them to Holders of Allowed DIP Facility Claims in accordance with the terms of the DIP Documents, and (C) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agent, under the Plan; *provided further*, however, to the extent the DIP Facility and the Allowed DIP

Facility Claims are assumed by the Successful Bidder, nothing herein shall affect the enforceability of the rights, Claims and interests of the DIP Agent against such Successful Bidder under the agreements relating to the DIP Facility.

**J.      Corporate Action.**

Upon the Plan Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan and the Sale Transaction Documentation (including any action to be undertaken by the Debtors or the Plan Administrator, as applicable) shall be deemed authorized, approved, and, to the extent taken prior to the Plan Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Plan Administrator, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, the creation of the Successful Bidder, the consummation of the Sale Transaction, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates; *provided, however,* that for the avoidance of doubt, the Successful Bidder may be formed by a person or entity other than the Debtors, as set forth in the Description of Transaction Steps.

Upon the Plan Effective Date or as soon as reasonably practicable thereafter, after making all distributions provided for under the Plan, the Debtors shall be deemed to have been dissolved and terminated, except as necessary to satisfy their obligations under the Sale Transaction Documentation.  The directors, managers, and officers of the Debtors and the Plan Administrator, as applicable, shall be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate to implement the provisions of this Article IVJ.

The authorizations and approvals contemplated by this Article IV .J shall be effective notwithstanding any requirements under applicable nonbankruptcy law.

**K.      Dissolution of the Boards of the Debtors.**

As of the Plan Effective Date, the existing boards of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.

As of the Plan Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Debtors with respect to their affairs other than matters substantially related to the transactions described in Article IVC.1-2 of the Plan.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of the applicable state(s) of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of any of the Debtors or any of their affiliates.

**L.      Release of Liens.**

Except as otherwise expressly provided herein, on the Plan Effective Date, all Liens on any property of any Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors shall automatically be discharged and released.

**M.    Effectuating Documents; Further Transactions.**

The Debtors and the officers and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

**N.    Exemption from Certain Taxes and Fees.**

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan, the Sale Transaction or the Sale Transaction Documentation or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**O.    Causes of Action.**

As of the Plan Effective Date, the Debtors shall assign and transfer to the Successful Bidder all of the Transferred Causes of Action pursuant to the Sale Transaction Documentation on the Plan Effective Date.  The Transferred Causes of Action shall be set forth and described in the Plan Supplement, the description of which shall be subject to the consent of the Successful Bidder.  Any Causes of Action held by the Debtors on the Plan Effective Date that are not Transferred Causes of Action shall vest in the Debtors on the Plan Effective Date.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any such Cause of Action against them as any indication that the Successful Bidder or the Debtors will not pursue any and all available Causes of Actions against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

**P.    Closing the Chapter 11 Cases.**

Upon the occurrence of the Plan Effective Date, the Plan Administrator shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Mission Coal Company, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Mission Coal Company.

When all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close any remaining Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE V**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.    Assumption and Rejection of Executory Contracts and Unexpired Leases.**

On the Plan Effective Date, the Debtors shall assume and assign to the Successful Bidder, as part of the Sale Transaction, the Executory Contracts and Unexpired Leases that are required to be assigned to the Successful Bidder

27

pursuant to the Sale Transaction Documentation. Except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected on the Plan Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan, the Plan Supplement or the Sale Transaction Documentation; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Plan Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to the Successful Bidder or another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (5) is a D&O Policy; or (6) is the Sale Transaction Documentation or the Successful Bidder Documentation; *provided that*, notwithstanding anything to the contrary in the Plan, to the extent any (x) real property leases or related contracts (including royalty agreements and third-party conveyances) and (y) contracts for the purchase, sale, transportation or reclamation of coal, in the case of both (x) and (y), relating to the mines included in the Acquired Assets to which any of the Debtors is a party thereto as of the Plan Effective Date, are deemed to be, and treated as though they are, Executory Contracts or Unexpired Leases, such leases or contracts shall automatically be deemed assumed and assigned to the Successful Bidder on the Plan Effective Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption and assignment of the Executory Contracts or Unexpired Leases as provided in the Sale Transaction Documentation and the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan or Sale Transaction Documentation are effective as of the Plan Effective Date. Any motions to assume Executory Contracts or Unexpired Leases pending on the Plan Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Plan Effective Date.

