# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No. 524** |

**ORDER (I) APPROVING THE ADEQUACY
OF THE DISCLOSURE STATEMENT, (II) APPROVING
THE SOLICITATION AND NOTICE PROCEDURES WITH
RESPECT TO CONFIRMATION OF THE JOINT CHAPTER
11 PLAN OF MISSION COAL COMPANY AND CERTAIN
OF ITS DEBTOR AFFILIATES, (III) APPROVING THE FORMS OF
BALLOTS AND NOTICES IN CONNECTION THEREWITH, AND
(IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order"), pursuant to sections 105, 363, 1125, 1126, and 1128 of the Bankruptcy Code and Bankruptcy Rules 2002, 3016, 3017, 3018, 3020, approving (a) the adequacy of the Disclosure Statement, (b) the Solicitation and Voting Procedures, (c) the Voting Record Date, (d) the form and manner of the Solicitation Packages and the materials contained therein, (e) the Plan Supplement Notice, (f) the Non-Voting Status Notices, (g) the form of Rejection Notices to counterparties to Executory Contracts and Unexpired Leases

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

that will be rejected pursuant to the Plan, (h) the Voting and Tabulation Procedures, (i) the Confirmation Hearing Notice, and (j) certain dates and deadlines related thereto, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *General Order of Reference* from the United States District Court for the Northern District of Alabama, dated July 16, 1984, as amended July 17, 1984; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as provided herein.

## I.      Approval of the Disclosure Statement.

2.      The Disclosure Statement, substantially in the form attached hereto as **<u>Schedule 1</u>**, is approved as providing holders of Claims entitled to vote on the Plan with adequate information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.

3.      The Disclosure Statement (including all applicable exhibits thereto) provides holders of Claims, holders of Interests, and other parties in interest with sufficient notice of the

Case 18-04177-TOM11    Doc 762    Filed 02/08/19    Entered 02/08/19 14:41:28    Desc
Main Document      Page 2 of 170

injunction, exculpation, and release provisions contained in <u>Article IX</u> of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

## II.     Approval of the Solicitation and Voting Procedures.

4.      The Debtors are authorized to solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation and Voting Procedures, substantially in the form attached hereto as **<u>Schedule 2</u>**, which are hereby approved in their entirety.

## III.     Approval of the Materials and Timeline for Soliciting Votes and the Procedures for Confirming the Plan.

### A.     Approval of Certain Dates and Deadlines with Respect to the Plan, Disclosure Statement, and Sale.

5.      The following dates are hereby established (subject to modification as necessary, with the reasonable consent of the Required Lenders and the orders approving the Debtors' postpetition financing facility) with respect to solicitation of votes on the Plan, confirmation of the Plan, and approval of the Sale (all times prevailing Central Time):

| Event | Date |
|---|---|
| Voting Record Date | **February 6, 2019** |
| Solicitation Deadline | **February 11, 2019** |
| Publication Deadline | **Within three (3) business days of entry of the Disclosure Statement Order** |
| Bid Deadline | **February 13, 2019, at 4:00 p.m., prevailing Central Time** |
| Auction | **February 27, 2019, at 10:00 a.m., prevailing Eastern Time** |
| Sale Objection Deadline | **March 6, 2019, at 4:00 p.m., prevailing Central Time** |
| Voting Deadline | **March 11, 2019, at 4:00 p.m., prevailing Central Time** |
| Plan Objection Deadline | **March 11, 2019, at 4:00 p.m., prevailing Central Time** |

Case 18-04177-TOM11     Doc 762     Filed 02/08/19     Entered 02/08/19 14:41:28     Desc
Main Document      Page 3 of 170

| Event | Date |
|---|---|
| Deadline to File Voting Report | **One week prior to the Confirmation Hearing** |
| Deadline to File Confirmation Brief and Confirmation Objection Reply/Statements in Support of Confirmation | **March 18, 2019, at 12:00 p.m., prevailing Central Time** |
| Deadline to File Reply/Statements in Support of the Sale | **March 18, 2019, at 12:00 p.m., prevailing Central Time** |
| Sale Hearing | **March 20, 2019, at 10:00 a.m., prevailing Central Time** |
| Confirmation Hearing | **March 20, 2019, at 10:00 a.m., prevailing Central Time** |

6.     The Court will consider both confirmation of the Plan and approval of the Sale pursuant to section 363 of the Bankruptcy Code at the March 20, 2019 hearing.  Approval of the Sale may proceed without confirmation of the Plan if the applicable standards for confirmation are not met.

**B.     Approval of the Administrative Claims Bar Date.**

7.     Except as otherwise provided in the Plan, requests for payment of Administrative Claims which:  (a) with respect to Administrative Claims other than Estate Retained Professional Fee Claims, shall be Voting Deadline; and (b) with respect to Estate Retained Professional Fee Claims, shall be 30 days after the Plan Effective Date.  Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims will be deemed discharged as of the Plan Effective Date.

**A.     Approval of the Confirmation Hearing Notice.**

8.     The Confirmation Hearing Notice, substantially in the form attached hereto as **Schedule 8**, shall be filed by the Debtors and served upon parties in interest in the chapter 11 cases

4

on or before February 11, 2019, constitutes adequate and sufficient notice of the hearing to consider approval of the Plan, the manner in which a copy of the Plan could be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules. The Debtors shall publish the Confirmation Hearing Notice (in a format modified for publication) one time by the Publication Deadline, within three (3) business days of entry of the Disclosure Statement Order, in the *USA Today* (national edition) and the *Birmingham News, Alabama Messenger, Kingsport Times-News, and Charleston Gazette-Mail*.

**B.      Approval of the Form of and Distribution of Solicitation Packages to Parties Entitled to Vote on the Plan.**

9.      The forms of the following documents to be included in the Solicitation Packages are hereby approved:

a.      an appropriate form of Ballot substantially in the forms attached hereto as **Schedules 3A, 3B, and 3C** respectively;[3]

b.      the Cover Letter substantially in the form attached hereto as **Schedule 7**; and

c.      the Confirmation Hearing Notice substantially in the form attached hereto as **Schedule 8**.

10.      The Solicitation Packages provide the holders of Claims entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Bankruptcy Local Rules.

---

[3]   The Debtors will use commercially reasonable efforts to ensure that any holder of a Claim who has filed duplicate Claims against the Debtors (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class.

5

11.    The Debtors shall distribute Solicitation Packages to all holders of Claims entitled to vote on the Plan on or before the Solicitation Deadline.  Such service shall satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.

12.    The Debtors are authorized, but not directed or required, to distribute the Plan, the Disclosure Statement, and this Order to holders of Claims entitled to vote on the Plan in electronic format (i.e., on a CD-ROM or flash drive).  The Ballots as well as the Cover Letter and the Confirmation Hearing Notice will *only* be provided in paper form.  On or before the Solicitation Deadline, the Debtors shall provide (a) complete Solicitation Packages to the Bankruptcy Administrator and (b) the Disclosure Statement Order (in electronic format) and the Confirmation Hearing Notice to all parties on the 2002 List as of the Voting Record Date.

13.    Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact the Notice and Claims Agent and request paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense).

14.    The Notice and Claims Agent is authorized to assist the Debtors in (a) distributing the Solicitation Package, (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by holders of Claims against the Debtors, (c) responding to inquiries from holders of Claims and Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Package, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, (d) soliciting votes on the Plan, and (e) if necessary, contacting creditors regarding the Plan.

15. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each Ballot, (b) overnight delivery, or (c) personal delivery, so that the Ballots are ***actually received*** by the Notice and Claims Agent no later than the Voting Deadline as set forth in the applicable Ballot.

### C. Approval of Notice of Filing of the Plan Supplement.

16. The Debtors are authorized to send notice of the filing of the Plan Supplement, which will be filed and served at least seven (7) days prior to the Voting Deadline, substantially in the form attached hereto as **Schedule 9**, on the date the Plan Supplement is filed pursuant to the terms of the Plan, or as soon as practicable thereafter.

### D. Approval of the Form of Notices to Non-Voting Classes.

17. Except to the extent the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to holders of Claims or Interests in Non-Voting Classes, as such holders are not entitled to vote on the Plan. Instead, on or before the Solicitation Deadline, the Notice and Claims Agent shall mail (first-class postage prepaid) a Non-Voting Status Notice in lieu of Solicitation Packages, the form of each of which is hereby approved, to those parties, outlined below, who are not entitled to vote on the Plan:

7

| Class(es) | Status | Treatment |
|---|---|---|
| 1, 2 | Unimpaired—Presumed to Accept | Will receive a Non-Voting Status Notice, substantially in the form attached to the Disclosure Statement Order as **Schedule 4**, in lieu of a Solicitation Package. |
| 8, 9 | Impaired—Deemed to Reject | Will receive a Non-Voting Status Notice, substantially in the forms attached to the Disclosure Statement Order as **Schedule 5**, in lieu of a Solicitation Package. |
| N/A | Disputed Claims | Holders of Claims that are subject to a pending objection by the Debtors are not entitled to vote the disputed portion of their Claim. As such, holders of such Claims will receive a notice, substantially in the forms attached to the Disclosure Statement Order as **Schedule 6** (which notice shall be served together with such objection). |

18.     The Debtors will not provide the holders of Class 6 (Intercompany Claims) or Class 7 (Intercompany Interests) with a Solicitation Package or any other type of notice in connection with solicitation.

19.     The Debtors are not required to mail Solicitation Packages or other solicitation materials to the following: (a) holders of Claims that have already been paid in full during the chapter 11 cases or that are authorized to be paid in full in the ordinary course of business pursuant to an order previously entered by this Court, or (b) any party to whom the Disclosure Statement Hearing Notice was sent but was subsequently returned as undeliverable.

### E.     Approval of Notices to Contract and Lease Counterparties.

20.     The Debtors are authorized to mail a Rejection Notice of any Executory Contracts or Unexpired Leases, substantially in the form attached hereto as **Schedule 10**, to the applicable

counterparties to Executory Contracts and Unexpired Leases that will be rejected pursuant to the Plan (as the case may be), within the time periods specified in the Plan.

**F.    Approval of the Procedures for Filing Objections to the Plan.**

21.     Objections to the Plan will not be considered by the Court unless such objections are timely filed and properly served in accordance with this Order and the Bidding Procedures Order.  Additionally, all objections to confirmation of the Plan or requests for modifications to the Plan, if any, ***must***:   (a) be in writing, (b) conform to the Bankruptcy Rules, (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection, and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the notice parties identified in the Confirmation Hearing Notice.  Failure to appear at the Confirmation Hearing to prosecute any written objection may result in such objection being overruled without further notice.

**IV.    Miscellaneous.**

22.     The Debtors reserve the right, subject to the reasonable consent of the Required Lenders, to modify the Plan without further order of the Court in accordance with <u>Article XII</u> of the Plan, including the right to withdraw the Plan as to an individual Debtor at any time before the Confirmation Date.

23.     Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim at any time.

24.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

25.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice.

9

26.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

27.     The Debtors and the Notice and Claims Agent are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

28.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated:  February 8, 2019
Birmingham, Alabama

/s/ Tamara O. Mitchell
THE HONORABLE TAMARA O. MITCHELL
UNITED STATES BANKRUPTCY JUDGE

**Schedule 1**

**Disclosure Statement**

**THIS THIRD AMENDED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THE INFORMATION IN THIS THIRD AMENDED DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS THIRD AMENDED DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**THIRD AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF**
**MISSION COAL COMPANY, LLC AND CERTAIN OF ITS DEBTOR AFFILIATES**

Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      stephen.hessler@kirkland.com
      ciara.foster@kirkland.com

- and -

James H.M. Sprayregen, P.C.
Brad Weiland (admitted *pro hac vice*)
Melissa N. Koss (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:      james.sprayregen@kirkland.com
      brad.weiland@kirkland.com
      melissa.koss@kirkland.com

*Co-Counsel to the Debtors*

Daniel D. Sparks
Bill D. Bensinger
**CHRISTIAN & SMALL LLP**
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Telephone:      (205) 795-6588
Facsimile:      (205) 328-7234
Email:      ddsparks@csattorneys.com
      bdbensinger@csattorneys.com

*Co-Counsel to the Debtors*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS THIRD AMENDED DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF MISSION COAL COMPANY, LLC AND CERTAIN OF ITS DEBTOR AFFILIATES.[2] NOTHING IN THIS THIRD AMENDED DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS THIRD AMENDED DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED HEREIN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS THIRD AMENDED DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS THIRD AMENDED DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE COURT'S APPROVAL OF THE PLAN OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

THE DEBTORS ARE CURRENTLY RUNNING A SALE PROCESS FOR THEIR ASSETS AND PREFER THAT THE SALE TRANSACTION BE APPROVED AND CONSUMMATED THROUGH THE PLAN. THE DIP LENDERS PREFER THAT THE SALE TRANSACTION BE APPROVED AND CONSUMMATED THROUGH A SEPARATE SALE ORDER PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE (A "SALE ORDER") AND NOT REQUIRE CONSUMMATION OF THE PLAN IN ORDER TO CLOSE ON THE SALE. THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED IN THE CHAPTER 11 CASES (THE "COMMITTEE") WILL SUPPORT THE LENDERS PARTY TO THE DIP FACILITY (THE "DIP LENDERS") IN SEEKING TO HAVE THE DEBTORS SEEK APPROVAL OF, AND CONSUMMATE, ANY SALE TRANSACTION WITH THE DIP LENDERS FOR THE ASSETS THE DIP LENDERS ARE ACQUIRING PURSUANT TO AN ORDER OF THE COURT PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, AND NOT PURSUANT TO A CHAPTER 11 PLAN, WHICH SUPPORT INCLUDES THE COMMITTEE FILING THE APPROPRIATE PLEADINGS WITH THE COURT AND THE PROSECUTION THEREOF IN REGARD TO THE RELIEF SOUGHT BY THE DIP LENDERS THROUGH A SALE ORDER. IN THE EVENT THE SUCCESSFUL BIDDER AT THE AUCTION WITH RESPECT TO SOME OR ALL OF THE DEBTORS' ASSETS IS A PARTY OTHER THAN THE DIP LENDERS, AND SUCH PARTY DESIRES TO HAVE THE SALE TRANSACTION IN RESPECT OF SUCH ASSETS APPROVED AND CONSUMMATED PURSUANT TO A SALE ORDER, AND NOT PURSUANT TO A PLAN, THE COMMITTEE WILL NOT OBJECT TO SUCH TRANSACTION ON THE GROUNDS THAT IT SEEKS TO CLOSE PURSUANT TO A SALE ORDER AND NOT A PLAN, SUBJECT IN ALL RESPECTS TO THE COMMITTEE'S RIGHT TO EXERCISE ITS FIDUCIARY DUTIES TO DETERMINE TO OBJECT. FOR THE AVOIDANCE OF DOUBT, THE FOREGOING SHALL NOT PROHIBIT THE COMMITTEE FROM SUPPORTING THE CONFIRMATION OF A PLAN TO THE EXTENT SUCH PLAN IS NOT INCONSISTENT WITH THE FOREGOING. THE DEBTORS' SOLICITATION OF VOTES FOR THE PLAN SHALL NOT PREJUDICE ANY PARTY'S RIGHTS WITH RESPECT THERETO AND DOES NOT CONSTITUTE A DETERMINATION BY THE COURT WITH RESPECT TO HOW THE SALE TRANSACTION SHALL BE CONSUMMATED.

THIS THIRD AMENDED DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS SECOND AMENDMENT DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as may be amended, supplemented or modified from time to time, the "Plan"), attached hereto as **Exhibit A**.

REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS THIRD AMENDED DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT OR THIRD-PARTY ADVISORS EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS THIRD AMENDED DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS THIRD AMENDED DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS THIRD AMENDED DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS THIRD AMENDED DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS THIRD AMENDED DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS THIRD AMENDED DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS THIRD AMENDED DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS THIRD AMENDED DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS THIRD AMENDED DISCLOSURE STATEMENT WAS FILED. THE WIND-DOWN FINANCIAL PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED THIRD AMENDED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS THIRD AMENDED DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS THIRD AMENDED DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE COURT, AND THE PLAN EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

**TABLE OF CONTENTS**

Page

**ARTICLE I. INTRODUCTION**................................................................................................**1**
    A.    The Plan ...........................................................................................................1
    B.    The Plan Structure............................................................................................2
    C.    The DIP Lenders and Committee Stipulation ..................................................4
    D.    The Sale Transaction........................................................................................5

**ARTICLE II. QUESTIONS AND ANSWERS REGARDING THIS THIRD AMENDED**
    **DISCLOSURE STATEMENT** .....................................................................**10**
    A.    What is Chapter 11?........................................................................................10
    B.    Why are the Debtors sending me this Third Amended Disclosure Statement?...............10
    C.    Might the Debtors seek approval of and consummate the Sale Transaction pursuant to an
        order pursuant to section 363 of the Bankruptcy Code as opposed to pursuant to the Plan? .........10
    D.    Am I entitled to vote on the Plan?..................................................................10
    E.    What will I receive from the Debtors if the Plan is Consummated? ...............11
    F.    What will I receive from the Debtors if I hold an Allowed Administrative Claim or an
        Allowed Priority Tax Claim? .........................................................................12
    G.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
        Plan goes effective, and what is meant by "Confirmation," "Plan Effective Date," and
        "Consummation?"...........................................................................................12
    H.    What are the sources of cash and other consideration required to fund the Plan? .........12
    I.    Will there be releases and exculpation granted to parties in interest as part of the Plan? ...........12
    J.    What is the deadline to vote on the Plan?.......................................................13
    K.    How do I vote for or against the Plan?............................................................13
    L.    Why is the Court holding a Confirmation Hearing, and when is the Confirmation Hearing
        set to occur? ...................................................................................................13
    M.    What is the purpose of the Confirmation Hearing?........................................13
    N.    What is the Effect of the Plan on the Debtors' Asset Retirement Obligations Under
        Environmental Laws? .....................................................................................13
    O.    What is the effect of the Plan on the Debtors' ongoing business? .................14
    P.    Who do I contact if I have additional questions with respect to this Third Amended
        Disclosure Statement or the Plan?..................................................................14
    Q.    Do the Debtors recommend voting in favor of the Plan?...............................14

**ARTICLE III. BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES**............**14**
    A.    Corporate History...........................................................................................14
    B.    The Debtors' Capital Structure ......................................................................17

**ARTICLE IV. EVENTS LEADING UP TO THE CHAPTER 11 CASES**.......................................**20**
    A.    Adverse Market Conditions ...........................................................................20
    B.    Acquisition and Expansion Efforts ................................................................21
    C.    Coal Industry Liabilities.................................................................................21
    D.    The Debtors' Proactive Approach to Addressing Liquidity Constraints........................21

**ARTICLE V. ADMINISTRATION OF THE CHAPTER 11 CASES** ............................................**22**
    A.    First Day Pleadings and Other Case Matters .................................................22
    B.    Employment and Compensation of Advisors.................................................26
    C.    Appointment of Official Committee...............................................................26
    D.    Ongoing Internal Independent Director and Committee Led Investigations................26
    E.    Key Employee Retention Plan ........................................................................28
    F.    Summary of Claims Process, Bar Date and Claims Filed ..............................28
    G.    Exclusivity .....................................................................................................29
    H.    Extension of Exclusivity ................................................................................29

i

    I.      Extension of Assumption Period Under Section 365(d)(4) of the Bankruptcy Code........29
    J.      Extension of Removal Period................................................................................29
    K.     Cost Cutting Measures.......................................................................................29
    L.      Postpetition Marketing, Bidding, and Auction Process.......................................30
    M.    Section 1113 and 1114 Process...........................................................................30

**ARTICLE VI. SUMMARY OF THE PLAN..............................................................................31**
    A.     General Settlement of Claims and Interests ......................................................31
    B.     Proposed Creditor Recoveries...........................................................................31
    C.     The Sale Transaction..........................................................................................33
    D.     Restructuring Transactions .................................................................................33
    E.     The Plan Administrator.......................................................................................33
    F.      Corporate Action.................................................................................................34
    G.     Recoveries to Certain Holders of Claims and Interests......................................34
    H.     Release, Injunction, and Related Provisions .....................................................35

**ARTICLE VII. VOTING AND CONFIRMATION.....................................................................38**
    *A.*     *Classes Entitled to Vote on the Plan*.................................................................38
    *B.*     *Votes Required for Acceptance by a Class*........................................................38
    *C.*     *Certain Factors to Be Considered Prior to Voting* ...........................................38
    *D.*     *Classes Not Entitled to Vote on the Plan*..........................................................39
    *E.*     *Solicitation Procedures*.....................................................................................39
    *F.*      *Voting Procedures*.............................................................................................40
    *G.*     *Confirmation Objection Deadline* .....................................................................41
    H.     Confirmation Hearing ........................................................................................42
    I.      Confirmation Standards ......................................................................................42
    J.      Acceptance by Impaired Classes.........................................................................44
    K.     Confirmation Without Acceptance by All Impaired Classes ..............................45

**ARTICLE VIII. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING...........46**
    A.     Risk Factors and Considerations Regarding the Debtors' Business and Operations ....................46
    B.     Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims
           Under the Plan....................................................................................................49
    C.     Certain Bankruptcy Law Considerations ...........................................................50
    D.     Disclosure Statement Disclaimer .......................................................................52
    E.     Liquidation Under Chapter 7.............................................................................54

**ARTICLE IX. MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES .........54**
    *A.*     *Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Holders*
           *of Allowed Class 9 Interests*.............................................................................55
    B.     Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class
           3 DIP Facility Claims.........................................................................................56
    *C.*     *Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class*
           *4 Second  Lien Secured Claims.*.........................................................................56
    *D.*     *Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class*
           *5 General  Unsecured Claims.*...........................................................................57
    *D.*     *Character of Gain or Loss.*.................................................................................57
    *E.*     *Market Discount.*................................................................................................57
    *F.*      *Accrued Interest.*................................................................................................58
    *G.*     *Limitation on Use of Capital Losses*..................................................................58
    *H.*     *Information Reporting and Backup Withholding* ................................................58

**ARTICLE X. RECOMMENDATION OF THE DEBTORS.........................................................59**

## <u>EXHIBITS</u>

**EXHIBIT A**  Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates

**EXHIBIT B**  Wind-Down Financial Projection

The Debtors submit this disclosure statement (this "<u>Third Amended Disclosure Statement</u>") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes to accept or reject the Plan.[4]  A copy of the Plan as amended is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE PLAN, IF CONSUMMATED, WILL EFFECTUATE THE TERMS OF THE SALE TRANSACTION.  THE COURT WILL CONSIDER BOTH CONFIRMATION OF THE PLAN AND APPROVAL OF THE SALE PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AT THE MARCH 20, 2019 HEARING.  APPROVAL OF THE SALE MAY PROCEED WITHOUT CONFIRMATION OF THE PLAN IF THE APPLICABLE STANDARDS FOR CONFIRMATION ARE NOT MET.**

**EACH OF THE DEBTORS' BOARDS OF MANAGERS OR SOLE MEMBERS HAS APPROVED THE PLAN AND BELIEVES THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES. AS SUCH, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ACCEPT THE PLAN BY RETURNING THEIR BALLOTS (EACH, A "<u>BALLOT</u>") SO AS TO BE <u>ACTUALLY</u> <u>RECEIVED</u> BY THE NOTICE AND CLAIMS AGENT (AS DEFINED HEREIN) NO LATER THAN <u>MARCH 11, 2019, AT 4:00 P.M. (PREVAILING CENTRAL TIME)</u>.  ASSUMING THE REQUISITE ACCEPTANCES TO THE PLAN ARE OBTAINED, THE DEBTORS WILL SEEK THE COURT'S APPROVAL OF THE PLAN AT THE CONFIRMATION HEARING ON <u>MARCH 20, 2019, AT 10:00 A.M., PREVAILING CENTRAL TIME</u>.**

**THE DEBTORS BELIEVE THAT THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO HOLDERS OF CLAIMS.  ACCORDINGLY, THE DEBTORS BELIEVE THAT THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

A.      *The Plan*

As more fully described below, the Debtors filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code on the Commencement Date.  The purpose of a chapter 11 bankruptcy case is to resolve the affairs of a debtor and distribute the proceeds of the debtor's estate pursuant to a confirmed chapter 11 plan.  To that end, the Debtors filed the Plan, the terms of which are more fully described herein.  The Plan contemplates a transfer of the Acquired Assets to the Successful Bidder, whose bid for the Acquired Assets will be selected as the highest or otherwise best bid at the Debtors' Auction.  The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and to distribute all property of the Debtors' Estates that is or becomes available for distribution, in each case, generally in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Debtors' Estates, and therefore the Debtors seek to confirm the Plan.

---

[3]     If the Plan is not confirmed or the Plan Effective Date does not occur, the Debtors reserve all of their rights regarding the Third Amended Disclosure Statement and the Plan and any statement set forth in the Third Amended Disclosure Statement and the Plan, as applicable.  Furthermore, if the Plan is not confirmed or the Plan Effective Date does not occur, nothing in the Third Amended Disclosure Statement or the Plan shall be deemed an admission by the Debtors, and the Debtors reserve all such rights regarding the Third Amended Disclosure Statement and the Plan and any statement set forth in the Third Amended Disclosure Statement and the Plan, including, without limitation, all rights with respect to the consummation of the Sale Transaction contemplated herein.

[4]     The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Third Amended Disclosure Statement and the Plan, the Plan will govern.

Generally speaking, the Plan:

(a) provides for 100 percent recoveries for Allowed Administrative Claims, Priority Tax Claims, Estate Retained Professional Fee Claims, Other Priority Claims and Other Secured Claims;

(b) provides for up to 95 percent recoveries for Holders of DIP Facility Claims, which impairment, the Debtors believe, has been agreed to pursuant to the DIP Lenders and Committee Stipulation;

(c) provides for distribution from the Sale Transaction Proceeds to Holders of Allowed Second Lien Secured Claims, to the extent Allowed DIP Facility Claims are satisfied in full in cash or the holders of the Allowed DIP Facility Claims accept different treatment or less than payment in full;

(d) provides for distribution from the Sale Transaction Proceeds to Holders of Allowed General Unsecured Claims, to the extent Allowed DIP Facility Claims and Allowed Second Lien Secured Claims are satisfied in full in cash;

(e) provides for the distribution of the General Unsecured Claims Amount to Holders of Allowed General Unsecured Claims;

(f) provides for consummation of the Sale Transaction; and

(g) designates a Plan Administrator to (i) wind down the Debtors' businesses and affairs; and (ii) pay and reconcile Claims as provided therein; and (iii) administer the Plan in an effective and efficient manner.

The Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Plan classifies Holders of Claims and Interests according to the type of the Holder's Claim or Interest, as more fully described below.  Holders of Claims in Class 3 (DIP Facility Claims), Class 4 (Second Lien Secured Claims) and Class 5 (General Unsecured Claims) are entitled to vote to accept or reject the Plan.

---

**The DIP Lenders do not believe that by virtue of the DIP Lenders and Committee Stipulation the DIP Lenders have agreed to be impaired.**

---

**The Holders of the Second Lien Secured Claims object to the payment of claims held by creditors or lien holders that are junior in priority to the Second Lien Secured Claims, if such payments are made from sale proceeds of collateral that secures the Second Lien Secured Claims, unless the Second Lien Secured Claims are paid in full.**

---

B.    *The Plan Structure*

The Plan proposes to fund creditor recoveries from the Sale Transaction Proceeds, the Estate Retained Professional Fees Escrow Amount, the Wind-Down Amount, the General Unsecured Claims Amount, the Debtors' rights under the Sale Transaction Documentation, payments made directly by the Successful Bidder on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Successful Bidder pursuant to sections 365 or 1123 of the Bankruptcy Code, and/or all Causes of Action not previously settled, released, or exculpated under the Plan.  The Debtors will market their assets pursuant to the terms of the Bidding Procedures Order and will hold the Auction to the extent Qualified Bids for the Debtors' assets are submitted in accordance with the Bidding Procedures.  The Debtors intend to consummate the Sale Transaction with the bidder that provides the highest or otherwise best offer as contemplated under the Bidding Procedures Order, the Sale Transaction Documentation and the Plan.  The Debtors will announce the Successful Bidder(s) and the Successful Bid(s) after the conclusion of the Auction, including the proposed purchase price of the Assets..

Pursuant to the Plan, the Debtors or the Plan Administrator shall pay or provide for payments of Claims as follows:

- Holders of Other Priority Claims will be paid in full on the Plan Effective Date (or as soon thereafter as such Other Priority Claims become due and Allowed in the ordinary course);

- Holders of Other Secured Claims (including all Secured Tax Claims), will receive, at the election of the Debtors:

    (i)     payment in full in Cash;

    (ii)    the collateral securing such Other Secured Claims;

    (iii)   reinstatement of such Other Secured Claims, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such Other Secured Claims to demand or to receive payment prior to the stated maturity of such Other Secured Claim from and after the occurrence of default; or

    (iv)    such other treatment rendering such Other Secured Claims Unimpaired.

- Each Holder of DIP Facility Claims will receive either (i) payment in full in Cash of the Obligations (which amount shall include the full roll-up of the Prepetition First Lien Obligations Amount, including the Prepayment Premium, plus the First Lien Accrued Adequate Protection Payments) (each as defined in the DIP Documents to the extent not defined herein) or (ii) treatment that is otherwise acceptable to the Required Lenders;

- Each Holder of Second Lien Secured Claims will receive its Pro Rata share, based on the Allowed amount of its Second Lien Secured Claim, of the remaining amount of the Sale Transaction Proceeds, solely to the extent the Allowed DIP Facility Claims are paid in full in Cash;

- Each Holder of General Unsecured Claims will receive (i) its Pro Rata share of the General Unsecured Claims Amount (as provided in Article IV.H of the Plan) and (ii) the remaining amount of the Sale Transaction Proceeds, solely to the extent the Allowed DIP Facility Claims and, to the extent Allowed, the Allowed Second Lien Secured Claims are paid in full in Cash;

- Each Intercompany Claim will, at the election of the Debtors, be reinstated or canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect;

- Intercompany Interests will, at the election of the Debtors, be reinstated or canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect;

- Section 510(b) Claims will be canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim;

- Interests will be canceled, released, and extinguished, and will be of no further force or effect. Each Holder of an Interest will not receive any distribution on account of such Interest.

3

The Debtors believe that the Plan is in the best interest of the Estates and urge Holders of Claims in Class 3 (DIP Facility Claims), Class 4 (Second Lien Secured Claims), and Class 5 (General Unsecured Claims) to vote to accept the Plan.

## C. The DIP Lenders and Committee Stipulation

Pursuant to the DIP Lenders and Committee Stipulation [Docket No. 611], the Plan incorporates the material terms of this sharing mechanic and provides a settlement of claims arising under the First Lien Credit Agreement and forms the consideration for the General Unsecured Claims Amount to be held in the General Unsecured Claims Cash Pool Account. In accordance with the terms of the DIP Lenders and Committee Stipulation, the Plan provides for the below:

In the event the DIP Lenders are not the Successful Bidder at the Auction, the following sharing mechanic shall apply with respect to Sale Transaction Proceeds received by the DIP Lenders in excess of the amount equal to:

(i) the New Money DIP Loans (plus all interest accrued thereon, as applicable) from the Commencement Date through the date of the closing of the Sale *plus* (ii) the Exit Fee *plus* (iii) the Prepetition First Lien Obligations Amount excluding the Prepayment Premium (the "Prepetition Claim Amount") plus (iv) any interest accrued on the Prepetition Claim Amount from the Commencement Date through the date of Closing (whether as adequate protection or under the DIP Credit Agreement post-Roll-Up) (collectively, the "DIP Claim Threshold"):

    (a)    The DIP Lenders shall contribute 50% of (a) the Exit Fee and (b) the first $5 million in excess of the DIP Claim Threshold received by the DIP Lenders on account of the DIP Facility Claims to the General Unsecured Claims Cash Pool Account.