**B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Bankruptcy Court and served on the Debtors or, after the Plan Effective Date, the Plan Administrator, as applicable, no later than 30 days following the entry of an Order of the Court (including the Confirmation Order) approving such rejection. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served on the Debtors no later than the Plan Objection Deadline set forth in the Disclosure Statement Order.

**Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claim were not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim. Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, or the property for any of the foregoing without the need for any objection by the Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims against the appropriate Debtor, except as otherwise provided by order of the Bankruptcy Court.

**C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed by the Debtors as set forth in Article V.A, as reflected on the Cure Notice shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of such Cure Costs in Cash on or about the Plan Effective Date, subject to the limitations described below and set forth in the Sale Transaction Documentation and Article IV.C herein, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1)

28

the Cure Costs, (2) the ability of the Successful Bidder or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

Unless otherwise provided in the Bidding Procedures Order, another order of the Bankruptcy Court, or in the Sale Transaction Documentation, the Debtors shall have caused Cure Notices of proposed assumption to be sent to applicable counterparties by January 14, 2019. Any objection by such counterparty must have been Filed, served, and actually received by the Debtors not later than February 11, 2019 at 4:00 p.m. (prevailing Central Time) as set forth in the Bidding Procedures Order. Any counterparty to an Executory Contract or Unexpired Lease that failed to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption.

In any case, if the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or, with respect to the Assumed Contracts, the Successful Bidder (in accordance with the Sale Transaction Documentation) will have the right to remove such Executory Contract or Unexpired Lease from the Assumed Contracts and Leases List, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Plan Effective Date.

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed (or assumed and assigned) Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. **All liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court**.

**D.      D&O Policies.**

The D&O Policies shall be assumed by the Debtors on behalf of the applicable Debtor effective as of the Plan Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such insurance policy previously was rejected by the Debtors or the Debtors' Estates pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Plan Effective Date, and coverage for defense and indemnity under any of the D&O Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Policies.

**E.      Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Final Order of the Bankruptcy Court to the contrary.

**F.      Reservation of Rights.**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed Contracts and Leases List, nor anything contained in the Plan or Sale Transaction Documentation, shall constitute an admission by the Debtors or any other Entity, as applicable, that any such contract or lease is in fact an Executory Contract or

Unexpired Lease or that either any Debtor or any other Entity, as applicable, has any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

**G.        Nonoccurrence of the Plan Effective Date.**

In the event that the Plan Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**ARTICLE VI**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**A.        Timing and Calculation of Amounts to Be Distributed.**

Unless otherwise provided in the Plan, on the Plan Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Plan Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the Debtors or the Plan Administrator on behalf of the Debtors, as applicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

**B.        Rights and Powers of the Plan Administrator.**

**1.        Powers of the Debtors and the Plan Administrator.**

Except as otherwise set forth herein, all distributions under the Plan shall be made on the Plan Effective Date or as soon as reasonably practicable thereafter by the Debtors or the Plan Administrator (or its designee(s)), the timing of which shall be subject to the reasonable discretion of the Debtors or the Plan Administrator, as applicable.

On and after the Plan Effective Date, the Plan Administrator and its designees or representatives shall have the right to object to, Allow, or otherwise resolve any Second Lien Secured Claim, General Unsecured Claim, Priority Claim, or Other Secured Claim, subject to the terms hereof.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. However, in the event that the Plan Administrator is so ordered after the Plan Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash by the Debtors.