    (b)    The DIP Lenders shall contribute 10% of the second $5 million in excess of the DIP Claim Threshold received by the DIP Lenders on account of the DIP Facility Claim to the General Unsecured Claims Cash Pool Account.

    (c)    The DIP Lenders shall contribute 20% of the next $15 million in excess of the DIP Claim Threshold received by the DIP Lenders on account of the DIP Facility Claim to the General Unsecured Claims Cash Pool Account.

    (d)    The DIP Lenders shall contribute 35% of the next $15 million in excess of the DIP Claim Threshold received by the DIP Lenders on account of the DIP Facility Claim to the General Unsecured Claims Cash Pool Account.

    (e)    The DIP Lenders shall contribute 40% of any additional amounts in excess of the DIP Claim Threshold up to the amount of the Prepayment Premium received by the DIP Lenders on account of the DIP Facility Claims, to the General Unsecured Claims Cash Pool Account.

For the purposes of calculating the DIP Claim Threshold, any interest accrued on the Prepetition Claim Amount from the Commencement Date through the date of Closing (whether as adequate protection or under the DIP Credit Agreement post-rollup after February 1, 2019 up to and through April 12, 2019 (the "Deferred DIP Interest") shall not be included in the DIP Claim Threshold; provided, however, if the sale to the Successful Bidder does not close on or before April 12, 2019 and the DIP Facility Claims are not repaid in full on or before that time, the Deferred DIP Interest shall be included for purposes of calculating the DIP Claim Threshold.

In the event the DIP Facility Claim is not paid in full in cash from the proceeds of the Sale (or the DIP Lenders acquire the Debtors' assets via a credit bid pursuant to section 363(k) of the Bankruptcy Code in an amount less than the full amount of the DIP Claim), and there is distributable value from assets of the Debtors' estates, if any, that do not constitute the DIP Lenders' collateral, the DIP Lenders shall reduce the allowed amount of any deficiency claim to 25% of the amount of such claim. For the avoidance of doubt, the DIP Lenders' deficiency claim shall be determined based upon the full amount of the DIP Facility Claim.

In the event the DIP Lenders are the Successful Bidder at the Auction, the DIP Lenders shall instead pay $1.5 million, plus 100% of any amounts not otherwise used that have been set aside for the Professional Fees Escrow Amount that the DIP Lenders have agreed to fund at closing of the Sale pursuant to the terms of the Opening Bidder's Proposed Agreement, to fund the General Unsecured Claims Cash Pool.

Pursuant to the terms of the DIP Lenders and Committee Stipulation, the DIP Lenders have agreed to limit the amount of any credit bid at the Auction to no greater than $147 million of the DIP Facility Claims (in addition to the (i) $38 million in additional cash consideration consisting of $16.3 million for the Professional Fees Escrow Amount, $15 million for the Payroll Escrow Amount and $6.7 million for the Wind-Down Escrow Amount; (ii) $50,000 for purchased Avoidance Actions; and (iii) Assumed Liabilities).

> **The Debtors have not agreed to incorporate certain provisions of the DIP Lenders and Committee Stipulation into the Plan. In particular, the DIP Lenders and Committee Stipulation provides that any funds to be distributed to the Committee under the DIP Lenders and Committee Stipulation, in the sole discretion of the Committee, shall either be used to fund distributions to general unsecured creditors or to fund a litigation trust (the "Litigation Trust"), to the extent one may be created and approved by the Court, to be controlled solely by the Committee or such subsequently appointed litigation trustee, as applicable. The DIP Lenders and the Committee have agreed that a Litigation Trust could be requested and/or approved and reserve any and all rights to request that the Court create such Litigation Trust. The Debtors reserve any and all rights to challenge any such request.**
>
> **Additionally, pursuant to the terms of the DIP Lenders and Committee Stipulation, the Committee will support the DIP Lenders in seeking to have the Debtors seek approval of, and consummate, any Sale Transaction with the DIP Lenders for the assets the DIP Lenders are acquiring pursuant to a Sale Order, and not pursuant to a chapter 11 plan, which support includes the Committee filing the appropriate pleadings with the Court and the prosecution thereof in regard to the relief sought by the DIP Lenders through a Sale Order.**
>
> **In the event the Successful Bidder at the Auction with respect to some or all of the Debtors' assets is a party other than the DIP Lenders, and such party desires to have the Sale Transaction in respect of such assets approved and consummated pursuant to a Sale Order, and not pursuant to a plan, the Committee will not object to such transaction on the grounds that it seeks to close pursuant to a Sale Order and not a plan, subject in all respects to the Committee's right to exercise its fiduciary duties to determine to object. For the avoidance of doubt, the foregoing shall not prohibit the Committee from supporting the confirmation of a plan to the extent such plan is not inconsistent with the foregoing.**

> **The Holders of the Second Lien Secured Claims object to the payment of claims held by creditors or lien holders that are junior in priority to the Second Lien Secured Claims, if such payments are made from sale proceeds of collateral that secures the Second Lien Secured Claims, unless the Second Lien Secured Claims are paid in full.**

D.     *The Sale Transaction*

The Plan contemplates the sale of substantially all of the assets of the Debtors (the "Sale Transaction") in accordance with the terms and conditions set forth in the Sale Transaction Documentation, by and among the Debtors and the Successful Bidder. The Debtors, with the assistance of their advisors, have undertaken a robust postpetition marketing process in support of the Sale Transaction. Prior to the entry of the Bidding Procedures Order, the Debtors, with their advisors, began canvassing the marketplace to identify potential financial or strategic purchasers. In total, Jefferies contacted 54 potential purchasers. Upon its entry, a copy of the Bidding Procedures Order was distributed to all potential purchasers that remained active in the sale process. Nondisclosure agreements have been entered into with 39 potential purchasers who have been given access to an electronic data room containing diligence materials related to the Debtors' assets. In addition, the Debtors have, to date, received 15 non-binding letters of intent and conducted in-person management meetings and/or site visits for 15 potential purchasers of the Debtors' assets.

Generally, the Sale Transaction contemplates that:

(a)     the Debtors shall, among other things, transfer the Acquired Assets, including all Transferred Causes of Action held by the Debtors, to the Successful Bidder free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than the Assumed Liabilities) pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code, the Plan and the Confirmation Order; and

(b)     the Successful Bidder shall acquire all Assumed Liabilities, including payment of all Cure Costs that are required to be paid pursuant to any Executory Contracts or Unexpired Leases that are assumed by the Debtors and assigned to the Successful Bidder pursuant to the Sale Transaction Documentation and the Plan.

The Acquired Assets are generally comprised of the following assets and interests:[5]

all of the Debtors' direct or indirect right, title and interest in, to or under the following properties, rights, claims and assets (in each case, except for and to the extent related to the Excluded Assets or the Excluded Liabilities, as applicable) of every kind and description, wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased, licensed, used or held for use, in or relating to the Debtors' business, whether or not reflected on the books and records of the Debtors, as the same shall exist on the Closing Date:

(a)     all Inventory;

(b)     all Equipment used in the Debtors' business or located on the real property, including (i) any software installed on computers, to the extent such software licenses are assignable and (ii) those specific assets set forth in the Sale Transaction Documentation;

(c)     all Assumed Contracts, except to the extent primarily used in connection with the Excluded Assets and subject to the Sale Transaction Documentation;

(d)     all (i) Owned Real Property, (ii) Leased Real Property (and any agreement and rights related thereto or under the applicable Lease to the extent that such agreement or Lease is an Assumed Contract), (iii) the Lessor Leases (to the extent that a Lessor Lease is an Assumed Contract) and (iv) Occupancy Agreements (to the extent that an Occupancy Agreement is an Assumed Contract), in each case, together with all interests in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(e)     all coal reserves to the extent of the Debtors' interest (but excluding coal reserves at the Pinnacle Business);

(f)     all rights to subside lands associated with mining operations and all rights to the waiver of and release from subsidence liability and indemnity rights under any and all conveyances,

---

[5] Capitalized terms used in the section but not defined herein shall have the meanings ascribed to them in the Opening Bidder's Proposed Agreement (as defined in the Bidding Procedures Order). For the avoidance of doubt, the description of the Acquired Assets set forth herein is for informational purposes only, as the Opening Bidder's Proposed Agreement contemplates approval and consummation of the Sale pursuant to an order pursuant to section 363 of the Bankruptcy Code (as opposed to approval and consummation of the Sale pursuant to the Plan). However, the Debtors anticipate that another Successful Bidder will seek to acquire substantially similar assets.

6

representations and instruments or agreements of any kind and nature applicable to the Debtors' coal mining activities and interests;

(g)    all rights of the Debtors to the warranties and licenses received from manufacturers or sellers of the Equipment, Improvements or any component thereof, except to the extent prohibited by law;

(h)    all Transferred Permits;

(i)    all Intellectual Property, Accounts Receivable, and Pre-Paid Expenses;

(j)    all goodwill, customer and referral relationships, other intangible property and all privileges, relating to, arising from or associated with any of the Acquired Assets (including the Intellectual Property), the Assumed Liabilities and/or the Debtors' business, in each case arising after the Closing;

(k)    all Documents and other books and records (financial, accounting and other) except to the extent related to the Excluded Assets or the Excluded Liabilities, and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, that are used or useful in, held for use in or intended to be used in, or that arise in any way out of or are related to, the Acquired Assets, the Assumed Liabilities or the Debtors' business but only to the extent permitted by Legal Requirements and not subject to attorney-client privilege or other work product privilege;

(l)    all interests, rights, rebates, abatements, remedies, recoveries and benefits of the Debtors, and all claims, demands, indemnification rights and causes of action, arising under or relating to any of the Acquired Assets (including Intellectual Property to the extent transferrable or assignable), the Assumed Liabilities or the Debtors' business, including those arising out of Assumed Contracts, express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors or others to the extent relating to the operation of the Debtors' business or affecting the Equipment, Inventory or other tangible Acquired Assets or ordered by the Debtors prior to the Closing Date (and in any case, any component thereof) to the extent set forth in the Sale Transaction Documentation;

(m)    all Avoidance Actions;

(n)    all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts (to the extent transferrable) and other bank deposits, instruments and investments of the Debtors, including any cash collateral used to secure

surety bonds or other transactional assurances, excluding, for the avoidance of doubt, the Cash Consideration and prepaid deposits related to professional fee retainers;

(o)     all third party directors and officers liability, business interruption, property or casualty insurance proceeds, to the extent receivable by the Successful Bidder or the Debtors in respect of the Acquired Assets or the Assumed Liabilities after the Closing Date;

(p)     all telephone, telex and telephone facsimile numbers and other directory listings;

(q)     all assets, if any, listed in the Sale Transaction Documentation;

(r)     all proceeds and products of any of the Acquired Assets;

(s)     all proceeds from the sale of any of the Excluded Assets other than Avoidance Actions up to an amount equal to the Permitted Proceeds Amount;

(t)     any Tax Refunds of the Debtors with respect to Apportioned Taxes that are paid by the Successful Bidder;

(u)     any insurance policies of the Debtors relating to the Acquired Assets or the Assumed Liabilities solely to the extent Successful Bidder has provided written notice to the Debtors prior to the Bid Deadline of its intention to acquire such insurance policies; and

(v)     the assets of the Debtors associated with the Pinnacle Business that are set forth in the Sale Transaction Documentation.

The Assumed Liabilities are generally comprised of the following assets and interests:

(a)     all Liabilities under the Assumed Contracts;

(b)     all Cure Costs;

(c)     outstanding Trade Payables related to the Acquired Assets incurred in the Ordinary Course of Business after the Commencement Date and during the Chapter 11 Cases to the extent consistent with the Budget (as defined in the Final DIP Order);

(d)     Liabilities arising out of the ownership or operation of the Business or Acquired Assets for periods following the Closing Date, including with respect to: (i) workers' compensation liabilities or occupational health claims relating to any Buyer Employee arising out of an event that occurs after the Closing Date; (ii) any and all Black Lung Assumed Liabilities; and (iii) the Release of, or exposure of any Person to, any Hazardous Substances first occurring after the Closing Date;

(e)     Transfer Taxes;

(f)     all Liabilities with respect to Taxes imposed on the Business or the Acquired Assets that are attributable to any Post-Closing Tax Period;

(g)     all Liabilities of the Debtors as a result of any action taken by the Debtors at Buyer's or its Affiliates' request as set forth in the Successful Bidder's asset purchase agreement;

(h)     all Liabilities of the Debtors with respect to the Transferred Permits or otherwise arising out of or relating to the Transferred Permits, including: (i) all Liabilities for Reclamation and, if applicable, post-mining and post-Gas Well operation Liabilities; (ii) compliance with performance obligations or standards under the Transferred Permits and associated Legal

8

Requirements; and (iii) obligations to replace and/or increase bonds or other financial assurance instruments associated with the Transferred Permits, excluding, in each of the preceding cases (i)-(iii), any civil or administrative fines or penalties or criminal sanctions imposed by any Governmental Authority for which Debtors or any of their Affiliates have received a written notice of violation or notice of claim (or other written notice of similar legal intent or meaning) on or prior to the Closing Date;

(i) all Liabilities to the extent arising out of or relating to compliance with Environmental, Health and Safety Laws, Mining Law, MSHA, OSHA and any mine or Gas Well operating or safety compliance matters, related to the Acquired Assets or the acquired Gas Wells, but excluding any civil or administrative fines or penalties or criminal sanctions imposed by any Governmental Authority for which Debtors or any of their Affiliates have received a written notice of violation or notice of claim (or other written notice of similar legal intent or meaning) on or prior to the Closing Date;

(j) regulatory violations and obligations on or in relation to the Transferred Permits first arising post-Closing (except, however, for any violations or obligations arising from any action or inaction taken by any Debtor or an Affiliate of any Debtor with respect to Transferred Permits that are not transferred as of the Closing Date);

(k) if, and only to the extent, the Debtors are unable to sell the Excluded Assets utilized in the Pinnacle Business to a third party purchaser, Liabilities for Reclamation with respect to the existing Permits issued to the Debtors for the Pinnacle Business, to the extent that such Liabilities are not funded by the issuers of the Debtors ' surety bonds; provided, however, that such unfunded Reclamation Liabilities may be satisfied through the performance of Reclamation by Buyer, the provision by Buyer of Reclamation services from a third party, and/or the payment by Buyer for Reclamation, as determined by Buyer in its sole and absolute discretion;

(l) accrued but unpaid Liabilities of the Debtors with respect to Real Property Taxes assessed with respect to the Acquired Assets, solely to the extent necessary to transfer the Acquired Assets free and clear of any statutory senior priority lien on such Acquired Assets; and

(m) all Liabilities or other obligations with respect to the WARN Act arising, accruing, or as a result of actions taken following the Closing Date.

It is anticipated that the Successful Bidder will acquire proceeds from insurance policies (including D&O) to the extent they relate to an Acquired Asset or Assumed Liability. The Successful Bidder will only acquire the actual insurance policies (if transferrable and subject to consent) relating to Acquired Assets or Assumed Liabilities if they notify the Debtors prior to the Bid Deadline that they will acquire those. The Debtors have not received any such notice at this time.

The Bid Deadline will be on February 13, 2019, and in the event there are multiple bids, an Auction will be held on February 27, 2019. Depending on the results of this Auction, There may be one or more successful bidders.

**THE DEBTORS WILL ANNOUNCE THE WINNING BIDDERS AFTER THE AUCTION AND WILL FILE NOTICE ON THE DOCKET NOTIFYING ALL PARTIES-IN-INTEREST IN ADVANCE OF THE VOTING DEADLINE OF MARCH 11, 2019.**

Parties may object to the Sale, and the Sale Objection Deadline is currently set for Wednesday, March 6, 2019. Failure to appear at the Sale Hearing to prosecute any written objection may result in such objection being overruled without further notice. As set forth in the Bidding Procedures Order, any objection that Mission Coal Funding, LLC may have to the Sale; including, but not limited to, an objection based on the Debtors' failure to satisfy the conditions of section 363(f) of the Bankruptcy Code are preserved and may be asserted at or before the hearing to approve the Sale.

9

# ARTICLE II.
## QUESTIONS AND ANSWERS REGARDING THIS THIRD AMENDED DISCLOSURE STATEMENT

A.      *What is Chapter 11?*

Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.      *Why are the Debtors sending me this Third Amended Disclosure Statement?*

The Debtors are seeking to obtain Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  The Plan contemplates a sale of the Debtors' assets to the Successful Bidder, and this Third Amended Disclosure Statement is being submitted to provide information about this transaction and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

C.      *Might the Debtors seek approval of and consummate the Sale Transaction pursuant to an order pursuant to section 363 of the Bankruptcy Code as opposed to pursuant to the Plan?*

In the event that the Successful Bidder, selected by the Debtors as the highest and otherwise best bid in consultation with the Consultation Parties as required by the Bid Procedures, requires that the Sale Transaction be consummated through a 363 sale, the Debtors shall seek approval of such Sale Transaction and entry of such Sale Order on March 20, 2019, unless otherwise agreed by the Successful Bidder.  Notwithstanding the forgoing, nothing shall require the Debtors to consummate the Sale Transaction with the Required Lenders pursuant to a Sale Order and (i) the Debtors reserve all of their rights to argue that any Sale Transaction with the Required Lenders must be approved and consummated pursuant to a chapter 11 plan of reorganization and (b) the Required Lenders reserve all of their rights to argue that any Sale Transaction with the Debtors must be approved and consummated pursuant to section 363 of the Bankruptcy Code and not require consummation of a chapter 11 plan of reorganization in order to close the Sale Transaction.

The Court will consider both confirmation of the Plan and approval of the Sale pursuant to section 363 of the Bankruptcy Code at the March 20, 2019 hearing.  Approval of the Sale may proceed without confirmation of the Plan if the applicable standards for confirmation are not met.

D.      *Am I entitled to vote on the Plan?*

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests in <u>Article III</u> of the Plan pursuant to section 1122(a) of the Bankruptcy Code is referred to as a "<u>Class</u>."  Each Class's respective voting status is set forth below:

10

1. *Summary of Classification*

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | DIP Facility Claims | Impaired | Entitled to Vote |
| Class 4 | Second Lien Secured Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 7 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

E.    *What will I receive from the Debtors if the Plan is Consummated?*

The following table provides a summary of the anticipated recovery to Holders of Allowed Claims and Interests under the Plan.  Any estimates of Claims in this Third Amended Disclosure Statement may vary from the final amounts Allowed by the Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

| Class | Claim/Interest | Estimated Allowed Amount ($ mm) | Anticipated Recovery |
|-------|----------------|---------------------------------|----------------------|
| 1 | Other Priority Claims | $0 | 0% |
| 2 | Other Secured Claims | $0 | N/A |
| 3 | DIP Facility Claims | $209.2[6] | 69% - 95%[7] |
| 4 | Second Lien Secured Claims | $71.7 - $127.2 | 0%[8] |

---

[6]    Such amount is calculated as of January 2, 2019.

[7]    The anticipated recovery for DIP Facility Claims is based upon the sharing mechanism set forth in the DIP Lenders and Committee Stipulation.

[8]    Recoveries for Second Lien Secured Claims may be higher in the event the Sale Transaction Proceeds provide sufficient consideration to pay Allowed DIP Facility Claims in full in cash.

11

| Class | Claim/Interest | Estimated Allowed Amount ($ mm) | Anticipated Recovery |
|---|---|---|---|
| 5 | General Unsecured Claims | $87.7 - $1,414.0[9] | 0% - 1%[10] |
| 6 | Intercompany Claims | $401.8 | N/A |
| 7 | Intercompany Interests | N/A | N/A |
| 8 | Section 510(b) Claims | N/A | N/A |
| 9 | Interests | N/A | N/A |

F.   *What will I receive from the Debtors if I hold an Allowed Administrative Claim or an Allowed Priority Tax Claim?*

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Administrative Claims and the Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  The Administrative Claims and Priority Tax Claims will be satisfied as set forth in Article II of the Plan.

G.   *If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Plan Effective Date," and "Consummation?"*

"Confirmation" of the Plan refers to approval of the Plan by the Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Plan Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  "Consummation" means the occurrence of the Plan Effective Date.

H.   *What are the sources of cash and other consideration required to fund the Plan?*

The Plan will be funded by the following sources of cash and consideration: the Sale Transaction Proceeds, the Estate Retained Professional Fees Escrow Amount, the Wind-Down Amount, the General Unsecured Claims Amount, the Debtors' rights under the Sale Transaction Documentation, payments made directly by the Successful Bidder on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Successful Bidder pursuant to sections 365 or 1123 of the Bankruptcy Code, and/or all Causes of Action not previously settled, released, or exculpated under the Plan, if any, shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided in the Plan.

I.   *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, the Plan contemplates releases and exculpation of the Debtors and other parties in interest as set forth in Article IX of the Plan.  However, the Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing.  The releases and exculpation set forth in the Plan are subject to the conclusion of that

---

[9]   The low range of the General Unsecured Claims estimate is representative of a Successful Bidder assuming the Debtors' CBAs and retiree obligations.

[10]   Recoveries for General Unsecured Claims may be higher in the event the Sale Transaction Proceeds provide sufficient consideration to pay Allowed DIP Facility Claims and Allowed Second Lien Secured Claims in full in cash.

investigation and determination with respect to any potential Estate Claims or Causes of Action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims pending completion of the investigation.  Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that will be released pursuant to the Plan will be discharged pursuant to the Plan, and all Entities that are subject to exculpation pursuant to the Plan, will be permanently enjoined, from and after the Plan Effective Date, from taking certain actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties.

J.      *What is the deadline to vote on the Plan?*

The Voting Deadline is **March 11, 2019, at 4:00 p.m., prevailing Central Time**.

K.      *How do I vote for or against the Plan?*

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, you must submit your ballot in accordance with the instructions provided in **Article VII.F.2** of this Second Amendment Disclosure Statement.  **BALLOTS SENT BY FACSIMILE TRANSMISSION ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

L.      *Why is the Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur?*

Section 1128 of the Bankruptcy Code requires the Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

The Court has scheduled the Confirmation Hearing for **March 20, 2019, at 10:00 a.m., prevailing Central Time**.  The Confirmation Hearing may be adjourned from time to time without further notice.

---

**The Court will consider both confirmation of the Plan and approval of the Sale pursuant to section 363 of the Bankruptcy Code at the March 20, 2019 hearing.  Approval of the Sale may proceed without confirmation of the Plan if the applicable standards for confirmation are not met.**

---

Objections to Confirmation of the Plan must be filed with the Court and served so as to be *actually received* by the appropriate notice parties by **March 11, 2019, at 4:00 p.m. (prevailing Central Time)**.  Failure to appear at the Confirmation Hearing to prosecute any written objection may result in such objection being overruled without further notice.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the *Birmingham News*, *Alabama Messenger*, *Kingsport Times-News*, *Charleston Gazette-Mail*, and *USA Today* (national edition).

M.      *What is the purpose of the Confirmation Hearing?*

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under the chapter 11 plan, any person acquiring property under the chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of the chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

What is the Effect of the Plan on the Debtors' Asset Retirement Obligations Under Environmental Laws?

Following the Plan Effective Date, asset retirement obligations (including reclamation and similar obligations) of the Debtors shall be assumed by the Buyer to the extent set forth in the Sale Transaction Documentation.  The Debtors cannot guarantee that any Buyer will seek to assume all of the Debtors' asset retirement obligations under Environmental Law.

*N.*     *What is the effect of the Plan on the Debtors' ongoing business?*

Upon consummation of the Plan and the Sale Transaction, it is anticipated that substantially all of the Debtors' assets will be transferred to the Successful Bidder, or subject to Wind-Down by the Plan Administrator in accordance with Wind-Down Budget.

*O.*     *Who do I contact if I have additional questions with respect to this Third Amended Disclosure Statement or the Plan?*

If you have any questions regarding this Third Amended Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent, Omni Management Group:

*By Hand Delivery or Overnight Mail at*:

Omni Management Group
Re: Mission Coal Company, LLC, et al.
5955 DeSoto Ave., Suite 100
Woodland Hills, CA 91367

*By electronic mail at*
missioncoal@omnimgt.com

*By telephone at*:
888-585-6494 (U.S.)
818-906-8300 (International)

Copies of the Plan, this Third Amended Disclosure Statement and any other publicly filed documents in the chapter 11 cases are available upon written request to the Debtors' Notice and Claims Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Notice and Claims Agent at www.omnimgt.com/missioncoal (free of charge) or the Court's website at https://ecf.alnb.uscourts.gov (for a fee).

*P.*     *Do the Debtors recommend voting in favor of the Plan?*

Yes. The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe the Plan, which contemplates a sale of substantially all of the Debtors' assets to the Successful Bidder, is in the best interest of all Holders of Claims, and that other alternatives fail to realize or recognize the value inherent under the Plan.

## ARTICLE III.
## BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES

*A.*     *Corporate History*

   1.   *Formation and Business*

Mission Coal Company, LLC ("Mission Coal") was formed on January 31, 2018 through a reorganization that combined and consolidated the operations of Seneca Coal Resources, LLC and its wholly-owned subsidiaries ("Seneca") and Seminole Coal Resources, LLC and its wholly-owned subsidiaries ("Seminole").

Headquartered in Kingsport, Tennessee, Mission Coal is engaged in the business of extracting, processing, and marketing metallurgical coal—and, to a lesser extent, thermal coal—from deep and surface mines.[11] Mission

---

[11]   Metallurgical or "met coal" refers to the various grades of coal with suitable carbonation properties to make coke in the steelmaking process. This is in contrast to thermal coal, which is used to produce electricity, steam, or both. For the year that ended December 31, 2017, met coal accounted for 96% of the Debtors' total coal sales revenue.

Coal's traditional end customers include steel and coke producers, industrial customers, and electric utilities, and is uniquely positioned within the coal industry because of its primary focus on met, rather than thermal, coal. Today, Mission Coal is a leading producer of met coal assets in the United States.

2. *Mining Operations*

The Debtors' operating assets are comprised of two deep mines and one surface mine in West Virginia and one deep mine located in Alabama. Through these distinct active mining operations, Mission Coal was able to access qualities of coal with volatility in the low-, mid-, and high-vol ranges, which allows the Debtors to develop relationships with a diverse customer base.

The Debtors control approximately 318 million tons of proven and probable coal reserves. During the year ended December 31, 2017, the Debtors produced approximately 3.4 million tons of coal. The Debtors' mines include:

- Oak Grove Mining Complex. The Oak Grove Mining Complex ("Oak Grove") is located in Bessemer, Alabama. Oak Grove commenced mining operations in 1975 and, until 2003, was owned and operated by US Steel. In 2007, Cliffs Natural Resources acquired Oak Grove and owned it until Seneca's acquisition of the property in December 2015. Oak Grove mines in the Blue Creek seam in Alabama, and the mine is unique in producing a high quality, mid-volume coal with low sulfur and low ash. When sold, this product takes no discount from the Australian benchmark. As of December 2018, there are an estimated 51 million clean recoverable tons at Oak Grove. The mine is approximately 1,000 feet deep and home to 360 unionized workers.

- Maple Eagle. The Debtors maintain active mining operations at the Seminole West Virginia Mining Complex ("Maple Eagle"). Maple Eagle was owned and operated by Walter Energy until 2016. Seminole Coal Resources acquired the asset package that became Maple Eagle in February 2016, and, although it is an older facility, it nonetheless produces a high quality product. Maple Eagle is located on the Eagle Seam, which contains high volume coal with excellent coking characteristics. There are currently 4,891,071 clean recoverable tons of reserves at Maple Eagle. Maple Eagle contains two super-sections with continuous miners that can mine simultaneously. On average, Maple Eagle produces 400,000—800,000 clean tons of coal annually. The Debtors anticipate that a third super-section will soon be operational and have plans to open additional surface mines with high wall miners, which will increase Maple Eagle's production capacity to 1.2 million clean tons.

- Pinnacle Mining Complex. The Pinnacle Mining Complex ("Pinnacle") is located in West Virginia. Pinnacle was originally opened in 1969 and was owned by US Steel until 2003, after which it was sold to Cliffs Natural Resources. Seneca acquired Pinnacle from Cliffs Natural Resources on December 22, 2015. The complex at Pinnacle contains an impoundment, a mine with thirteen miles of belt line, a predominately union work force, and comparatively difficult mining conditions. Pinnacle contains an estimated 39 million clean recoverable tons of reserves of which 9 million are inactive. The coal historically produced at Pinnacle is low vol coal and is considered to be of a lesser quality than the coal produced at its sister mines. On average, coal from Pinnacle will take a 12 to 15 percent discount to the Australian benchmark. The last day that Pinnacle produced coal was October 4, 2018 and the operations at the preparation plant were idled on December 8, 2018.

3. *Management*

The Debtors' current management team is composed of highly capable professionals with substantial industry experience. Information regarding Mission Coal Company, LLC's executive officers is as follows:

*Mike Zervos.* Mike Zervos currently serves as Chief Executive Officer and President of Mission Coal Company. He joined the Company in November 2016 after previously serving as Chief Executive Officer and President at United Coal Company (since April 2005). Prior to his time at United Coal Company, he formed Global Energy Management, LLC to pursue coal mining acquisition opportunities in Central Appalachia. He received his Bachelor of Science and M.B.A. from West Virginia University.

15

*Alan Jones.* Alan Jones is the Vice President of Accounting of Mission Coal Company. He joined Mission Coal Company in 2017 after previously serving as Senior Vice President of Technical Accounting at Contura Energy. Prior to working at Contura, he spent seven years at Alpha Natural Resources where he served as Chief Accounting Officer. Before transitioning to the coal industry, he spent sixteen years at Ernst and Young in Assurance & Advisory Business Services department. He received his Bachelor of Science in Accounting from Virginia Commonwealth University School of Business.

*Gary Broadbent.* Gary Broadbent is the General Counsel, Vice President of Human Resources, and Secretary of Mission Coal Company. He joined Mission Coal Company after previously serving at Murray Energy Corporation for eight years, occupying a number of roles including Senior Corporate Counsel and Director of Investor and Media Relations. He received his Bachelor's degree from Kent State University, and both his J.D. and M.B.A. from Case Western Reserve University.

4. *Customers*

The Debtors' customer base principally consists of domestic and international steel producers that purchase the Debtors' met coal and domestic electric utilities and industrial companies that purchase the Debtors' thermal coal. The Debtors market internationally to customers in the Atlantic Basin (particularly in Europe, the United Kingdom, and Brazil), and export sales made up approximately 55 percent of the Debtors' coal sale revenue in 2017. The Debtors have a very concentrated customer base, as their ten largest customers accounted for 77 percent of the Debtors' coal sale revenue in 2017.