**2.        Fees of Plan Administrator and Expenses Incurred On or After the Plan Effective Date.**

Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Plan Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to or action, order, or approval of the Bankruptcy Court in Cash by the Debtors if such amounts relate to any actions taken hereunder.

**C.  Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

**1.  Record Date for Distribution.**

On the Distribution Record Date, the Claims Register shall be closed and the Debtors, the Plan Administrator, or any other party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

**2.  Delivery of Distributions on DIP Facility Claims**

Notwithstanding any provision of the Plan to the contrary, all distributions on account of Allowed DIP Facility Claims shall be governed by DIP Documents and such distributions shall be deemed complete when made to the DIP Agent, which shall be deemed the Holder of its respective portion of the Allowed DIP Facility Claims for purposes of distributions to be made hereunder.  The DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed DIP Facility Claims.  As soon as practicable following compliance with the requirements set forth in this Article VI, the DIP Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed DIP Facility Claims.

**3.  Delivery of Distributions in General.**

(a)  Payments and Distributions on Disputed Claims.

Distributions made after the Plan Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Plan Effective Date but which later become Allowed Claims shall, in the reasonable discretion of the Plan Administrator, be deemed to have been made by the Plan Administrator on the Plan Effective Date unless the Plan Administrator and the Holder of such Claim agree otherwise.

(b)  Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by, as applicable, the Debtors or the Plan Administrator, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim, other than with respect to Estate Retained Professional Fee Claims, until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

(c)  Distributions.

On and after the Plan Effective Date, the Debtors shall make the distributions required to be made on account of Allowed Claims under the Plan.  Any distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date, shall be held by the Debtors in reserve in accordance with the Plan, as applicable, and distributed on the next Subsequent Distribution Date that occurs after such Claim is Allowed.  Subject to Article VI.E, no interest shall accrue or be paid on the unpaid amount of any distribution paid pursuant to the Plan.

**4.  Minimum; *De Minimis* Distributions.**

No Cash payment of less than $100, in the reasonable discretion of the Plan Administrator, shall be made to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest.

**5.  Undeliverable Distributions and Unclaimed Property.**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Plan Administrator has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date the

distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Debtors, automatically and without need for a further order by the Bankruptcy Court and the Claim of any holder to such property or interest in property shall be released, settled, compromised, and forever barred.

### 6. Manner of Payment Pursuant to the Plan.

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Plan Administrator by check or by wire transfer, at the sole and exclusive discretion of the Plan Administrator.

### D. Compliance with Tax Requirements/Allocations.

In connection with the Plan, to the extent applicable, the Plan Administrator shall request distributees to provide appropriate documentation that may be required for an exemption from withholding or reporting, and shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements unless an exception applies. Notwithstanding any provision in the Plan to the contrary, the Plan Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes is reasonable and appropriate. The Plan Administrator reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

### E. Allocation of Plan Distributions Between Principal and Interest.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed therein.

### F. Setoffs and Recoupment.

Except as otherwise expressly provided herein, the Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim it may have against the Holder of such Claim.

### G. Claims Paid or Payable by Third Parties.

### 1. Claims Paid by Third Parties.

The Debtors shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

32

2. **Claims Payable by Insurance, Third Parties.**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable. To the extent that one or more of the Debtors' insurers, sureties, or non-Debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3. **Applicability of Insurance Policies.**

Notwithstanding anything to the contrary in the Plan or Confirmation Order, Confirmation and Consummation of the Plan shall not limit or affect the rights of any third-party beneficiary or other covered party of any of the Debtor's insurance policies with respect to such policies, including the D&O Policies.

**H.      Indefeasible Distributions.**

Any and all distributions made under the Plan shall be indefeasible and not subject to clawback.