Under a coal sale and agency agreement, the Debtors primarily market and sell their product through their affiliation with a third-party broker, Robindale Energy Services, Inc. ("Robindale"), rather than directly to their end customers. Pursuant to this arrangement, which began in 2017, Robindale takes title to and resells the Debtors' coal to end customers. At the time Robindale takes title, it remits 50% of the sale price to the Debtors. After arranging for sales with the end customer, the proceeds from these coal sales are remitted from the customer to Robindale before the remaining 50% is remitted to the Debtors, which typically happens within seven days of Robindale's collection of the funds. Further, the Debtors are party to a wash coal purchase agreement at the Pinnacle preparation plant, which provides additional liquidity.

5. *Competition*

The North American coal industry is intensely competitive. In addition to competition from other coal producers, the Debtors compete with producers of alternative fuels used for electrical power generation, such as nuclear energy, natural gas, hydropower, petroleum, solar, and wind. Costs and other factors such as safety, environmental, and regulatory considerations related to alternative fuels affect the overall demand for coal as a fuel. Political dynamics in the United States have additionally resulted in a volatile and unpredictable coal market.

Certain of the Debtors' mines produce coal for export customers and have contracts with railway and port entities for delivery. The Debtors' export customers may purchase coal from the Debtors or from other producers around the world with similar coal quality, access to ports, and more economical shipping to the customer, as some of the Debtors' competitors are located closer to the customers' facilities.

6. *Employees*

Between their operation facilities and home office, the Debtors currently employ approximately 779 individuals on a full- or part-time basis, although this number will be reduced by approximately 43 employees upon the idling of the Pinnacle mine. Of the 779 employees currently employed by the Debtors, 366 are non-union employees and 413 are union employees represented by the UMWA. The Debtors' employees include miners, engineers, truck drivers, mechanics, electricians, administrative support staff, managers, directors, and executives. The Debtors provide their employees with health and welfare benefit plans, including medical, prescription drug, dental, and vision plans. The Debtors also contribute to plans established for certain retirees who retired before October 1, 1994 under the Coal Industry Retiree Health Benefits Act of 1992, 26 U.S.C. § 9701 *et seq.* (the "Coal

16

Act"). Like other coal companies, the Debtors also incur costs and make award payments in accordance with the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 901-45 (the "Black Lung Act").

Separately, the Debtors are subject to other workers' compensation laws in the states in which they operate. The Debtors maintain high-deductible workers' compensation coverage through Rockwood Casualty Insurance Company. The Debtors incur significant premiums due to these obligations, and may be required to contribute additional premiums in the future depending on the number and amount of forthcoming claims. The Debtors intend to, and have received authority to, continue making all payments to their current employees and all payments with respect to government regulations, including workers' compensation programs, among others.

B.      The Debtors' Capital Structure

    1.   The Debtors' Capital Structure

As described in greater detail below, as of the Commencement Date, the Debtors have approximately $175 million in total funded debt obligations. The obligations consist of approximately $104 million of First Lien Credit Agreement (as described below) and $71 million of Second Lien Credit Agreement (as described below).

        (a)     DIP Credit Agreement

Reference is made to the Credit Agreement, dated as of January 31, 2018 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "First Lien Credit Agreement," and the loans and other obligations outstanding thereunder, the "First Lien Loans"), by and among Mission Coal, as borrower, the guarantors party thereto, Delaware Trust Company, as Administrative Agent (in such capacity, the "First Lien Agent"), and the other lenders parties thereto (the "First Lien Lenders").

The First Lien Credit Agreement includes a Prepayment Premium (as defined in the Final DIP Order) that permits Mission Coal to repay the First Lien Loans before the scheduled maturity date. Mission Coal may repay all or any portion of the First Lien Credit Agreement at any time prior to the maturity date at a price equal to 100% of the principal amount, plus the Prepayment Premium. The Prepayment Premium is calculated as set forth in the First Lien Credit Agreement and as of the Commencement Date was $42,177,072.

**Despite having previously reserved its rights to challenge the amount of the Prepayment Premium, the Committee's ability to challenge is now subject to the DIP Lenders and Committee Stipulation.**

Pursuant to that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement (the "DIP Credit Agreement") by and among Mission Coal, the guarantors party thereto, and the DIP Lenders, the DIP Lenders provided the Debtors with a DIP Facility in the aggregate amount of no less than $209,229,024, as of January 2, 2019, which includes, (i) the aggregate principal amount of up to $54.5 million in respect of new money term loan commitments and (ii) a roll-up of the entire amount outstanding under the First Lien Credit Agreement, including the Prepayment Premium (collectively, the "Prepetition First Lien Obligations"), plus all accrued interest thereon. $50 million of the Prepetition First Lien Obligations were rolled-up upon entry of the Interim DIP Order[12] and the remainder was rolled-up upon entry of the Final DIP Order. Pursuant to the Plan, the DIP Lenders will have a deficiency claim for the unsecured portion of any DIP Facility Claim to the extent that the value of the collateral securing such First Lien Claim is less than the amount of the interest of such DIP Facility Claim in such collateral (the "DIP Facility Deficiency Claims"). In the aggregate, the DIP Facility Deficiency Claims shall be calculated as the allowed amount of the DIP Facility Claims minus the allowed amount of the DIP Facility Secured Claims. DIP Facility Deficiency Claims, if any, shall be General Unsecured Claims.

---

[12]    "Interim DIP Order" means the *Interim Order (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(A), 361, 362, 363, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1), and 364(E), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and 4001(C)* [Docket No. 64].

17

Pursuant to the DIP Lenders and Committee Stipulation and as reflected in the Plan, to the extent that the DIP Lenders have a DIP Facility Deficiency Claim, the Allowed amount of the DIP Facility Deficiency Claims, in the aggregate, will be calculated in accordance with the DIP Lenders and Committee Stipulation. DIP Facility Deficiency Claims, if any, shall be General Unsecured Claims.

(b)     Second Lien Credit Agreement

As of the Commencement Date, the Debtors have approximately $71,691,874 outstanding under the Amended and Restated Secured Loan Agreement, dated as of January 31, 2018 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "Second Lien Credit Agreement"), and the loans and other obligations outstanding thereunder, the "Second Lien Loans") by and among Mission Coal, Seminole Coal Resources, LLC, Seneca Coal Resources, LLC, collectively as the borrowers, the guarantors party thereto, and Mission Coal Funding, LLC (collectively, the "Second Lien Lender"). Pursuant to the Plan, the Second Lien Lenders will have a deficiency claim for the unsecured portion of any Second Lien Claim to the extent that the value of the collateral securing such Second Lien Claim is less than the amount of the interest of such Second Lien Loans in such collateral (the "Second Lien Deficiency Claims"). In the aggregate, the Second Lien Deficiency Claims shall be calculated as the allowed amount of the Second Lien Claims minus the allowed amount of the Second Lien Secured Claims. Second Lien Deficiency Claims, if any, shall be General Unsecured Claims.

The Second Lien Loans bear interest at a rate of 20 percent per annum, which is currently PIK interest. The Second Lien Loans are secured by liens that are junior in priority to the liens securing the First Lien Loans on substantially all of the Debtors' assets. The Second Lien Loans contain a Second Lien Credit Agreement Prepayment Premium in the event of a voluntary or mandatory repayment, redemption, prepayment, an acceleration of the Loan in an amount equal to the present value of the sum of all required payments of interest (including, for the avoidance of doubt, PIK interest) on the Loan being repaid, prepaid, redeemed, that have become or are declared accelerated.

> **The holders of the Second Lien Secured Claims assert a claim as of the Commencement Date in the amount of $127,201,133.37.**

2.     *Other Non-Financial Obligations*

Like other coal companies, the Debtors have contractual and statutory obligations relating to their current and retired employees, as well as asset retirement and reclamation obligations.

(a)     Employee Benefit Obligations

The Debtors have ongoing pension and OPEB obligations. The pension obligations include collectively bargained contributions owed to a multi-employer pension plan maintained pursuant to the CBAs. As of the Commencement Date, the Debtors estimate the present value of their retiree medical obligations to be approximately $61.1 million. Benefits, eligibility, and cost-sharing provisions vary by plan documents and CBAs.

Certain of Seneca's subsidiaries, Debtors Oak Grove Resources, LLC ("Oak Grove") and Pinnacle Mining Company, LLC ("Pinnacle Mining") are required to make contributions to the United Mine Workers of America 1974 Pension Plan (the "1974 Pension Plan") at contractually determined rates. If Oak Grove and Pinnacle Mining were to withdraw from the 1974 Pension Plan, they would incur statutory "withdrawal liability" obligations, for which each of the Debtors would be jointly and severally liable under applicable law. If the Debtors were authorized by the Bankruptcy Court to fully withdraw from the 1974 Pension Plan, the Debtors would owe the 1974 Pension Plan withdrawal liability in excess of $1.19 billion, which the Debtors believe would be a general unsecured claim under the plan.[13]

---

[13]     The amount of estimated withdrawal liability for the 1974 Pension Plan set forth herein reflects the amount in the proofs of claim filed by the 1974 Pension Plan, and is current as of July 2018 (for a withdrawal that occurs during the plan year beginning July 1, 2018 and ending June 30, 2019). In addition to the withdrawal liability obligations described above, the UMWA Plans

18

Additionally, Oak Grove and Pinnacle Mining are obligated to make contributions to the 1993 Benefit Plan and Trust (the "1993 Benefit Plan" and together with the 1974 Pension Plan, the "UMWA Plans"), which provides medical and other benefits to certain retired members of the UMWA and, in some instances, their spouses and dependents.

(b) Workers' Compensation and Black Lung Act Obligations

As required by federal and state law, the Debtors provide benefits to employees for awards related to workers' compensation and pneumoconiosis (more commonly known as black lung disease). Pursuant to the Black Lung Act, coal miners who suffer from pneumoconiosis and their dependents may file disability claims with the U.S. Department of Labor (the "DOL"), which then investigates the claims and assigns liability to make benefit award payments for those claims to a "responsible operator" (likely the miner's most recent employer or a successor of the employer) (the "Black Lung Act Claims").

Black Lung Act Claims include claims for the payment of (a) disability benefit awards to workers who suffer from black lung disease and (b) excise taxes to fund the Black Lung Disability Trust Fund (the "Black Lung Fund"). If a responsible coal operator fails to pay a benefit award, the Black Lung Fund will pay the award and the DOL can (i) assert liens (with the same priority as tax claims) against the assets of the responsible operator and (ii) exercise subrogation rights of the underlying claimant. In addition, the Black Lung Act requires a coal operator either to secure its payment obligations by posting collateral or to obtain insurance for its payment obligations. A coal operator's directors and officers may also be held personally liable for unpaid benefits.

The Debtors are insured for federal and state workers' compensation and black lung benefits for employees by a third-party insurance provider. In addition, the Debtors assumed obligations with respect to certain self-insured periods of subsidiaries of Seneca as part of its acquisition.

(c) Asset Retirement Obligations

Like other coal companies, the Debtors have asset retirement obligations that are related to mine reclamation and closure costs. Reclamation obligations primarily represent the fair value of future anticipated costs to restore surface land to levels equal to or greater than pre-mining conditions, as required by the federal Surface Mining Control and Reclamation Act as well as certain state laws.

The Debtors' asset retirement obligations primarily consist of spending estimates for surface land reclamation and support facilities at both their surface and underground mines in accordance with applicable reclamation laws in the United States, as defined by each mining permit. Asset retirement obligations are determined for each mine using various estimates and assumptions, including, among other items, estimates of disturbed acreage as determined from engineering data, estimates of future costs to reclaim the disturbed acreage and the timing of these cash flows, discounted using a credit-adjusted, risk-free rate. The Debtors' asset retirement obligations as of December 31, 2018 were approximately $19.9 million, including amounts classified as a current liability, of which $36,495,000 in outstanding surety (the "Surety Bonds") are secured by $6,476,936 in aggregate collateral (the "Escrowed Funds").[14]

The Surety Bonds were issued by Indemnity National Insurance Company (the "Surety"), pursuant to that Agreement for Coal Reclamation Bonds and Performance Bonds (the "Bond Agreement"), and were issued in favor

---

assert that Oak Grove and Pinnacle Mining owe the 1974 Pension Plan in excess of $9.6 million in the aggregate, and the 1993 Benefit Plan in excess of $1.1 million in the aggregate, in each case arising from pre-petition payment delinquencies (including catch-up payments pursuant to a prior settlement between Oak Grove, Pinnacle Mining and the UMWA Plans and certain of their affiliates). The 1993 Benefit Plan has also asserted contingent claims against Oak Grove and Pinnacle Mining for amounts that would become due if the Debtors were to cease providing retirement coverage to certain retirees under their individual employer plan and the 1993 Benefit Plan were to then enroll and begin providing coverage to these individuals.

[14] The facts and figures provided herein are reflective of the Debtors' books and records and such facts and figures may not be reflective of current obligations as of the date hereof.

19

of the West Virginia Department of Environmental Protection (the "WVDEP") and the Alabama Surface Mining Commission ("ASMC" and collectively with WVDEP, the "Regulatory Authorities").

The Surety has asserted that the Disclosure Statement does not address the likelihood that a Buyer will not acquire all of the Debtors' mining permits. According to the Surety, if the Debtors retain any mining permits after the Sale Process, the Debtors will be unable to confirm a plan unless that plan fully funds the asset retirement obligations associated with those mining permits. The Surety further asserts that, absent the consent of the Surety and the Regulatory Authorities or the release and/or replacement of the Surety Bonds, the Debtors cannot utilize the Escrowed Funds to satisfy their asset retirement obligations.

The Surety further asserts that the Plan cannot be confirmed to the extent that Article VI.G.2. of the Plan requires the Regulatory Authorities to pursue remedies under the Surety Bonds prior to receiving a distribution under the Plan. According to the Surety, the sole mechanism by which the Regulatory Authorities can collect upon the Surety Bonds is to pursue the forfeiture of the Surety Bonds under applicable state law. The forfeiture of the Surety Bonds, however, would preclude the Debtors from transferring its mining permits to the Buyer and would subject the Debtors and their officers, directors, and other owners and controllers, to fines and penalties of both a civil and criminal nature.

The Surety further asserts that the Plan cannot be confirmed unless it provides, in pertinent part, that, notwithstanding any other provision of the Plan, the rights of the Surety with respect to the Surety Bonds, the Bond Agreement (including any related agreements), and the common law, including, but not limited to, the Surety's exclusive right to control and access the Escrowed Funds, shall not be released discharged, impaired, precluded or enjoined, unless and until all of the Surety Bonds are replaced or released by the Regulatory Authorities and all liabilities of the Debtors under the Bond Agreement are extinguished.

## ARTICLE IV.
## EVENTS LEADING UP TO THE CHAPTER 11 CASES

A.    *Adverse Market Conditions*

The Debtors are subject to the same fluctuating market conditions as other companies operating in the coal industry. Although the met coal market is not currently in decline, over the past five-year period, the coal industry has been in turmoil. Coal mining businesses across the United States and around the world experienced pressure from the downward spiral in commodity prices, and the fate of many of these companies is yet to be determined. Even in the currently favorable met coal market, there still exist several requirements to maintain a coal mining business, including an inventory of economic sites to mine, a consistent mining program to offset the natural declines in production that occur almost immediately, a relatively consistent outlook for commodity prices, and compliance with restrictive federal and state regulations on coal producers.

Federal and state regulatory authorities impose significant obligations on the coal mining industry with respect to employee health and safety, permitting and licensing requirements, environmental protection, the reclamation and restoration of mining properties after mining has been completed, and the effect of mining on surface and groundwater quality. The costs of compliance, particularly the decades of liabilities the Debtors assumed in their purchase of Seneca, have further contributed to the Debtors' financial difficulties. Other regulations, such as those governing reclamation and mine safety, most notably those administered by the Mine Safety Health Administration, have imposed even more direct costs on the Debtors.

As noted above, the Debtors are not alone in their difficult position. Other similarly situated companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings. But unlike many of their peers in the coal industry, the Debtors simply have not had enough time to establish solid relationships or a firm reputation, and the adverse market conditions have hit this newcomer to the field particularly harshly.

Practically speaking, the fact that so many coal companies have gone through the bankruptcy process prior to the Debtors has diminished their bargaining power with their vendors. Many vendors who are major industry

players have been stakeholders in other bankruptcies over the past several years, and acting out of self-protection, have imposed stringent terms on the Debtors. The Debtors have generally lost most credit terms from key vendors. This results in a constrained market and a near holding pattern for Mission Coal, who is frequently subject to disadvantageous business terms and unable to substitute its vendors' services with less expensive alternative providers.

### B.      Acquisition and Expansion Efforts

The series of acquisitions that led to the Debtors' founding took place within a relatively short timeframe, and greatly increased the Debtors' obligations. The legacy liabilities under the Existing CBAs (as defined herein), including Debtors' obligations to contribute to both the 1974 Pension Plan and the 1993 Benefit Plan and Trust with respect to employee pensions and retiree medical and other benefits, respectively, contributed to the Debtors' financial state in a significant way. Further, developing a fully-formed back office brought with it numerous upfront and recurring costs. However, the Company's operating performance has left the Debtors significantly overleveraged.

### C.      Coal Industry Liabilities

Under the Black Lung Benefits Revenue Act of 1977 and the Black Lung Benefits Reform Act of 1977, as amended in 1981, each coal mine operator must pay federal black lung benefits to eligible current and former employee claimants and also make payments to a trust fund for the payment of benefits and medical expenses to eligible claimants who last worked in the coal industry prior to January 1, 1973. Mission Coal recorded $1,700,000 of expenses related to this excise tax in 2017. With the implementation of the Patient Protection and Affordable Care Act in 2010 and the amendment of federal black lung regulations, the number of claimants who are awarded federal black lung benefits has increased and will likely continue to increase, as will the amounts of those awards. Mission Coal's payment obligations for federal black lung benefits are secured by insurance coverage by a high deductible insurance program.

When coupled with the external pricing pressure, increased regulation, and other costs associated with the Debtors' business, these liabilities have hindered the Debtors' ability to operate competitively in the current market environment.

### D.      The Debtors' Proactive Approach to Addressing Liquidity Constraints

In early 2018, in order to provide additional capital for their business, the Debtors pursued a financing that sought to modify their debt load, including their Second Lien Loans, and refinance certain other existing debt. Even in light of the renegotiations and alleviations this financing provided, for the above-discussed reasons, the Debtors nonetheless quickly found themselves in need of additional capital.

In the face of looming financial difficulties, the Debtors took proactive steps to lessen the burden of their liabilities, including, among other things, reduction in workforce in the months preceding the Commencement Date and temporarily halting mining operations at the Pinnacle mine. Further, the Debtors were underperforming due to inadequate funding, availability of capital, and the above-discussed inventory transportation issues. As a result, despite the Debtors' efforts to reduce operating and capital expenditures, the Debtors' interest burden and balance sheet, particularly in light of the necessary repairs, remained unsustainable.

Mission Coal completed a sale-leaseback transaction with Bay Point in May 2018, which involved Bay Point buying six longwall shields and leasing them back to the Debtors. This transaction should have ultimately injected $16 million into Mission Coal. However, $4 million of the proceeds were never received, as certain contingencies were not met to release this final amount of fee proceeds.

In the weeks prior to the Commencement Date, the Debtors successfully negotiated a covenant waiver with the First Lien Lenders, pursuant to which the First Lien Lenders agreed to forbear from exercising remedies with respect to various events of default under the First Lien Credit Agreement through September 15, 2018 to allow the Debtors the flexibility to explore restructuring options. On September 14, 2018, the Company and the First Lien Lenders entered into a further amended forbearance agreement through September 30, 2018. The most promising alternative to an in-court chapter 11 process was a long-term forbearance proposal that would have (i) extended a

forbearance through March 31, 2019 and (ii) invested from various third parties $34 million into Mission Coal to strengthen liquidity, catch up on any outstanding payments, and allow the Debtors to commit to more planned expansion of their operational assets. After several productive rounds of negotiation and discussion, however, this additional funding could not be secured, and the Debtors' dire liquidity situation became too much for the lenders and Mission Coal to bear, making the long-term forbearance no longer viable.

Prior to the Commencement Date, the Debtors appointed two independent board members— Tony Horton and David Heiman —to the board of directors of Mission Coal. Each of Mr. Horton and Mr. Heiman have significant restructuring experience, particularly in the energy sector. Mr. Horton previously served as the Executive Vice President, Chief Financial Officer, and Chief Risk Officer at Energy Future Holdings ("EFH"), where he was the senior executive involved in EFH's restructuring efforts. Mr. Horton is also a current independent director at EXCO Resources, where he leads the Strategic and Restructuring Committee and is Chair of the Audit Committee. Mr. Heiman previously served as a partner in Jones Day's Business Restructuring practice group and is a past chair of the American College of Bankruptcy.

Since their appointment, Mr. Horton and Mr. Heiman have played a key role in advising the Debtors' board of directors on operational and financial matters. In addition, and in connection with the Debtors' restructuring initiatives, Mr. Horton and Mr. Heiman have been tasked with, among other things, leading a postpetition independent investigation into certain potentially valuable causes of action.

## ARTICLE V.
## ADMINISTRATION OF THE CHAPTER 11 CASES

A.      *First Day Pleadings and Other Case Matters*

On the Commencement Date, or shortly thereafter, in addition to the voluntary petitions for relief filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also filed a number of first day motions and applications (collectively, the "First Day Pleadings") with the Court. On October 16 and November 19, 2018, the Court entered orders granting interim and final relief, respectively, to, among other things: (a) prevent interruptions to the Debtors' businesses; (b) ease the strain on the Debtors' relationships with certain essential constituents; (c) allow the Debtors to retain certain advisors necessary to assist the Debtors with the administration of the chapter 11 cases; and (d) allow the Debtors to have access to postpetition financing and cash collateral (each, a "First Day Order").

1.      *Administrative Motions*

To facilitate a smooth and efficient administration of the chapter 11 cases, the Debtors filed First Day Pleadings seeking orders authorizing the joint administration of the Debtors' chapter 11 cases, and establishing certain notice, case management and administrative procedures.

2.      *Operational Relief*

The Debtors filed certain motions and applications requesting various types of "first day" and "second day" relief. The relief granted enabled the Debtors to preserve value and efficiently administer the chapter 11 cases, including, among other things, orders authorizing the Debtors to:

- continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms, and continue to perform intercompany transactions;

- pay certain prepetition taxes and fees;

- pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, honor the terms of their premium financing agreement and pay premiums thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business;

22

- pay employees' wage claims and related obligations in the ordinary course of business and continue certain employee benefit programs;

- make payment on account of prepetition claims of certain shippers, lienholders, 503(b)(9) claimants, and critical vendors;

- establish procedures for utilities to request adequate assurance, pursuant to which the utilities were prohibited from discontinuing service except in certain circumstances; and

- continue making payments to their surety bond provider in accordance with their prepetition bonding arrangements.

3. *Debtor-In-Possession Financing*

In connection with filing for chapter 11, the Debtors, with the assistance of Jefferies LLC ("Jefferies"), initiated two parallel processes for identifying sources of capital on the best available terms: (a) negotiations with the Debtors' existing funded debt stakeholders and (b) a marketing process with potential alternative sources of capital from parties outside the Debtors' existing capital structure. Specifically, in order to evaluate alternatives to the ultimately Court-approved DIP Financing, Jefferies solicited interest from twenty parties that routinely provide DIP facilities, of which nine entered into non-disclosure agreements and were provided an opportunity to perform due diligence.

All of the lenders contacted by Jefferies expressed concern about providing, and were ultimately unwilling to provide, debtor-in-possession financing because, among other things, the Debtors' recent financial performance had deteriorated, and the Prepetition Secured Parties hold liens on substantially all of the Debtors' assets, leaving no unencumbered collateral available to be pledged to a third party lender. Additionally, these potential lenders informed Jefferies that in these circumstances they were not willing to pursue a nonconsensual priming DIP against the Prepetition Secured Parties.

Absent postpetition financing, the Debtors would be unable to continue to operate. Accordingly, the Debtors endeavored to negotiate acceptable debtor-in-possession financing terms with their First Lien Lenders. The Court approved DIP Financing that provides $54,500,000 in new money funding, subject to certain terms and conditions including a "roll-up" of the First Lien Lenders' prepetition claims and required milestones related to the progression labor negotiations and the resolution of the Debtors' existing labor agreements and retiree benefits, a marketing process, and the confirmation of the chapter 11 plan described herein.

4. *Oak Grove Coal Mining Lease*

Prior to the Commencement Date, WPP LLC, by NRP (Operating) LLC, its sole member ("NRP") and certain of the Debtors were a party to a series of agreements relating to the mining of coal at Oak Grove (collectively, the "Oak Grove Coal Mining Lease"). As set forth in the DIP Objection, NRP asserted that the Oak Grove Coal Mining Lease terminated prior to the Commencement Date.[15] As set forth in the Assumption Motion, the Debtors asserted that the Oak Grove Coal Mining Lease had not terminated prepetition and sought to, among other things, assume the Oak Grove Coal Mining Lease.[16] After good-faith and arm's length negotiations between the Debtors, NRP, and the DIP Lenders, the parties entered into an *Agreed Order and Settlement Agreement Related to Motion to Assume Oak Grove*

---

[15] The "DIP Objection" means the *Objection to the Interim Order and Motion for Entry of a Final Order (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(E), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c)* [Docket No. 172].

[16] The "Assumption Motion" means *Debtors' Motion for Entry of an Order Authorizing and Approving the Debtors' Assumption of the Oak Grove Coal Mining Lease* [Docket No. 228].

23

*Coal Mining Lease* [Docket No. 299] (the <u>Agreed Order and Settlement Agreement</u>") pursuant to which the Oak Grove Coal Mining Lease was reinstated and assumed by the Debtors, and the parties agreed to enter into an amended and restated coal mining lease (the "<u>2018 Lease</u>"). The Agreed Order and Settlement Agreement also provided the Debtors with the option to explore assignment of the Pinnacle lease. The 2018 Lease was executed by the parties thereto on December 10, 2018, with an effective date of November 20, 2018. Although the UMWA did not file a formal objection to the Assumption Motion, counsel for the UMWA presented questions to the Court regarding a narrow issue related to a carve-out related therein. After a colloquy in open court, the Debtors offered their Chief Restructuring Officer as a witness to clarify any questions outstanding, the UMWA's counsel chose not to cross examine him. The objection was overruled. The UMWA believes that the transfer in the Agreed Order and Settlement Agreement was in direct violation of the UMWA's rights under the CBA and reserves its rights with regard to the transfer of assets that arose pursuant to the Agreed Order and Settlement Agreement.

5. *Automatic Stay*

The filing of the Debtors' bankruptcy petitions on the Commencement Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions against the Debtors' and their Estates, the enforcement of Liens, Claims, encumbrances, and interests against property of the Debtors, and both the commencement and the continuation of prepetition litigation against the Debtors. With certain limited exceptions and/or modifications as permitted by order of the Court, the automatic stay remains in effect until the Plan Effective Date.

6. *Prepetition Litigation*

The Debtors are or were subject to a limited number of legal proceedings in both state and federal court that commenced prepetition. Some of the more significant proceedings are summarized below.

(a) *Cliffs Natural Resources Inc., v. Seneca Coal Resources, LLC, et al.*, 17-567-GAM (D.C. DE).

The Debtors were involved in vigorously contested litigation with Cliffs Natural Resources stemming from allegations of fraudulent transfer and breaches of responsibilities flowing from the Seneca asset purchase (the "<u>Cliffs Litigation</u>"). Although the Debtors prevailed in their motion to dismiss from federal court, the case was refiled in state court in Delaware. The monetary amount and liabilities remain in dispute.

(b) *Bluestone Coal Corporation, and Double-Bonus Mining Company v. Pinnacle Mining Company, LLC, and Target Drilling, Inc.*, 2:16-cv-06098 (D.C. W. Va.)

Bluestone Coal Corporation and Double-Bonus Mining Corporation filed an action against Seneca related to the 2015 flooding and closing of its Double Bonus Mine in West Virginia (the "Bluestone Litigation"). A mediation among the parties took place in June 2018 in Charleston with full insurance provider participation. A trial was scheduled for November 13, 2018, but has been moved by agreement of the parties.

The Bluestone litigation was settled by all the parties, following a mediation before a judge and all the insurance carriers. Bluestone and Double-Bonus filed a motion to lift the automatic stay to enforce a portion of the settlement [Docket No. 401]. The Debtors filed an objection to the lift-stay motion [Docket No. 634].

(c) *The Alabama Dust Actions.*

In 2004, an action was commenced against Oak Grove prior to Mission Coal's founding.[17] This case, originally filed against Cliffs Natural Resources as defendant, involved 650 plaintiffs' health, nearby homes, and

---

[17] *Joann Waid et al v. United States Steel Mining Co. et al.*, 68-CV-2004-001234-00, Circuit Court of Jefferson County, Alabama; *Jane Alexander v. Cliffs North American Coal LLC et al.*, 68-CV-2010-000054.00, Circuit Court of Jefferson County, Alabama; *Violet Brown et al v. Cliffs North American Coal, LLC, et al.*, 68-CV-2011-900376.00.

24

property (collectively, the "Waid Claimants"). Mission Coal inherited this legacy liability in the Seneca acquisition. Seneca agreed to settle the case in 2017 for a system of structured payments, which were scheduled to be paid in 2018 and 2019. As part of the settlement, the Debtors were granted permanent, perpetual, non-exclusive easements by various property owners, which permit the Debtors to release particulates and coal dust into the air and upon certain properties surrounding, or about the coal preparation plant, and surrounding, or about the refuse pile adjacent to the coal preparation plant ("Easements"), which coal preparation plant is known as the Concord Coal Preparation Plant, and is located at 1500 Concord Mine Road, Hueytown, Jefferson County, Alabama ("The Prep Plant").

The Debtors maintain that the Easements are a property right that have been granted to the Debtors and cannot be terminated in the event the settlement agreement is determined to be an executory contract and rejected pursuant to section 365 of the Bankruptcy Code, or otherwise determined to be a prepetition claim that is subject to treatment under the Plan. Therefore, the Debtors believe that they will retain the benefit of the Easements granted, which are interests in real property.

The Waid Claimants believe that the Easements are conditional easements that are executory contracts and that the Easements will become a continuing and perpetual easement running with the land, when the Debtors, or the Debtors' assigns assume or assign the executory contract and pay the balance of the Waid Settlement Fund, which is more particularly described in the settlement agreement. The Waid Claimants believe that the settlement is approved by the Circuit Court of Jefferson County, Alabama, a Court of competent jurisdiction; that the Court's Order provides the claimants with the unilateral right to terminate the easement after notice and an opportunity to cure and that the easement automatically terminates, if the default is not cured, and that this settlement agreement is recorded in the Probate Records and does not allege any grounds for avoidance of the claim or lien. The Waid Claimants also believe that the Easement is subject to revocation in the Circuit Court's order and that until the easement is fully paid for, it is subject to revocation, it is an inchoate property interest and is not fully complete. The Waid Claimants believe that the balance of the amount necessary to finalize the settlement agreement and make the Easements perpetual and non-conditional is approximately $1,320,059.03. The Waid Claimants further believe that the Easements will be automatically terminated and become null and void, upon any default in failing to make any payments, thereby giving the Waid Claimants the right to file documentation in the Probate Court of Jefferson County, Alabama, Bessemer Division, terminating the Easements. The Waid Claimants assert that failure to assume the executory contract and pay the balance due, thereby resulting in the termination of the Easements will render it impossible to use the Prep Plant and to mine, clean and prepare coal on the subject property. The Waid Claimants also believe that the right to terminate the easement is in the nature of a lien under 11 U.S.C. Sec. 101 (37) and that lien cannot be avoided by the assignment or rejection of the settlement agreement, and that any sale would be subject to the lien and the Waid Claimants' right to revoke the easement. The Waid Claimants also disagree with the characterization of the claims as a "legacy liability" as they believe that the claim arises from the sale of an asset - the easements - and the right to terminate the easement can be exercised so long as the obligation to pay for the easement is not met. The Waid Claimants believe that the settlement agreement is an executory contract and is also a secured claim to the extent of the lien on the easement and that it is of continuing value to the dominant estate. The Waid Claimants believe that the Debtors have not provided sufficient information regarding how the Settlement Agreement can be rejected without the easement being rejected and terminated. The Waid Claimants also believe that the settlement agreement shows that the claims are not based upon personal injuries and thus the claims giving rise to the easements do not involve the Claimants' "health".