**ARTICLE VII**
**THE PLAN ADMINISTRATOR**

**A.      The Plan Administrator.**

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Wind-Down Escrow Amount and the General Unsecured Claims Amount (if any), and wind down the businesses and affairs of the Debtors, including: (1) liquidating, receiving, holding, and investing, supervising, and protecting the Excluded Assets; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Wind-Down Escrow Account, the General Unsecured Claims Amount (if any), and the Sale Transaction Proceeds, if any and to the extent applicable; (3) making distributions from the Wind-Down Escrow Account, the General Unsecured Claims Amount (if any), and the Sale Transaction Proceeds, if any and to the extent applicable, as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying reasonable fees, expenses, debts, charges, and liabilities of the Debtors on and after the Plan Effective Date; (7) administering and paying taxes of the Debtors on and after the Plan Effective Date, including filing tax returns; (8) representing the interests of the Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator in accordance with the Plan Administrator Agreement. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the Debtors in the Plan Administrator Agreement shall be terminated.

4. **Plan Administrator Rights and Powers.**

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan, and as otherwise provided in the Confirmation Order. The Plan Administrator

shall be the exclusive trustee of the Excluded Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code § 1123(b)(3)(B).

### 5. Retention of Professionals.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Debtors upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business by the Debtors and shall not be subject to the approval of the Bankruptcy Court.

### 6. Compensation of the Plan Administrator.

The Plan Administrator's post-Plan Effective Date compensation will be set forth in the Plan Supplement and paid by the Debtors.

### 7. Plan Administrator Expenses.

All costs, expenses and obligations incurred by the Plan Administrator in administering this Plan, the Debtors on or after the Plan Effective Date, or in any manner connected, incidental or related thereto, in effecting distributions from the Debtors thereunder (including the reimbursement of reasonable expenses) shall be a charge against the Excluded Assets remaining from time to time in the hands of the Plan Administrator. Such costs, expenses and obligations shall be paid from the Wind-Down Escrow Account as they are incurred without the need for Bankruptcy Court approval.

## B. Wind-Down.

On and after the Plan Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

As soon as practicable after the Plan Effective Date, the Plan Administrator shall: (1) cause the Debtors to comply with, and abide by, the terms of the Sale Transaction Documentation and any other documents contemplated thereby; (2) take any actions necessary to wind down the Debtors' Estates; *provided* that the Debtors shall not be dissolved until the satisfaction of the conditions precedent to such dissolution in <u>Article VIII</u>; (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. From and after the Plan Effective Date, except as set forth herein, the Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have cancelled pursuant to this Plan all Interests, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Plan Effective Date.

The filing of the final monthly operating report (for the month in which the Plan Effective Date occurs) and all subsequent quarterly operating reports shall be the responsibility of the Plan Administrator.

## C. Exculpation; Indemnification; Insurance; Liability Limitation.

On and after the Effective Date, the Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Debtors. The Plan Administrator may obtain, at the expense of the Debtors, but solely from the Wind-Down Escrow Amount and pursuant to the Wind-Down Budget, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

**D.      Tax Returns.**

After the Plan Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

**E.      Dissolution of the Debtors.**

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator that all distributions have been made, completion of all its duties under the Plan, and entry of a final decree closing the last of the Debtors' Chapter 11 Cases, the Debtors shall be deemed to be dissolved without any further action by the Debtors, the Plan Administrator, or the Bankruptcy Court, including the filing of any documents with the secretary of state for each state in which each of the Debtors is formed or any other jurisdiction. The Plan shall constitute a plan of distribution as contemplated in the Delaware General Corporation Law. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Debtors in and withdraw the Debtors from applicable state(s).