The Waid Claimants reserve all of their rights to make such arguments at confirmation or otherwise and the Debtors reserve all rights with respect to the Waid Claimants' arguments.

Another action involving 107 plaintiffs was brought in 2017 involving coal dust emissions.[18] Discovery in this matter is ongoing and both litigation costs and possible outcomes are yet to be determined at this time.

_____

[18] *Linda Weekly, et al. v. Seneca North American Coal, LLC*, 68-cv-2017-900131 (Circuit Court of Jefferson County, Alabama).

B.    *Employment and Compensation of Advisors*

   To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the chapter 11 cases, the Debtors sought and the Court authorized the retention and employment of the following advisors:  (a) on October 16, 2018, Omni Management Group as Notice and Claims Agent to the Debtors [Docket No. 66]; (b) on November  28, 2018,  Kirkland & Ellis LLP as counsel to the Debtors [Docket No. 349]; (c) on November 28, 2018, Christian & Small LLP as co-counsel to the Debtors [Docket No. 348]; (d) on November 30, 2018, Jefferies as investment banker and financial advisor to the Debtors [Docket No. 364]; and (e) on November 30, 2018, Zolfo Cooper, LLC as restructuring advisor to the Debtors [Docket No. 363].  On December 10, 2018, Zolfo Cooper, LLC filed a supplementary declaration regarding their purchase by AlixPartners, LLC [Docket No. 413].  Further, on December 19, 2018, the Court approved the Debtors' motion seeking approval of procedures for the interim compensation and reimbursement of expenses of retained Professionals in the chapter 11 cases [Docket No. 480].  Finally, on November 28, 2018, Ernst & Young LLP as valuation and tax advisory services provider for the Debtors [Docket No. 356], and on January 23, 2019, the Court authorized the appointment of an independent Fee Examiner [Docket No. 576].

C.    *Appointment of Official Committee*

   On October 25, 2018, the Bankruptcy Administrator for the Northern District of Alabama filed the *Appointment of Unsecured Creditors Committee* [Docket No. 147], notifying parties in interest that the Bankruptcy Administrator had appointed a statutory committee of unsecured creditors (the "Committee") in the chapter 11 cases. The Committee is currently composed of the following members:  United Central Industrial Supply Company, LLC, Pense Bros. Drilling Co., Inc., Coal Specialty Funding, LLC, the UMWA 1974 Pension Plan, the UMWA, Cleveland-Cliffs Inc. f.k.a. Cliffs Natural Resources, Inc., Tracy Burton (Plaintiff in Linda Weekly, et al vs. Seneca North American Coal, LLC, White Armature Works, Inc., and Webster, et al vs. Oak Grove et al.  The Committee has retained Lowenstein Sandler LLP and Baker, Donelson, Bearman, Caldwell & Berkowitz, PC as its legal counsel and Berkeley Research Group, LLC ("BRG") as its financial advisor.

   Since the formation of the Committee, the Debtors have consulted with the Committee concerning the administration of the chapter 11 cases, and the Committee has been an active participant in the chapter 11 cases. The Debtors have kept the Committee informed of, and have conferred with the Committee on, matters relating to the Debtors' business operations and have sought the concurrence of the Committee to the extent that its constituency would be affected by proposed actions or transactions outside of the ordinary course of the Debtors' businesses. The Committee has participated actively with the Debtors' management and professional advisors in reviewing the Debtors' business plans and operations.

D.    *Ongoing Internal Independent Director and Committee Led Investigations*

   In September 2018, the Debtors' board of directors appointed two independent members, Tony Horton and David Heiman.  Mr. Horton and Mr. Heiman both have extensive business and restructuring experience, particularly in the energy sector, as well as strong backgrounds as independent directors.  Mr. Horton previously served as the Executive Vice President, Chief Financial Officer, and Chief Risk Officer at Energy Future Holdings, where he was the senior executive involved in the company's restructuring efforts.  Mr. Horton is also a current independent director at EXCO Resources, where he leads the Strategic and Restructuring Committee and is Chair of the Audit Committee. Mr. Heiman founded the business restructuring practice group at Jones Day and served as a partner for over 35 years and is the former President of the American College of Bankruptcy.

   Since their appointment, Mr. Horton and Mr. Heiman have actively participated as members of the board with management and the advisors on the restructuring of Mission Coal.  This includes, among other things, conducting and overseeing a postpetition independent investigation into any potential claims and causes of action belonging to the Debtors' estates (the "Independent Investigation").  The Independent Investigation has been ongoing since late October 2018, with the assistance of Kirkland as counsel and AlixPartners as financial advisors.  In addition, a forensic accountant at AlixPartners has been providing ongoing assistance to Mr. Horton and Mr. Heiman throughout the Independent Investigation.  The Independent Investigation is an iterative and the Debtors reserve all rights, in the reasonable exercise of their business judgment, to pursue, prosecute, settle, release, abandon, or otherwise resolve any potential claims or causes of action that are identified in connection with the Independent Investigation.  For the

26

avoidance of doubt, the Debtors' release of the Released Parties is subject to the conclusion of the Independent Investigation and all rights are reserved.

The investigation has included a legal analysis and factual investigation of certain transactions to determine whether they give rise to potential claims. Specifically, Mr. Heiman and Mr. Horton are investigating payments made to sponsors, affiliated entities, third parties, and other related entities, and loans made to insiders and affiliated parties, for viable causes of action including but not limited to intentional fraudulent transfer, constructive fraudulent transfer, breach of fiduciary duty, equitable subordination, recharacterization, and/or preference. The efforts by the independent directors and the Debtors' existing financial advisors to date have included, among other activities, the review and evaluation of hundreds of thousands of pages of Debtors' documents pertinent to the Independent Investigation, the analysis of the sources and uses of certain of Debtors' loans, and the identification and quantification of the amount and business purpose of various transactions. In addition, in furtherance of the Independent Investigation, on November 30, 2018, Mr. Horton and Mr. Heiman served discovery requests on Thomas Clarke, Ana Clarke, Kenneth McCoy, Jason McCoy, Charles Ebetino, and Mission Coal Funding, LLC. On December 17, 2018, the independent directors served discovery requests on Bay Point Capital Partners, LP. The counsel and advisors to Mr. Horton and Mr. Heiman have reviewed, and are continuing to analyze, the documents produced to date by these parties in response to those discovery requests.

Also as part of the Independent Investigation, the independent directors are scheduling interviews with potential witnesses from the Debtors and affiliated entities, as well as equity holders of the Debtors, and have engaged in several calls with Debtors' management involving follow-up questions or additional background. They also have had, and continue to have, discussions with the Debtors' existing financial advisors, regarding the Debtors' business and history, historical transactions, and considerations related to potential claims.

Throughout the course of the investigation, Kirkland has taken direction from Mr. Horton and Mr. Heiman. Kirkland has regularly consulted with and reported to Mr. Horton and Mr. Heiman on the status of the investigation and the facts surrounding the potential claims. At the direction of independent directors, Kirkland has cooperated with the Committee and other creditor groups regarding the potential claims. In light of that cooperation and to minimize the waste of estate resources, the independent directors and Committee stipulated to a schedule that will govern the Committee's investigation [Docket No. 275]. Pursuant to that stipulation, the Committee originally had until February 28, 2019 to challenge, or move for standing to challenge, as applicable, the validity, perfection, priority, extent, or enforceability of the Second Lien Secured Claims. Subsequently, by agreement, the Committee's challenge deadline as to Mission Coal Funding LLC, Kenneth R. McCoy, Jason R. McCoy and Charles A. Ebetino, Jr. was extended to and including one (1) business day before objections are due in connection with the Debtors' proposed plan of reorganization, without prejudice to the Committee's right to seek further extensions either by consent of the parties or further order of the Court. Similarly, by agreement, the Committee's challenge deadline as to the Debtors and Thomas and Ana Clarke and their related entities was extended to March 8, 2019, without prejudice to the Committee's right to seek further extensions either by consent of the parties or further order of the Court.

The Independent Investigation is ongoing at this time. Mr. Horton and Mr. Heiman will continue to work with the Debtors' retained advisors to complete the investigation and to solicit the view, input, and analyses of the Committee and other creditor groups before reaching a final decision and recommendation regarding the potential claims or causes of action. Such potential claims and causes of action are subject to the conclusion of the Independent Investigation.

The release of the potential claims is subject to the conclusion of the investigation by Mr. Horton and Mr. Heiman. Upon conclusion of the Independent Investigation, the Debtors will update the Plan to indicate one of the following: (i) the releases set forth in the Plan are no longer subject to the Independent Investigation if no viable claims or causes of action are identified; (ii) viable claims or causes of action have been identified and a settlement has been reached; or (iii) certain claims or causes of action are being retained and/or certain parties are not released. Despite the fact that the Plan as currently proposed assumes the Releases will be granted and no recovery will be realized for any claims or causes of action, the Debtors may modify the Plan to include certain modifications to the Releases, dependent upon the results of the Independent Investigation. A subsequent change could provide for additional recoveries to Holders of General Unsecured Claims. Because such a modification would not negatively impact the recoveries for General Unsecured Claims, the Debtors do not believe that further solicitation would be required.

The Committee, pursuant to section 1103 of the Bankruptcy Code, is separately conducting a parallel investigation into potential claims and causes of action belonging to the Debtors' estates (the "Committee Investigation"). On November 12, 2018, the Committee sought 2004 examinations and document productions from the Debtors, Mission Coal Funding, LLC, Thomas and Ana Clarke, Charles Ebetino, Kenneth McCoy and Jason McCoy. The Committee and these various parties (and Bay Point Advisors) thereafter entered into agreed scheduling orders governing the timing of discovery. Those parties have produced in excess of 214,000 documents as of January 28, 2019, which are being reviewed and analyzed by the Committee, and continue to produce documents relevant to the Committee's investigation. The Committee has sent additional document requests to certain of these parties in accordance with the agreed scheduling orders. The Committee's review and analysis of these document productions is ongoing.

The Committee believes that the Committee Investigation to date has uncovered numerous transactions, which occurred both before and after Mission Coal Company, LLC's formation on January 31, 2018, that merit further scrutiny. The Committee believes that these transactions include potentially fraudulent transfers and other value-destructive behavior from which potential claims against the Debtors, their insiders, and/or other related third parties may arise. The Committee believes that many of these transactions involve third parties that have overlapping or common ownership with certain of the Debtors.

In furtherance of its investigation, on January 30, 2019, the Committee sought 2004 examination and document production from Cherry Bekaert LLP, who served as the auditor for debtors Seneca Coal Resources, LLC and Seminole Coal Resources, LLC and their subsidiaries.

Based on the Committee Investigation to date, the Committee has identified witnesses it wishes to interview and began conducting witness interviews on February 7, 2019. The Committee continues to schedule interviews, interview witnesses and evaluate the viability of any potential claims against the Debtors, insiders or other related third parties. This process is ongoing and is not complete.

> **The Committee has up until one (1) business day before objections are scheduled to be filed with the Court in connection with the Debtors' proposed plan of reorganization to object to the Second Lien Secured Claims.**

E.    *Key Employee Retention Plan*

On December 27, 2018, the Court entered the *Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* (the "KERP") [Docket No. 509]. The Debtors also sought approval of a Key Employee Incentive Plan but voluntarily chose to continue this relief, which the Court granted pursuant under the *Order Continuing the Debtors' Key Employee Incentive and All Objections* [Docket No. 510], without any prejudice to later seek approval of this relief.

The KERP authorizes the Debtors to pay up to an aggregate amount of $1,122,530.87 to 40 of the Debtors' non-insider employees (out of a population of approximately 796 employees, or approximately 5% of the Debtors' total employee population) that the Debtors determined are essential to the Debtors' business operations (the "KERP Participants"). The KERP Participants work across various departments within the Debtors' business—including corporate level employees involved in human resources, accounting, and financial planning, as well as operational mine-level employees involved in critical safety, maintenance, engineering and environmental aspects of the Debtors' operations.

F.    *Summary of Claims Process, Bar Date and Claims Filed*

On November 16, 2018, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs. Interested parties may review the Schedules and SOFAs and amendments thereto by visiting the Debtors' Case Information Website (located at http://www.omnimgt.com/missioncoal).

On December 20, 2018, the Court entered the Bar Date Order, which establishes procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date

<u>Notice</u>"). Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in the Debtors' chapter 11 cases was **January 18, 2019 at 5:00 p.m., prevailing Central Time** (the "<u>Bar Date</u>")[19]; and the last date for governmental units to file Proofs of Claim in the Debtors' chapter 11 cases is **April 12, 2019, at 5:00 p.m. prevailing Central Time**. The Bar Date Notice was published in the following local and national publications: *Birmingham News*, *Alabama Messenger*, *Kingsport Times-News*, *Charleston Gazette-Mail*, and *USA Today* (national edition).

Pursuant to the Disclosure Statement Order, the deadline for filing requests for payment of Administrative Claims is (a) with respect to Administrative Claims other than Estate Retained Professional Fee Claims, the Voting Deadline; and (b) with respect to Estate Retained Professional Fee Claims, 30 days after the Plan Effective Date.

G.    *Exclusivity*

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Court enters an order for relief under chapter 11 of the Bankruptcy Code, during which only the debtor may file a chapter 11 plan. If the debtor files a chapter 11 plan within such 120-day period, section 1121(c)(3) of the Bankruptcy Code extends the exclusivity period by an additional 60 days to permit the debtor to seek acceptances of such plan. Section 1121(d) of the Bankruptcy Code also permits the Court to extend these exclusivity periods "for cause." On January 2, 2019, the Debtors' filed their Plan. Without further order of the Court, the Debtors' exclusivity period to file a chapter 11 plan will expire on February 11, 2019, which is 120 days after the Debtors filed for relief under chapter 11 of the Bankruptcy Code.

H.    *Extension of Exclusivity*

On January 16, 2019, the Debtors filed a motion to extend the Debtors' exclusive periods to file a chapter 11 plan and solicit acceptances thereof [Docket No. 555]. The motion seeks an extension of the deadline to file a chapter 11 plan through May 12, 2019 and to solicit acceptance of such a plan through July 11, 2019.

I.    *Extension of Assumption Period Under Section 365(d)(4) of the Bankruptcy Code*

On January 16, 2019, the Debtors filed a motion to extend the time period within which the Debtors must assume or reject unexpired leases of nonresidential real property by an additional 90 days, through May 12, 2019, without prejudice to the Debtors' right to seek further extensions.

J.    *Extension of Removal Period*

On January 14, 2019, the Court approved the Debtors' motion to extend the time within which the Debtors may remove actions 120 days through May 12, 2019 [Docket No. 546].

K.    *Cost Cutting Measures*

The Debtors have worked diligently to reduce costs. For example, the Debtors explored the possibility of utilizing a more cost-effective coal sales broker and renegotiated more favorable terms with the Debtors' existing broker, Robindale Energy Services, Inc. Both prior to the filing and on an ongoing basis, the Debtors' purchasing department has continuously tried to renegotiate with virtually all vendors and suppliers for more favorable pricing and terms. In addition, the Debtors put a freeze on hiring new permanent employees at the corporate location. Open positions were not recruited for and no full-time permanent replacements have been hired as prior employees have left the corporate office. The Debtors also continue to idle operations at the Pinnacle mine and have strategically

---

[19]    Notwithstanding anything in the Bar Date Order, the professionals of the Prepetition First Lien Parties and the DIP Parties are not required to file Proofs of Claim for any prepetition claims or postpetition claims and/or requests for payment of administrative expense claims in any of these chapter 11 cases with respect to their fees and expenses, which fees and expenses shall be paid pursuant to the Final DIP Order.

29

redeployed its machinery and equipment among the mines and plants to produce and process coal in a more efficient and cost-effective manner.

L.    *Postpetition Marketing, Bidding, and Auction Process*

On December 5, 2018, the Debtors filed the Bidding Procedures Motion, which, among other things, sought to establish (a) dates and deadlines for the submission of bids and the Auction of substantially all assets of the Debtors, and (b) requirements for bids to be "Qualified Bids" that will be considered at the Auction. On December 21, 2019, the Court entered an order approving the Bidding Procedures, which, among other things, establish **February 13, 2019 at 4:00 p.m. (prevailing Central Time)** as the final bid deadline.  On **February 27, 2019, at 10:00 a.m. (prevailing Eastern Time)**, to the extent Qualified Bids are received, the Debtors will hold an Auction for all or substantially all of their assets.

As set forth in the Bidding Procedures, the Debtors prefer the Sale Transaction be approved and consummated through the Plan and the DIP Lenders prefer the Sale Transaction be approved and consummated through a separate Sale Order pursuant to Bankruptcy Code section 363 and not require consummation of the Plan in order to close on the Sale Transaction. Additionally, the Committee will support the DIP Lenders in seeking to have the Debtors seek approval of, and consummate, any Sale Transaction with the DIP Lenders for the assets the DIP Lenders are acquiring pursuant to a Sale Order, and not pursuant to a chapter 11 plan, which support includes the Committee filing the appropriate pleadings with the Court and the prosecution thereof in regard to the relief sought by the DIP Lenders through a Sale Order.

In the event the Successful Bidder at the Auction with respect to some or all of the Debtors' assets is a party other than the DIP Lenders, and such party desires to have the Sale Transaction in respect of such assets approved and consummated pursuant to a Sale Order, and not pursuant to a plan, the Committee will not object to such transaction on the grounds that it seeks to close pursuant to a Sale Order and not a plan, subject in all respects to the Committee's right to exercise its fiduciary duties to determine to object.  For the avoidance of doubt, the foregoing shall not prohibit the Committee from supporting the confirmation of a plan to the extent such plan is not inconsistent with the foregoing.

M.    *Section 1113 and 1114 Process*

The reduction of the Debtors' legacy labor liabilities remains a crucial and necessary step towards the Debtors' successful emergence from these chapter 11 cases.  The Debtors are signatories to two collective bargaining agreements (the "CBAs") with the United Mine Workers of America (the "UMWA").  The CBAs include crippling financial obligations and liabilities with respect to UMWA-represented employees and retirees.  Since the commencement of these chapter 11 cases, the Debtors have formally met with the UMWA numerous times to discuss the Debtors' need to modify certain pension, retiree benefits, and other obligations arising under the CBAs, and have also engaged in numerous email exchanges with the UMWA regarding the same.  The Debtors have presented the UMWA with multiple proposals, and remain open to continuing good-faith negotiations.  Although the UMWA has been unwilling to modify the CBAs on the terms presented by the Debtors and has not presented a counterproposal including modifications to which it could agree, the Debtors are willing to continue to engage in negotiations with the UMWA in the hopes of coming to a consensual arrangement that would reduce the crippling financial burden of the Debtors' CBAs.

On January 31, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing, but not Directing, the Debtor to A) Reject Their Collective Bargaining Agreements, (B) Modify Certain Union-Related Retiree Benefits, and (C) Implement Terms of Their Section 113 and Section 1114 Proposal, and (II) Granting Related Relief* [Docket No. 635] (the "1113/1114 Motion").  Pursuant to the *Notice of Hearing on Debtors' Motion for Entry of an Order (I) Authorizing, but not Directing, the Debtor to A) Reject Their Collective Bargaining Agreements, (B) Modify Certain Union-Related Retiree Benefits, and (C) Implement Terms of Their Section 113 and Section 1114 Proposal, and (II) Granting Related Relief* [Docket No. 639], this Motion is set for a hearing that will begin on February 20, 2019 (the "1113/1114 Hearing").

30

THE UMWA DISPUTES THIS CHARACTERIZATION OF THE DEBTORS' EFFORTS AND THE ABOVE DESCRIPTION OF THE NEGOTIATIONS. THE UMWA FURTHER BELIEVES THESE EFFORTS ARE DOOMED TO FAILURE.

The Debtors do not agree with the UMWA's description of these events and reserve all rights to dispute these claims and plan to do so at the 1113/1114 Hearing.

## ARTICLE VI.
## SUMMARY OF THE PLAN

THIS **ARTICLE VI** IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO. ALTHOUGH THE STATEMENTS CONTAINED IN THIS THIRD AMENDED DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS THIRD AMENDED DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL SUCH TERMS AND PROVISIONS, AND SHOULD <u>NOT</u> BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF (INCLUDING ATTACHMENTS) WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS **ARTICLE VI** AND THE PLAN (INCLUDING ATTACHMENTS), THE LATTER SHALL GOVERN.

The Plan provides for the sale of all or substantially all of the Debtors' assets through the Sale Transaction. The key terms of the Plan are as follows:

A.       *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Plan Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Distributions made to Holders of Allowed Claims in any Class are intended to be final.

B.       *Proposed Creditor Recoveries*

The Plan proposes to fund creditor recoveries from Cash on hand, debt issued or assumed by the Successful Bidder or any of its subsidiaries, the Sale Transaction Proceeds, the General Unsecured Claims Amount, the Debtors' rights under the Sale Transaction Documentation, payments made directly by the Successful Bidder on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Amounts made by the Successful Bidder pursuant to sections 365 or 1123 of the Bankruptcy Code and all Causes of Action not previously settled, released, or exculpated under the Plan. The Debtors will continue to market their assets on a postpetition basis and will hold the Auction to the extent Qualified Bids for the Debtors' assets are submitted in accordance with the Bidding Procedures. The Debtors intend to consummate the Sale Transaction with the bidder that provides the highest or otherwise best offer as contemplated under the Bidding Procedures Order, the Sale Transaction Documentation and the Plan.

31

Pursuant to the Plan, the Debtors or the Plan Administrator shall pay or provide for payments of Claims as follows:

- Holders of Other Priority Claims will be paid in full on the Plan Effective Date (or as soon thereafter as such Other Priority Claims become due and Allowed in the ordinary course);

- Holders of Other Secured Claims (including all Secured Tax Claims), will receive, at the election of the Debtors:

  (i) payment in full in Cash;

  (ii) the collateral securing such Other Secured Claims;

  (iii) reinstatement of such Other Secured Claims, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such Other Secured Claims to demand or to receive payment prior to the stated maturity of such Other Secured Claim from and after the occurrence of default; or

  (iv) such other treatment rendering such Other Secured Claims Unimpaired;

- Each Holder of DIP Facility Claims will receive either (i) payment in full in Cash of the Obligations (which amount shall include the full roll-up of the Prepetition First Lien Obligations Amount, including the Prepayment Premium, plus the First Lien Accrued Adequate Protection Payments) (each as defined in the DIP Documents to the extent not defined herein) or (ii) treatment that is otherwise acceptable to the Required Lenders;

- Each holder of Second Lien Secured Claims will receive its Pro Rata share, based on the Allowed amount of its Second Lien Secured Claim, of the remaining amount of the Sale Transaction Proceeds, solely to the extent the Allowed DIP Facility Claims are paid in full in Cash;

- Each Holder of General Unsecured Claims will receive (i) its Pro Rata share of the General Unsecured Claims Amount (as provided in Article IV.E. of the Plan) and (ii) the remaining amount of the Sale Transaction Proceeds, solely to the extent the Allowed DIP Facility Claims and, to the extent Allowed, the Allowed Second Lien Secured Claims are paid in full in Cash;

- Each Intercompany Claim will, at the election of the Debtors, be reinstated or canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect;

- Intercompany Interests will, at the election of the Debtors, be reinstated or canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect;

- Section 510(b) Claims will be canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim;

- Interests will be canceled, released, and extinguished, and will be of no further force or effect. Each Holder of an Interest will not receive any distribution on account of such Interest.

The Debtors believe that the Plan is in the best interest of the Estates and urge Holders of Claims in Class 3 (DIP Facility Claims), Class 4 (Second Lien Secured Claims), and Class 5 (General Unsecured Claims) to vote to accept the Plan.

C.     *The Sale Transaction*

Following the Confirmation Date, as set forth in the Plan, the Debtors shall be authorized to consummate the Sale Transaction to the Successful Bidder pursuant to the terms of the Sale Transaction Documentation, the Plan, and the Confirmation Order. Generally, the Sale Transaction contemplates that:

(a)     the Debtors shall consummate the Sale Transaction by, among other things, transferring the Acquired Assets, including all Transferred Causes of Action held by the Debtors, to the Successful Bidder free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than the Assumed Liabilities) pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code, the Plan and the Confirmation Order;

(b)     upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Sale Transaction Documentation and the Plan, and any documents in connection herewith and therewith, shall be deemed authorized and approved without any requirement of further act or action by the Debtors, the Debtors' shareholders or boards of directors, or any other Entity or Person; and

(c)     the Debtors shall be authorized to execute and deliver, and to consummate the transactions contemplated by, the Sale Transaction Documentation and the Plan, as well as to execute, deliver, file, record, and issue any note, documents, or agreements in connection therewith, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.

**The holders of the Second Lien Secured Claims have not consented to the proposed Sale and have preserved their objections to the Sale, including their objection rights under Section 363(f) of the Bankruptcy Code.**

D.     *Restructuring Transactions*

Upon the entry of the Confirmation Order, the Debtors, the Plan Administrator, and the Successful Bidder are authorized, without further order of the Bankruptcy Court, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions and the Sale Transaction under or in connection with the Plan, including: (1) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) rejection, assumption, or assumption and/or assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) any transaction described in the Description of Transaction Steps; and (6) subject to the occurrence of the Plan Effective Date, the consummation of the transactions contemplated by the Sale Transaction Documentation.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

E.     *The Plan Administrator*

On and after the Plan Effective Date, the Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Plan Effective Date, the authority, power, and incumbency of the persons acting as

33

managers and officers of the Debtors shall be deemed to have resigned, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Debtors, and shall succeed to the powers of the Debtors' managers, directors, and officers.

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the Retained Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Debtors' Estates appointed pursuant to the Bankruptcy Code § 1123(b)(3)(B).

Among other things, the Plan Administrator shall be responsible for: (1) liquidating, receiving, holding, and investing, supervising, and protecting the Retained Assets; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Wind-Down Amount, the General Unsecured Claims Amount, and the Sale Transaction Proceeds, if any and to the extent applicable; (3) making distributions from the Wind-Down Amount, the General Unsecured Claims Amount, and the Sale Transaction Proceeds, if any and to the extent applicable as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying reasonable fees, expenses, debts, charges, and liabilities of the Debtors on and after the Plan Effective Date; (7) administering and paying taxes of the Debtors on and after the Plan Effective Date, including filing tax returns; (8) representing the interests of the Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator's post-Plan Effective Date compensation shall be set forth in the Plan Supplement and paid by the Debtors.

*F.        Corporate Action*

Upon the Plan Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan and the Sale Transaction Documentation (including any action to be undertaken by the Debtors or the Plan Administrator, as applicable) shall be deemed authorized, approved, and, to the extent taken prior to the Plan Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Plan Administrator, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, including the creation of the Successful Bidder, the consummation of the Sale Transaction, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates; *provided, however,* that for the avoidance of doubt, the Successful Bidder may be formed by a person or entity other than the Debtors, as set forth in the Description of Transaction Steps.

Upon the Plan Effective Date or as soon as reasonably practicable thereafter, after making all distributions provided for under the Plan, the Debtors shall be deemed to have been dissolved and terminated, except as necessary to satisfy their obligations under the Sale Transaction Documentation. The directors, managers, and officers of the Debtors and the Plan Administrator, as applicable, shall be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate in their sole discretion.

*G.        Recoveries to Certain Holders of Claims and Interests*

The recoveries to holders of Claims and Interests are described in **Article IV.D** of this Third Amended Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

H.     *Release, Injunction, and Related Provisions*

The Plan contains certain releases, as described in **Article II.I** of this Third Amended Disclosure Statement entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"

**The Plan provides that all holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes who abstain from voting, vote to reject the Plan or are deemed to reject the Plan *and* who do not opt-out of the release provisions contained in Article IX of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the Debtors (the "Debtor Releases") and the Released Parties (the "Third Party Releases").**

**By opting-out of the releases set forth in Article IX.C of the Plan you will forgo the benefit of obtaining the releases set forth in Article IX.C of the Plan if you otherwise would be a Released Party thereunder.  The releases are an integral element of the Plan.**

The release, exculpation, and injunction provisions that are contained in Article IX of the Plan are copied in pertinent part below.

1.     *Release of Liens*

**Except as otherwise specifically provided in the Plan, the Sale Transaction Documentation or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Plan Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the Sale Transaction Documentation, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert either (i) to the Debtors and their successors and assigns or (ii) the Successful Bidder, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  In addition, the DIP Agent shall execute and deliver all documents reasonably requested by the Debtors or Plan Administrator to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

---

**CERTAIN PARTIES ASSERT THAT THE RELEASES UNDER ARTICLE VIII OF THE PLAN ARE NOT CONSISTENT WITH APPLICABLE LAW, INCLUDING THAT THE RELEASES ARE NON-CONSENSUAL.  THE DEBTORS DISAGREE WITH THIS CHARACTERIZATION OF THESE MATTERS AND RESERVE ALL RIGHTS.**

**To the extent the Debtors seek to grant releases, the Debtors will demonstrate at the Confirmation Hearing that the Debtors' releases are consistent with applicable law and that the Court should approve such releases.**

**The Debtors will also demonstrate at the Confirmation Hearing that any third party releases are consensual because each class that is presumed to accept, deemed to reject, or votes to reject will be provided with an opt-out notice.  Classes that are eligible to accept or reject the Plan have the opportunity to affirmatively opt-out of granting the third party releases; *provided, however* that Holders of Claims who vote to accept the Plan are considered a Releasing Party.**

---

2.     *Releases by the Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Plan Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or**

out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Third Amended Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Third Amended Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of the Sale, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases herein are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases herein; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors asserting any claim released by the releases herein against any of the Released Parties.

3. *Releases by Holders of Claims and Interests*[20]

As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Third Amended Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Third Amended Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of the Sale, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

---

[20] The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The Releases by Holders of Claims and Interests are subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

4. *Exculpation*[21]

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Third Amended Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Third Amended Disclosure Statement or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of the Sale, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of commercially sensitive confidential information for competitive purposes that causes damages, or ultra vires acts as determined by a Final Order.