**ARTICLE VIII**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

**A.      Allowance of Claims and Interests.**

**1.      General.**

On and after the Plan Effective Date, the Debtors shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest immediately before the Plan Effective Date, and, to the extent that any Claim or Interest constitutes an Acquired Asset, the Successful Bidder shall have and retain any and all rights and defenses that the applicable Debtor had with respect to any Claim or any Interest immediately before the Plan Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Plan Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

**B.      Claims and Interests Administration Responsibilities.**

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Plan Effective Date, the Plan Administrator, by order of the Bankruptcy Court, shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.      **Estimation of Claims and Interests.**

On and after the Plan Effective Date, the Plan Administrator may (but are not required to), at any time, request that the Bankruptcy Court estimate any Claim or Interest pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012, for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      **Adjustment to Claims or Interests without Objection.**

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Plan Administrator without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      **Time to File Objections to Claims.**

Any objections to Claims shall be Filed on or before the later of (1) 180 days after the Plan Effective Date and (2) such other period of limitation as may be specifically fixed by the Debtors or by a Final Order for objecting to such claims.

F.      **Disallowance of Claims.**

Other than with respect to Claims Allowed under the Plan, to the maximum extent provided by section 502(d) of the Bankruptcy Code, any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall automatically be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Plan Administrator. All Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall automatically be deemed satisfied and expunged from the Claims Register as of the Plan Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

G.      **Amendments to Claims.**

On or after the Plan Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Interest may not be Filed or amended without the prior authorization of the Debtors or the Plan Administrator, as applicable, and any such new or amended Claim or Interest Filed shall automatically be deemed disallowed in full and expunged without any further action.

**H.  No Distributions Pending Allowance.**

If an objection to a Claim or Interest or portion thereof is Filed as set forth in Article VIII of the Plan, or if such Claim or Interest is scheduled as Disputed, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof unless and until such Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest.

**I.  Distributions After Allowance.**

To the extent that a Disputed Claim or Disputed Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Plan Administrator shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Plan Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim or Interest, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law or as otherwise provided in Article III.B of the Plan.

**J.  Undeliverable Distribution Reserve.**

**1.  Deposits.**

If a distribution under the Plan to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed or is an Undeliverable Distribution, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Article VI.C.7.

**2.  Disclaimer.**

The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to either (i) attempt to locate any Holder of a Claim, or (ii) obtain an executed Internal Revenue Service Form W-9 from any Holder of a Claim; *provided* that in his or her sole discretion, the Plan Administrator may periodically publish notices of unclaimed distributions.

**3.  Distribution from Reserve.**

Within fifteen (15) Business Days after the Holder of an Allowed Claim satisfies the requirements of this Plan, such that the distribution(s) attributable to its Claim is no longer an unclaimed or undeliverable distribution (*provided* that satisfaction occurs within the time limits set forth in Article VI.C.7), the Plan Administrator shall distribute out of the Undeliverable Distribution Reserve the amount of the unclaimed or undeliverable distribution attributable to such Claim, including the interest that has accrued on such unclaimed or undeliverable distribution while in the Undeliverable Distribution Reserve, to such Holder.

**K.  Single Satisfaction of Claims.**

Holders of Allowed Claims may assert such Claims against the Debtors obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the Debtors based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

Case 18-04177-TOM11    Doc 523    Filed 01/02/19    Entered 01/02/19 17:48:01    Desc
Main Document    Page 94 of 107

## ARTICLE IX
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

**A.      Settlement, Compromise, and Release of Claims and Interests.**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Plan Effective Date, the Plan Administrator may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

**B.      Discharge of Claims and Termination of Interests.**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Plan Effective Date by the Plan Administrator), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Commencement Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date with respect to a Claim that is Unimpaired by the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Plan Effective Date occurring.

**C.      Release of Liens.**

**Except as otherwise specifically provided in the Plan, the Sale Transaction Documentation or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Plan Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the Sale Transaction Documentation, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert either (i) to the Debtors and their successors and assigns or (ii) the Successful Bidder, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  In addition, the DIP Agent shall execute and deliver all documents reasonably requested by the Debtors or Plan Administrator to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

38

D. **Releases by the Debtors.**[4]

[Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Plan Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases herein are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases herein; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors asserting any claim released by the releases herein against any of the Released Parties.]