5. *Injunction*

Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such

---

[21] The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The exculpation set forth in this paragraph is subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

Case 18-04177-TOM11    Doc 762    Filed 02/08/19    Entered 02/08/19 14:41:28    Desc
Main Document    Page 55 of 170

Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

For more detail, see Article IX of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

## ARTICLE VII.
## VOTING AND CONFIRMATION

On February 5, 2019, the Debtors filed this Third Amended Disclosure Statement with the Court seeking entry of an order approving the adequacy of this Third Amended Disclosure Statement and the solicitation procedures and deadlines contemplated herein.

A.    *Classes Entitled to Vote on the Plan*

The following Classes are the only Classes entitled to vote to accept or reject the Plan (the "Voting Classes"):

| Class | Claim | Status |
|-------|-------|--------|
| 3 | DIP Facility Claims | Impaired |
| 4 | Second Lien Secured Claims | Impaired |
| 5 | General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined herein) or a Ballot. If your Claim is included in the Voting Classes, you should read your Ballot and carefully follow the instructions set forth therein. Please use only the Ballot that accompanies this Third Amended Disclosure Statement or the Ballot that the Debtors, or the Notice and Claims Agent on behalf of the Debtors, otherwise provide to you.

B.    *Votes Required for Acceptance by a Class*

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Each Class of Claims entitled to vote on the Plan will have accepted the Plan if: (a) the Holders of at least two-thirds in dollar amount of the Claims actually voting in each Class vote to accept the Plan; and (b) the Holders of more than one-half in number of the Claims actually voting in each Class vote to accept the Plan.

C.    *Certain Factors to Be Considered Prior to Voting*

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan, including that:

- the financial information contained in this Third Amended Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Third Amended Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Court will confirm the Plan;

38

- the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Estate Retained Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of Holders within the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in such Voting Classes.

For a further discussion of risk factors, please refer to **Article VIII** hereof, entitled "Certain Risk Factors to be Considered Before Voting."

D.     *Classes Not Entitled to Vote on the Plan*

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan, or if they will receive no property under the plan, in which case they are deemed to reject the proposed plan. Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 6 | Intercompany Claims | Impaired / Unimpaired | Presumed to Accept or Reject |
| 7 | Intercompany Interests | Impaired / Unimpaired | Presumed to Accept or Reject |
| 8 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 9 | Interests | Impaired | Deemed to Reject |

E.     *Solicitation Procedures*

1.     *Notice and Claims Agent*

The Debtors retained Omni Management Group to act, among other things, as the notice and claims agent in connection with the solicitation of votes to accept or reject the Plan.

2.     *Solicitation Package*

Pursuant to the Disclosure Statement Order, Holders of Claims who are entitled to vote to accept or reject the Plan as of **January 30, 2019** (the "Voting Record Date"), will receive appropriate solicitation materials (the "Solicitation Package"), which will include, in part, the following:

- the appropriate Ballot(s) and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope; and

- this Third Amended Disclosure Statement, including the Plan as an exhibit thereto.

3. *Distribution of the Solicitation Package and Plan Supplement*

The Debtors will cause the Notice and Claims Agent to distribute the Solicitation Packages to Holders of Claims in the Voting Classes on or before **the date that is three (3) business days after entry of the Disclosure Statement Order**, which will be at least 28 days before the Voting Deadline (*i.e.*, 4:00 p.m. prevailing Central Time on March 11, 2019).

The Solicitation Package (except for the Ballots) may also be obtained: (a) from Omni Management Group by (i) visiting www.omnimgt.com/missioncoal; (ii) writing to Omni Management Group, Re: Mission Coal Company, LLC, et al., 5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367; or (b) for a fee via PACER at https://ecf.alnb.uscourts.gov.

At least 7 days prior to the Voting Deadline and Plan Objection Deadline, the Debtors intend to file the Plan Supplement. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available at www.omnimgt.com/missioncoal. The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement (a) from Omni Management Group by (i) calling the Debtors' restructuring hotline at 888-585-6494 (U.S.) or 818-906-8300 (International); (ii) visiting the Debtors' restructuring website at: www.omnimgt.com/missioncoal; (iii) writing to Omni Management Group, Re: Mission Coal Company, LLC, et al., 5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367; or (b) for a fee via PACER at https://ecf.alnb.uscourts.gov.

As described above, certain Holders of Claims may not be entitled to vote because they are Unimpaired or are otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code. In addition, certain Holders of Claims and Interests may be Impaired but are receiving no distribution under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote. Such Holders will receive only notice of the Confirmation Hearing and a non-voting status notice. The Debtors are only distributing a Solicitation Package, including this Third Amended Disclosure Statement and a Ballot to be used for voting to accept or reject the Plan, to the Holders of Claims entitled to vote to accept or reject the Plan as of the Voting Record Date.

F. *Voting Procedures*

If, as of the Voting Record Date, you are a Holder of a Claim in Class 3, 4, or 5—the Voting Classes—you may vote to accept or reject the Plan in accordance with the Solicitation Procedures by completing the Ballot and returning it in the envelope provided. If your Claim or Interest is not included in the Voting Classes you are not entitled to vote and you will not receive a Solicitation Package. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

1. *Voting Deadline*

The Voting Deadline is **March 11, 2019, at 4:00 p.m., prevailing Central Time**. To be counted as a vote to accept or reject the Plan, a Ballot must be properly executed, completed, and delivered, whether by first class mail, overnight delivery, or personal delivery, so that the Ballot is **actually received** by the Notice and Claims Agent no later than the Voting Deadline.

2. *Voting Instructions*

As described above, the Debtors have retained Omni Management Group to serve as the Notice and Claims Agent for purposes of the Plan. Omni Management Group is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

| BALLOTS |
|---|
| To be counted, all Ballots must be **actually** **received** by Omni Management Group by the Voting Deadline, which is **March 11, 2019, at 4:00 p.m., prevailing Central Time**, at the following address: |

| **If by First Class Mail, Ballots must be sent to:** | **If by Hand Delivery or Overnight Mail, Ballots must be sent to:** |
|---|---|
| c/o Omni Management Group<br>**Re: Mission Coal Company, LLC, et al.**<br>Attn: Voting Department<br>5955 DeSoto Ave., Suite 100<br>Woodland Hills, CA 91367 | c/o Omni Management Group<br>**Re: Mission Coal Company, LLC, et al.**<br>Attn: Voting Department<br>5955 DeSoto Ave., Suite 100<br>Woodland Hills, CA 91367 |

| **If by Email, scanned Ballots must be sent to:** |
|---|
| missioncoal@omnimgt.com |

| If you have any questions on the procedure for voting on the Plan, please call the Debtors' restructuring hotline maintained by Omni Management Group at:<br>888-585-6494 (U.S.) or 818-906-8300 (International). |
|---|

More detailed instructions regarding the procedures for voting on the Plan are contained in the Ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each Ballot; (b) overnight courier; or (c) hand-delivery, so that the Ballots are **actually** **received** by Omni Management Group no later than the Voting Deadline at the return address set forth in the applicable Ballot. Any Ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim in a Voting Class held by such Holder. By signing and returning a Ballot, each Holder of a Claim entitled to vote will certify to the Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked. It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

3.      *Ballots Not Counted*

No Ballot will be counted if, among other things:  (i) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (ii) it was transmitted by means other than as specifically set forth in the ballots; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed, and for which the applicable claims bar date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to any party other the Notice and Claims Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

G.      *Confirmation Objection Deadline*

Parties must object to Confirmation of the Plan by **March 11, 2019, at 4:00 p.m., prevailing Central Time** (the "Confirmation Objection Deadline"). All objections to the Plan must be filed with the Court and served on the Debtors and certain other parties in interest so that they are **actually** **received** on or before the Confirmation Objection

Deadline. Failure to appear at the Confirmation Hearing to prosecute any written objection may result in such objection being overruled without further notice.

## H.    *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. The Court has scheduled the Confirmation Hearing for **March 20, 2019, at 10:00 a.m., prevailing Central Time.** The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Third Amended Disclosure Statement and solicitation procedures. Any objection to the Plan must (1) be in writing; (2) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Court and served so that it is actually received by the following notice parties set forth in this Third Amended Disclosure Statement no later than the Confirmation Objection Deadline. Unless an objection to the Plan is timely served and filed, it may not be considered by the Court. Failure to appear at the Confirmation Hearing to prosecute any written objection may result in such objection being overruled without further notice.

## I.    *Confirmation Standards*

At a Confirmation Hearing, the Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the Plan and incident to the chapter 11 cases, has been or will be disclosed to the Court, and any such payment: (i) made before the confirmation of the Plan is reasonable; or (ii) is subject to the approval of the Court as reasonable, if it is to be fixed after confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Plan Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code. With respect to each Class of Interests, each Holder of an Impaired Interest will have accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Plan Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan will have either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code.

42

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that: (i) Holders of Claims specified in sections 507(a)(2) will receive payment in full, in Cash; (ii) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims payment in full, in Cash; and (iii) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim payment in full, in Cash.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial restructuring of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or restructuring.

- The Debtors have paid or the Plan provides for the payment of the required fees pursuant to 28 U.S.C. § 1930.

1. *Best Interests of Creditors Test—Liquidation Analysis*

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Court must still independently determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such holder with a recovery that has a value at least equal to the value of the recovery that each such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code beginning on what would have been the Plan Effective Date. Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Plan Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under chapter 7 beginning on the Plan Effective Date.

The Debtors believe that the Plan will satisfy the best interests test because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will not be less than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. After accounting for administrative expenses, unsecured creditors (including any secured creditor deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will be liquidated through the Sale Transaction and the Plan effects a liquidation of the Debtors' remaining assets. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a recovery to holders of the DIP Facility Claims, Second Lien Secured Claims and Allowed General Unsecured Claims that is equal to or greater than what such claimants would receive under a chapter 7 liquidation.[22] Liquidating the Debtors' Estates under the Plan likely provides holders

---

[22] There is a possibility that there will not be a greater recovery for the Second Lien Secured Claims and Allowed General Unsecured Claims, although this is dependent on the results of the Auction, if one is held. However, in no event do the Debtors believe that Holders of such Claims would receive more in a chapter 7 liquidation than under the Plan.

43

of the DIP Facility Claims, Second Lien Secured Claims, and Allowed General Unsecured Claims with a larger, timelier recovery primarily due to the expectation of materially lower realized sale proceeds in chapter 7.

A chapter 7 liquidation beginning on what would have been the Plan Effective Date would provide less recovery for creditors than the Plan. The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee would not have the technical expertise or knowledge of the Debtors' business (or the Company) that the Debtors had when they proposed to sell their assets pursuant to the Plan. Moreover, the distributable proceeds under a chapter 7 liquidation would be lower because of the chapter 7 trustee's fees and expenses.

Sale proceeds in chapter 7 would likely be significantly lower particularly in light of in light of a potential lack of liquidity in a chapter 7 that would potentially lead to the Company's mines being shutdown, the highly technical nature of the Debtor's assets and the time delay associated with the chapter 7 trustee's learning curve for these assets. In addition to the expected material reduction in sale proceeds, recoveries would be further reduced (in comparison with those provided for under the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' technical assets, and these specific chapter 11 cases, in order to complete the administration of the Debtors' Estates. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

In a chapter 7 liquidation, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the chapter 11 cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case. Moreover, the conversion to chapter 7 would also require entry of a new bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7. See Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries relative to those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in materially reduced sale proceeds, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the chapter 11 cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

> **The Waid Claimants believe that the above disclosure regarding liquidation is not meaningful and that it contains conclusory assertions without any data or factual support. The Debtors dispute this characterization and reserve all rights.**

### 2. *Financial Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation or the need for further financial restructuring, unless the plan contemplates such liquidation or restructuring. The Plan provides for the sale of the Debtors' businesses. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### J. *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to confirmation, which, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan either: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—(A) cures any such default that occurred before or after the commencement of the case under this title, other

44

than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan. Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or to reject a plan. Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of creditors or interests.

Claims in Classes 1 and 2 are Unimpaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan. Holders of Claims in Classes 5, 6, and 7 will be deemed either impaired or unimpaired, and Claims and Interests in Classes 7, 8, and 9 will receive no distribution under the Plan and are, therefore, presumed deemed to have rejected the Plan.

Claims in Classes 3, 4, and 5 are Impaired under the Plan, and as a result, the Holders of Claims in such Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described directly below. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

K.    *Confirmation Without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it or if an impaired class is deemed to reject the plan; *provided* that the plan is accepted by at least one impaired class (without regard to the votes of insiders). Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

1.    *No Unfair Discrimination*

The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent but that such treatment be "fair." In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

2. *Fair and Equitable Test*

The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class. As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement because there is no Class receiving more than 100 percent of the amount of the Allowed Claims in such Class, and no Class that is junior to a dissenting Class that will receive or retain any property on account of the Claims or Interests in such junior Class.

(a) *Secured Claims*

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the Plan Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

(b) *Unsecured Claims*

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that the plan provides either: (i) that each holder of a claim of such class receives or retains on account of such claim property of a value, as of the Plan Effective Date of the plan, equal to the allowed amount of such claim; or (ii) no holder of any claim or any interest that is junior to the claims of such class will receive or retain any property under the plan on account of such junior claim or junior interest.

(c) *Interests*

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that the plan provides that either: (i) each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the Plan Effective Date of the plan, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (ii) that no holder of any interest that is junior to the interests of such class will receive or retain any property under the plan on account of such junior interest.

> **The Waid Claimants assert that the Plan violates the absolute priority rule because it allows other subordinate claims to be paid without the Waid Claimants being paid anything. This is a confirmation issue and the Debtors reserve all rights.**

**ARTICLE VIII.**
**CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING**

Holders of Claims entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Third Amended Disclosure Statement and the documents delivered together with this Third Amended Disclosure Statement, referred to or incorporated by reference in this Third Amended Disclosure Statement, before voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A. *Risk Factors and Considerations Regarding the Debtors' Business and Operations*

1.    *The Debtors May Not Be Able to Achieve Their Projected Financial Results*

The financial projections set forth in this Third Amended Disclosure Statement represent the best estimate of the future financial performances of the Debtors based on currently known facts and assumptions about future operations as well as the United States and world economies in general and, specifically, the coal industry. The actual financial results may differ significantly from the projections. If the Debtors do not achieve their projected financial results, then the value of the Debtors debt or equity issued pursuant to the Plan may experience a decline and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. There are numerous factors and assumptions inherent in estimating the quantities and qualities of, and costs to mine, coal reserves, including many factors beyond the Debtors' control, including the following:

    (a)    quality of the coal;

    (b)    geological and mining conditions;

    (c)    the percentage of coal ultimately recoverable;

    (d)    the assumed effects of regulation, including the issuance of required permits, taxes, including severance and excise taxes and royalties, and other payments to governmental agencies;

    (e)    assumptions concerning the timing for the development of the reserves;

    (f)    assumptions concerning physical access to the reserves; and

    (g)    assumptions concerning equipment and productivity, future coal prices, operating costs, including for critical supplies such as fuel, tires and explosives, capital expenditures and development and reclamation costs.

As a result, estimates of the quantities and qualities of economically recoverable coal attributable to any particular group of properties, classifications of reserves based on risk of recovery, estimated cost of production, and estimates of future net cash flows expected from these properties as prepared by different engineers, or by the same engineers at different times, may vary materially because of changes in the above factors and assumptions. Actual production recovered from identified reserve areas and properties, and revenues and expenditures associated with the Debtors' mining operations, may vary materially from estimates. Any inaccuracy in the Debtors' estimates related to their reserves could result in decreased profitability from lower than expected revenues and/or higher than expected costs.

2.    *If the Assumptions Underlying the Debtors' Estimates of Reclamation and Mine Closure Obligations Are Inaccurate, the Debtors' Costs Could Be Greater Than Anticipated.*

The Debtors base their estimates of reclamation and mine closure liabilities on permit requirements, engineering studies and the Debtors' engineering expertise related to these requirements. The Debtors' management and engineers periodically review these estimates. The estimates can change significantly if actual costs vary from the Debtors' original assumptions or if governmental regulations change significantly. The Debtors are required to record new obligations as liabilities at fair value under generally accepted accounting principles.

3.    *The Debtors May Seek Approval of the Sale Pursuant to an Order Pursuant to Section 363 of the Bankruptcy Code.*

In the event that the Successful Bidder, selected by the Debtors as the highest and otherwise best bid in consultation with the Consultation Parties as required by the Bid Procedures, requires that the Sale Transaction be consummated through a 363 sale, the Debtors shall seek approval of such Sale Transaction and entry of such Sale Order on March 20, 2019, unless otherwise agreed by the Successful Bidder. Notwithstanding the forgoing, nothing shall require the Debtors to consummate the Sale Transaction with the Required Lenders pursuant to a Sale Order and

(i) the Debtors reserve all of their rights to argue that any Sale Transaction with the Required Lenders must be approved and consummated pursuant to a chapter 11 plan of reorganization and (b) the Required Lenders reserve all of their rights to argue that any Sale Transaction with the Debtors must be approved and consummated pursuant to section 363 of the Bankruptcy Code as opposed to pursuant to the Plan and not require consummation of a chapter 11 plan of reorganization in order to close the Sale Transaction. The Debtors might also be required to seek approval and consummation of the Sale Transaction pursuant to a Sale Order, as opposed to pursuant to the Plan, in the event the Sale Transaction Proceeds reasonably expected to be received by the Debtors from the Successful Bidder, or other cash that may be available for distribution on account of Claims, is an amount insufficient to pay in full in Cash the DIP Facility Claims, Administrative Claims, Estate Retained Professional Fee Claims, Priority Tax Claims and Other Priority Claims (to the extent such Claims are not Assumed Liabilities, and except to the extent the holder of any such Claims agrees to alternative treatment otherwise acceptable to such holder).

> **On December 16, 2018, Mission Coal Funding LLC filed the *Limited Objection of Mission Coal Funding LLC to Debtors' Bidding Procedures Motion* [Docket No. 439].**

      4. *The Sale Transaction May Not Close.*

The Successful Bidder is expected to agree to purchase certain of the Debtors' assets and assume certain liabilities through the Sale Transaction and may require that certain conditions be met, including approval of this Third Amended Disclosure Statement, Confirmation of the Plan, entry of a Sale Order, and, if applicable, the closing of the Sale Transaction within the respective time periods specified in the Sale Transaction Documentation and that no event giving rise to termination of the Sale Transaction Documentation has occurred (such events as set forth in the Sale Transaction Documentation).

To the extent the terms or conditions of the Sale Transaction Documentation are not satisfied or modified in the Debtors' and Successful Bidder's sole discretion, or to the extent other events giving rise to termination of the Sale Transaction Documentation occur, the Sale Transaction Documentation may be terminated prior to Confirmation or consummation of the Plan. Such termination could adversely affect creditor recoveries as well as the Debtors' ability to confirm and consummate the Plan.

      5. *The Loss of the Services of Key Personnel Could Have a Material Adverse Effect on the Debtors' Business.*

The leadership of the Debtors' executive officers and directors form a critical element of the Debtors' success. The death or disability of any of the Debtors' executive officers or directors, or other extended or permanent loss of their services, or any negative market or industry perception with respect to them or arising from their loss, could have a material adverse effect on the Debtors' businesses. The Debtors' executive officers and other members of senior management have substantial experience and expertise in the Debtors' business that will likely make significant contributions to the Debtors' growth and success. The unexpected loss of services of one or more of these individuals would adversely affect the Debtors.

      6. *Upon a Sale, a Purchaser May be Precluded from Conducting Mining Activities, Transferring Permits, or Obtaining New Permits in Any State.*

In order to conduct its operations, the Debtors are required to obtain mining permits issued by, as applicable, the West Virginia Department of Environmental Protection and the Alabama Surface Mining Commission. After each Regulatory Authority approves a permit, but before the permit is issued, a mine operator must post a penal bond payable to the applicable state to secure its reclamation obligations under the state specific version of the Surface Coal Mining and Reclamation Act. If a permittee fails to comply with the Act's reclamation requirements, the Regulatory Authorities can, among other remedies, issue fines and penalties, order the cessation of mining activities, revoke the permittee's permits, and/or forfeit the applicable bonds. The forfeiture of a bond not only affects the specific permit at issue, but also precludes the permittee (or any person or entity affiliated with the permittee) from conducting mining activities, transferring permits, or obtaining new permits in any state.

7.   *Acts of Terrorism, War, Natural Disasters, Severe Weather, and Political, Economic, and Military Conditions May Impede the Debtors' Ability to Operate or May Otherwise Negatively Affect Their Financial Results.*

Terrorist attacks and other acts of war or hostility have created many economic and political uncertainties. The Debtors cannot predict the extent to which disruptions in air or other forms of travel as a result of terrorist acts, security alerts or wars, uprisings, or hostilities throughout the world will directly or indirectly affect the Debtors' businesses and operating results, as applicable. In addition, natural and man-made disasters such as major fires, floods, hurricanes, earthquakes, and oil spills could also adversely affect the Debtors' business and operating results, as applicable. Such events could lead to the loss of use of one or more mining facilities for an extended period of time and disrupt the ability to mine or deliver coal to customers.

In most cases, the Debtors have insurance that covers portions of losses from natural disasters, but that insurance remains subject to deductibles and maximum payouts in many cases. Although the Debtors may have insurance coverage for natural disasters, the timing of their receipt of insurance proceeds, if any, is out of their control. Additionally, a natural disaster affecting one or more of the Debtors' properties may affect the level and cost of insurance coverage they can obtain in the future, which may adversely affect the Debtors' financial position.

B.    *Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims Under the Plan.*

1.   *Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recovery of Some Holders of Allowed Claims.*

The estimate of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Third Amended Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Third Amended Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan.

2.   *The Debtors May Not Be Able to Satisfy the Conditions Precedent to Consummation of the Plan.*

To the extent that the Debtors are unable to satisfy the conditions precedent to Consummation of the Plan, the Debtors may be unable to consummate the Plan and parties may terminate their support, financial or otherwise, for the Plan prior to the Confirmation or Consummation of the Plan. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

3.   *The Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in the Voting Classes.*

The Debtors cannot know with certainty, at this time, the number or amount of Claims in the Voting Classes that will ultimately be Allowed and how the amount of Allowed Claims will compare to the estimates provided herein. For example, a number of Proofs of Claim may allege Claims in an unliquidated amount that will require future resolution, making the amount of any Allowed Claim based on such Proof of Claim entirely speculative as of the date of this Third Amended Disclosure Statement. In addition, the Debtors are continuing to review the Proofs of Claim filed in their chapter 11 cases. As such, the estimated amount of Claims may materially change due to the Debtors' ongoing review. Accordingly, because certain Claims under the Plan will be paid on a Pro Rata basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims in the Voting Classes.

4.   *The Debtors Cannot Guaranty Recoveries or the Timing of Such Recoveries.*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims, including Administrative Claims, Priority Tax Claims, and Other Priority Claims, it is possible that the actual amount of such Allowed Claims is materially higher than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual distributions to Holders of Allowed Claims may be

49

affected by many factors that cannot be predicted. Therefore, the Debtors cannot guaranty the timing of any recovery on an Allowed Claim.

     5.    *Certain Tax Implications of the Debtors' Bankruptcy*

Holders of Allowed Claims should carefully review **Article IX** of this Third Amended Disclosure Statement, "Material United States Federal Income Tax Consequences," in regard to the tax implications of the Plan and the chapter 11 cases.

C.      *Certain Bankruptcy Law Considerations*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes:

     1.    *Parties in Interest May Object to the Plan's Classification of Claims.*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

Furthermore, certain parties in interest, including the Debtors, reserve the right, under the Plan, to object to the amount or classification of any Claim. The estimates set forth in this Third Amended Disclosure Statement cannot be relied upon by any Holder of a Claim when such Claim is or may be subject to an objection or is not yet Allowed. Any Holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Third Amended Disclosure Statement.

     2.    *Failure to Satisfy Vote Requirements.*

In the event that votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

     3.    *The Debtors May Not Be Able to Secure Confirmation of the Plan.*

The Debtors will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial restructuring unless such liquidation or restructuring is contemplated by the plan; and (iii) the value of distributions to non-accepting Holders of Claims and Interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. According to the Plan, there are various documents that must be in form and substance acceptable to the Debtors, the Required Lenders, and/or the Successful Bidder, and there are certain funding amounts that must also be agreed to by these parties prior to Confirmation. If agreement cannot be reached on these documents or these funding amounts, Confirmation of the Plan may not occur. Further, if the requisite acceptances are not received, the Debtors may seek to accomplish an alternative restructuring and obtain acceptances to an alternative plan of reorganization for the

Debtors, or otherwise, that may not have the support of the Holders of Allowed Claims and Allowed Interests and/or may be required to liquidate these Estates under chapter 7 or 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan. Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Third Amended Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Court determines that this Third Amended Disclosure Statement, the Debtors' proposed procedures for the solicitation of Ballots from Holders of Allowed Claims, and the voting results are appropriate, the Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not Confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan. Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4. *Failure to Consummate the Plan.*

As of the date of this Third Amended Disclosure Statement, there can be no assurance that the conditions to Consummation of the Plan will be satisfied or waived. Accordingly, even if the Plan is confirmed by the Court, there can be no assurance that the Plan will be consummated and the Restructuring Transactions completed.

5. *Nonconsensual Confirmation.*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

6. *Risk of Non-Occurrence of the Plan Effective Date.*

Although the Debtors believe that the Plan Effective Date may occur quickly after the Sale Date, there can be no assurance as to such timing or as to whether such a Plan Effective Date will, in fact, occur.

7. *Compliance with the DIP Facility.*

The DIP Facility is scheduled to mature on April 12, 2019 (the "DIP Maturity Date"). There can be no assurance that the Plan will be confirmed and consummated by the DIP Maturity Date, and there can be no assurance that the DIP Lenders would extend the DIP Maturity Date or forbear from exercising their rights and remedies under the DIP Facility, which may result in the inability of the Debtors to consummate the Plan.

In addition, the DIP Facility contains financial and other covenants regarding, among other things, the Debtors' liquidity and earnings. There can be no assurance that the Debtors will be able to comply with these covenants. If the Debtors fail to comply with such covenants and terms, the Debtors would be required to obtain waivers or forbearance from the lenders under the DIP Facility and, if such waivers or forbearance are not obtained, there could be a material adverse effect on the Debtors' financial condition and the Debtors may not be able to consummate the Plan.

8. *Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan.*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Court orders certain Allowed Claims and Allowed Interests to be subordinated to other Allowed Claims and Allowed Interests. The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

9. *The Debtors May Lack Sufficient Liquidity to Satisfy Certain Priority and Administrative Claims in Full in Cash.*

It is possible that Allowed Administrative Claims, Priority Tax Claims, Other Priority Claims, Estate Retained Professional Fee Claims and the costs of the wind down may exceed the funding available with respect to such Claims, in which case the Plan will not become effective. Further, in the event the Sale Transaction Proceeds reasonably expected to be received by the Debtors from the Successful Bidder, or other cash that may be available for distribution on account of Claims, is an amount insufficient to pay in full in Cash the DIP Facility Claims, Administrative Claims, Estate Retained Professional Fee Claims, Priority Tax Claims and Other Priority Claims (to the extent such Claims are not Assumed Liabilities, and except to the extent the holder of any such Claims agrees to alternative treatment otherwise acceptable to such holder), the Debtors may not be able to confirm the Plan.

10. *Releases, Injunctions, and Exculpations Provisions May Not Be Approved.*

Article IX of the Plan provides for certain releases, injunctions, and exculpations. However, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

11. *The Closing Conditions of the Sale Transaction May Not Be Satisfied.*

It is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction, which would prevent the Debtors from consummating the Plan. If this occurs, the chapter 11 cases may be converted to cases under chapter 7 or dismissed.

D. *Disclosure Statement Disclaimer*

1. *The Financial Information Contained in this Third Amended Disclosure Statement Has Not Been Audited.*

In preparing this Third Amended Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Third Amended Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial

52

condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained in this Third Amended Disclosure Statement and attached hereto is without inaccuracies.

2. *Information Contained in this Third Amended Disclosure Statement Is for Soliciting Votes.*

The information contained in this Third Amended Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3. *This Third Amended Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.*

This Third Amended Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Third Amended Disclosure Statement, or the exhibits or the statements contained in this Third Amended Disclosure Statement.

4. *This Third Amended Disclosure Statement May Contain Forward Looking Statements.*

This Third Amended Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

5. *No Admissions Made.*

The information and statements contained in this Third Amended Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Consenting Stakeholders, Holders of Allowed Claims, or any other parties in interest.

6. *Failure to Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Third Amended Disclosure Statement. The Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Plan Effective Date of the Plan irrespective of whether this Third Amended Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

7. *No Waiver of Right to Object or Right to Recover Transfers and Assets.*

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates are specifically or generally identified in this Third Amended Disclosure Statement.

8. *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.*

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Third Amended Disclosure Statement. Although the Debtors' advisors have performed certain

limited due diligence in connection with the preparation of this Third Amended Disclosure Statement, they have not verified independently the information contained in this Third Amended Disclosure Statement.

9. *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.*

The statements contained in this Third Amended Disclosure Statement are made by the Debtors as of the date of this Third Amended Disclosure Statement, unless otherwise specified in this Third Amended Disclosure Statement, and the delivery of this Third Amended Disclosure Statement after the date of this Third Amended Disclosure Statement does not imply that there has not been a change in the information set forth in this Third Amended Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Third Amended Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Third Amended Disclosure Statement. Further, although the Debtors may subsequently update the information in this Third Amended Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Court.

10. *No Representations Outside this Third Amended Disclosure Statement Are Authorized.*

No representations concerning or relating to the Debtors, the chapter 11 cases, or the Plan are authorized by the Court or the Bankruptcy Code, other than as set forth in this Third Amended Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Third Amended Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors.

E. *Liquidation Under Chapter 7.*

If no chapter 11 plan can be confirmed, the Debtors' chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation could have on the recoveries of Holders of Claims and the Debtors' liquidation analysis is set forth in **Article VII.I.1** of this Third Amended Disclosure Statement entitled "Best Interests of Creditors Test—Liquidation Analysis."

## ARTICLE IX.
## MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors and beneficial owners of Claims (each, a "Holder"). This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not apply to Holders that are not U.S. Persons (as such term is defined in the Tax Code) and does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other

54

integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below.

The Debtors expect to treat the Sale Transaction as a taxable sale of assets for U.S. federal income tax purposes.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

A. *Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Holders of Allowed Class 9 Interests*

Immediately prior to the Consummation of the Plan, Mission Coal and Seneca will be treated as partnerships for U.S. federal income tax purposes, and Seminole will be treated as a disregarded entity for U.S. federal income tax purposes (with its assets being treated as owned by Mission Coal for such purposes). Accordingly, the U.S. federal income tax consequences of consummating the Plan will generally not be borne by Mission Coal, Seneca, or Seminole Coal Recourses, LLC, but will be borne by Mission Coal's and Seneca's partners, *i.e.*, the Holders of the Class 9 Interests.

1.   Taxable Transfer of Assets

Pursuant to the Sale Transaction, the Debtors will transfer all or substantially all of their assets to the Successful Bidder, whereby the Cash received in such a Sale Transaction will be used to fund the applicable creditor recoveries pursuant to the Plan. Such transfer generally should be treated as a taxable sale or exchange of the assets of the Debtors for U.S. federal income tax purposes.