E. **Releases by Holders of Claims and Interests.**[5]

[As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any

---

[4] The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The releases by the Debtors are subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

[5] The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The Releases by Holders of Claims and Interests are subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.]

F.      Exculpation.[6]

[Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of commercially sensitive confidential information for competitive purposes that causes damages, or ultra vires acts as determined by a Final Order.]

---

[6]    The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The exculpation set forth in this paragraph is subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

**G. Injunction.**

Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

**H. Recoupment.**

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**I. Subordination Rights.**

Any distributions under the Plan to Holders shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

**J. Reimbursement or Contribution.**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

**K. Reservation of the United States.**

As to the United States, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall expand the scope of discharge, release, or injunction to which the Debtors are entitled under the Bankruptcy Code, if any. The discharge, release, and injunction provisions contained in the Plan, the Plan Supplement, and the Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any actions, including but not limited to any police or regulatory action, against anyone.

Notwithstanding anything contained in the Plan, the Plan Supplement, or the Confirmation Order to the contrary, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall discharge, release, impair, or otherwise preclude: (a) any liability to the United States that is a "claim" within the meaning of section 101(5) of the Bankruptcy Code, irrespective of whether the claim arose on, after, or before the Confirmation Date; (b) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (c) any valid right of setoff or recoupment of the United States against any of the Debtors; or (d) any liability of the Debtors under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee, or operator of property that such entity owns, operates, or leases on, before, and/or after the Confirmation Date. Nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement: (a) enjoin or otherwise bar the United States and/or any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in this paragraph, or (b) divest any court, commission, or tribunal of jurisdiction from resolving any matters relating to the liabilities and/or claims set forth in this paragraph, or (c) confer in the Bankruptcy Court jurisdiction over any matter as to which it would not have jurisdiction under the Bankruptcy Code.

Moreover, nothing in the Confirmation Order, the Plan, or the Plan Supplement shall release or exculpate any non-Debtor, including any Released Parties and/or Exculpated Parties, from any liability to the United States, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties and/or Exculpated Parties, nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement enjoin the United States from bringing any claim, suit, action, or other proceeding against the Released Parties and/or Exculpated Parties for any liability whatsoever.

Nothing contained in the Plan, the Plan Supplement, or the Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors, nor shall the Plan, the Plan Supplement, or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in the Plan, the Plan Supplement, or the Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

**L.     No Successor Liability.**

Except as otherwise expressly provided in the Plan or Sale Transaction Documentation, the Successful Bidder does not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other party relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on, or after the Plan Effective Date.  The Successful Bidder is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity, and shall not have any successor or transferee liability of any kind or character, except that the Successful Bidder shall assume the obligations specified in the Sale Transaction Documentation.  Notwithstanding the forgoing, the sale of the Debtors' assets free and clear of any successorship obligations under any Collective Bargaining Agreement and/or with respect to any Benefit Plan is expressly conditioned on the Debtors' obtaining relief from such obligations under sections 1113 and 1114 of the Bankruptcy Code, as applicable.

**ARTICLE X**
**CONDITIONS PRECEDENT TO**
**CONFIRMATION AND THE PLAN EFFECTIVE DATE**

**A.     Conditions Precedent to Confirmation.**

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of the Plan:  (1) the Bankruptcy Court shall have entered the Disclosure Statement Order and the Confirmation Order, and (2) the Sale Transaction Documentation shall not have been terminated in accordance with its terms.