Accordingly, the Debtors may recognize gain upon the transfer of certain assets to the Successful Bidder As described above, because Mission Coal and Seneca are partnerships for U.S. federal income tax purposes, such gain

55

or loss will be allocated to the Holders of the Class 9 Interests. The amount of gain or loss allocable to any particular Holder of a Class 9 Interest depends, in part, on when and at what price such Holder paid for its Class 9 Interest and the extent to which it has previously been allocated amortization or depreciation deductions with respect to the transferred assets. The Holders of the Class 9 Interests are urged to consult their tax advisors regarding the allocation of gain and loss and the deductibility of any losses recognized as a result of the transfer of assets (including any other limitations that may be imposed by the tax law based on a holder's individual circumstances).

        2.    <u>COD Income.</u>

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("<u>COD Income</u>") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "<u>Bankruptcy Exception</u>"), or (b), to the extent that the taxpayer is insolvent immediately before the discharge (the "<u>Insolvency Exception</u>"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("<u>NOLs</u>"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

Under section 108(d)(6) of the Tax Code, when an entity, such as Mission Coal or Seneca, that is taxed as a partnership realizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the partner level rather than at the entity level. Accordingly, the Holders of Allowed Class 9 Interests will be treated as receiving their allocable share, if any, of the COD Income realized by Mission Coal or Seneca.

The Debtors, and accordingly, the Holders of the Class 9 Interests, expect to realize significant COD Income as a result of the consummation of the Plan. The exact amount of any COD Income that will be realized by the Debtors and the Holders of the Class 9 Interests will not be determinable until the consummation of the Plan.

**B.**    *Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 3 DIP Facility Claims*

The DIP Lenders shall receive payment in full in Cash of the Obligations, which amount shall include the full roll-up of the Prepetition First Lien Obligations Amount, including the Prepayment Premium, plus the First Lien Accrued Adequate Protection Payments) from the Sale Transaction Proceeds (each as defined in the DIP Documents to the extent not defined herein). Holders of the DIP Facility Claims will recognize gain or loss equal to the (a) the sum of (i) any Cash received minus (b) the Holder's adjusted tax basis in its DIP Facility Claim.

To the extent that Holders of DIP Facility Claims seek treatment otherwise acceptable to them as provided herein, the tax consequences of such treatment may change.

**C.**    *Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 4 Second Lien Secured Claims.*

Pursuant to the Plan, each Holder of an Allowed Class 4 Second Lien Secured Claim will receive its *pro rata* share, based on the Allowed amount of its Second Lien Secured Claim, of Cash, solely to the extent the DIP Facility Claims are paid in full in cash. Such Holders will recognize gain or loss equal to (i) the sum of any Cash received minus (ii) the Holder's adjusted tax basis in its Second Lien Secured Claim..

D.     *Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 5 General Unsecured Claims.*

Pursuant to the Plan, each Holder of an Allowed Class 5 General Unsecured Claim will receive its *pro rata* share of Cash, to the extent the DIP Facility Claims and the Second Lien Secured Claims are paid in full in Cash. Such Holders should recognize gain or loss equal to (a) the sum of any Cash received, minus (b) the Holder's adjusted tax basis in its General Unsecured Claim.

D.     *Character of Gain or Loss.*

Where gain or loss is recognized by a Holder of a Claim upon the exchange of its Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, whether the Allowed Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Allowed Claim was acquired at a market discount (discussed below), whether and to what extent the Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. Each Holder of an Allowed Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Claim.

Holders of Allowed Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For corporate Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

E.     *Market Discount.*

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount" ("OID")  its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of debt constituting its Allowed Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

Section 451 of the IRC (as discussed below) generally would require accrual method Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) to include certain items of income such as market discount no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with market discount is effective for taxable years beginning after December 31, 2018. However, the IRS recently announced in Notice 2018-80 that it intends to issue proposed regulations confirming that taxpayers may continue to defer income—including market discount income—for tax purposes until there is a payment or sale at a gain. Accordingly, although market discount may have to be included in income currently as it accrues for financial accounting purposes, taxpayers may continue to defer the income for tax purposes. Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

57

*F.*     *Accrued Interest.*

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary; however, the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the terms of the Plan, distributions in respect of Allowed Claims are allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for Holders.

U.S. federal income tax laws enacted in December 2017 added section 451 of the IRC. Under this new provision, accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) generally would be required to include certain items of income such as OID (but not market discount) no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with OID is effective for taxable years beginning after December 31, 2018. Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

*G.*     *Limitation on Use of Capital Losses*

A Holder of a Claim who recognizes capital losses as a result of the transactions undertaken pursuant to the Plan will be subject to limits on the use of such capital losses. For a non-corporate Holder, capital losses may be used to offset any capital gains recognized (without regard to holding periods), and also ordinary income recognized to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of such capital losses over such capital gains. A non-corporate Holder may carry over unused capital losses recognized and apply them against future capital gains recognized and a portion of their ordinary income recognized for an unlimited number of years. Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

*H.*     *Information Reporting and Backup Withholding*

The Debtors will withhold all amounts required by law to be withheld from distributions or payments. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan. In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

58

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**ARTICLE X.**
**RECOMMENDATION OF THE DEBTORS**

**In the opinion of the Debtors, the Plan is preferable to any potential alternatives described in this Third Amended Disclosure Statement because the Plan provides for a larger distribution to the Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.**

[*Balance of page intentionally left blank.*]

Respectfully submitted,

Dated:  February 8, 2019

MISSION COAL COMPANY, LLC
on behalf of itself and all other Debtors

/s/ Kevin Nystrom
_____
Name: Kevin Nystrom
Title: Chief Restructuring Officer
Company: Mission Coal Company, LLC

**Exhibit A**

**Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates**

*Intentionally Omitted*

**Exhibit B**

**Wind-Down Financial Projections**

A plan is feasible under section 1129(a) of the Bankruptcy Code if it is unlikely that confirmation will be followed by liquidation or the need for further financial reorganization. The Debtors analyzed their ability to meet their obligations under the Disclosure Statement and Plan after the Plan Effective Date. Based on the Debtors' analysis, as further described below, they will have sufficient assets to accomplish the tasks under the Disclosure Statement and Plan. Therefore, the Debtors believe that pursuant to the Disclosure Statement and Plan they meet the feasibility requirements of the Bankruptcy Code.

While the Debtors expect all assets to be sold by the Plan Effective Date, certain assets may not be sold through the current sale process, and those assets will be liquidated and/or abandoned at the discretion of the Plan Administrator. To the extent those dispositions generate additional proceeds, they will be distributed pursuant to the terms of the Plan. Therefore, the financial projections below reflect only the estimated residual balance sheet an income statement relating to the wind down of the residual estate. As provided for in the Opening Bidder's Proposed Agreement, if the DIP Lenders are the Successful Bidder, they will contribute approximately $38.5 million towards the satisfaction of Administrative Claims and wind-down of the estates. The wind-down is expected to take approximately one year. It is anticipated that the bulk of the remaining Administrative Claims will be satisfied in the first 90 days post Effective Date with the ongoing satisfaction of trailing healthcare and workers compensation related claims being paid throughout the year.

The table below summarizes the estimated activity of the Debtors for the year following the Plan Effective Date. These are preliminary estimates only and are subject to material change as the Debtors continue their diligence and review filed claim information to refine the estimated amounts. Similarly, on the Effective Date the General Unsecured Claims Cash Pool Account will be funded. Upon reconciling General Unsecured Claims, the Plan Administrator will make distributions to holders of Allowed General Unsecured Claims throughout the wind-down period pursuant to the terms of the Plan. The timing and amount of such distributions are subject to the completion of the claims reconciliation process.

**Mission Coal Company**
**Estimated Pro-Forma Wind Down Income Statement**

| ($ in Thousands) | 2Q19 | 3Q19 | 4Q19 | 1Q20 | Total |
|---|---|---|---|---|---|
| Revenues / Receipts: | | | | | |
| Receipts | - | - | - | - | - |
| Total Revenues / Receipts | - | - | - | - | - |
| Costs and Expenses: | | | | | |
| Satisfaction of Administration claims | 31.0 | 2.0 | 2.0 | 2.0 | 37.0 |
| Professionals | 16.3 | - | - | - | 16.3 |
| Employee Related Costs | 9.0 | 2.0 | 2.0 | 2.0 | 15.0 |
| Other Administrative Claims | 5.7 | - | - | - | 5.7 |
| Wind-Down Costs | 0.2 | 0.2 | 0.2 | 0.3 | 1.0 |
| Employee Wages & Benefits | 0.1 | 0.1 | 0.1 | 0.2 | 0.5 |
| Office Costs | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| Restructuring Related Costs | 0.1 | 0.1 | 0.1 | 0.1 | 0.4 |
| Total Costs and Expenses | 31.2 | 2.2 | 2.2 | 2.3 | 38.0 |
| Distributions to General Unsecured Claims | tbd | tbd | tbd | tbd | tbd |
| Net Income / (Loss) Attributable to Mission Coal Company | (31.2) | (2.2) | (2.2) | (2.3) | (38.0) |

**Schedule 2**

**Form of Solicitation and Voting Procedures**

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## SOLICITATION AND VOTING PROCEDURES

**PLEASE TAKE NOTICE THAT** on [●], 2019, the United States Bankruptcy Court for the Northern District of Alabama (the "Court") entered an order (the "Disclosure Statement Order"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors"),[2] to solicit votes on the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan"); (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

### A.    The Voting Record Date.

The Court has established **February 6, 2019**, as the record date for purposes of determining which holders of Claims in Class 3 (DIP Facility Claims), Class 4 (Second Lien Secured Claims), and Class 5 (General Unsecured Claims) are entitled to vote on the Plan (the "Voting Record Date"). Accordingly, only Holders of DIP Facility Claims, Second Lien Secured Claims, and General Unsecured Claims as of such date are entitled to vote on the Plan.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2]    Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order.

### B. The Voting Deadline.

The Court has established **March 11, 2019, at 4:00 p.m., prevailing Central Time**, as the voting deadline (the "Voting Deadline") for the Plan. The Debtors may extend the Voting Deadline, with the reasonable consent of the Required Lenders and the orders approving the Debtors' postpetition financing facility, without further order of the Court. To be counted as votes to accept or reject the Plan, all ballots (the "Ballots")[3] must be properly executed, completed, and delivered by: (1) first class mail (using the reply envelope provided in the Solicitation Package or otherwise); (2) overnight courier; (3) personal delivery; or (4) via electronic mail so that they are ***actually received*** by the Notice and Claims Agent, in any case, no later than the Voting Deadline. The Ballots will clearly indicate the appropriate return address.

### C. Form, Content, and Manner of Notices.

### 1. The Solicitation Package.

The following materials shall constitute the solicitation package (the "Solicitation Package"):

- a. a copy of these Solicitation and Voting Procedures;

- b. a Ballot, together with detailed voting instructions and a pre-addressed, postage prepaid return envelope;

- c. the Cover Letter;

- d. the Disclosure Statement (and exhibits thereto, including the Plan);

- e. the Disclosure Statement Order (without exhibits except the Solicitation and Voting Procedures, as set forth above);

- f. the Confirmation Notice; and

- g. any other materials the Court approves as part of the Solicitation Package, which may include a letter from the Official Committee of Unsecured Creditors.

### 2. Distribution of the Solicitation Package.

The Solicitation Package shall provide the Plan, the Disclosure Statement, and the Disclosure Statement Order (without exhibits except the Solicitation and Voting Procedures) in electronic format (i.e., CD-ROM or flash drive format), and all other contents of the Solicitation Package, including Ballots, shall be provided in paper format. Any party that receives the materials in electronic format, but would prefer paper format may contact Omni Management Group.

---

3    For the avoidance of doubt, the defined term Ballots includes the DIP Facility Claim ballots (the "DIP Facility Claim Ballots"), the Second Lien Secured Claim ballots (the "Second Lien Secured Claim Ballots"), and the General Unsecured Claim ballots (the "General Unsecured Claim Ballots").

2

(the "Notice and Claims Agent") by: (a) calling the Notice and Claims Agent at 888-585-6494 (U.S.) or 818-906-8300 (International); (b) visiting the Debtors' restructuring website at: http://www.omnimgt.com/missioncoal; (c) writing to the Notice and Claims Agent at Omni Management Group, Re: Mission Coal Company, et al., 5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367; and/or (d) emailing missioninfo@omnimgt.com and requesting paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense).

The Debtors shall serve or cause to be served all of the materials in the Solicitation Package (excluding the Ballots) on the Bankruptcy Administrator and all parties who have requested service of papers in this case pursuant to Bankruptcy Rule 2002 as of the Voting Record Date. In addition, the Debtors shall mail or cause to be mailed the Solicitation Package to all holders of Claims in the Voting Classes who are entitled to vote as described in Section D below, on or before February 11, 2019.

To avoid duplication, the Debtors will use commercially reasonable efforts to ensure that any holder of a Claim who has filed or purchased duplicative Claims against a Debtor (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against that Debtor.

3. **Resolution of Disputed Claims for Voting Purposes; Resolution Event.**

a. Absent a further order of the Court, the holder of a Claim that is in a Voting Class and is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection.

b. If a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is filed with the Court on or prior to seven (7) days before the Voting Deadline:

(i) the Debtors shall cause the applicable holder to be served with a Disputed Claim Notice, substantially in the form annexed as **Schedule 6** to the Disclosure Statement Order (which notice shall be served together with such objection); such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots), as well as how they may opt out of the third-party releases set forth in Article IX.E of the Plan (the "Third Party Releases");

(ii) the Debtors shall cause the applicable holder to be served with an *Opt Out Form for Disputed Claim Holders*, substantially in the form annexed as **Exhibit A** to the Notice to Disputed Claim Holders; and

(iii) the applicable holder shall not be entitled to vote to accept or reject the Plan on account of such claim unless a Resolution Event (as defined herein) occurs as provided herein.

3

c. If a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is filed with the Court less than seven (7) days prior to the Voting Deadline, the applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the holder of such Claim and without further order of the Court, unless the Court orders otherwise.

d. A "Resolution Event" means the occurrence of one or more of the following events no later than two (2) business days prior to the Voting Deadline:

i. an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

ii. an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

iii. a stipulation or other agreement is executed between the holder of such Claim and the Debtors resolving the objection and allowing such Claim in an agreed upon amount; or

iv. the pending objection is voluntarily withdrawn by the objecting party.

e. No later than one (1) business day following the occurrence of a Resolution Event, the Debtors shall cause the Notice and Claims Agent to distribute via email, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant holder to the extent such holder has not already received a Solicitation Package containing a Ballot.

## 4. Non-Voting Status Notices for Unimpaired Classes and Classes Deemed to Reject the Plan.

Certain holders of Claims that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code will receive the *Notice of Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan*, substantially in the form annexed as **Schedule 4** to the Disclosure Statement Order.  Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots).

Certain holders of Claims and Interests who are not entitled to vote because they are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code will receive the *Notice of Non-Voting Status to Holders of Impaired Claims and Equity Interests Deemed to Reject the Plan*, substantially in the form annexed as **Schedule 5** to the Disclosure Statement Order.  Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots), as well as how they may opt out of the Third Party

4

Releases provided by the Plan. The holders of such Claims and Interests will also receive an *Opt-Out Form for Holders of Impaired Claims and Equity Interests Deemed to Reject the Plan*, substantially in the form annexed as **Exhibit A** to **Schedule 5**. In addition, holders of Claims and Interests in the classes deemed to reject the Plan will also receive the Disclosure Statement (together with the Plan attached as **Exhibit A** thereto).

### 5. Notices in Respect of Executory Contracts and Unexpired Leases.

Counterparties to Executory Contracts and Unexpired Leases that receive a notice of rejection, substantially in the forms attached as **Schedule 10** to the Disclosure Statement Order, respectively, may file an objection to the Debtors' proposed assumption, assumption and assignment, or rejection, as applicable. Such objections must be ***actually received*** as set forth in the notice of assumption or notice of rejection.

### D. Voting and Tabulation Procedures.

### 1. Holders of Claims Entitled to Vote.

Only the following holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims:

a. Holders of Claims who, on or before the Voting Record Date, have timely filed a Proof of Claim that (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date, and (ii) is not the subject of a pending objection, other than a "reduce and allow" objection, filed with the Court at least seven days prior to the Voting Deadline, pending a Resolution Event as provided herein; *provided* that a holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package and be entitled to vote such Claim in the reduced amount contained in such objection absent a further order of the Court;

b. Holders of Claims who, pursuant to the Bar Date Order, are exempt from any requirement to file a Proof(s) of Claim on or before the applicable Bar Date or have filed a single, master proof of claim by the relevant Bar Date with respect to all claims under an applicable facility, loan document, or indenture;

c. Holders of Claims that are listed in the Schedules; *provided* that Claims that are scheduled as contingent, unliquidated, or disputed (excluding such scheduled disputed, contingent, or unliquidated Claims that have been paid or superseded by a timely Filed Proof of Claim) shall be allowed to vote only in the amounts set forth in Section D.2(d) of these Solicitation and Voting Procedures;

d. Holders whose Claims arise (i) pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Court, (ii) in an order entered by the Court, or (iii) in a document executed by the Debtors

5

pursuant to authority granted by the Court, in each case regardless of whether a Proof of Claim has been filed;

e.     Holders of any Disputed Claim that has been temporarily allowed to vote on the Plan pursuant to Bankruptcy Rule 3018;

f.     the assignee of any Claim that was transferred on or before the Voting Record Date by any Entity described in subparagraphs (a) through (d) above; *provided* that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date;

g.     any holders of Claims who have filed or purchased duplicate Claims within the same Voting Class shall be provided with only one Solicitation Package and one ballot for voting a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims; and

h.     holders of Claims filed in an amount of $0.00 are not entitled to vote.

## 2.     <u>Establishing Claim Amounts for Voting Purposes</u>.

**<u>Class 3 Claims</u>**. The Claims amount of Class 3 Claims is based on Claims arising under the DIP Facility or the Final DIP Order, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations.

**<u>Class 4 Claims</u>**. The Claims amount of Class 4 Claims is based on Claims on account of the Second Lien Credit Agreement, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations.

**<u>Class 5 Claims</u>**. The Claims amount of Class 5 Claims is based on General Unsecured Claims for voting purposes only will be established based on the amount of the applicable positions held by such Class 5 Claim holder as of the Voting Record Date, as evidenced by (a) the Debtors' applicable books and records, and (b) the claims register maintained in the chapter 11 cases.

**<u>Filed and Scheduled Claims</u>**. The Claim amount established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim. Moreover, any amounts filled in on Ballots by the Debtors through the Notice and Claims Agent, as applicable, are not binding for purposes of allowance and distribution. In tabulating votes, the following hierarchy shall be used to determine the amount of the Claim associated with each claimant's vote:

a.     the Claim amount (i) settled and/or agreed upon by the Debtors, as reflected in a document filed with the Court, including the Plan, (ii) set forth in an order of the Court, or (iii) set forth in a document executed by the Debtors pursuant to authority granted by the Court;

b.     the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event pursuant to these Solicitation and Voting Procedures;

6

c.      the Claim amount contained in a Proof of Claim that has been timely filed by the applicable Claims Bar Date (or deemed timely filed by the Court under applicable law), except for any amounts asserted on account of any interest accrued after the Commencement Date; *provided*, *however*, that any Ballot cast by a holder of a Claim who timely files a Proof of Claim in respect of (i) a contingent Claim or a Claim in a wholly-unliquidated or unknown amount (based on a reasonable review by the Debtors and/or the Notice and Claims Agent) that is not the subject of an objection will count toward satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as a Ballot for a Claim in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code, and (ii) a partially liquidated and partially unliquidated Claim, which Claim will be Allowed for voting purposes only in the liquidated amount; *provided further*, *however*, that to the extent the Claim amount contained in the Proof of Claim is different from the Claim amount set forth in a document filed with the Court as referenced in subparagraph (a) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the respective Proof of Claim for voting purposes;

d.      the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely filed Proof of Claim); *provided* that such Claim is not scheduled as contingent, disputed, or unliquidated and/or has not been paid; provided, however, that if the applicable Claims Bar Date has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall vote at $1.00; and

e.      in the absence of any of the foregoing, such Claim shall be disallowed for voting purposes.

**3.      <u>Voting and Ballot Tabulation Procedures</u>.**

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots, so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Local Rules:

a.      except as otherwise provided in the Solicitation and Voting Procedures, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors shall reject such Ballot as invalid and, therefore, shall not count it in connection with confirmation of the Plan;

b.      the Notice and Claims Agent will file with the Court by no later than one week before the Confirmation Hearing, a voting report (the "<u>Voting Report</u>").  The Voting Report shall, among other things, delineate every Ballot that does not conform to the Solicitation and Voting Procedures or

7

that contains any form of irregularity including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or damaged (collectively, in each case, the "Irregular Ballots"). The Voting Report shall indicate the Debtors' decision with regard to each Irregular Ballot;

c.  the method of delivery of Ballots to be sent to the Notice and Claims Agent is at the election and risk of each holder, and except as otherwise provided, a Ballot will be deemed delivered only when the Notice and Claims Agent actually receives the executed Ballot;

d.  an executed Ballot is required to be submitted by the Entity submitting such Ballot. Delivery of a Ballot to the Notice and Claims Agent by facsimile or any electronic means other than as expressly approved by the Disclosure Statement Order or these Solicitation and Voting Procedures will not be valid;[4]

e.  no Ballot should be sent to the Debtors, the Debtors' agents (other than the Notice and Claims Agent), or the Debtors' financial or legal advisors, and, if so sent, will not be counted;

f.  if multiple Ballots are received from the same holder with respect to the same Claim prior to the Voting Deadline, the last properly executed Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;

g.  Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular holder within a Class for the purpose of counting votes;

h.  a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a holder of Claims must indicate such capacity when signing;

i.  the Debtors, subject to a contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either

---

[4]  For the avoidance of doubt, a Ballot may be submitted via electronic mail to the Notice and Claims Agent at missioncoal@omnimgt.com. For any Ballot cast via electronic mail, the format of the attachment must be found in the common workplace and industry standard format (i.e., industry-standard PDF file) and the received date and time in the Notice and Claims Agent's inbox will be used as the timestamp for receipt.

8

before or after the close of voting, and any such waivers will be documented in the Voting Report;

j.    neither the Debtors nor any other Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification;

k.    unless waived or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted;

l.    in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

m.    subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

n.    if a Claim has been estimated or otherwise Allowed only for voting purposes by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

o.    if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

p.    the following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (i) any Ballot that is illegible or contains insufficient information to permit the identification of the holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (iv) any unsigned Ballot or Ballot lacking an original signature; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (vi) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein;

q.    after the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors;

Case 18-04177-TOM11    Doc 762    Filed 02/08/19    Entered 02/08/19 14:41:28    Desc
Main Document      Page 91 of 170

r.       the Debtors are authorized to enter into stipulations with the holder of any Claim agreeing to the amount of a Claim for voting purposes; and

s.       where any portion of a single Claim has been transferred to a transferee, all holders of any portion of such single Claim will be (a) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other solicitation and voting procedures set forth herein), and (b) required to vote every portion of such Claim collectively to accept or reject the Plan.  In the event that (a) a Ballot, (b) a group of Ballots within a Voting Class received from a single creditor, or (c) a group of Ballots received from the various holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots shall not be counted.

### E.       Amendments to the Plan and Solicitation and Voting Procedures.

The Debtors reserve the right, in consultation with counsel to the Required Lenders, to make non-substantive or immaterial changes to the Disclosure Statement, Plan, Ballots, Confirmation Hearing Notice, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Package before their distribution.

*       *       *       *       *

10

## Schedule 3A

**Form of DIP Facility Claim Ballot**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**BALLOT FOR VOTING TO
ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF
MISSION COAL COMPANY, LLC AND CERTAIN OF ITS DEBTOR AFFILIATES**

**CLASS 3 HOLDERS OF DIP FACILITY CLAIMS**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
> CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT
> MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE
> *ACTUALLY RECEIVED*
> BY THE NOTICE AND CLAIMS AGENT BY MARCH 11, 2019, AT 4:00 P.M., PREVAILING
> CENTRAL TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE FOLLOWING:**

The Debtors are soliciting votes with respect to the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2019 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this ballot (this "DIP Facility Claim Ballot") because you are a Holder of a DIP Facility Claim as of February 6, 2019 (the "Voting Record Date"). As a result, you are entitled to vote on behalf of both your Class 3 DIP Facility Claim.

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this DIP Facility Claim Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Omni

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

Management Group. (the "Notice and Claims Agent") at no charge by: (i) calling the Notice and Claims Agent at 888-585-6494 (U.S.) or 818-906-8300 (International), (ii) visiting the Debtors' restructuring website at: http://www.omnimgmt.com/missioncoal, (iii) writing to the Notice and Claims Agent at Omni Management Group, Re: Mission Coal Company, LLC, et al., 5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367; and/or (iv) emailing missioninfo@omnimgmt.com and requesting paper copies of the corresponding materials previously received in electronic format. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.alnb.uscourts.gov.

This DIP Facility Claim Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this DIP Facility Claim Ballot in error, please contact the Notice and Claims Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claims have been placed in Class 3 DIP Facility Claims under the Plan.

**Item 1.  Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the holder of a Class 3 DIP Facility Claim in the following *aggregate* unpaid amount:

| $ |
|---|

**Item 2.  Vote on Plan.**

The holder of the Class 3 DIP Facility Claim against the Debtors, the aggregate amount of which is set forth in Item 1, votes to (please check one):

| ☐ **ACCEPT** (vote FOR) the Plan | ☐ **REJECT** (vote AGAINST) the Plan |
|---|---|

**Item 3.  Important information regarding the Third Party Releases.**

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE IX.E OF THE PLAN SET FORTH BELOW.**

**IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**YOU MAY ELECT TO OPT OUT OF THE RELEASES CONTAINED IN ARTICLE IX.E OF THE PLAN *ONLY IF* YOU CHECK THE BOX BELOW AND (A) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR (B) VOTE TO REJECT THE PLAN. IF YOU (A) VOTE TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, (C) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, OR (D) VOTE TO REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, IN EACH CASE YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN.**

**The Holder of a Class 3 DIP Facility Claim identified in Item 1 elects to:**

| ☐ **OPT OUT of the Third Party Releases** |
|---|

2

**Article IX.E of the Plan contains the following Third Party Releases:** [2]  **As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.**

\*     \*     \*

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE SUCCESSFUL BIDDER; (B) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (C) ALL HOLDERS OF CLAIMS AND INTERESTS WHO VOTE TO ACCEPT THE PLAN; (D) ALL HOLDERS OF CLAIMS OR INTERESTS THAT (I) ABSTAIN FROM VOTING ON THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, (II) VOTE TO REJECT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, OR (III) ARE DEEMED TO REJECT OR PRESUMED TO ACCEPT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (E) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (D); (E) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (E) EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (G) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS,

---

[2]  The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The Releases by Holders of Claims and Interests are subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

3

EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

UNDER THE PLAN, "RELEASED PARTY" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE SUCCESSFUL BIDDER; (B) THE DIP AGENT; (C) THE DIP LENDERS; (D) THE FIRST LIEN AGENT; (E) THE FIRST LIEN LENDERS; (F) THE SECOND LIEN LENDER; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); (H) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (G), EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (I) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE NOT IN VOTING CLASSES THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE IX.E OF THE PLAN USING THE ENCLOSED OPT OUT FORM, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. BY ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN YOU WILL FORGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN IF YOU OTHERWISE WOULD BE A RELEASED PARTY THEREUNDER.

**Item 4. Certifications.**

By signing this DIP Facility Claim Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

    (a)    that, as of the Voting Record Date, either: (i) the Entity is the Holder of the DIP Facility Claim being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the DIP Facility Claim being voted;

    (b)    that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

    (c)    that the Entity has cast the same vote with respect to all DIP Facility Claims; and

    (d)    that no other DIP Facility Claim Ballots with respect to the amount of the DIP Facility Claim identified in Item 1 have been cast or, if any other DIP Facility Claim Ballots have been cast with respect to such DIP Facility Claim, then any such earlier DIP Facility Claim Ballots are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS DIP FACILITY CLAIM BALLOT AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

1. **In the envelope provided via first class mail, overnight courier, or hand delivery to:**

| If by First Class Mail: | If by Hand Delivery or Overnight Mail: |
|---|---|
| Omni Management Group<br>**Re: Mission Coal Company, LLC, *et al.*,**<br>Attn: Voting Department<br>5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367 | Omni Management Group<br>**Re: Mission Coal Company, LLC, *et al.*,**<br>Attn: Voting Department<br>5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367 |

2. **Via electronic mail service to:**

missioncoal@omnimgt.com
with a reference to "Mission Ballot" in the subject line.

IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE*
THIS DIP FACILITY CLAIM BALLOT **ON OR BEFORE MARCH 11, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME,** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS DIP FACILITY CLAIM BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.

5

| Class 3 — DIP Facility Claims |
|---|

## INSTRUCTIONS FOR COMPLETING THIS DIP FACILITY CLAIM BALLOT

1. The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the DIP Facility Claim Ballot or in these instructions (the "Ballot Instructions"), but not otherwise defined therein or herein, shall have the meaning set forth in the Plan, a copy of which also accompanies the DIP Facility Claim Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS DIP FACILITY CLAIM BALLOT.**

2. The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your DIP Facility Claim Ballot is counted, you must either: (a) complete and submit this hard copy DIP Facility Claim Ballot or (b) email a scanned copy DIP Facility Claim Ballot in PDF format to Notice and Claims Agent at missioncoal@omnimgt.com.[3] Ballots will not be accepted by facsimile or other electronic means other than electronic mail.

4. The DIP Facility Claim Ballot *must* be returned to the Notice and Claims Agent so as to be *actually received* by the Notice and Claims Agent on or before the Voting Deadline. **The Voting Deadline is March 11, 2019, at 4:00 p.m.,** prevailing Central Time.

5. If the DIP Facility Claim Ballot is received *after* the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors. Additionally, **the following DIP Facility Claim Ballots will *not* be counted**:

   (a) any DIP Facility Claim Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;
   (b) any DIP Facility Claim Ballot cast by a party that does not hold a Claim in a Class that is entitled to vote on the Plan;
   (c) any DIP Facility Claim Ballot sent by facsimile or any electronic means other than electronic mail;
   (d) any unsigned DIP Facility Claim Ballot;
   (e) any DIP Facility Claim Ballot that does not contain an original *signature; provided*, however, that any DIP Facility Claim Ballot submitted via electronic mail shall be deemed to contain an original signature;
   (f) any DIP Facility Claim Ballot not marked to accept or reject the Plan; and
   (g) any DIP Facility Claim Ballot submitted by any party not entitled to cast a vote with respect to the Plan.

6. The method of delivery of DIP Facility Claim Ballots to the Notice and Claims Agent is at the election and risk of each Holder of a Class 3 DIP Facility Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Notice and Claims Agent *actually receives* the originally executed DIP Facility Claim Ballots. In all cases, holders should allow sufficient time to assure timely delivery.

---

[3] For any Ballot cast via electronic mail, the format of the attachment must be found in the common workplace and industry standard format (i.e., industry-standard PDF file) and the received date and time in the Notice and Claims Agent's inbox will be used as the timestamp for receipt.

7. If multiple DIP Facility Claim Ballots are received from the same holder of a DIP Facility Claim with respect to the same DIP Facility Claim prior to the Voting Deadline, the latest, timely received, and properly completed DIP Facility Claim Ballot will supersede and revoke any earlier received DIP Facility Claim Ballots.