**B.     Conditions Precedent to the Plan Effective Date.**

It shall be a condition to Consummation that the following conditions shall have been satisfied or waived

pursuant to the provisions of the Plan:

1.        the Bankruptcy Court shall have entered the Confirmation Order; *provided* that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry;

2.        the occurrence of the Closing (as such term is defined and described in the Sale Transaction Documentation);

3.        the General Unsecured Claims Amount (if any) shall have been funded;

4.        the Disclosure Statement Order and the Confirmation Order shall have been entered and shall not have been stayed, modified, or vacated on appeal;

5.        the Debtors have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring Transactions;

6.        the establishment of an Estate Retained Professional Fee Escrow Account funded in the amount equal to the Estate Retainer Professional Fee Escrow Amount;

7.        the establishment of a Wind-Down Escrow Account funded in an amount equal to the Wind-Down Escrow Amount;

8.        all fees and expenses of the DIP Agent and DIP Lenders payable pursuant to the Final DIP Order, including all fees and expenses of the legal advisors, financial advisors and other consultants of the DIP Agent and the DIP Lenders (including without limitation the fees of Akin Gump Strauss Hauer & Feld LLP, Burr & Forman LLP, Jackson Kelly, PLLC, Houlihan Lokey Capital, Inc., including any Transaction Fee payable pursuant to that certain Agreement dated as of July 31, 2018 between, among others, Houlihan Lokey Capital, Inc. and Mission Coal Company, LLC, and Seward & Kissel LLP), including any estimates of such fees and expenses through and including the Plan Effective Date, shall have been paid in full in Cash; and

9.        any and all requisite governmental, regulatory and third-party approvals and consents shall have been obtained.

10.       to extent required by the Successful Bidder, the Debtors shall have (a) reached an agreement with the applicable authorized representatives of the employees and retirees regarding modifications to the Debtors' collective bargaining agreements and retiree benefits, respectively, which shall include the removal of the successorship clause or waiver of the successorship clause with respect to the Sale Transaction in form and substance acceptable to the Required Lenders or the Successful Bidder (to the extent the Required Lenders are not the Successful Bidder), or (b) absent such agreement, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the Required Lenders or the Successful Bidder (to the extent the Required Lenders are not the Successful Bidder), authorizing the rejection of the Debtors' collective bargaining agreements under section 1113 of the Bankruptcy Code and the modification of the Debtors' retiree benefits under section 1114 of the Bankruptcy Code and such order shall have become a Final Order;

11.       on the Plan Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## C.    Waiver of Conditions.

The conditions to Consummation of the Plan set forth in <u>Article X.B</u> may be waived by the Debtors, with the consent of the Required Lenders, such consent not to be unreasonably withheld; *provided* that the condition set forth in <u>Article XI.B.8</u> may not be waived without the consent of the parties named therein.

43

D.      **Substantial Consummation.**

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Plan Effective Date.

E.      **Effect of Non-Occurrence of Conditions to the Plan Effective Date.**

If the Plan Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, the Debtors' Estates, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, the Debtors' Estates, any Holders, or any other Entity in any respect.

## ARTICLE XI
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      **Modification and Amendments.**

Subject to the limitations contained in the Plan and the Sale Transaction Documentation, the Debtors, with the consent (not to be unreasonably withheld) of the Required Lenders (to the extent that the Required Lenders are not the Successful Bidder, then only to the extent directly related to effectuating a distribution on account of their Claims) and the Successful Bidder (but solely to the extent directly related to the Sale Transaction Documentation or the Sale Transaction), reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the Sale Transaction Documentation, the Debtors, with the consent (not to be unreasonably withheld) of the Required Lenders (to the extent that the Required Lenders are not the Successful Bidder, then only to the extent directly related to effectuating a distribution on account of their Claims) and the Successful Bidder (but solely to the extent directly related to the Sale Transaction Documentation or the Sale Transaction), expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.