8. The DIP Facility Claim Ballot does ***not*** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

9. **Please be sure to sign and date the DIP Facility Claim Ballot**.  You should indicate that you are signing a DIP Facility Claim Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Notice and Claims Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the DIP Facility Claim Ballot.

10. Each ballot votes *only* your Claims indicated on that ballot, so please complete and return each ballot you receive.

**PLEASE RETURN YOUR DIP FACILITY CLAIM BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS DIP FACILITY CLAIM BALLOT,
THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE NOTICE AND CLAIMS AGENT AT:  888-585-6494 (U.S. AND CANADA) OR
818-906-8300 (INTERNATIONAL) OR EMAIL MISSIONINFO@OMNIMGT.COM.**

---

**IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THIS DIP FACILITY CLAIM BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS MARCH 11, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS.**

---

7

**<u>Schedule 3B</u>**

**Form of Class 4 Ballot**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**BALLOT FOR VOTING TO
ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF
MISSION COAL COMPANY, LLC AND CERTAIN OF ITS DEBTOR AFFILIATES**

**CLASS 4 HOLDERS OF SECOND LIEN SECURED CLAIMS**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE NOTICE AND CLAIMS AGENT BY MARCH 11, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE FOLLOWING:**

The Debtors are soliciting votes with respect to the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2019 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this ballot (this "Second Lien Secured Claim Ballot") because you are a Holder of a Second Lien Secured Claim as of February 6, 2019 (the "Voting Record Date"). As a result, you are entitled to vote on behalf of both your Class 4 Second Lien Secured Claim.

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Second Lien Secured Claim Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

(a) Omni Management Group. (the "Notice and Claims Agent") at no charge by: (i) calling the Notice and Claims Agent at 888-585-6494 (U.S.) or 818-906-8300 (International), (ii) visiting the Debtors' restructuring website at: http://www.omnimgmt.com/missioncoal, (iii) writing to the Notice and Claims Agent at Omni Management Group, Re: Mission Coal Company, LLC, et al., 5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367; and/or (iv) emailing missioninfo@omnimgmt.com and requesting paper copies of the corresponding materials previously received in electronic format. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.alnb.uscourts.gov.

This Second Lien Secured Claim Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Second Lien Secured Claim Ballot in error, please contact the Notice and Claims Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claims have been placed in Class 4 Second Lien Secured Claims under the Plan.

**Item 1. Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the holder of a Class 4 Second Lien Secured Claim in the following *aggregate* unpaid amount:

$$\$_____$$

**Item 2. Vote on Plan.**

The holder of the Class 4 Second Lien Secured Claim against the Debtors, the aggregate amount of which is set forth in Item 1, votes to (please check one):

| ☐ **ACCEPT** (vote FOR) the Plan | ☐ **REJECT** (vote AGAINST) the Plan |
|---|---|

**Item 3. Important information regarding the Third Party Releases.**

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE IX.E OF THE PLAN SET FORTH BELOW.**

**IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**YOU MAY ELECT TO OPT OUT OF THE RELEASES CONTAINED IN ARTICLE IX.E OF THE PLAN *ONLY IF* YOU CHECK THE BOX BELOW AND (A) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR (B) VOTE TO REJECT THE PLAN. IF YOU (A) VOTE TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, (C) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, OR (D) VOTE TO REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, IN EACH CASE YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN.**

**The Holder of a Class 4 Second Lien Secured Claim identified in Item 1 elects to:**

| ☐ **OPT OUT of the Third Party Releases** |
|---|

**Article IX.E of the Plan contains the following Third Party Releases:** [2]  **As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.**

\*　　\*　　\*

UNDER THE PLAN, "<u>RELEASING PARTY</u>" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE SUCCESSFUL BIDDER; (B) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (C) ALL HOLDERS OF CLAIMS AND INTERESTS WHO VOTE TO ACCEPT THE PLAN; (D) ALL HOLDERS OF CLAIMS OR INTERESTS THAT (I) ABSTAIN FROM VOTING ON THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, (II) VOTE TO REJECT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, OR (III) ARE DEEMED TO REJECT OR PRESUMED TO ACCEPT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (E) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (D); (E) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (E) EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (G) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS,

---

[2]  The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The Releases by Holders of Claims and Interests are subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

UNDER THE PLAN, "RELEASED PARTY" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE SUCCESSFUL BIDDER; (B) THE DIP AGENT; (C) THE DIP LENDERS; (D) THE FIRST LIEN AGENT; (E) THE FIRST LIEN LENDERS; (F) THE SECOND LIEN LENDER; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); (H) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (G), EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (I) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE NOT IN VOTING CLASSES THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN <u>ARTICLE IX.E OF THE PLAN USING THE ENCLOSED OPT OUT FORM</u>, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. BY ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN <u>ARTICLE IX.E</u> OF THE PLAN YOU WILL FORGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN <u>ARTICLE IX.D</u> OF THE PLAN IF YOU OTHERWISE WOULD BE A RELEASED PARTY THEREUNDER.

**<u>Item 4</u>. Certifications.**

By signing this Second Lien Secured Claim Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(e) that, as of the Voting Record Date, either: (i) the Entity is the Holder of the Second Lien Secured Claim being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Second Lien Secured Claim being voted;

(f) that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(g) that the Entity has cast the same vote with respect to all Second Lien Secured Claims; and

(h) that no other Second Lien Secured Claim Ballots with respect to the amount of the Second Lien Secured Claim identified in Item 1 have been cast or, if any other Second Lien Secured Claim Ballots have been cast with respect to such Second Lien Secured Claim, then any such earlier Second Lien Secured Claim Ballots are hereby revoked.

4

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS <u>SECOND LIEN SECURED CLAIM</u> BALLOT AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

1.  **In the envelope provided via first class mail, overnight courier, or hand delivery to:**

| <u>If by First Class Mail:</u> | <u>If by Hand Delivery or Overnight Mail:</u> |
|:---:|:---:|
| Omni Management Group<br>**Re: Mission Coal Company, LLC, *et al.*,**<br>Attn: Voting Department<br>5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367 | Omni Management Group<br>**Re: Mission Coal Company, LLC, *et al.*,**<br>Attn: Voting Department<br>5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367 |

2.  **Via electronic mail service to:**

missioncoal@omnimgt.com
<u>with a reference to "Mission Ballot" in the subject line.</u>

---

IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE*
THIS <u>SECOND LIEN SECURED CLAIM</u> BALLOT **ON OR BEFORE MARCH 11, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME**, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED
BY THIS <u>SECOND LIEN SECURED CLAIM</u> BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.

---

5

**INSTRUCTIONS FOR COMPLETING THIS SECOND LIEN SECURED CLAIM BALLOT**

11. The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Second Lien Secured Claim Ballot or in these instructions (the "Ballot Instructions"), but not otherwise defined therein or herein, shall have the meaning set forth in the Plan, a copy of which also accompanies the Second Lien Secured Claim Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS SECOND LIEN SECURED CLAIM BALLOT.**

12. The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

13. To ensure that your Second Lien Secured Claim Ballot is counted, you must either: (a) complete and submit this hard copy Second Lien Secured Claim Ballot or (b) email a scanned copy Second Lien Secured Claim Ballot in PDF format to Notice and Claims Agent at missioncoal@omnimgt.com.[3] Ballots will not be accepted by facsimile or other electronic means other than electronic mail.

14. The Second Lien Secured Claim Ballot *must* be returned to the Notice and Claims Agent so as to be *actually received* by the Notice and Claims Agent on or before the Voting Deadline. **The Voting Deadline is March 11, 2019, at 4:00 p.m.,** prevailing Central Time.

15. If the Second Lien Secured Claim Ballot is received *after* the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors. Additionally, **the following Second Lien Secured Claim Ballots will *not* be counted**:

   (h) any Second Lien Secured Claim Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

   (i) any Second Lien Secured Claim Ballot cast by a party that does not hold a Claim in a Class that is entitled to vote on the Plan;

   (j) any Second Lien Secured Claim Ballot sent by facsimile or any electronic means other than electronic mail;

   (k) any unsigned Second Lien Secured Claim Ballot;

   (l) any Second Lien Secured Claim Ballot that does not contain an original *signature; provided*, however, that any Second Lien Secured Claim Ballot submitted via electronic mail shall be deemed to contain an original signature;

   (m) any Second Lien Secured Claim Ballot not marked to accept or reject the Plan; and

   (n) any Second Lien Secured Claim Ballot submitted by any party not entitled to cast a vote with respect to the Plan.

16. The method of delivery of Second Lien Secured Claim Ballots to the Notice and Claims Agent is at the election and risk of each Holder of a Class 4 Second Lien Secured Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Notice and Claims Agent *actually receives* the originally executed Second Lien Secured Claim Ballots. In all cases, holders should allow sufficient time to assure timely delivery.

17. If multiple Second Lien Secured Claim Ballots are received from the same holder of a Second Lien Secured Claim with respect to the same Second Lien Secured Claim prior to the Voting Deadline, the latest, timely received, and

---

[3] For any Ballot cast via electronic mail, the format of the attachment must be found in the common workplace and industry standard format (i.e., industry-standard PDF file) and the received date and time in the Notice and Claims Agent's inbox will be used as the timestamp for receipt.

properly completed Second Lien Secured Claim Ballot will supersede and revoke any earlier received Second Lien Secured Claim Ballots.

18. The Second Lien Secured Claim Ballot does **not** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

19. **<u>Please be sure to sign and date the Second Lien Secured Claim Ballot</u>**.  You should indicate that you are signing a Second Lien Secured Claim Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Notice and Claims Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Second Lien Secured Claim Ballot.

20. Each ballot votes **only** your Claims indicated on that ballot, so please complete and return each ballot you receive.

<u>**PLEASE RETURN YOUR SECOND LIEN SECURED CLAIM BALLOT PROMPTLY**</u>

**IF YOU HAVE ANY QUESTIONS REGARDING THIS <u>SECOND LIEN SECURED CLAIM</u> BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE NOTICE AND CLAIMS AGENT AT:  <u>888-585-6494</u> (U.S. AND CANADA) OR <u>818-906-8300</u> (INTERNATIONAL) OR EMAIL MISSIONINFO@OMNIMGT.COM.**

---

**IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THIS SECOND LIEN SECURED CLAIM BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS MARCH 11, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS.**

---

**Schedule 3C**

**Form of Class 5 Ballot**

**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**BALLOT FOR VOTING TO
ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF
MISSION COAL COMPANY, LLC AND CERTAIN OF ITS DEBTOR AFFILIATES**

**CLASS 5** HOLDERS OF **GENERAL UNSECURED CLAIMS**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED*
> BY THE NOTICE AND CLAIMS AGENT BY MARCH 11, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE FOLLOWING:**

The Debtors are soliciting votes with respect to the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2019 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this ballot (this "General Unsecured Claim Ballot") because you are a Holder of a General Unsecured Claim as of February 6, 2019 (the "Voting Record Date"). As a result, you are entitled to vote on behalf of both your Class 5 General Unsecured Claim.

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this General Unsecured Claim Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

(a) Omni Management Group. (the "Notice and Claims Agent") at no charge by: (i) calling the Notice and Claims Agent at 888-585-6494 (U.S.) or 818-906-8300 (International), (ii) visiting the Debtors' restructuring website at: http://www.omnimgmt.com/missioncoal, (iii) writing to the Notice and Claims Agent at Omni Management Group, Re: Mission Coal Company, LLC, et al., 5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367; and/or (iv) emailing missioninfo@omnimgmt.com and requesting paper copies of the corresponding materials previously received in electronic format. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.alnb.uscourts.gov.

This General Unsecured Claim Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this General Unsecured Claim Ballot in error, please contact the Notice and Claims Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claims have been placed in Class 5 General Unsecured Claims under the Plan.

**Item 1. Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the holder of a Class 5 General Unsecured Claim in the following *aggregate* unpaid amount:

$\$\underline{\hspace{3cm}}$

**Item 2. Vote on Plan.**

The holder of the Class 5 General Unsecured Claim against the Debtors, the aggregate amount of which is set forth in Item 1, votes to (please check one):

| ☐ **ACCEPT** (vote FOR) the Plan | ☐ **REJECT** (vote AGAINST) the Plan |
|---|---|

**Item 3. Important information regarding the Third Party Releases.**

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE IX.E OF THE PLAN SET FORTH BELOW.**

**IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**YOU MAY ELECT TO OPT OUT OF THE RELEASES CONTAINED IN ARTICLE IX.E OF THE PLAN *ONLY IF* YOU CHECK THE BOX BELOW AND (A) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR (B) VOTE TO REJECT THE PLAN. IF YOU (A) VOTE TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, (C) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, OR (D) VOTE TO REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, IN EACH CASE YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN.**

**The Holder of a Class 5 General Unsecured Claim identified in Item 1 elects to:**

| ☐ **OPT OUT of the Third Party Releases** |
|---|

**Article IX.E of the Plan contains the following Third Party Releases:** [2]  As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

\*      \*      \*

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE SUCCESSFUL BIDDER; (B) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (C) ALL HOLDERS OF CLAIMS AND INTERESTS WHO VOTE TO ACCEPT THE PLAN; (D) ALL HOLDERS OF CLAIMS OR INTERESTS THAT (I) ABSTAIN FROM VOTING ON THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, (II) VOTE TO REJECT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, OR (III) ARE DEEMED TO REJECT OR PRESUMED TO ACCEPT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (E) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (D); (E) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (E) EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (G) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS,

---

[2]   The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The Releases by Holders of Claims and Interests are subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

UNDER THE PLAN, "RELEASED PARTY" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE SUCCESSFUL BIDDER; (B) THE DIP AGENT; (C) THE DIP LENDERS; (D) THE FIRST LIEN AGENT; (E) THE FIRST LIEN LENDERS; (F) THE SECOND LIEN LENDER; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); (H) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (G), EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (I) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE NOT IN VOTING CLASSES THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN <u>ARTICLE IX.E OF THE PLAN USING THE ENCLOSED OPT OUT FORM</u>, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. BY ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN <u>ARTICLE IX.E</u> OF THE PLAN YOU WILL FORGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN <u>ARTICLE IX.D</u> OF THE PLAN IF YOU OTHERWISE WOULD BE A RELEASED PARTY THEREUNDER.

<u>Item 4</u>.  **Certifications.**

By signing this General Unsecured Claim Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(i)  that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the General Unsecured Claim being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the General Unsecured Claim being voted;

(j)  that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(k)  that the Entity has cast the same vote with respect to all General Unsecured Claims; and

(l)  that no other General Unsecured Claim Ballots with respect to the amount of the General Unsecured Claim identified in Item 1 have been cast or, if any other General Unsecured Claim Ballots have been cast with respect to such General Unsecured Claim, then any such earlier General Unsecured Claim Ballots are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than holder) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |

**PLEASE COMPLETE, SIGN, AND DATE THIS <u>GENERAL UNSECURED CLAIM BALLOT</u> AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

3.      In the envelope provided via first class mail, overnight courier, or hand delivery to:

| <u>If by First Class Mail:</u> | <u>If by Hand Delivery or Overnight Mail:</u> |
|---|---|
| Omni Management Group<br>**Re: Mission Coal Company, LLC, *et al.*,**<br>Attn: Voting Department<br>5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367 | Omni Management Group<br>**Re: Mission Coal Company, LLC, *et al.*,**<br>Attn: Voting Department<br>5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367 |

4.      Via electronic mail service to:

missioncoal@omnimgt.com
<u>with a reference to "Mission Ballot" in the subject line.</u>

---

IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE*
THIS <u>GENERAL UNSECURED CLAIM</u> BALLOT **ON OR BEFORE MARCH 11, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME,** (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED
BY THIS <u>GENERAL UNSECURED CLAIM</u> BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.

| **Class 5 — General Unsecured Claims** |
|:---:|

### INSTRUCTIONS FOR COMPLETING THIS GENERAL UNSECURED CLAIM BALLOT

21. The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the General Unsecured Claim Ballot or in these instructions (the "Ballot Instructions"), but not otherwise defined therein or herein, shall have the meaning set forth in the Plan, a copy of which also accompanies the General Unsecured Claim Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS GENERAL UNSECURED CLAIM BALLOT.**

22. The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

23. To ensure that your General Unsecured Claim Ballot is counted, you must either: (a) complete and submit this hard copy General Unsecured Claim Ballot or (b) email a scanned copy General Unsecured Claim Ballot in PDF format to Notice and Claims Agent at missioncoal@omnimgt.com.[3] Ballots will not be accepted by facsimile or other electronic means other than electronic mail.

24. The General Unsecured Claim Ballot **must** be returned to the Notice and Claims Agent so as to be **actually received** by the Notice and Claims Agent on or before the Voting Deadline. **The Voting Deadline is March 11, 2019, at 4:00 p.m.**, prevailing Central Time.

25. If the General Unsecured Claim Ballot is received **after** the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors. Additionally, **the following General Unsecured Claim Ballots will *not* be counted**:

    (o) any General Unsecured Claim Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

    (p) any General Unsecured Claim Ballot cast by a party that does not hold a Claim in a Class that is entitled to vote on the Plan;

    (q) any General Unsecured Claim Ballot sent by facsimile or any electronic means other than electronic mail;

    (r) any unsigned General Unsecured Claim Ballot;

    (s) any General Unsecured Claim Ballot that does not contain an original *signature; provided*, however, that any General Unsecured Claim Ballot submitted via electronic mail shall be deemed to contain an original signature;

    (t) any General Unsecured Claim Ballot not marked to accept or reject the Plan; and

    (u) any General Unsecured Claim Ballot submitted by any party not entitled to cast a vote with respect to the Plan.

26. The method of delivery of General Unsecured Claim Ballots to the Notice and Claims Agent is at the election and risk of each Holder of a Class 5 General Unsecured Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Notice and Claims Agent **actually receives** the originally executed General Unsecured Claim Ballots. In all cases, holders should allow sufficient time to assure timely delivery.

27. If multiple General Unsecured Claim Ballots are received from the same holder of a General Unsecured Claim with respect to the same General Unsecured Claim prior to the Voting Deadline, the latest, timely received, and

---

[3] For any Ballot cast via electronic mail, the format of the attachment must be found in the common workplace and industry standard format (i.e., industry-standard PDF file) and the received date and time in the Notice and Claims Agent's inbox will be used as the timestamp for receipt.

properly completed General Unsecured Claim Ballot will supersede and revoke any earlier received General Unsecured Claim Ballots.

28. The General Unsecured Claim Ballot does **not** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

29. **Please be sure to sign and date the General Unsecured Claim Ballot**. You should indicate that you are signing a General Unsecured Claim Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Notice and Claims Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the General Unsecured Claim Ballot.

30. Each ballot votes **only** your Claims indicated on that ballot, so please complete and return each ballot you receive.

### PLEASE RETURN YOUR GENERAL UNSECURED CLAIM BALLOT PROMPTLY

**IF YOU HAVE ANY QUESTIONS REGARDING THIS <u>GENERAL UNSECURED CLAIM</u> BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE NOTICE AND CLAIMS AGENT AT: <u>888-585-6494</u> (U.S. AND CANADA) OR <u>818-906-8300</u> (INTERNATIONAL) OR EMAIL MISSIONINFO@OMNIMGT.COM.**

---

**IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THIS GENERAL UNSECURED CLAIM BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS MARCH 11, 2019, AT 4:00 P.M. PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS.**

---

**Schedule 4**

**Form of Non-Impaired Non-Voting Status Notice**

# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF NON-VOTING
## STATUS TO HOLDERS OF UNIMPAIRED CLAIMS
## CONCLUSIVELY PRESUMED TO ACCEPT THE PLAN

**PLEASE TAKE NOTICE THAT** on [●], 2019, the United States Bankruptcy Court for the Northern District of Alabama (the "Court") entered an order [Docket No.[●]] (the "Disclosure Statement Order"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim under the Plan, ***you are not entitled to vote on the Plan***. Specifically, under the terms of the Plan, as a holder of a Claim (as currently asserted against the Debtors) that is not Impaired and conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, you are ***not*** entitled to vote on the Plan.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

PLEASE TAKE FURTHER NOTICE THAT the hearing at which the Court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **March 20, 2019, at 10:00 a.m.**, prevailing Central Time, before the Honorable Honorable Tamara O. Mitchell, in the United States Bankruptcy Court for the Northern District of Alabama, located at 1800 Fifth Avenue North, Birmingham, Alabama 35203.

PLEASE TAKE FURTHER NOTICE THAT the deadline for filing objections to the Plan is **March 11, 2019, at 4:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline"). Any objection to the Plan *must*: (a) be in writing, (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court, (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, and (d) be filed with the Court (contemporaneously with a proof of service). Failure to appear at the Confirmation Hearing to prosecute any written objection may result in such objection being overruled without further notice.

PLEASE TAKE FURTHER NOTICE THAT if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Omni Management Group, the notice and claims agent retained by the Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by: (a) calling the Notice and Claims Agent at 888-585-6494 (U.S. and Canada) or 818-906-8300 (International), (b) visiting the Debtors' restructuring website at: http://www.omnimgt.com/missioncoal, (c) writing to the Notice and Claims Agent at Omni Management Group, Re: Mission Coal Company, LLC, et al., 5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367; and/or (d) emailing missioninfo@omnomgt.com and requesting paper copies of the corresponding materials previously received in electronic format. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.alnb.uscourts.gov.

> ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE IX.E CONTAINS A THIRD-PARTY RELEASE**. PURSUANT TO THE PLAN YOU MAY OPT OUT OF THE THIRD-PARTY RELEASE BY COMPLETING THE FORM ATTACHED HERETO AS **EXHIBIT A**. IN THE EVENT THAT YOU DO NOT OPT OUT YOU **ARE DEEMED TO HAVE CONSENTED** TO THE RELEASES SET FORTH IN ARTICLE IX.E. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**Article IX.E of the Plan contains the following Third Party Releases:[3] As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating**

---

[3] The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The Releases by Holders of Claims and Interests are subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

\*     \*     \*

UNDER THE PLAN, "<u>RELEASING PARTY</u>" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE SUCCESSFUL BIDDER; (B) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (C) ALL HOLDERS OF CLAIMS AND INTERESTS WHO VOTE TO ACCEPT THE PLAN; (D) ALL HOLDERS OF CLAIMS OR INTERESTS THAT (I) ABSTAIN FROM VOTING ON THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, (II) VOTE TO REJECT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, OR (III) ARE DEEMED TO REJECT OR PRESUMED TO ACCEPT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (E) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (D); (E) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (E) EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS,

FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (G) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

UNDER THE PLAN, "RELEASED PARTY" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE SUCCESSFUL BIDDER; (B) THE DIP AGENT; (C) THE DIP LENDERS; (D) THE FIRST LIEN AGENT; (E) THE FIRST LIEN LENDERS; (F) THE SECOND LIEN LENDER; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); (H) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (G), EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (I) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

Birmingham, Alabama
Dated: [●], 2019

*/s/ Daniel D. Sparks*

Daniel D. Sparks
Bill D. Bensinger
**CHRISTIAN & SMALL LLP**
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Telephone:     (205) 795-6588
Facsimile:     (205) 328-7234
Email:          ddsparks@csattorneys.com
                    bdbensinger@csattorneys.com

- and -

James H.M. Sprayregen, P.C.
Brad Weiland (admitted *pro hac vice*)
Melissa N. Koss (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          james.sprayregen@kirkland.com
                    brad.weiland@kirkland.com
                    melissa.koss@kirkland.com

- and -

Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          stephen.hessler@kirkland.com
                    ciara.foster@kirkland.com

*Co-Counsel to the Debtors*

**<u>Exhibit A to Unimpaired Non-Voting Status Notice</u>**

**Opt-Out Form for Holders of Unimpaired Claims and Interests Deemed to Accept the Plan**

**OPTIONAL:  RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a holder of a Claim or Interest that is not entitled to vote on the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of its Debtor Affiliates* (as may be amended from time to time, the "Plan").  You may choose to opt out of the releases set forth in Article IX.E of the Plan.

**Item 1**. Important information regarding the Third Party Releases.

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE IX.E OF THE PLAN SET FORTH BELOW.**

**IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**OPTIONAL RELEASE ELECTION.  YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE IX.E OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:**



☐  **OPT OUT of the Third Party Releases**

**Article IX.E of the Plan contains the following Third Party Releases:[1]  As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan,**

---

[1]  The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The Releases by Holders of Claims and Interests are subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

\*       \*       \*

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE SUCCESSFUL BIDDER; (B) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (C) ALL HOLDERS OF CLAIMS AND INTERESTS WHO VOTE TO ACCEPT THE PLAN; (D) ALL HOLDERS OF CLAIMS OR INTERESTS THAT (I) ABSTAIN FROM VOTING ON THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, (II) VOTE TO REJECT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, OR (III) ARE DEEMED TO REJECT OR PRESUMED TO ACCEPT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (E) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (D); (E) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (E) EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (G) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

UNDER THE PLAN, "RELEASED PARTY" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE SUCCESSFUL BIDDER; (B) THE DIP AGENT; (C) THE DIP LENDERS; (D) THE FIRST LIEN AGENT; (E) THE FIRST LIEN LENDERS; (F) THE SECOND LIEN LENDER; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); (H) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (G), EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS,

MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (I) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE NOT IN VOTING CLASSES THAT DO NOT OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE IX.E OF THE PLAN USING THE ENCLOSED OPT OUT FORM, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. BY ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN YOU WILL FORGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN IF YOU OTHERWISE WOULD BE A RELEASED PARTY THEREUNDER.

**Item 2. Certifications.**

By signing this Opt Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors that:

(a) as of the Voting Record Date, either: (i) the Entity is the holder of a Claim or Interest; or (ii) the Entity is an authorized signatory for the Entity that is a holder of the Claim or Interest;

(b) the Entity (or in the case of an authorized signatory, the holder) has received a copy of the *Notice of Non-Voting Status to Holders of Impaired Claims and Equity Interests Deemed to Reject the Plan* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c) the Entity has submitted the same respective election concerning the releases with respect to all Claims and Interests; and

(d) no other Opt Out Form has been submitted or, if any other Opt Out Forms have been submitted with respect to such Claim and Interests, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| | |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**IF YOU HAVE MADE THE OPTIONAL OPT-OUT ELECTION, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

5.      **In the envelope provided via first class mail, overnight courier, or hand delivery to:**

Omni Management Group,
Re: Mission Coal Company, LLC, et al.,
5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367

6.      **Via electronic mail service to:**

missioncoal@omnimgt.com
with a reference to "Mission Opt-out Form" in the subject line.

THE VOTING DEADLINE IS **MARCH 11, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME**.  THE NOTICE AND CLAIMS AGENT MUST ***ACTUALLY RECEIVE*** YOUR OPT-OUT ELECTION ON OR BEFORE THE VOTING DEADLINE IF YOU WISH TO OPT OUT.

## Schedule 5

**Form of Impaired Non-Voting Status Notice**

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF NON-VOTING
## STATUS TO HOLDERS OF IMPAIRED CLAIMS
## AND EQUITY INTERESTS DEEMED TO REJECT THE PLAN

**PLEASE TAKE NOTICE THAT** on [●], 2019, the United States Bankruptcy Court for the Northern District of Alabama (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim or Interest under the Plan, ***you are not entitled to vote on the Plan***. Specifically, under the terms of the Plan, as a holder of a Claim or Interest (as currently asserted against the Debtors) that is receiving no distribution under the Plan, you are deemed to reject the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

PLEASE TAKE FURTHER NOTICE THAT the hearing at which the court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **March 20, 2019, at 10:00 a.m.**, prevailing Central Time, before the Honorable Tamara O. Mitchell, in the United States Bankruptcy Court for the Northern District of Alabama, located at 1800 Fifth Avenue North, Birmingham, Alabama 35203.

PLEASE TAKE FURTHER NOTICE THAT the deadline for filing objections to the Plan is **March 11, 2019, at 4:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline"). Any objection to the Plan *must*: (a) be in writing, (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the court, (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, and (d) be filed with the court (contemporaneously with a proof of service). Failure to appear at the Confirmation Hearing to prosecute any written objection may result in such objection being overruled without further notice.

PLEASE TAKE FURTHER NOTICE THAT if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Omni Management Group, the notice and claims agent retained by the Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by: (a) calling the Notice and Claims Agent at 888-585-6494 (U.S. and Canada) or 818-906-8300 (International), (b) visiting the Debtors' restructuring website at: http://www.omnimgt.com/missioncoal, (c) writing to the Notice and Claims Agent at Omni Management Group, Re: Mission Coal Company, LLC, et al., 5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367; and/or (d) emailing missioninfo@omnomgt.com and requesting paper copies of the corresponding materials previously received in electronic format. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.alnb.uscourts.gov.

---

ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE IX.E CONTAINS A THIRD-PARTY RELEASE**. PURSUANT TO THE PLAN YOU MAY OPT OUT OF THE THIRD-PARTY RELEASE BY COMPLETING THE FORM ATTACHED HERETO AS **EXHIBIT A**. IN THE EVENT THAT YOU DO NOT OPT OUT YOU **ARE DEEMED TO HAVE CONSENTED** TO THE RELEASES SET FORTH IN ARTICLE IX.E. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

---

**Article IX.E of the Plan contains the following Third Party Releases:**[3] **As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating**

---

[3] The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The Releases by Holders of Claims and Interests are subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

\*　　　\*　　　\*

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE SUCCESSFUL BIDDER; (B) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (C) ALL HOLDERS OF CLAIMS AND INTERESTS WHO VOTE TO ACCEPT THE PLAN; (D) ALL HOLDERS OF CLAIMS OR INTERESTS THAT (I) ABSTAIN FROM VOTING ON THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, (II) VOTE TO REJECT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, OR (III) ARE DEEMED TO REJECT OR PRESUMED TO ACCEPT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (E) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (D); (E) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (E) EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS,

FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (G) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

UNDER THE PLAN, "RELEASED PARTY" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE SUCCESSFUL BIDDER; (B) THE DIP AGENT; (C) THE DIP LENDERS; (D) THE FIRST LIEN AGENT; (E) THE FIRST LIEN LENDERS; (F) THE SECOND LIEN LENDER; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); (H) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (G), EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (I) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE NOT IN VOTING CLASSES THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE IX.E OF THE PLAN USING THE ENCLOSED OPT OUT FORM, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. BY ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN YOU WILL FORGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN IF YOU OTHERWISE WOULD BE A RELEASED PARTY THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

Birmingham, Alabama
Dated:  [●], 2019

*/s/ Daniel D. Sparks*
Daniel D. Sparks
Bill D. Bensinger
**CHRISTIAN & SMALL LLP**
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Telephone:    (205) 795-6588
Facsimile:    (205) 328-7234
Email:        ddsparks@csattorneys.com
              bdbensinger@csattorneys.com

- and -

James H.M. Sprayregen, P.C.
Brad Weiland (admitted *pro hac vice*)
Melissa N. Koss (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              brad.weiland@kirkland.com
              melissa.koss@kirkland.com

- and -

Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        stephen.hessler@kirkland.com
              ciara.foster@kirkland.com

*Co-Counsel to the Debtors*

**Exhibit A to Impaired Non-Voting Status Notice**

**Opt-Out Form for Holders of Impaired Claims and Interests Deemed to Reject the Plan**

**OPTIONAL: RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a holder of a Claim or Interest that is not entitled to vote on the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of its Debtor Affiliates* (as may be amended from time to time, the "Plan"). You may choose to opt out of the releases set forth in Article IX.E of the Plan.