B.      **Effect of Confirmation on Modifications.**

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and before the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      **Revocation or Withdrawal of the Plan.**

Subject to the terms of the Sale Transaction Documentation, and with the consent of the Required Lenders (to the extent that the Required Lenders are not the Successful Bidder, then only to the extent directly related to effectuating a distribution on account of their Claims) and the Successful Bidder (but solely to the extent directly related to the Sale Transaction Documentation or the Sale Transaction), the Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan with respect to any Debtor, or if Confirmation or Consummation does not occur with respect to any Debtor, then:  (1) the Plan with respect to such Debtor shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan with respect to such Debtor (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan with respect to such Debtor, and any document or agreement executed pursuant to the Plan with respect to such Debtor, shall be deemed null and void; and

44

(3) nothing contained in the Plan with respect to such Debtor shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

# ARTICLE XII
# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, on and after the Plan Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and/or assigned; (c) the Debtors amending, modifying, or supplementing, after the Plan Effective Date, pursuant to Article V of the Plan, any Executory Contracts or Unexpired Leases to the Assumed Contracts and Leases List or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Plan Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

45

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article IX of the Plan and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.G.1 of the Plan;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Sale Transaction Documentation, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     Hear and determine matters concerning section 1145 of the Bankruptcy Code;

23.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Plan Effective Date;

24.     Enforce all orders previously entered by the Bankruptcy Court;

25.     To resolve any disputes arising under the Sale Transaction Documentation or other documents related to the Sale Transaction;

26.     Hear any other matter not inconsistent with the Bankruptcy Code; and

27.     Enter an order concluding or closing the Chapter 11 Cases.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

**A.**     **Immediate Binding Effect.**

Subject to <u>Article VIII</u> of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Plan Effective Date, the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunction described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

**B.**     **Additional Documents.**

On or before the Plan Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, all Holders of Claims or Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.**     **Dissolution of Statutory Committees.**

On the Plan Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases on the Plan Effective Date.

**D.**     **Reservation of Rights.**

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the Debtors or any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or any Debtor with respect to the Holders of Claims or Interests prior to the Plan Effective Date.

**E.**     **Successors and Assigns.**

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, Affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**F.**     **Service of Documents.**

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors shall be served on:

    **1.**     **the Debtors:**

> Mission Coal Company, LLC
> 7 Sheridan Square, Suite 300
> Kingsport, Tennessee 37660
> Attention: Gary M. Broadbent

> with copies to:

47

Christian & Small LLP
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Attn: Daniel D. Sparks, and Bill D. Bensinger

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attn.: Melissa Koss

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: Stephen E. Hessler, P.C., and Ciara Foster

After the Plan Effective Date, the Debtors shall have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Plan Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

**G.      Enforcement of Confirmation Order.**

On and after the Plan Effective Date, the Debtors, the Plan Administrator, and the Successful Bidder, as applicable, shall be entitled to enforce the terms of the Confirmation Order and the Plan.

**H.      Term of Injunctions or Stays.**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Plan Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order (including the injunction set forth in Article IX.G) shall remain in full force and effect in accordance with their terms.

**I.      Entire Agreement.**

Except as otherwise indicated, the Plan, the Confirmation Order, the Sale Transaction Documentation, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**J.      Exhibits.**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at *www.omnimgt.com/missioncoal* or the Bankruptcy Court's website at http://www.alnb.uscourts.gov.

**K.       Nonseverability of Plan Provisions.**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall not alter or interpret such term or provision to make it valid or enforceable, *provided* that at the request of the Debtors, which request shall be made with the consent of the Required Lenders (to the extent that the Required Lenders are not the Successful Bidder, then only to the extent directly related to effectuating a distribution on account of their Claims) and the Successful Bidder (but solely to the extent directly related to the Sale Transaction Documentation of the Sale Transaction), such consent not to be unreasonably withheld, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted, *provided*, *further*, that any such alteration or interpretation shall be acceptable to the Debtors.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

**L.       Waiver.**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

Respectfully submitted,

Dated:  [●], 2019

MISSION COAL COMPANY, LLC
on behalf of itself and all other Debtors

*/s/*
_____

Name: Kevin J. Nystrom
Title: Chief Restructuring Officer
Company: Mission Coal Company, LLC

49

**Exhibit B**

**Wind-Down Financial Projections [To be filed in advance of the Disclosure Statement Hearing]**