**Item 1.** Important information regarding the Third Party Releases.

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE IX.E OF THE PLAN SET FORTH BELOW.**

**IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**OPTIONAL RELEASE ELECTION. YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE IX.E OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:**

> ☐ **OPT OUT of the Third Party Releases**

**Article IX.E of the Plan contains the following Third Party Releases:** [1] **As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan,**

---

[1] The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The Releases by Holders of Claims and Interests are subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

\*       \*       \*

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE SUCCESSFUL BIDDER; (B) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (C) ALL HOLDERS OF CLAIMS AND INTERESTS WHO VOTE TO ACCEPT THE PLAN; (D) ALL HOLDERS OF CLAIMS OR INTERESTS THAT (I) ABSTAIN FROM VOTING ON THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, (II) VOTE TO REJECT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, OR (III) ARE DEEMED TO REJECT OR PRESUMED TO ACCEPT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (E) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (D); (E) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (E) EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (G) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

UNDER THE PLAN, "RELEASED PARTY" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE SUCCESSFUL BIDDER; (B) THE DIP AGENT; (C) THE DIP LENDERS; (D) THE FIRST LIEN AGENT; (E) THE FIRST LIEN LENDERS; (F) THE SECOND LIEN LENDER; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); (H) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (G), EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS,

MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (I) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE NOT IN VOTING CLASSES THAT DO NOT OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE IX.E OF THE PLAN USING THE ENCLOSED OPT OUT FORM, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. BY ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN YOU WILL FORGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN IF YOU OTHERWISE WOULD BE A RELEASED PARTY THEREUNDER.

**Item 2. Certifications.**

By signing this Opt Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors that:

(e) as of the Voting Record Date, either: (i) the Entity is the holder of a Claim or Interest; or (ii) the Entity is an authorized signatory for the Entity that is a holder of the Claim or Interest;

(f) the Entity (or in the case of an authorized signatory, the holder) has received a copy of the *Notice of Non-Voting Status to Holders of Impaired Claims and Equity Interests Deemed to Reject the Plan* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(g) the Entity has submitted the same respective election concerning the releases with respect to all Claims and Interests; and

(h) no other Opt Out Form has been submitted or, if any other Opt Out Forms have been submitted with respect to such Claim and Interests, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| | _____ |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than holder) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |

**IF YOU HAVE MADE THE OPTIONAL OPT-OUT ELECTION, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

1.      **In the envelope provided via first class mail, overnight courier, or hand delivery to:**

<u>Omni Management Group,</u>
<u>Re: Mission Coal Company, LLC, et al.,</u>
<u>5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367</u>

2.      **Via electronic mail service to:**

missioncoal@omnimgt.com
<u>with a reference to "Mission Opt-out Form" in the subject line.</u>

---

THE VOTING DEADLINE IS **MARCH 11, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME**.  THE NOTICE AND CLAIMS AGENT MUST ***ACTUALLY RECEIVE*** YOUR OPT-OUT ELECTION ON OR BEFORE THE VOTING DEADLINE IF YOU WISH TO OPT OUT.

---

## Schedule 6

**Form of Notice to Disputed Claim Holders**

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF NON-VOTING
## STATUS WITH RESPECT TO DISPUTED CLAIMS

**PLEASE TAKE NOTICE THAT** on [●], 2019, the United States Bankruptcy Court for the Northern District of Alabama (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because you are the holder of a Claim that is subject to a pending objection by the Debtors. **You are not entitled to vote any disputed portion of your Claim on the Plan unless one or more of the following events have taken place before March 9, 2019 (the date that is two business days before the Voting Deadline)** (each, a "Resolution Event"):

1. an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

2. an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

3. a stipulation or other agreement is executed between the holder of such Claim and the Debtors temporarily allowing the holder of such Claim to vote its Claim in an agreed upon amount; or

4. the pending objection to such Claim is voluntarily withdrawn by the objecting party.

Accordingly, this notice is being sent to you for informational purposes only.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Omni Management Group, the notice and claims agent retained by the Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by: (a) calling the Notice and Claims Agent at 888-585-6494 (U.S. and Canada) or 818-906-8300 (International), (b) visiting the Debtors' restructuring website at: http://www.omnimgt.com/missioncoal, (c) writing to the Notice and Claims Agent at Omni Management Group, Re: Mission Coal Company, LLC, et al., 5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367; and/or (d) emailing missioninfo@omnomgt.com and requesting paper copies of the corresponding materials previously received in electronic format. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.alnb.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE THAT** if a Resolution Event occurs, then no later than one business day thereafter, the Notice and Claims Agent shall distribute a ballot, and a pre-addressed, postage pre-paid envelope to you, which must be returned to the Notice and Claims Agent no later than the Voting Deadline, which is on **March 11, 2019, at 4:00 p.m.**, prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claims, you should contact the Notice and Claims Agent in accordance with the instructions provided above.

2

ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE IX.E CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE NOT IN VOTING CLASSES THAT DO NOT OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE IX.E OF THE PLAN USING THE ENCLOSED OPT OUT FORM, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  BY ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN YOU WILL FORGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN IF YOU OTHERWISE WOULD BE A RELEASED PARTY THEREUNDER.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

3

Birmingham, Alabama
Dated: [●], 2019

*/s/ Daniel D. Sparks*

Daniel D. Sparks
Bill D. Bensinger
**CHRISTIAN & SMALL LLP**
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Telephone:     (205) 795-6588
Facsimile:      (205) 328-7234
Email:           ddsparks@csattorneys.com
                     bdbensinger@csattorneys.com

- and -

James H.M. Sprayregen, P.C.
Brad Weiland (admitted *pro hac vice*)
Melissa N. Koss (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           james.sprayregen@kirkland.com
                     brad.weiland@kirkland.com
                     melissa.koss@kirkland.com

- and -

Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           stephen.hessler@kirkland.com
                     ciara.foster@kirkland.com

*Co-Counsel to the Debtors*

<u>**Exhibit A to Notice to Disputed Claim Holders**</u>

**Opt-Out Form for Disputed Claims Holders**

**OPTIONAL: RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a holder of a Claim that is subject to a pending objection by the Debtors. You are not entitled to vote any disputed portion of your Claim on the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of its Debtor Affiliates* (as may be amended from time to time, the "Plan"). You may choose to opt out of the releases set forth in Article IX.E of the Plan.

**Item 1**. **Important information regarding the Third Party Releases.**

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE IX.E OF THE PLAN SET FORTH BELOW.**

**IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE IX.E OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**OPTIONAL RELEASE ELECTION. YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE IX.E OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:**

☐ **OPT OUT of the Third Party Releases**

**Article IX.E of the Plan contains the following Third Party Releases:** [1] **As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is: (1) in exchange for the good and valuable consideration provided by the**

---

[1]   The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The Releases by Holders of Claims and Interests are subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

**Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.**

*  *  *

UNDER THE PLAN, "<u>RELEASING PARTY</u>" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE SUCCESSFUL BIDDER; (B) ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (C) ALL HOLDERS OF CLAIMS AND INTERESTS WHO VOTE TO ACCEPT THE PLAN; (D) ALL HOLDERS OF CLAIMS OR INTERESTS THAT (I) ABSTAIN FROM VOTING ON THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, (II) VOTE TO REJECT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN, OR (III) ARE DEEMED TO REJECT OR PRESUMED TO ACCEPT THE PLAN *AND* WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (E) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (D); (E) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (E) EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (G) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

UNDER THE PLAN, "RELEASED PARTY" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE SUCCESSFUL BIDDER; (B) THE DIP AGENT; (C) THE DIP LENDERS; (D) THE FIRST LIEN AGENT; (E) THE FIRST LIEN LENDERS; (F) THE SECOND LIEN LENDER; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH (F); (H) WITH RESPECT TO EACH ENTITY IN CLAUSE (A) THROUGH (G), EACH SUCH ENTITY'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (I) WITH RESPECT TO EACH DEBTOR, EACH SUCH DEBTOR'S CURRENT AND FORMER EQUITY HOLDERS, SUBSIDIARIES, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH.

ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE NOT IN VOTING CLASSES THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN <u>ARTICLE IX.E OF THE PLAN USING THE ENCLOSED OPT OUT FORM</u>, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. BY ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN <u>ARTICLE IX.E</u> OF THE PLAN YOU WILL FORGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN <u>ARTICLE IX.D</u> OF THE PLAN IF YOU OTHERWISE WOULD BE A RELEASED PARTY THEREUNDER.

<u>Item 2</u>.  **Certifications.**

By signing this Opt Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors that:

2

(a) as of the Voting Record Date, either: (i) the Entity is the holder of a Claim or Interest; or (ii) the Entity is an authorized signatory for the Entity that is a holder of the Claim or Interest;

(b) the Entity (or in the case of an authorized signatory, the holder) has received a copy of the *Notice of Non-Voting Status with Respect to Disputed Claims* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c) the Entity has submitted the same respective election concerning the releases with respect to all Claims and Interests; and

(d) no other Opt Out Form has been submitted or, if any other Opt Out Forms have been submitted with respect to such Claim and Interests, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| | |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**IF YOU HAVE MADE THE OPTIONAL OPT-OUT ELECTION, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

**3.        In the envelope provided via first class mail, overnight courier, or hand delivery to:**

Omni Management Group,
Re: Mission Coal Company, LLC, et al.,
5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367

**4.        Via electronic mail service to:**

missioncoal@omnimgt.com
with a reference to "Mission Opt-out Form" in the subject line.

THE VOTING DEADLINE IS **MARCH 11, 2019, AT 4:00 P.M., PREVAILING CENTRAL TIME**.  THE NOTICE AND CLAIMS AGENT MUST *ACTUALLY RECEIVE* YOUR OPT-OUT ELECTION ON OR BEFORE THE VOTING DEADLINE IF YOU WISH TO OPT OUT.

3

## **Schedule 7**

**Form of Cover Letter**

_____, 2019

Via First Class Mail

RE:  **In re Mission Coal Company, LLC,** *et al.*,
     **Chapter 11 Case No. 18-04177-TOM11 (Jointly Administered)**

TO ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN:

Mission Coal Company, LLC and certain of its affiliated debtors and debtors in possession (collectively, the "Debtors")[1] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Northern District of Alabama (the "Court") on October 14, 2018.

You have received this letter and the enclosed materials because you are entitled to vote on the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan").[2] On [●], 2019, the Court entered an order (the "Disclosure Statement Order"): (a) authorizing the Debtors to solicit acceptances for the Plan, (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Package"), and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan, and for filing objections to the Plan.

> YOU ARE RECEIVING THIS LETTER BECAUSE YOU ARE ENTITLED TO
> VOTE ON THE PLAN.  THEREFORE, YOU SHOULD READ THIS LETTER
> CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY.  IF YOU DO
> NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.

In addition to this cover letter, the enclosed materials comprise your Solicitation Package, and were approved by the Court for distribution to holders of Claims in connection with the solicitation of votes to accept the Plan.  The Solicitation Package consists of the following:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102).  The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2] Capitalized terms used but not otherwise defined herein have the meanings as set forth in the Plan.

a. a copy of the Solicitation and Voting Procedures;

b. a ballot, together with detailed voting instructions and a pre-addressed, postage prepaid return envelope;

c. this letter;

d. the Disclosure Statement, as approved by the Bankruptcy Court (and exhibits thereto, including the Plan);

e. the Disclosure Statement Order (excluding the exhibits thereto, except the Solicitation and Voting Procedures);

f. the notice of the hearing to consider confirmation of the Plan; and

g. any other materials the Court has approved as part of the Solicitation Package.

Mission Coal Company, LLC (on behalf of itself and each of the other Debtors) has approved the filing of the Plan and the solicitation of votes to accept the Plan. The Debtors believe that the acceptance of the Plan is in the best interests of their estates, holders of Claims, and all other parties in interest. Moreover, the Debtors believe that any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses, which, in turn, likely would result in smaller distributions (or no distributions) on account of Claims asserted in the chapter 11 cases.

> **THE DEBTORS STRONGLY URGE YOU TO PROPERLY AND TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN. BALLOTS SHOULD BE SUBMITTED IN ACCORDANCE WITH THE INSTRUCTIONS INDICATED ON YOUR BALLOT.**
>
> **THE VOTING DEADLINE IS 4:00 P.M., PREVAILING CENTRAL TIME ON MARCH 11, 2019.**

The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions, however, please feel free to contact Omni Management Group, the notice and claims agent retained by the Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by: (a) calling the Notice and Claims Agent at 888-585-6494 (U.S. and Canada) or 818-906-8300 (International), (b) visiting the Debtors' restructuring website at: http://www.omnimgt.com/missioncoal, (c) writing to the Notice and Claims Agent at Omni Management Group, Re: Mission Coal Company, LLC, et al., 5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367; and/or (d) emailing missioninfo@omnimgt.com and requesting paper copies of the corresponding materials previously received in electronic format. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.alnb.uscourts.gov. Please be advised that the Notice and Claims Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may *not* advise you as to whether you should vote to accept or reject the Plan.

Sincerely,

_____
Mission Coal Company, LLC on its own behalf
and for each of the Debtors

## Schedule 8

**Form of Confirmation Hearing Notice**

**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF HEARING TO CONSIDER
CONFIRMATION OF THE CHAPTER 11 PLAN FILED BY
THE MISSION COAL COMPANY, LLC AND CERTAIN OF ITS
DEBTOR AFFILIATES AND RELATED VOTING AND OBJECTION DEADLINES**

**PLEASE TAKE NOTICE THAT** on [●], 2019, the United States Bankruptcy Court for the Northern District of Alabama (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"), and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **March 20, 2019, at 10:00 a.m.**, prevailing Central Time, before the Honorable Tamara O. Mitchell, in the United States Bankruptcy Court for the Northern District of Alabama, located at 1800 Fifth Avenue North, Birmingham, Alabama 35203.[3] The Court will also consider approval of the Sale

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

[3] The Debtors are currently running a sale process for their assets and prefer that the Sale Transaction be approved and consummated through the Plan. The DIP Lenders prefer that the Sale Transaction be approved and consummated through a separate sale order pursuant to section 363 of the Bankruptcy Code and not require approval of the Sale

pursuant to section 363 of the Bankruptcy Code at the March 20, 2019 hearing. Approval of the Sale may proceed without confirmation of the Plan if the applicable standards for confirmation are not met.

> **PLEASE BE ADVISED**: THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

## CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**. The voting record date is **February 6, 2019,** which is the date for determining which holders of Claims in Classes 3, 4, and 5 are entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is on **March 11, 2019, at 4:00 p.m.,** prevailing Central Time (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **_must_**: (a) follow the instructions carefully; (b) complete **_all_** of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **_actually received_** by the Debtors' notice and claims agent, Omni Management Group (the "Notice and Claims Agent") on or before the Voting Deadline. **_A failure to follow such instructions may disqualify your vote_**.

## CRITICAL INFORMATION REGARDING
## THE ADMINISTRATIVE CLAIMS BAR DATE

All requests for payment of Administrative Claims must be Filed and served on the Debtors no later than the Administrative Claims Bar Date, which will be the Voting Deadline. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, or their property and such Administrative Claims shall be deemed discharged as of the Plan Effective Date.

## CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

Any objections, if any, to the Plan **must**: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Bankruptcy Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the court (contemporaneously with a proof of service), so that it may be **actually received** by the following parties, prior to **March 11, 2019, at 4:00 p.m.** Failure to appear at the Confirmation

---

consummation of the Plan in order to close on the sale. The Debtors' solicitation of votes for the Plan shall not prejudice any party's rights with respect thereto and does not constitute a determination by the Court with respect to how the Sale Transaction be consummated.

Hearing to prosecute any written objection may result in such objection being overruled without further notice.

| Counsel to the Debtors | U.S. Bankruptcy Administrator |
|---|---|
| Christian & Small LLP<br>505 North 20th Street, Suite 1800<br>Birmingham, Alabama 35203<br>Attn: Daniel D. Sparks (ddsparks@csattorneys.com)<br>and Bill D. Bensinger (bdbensinger@csattorneys.com)<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn.: Brad Weiland (brad.weiland@kirkland.com)<br>and Melissa Koss (melissa.koss@kirkland.com)<br><br>Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn.: Stephen E. Hessler, P.C.<br>(stephen.hessler@kirkland.com) and Ciara Foster<br>(ciara.foster@kirkland.com) | Office of the U.S. Bankruptcy Administrator<br>Northern District of Alabama<br>1800 5th Ave. N, Suite 325<br>Birmingham, Alabama 35203<br>Attn.: Thomas Corbett |
| **Counsel to the Official Committee of Unsecured Creditors** | **Counsel to the DIP Lender** |
| Baker, Donelson, Bearman, Caldwell & Berkowitz, PC<br>1400 Wells Fargo Tower<br>420 20th Street N<br>Attn: Rita Hullett, Esq. (rhullett@bakerdonelson.com)<br><br>Lowenstein Sandler LLP<br>1251 Avenue of the Americas<br>New York, New York 100220<br>Attn: Jeffrey Cohen, Esq. (jcohen@lowenstein.com)<br>and Jennifer Kimble, Esq. (jkimble@lowenstein.com)<br><br>Lowenstein Sandler LLP<br>One Lowenstein Drive<br>Roseland, New Jersey 07068<br>Attn: Mary Seymour, Esq.<br>(mseymour@lowenstein.com) | Akin Gump Strauss Hauer & Feld LLP<br>Bank of America Tower<br>1 Bryant Park<br>New York, New York 10036<br>Attn: Arik Preis, Esq. (apreis@akingump.com) and<br>Jason P. Rubin, Esq. (jrubin@akingump.com) and<br>Lisa G. Beckerman, Esq.<br>(lbeckerman@akingump.com) |

3

## RELEASES, EXCULPATIONS, AND INJUNCTIONS[4]

---

ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION,
AND INJUNCTION PROVISIONS, AND **ARTICLE IX.E CONTAINS A THIRD-
PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE
PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

---

### Relevant Definitions

"***Exculpated  Party***" means, collectively, and in each case in its capacity as such: (a) the Debtors;
(b) the Successful Bidder; (c) the DIP Lenders; (d) the DIP Agent; (e) the First Lien Lenders; (f)
the First Lien Agent; (g) the Committee and its members; (h) the Second Lien Lender; (i) with
respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's
and its current and former Affiliates' current and former equity holders, subsidiaries, officers,
directors, managers, principals, members, employees, agents, advisory board members, financial
advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and
other professionals, each in their capacity as such; and (j) with respect to each Debtor, each such
Debtor's current and former equity holders, subsidiaries, officers, directors, managers, principals,
members, employees, agents, advisory board members, financial advisors, partners, attorneys,
accountants, investment bankers, consultants, representatives, and other professionals, each in
their capacity as such.

"***Released Party***" means, collectively, and in each case in its capacity as such: (a) the Successful
Bidder; (b) the DIP Agent; (c) the DIP Lenders; (d) the First Lien Agent; (e) the First Lien Lenders;
(f) the Second Lien Lender; (g) each current and former Affiliate of each Entity in clause (a)
through (f); (h) with respect to each Entity in clause (a) through (g), each such Entity's current and
former equity holders, subsidiaries, officers, directors, managers, principals, members, employees,
agents, advisory board members, financial advisors, partners, attorneys, accountants, investment
bankers, consultants, representatives, and other professionals, each in their capacity as such; and
(i) with respect to each Debtor, each such Debtor's current and former equity holders, subsidiaries,
officers, directors, managers, principals, members, employees, agents, advisory board members,
financial  advisors,  partners,  attorneys,  accountants,  investment  bankers,  consultants,
representatives, and other professionals, each in their capacity as such.

"***Releasing Parties***" means, collectively, and in each case in its capacity as such:  (a) the Successful
Bidder; (b) all holders of Claims and Interests that are deemed to accept the Plan; (c) all Holders
of Claims and Interests who vote to accept the Plan; (d) all Holders of Claims or Interests that (i)
abstain from voting on the Plan **and** who do not opt out of the releases in the Plan, (ii) vote to
reject the Plan **and** who do not opt out of the releases in the Plan, or (iii) are deemed to reject or
presumed to accept the Plan **and** who do not opt out of the releases in the Plan; (e) each current
and former Affiliate of each Entity in clause (a) through (d); (e) with respect to each Entity in

---

[4]  After commencing the chapter 11 cases, the Debtor's board of directors authorized two of its independent
members to conduct and oversee a postpetition independent investigation into any potential claims and causes
of action belonging to the Debtors' estates.  For the avoidance of doubt, the Debtors' release of the Released
Parties are subject to the conclusion of the aforementioned investigation and rights are reserved.

4

clause (a) through (e) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (g) with respect to each Debtor, each such Debtor's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

**<u>DEBTOR RELEASE</u>.[5] Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Plan Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases herein are: (1) in exchange for the good and**

---

[5]   The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The releases by the Debtors are subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases herein; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors asserting any claim released by the releases herein against any of the Released Parties.

**THIRD PARTY RELEASES.**[6] As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar

---

[6] The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The Releases by Holders of Claims and Interests are subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

6

to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

**EXCULPATION.**[7] Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of commercially sensitive confidential information for competitive purposes that causes damages, or ultra vires acts as determined by a Final Order.

**INJUNCTION.** Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in

---

[7]   The Debtors' and the Committee's investigation into potential Estate Claims and Causes of Action are ongoing. The exculpation set forth in this paragraph is subject to the conclusion of the investigation and determination with respect to any potential claims or causes of action, if any, identified therein, and the Debtors expressly reserve the right to bring and do not release any such Claims.

Case 18-04177-TOM11    Doc 762    Filed 02/08/19    Entered 02/08/19 14:41:28    Desc
Main Document        Page 159 of 170

connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

## ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received a CD-ROM), please feel free to contact the Debtors' Notice and Claims Agent, by: (a) calling the Notice and Claims Agent at (888) 585-6494 (U.S. and Canada) or (818) 906-8300 (International), (b) visiting the Debtors' restructuring website at: http://www.omnimgt.com/missioncoal, (c) writing to the Notice and Claims Agent at Omni Management Group, Re: Mission Coal Company, LLC, et al., 5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367; and/or (d) missioninfo@omnimgt.com and requesting paper copies of the corresponding materials previously received in electronic format. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.alnb.uscourts.gov. Please be advised that the Notice and Claims Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may ***not*** advise you as to whether you should vote to accept or reject the Plan.

**The Plan Supplement**. The Debtors will file the Plan Supplement (as defined in the Plan) at least 7 days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and will serve notice on all holders of Claims entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement, (b) list the information contained in the Plan Supplement, and (c) explain how parties may obtain copies of the Plan Supplement.

---

### BINDING NATURE OF THE PLAN:

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

---

8

Birmingham, Alabama
Dated: [●], 2019

/s/ Daniel D. Sparks
Daniel D. Sparks
Bill D. Bensinger
**CHRISTIAN & SMALL LLP**
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Telephone:     (205) 795-6588
Facsimile:     (205) 328-7234
Email:          ddsparks@csattorneys.com
                 bdbensinger@csattorneys.com

- and -

James H.M. Sprayregen, P.C.
Brad Weiland (admitted *pro hac vice*)
Melissa N. Koss (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          james.sprayregen@kirkland.com
                 brad.weiland@kirkland.com
                 melissa.koss@kirkland.com

- and -

Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          stephen.hessler@kirkland.com
                 ciara.foster@kirkland.com

*Co-Counsel to the Debtors*

**Schedule 9**

**Form of Plan Supplement Notice**

# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on [●], 2019, United States Bankruptcy Court for the Northern District of Alabama (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Mission Coal Company, LLC and certain of its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (e) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order approving the Disclosure Statement, the Debtors filed the Plan Supplement with the Court on [●] [Docket No. [●]]. The Plan Supplement includes the following documents (each as defined in the Plan): (a) the Assumed Contracts List; (b) the Rejected Contracts List; (c) the identity of the Plan Administrator and the compensation of the Plan Administrator; (d) the Wind-Down Budget; (e) the Description of Restructuring Transaction; (f) the Successful Bidder Documentation; (g) those Transferred Causes of Action that shall be transferred to the Successful Bidder pursuant to the Sale Transaction; (h) a list of Retained Causes of Action; and (i) the Plan Administrator Agreement; *provided* that, through the Plan Effective

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2] Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

Date, the Plan Supplement, and the exhibits thereto may be amended or modified in accordance with the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **March 20, 2019**, at 10:00 a.m. prevailing Central Time, before the Honorable Tamara O. Mitchell, in the United States Bankruptcy Court for the Northern District of Alabama, located at 1800 Fifth Avenue North, Birmingham, Alabama 35203.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **March 11, 2019, at 4:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline"). Any objection to the Plan ***must***: (a) be in writing, (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court, (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, and (d) be filed with the Court (contemporaneously with a proof of service). Failure to appear at the Confirmation Hearing to prosecute any written objection may result in such objection being overruled without further notice.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Omni Management Group, the notice and claims agent retained by the Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by: (a) calling the Notice and Claims Agent at (888) 585-6494 (U.S. and Canada) or (818) 906-8300 (International), (b) visiting the Debtors' restructuring website at: http://www.omnimgt.com/missioncoal, (c) writing to the Notice and Claims Agent at Omni Management Group, Re: Mission Coal Company, LLC, et al., 5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367; and/or (d) emailing missioninfo@omnomgt.com and requesting paper copies of the corresponding materials previously received in electronic format. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.alnb.uscourts.gov.

---

ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE IX.E CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

---

Birmingham, Alabama
Dated: [●], 2019

/s/ Daniel D. Sparks

Daniel D. Sparks
Bill D. Bensinger
**CHRISTIAN & SMALL LLP**
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Telephone:    (205) 795-6588
Facsimile:    (205) 328-7234
Email:        ddsparks@csattorneys.com
              bdbensinger@csattorneys.com

- and -

James H.M. Sprayregen, P.C.
Brad Weiland (admitted *pro hac vice*)
Melissa N. Koss (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              brad.weiland@kirkland.com
              melissa.koss@kirkland.com

- and -

Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        stephen.hessler@kirkland.com
              ciara.foster@kirkland.com

*Co-Counsel to the Debtors*

3

## Schedule 10

**Form of Notice of Rejection of Executory Contracts and Unexpired Leases**

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE REGARDING
## EXECUTORY CONTRACTS AND UNEXPIRED
## LEASES TO BE REJECTED PURSUANT TO THE PLAN

**PLEASE TAKE NOTICE THAT** on [●], 2019, United States Bankruptcy Court for the Northern District of Alabama (the "<u>Court</u>") entered an order [Docket No. [●]] (the "<u>Disclosure Statement Order</u>"): (a) authorizing Mission Coal Company, LLC and certain of its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>"), to solicit acceptances for the *Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "<u>Plan</u>"),[2] (b) approving the *Disclosure Statement for the Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* (the "<u>Disclosure Statement</u>") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the Assumed Contracts List, and pursuant to the Plan, all Executory Contracts and Unexpired Leases that are not being assumed in connection with the Sale Transaction are automatically rejected as of the Plan Effective Date. The determination to reject those Executory Contracts and Unexpired Leases that are not on the Assumed Contracts List is subject to revision.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

> **PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT WILL BE REJECTED PURSUANT TO THE PLAN. THEREFORE, YOU ARE ADVISED TO REVIEW CAREFULLY THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN.[3]**

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **March 20, 2019, at 10:00 a.m.**, prevailing Central Time, before the Honorable Tamara O. Mitchell, in the United States Bankruptcy Court for the Northern District of Alabama, located at 1800 Fifth Avenue North, Birmingham, Alabama 35203.

**PLEASE TAKE FURTHER NOTICE THAT** all proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed by the date that is thirty (30) days following the entry of an Order of the Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an executory contract or unexpired lease not Filed within such time shall be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, their estates, the plan administrator, and/or the purchaser, or property of the foregoing parties, without the need for any objection by the Debtors, their estates, the plan administrator, and/or the purchaser and without the need for any further notice to, or action, order, or approval of the Court.**

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the proposed rejection of an Executory Contract or Unexpired Lease is **March 11, 2019, at 4:00 p.m.**, prevailing Central Time (the "Contract Rejection Objection Deadline"). Any such objection ***must***: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the proposed rejection of such Executory Contract or Unexpired Lease; and (d) be filed with the Court (contemporaneously with a proof of service) so as to be ***actually received*** on or before the Contract Rejection Objection Deadline by the Court and the following parties: (a) counsel for the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn.: Brad Weiland and Melissa Koss; (b) counsel to the DIP Lenders, Akin Gump Strauss Hauer & Feld LLP, Bank of America Tower, 1 Bryant Park, New York, New York 10036, Attn: Arik Preis and Jason P. Rubin; (c) counsel to the Official Committee of Unsecured Creditors, Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020, Attn: Jeffrey L. Cohen and Jennifer B. Kimble.; and (d) Office of the Bankruptcy Administrator for the Northern District of Alabama, 1800 5th Ave. N, Suite 325, Birmingham, Alabama 35203, Attn.: Thomas Corbett. Failure to

---

[3] Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed Contract and Leases List nor anything contained in the Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Plan Administrator has any liability thereunder. Further, the Debtors expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from the Assigned Contracts Schedule and reject such Executory Contract or Unexpired Lease, pursuant to the terms of the Plan, up until the Plan Effective Date and (b) contest any Claim asserted in connection with rejection of any Executory Contract or Unexpired Lease.

appear at the Confirmation Hearing to prosecute any written objection may result in such objection being overruled without further notice.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to Plan in connection with the rejection of the Executory Contract(s) and Unexpired Lease(s) identified above and/or related rejection damages proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the Confirmation Hearing (or such other date as fixed by the Court). Failure to appear at any such hearing to prosecute any written objection may result in such objection being overruled without further notice.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Omni Management Group, the notice and claims agent retained by the Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by: (a) calling the Notice and Claims Agent at (888) 585-6494 (U.S. and Canada) or (818) 906-8300 (International), (b) visiting the Debtors' restructuring website at: http://www.omnimgt.com/missioncoal, (c) writing to the Notice and Claims Agent at Omni Management Group, Re: Mission Coal Company, LLC, et al., 5955 DeSoto Ave., Suite 100, Woodland Hills, CA 91367; and/or (d) emailing missioninfo@omnomgt.com and requesting paper copies of the corresponding materials previously received in electronic format. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: https://ecf.alnb.uscourts.gov.

---

ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE IX.E CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

---

3

Birmingham, Alabama
Dated: [●], 2019

/s/ Daniel D. Sparks

Daniel D. Sparks
Bill D. Bensinger
**CHRISTIAN & SMALL LLP**
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Telephone:     (205) 795-6588
Facsimile:     (205) 328-7234
Email:          ddsparks@csattorneys.com
                bdbensinger@csattorneys.com

- and -

James H.M. Sprayregen, P.C.
Brad Weiland (admitted *pro hac vice*)
Melissa N. Koss (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          james.sprayregen@kirkland.com
                brad.weiland@kirkland.com
                melissa.koss@kirkland.com

- and -

Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          stephen.hessler@kirkland.com
                ciara.foster@kirkland.com

*Co-Counsel to the Debtors*

Case 18-04177-TOM11   Doc 762   Filed 02/08/19   Entered 02/08/19 14:41:28   Desc
Main Document     Page 170 of 170