# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## MEMORANDUM OPINION AND ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (A) REJECT THEIR COLLECTIVE BARGAINING AGREEMENTS, (B) MODIFY CERTAIN UNION-RELATED RETIREE BENEFITS, AND (C) IMPLEMENT TERMS OF THEIR SECTION 1113 AND SECTION 1114 PROPOSAL, AND (II) GRANTING RELATED RELIEF

This case came before the Court for hearing on February 20, 21, and 22, 2019 on *Debtors' Motion for Entry of an Order (I) Authorizing, but Not Directing, the Debtors to (A) Reject Their Collective Bargaining Agreements, (B) Modify Certain Union-Related Retiree Benefits, and (C) Implement Terms of Their Section 1113 and Section 1114 Proposal, and (II) Granting Related Relief* [Docket No. 635] (the "Section 1113/1114 Motion"), filed on January 31, 2019, by Mission Coal Company, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"); the *United Mineworkers of America's Objection to Debtors' Motion for Entry of an Order (I) Authorizing, but Not Directing, the Debtors to (A) Reject Their Collective Bargaining Agreements, (B) Modify Certain Union-Related Retiree Benefits, and (C) Implement Terms of Their Section 1113 and Section 1114 Proposal, and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

*(II) Granting Related Relief* [Docket No. 797]; the *Objection of the United Mine Workers of America 1974 Pension Plan and Trust and the United Mine Workers of America 1993 Benefit Plan to the Debtors' Motion for Entry of an Order (I) Authorizing, but Not Directing, the Debtors to (A) Reject Their Collective Bargaining Agreements, (B) Modify Certain Union-Related Retiree Benefits, and (C) Implement Terms of Their Section 1113 and Section 1114 Proposal, and (II) Granting Related Relief* [Docket No. 801]; and the *United Mineworkers of America's Amended Supplemental Objection to Debtors' Motion [Dkt. No. 635] for Entry of an Order Authorizing the Debtors to Reject Their Collective Bargaining Agreements* [Docket No. 851]. Appearances of counsel were as noted on the record. This Court has considered the pleadings, arguments of counsel, the testimony of witnesses, the exhibits, and the law, and finds and concludes as follows.[2]

## <u>INTRODUCTION</u>

At the outset, the Court notes and recognizes the impact any ruling on the pending Motion and Objections has on multiple stake holders in these chapter 11 cases. As noted on the record during the hearing, multiple parties including creditors, employees and the community may be impacted by the results of this decision. However, the impact on each employee and each retiree is huge, and may be difficult for many, if not all, to understand, much less accept as fair, equitable or just. The Court is keenly aware of this, and also aware of the employees' - especially the miners' - interest in the outcome of this motion.

In *In re Patriot Coal*, the following was noted:

[T]here is unquestionably no dispute that the lives and livelihood of Debtors' employees, both, union and non-union, current, and retired, depend on the outcome of Debtors' reorganization. "The retirees' health and access to health care depend on the outcome of these cases. Indeed, without the dedication and sacrifice of the

---

[2] This Memorandum Opinion and Order constitutes findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to contested matters in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Bankruptcy Procedure 9014.

2

coal miners and their families, there would be no coal, and there would be no Patriot Coal."[3]

The *Patriot Coal* court also noted, without "men and women willing to bend their knees to excavate coal" there would be no need for the chapter 11 cases or the mines.[4]

This Court recognizes that the miners are the backbone and crucial workforce in these mining operations. Essentially, after all the documents have been reviewed, all the testimony has been presented, and arguments have been made by preeminent, highly-capable attorneys, the remaining dilemma facing this Court is straightforward. The Court must decide whether to rule in a manner that results in a shut down of the mines, or rule in a manner that allows the possibility that the mining operations continue, in the hopes that with a new owner, new management, the potential investment of capital, or other changes, the Mines continue operating, the miners keep valuable jobs, and the miners are able to benefit as the Mines become more profitable.

## FINDINGS OF FACT[5]

1.      Mission Coal Company, LLC ("<u>Mission Coal</u>"), was formed on January 31, 2018, through a reorganization that combined and consolidated the operations of Seneca Coal Resources, LLC ("<u>Seneca</u>"), and its wholly-owned subsidiaries, and Seminole Coal Resources, LLC ("<u>Seminole</u>"), and its wholly-owned subsidiaries. *See* DX-51 ¶ 6.

2.      Oak Grove Resources, LLC, and Pinnacle Mining Company, LLC, each subsidiaries of Seneca, own metallurgical coal mines (the "<u>Oak Grove Mine</u>" and "<u>Pinnacle Mine</u>," respectively, and collectively, the "<u>Mines</u>"), and are each parties to substantially similar collective bargaining agreements with the United Mine Workers of America (the "<u>UMWA</u>"), which

---

[3] *In re Patriot Coal Corp.*, 493 B.R. 65, 78 (Bankr. E.D. Mo. 2013) (quoting *In re Patriot Coal Corp.*, 482 B.R. 718, 722 (Bankr. S.D.N.Y. 2012).
[4] *Patriot Coal*, 493 B.R. at 78.
[5] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343, 345 n.2 (5th Cir. 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975)

3

represents miners employed at the Mines.  *See id.* at ¶ 8; Hr'g Tr. 24:4–25:24, Feb. 20, 2019 (Nystrom); DX-4; DX-5.

3.      Internal and external factors, such as rail and port disruptions and adverse mining and geological conditions, as well as the enormous capital infusions required to update and operate the Mines led to a liquidity crisis rendering the Debtors incapable of meeting their obligations.  *See* Nystrom Decl. ¶¶ 7, 8; Hr'g Tr. 116:14–118:12, Feb. 20, 2019 (Zervos).

4.      After failed attempts to restructure out of court, *see* Hr'g Tr. 166:6–16, Feb. 20, 2019 (Szlezinger); Nystrom Decl. ¶ 17, the Debtors filed for chapter 11 relief on October 14, 2018 (the "Petition Date"), commencing these chapter 11 Cases.  To fund these chapter 11 Cases and their operations, the Debtors entered into the *Senior Secured Superpriority Debtor-in-Possession Credit Agreement*, dated as of October 16, 2018 (the "DIP Facility"), with their first lien creditors (the "DIP Lenders").  *See* DX-63 at Ex. 1 to Ex. A; DX-51 ¶¶ 20–21.  At the time the Debtors filed for chapter 11 protection, the Debtors had only $54,000 of cash on hand, and the DIP Facility was the Debtors' only option if the Debtors were to continue operating the Mines; absent the DIP Facility, the Debtors would have ceased operations and liquidated, and all employees would have lost their jobs.  *See* Hr'g Tr. 37:8–38:1. Feb. 20, 2019 (Nystrom); *id.* at 168:14–15 (Szlezinger).

5.      The DIP Facility mandates that the Debtors conduct a process for the sale of substantially all of the Debtors' assets including, but not limited to, the Mines, in accordance with the schedule set forth on its Schedule 6.26 (as amended or modified from time to time, the "DIP Milestones").  *See, e.g.*, DX-63 at Ex. 1 to Ex. A, Sch. 6.26; DX-166 at Ex. 1 to Ex. A, Sch. 6.26; Nystrom Decl. ¶ 23.  To that end, the Debtors have been conducting a sales process, for which the deadline to submit bids (the "Bid Deadline") passed on February 13, 2019.  DX-147 at ¶ 5.

4

6.      No potential buyer, including the DIP Lenders who submitted an opening bid for the Debtors' assets in the form of a proposed asset purchase agreement (the "Proposed APA"), is willing to take the Debtors' assets subject to the legacy and labor costs imposed by the collective bargaining agreements described below.  *See* Hr'g Tr. 198:5–15, Feb. 20, 2019 (Szlezinger); DX-84 at Ex. A; DX-147 ¶ 7.

7.      Accordingly, pursuant to sections 1113 and 1114 of the Bankruptcy Code, and in accordance with the DIP Milestones, *see* DX-63 at Ex. 1 to Ex. A, Sch. 6.26, DX-166 at Ex. 1 to Ex. A, Sch. 6.26, the Debtors are seeking authorization, but not direction, to reject their collective bargaining agreements to eliminate the successorship provisions and to implement their final proposal pursuant to which, upon the closing of the proposed sale, the Debtors will terminate their retiree benefit obligations and any other obligations remaining under the collective bargaining agreements.

### A.      **The Debtors' Labor Obligations.**

8.      The Debtors are party to:  (a) a collective bargaining agreement dated April 27, 2018, between Oak Grove Resources, LLC, and the UMWA (together with all amendments, predecessor and successor agreements, side letters, and memoranda of understanding, the "Oak Grove CBA,"), and (b) a collective bargaining agreement dated April 27, 2018 between Pinnacle Mining Company, LLC, and the UMWA (together with all amendments, predecessor and successor agreements, side letters, and memoranda of understanding, the "Pinnacle CBA," and together with the Oak Grove CBA, collectively, the "CBAs").  *See* DX-4; DX-5; Hr'g Tr. 24:4–25:24, Feb. 20, 2019 (Nystrom).

9.      The CBAs covered approximately 650 of the Debtors' employees prior to the idling of the Pinnacle Mine and address virtually all aspects of the employer-employee relationship,

including wage rates, work rules, paid time off, and health and welfare benefits afforded to UMWA employees. *See* DX-51 ¶¶ 8, 9.

10.     In addition, the Debtors owe retiree benefits (as such term is defined by section 1114 of the Bankruptcy Code, the "<u>Retiree Benefits</u>") to certain former employees as well as their spouses and dependents. These Retiree Benefits include healthcare benefits administered by Anthem Insurance Companies, Inc. ("<u>Anthem</u>") and paid for by the Debtors. *Id.* at ¶ 11; Hr'g Tr. 33:20–22, Feb. 20, 2019 (Nystrom). The Debtors project that it will cost an average of $1.5 million per year over the next five years to fund the Anthem policy, and that the net present value of the Debtors' future obligations to fund the Anthem policy is approximately $45,413,778, as of December 31, 2018. *See* Hr'g Tr. 33:19–25, Feb. 20, 2019 (Nystrom); *id.* at 109:6–9 (Dungan); DX-120 at 3–4.

11.     The Debtors are also responsible for pension liabilities and retiree benefit obligations arising from the Debtors' relationship with the UMWA, including contributions to the 1974 Pension Plan[6] and the 1993 Benefit Plan[7] (collectively, the "<u>UMWA Funds</u>"), and the Union Savings Plan.[8] *See* Hr'g Tr. 26:5–20, Feb. 20, 2019 (Nystrom); *id.* at 32:17–21 (Nystrom).

12.     With respect to the 1974 Pension Plan, the Debtors contribute $5.00 per hour of qualified work performed by represented employees and have contributed an average of $5.8 million per year over the past three years. Hr'g Tr. 31:8–16, Feb. 20, 2019 (Nystrom). With respect to the 1993 Benefit Plan, the Debtors contribute $0.50 per hour of qualified work

---

[6] The United Mine Workers of America 1974 Pension Plan and Trust (the "<u>1974 Pension Plan</u>") is a multiemployer, defined-benefit pension plan established pursuant to 29 U.S.C. § 186(c)(5). The 1974 Pension Plan is responsible for pension and death benefits to approximately 83,000 retired or disabled miners and their eligible surviving spouses. *See* DX-111; DX-112

[7] The United Mine Workers of America 1993 Benefit Plan and Trust (the "<u>1993 Benefit Plan</u>") provides retiree health benefits to a retired coal miners and dependents. *See* DX-113; DX-116.

[8] The savings plan (the "<u>Union Savings Plan</u>") is a qualified retirement benefit plan that provides additional retirement income to employees and their dependents, funded by voluntary wage deferrals, certain enhanced premium contributions and certain supplemental pension contributions made by the Debtors.

6

performed by represented employees and have contributed an average of $700,000 per year over the past three years. Hr'g Tr. 32:9–12, Feb. 20, 2019 (Nystrom). With respect to the Union Savings Plan, the Debtors contribute between $1.50 to $3.00 per hour of qualified work performed by represented employees and have contributed an average of $2.3 million per year over the past three years. Hr'g Tr. 32:23–33:11, Feb. 20, 2019 (Nystrom).

13. Thus, in the aggregate, the Debtors pay, on average, approximately $10.3 million per year on account of the above-described obligations. In addition, the 1974 Pension Plan is massively underfunded and in critical status, and the UMWA Funds have estimated the Debtors' portion of underfunded obligations to the 1974 Pension Plan at approximately $1.2 billion dollars. *See* DX-168.

14. The Debtors are current on all postpetition payments to the UMWA Funds, the Union Savings Plan, and Anthem. Hr'g Tr. 31:17–20, Feb. 20, 2019 (Nystrom); *id.* at 32:13–16 (Nystrom); *id.* at 33:12–15 (Nystrom); *id.* at 34:8–11 (Nystrom).

**B.** **The Chapter 11 Cases and Going-Concern Sale.**

a. *The Debtors' Prepetition Struggles*

15. Market forces in the coal industry have affected a number of companies, many of which have filed for chapter 11. *See* DX-51 ¶ 6. ERP Environmental Fund, a former corporate affiliate of Seneca and Seminole, acquired the assets at Seneca and Seminole that were eventually organized as Mission Coal in January 2018 as a result of opportunities presented by the marketing of distressed coal assets. *Id.*

16. Many of the mining assets ERP acquired in the reorganization had been idled for a period of time or otherwise fallen into disrepair, requiring enormous upfront capital infusions, including necessary equipment repairs and infrastructural investment, which resulted in higher than usual capital and operating expenditures for Mission Coal. *Id.* ¶ 7. Prior to Mission Coal's

7

organization, Seneca and Seminole estimated that, in 2017 alone, substantial capital expenditures of approximately $60 million would be required to bring the Mines back into productive, efficient operation. *See* Hr'g Tr. 118:1–12, Feb. 20, 2019 (Zervos). And in 2018, as of the Petition Date, the Debtors had spent another approximately $28 million upgrading the facilities at these Mines. *See* DX-51 ¶ 8.

17. Further operational challenges drove the company to bankruptcy. For example, the railroad typically used to ship coal experienced severe freezing that stifled deliveries while the price of coal was increasing. Hr'g Tr. 119:13–120:2, Feb. 20, 2019 (Zervos). The unforeseen weather conditions left the Debtors with hundreds of thousands of tons of coal that they were unable to ship, causing the Debtors to lose in excess of $70 million. Hr'g Tr. 120:4–11, Feb. 20, 2019 (Zervos).

18. In addition to the unforeseen weather conditions and capital expenditure needs, the Pinnacle Mine experienced severe geological constraints, including flooding and entering into a fault zone, each of which simultaneously increased costs and restricted production. *See* Hr'g Tr. 116:3–24, Feb. 20, 2019 (Zervos).

19. These operational difficulties, along with the Debtors' workforce obligations and substantial debt obligations, seriously constrained the Debtors' liquidity to the point that they became incapable of meeting their obligations. DX-51 ¶ 8; Hr'g Tr. 120:12–121:2, Feb. 20, 2019 (Zervos).

20. With mounting pressure stemming from the Debtors' increasingly constrained liquidity, the Debtors began analyzing the potential for an out-of-court process to restructure their debt. DX-51 ¶ 17. In mid-2018, the Debtors sought to refinance their debt and/or to raise additional capital. *Id.* This proved impossible. *Id.* The Debtors also attempted to improve operations and reduce the burden of their liabilities by reducing their workforce and idling mining

8

operations at the Pinnacle Mine. *Id.* Finally, the Debtors attempted to negotiate additional covenant waivers (and waivers of payment defaults) with their prepetition first lien lenders and raise from other third parties approximately $34 million of new capital into the Debtors' operations to strengthen liquidity and allow the Debtors to commit to more planned expansion of their operational assets. *Id.* Unfortunately, despite getting relief from their prepetition first lien lenders to extend their runway for more than two months and despite several rounds of negotiation and discussion, the additional funding could not be secured, and the Debtors were left with no other option but bankruptcy. *Id.*; *see also* Hr'g Tr. 166:8–22, Feb. 20, 2019 (Szlezinger).

            b.    *Solicitation of the DIP Facility*

21.     In August 2018, the Debtors engaged Jefferies LLC ("Jefferies"), an investment banking and financial advisory firm, to, among other things, solicit interest in providing debtor-in-possession financing to fund the Debtors' operations and these chapter 11 Cases. *See* DX-59 ¶ 7. At that time, the company's financial condition was in a precarious state; it had ongoing defaults with its lenders regarding nonpayment of interest, had breached liquidity and other covenants, and was running out of cash quickly. *See* Hr'g Tr. 165:22–166:5, Feb. 20, 2019 (Szlezinger). In light of the operational difficulties and performance history of the company, and the fact that the company had no unencumbered collateral, out of the twenty parties solicited to provide debtor-in-possession financing, only one party, the prepetition first lien lenders, was willing to provide any sort of DIP financing. DX-59 ¶ 8; Hr'g Tr. 167:5–168:15, Feb. 20, 2019 (Szlezinger).

22.     Negotiation of the DIP Facility was extensive, strenuous, and arm's-length, with the Debtors, along with Jefferies, commencing negotiations in the middle of September 2018, including regarding the amount and structure of financing, and the timeline of the forthcoming

Case 18-04177-TOM11   Doc 902   Filed 03/01/19   Entered 03/01/19 15:49:32   Desc
Main Document      Page 9 of 63

chapter 11 cases.  *See* Hr'g Tr. 168:16–169:10, Feb. 20, 2019 (Szlezinger); *id.* at 170:15–21 (Szlezinger).

c.    <u>*The Debtors Initiate These Chapter 11 Cases*</u>

23.    With just $54,000 of cash on hand, approximately $175 million of secured debt obligations, and no potential out-of-court restructuring or refinancing available, the Debtors were left with no choice but to commence these chapter 11 Cases.  Hr'g Tr. 37:15–18, Feb. 20, 2019 (Nystrom); *id.* at 168:12–15 (Szlezinger); DX-59 ¶ 8.

24.    Shortly after the initiation of these chapter 11 Cases, the Debtors entered into the DIP Facility on October 16, 2018.  On October 16, 2018, and November 19, 2018, the Court held contested hearings on the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(A), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c)*, dated October 15, 2018 [Docket No. 34] (the "<u>DIP Motion</u>").

25.    On October 16, 2018, the Court entered the *Interim Order (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(A), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c)* [Docket No. 64] (the "<u>Interim DIP Order</u>").

26.    Collateral for the DIP Facility included certain leasehold interests at the Mines, including certain leases (the "<u>NRP Leases</u>") by NRP (Operating) LLC ("<u>NRP</u>") granting coal mining, processing, and transport rights on certain leased premises owned by WPP LLC to Oak

10

Grove and Pinnacle.  *See, e.g.*, Interim DIP Order ¶¶ 10, 25.  During these chapter 11 Cases, a dispute arose between Oak Grove, Pinnacle, and NRP regarding whether NRP had validly terminated the NRP Leases prior to the Petition Date (the "NRP Lease Dispute").  *See Objection to the Interim Order and Motion for Entry of a Final Order (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(A), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c)* [Docket No. 172].  To resolve the NRP Lease Dispute, the parties entered into the *Agreed Order and Settlement Agreement Related to Motion to Assume Oak Grove Coal Mining Lease* [Docket No. 299] (the "NRP Settlement Order").  *See* DX-154.

27.     The Court held a contested hearing on the Debtors' motion for entry of the NRP Settlement Order on November 19, 2018, and entered the NRP Settlement Order on November 20, 2018, overruling the objection by the UMWA.  *Id.* at ¶ 2.  Pursuant to the NRP Settlement Order, NRP agreed that the Debtors "shall have an option . . . to have NRP reinstate the coal mining lease between NRP and Pinnacle dated December 22, 2015 (the "2015 Pinnacle Lease") . . . with respect to all of the premises covered thereby, except the Pocahontas No. 4 reserves shown on Exhibit B of the 2015 Pinnacle Lease."  *Id.* at 6.  2The NRP Settlement Order further provided that if the Debtors exercise their reinstatement option, and the 2015 Pinnacle Lease is reinstated, the "Debtors will then assume the 2015 Pinnacle Lease, and concurrent therewith, NRP and the Debtors will enter an amended and restated lease on the same terms as Exhibit A attached" to the NRP Settlement Order.  *Id.*  Thus, pursuant to the NRP Settlement Order, the Debtors have an option to reinstate and assume the 2015 Pinnacle Lease, and, whether or not the Debtors elect that option, NRP remains the owner of the Pocahontas No. 4 reserves.  No parties in interest, including the

11

UMWA, appealed the NRP Settlement Order. No evidence in the record suggests that the Debtors have exercised their option under the NRP Settlement Order to reinstate the Pinnacle Lease.

28. On November 20, 2018, the Court also entered the *Final Order Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(A), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, and (IV) Granting Related Relief* [Docket No. 300], providing the Debtors with approximately $54.5 million of new money to fund the chapter 11 Cases and ongoing operations (the "New DIP Money").

29. The New DIP Money provided only enough liquidity to fund these Chapter 11 Cases and the Debtors' operations through the DIP Facility's maturity on April 12, 2019. *See* DX-63 at Ex. 2 to Ex. A; DX-125 at 5. Based on the Debtors' projections, absent a significant cash infusion, like a sale of the Debtors' assets, the Debtors will have approximately $5.3 million of liquidity during the week of April 12, 2019. DX-125 at 5.

30. In addition to the New DIP Money, the DIP Facility provided for the roll-up of the prepetition First Lien Loan, and all obligations in the First Lien Credit Agreement, bringing the total amount of indebtedness to the DIP Lenders to approximately $210 million as of the date hereof, all of which is due on the DIP Facility's maturity date. Hr'g Tr. 46:11–47:6, Feb. 20, 2019 (Nystrom). In addition to the approximately $210 million owed on account of the DIP Facility as of the date hereof, the Debtors owe approximately $72 million on account of second-lien debt. Hr'g Tr. 47:11–14, Feb. 20, 2019 (Nystrom).

d.  *The DIP Lenders' Proposed APA*

31. In light of the Debtors' inability to secure additional financing or to otherwise restructure its debt obligations, the Debtors, in consultation with their advisors, determined that a

transaction or series of transactions whereby the Debtors sell substantially all of their assets is the Debtors' only option. Hr'g Tr. 206:9–25, Feb. 20, 2019 (Szlezinger). To that end, prior to and subsequent to the Petition Date, the Debtors and their advisors engaged in extensive, arm's-length negotiations with the DIP Lenders regarding a transaction that would result in the going concern sale of a substantial majority of the Debtors' operating assets, thereby avoiding immediate liquidation and the resulting loss of hundreds of jobs. *See* Hr'g Tr. 165:24–166:22, Feb. 20, 2019 (Szlezinger); *id.* at 169:6–170:3 (Szlezinger).

32. During negotiations, the DIP Lenders proposed the DIP Milestones, *i.e.,* the timeline governing the chapter 11 Cases, including the going-concern sale of substantially all of the Debtors' mining assets. *See* DX-64 at Ex. 1 to Ex. A, Sch. 6.26; DX-166 at Ex. 1 to Ex. A, Sch. 6.26; Hr'g Tr. 171:1–6, Feb. 20, 2019 (Szlezinger). As amended on January 29, 2019, the DIP Milestones relating to the sale are as follows:

- No later than November 27, 2018, the Debtors shall have filed with the Bankruptcy Court a motion for entry of an order (i) authorizing the Debtors' entry into the Stalking Horse APA; (ii) approving the bidding procedures (the "Bidding Procedures") to be used and bid protections to be provided in connection with the Sale; and (iii) setting the dates for submission of bids, the auction (if any) and the hearing approval of the Sale;

- No later than December 18, 2018, the Bankruptcy Court shall have entered an order approving the Bidding Procedures, which shall be in form and substance acceptable to the Required Lenders;

- No later than February 13, 2019, the Bid Deadline shall have occurred;

- To the extent required under the Bidding Procedures, no later than February 27, 2019, the Debtors shall have commenced an auction in connection with the Sale (the "Auction"); and

- No later than April 12, 2019, the confirmed Plan shall have become effective, or the Sale shall have closed.

DX-64 at Ex. 1 to Ex. A, Sch. 6.26.

13

33.     Following those negotiations, the DIP Lenders submitted an "opening bid" for the purchase of a substantial majority of the Debtors' operating assets, including the Oak Grove Mine, and the assumption of certain liabilities. *See* DX-84 at Ex. A (the "<u>DIP Lenders' Proposed APA</u>"). The key components of this potential transaction are fully set forth in the DIP Lenders' Proposed APA. The Debtors did not and, to date, have not executed the DIP Lenders' Proposed APA.

34.     Importantly, the DIP Lenders made clear that they would not purchase the Debtors' assets burdened by liabilities imposed by the CBAs in at least five places in the DIP Lenders' Proposed APA. Hr'g Tr. 185:1–7, Feb. 20, 2019 (Szlezinger); DX-84 at Ex. A §§ 2.2(b), 2.4(d), 2.4(m), 8.5(f), 8.9(a), 9.9.

35.     Specifically, the DIP Lenders' Proposed APA requires the elimination of any clause or provision imposing on the Debtors the requirement that a buyer assume the CBAs or any of the Debtors' liabilities or obligations under their CBAs (collectively, the "<u>Successorship Provisions</u>") or alternatively, rejection of the Debtor's collective bargaining agreements. *See, e.g.*, DX-84 at Ex. A § 9.9 (listing as a closing condition that "(a) The UMWA shall have agreed to waive or remove the successor clause in the UMWA Collective Bargaining Agreements, or (b) the Bankruptcy Court shall have granted a motion acceptable to Buyer filed by the applicable Seller pursuant to Section 1113(c) of the Bankruptcy Code authorizing the applicable Seller to reject the UMWA Collective Bargaining Agreements.").

36.     Successorship clauses are contractual provisions in collective bargaining agreements that seek to require an employer to bind a purchasing employer to all the terms and conditions of an existing collective bargaining agreement in the event of a sale or assignment of the business. The Oak Grove and Pinnacle CBAs each provide, for example:

> This Agreement shall be binding upon each signatory hereto, and their successors and assigns. In consideration of the Union's execution of this Agreement, the Employer signatory to this Agreement promises that its operations covered by this

14

Agreement - to include facilities and coal lands - shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement.

DX-4 at Art. I; DX-5 at Art. I.

37.     Because the DIP Lenders are unwilling to purchase the Mines subject to the CBAs, the DIP Lenders' Proposed APA provides that Buyer "shall purchase, acquire and accept from the Sellers free and clear of all Encumbrances . . . all of the Sellers' direct or indirect right, title and interest in, to or under the . . . properties, rights, claims and assets," DX-84 at Ex. 1 § 2.1, excluding "any and all Collective Bargaining Agreements," *id.* at § 2.2(b).

38.     Along with the above-referenced provisions, the DIP Lenders' Proposed APA makes clear in at least three other places that the DIP Lenders will not assume CBA or post-employment benefits obligations. *See* DX-84 at Ex. 1 § 2.4 ("Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge . . . (d) all Liabilities with respect to any Excluded Asset, including (i) any Benefit Plan, (ii) Contracts that are not Assumed Contracts, (iii) any and all Collective Bargaining Agreements, and (iv) Liabilities or other obligations in respect of any compensation or benefit plans, agreements, policies, practices, programs and arrangements of any ERISA Affiliate, including any Benefit Plan; . . . [and] (m) any and all Liabilities or other obligations arising under any employment or consulting agreement, Collective Bargaining Agreement or arrangement, or severance, retention or termination agreement, plan, policy, practice, program or arrangement with any employee, consultant or contractor (or its representatives) of any Seller"); *id.* at Ex. 1 § 8.5(f) ("Buyer does not accept or assume any Collective Bargaining Agreements to which any Seller is a party to or subject to, and expressly declines to be bound by or accept the terms of any such Collective Bargaining Agreements. Buyer

is not and shall not be obligated to, and does not, accept or adopt any wage rates, employee benefits, employee policies, or any other terms and conditions of employment").

39.     At no point during any negotiations with the DIP Lenders regarding their Proposed APA did the DIP Lenders indicate any willingness to waive or remove these provisions. *See* Hr'g Tr. 49:13–15, Feb. 20, 2019 (Nystrom); *id.* at 50:13–17 (Nystrom).

        e.      *The Section 1113/1114 Milestones*

40.     It appears clear to this Court that that the DIP Lenders will not enter into an APA to purchase the assets while they are encumbered by CBA or post-employment benefit obligations. The DIP Lenders, from the start of negotiations over the DIP Milestones, have been adamant about the necessity for DIP Milestones governing a section 1113/1114 process. *See* Hr'g Tr. 171:7–13. Feb. 20, 2019 (Szlezinger). Those DIP Milestones are set forth below:

- No later than November 14, 2018, the Debtors shall have made proposals in accordance with Bankruptcy Code sections 1113 and 1114 to the applicable authorized representatives of the employees and retirees regarding modifications to the Debtors' collective bargaining agreements which shall include the removal of the successorship clause or waiver by each union of the successorship clause with respect to the Sale, respectively, in form and substance acceptable to the Required Lenders;

- No later than January 31, 2019, the Debtors shall have (x) reached an agreement with the applicable authorized representatives of the employees and retirees regarding modifications to the Debtors' collective bargaining agreements and retiree benefits, respectively, which shall include the removal of the successorship clause or waiver of the successorship clause with respect to the sale, in form and substance acceptable to the Required Lenders, or (y) absent such agreement, filed a motion that is in form and substance acceptable to the Required Lenders under Bankruptcy Code section 1113 for rejection of the Debtors' collective bargaining agreements and under Bankruptcy Code section 1114 for modification of the Debtors' retiree benefits;

- In the event the Section 1113/1114 Motion is filed, not later than March 15, 2019, the Bankruptcy Court shall have entered an order approving the Section 1113/1114 Motion.

DX-64 at Ex. 1 to Ex. A, Sch. 6.26.

16

41.     Thus, the DIP Facility mandates an agreement regarding proposed modifications to the CBAs, or an order by the Court granting authority to the Debtors to modify and reject those agreements, by March 15, 2019.  *Id.*  Absent such agreement or order, the Debtors would be in default under the DIP Facility, and the DIP Lenders could exercise their rights to take over the assets upon which they have their first lien.  *See* Hr'g Tr. 117:4–24, Feb. 20, 2019 (Nystrom).  In that scenario, the Mines would close and all the employees, union and otherwise, would be laid off.  *Id.*

        f.     *The Debtors Pursue a Sale of Substantially All Assets In Accordance with the DIP Milestones*

42.     On December 21, 2018, the Court entered the *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manager of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief* [Docket No. 490] (the "Bidding Procedures Order").  *See* DX-83. Upon its entry, the Bidding Procedures Order, the Bid Procedures, and the Notice of Auction were distributed to all potential purchasers then remaining active in the sales process.  *See* DX-59 ¶ 13.

43.     Each of those documents make clear to potential bidders that, notwithstanding the terms of the DIP Lenders' Proposed APA, the Debtors were open to any and all bids, including those that assumed the CBAs.  *See* DX-83 ¶ 3 ("[N]otwithstanding anything to the contrary in the Opening Bidder's Proposed Agreement, a Qualified Bidder may provide for the assumption of the Employee Obligations, and in considering whether a bid is a Qualified Bid or a Successful Bid, the Debtors shall take into consideration whether the Potential Bidder or Qualified Bidder proposes to assume the Employee Obligations."); *id.* at Ex. 1 § 5(g) ("Each Bid must expressly propose a treatment of the Debtors' prepetition [CBAs] and post-employment benefits . . . . [A] Qualified

Case 18-04177-TOM11     Doc 902     Filed 03/01/19     Entered 03/01/19 15:49:32     Desc Main Document      Page 17 of 63

Bidder may provide for the assumption of the Employee Obligations."); *id.* at Ex. 2 at 2 ("[N]otwithstanding anything to the contrary in the Opening Bidder's Proposed Agreement, a Qualified Bidder may provide for the assumption of the Employee Obligations, and in considering whether a bid is a Qualified Bid or a Successful Bid, the Debtors will take into consideration whether the Potential Bidder or Qualified Bidder proposes to assume the Employee Obligations.").

44.     Prior to entry of the Bidding Procedures Order, the Debtors, with their advisors, had begun canvassing the marketplace to identify potential financial or strategic purchasers in what would become a two-stage sale process. *See* DX-59 ¶ 13; Hr'g Tr. 177:22–179:22, Feb. 20, 2019 (Szlezinger). In total, Jefferies contacted 54 potential purchasers. *See* DX-59 ¶ 13. Thirty-nine potential purchasers entered into non-disclosure agreements with the Debtors and were granted access to an electronic data room containing over 1,600 documents related to the Debtors assets. *Id.*; *see also* Hr'g Tr. 47:21–22, Feb. 21, 2019 (Sanson). The UMWA also requested and received access to the data room, and reviewed hundreds of documents from the data room. *See* Hr'g Tr. 59:25–126:3, Feb. 21, 2019 (Sanson); *id.* at 84:3–12 (Nystrom); *see also* Hr'g Tr. 83:24–87:24, Feb. 21, 2019 (Lucha); DX-29; DX-34.

45.     The data room contained historical financial information, monthly reports, production reports, information related to employee matters, projections, the CBAs, and other information related to the Debtors. *See* Hr'g Tr. 179:25–180:15, Feb. 20, 2019 (Szlezinger). Notably, the Debtors included in the data room a 2019 budget and five-year forecast reflecting the potential results a new buyer could achieve operating, among other things, the Oak Grove Mine, if they were willing to make the significant investment required to acquire the mine and inject the amount of additional capital necessary to operate it efficiently. *See* DX-126; Hr'g Tr. 57:1–9, Feb. 20, 2019 (Nystrom). The forecasts included the cost of the Oak Grove CBA and related legacy costs so that buyers could understand the impact of those liabilities on potential operating results.

*See* DX-126 at 5; Hr'g Tr. 58:1–12, Feb. 20, 2019 (Nystrom). The forecasts also assume that a going-concern sale has occurred, do not include debt-service costs associated with running the Oak Grove Mine, and do not assume anything with regard to the capital costs of a prospective buyer. *See* Hr'g Tr. 58:1–12, Feb. 20, 2019 (Nystrom); *id.* at 98:5–14 (Nystrom).

46. In addition to providing diligence materials to prospective purchasers in the data room, the Debtors provided a management presentation by their Chief Executive Officer, Mike Zervos, and set up numerous management meetings with prospective purchasers. *See* Hr'g Tr. 180:24–181:8, Feb. 20, 2019 (Szlezinger). Prospective purchasers were also given the opportunity to tour the mines. Hr'g Tr. 188:4–10, Feb. 20, 2019 (Szlezinger).

47. As part of the two-stage sale process, the Jefferies team set a deadline of November 28, 2018, for parties to send letters of interest. Hr'g Tr. 187:25–188:3, Feb. 20, 2019 (Szlezinger). None of the parties who sent letters of interest to the Debtors expressed an interest in adopting the CBAs. *See id.* at 182:2–6 (Szlezinger). There was, however, one financial sponsor that requested in its letter the Debtors' consent to meet with the UMWA. *Id.* The Debtors provided them a period of diligence of approximately six weeks and consented to their request to communicate with the UMWA. *See id.* at 182:7–12 (Szlezinger). Thereafter, that financial sponsor informed the Debtors that they are no longer interested in acquiring the Debtors' assets and would not be moving forward in the process. *See id.* at 182:19–183:1 (Szlezinger).

48. By the February 13, 2019 bid deadline, after the diligence period and following receipt of letters of interest from potential purchasers, a number of prospective buyers submitted bids for the Pinnacle Mine, the Maple Eagle Mine, and/or Oak Grove Mine. *See* DX-146 ¶ 5. At the time of the hearing on the Section 1113/1114 Motion, the Debtors were in the process of determining which of the bids, in their reasonable judgment after consultation with the

19

Consultation Parties (as defined in the Bidding Procedures Order), met the requirements outlined in the Bidding Procedures for entry into the auction. *Id.*

49.     Generally, bids received fell into three categories with regard to the CBAs. First, certain of the bids included a markup of the DIP Lenders' Proposed APA. *See* Hr'g Tr. 193:22–24, Feb. 20, 2019 (Szlezinger). All of those bids included the same language in the DIP Lenders' Proposed APA disclaiming the CBAs. *Id.* at 193:25–194:3 (Szlezinger). Second, certain of the bids included a wholly different proposed asset purchase agreement than the DIP Lenders' Proposed APA; each of those contained a provision making it clear that they were not willing to assume the CBAs. *Id.* at 195:4–9 (Szlezinger). Finally, certain bids did not include a proposed asset purchase agreement at all, and instead included a cover letter. *Id.* at 195:10–17 (Szlezinger). After conferring with those bidders, the Jefferies team concluded that those bidders did not want to assume the CBAs. *Id.* at 195:21–25 (Szlezinger).

50.     In addition to the bids received on the Bid Deadline, the Debtors also received an additional letter of interest. *See id.* at 196:3–5 (Szlezinger). However, the party that submitted the additional letter of interest has not performed much, if any, due diligence in connection with a potential sale or otherwise complied with the Bidding Procedures Order. *See id.* at 196:20–198:4 (Szlezinger). Specifically, that party has not met with management, taken a tour of the Mines, retained counsel or a financial advisor, provided a markup of the DIP Lenders' Proposed APA or another proposed asset purchase agreement, or made a deposit in escrow. *See id.* at 196:11–198:4 (Szlezinger). In fact, that party has not submitted a bid at all. *Id.* at 198:3–4 (Szlezinger).

51.     In short, despite the Debtors' efforts, no viable bidder is willing to buy the Debtors' assets subject to the UMWA CBAs and/or the Retiree Benefits. *See id.* at 198:12–15 (Szlezinger). As a result, unless the Debtors receive authority from this Court to modify and terminate their CBAs and other retiree benefits obligations pursuant to sections 1113 and 1114 of the bankruptcy

20

code, a sale of the Debtors' assets will not close. *See* DX-64 at Ex. 1 to Ex. A, Sch. 6.26; Hr'g Tr. 206:9–15, Feb. 20, 2019 (Szlezinger).

52.     Absent a sale, the Debtors will not have sufficient funds to repay the DIP Facility when it becomes due and payable. *See* Hr'g Tr. 47:7–10, Feb. 20, 2019 (Nystrom). Indeed, based on the Debtors' weekly cash projections, absent a sale, the Debtors will only have $5.3 million on the DIP Facility's maturity date. *See* DX-125 at 5; Hr'g Tr. 46:5–10, Feb. 20, 2019 (Nystrom). If the DIP Facility becomes due and the Debtors do not have sufficient funds to repay it, the Debtors will likely be administratively insolvent, *see* Hr'g Tr. 111:21–112:14, Feb. 21, 2019 (Nystrom), and, absent an infusion of new capital, will not have the liquidity required to continue operating the Mines, *see* Hr'g Tr. 206:19–25, Feb. 20, 2019 (Szlezinger). As a result, the Debtors would be required to close their Mines, and terminate both their union and non-union employees. *See* Hr'g Tr. 117:4–25, Feb. 21, 2019 (Nystrom).

C.      **The Labor Negotiations with the UMWA.**

53.     Shortly after these chapter 11 Cases commenced, the Debtors began negotiating with the UMWA in good faith concerning proposed modifications to the CBAs. *See generally* DX-162; *see also* DX-26, Lucha Decl. ¶ 7; Hr'g Tr. 124:4–14, Feb. 20, 2019 (Zervos); Hr'g Tr. 76:15–16, Feb. 21, 2019 (Lucha). The Debtors first met with the UMWA in person on November 6, 2018, at the UMWA's national headquarters in Triangle, Virginia, where the parties discussed the causes of the Debtors' bankruptcy and the CBA obligations the Debtors were seeking to modify. *See* Lucha Decl. ¶ 8; Hr'g Tr. 124:9–14, Feb. 20, 2019 (Zervos); Hr'g Tr. 90:7–91:7, Feb. 21, 2019 (Lucha). The UMWA agreed to represent the interests of retirees during negotiations with the Debtors. Hr'g Tr. 46:20–32, Feb. 21, 2019 (Sanson); *id.* at 75:23–76:1 (Lucha).

54.     On November 13, 2018 the Debtors presented the UMWA with their first proposal for modifications to the CBAs in accordance with the DIP Facility, including deletion of the

21

Successorship Provisions (the "First Proposal"). *See* DX-27; DX26, Lucha Decl. ¶ 9; Hr'g Tr. 48:1–5, Feb. 21, 2019 (Sanson). In their First Proposal, the Debtors also sought to withdraw from the 1974 Pension Plan, eliminate health care for retirees and laid off employees, terminate the annual safety equipment and protective clothing allowance, modify paid time off terms, and terminate letters of understanding related to reciprocal panel rights between the Pinnacle Mine and Oak Grove Mine. *See* DX-027; Lucha Decl. ¶ 9; Hr'g Tr. 79:8–80:12, Feb. 21, 2019 (Lucha).

55.     On November 14, 2018, the Debtors provided the UMWA with access to a data room containing over 1,600 documents regarding financial information, operations, shipped coal quality, key contracts, properties, employees and human resources, environmental issues, safety, legal issues, insurance, and other liabilities. *See* DX-29; DX-34; Lucha Decl. ¶ 10; Hr'g Tr. 83:24–85:14, Feb. 21, 2019 (Lucha). The Debtors also created and provided several documents in response to specific requests from the UMWA. Lucha Decl. ¶¶ 12, 16–17; Hr'g Tr. 85:8–14, Feb. 21, 2019 (Lucha).

56.     The Debtors met with the UMWA on November 29 and December 6, 2018, to discuss their First Proposal and the UMWA's related concerns. Lucha Decl. ¶¶ 15, 18; Hr'g Tr. 47:10–13, Feb. 21, 2019 (Sanson). After these two meetings, the UMWA rejected the Debtors' First Proposal and failed to provide a written counterproposal. Lucha Decl. ¶ 18; Hr'g Tr. 48:7–10, Feb. 21, 2019 (Sanson); *id.* at 80:16–18 (Lucha).

57.     The Debtors provided their second proposal to modify the CBAs (the "Second Proposal") to the UMWA on December 12, 2018. *See* DX-37; Hr'g Tr. 48:14–18, Feb. 21, 2019 (Sanson); *id.* at 80:21–81:3 (Lucha). The Debtors met with the UMWA on December 13, 2018, at which time the UMWA rejected the Second Proposal without providing a written counterproposal. *See* Lucha Decl. ¶¶ 21-22; Hr'g Tr. 47:14–15, 48:19–21, Feb. 21, 2019 (Sanson); *id.* at 81:4–5 (Lucha). The UMWA represented during that December 13, 2018,

Case 18-04177-TOM11     Doc 902     Filed 03/01/19     Entered 03/01/19 15:49:32     Desc
Main Document     Page 22 of 63

meeting, that it would provide a written counterproposal but no counterproposal was made or received. *See* Hr'g Tr. 93:13–17, Feb. 21, 2019 (Lucha).

58. On December 14, 2018, the Debtors provided a third proposal to modify the CBAs (the "Third Proposal"), which withdrew several of their previously proposed modifications in reaction to discussions with the UMWA. *See* DX-39; Lucha Decl. ¶ 23; Hr'g Tr. 49:3–13, Feb. 21, 2019 (Sanson); *see generally* DX-163 (comparing the Debtors' proposals). During the Debtors' fifth meeting with the UMWA, a telephonic meeting on December 17, 2018, the UMWA rejected the Third Proposal and again failed to make a counterproposal. *See* Lucha Decl. ¶ 24; Hr'g Tr. 47:16–17, 49:14–16 (Sanson), Feb. 21, 2019; *id.* at 91:16–17 (Lucha).

59. On December 18, 2018, the Debtors sent their fourth proposal of modifications to the CBAs (the "Fourth Proposal") to the UMWA. *See* DX-41; Lucha Decl. ¶ 25; Hr'g Tr. 49:21–23, Feb. 21, 2019 (Sanson). The Fourth Proposal included the following terms:

  a) Successorship clause. Deletion of the successorship clauses in the Oak Grove and Pinnacle CBAs in their entirety to allow the operations to be sold, conveyed, transferred, or assigned without requiring the new owner to assume the seller's 2018 labor agreements, or any employment, financial, or other obligations arising under or attributable to the CBAs and all associated agreements, side letters, and related agreements. Lucha Decl. ¶ 26.

  b) Right to subcontract. Deletion of section of the Pinnacle CBA that prevents employer from contracting out work customarily performed by CBA-covered employees. Lucha Decl. ¶ 26.

  c) Pension Contributions. Termination of contributions to all retirement plans, including the UMWA Funds. Lucha Decl. ¶ 26.

  d) Health and welfare benefits for UMWA Retiree Beneficiaries. Termination of provision requiring participation in and contributions to all retirement plans, including the UMWA Funds, and health care benefits for pensioners, surviving spouses, and their dependents. Lucha Decl. ¶ 26.

  e) Healthcare for laid-off employees. Elimination of the requirement to provide healthcare benefits for up to 180 days to employees who are laid off. Lucha Decl. ¶ 26.

23

f) <u>Termination of agreement</u>.  Termination of the UMWA CBAs and all associated agreements, side letters, benefit plans and related agreements effective as of the day after the effective date of the sale of the assets or operations covered by the CBAs.  Lucha Decl. ¶ 26.

60.    The UMWA did not provide a response or a counterproposal to the Debtors' Fourth Proposal.  *See* Lucha Decl. ¶ 25; Hr'g Tr. 50:2–4, Feb. 21, 2019 (Sanson); *id.* at 97:2–5 (Lucha).

61.    After the Debtors sent their Fourth Proposal and negotiations reached an impasse, the UMWA sent an additional information request to the Debtors.  *See* DX-44; Lucha Decl. ¶ 28; Hr'g Tr. 86:13–87:11, Feb. 21, 2019 (Lucha).  The majority of the information in the request had already been provided to the UMWA or was accessible to the UMWA in document productions previously made to the Official Committee of Unsecured Creditors, of which the UMWA is a member, in connection with its investigation of estate claims.  *See* Lucha Decl. ¶ 29; Hr'g Tr. 87:12–16, Feb. 21, 2019 (Lucha).  Even so, the Debtors further responded to the UMWA on January 29, 2019, pointing the UMWA to places in the data room where it could find the requested information and providing additional information.  *See* Lucha Decl. ¶ 29; Hr'g Tr. 87:17–24, Feb. 21, 2019 (Lucha).

62.    According to testimony at the hearing, each of the Debtors' proposals were based on the most complete and reliable information available at the time of each proposal.  Hr'g Tr. 82:8–11, Feb. 21, 2019 (Lucha).  Throughout negotiations, the UMWA steadfastly refused to agree to any modifications.  Specifically, the UMWA refused to eliminate the Successorship Provisions, withdraw from the 1974 Pension Plan, or terminate retiree healthcare.  Hr'g Tr. 93:20–94, Feb. 21, 2019 (Lucha).  The UMWA refused despite the fact that (as the UMWA Funds' counsel admitted in colloquy with the Court) the majority of renegotiated CBAs today do not include provisions for the 1974 Pension Plan or 1993 Benefit Plan.  *See* Hr'g Tr. 101:13–16, Feb. 21, 2019 (Lucha).  Nor

24

did the UMWA propose any alternative retiree healthcare options such as a VEBA, annuity, or buyout. *See* Hr'g Tr. 92:15–20, Feb. 21, 2019 (Lucha). The UMWA, through its witness, acknowledged at the hearing that it did not provide a written counterproposal to any of the Debtors' proposals. Hr'g Tr. 48:7–50:11, Feb. 21, 2019 (Sanson); *id.* at 82:15–17 (Lucha).

        D.       **The UMWA's Alleged Grievances.**

   63.     The UMWA has formally initiated two grievance disputes under the Grievance Procedures outlined in the CBAs. Hr'g Tr. 56:6–22, Feb. 21, 2019 (Sanson); *see also* DX-4; DX-5. Both alleged grievances are still pending and unresolved. Hr'g Tr. 56:6–22, Feb. 21, 2019 (Sanson). The Debtors have disputed those grievances, and no arbiter has made a determination that the Debtors are in non-compliance with the CBAs. *See id.* at 66:7-67:6 (Sanson).

        E.       **The Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 1113(c), and 1114(g).**

   64.     On January 31, 2019, the Debtors filed this Section 1113/1114 Motion pursuant to sections 363, 1113, and 1114 of title 11 of the United States Code for an order (i) authorizing, but not directing, the Debtors to (a) reject the two collective bargaining agreements entered into between certain of the Debtors and the UMWA for the Debtors' unionized workforce, (b) modify certain retiree benefits for the Debtors' retired UMWA employees (and their spouses and dependents), and (c) implement the terms of the Debtors' proposal submitted pursuant to sections 1113 and 1114 of the Bankruptcy Code, and (ii) granting related relief.[9] Along with the Section 1113/1114 Motion, the Debtors filed declarations of Kevin Nystrom, Chief Restructuring Officer of Mission Coal; Michael P. Zervos, Chief Executive Officer of Mission Coal; Leon Szlezinger, Managing Director and Joint Global Head of Restructuring & Recapitalization at Jefferies LLC, the Debtors' financial advisor; Dale Lucha, Owner and Managing Member of Lucha LLC; and

---

[9] *See* Docket No. 635.

25

Mark T. Dungan, Senior Director at Willis Towers Watson, as exhibits to the Section 1113/1114 Motion. Supplemental declarations for Mr. Szlezinger and Mr. Dungan were also filed prior to the hearing.[10] In addition to these declarations admitted as evidence at the hearing, Mr. Nystrom, Mr. Zervos, Mr. Szlezinger, Mr. Lucha, and Mr. Dungan testified during the hearing in support of the Section 1113/1114 Motion.

65. In the Section 1113/1114 Motion, the Debtors requested the authority to (a) reject the CBAs in their entirety and (b) implement the Fourth Proposal pursuant to which any Successorship Provision would be eliminated and, effective as of the day after the effective date of the sale of the assets or operations covered by the CBAs, the CBAs and the other obligations remaining under the CBAs, as well as the Retiree Benefits, would terminate.

66. The UMWA[11] and the UMWA Funds[12] filed objections to the Section 1113/1114 Motion. The UMWA also filed a supplemental objection[13] and an amended supplemental objection[14] to the Section 1113/1114 Motion. The UMWA and the UMWA Funds make the following arguments: (a) the proposed modifications in the Fourth Proposal are not truly necessary to permit the reorganization of the Debtors, in part because of a lack of conclusive evidence that there is no party willing to assume the Debtors' CBA obligations and that the Debtors haven't

---

[10] *See* Docket Nos. 831, 832.

[11] *See United Mineworkers of America's Objection to Debtors' Motion for Entry of an Order (I) Authorizing, but not Directing, the Debtors to (A) Reject their Collective Bargaining Agreements, (B) Modify Certain Union-Related Retiree Benefits, and (C) Implement Terms of their Section 1113 and 1114 Proposal, and (II) Granting Related Relief*, dated February 13, 2019 [Docket No. 797] (the "UMWA Objection").

[12] *See Objection of the United Mine Workers of America 1974 Pension Plan and Trust and the United Mine Workers of America 1993 Benefit Plan to the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Reject their Collective Bargaining Agreements, (B) Modify Certain Union-Related Retiree Benefits and (C) Implement Terms of their Section 1113 and Section 1114 Proposal, and (II) Granting Related Relief*, dated February 13, 2019 [Docket No. 801] (the "UMWA Funds Objection"). The UMWA Funds Objection was supported by the *Declaration of Dale Stover*. [Docket No. 801, Ex. A].

[13] *See United Mine Workers of America's Supplemental Objection to Debtors' Motion [Dkt. No. 635] for Entry of an Order Authorizing the Debtors to Reject their Collective Bargaining Agreements*, dated February 19, 2019 [Docket No. 841] (the "UMWA Supplemental Objection").

[14] *See United Mine Workers of America's Amended Supplemental Objection to Debtors' Motion [Dkt. No. 635] for Entry of an Order Authorizing the Debtors to Reject their Collective Bargaining Agreements*, dated February 20, 2019 [Docket No. 851].

26

shown that each component of their proposal is necessary; (b) the Debtors' proposals were not based on the most complete and reliable information available; (c) the negotiations were carried out in bad faith; (d) the UMWA had good cause to reject the proposal; and (e) the proposal fails to treat all parties fairly and equitably. The UMWA also alleges in its supplemental objections that the Debtors unilaterally breached the terms of the Pinnacle CBA based on an alleged conveyance of coal lands without UMWA approval and, thus, the Debtors are not entitled to relief under sections 1113 and 1114 of the Bankruptcy Code.

## JURISDICTION

67.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the District Court's General Order of Reference Dated July 16, 1984, as Amended July 17, 1984.[15]  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).[16]

68.     The statutory and legal predicates for the relief sought herein are sections 105(a), 363, 1113(c) and 1114(g) of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

## CONCLUSIONS OF LAW

### A.     Sections 1113 and 1114 of the Bankruptcy Code.

69.     Congress enacted section 1113 of the Bankruptcy Code in response to the Supreme Court's decision in *NLRB* v. *Bildisco & Bildisco*.[17]  In *Bildisco,* the Supreme Court held that a debtor may unilaterally reject a collective bargaining agreement under section 365(a) of the

---

[15] The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:
        The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.
[16] 28 U.S.C. §157(b)(2)(A) provides as follows:
        (b)(2) Core proceedings include, but are not limited to–
         (A) matters concerning administration of the estate[.]
[17] 465 U.S. 513 (1984).

27

Bankruptcy Code by showing that the agreement "burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract."[18] To address concerns that the Supreme Court's decision would permit debtors to use bankruptcy as a weapon in the collective bargain process, Congress enacted section 1113 to "replace the *Bildisco* standard with one that was more sensitive to the national policy favoring collective bargaining agreements."[19] Accordingly, section 1113 is intended to "ensure that well-informed and good faith negotiations occur in the market place, not as part of the judicial process."[20] It does so by imposing more stringent standards and rigorous procedures for rejecting a collective bargaining agreement than apply to an ordinary executory contract. Section 1113 thereby encourages the debtor-employer and the union to reach a negotiated settlement.[21]

70. Section 1113 provides in relevant part:

(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor

---

[18] *See In re AMR Corp.*, 477 B.R. 384, 405 (Bankr. S.D.N.Y. 2012) (quoting *NLRB* v. *Bildisco & Bildisco*, 465 U.S. 513, 526 (1984)).
[19] *Wheeling-Pittsburgh Steel Corp.* v. *United Steelworkers of America*, 791 F.2d 1074, 1089 (3d Cir. 1986).
[20] *New York Typographical Union No. 6* v. *Maxwell Newspapers, Inc.* (*In re Maxwell Newspapers, Inc.*), 981 F.2d 85, 90 (2d Cir. 1992).
[21] *See* Collier on Bankruptcy ¶ 1113.01 (citing the language and history of section 1113); *see also, e.g.*, *In re Walter Energy, Inc.*, 542 B.R. 859 (Bankr. N.D. Ala. 2015).

28

and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

71.    "Section 1113(b) requires that a debtor take a number of procedural steps prior to rejecting a collective bargaining agreement."[22]  At the outset, the debtor must provide the union with its proposed modifications to a collective bargaining agreement.  The proposed modifications must be (a) "based on the most complete and reliable information available at the time of the proposal," (b) "necessary to permit the reorganization of the debtor," and (c) "assure[] that all creditors, the debtor and all of the affected parties are treated fairly and equitably."[23]  The debtors must also provide the union with the relevant information necessary for the union to evaluate the proposal.[24]  Finally, the debtor must bargain in good faith with the union in an attempt to reach an

---

[22] *See AMR Corp.*, 477 B.R. at 406; *see also, e.g.*, *Walter Energy*, 542 B.R. at 877.
[23] 11 U.S.C. § 1113(b)(1)(A); *see also Walter Energy*, 542 B.R. at 877; *AMR Corp.*, 477 B.R. at 406.
[24] 11 U.S.C. § 1113(b)(1)(B); *see also Walter Energy*, 542 B.R. at 877; *AMR Corp.*, 477 B.R. at 406.

agreement between the time that the section 1113 proposal is made by the debtor and the date that any section 1113 application is heard.[25]

72.     Section 1113(c) also requires that a debtor establish the following three substantive requirements to reject a collective bargaining agreement:   (a) that the debtor's section 1113 proposal fulfills the requirements of the statute, (b) that the union refused to accept the proposal without good cause, and (c) that the balance of the equities favors rejection of the agreement.[26] The debtor bears the burden of proof by the preponderance of the evidence.[27]

73.     Similarly, the debtor may modify or terminate retiree benefits upon satisfying the following conditions:

> (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (f);
>
> (2) the authorized representative of the retirees has refused to accept such proposal without good cause; and
>
> (3) such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities;
>
> except that in no case shall the court enter an order providing for such modification which provides for a modification to a level lower than that proposed by the trustee in the proposal found by the court to have complied with the requirements of this subsection and subsection (f).[28]

74.     Subsection 1114(f) requires as follows:

---

[25] *See AMR Corp.*, 477 B.R. at 406 (citing 11 U.S.C. § 1113(b)(2)).
[26] 11 U.S.C. § 1113(c); *see also AMR Corp.*, 477 B.R. at 406.
[27] *See Walter Energy*, 542 B.R. at 878; *AMR Corp.*, 477 B.R. at 406 (citing *Truck Drivers Local 807* v. *Carey Transp., Inc.* (*Carey Transp. II*), 816 F.2d 82, 88 (2d Cir. 1987)); *In re Nw. Airlines Corp.*, 346 B.R. 307, 320–21 (Bankr. S.D.N.Y. 2006).
[28] 11 U.S.C. § 1114(g).

Case 18-04177-TOM11    Doc 902    Filed 03/01/19    Entered 03/01/19 15:49:32    Desc
Main Document    Page 30 of 63

(1) Subsequent to filing a petition and prior to filing an application seeking modification of the retiree benefits, the trustee shall—

(A) make a proposal to the authorized representative of the retirees, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (k)(3), the representative of the retirees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1), and ending on the date of the hearing provided for in subsection (k)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits.[29]

75.     "The statutory 'requirements for modification of retiree benefits are. . . substantially the same as the requirements for rejection of collective bargaining agreements.'"[30] "Thus, the nine-part analysis found in *In re American Provision Company*, discussed below, applies equally to both."[31] Courts thus routinely analyze motions for relief under sections 1113 and 1114 together, and the Court will do so here.[32] Accordingly, the following discussion relating to the requirements under section 1113 also applies to the relief the Debtors request under section 1114 as applicable to the UMWA and the UMWA Funds.

---

[29] 11 U.S.C. § 1114(f).

[30] *United Mine Workers of America 1974 Pension Plan and Trust v. Walter Energy, Inc.*, 579 B.R. 603, 608 (N.D. Ala. 2016) (quoting *In re Horizon Nat. Res. Co.*, 316 B.R. 268, 281 (Bankr. E.D. Ky. 2004)); *In re Walter Energy, Inc.*, 542 B.R. 858, 878 (Bankr. N.D. Ala. 2015).

[31] *In re Walter Energy, Inc.*, 542 B.R. 858, 878 (Bankr. N.D. Ala. 2015). *See also United Mine Workers of America 1974 Pension Plan and Trust v. Walter Energy, Inc.*, 579 B.R. 603, 610 (N.D. Ala. 2016) *Horizon Nat. Res.*, 316 B.R. at 280–81 (citing *In re Am. Provision Co.*, 44 B.R. 907, 909 (Bankr. D. Minn. 1984)).

[32] *See, e.g.*, *Horizon Nat. Res.*, 316 B.R. at 279–83; *In re Horsehead Indus., Inc.*, 300 B.R. 573, 583 (Bankr. S.D.N.Y. 2003).

31

## B.    Applicable Standard Under Sections 1113 and 1114 of the Bankruptcy Code.

76.     The requirements of section 1113 were restated in a nine-part test in *In re American Provision Co.*[33]  The test requires that the following be met:

> (a)     The debtor in possession must make a proposal to the union to modify the collective bargaining agreement;
>
> (b)     The proposal must be based on complete and reliable information available at the time of the proposal;
>
> (c)     The proposed modifications must be "necessary to permit the reorganization of the debtor";
>
> (d)     The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably;
>
> (e)     The debtor must provide to the union such relevant information as is necessary to evaluate the proposal;
>
> (f)     Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the union;
>
> (g)     At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement;
>
> (h)     The union must have refused to accept the proposal without good cause; and
>
> (i)     The balance of the equities must clearly favor rejection of the collective bargaining agreement.

---

[33] 44 B.R. 907, 909 (Bankr. D. Minn. 1984); *see also, e.g.*, *Walter Energy*, 542 B.R. at 878–79; *In re Ala. Symphony Ass'n,* 155 B.R. 556, 573 n.38 (Bankr. N.D. Ala. 1993) ("This test is almost universally followed in the bankruptcy courts."), *rev'd on other grounds*, *Local 256-733, Am. Fed. of Musicians* v. *Ala. Symphony Ass'n* (*In re Ala. Symphony Ass'n*), 211 B.R. 65 (N.D. Ala. 1996).

### C. Sections 1113 and 1114 Apply in a Liquidating Chapter 11 Case and the Debtors Need Not Demonstrate an Ability to Confirm a Liquidating Chapter 11 Plan

77.     At this stage, it is undetermined whether this bankruptcy case will proceed as a "Chapter 11 classic reorganization"[34] or as a liquidating chapter 11. No one has strenuously argued that §§ 1113 and 1114 should not apply in this case if it turns into a liquidation. Regardless, the Bankruptcy Code does not limit liquidation to chapter 7 cases.[35] To the contrary, chapter 11 expressly provides for liquidating chapter 11 plans of reorganization,[36] as recently made clear by the Eleventh Circuit Court of Appeals by finding that "a Chapter 11 liquidation qualifies as a type of 'reorganization.'"[37] Thus, no matter how this case proceeds, the Eleventh Circuit has determined that §§ 1113-1114 is applicable.

### D. The Debtors Have Satisfied the Statutory Requirements of Sections 1113 and 1114 of the Bankruptcy Code.

#### (1) The Debtors Made Proposals to the UMWA to Modify the CBAs.

78.     Section 1113 requires the Debtors to provide the UMWA with proposed modifications to the CBAs prior to filing an application to reject the agreement.[38] The bar for satisfying this requirement is low because, in most cases, this factor is a "routine formality."[39] Here, the Debtors have met this standard;[40] the Debtors made numerous proposals to the UMWA

---

[34] *See In re Walter Energy, Inc.*, 911 F.3d 1121, 1156 (11th Cir. 2018).

[35] *See e.g., In re Chicago Constr. Specialties, Inc.*, 510 B.R. 205, 214-16 (Bankr. N.D. Ill. 2014).

[36] 11 U.S.C. § 1129(a)(11) (enumerating as a confirmation requirement that "[c]onfirmation of the plan is not likely to be followed by . . . liquidation . . . unless such liquidation . . . is proposed in the plan"); *see also* 11 U.S.C. § 1123(b)(4) (Chapter 11 plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests[.]"); *Chicago Constr. Specialties*, 510 B.R. at 215.

[37] *In re Walter Energy, Inc.*, 911 F.3d 1121, 1156 (11th Cir. 2018). The Eleventh Circuit specifically referred to 11 U.S.C. § 1114(g) in making this determination. *Id.* However, the Eleventh Circuit's opinion concerned only § 1114. *See id.* at 1125. This Court has no reason to conclude that the same statement would not apply to § 1113 as well.

[38] 11 U.S.C. § 1113(b)(1)(A); *see also In re Nw. Airlines Corp.*, 346 B.R. 307, 320 (Bankr. S.D.N.Y. 2006).

[39] *See, e.g., Walter Energy*, 542 B.R. at 884; *In re Chi. Constr. Specialties*, 510 B.R. 205, 218 (Bankr. N.D. Ill. 2014).

[40] *See In re Pierce Terminal Warehouse, Inc.*, 133 B.R. 639, 647 (Bankr. N.D. Iowa 1991) (noting that section 1113(b)(1)(A) only requires that "an offer must be made," not that "the initial proposal by the [debtor] be the [proposal] that satisfies the substantive requirements of [section 1113](b)(1)(A).").

33

throughout these chapter 11 cases, and only filed the Section 1113/1114 Motion after reaching a stalemate in their negotiations with the UMWA.

79.     The unrebutted evidence shows that the Debtors met with the UMWA in an attempt to reach agreement, taking part in five formal negotiation sessions and engaging in further correspondence both before and after filing their Section 1113/1114 Motion. The UMWA did not request a single meeting. The Debtors were clear that they would meet at any time and location convenient to the UMWA and in fact travelled to the UMWA's headquarters in Triangle, Virginia, for each of the four in-person meetings that the UMWA agreed to take with the Debtors. *See* Hr'g Tr. 50:12–51:1, Feb. 21, 2019 (Sanson); *id.* at 76:4–14 (Nystrom).

80.     The Fourth Proposal included those modifications necessary to consummate the Proposed APA and satisfy milestones arising under the DIP Facility. This includes elimination of the Successorship Provisions or rejection of the CBAs. Indeed, after an extensive marketing process, no buyers emerged willing to purchase the assets as a going-concern burdened by the CBAs. *See* Hr'g Tr. 182:2–183:1, Feb. 20, 2019 (Zervos) (discussing the bids received on the bid deadline and confirming that no parties expressed an interest in adopting the CBAs). No contrary testimony or evidence was offered. Certainly, no entity is more familiar with coal operators than the UMWA, and if they had been aware of any potential purchasers, surely their representatives would have made that known.[41] That certain terms of the Fourth Proposal were non-negotiable does not render the Fourth Proposal defective or proffered in bad faith.[42]

---

[41] *See In re Lady H Coal Co., Inc.*, 199 B.R. 595, 607 (S.D.W. Va. 1996) ("Therefore, it is now time for the UMWA and the 1992 Plan to do what every creditor has a right to do at such a sale; encourage bidders who they would like to have operate these properties consider investing in or becoming an owner of the enterprise, or enter into an agreement with a buyer to assure that some of the profitability problems of the past are solved upon purchase of the Debtors' assets.").

[42] *See In re Ala. Symphony*, 155 B.R. 556, 573 (Bankr. N.D. Ala. 1993) (noting that the Bankruptcy Code "requires only that a debtor make *one* proposal, and that proposal must occur after the filing of the petition and before the application for rejection is made") (emphasis in original); *see also In re Chi. Constr. Specialties*, 510 B.R. 205, 219 (Bankr. N.D. Ill. 2014) ("[I]t may indeed be the case that opportunity to negotiate is limited by the facts. That, however, is not a consideration in determining whether the first factor of the nine-factor test has been satisfied.").

34

81.     The four proposals provided by the Debtors to the UMWA made clear that the Debtors were submitting proposals and were willing to negotiate, notwithstanding the circumstances in which the Debtors found themselves.

82.     Finally, similar to many chapter 11 cases, but even more so in these cases, the Debtors have had to move quickly.  The Debtors have limited liquidity and, if they do not sell their assets promptly, they will liquidate.  Upon the maturity of the DIP, without a successful sale, the Debtors will not have the cash on hand to satisfy their debt and will therefore default.  *See* Hr'g Tr. 112:1–14, Feb. 21, 2019 (Nystrom) (noting that, in the event the Debtors are unable to sell their assets, the Debtors will not have enough money to pay of the DIP loan and would have to immediately switch to a liquidation).

83.     Here, the Debtors submitted the Fourth Proposal within the timeframe the Bankruptcy Code contemplates, and the Court thus finds that the Fourth Proposal to the UMWA meets the standard required and that this factor is satisfied.

### (2)     The Debtors' Fourth Proposal Was Based on the Most Complete and Reliable Information, and the Debtor Provided Relevant, Necessary Information to the UMWA.

84.     Both the second and fifth factors of the *American Provision* test pertain to the information necessary to support rejection of a collective bargaining agreement or retiree benefits under sections 1113 and 1114.  The second factor addresses the information upon which the Debtors base their decision to reject the CBAs or terminate benefits.  The fifth factor, on the other hand, addresses the information the Debtors provide to the union or retirees.[43]  In both cases, a debtor must gather the "most complete information at the time and . . . base its proposal on the information it considers reliable," excluding "hopeful wishes, mere possibilities and

---

[43] 11 U.S.C. §§ 1113(b)(1)(A) and (B), 1114(f)(1)(A) and (B); *see also, e.g.*, *Walter Energy*, 542 B.R. at 886; *Chi. Constr. Specialties*, 510 B.R. at 219; *In re AMR Corp.*, 477 B.R. 384, 409 (Bankr. S.D.N.Y. 2012).

35

speculation."[44]   "The breadth and depth of the requisite information will vary with the circumstances, including the size and complicacy of the debtor's business and work force; the complexity of the wage and benefit structure under the collective bargaining agreement; and the extent and severity of modifications the debtor is proposing."[45]  To satisfy the second and fifth procedural requirements, a debtor need only provide that information within its power to provide.[46]

85.     The Debtors' day-to-day survival is predicated on having the most complete and reliable information at all times.  The Fourth Proposal was a result of the Debtors' severe and increasing liquidity constraints which show that the Debtors did not, and would not, have any cash to fund operations after mid-April 2019, and that, once the sale closes, the Debtors will not have any money to pay for obligations remaining under the CBAs.

86.     The Debtors determined their state of affairs by relying on extensive financial, business, and industry data routinely utilized and maintained in the ordinary course of their business and as reviewed and vetted by the Debtors' advisors.  This information includes, among other things, the Debtors' income statements, balance sheets, statements of cash flows, capital expenditure summaries, independent economic forecasts, and sales forecasts.  The Debtors' reliance on such data and their consultants satisfies their obligations to base their proposals upon the most complete and reliable information available.[47]

---

[44] *Chi. Constr. Specialties*, 510 B.R  at 219 (*quoting AMR Corp.*, 477 B.R. at 409); *see also In re Patriot Coal*, 493 B.R. 65, 119 (Bankr. E.D. Mo. 2013) (debtors must provide "sufficient information for the UMWA to evaluate the [p]roposals"); *In re Karykeion, Inc.*, 435 B.R. 663, 678 (Bankr. C.D. Cal. 2010) ("Just as section 1113 precludes a debtor from altering union contracts based on wishful thinking and speculation, a debtor facing imminent closure cannot base its rejection of its only suitor on a speculative white knight with greater riches.").

[45] *AMR Corp.*, 477 B.R. at 409 (quoting *In re Mesaba Aviation, Inc.* (*Mesaba I*), 341 B.R. 693, 714 (Bankr. D. Minn. 2006), *aff'd in part, rev'd in part sub nom. Ass'n of Flight Attendants v. Mesaba Aviation, Inc.* (*Mesaba II*), 350 B.R. 435 (D. Minn. 2006)).

[46] *See In re Pinnacle Airlines Corp.*, 483 B.R. 381, 411 (Bankr. S.D.N.Y. 2012); *see also, e.g.*, *Walter Energy*, 542 B.R. 859.

[47] *See, e.g.*, *In re Amherst Sparkle Mkt., Inc.*, 75 B.R. 847, 851 (Bankr. N.D. Ohio 1987) (granting motion to reject collective bargaining agreement based upon the debtor's use of expense projections and monthly operating reports which revealed successive financial losses).

87.     The Debtors set up a web-based data room to facilitate information sharing on a confidential basis.  The Debtors made the data room available to the UMWA on November 14, 2018.  The data room included over 1,600 documents regarding financial information, operations, shipped coal quality, key contracts, properties, employees and human resources, environmental issues, safety, legal issues, insurance, and other liabilities.  Additionally, the Debtors provided tens of thousands of documents separately to the UMWA, as well as documents responsive to the UMWA's additional document requests.  Under these facts and circumstances, the UMWA received from the Debtors all the relevant information necessary for them to evaluate the Fourth Proposal.

88.     The UMWA Objection makes much of the fact that the Debtors' projections (assuming someone buys the Mines and injects substantial additional capital into them) provide for $125 million in free cash flow over the next five years.[48]  However, the financial projections speak to a post-sale scenario and assume a capital infusion by a potential buyer of $146 million over five years.[49]  By definition, in a going-concern sale, the Debtors are not emerging from chapter 11 in their current form, and the purpose of the proposed labor concessions is to enable the sale.  In order to continue operating and have the opportunity to realize the projected free cash flow, the Debtors must effectuate the going-concern sale.  *See* Hr'g Tr. 111:21–112:14, Feb. 21, 2019 (Nystrom).  The Debtors have not identified a single viable bidder that is willing to assume the CBAs and take on such liabilities.  No credible evidence was offered that a viable alternative existed, or that a sale could be consummated absent the rejection of the CBAs.  Thus, the UMWA's argument that the relief requested is not necessary for the reorganization is not persuasive, given

---

[48] UMWA Obj. ¶¶ 8, 30–32.
[49] Further, the financial projections do not provide for debt service.  Therefore, unless the buyer purchased the assets without obtaining financing, the cash flow highlighted by the UMWA would be reduced by the buyer's debt service.

37

that all potential purchasers are unwilling to own the Debtors' assets with the CBAs or the Retiree Benefits in place.

89.     Here, the Debtors filed the Section 1113/1114 Motion once it had become clear that no alternative would allow them to meet their DIP Milestones and avoid default and liquidation. *See* Hr'g Tr. 171:1–177:15, Feb. 20, 2019 (Szlezinger); *id.* at 198:5–16 (Szlezinger). At the time the Debtors filed the Section 1113/1114 Motion, the "relevant information" was simple and apparent for all to see:  the Debtors could not survive absent a near-term sale.  A going-concern sale provided the best, and the only, chance for future employment of the Debtors' employees, and no potential buyer has indicated a willingness to assume the UMWA Funds Obligations or unmodified Retiree Benefits.  *See* Hr'g Tr. 182:2–22, Feb. 20, 2019 (Szlezinger).   In order to consummate any potential sale, the Debtors will have to meet conditions that they almost certainly would not have been able to meet without filing the Section 1113/1114 Motion.[50]  *See* Hr'g Tr. 171:1–177:15, Feb. 20, 2019 (Szlezinger); *id.* at 184:15–187:24 (Szlezinger); *id.* at 192:20–195:3 (Szlezinger); *id.* at 198:5–16 (Szlezinger).

90.     The Debtors' Fourth Proposal is necessary to facilitate a going-concern sale of the Debtors' assets, and the only other alternative absent a going-concern sale is to shut down the Mines and liquidate.   This alternative is dire and severe, and it would preclude, almost to a certainty, any future job opportunities for the UMWA and its members.  The Debtors provided the UMWA with clear and comprehensive financial, business, and operational information detailing

---

[50] *See also Walter Energy*, 542 B.R. at 887 ("It was not until the Debtors had no other choice but to pursue the Stalking Horse APA they filed the Section 1113/1114 Motion.  By this time, the 'relevant information' was simple and apparent for all to see: the Debtors could not survive absent a sale in the near term, the Proposed Buyer had emerged as the only viable bidder that would purchase the Alabama Coal Operations as a going-concern, the sale of the Alabama Coal Operations as a going-concern provides the best chance for future employment of the Debtors' employees, and the Stalking Horse APA requires elimination of the Successorship Provisions or rejection of the UMWA CBA. Moreover, upon closing of the sale(s) (or outright liquidation), the Debtors will have no money to pay Retiree Benefits.").

38

the Debtors' cash needs and the likelihood that the Debtors would run out of money in April 2019 unless the sale closes before then.

91.     No credible evidence or argument was offered that the information provided by the Debtors was incomplete or unreliable. Based on the above, the Court finds that the Debtors based their Fourth Proposal on the most complete information available at the time and that the Debtors provided the UMWA with the relevant information necessary to evaluate the Fourth Proposal. Accordingly, the Debtors have based their Fourth Proposal on the most complete and reliable information available, thus meeting the second and fifth factors of the *American Provision* test.

### (3)     The Fourth and Final Proposal Is Necessary to Permit the Going-Concern Sale and the Debtors' Reorganization.

92.     A debtor's proposed modifications to its collective bargaining agreements or retiree benefits must be "necessary to permit the reorganization of the debtor."[51] In the context of a liquidation or sale of substantially all of a debtor's assets, the phrase "'necessary to an effective reorganization' means . . . necessary to the Debtor's liquidation."[52] This factor is the most debated among the nine *American Provision* factors, and its interpretation now exists in two divergent forms: the "absolutely essential" view espoused by the Court of Appeals for the Third Circuit in *Wheeling-Pittsburgh Steel Corp.* v. *United Steelworkers of America*,[53] and the "necessary, but not

---

[51] 11 U.S.C. §§ 1113(b)(1)(A), 1114(g)(3).

[52] *In re Chi. Constr. Specialties*, 510 B.R. 205, 221 (Bankr. N.D. Ill. 2014); *see also Walter Energy*, 542 B.R. at 891 ("The only consideration is whether the Debtors' proposed elimination of the Successorship Provisions or rejection of the CBAs is necessary to permit the going-concern sale of the Alabama Coal Operations. The 363 Sale will not close unless the Successorship Provisions are eliminated or the CBAs are rejected, and consequently, this requirement has been met."); *In re Karykeion, Inc.*, 435 B.R. 663, 678–79 (Bankr. C.D. Cal. 2010) (finding rejection of the CBA is "necessary to permit the debtor's reorganization" where "the only reorganization option for the debtor is the sale of [its hospital] to [buyer] and that sale is contingent on the court approving the debtor's rejection of these CBAs"); *In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 522 (Bankr. S.D.N.Y. 1991) (discussing inability to apply literally section 1114's analogous "necessary to permit the reorganization of the debtor" language to a debtor liquidating in chapter 11).

[53] 791 F.2d 1074 (3d Cir. 1986).

Case 18-04177-TOM11    Doc 902    Filed 03/01/19    Entered 03/01/19 15:49:32    Desc
Main Document      Page 39 of 63

absolutely minimal" view formulated by the Court of Appeals for the Second Circuit in *Truck Drivers Local 807, Int'l Bhd. of Teamsters v. Carey Transportation, Inc.*[54]

93.     In *Wheeling-Pittsburgh*, the Third Circuit tracked the legislative history of section 1113 at length and concluded that the "necessary" language required that the debtor's proposal contain only the "minimum modifications . . . that would permit the reorganization."[55] The Third Circuit found this consistent with the purpose behind section 1113, which was to overturn the lenient *Bildisco* standard in favor of a more stringent standard.[56] It considered whether the modifications were intended to foster the debtor's ability to reorganize for the long-term, or whether they were only those that allowed the debtor to avoid liquidation. Based on its understanding of the legislative history, the Third Circuit determined that section 1113 required application of a stricter standard and that "necessary" modifications were only those that served the short-term goal of preventing the debtor's liquidation.[57]

94.     The Second Circuit, on the other hand, takes the view that "necessary" does not equate with "essential."[58] Thus, the Second Circuit's test formulates the "necessary" requirement as putting the burden on the debtor to make a proposal in good faith that includes necessary changes that will enhance the debtor's ability to successfully reorganize.[59] Under either the *Wheeling-Pittsburgh* or the *Carey Transportation* standard, the Debtors have satisfied their burden under the third factor of the *American Provision* test.

95.     Sections 1113 and 1114 require that the Debtors' Fourth Proposal be necessary to permit the Debtors' reorganization—*i.e.*, in these chapter 11 cases, those modifications necessary

---

[54] 816 F. 2d 82 (2d Cir. 1987).
[55] *See In re Ala. Symphony*, 155 B.R. 556, 574 (Bankr. N.D. Ala. 1993) (quoting *Wheeling-Pittsburgh*, 791 F.2d at 1087).
[56] *See id.* at 574 n.42.
[57] *See id.* at 574 (discussing *Wheeling-Pittsburgh*, 791 F.2d at 1089).
[58] *See id.* (discussing *Carey Transp. II*, 816 F.2d at 89).
[59] *See id.*

40

to consummate a going-concern sale.[60]  In sale contexts, the only consideration is "whether [the buyer's] purchase of the debtor's assets is necessary and whether they are likely to rescind their offer if their terms are not met."[61]  "The section 1113 inquiry focuses solely on the proposal made by the Debtors, not the other parties, and the UMWA is not entitled to a veto power over a going concern sale when the undisputed evidence establishes that it is the best way to maximize value for all creditors and provide the best chance for future employment for the Debtors' employees, including, but not limited to, UMWA-represented employees.[62]  Section 1113 was never intended to give unions such power.[63]  Rather, section 1113's purpose is "to prevent the Debtors from unilaterally rejecting the UMWA CBA, to encourage negotiations with the UMWA, and to plainly articulate the process for seeking rejection."[64]  Here, as in *Walter Energy*, "the Debtors have complied with these requirements and established that the modifications are necessary to permit their reorganization within the meaning of sections 1113 and 1114."[65]

96.      Undertaking a going-concern sale is a necessary step towards an ultimate exit from chapter 11.[66]  The market has spoken and no viable bidder is willing to assume the CBAs.  Unless the CBAs are rejected pursuant to section 1113 of the Bankruptcy Code and the Retiree Benefits are modified pursuant to section 1114 of the Bankruptcy Code to permit the consummation of the

---

[60] *See Walter Energy*, 542 B.R. at 878 ("Sections 1113 and 1114 only require that the Debtors' Fourth Proposal be necessary to permit the *Debtors'* reorganization—*i.e.*, in these Chapter 11 Cases, those modifications necessary to consummate a going-concern sale."); *See also In re Walter Energy, Inc.*, 911 F.3d 1121, 1156 (11th Cir. 2018).

[61] *See id*. at 891 ("The 'wisdom' of the Proposed Buyer's position regarding which of the Debtors' liabilities it is willing to assume or pay is irrelevant. The only consideration is whether the Debtors' proposed elimination of the Successorship Provisions or rejection of the CBAs is necessary to permit the going concern sale."); *In re Karykeion Inc*., 435 B.R. 663, 679 (Bankr. C.D. Cal. 2010) (refusing to "evaluate the wisdom" of purchaser's insistence on rejection of the CBAs).

[62] *See In re AMR Corp.*, 477 B.R. 384, 414 (Bankr. S.D.N.Y. 2012) (noting that "courts have rejected attempts to focus the Section 1113 inquiry on a proposal made by a party other than the debtor").

[63] *Walter Energy*, 542 B.R. at 891.

[64] *Id.* at 890.

[65] *Id.*

[66] *See id.* at 866 ("After a failed attempt to restructure pursuant to a Chapter 11 plan process and a restructuring support agreement, the Debtors are now liquidating their assets pursuant to a going concern sale to an entity owned by their first lien creditors.").

41

sale, the Debtors will run out of cash, trip their DIP Milestones, and be forced to liquidate or see the DIP Lenders exercise their rights and remedies following a default. To close the sale and/or confirm a plan of reorganization, the Debtors must reject the CBAs and implement the terms of the Fourth Proposal.[67] Based on the testimony, the Debtors ran an open, thorough, and fair bidding process, but no bidder was willing to purchase the Debtors' assets without substantially similar concessions as set forth in the Debtors' Fourth Proposal.[68] The "[going-concern sale] will not close unless the Successorship Provisions are eliminated or the CBAs are rejected, and consequently, this requirement has been met."[69]

97.    The UMWA insists that "[t]his is not *Walter Energy*," and that "the only similarity between this case and *Walter Energy* is that they both involved mining companies seeking chapter 11 relief in the Northern District of Alabama."[70] While the UMWA is correct that the price of coal has rebounded since this Court decided *Walter Energy*, for the purposes of section 1113's necessity prong this amounts to a distinction without a difference; as in *Walter*, the evidence in this case shows that (i) the Debtors must consummate a going-concern sale in order to avoid liquidation, *see* Hr'g Tr. 111:21–112:14, Feb. 21, 2019 (Nystrom), and (ii) no purchaser is willing to consummate such a sale if the sale includes the CBAs and unmodified Retiree Benefits, *see* Hr'g Tr. 182:2–22, Feb. 20, 2019 (Szlezinger) (discussing the bids and letter of interest received as of the bid deadline and stating that no potential buyers are willing to assume the CBAs).

---

[67] *See id.* at 867 ("If the sale is not approved or the sale fails to close, the Debtors will have no choice but to immediately pursue shut downs of the mines and/or convert to Chapter 7, thereby destroying the going concern value of the mines and eliminating future employment opportunities.").

[68] *See id.* at 884 ("The Debtors' investment banker testified that after an extensive marketing process, no buyers emerged willing to purchase the Alabama Coal Operations as a going-concern, let alone as a going-concern burdened by the UMWA CBA. No contrary testimony or evidence was offered.").

[69] *Id.* at 891.

[70] UMWA Obj. ¶ 6. The Court recognizes other differences in this case including, but not limited to, the amount of debt and the companies' respective histories. In the end, however, the crucial and overwhelming similarity is that essentially each company was left with only two choices: sell the mines or shut them down.

Case 18-04177-TOM11    Doc 902    Filed 03/01/19    Entered 03/01/19 15:49:32    Desc
Main Document    Page 42 of 63

98.     The Debtors have engaged, and continue to engage, in active efforts to sell their assets subject to the obligations, but no such offers have been received and none are anticipated.[71] The amount of the employee legacy costs and the liability arising from the Debtors' withdrawal from the 1974 Pension Plan are substantial.  *See* Hr'g Tr. 30:24–33:25, Feb. 20, 2019 (Nystrom); *id.* at 52:6–8 (Nystrom).  The testimony and evidence show that even if the Debtors obtained savings from the requested CBA modifications, the Debtors would still require substantial new capital following emergence to remain viable.  The Court finds credible that no potential buyers have an interest in assuming such obligations, let alone assuming such obligations and investing such new capital.  *See* Hr'g Tr. 177:11–15, Feb. 20, 2019 (Szlezinger).  The unrefuted evidence before the Court shows that the Debtors' assets cannot be sold subject to the CBAs and Retiree Benefits.   The Debtors have carried their burden of showing that, absent the rejection of the CBAs and the modification of Retiree Benefits, the sale(s) will not close and conversion of these cases to chapter 7 and a piecemeal liquidation will ensue.  The relief sought is therefore necessary to permit the Debtors' reorganization within the meaning of sections 1113 and 1114.

99.     The UMWA and the UMWA Funds insist that the modifications contained in the Fourth Proposal are not truly necessary.[72]  But they offered no testimony or evidence to dispute necessity.   The Debtors demonstrated based on the facts and circumstances of these chapter 11 cases that the Fourth Proposal is "necessary" within the meaning of sections 1113 and 1114 of the Bankruptcy Code.[73]

---

[71] *See id.*

[72] *See* UMWA Obj. ¶¶ 33–40; UMWA Funds Obj. ¶¶ 23–30.

[73] *See, e.g., In re Nw. Airlines Corp.*, 346 B.R. 307, 321 (Bankr. S.D.N.Y. 2006) (Debtors "need only make a showing as to the overall necessity of the proposal, rather than prove that each element of the proposal is necessary to reorganization") (citing *In re Royal Composing Room, Inc.*, 848 F.2d 345, 348 (2d Cir. 1988) (explaining that if a debtor were required to justify each element of its proposal, then "no proposal could ever be truly 'necessary,' since any single vital element of a proposal can hardly be 'necessary' if it can be replaced by some alternative not included in the package which would achieve the same dollar savings for the debtor"); *see also In re Falcon Prods., Inc.*, 354 B.R. 889, 894–98 (E.D. Mo. 2006) (holding that a debtor's request for distress modification of multiple pension plans must be evaluated in the aggregate and not on a plan-by-plan basis); *In re Appletree Mkts.*, 155 B.R. 431, 441 (S.D.

43

100.    The UMWA Funds contend that "[t]he Debtors' request for relief from the Successorship Clauses is overreaching in the absence of conclusive evidence that there is no party willing to assume the Debtors' collectively-bargained obligations to the UMWA Funds."[74] This argument is not persuasive. A robust marketing process has confirmed that no viable bidder is willing to purchase the assets burdened by the CBAs.[75] *See* Hr'g Tr. 196:3–4, Feb. 20, 2019; *id.* at 198:5–16 (Szlezinger).

101.    The Debtors simply cannot indefinitely delay seeking the relief requested in the hope that some unknown buyer might emerge at some unknown point in the future.[76] The Debtors will run out of money soon.[77] Without the relief sought, the Debtors will breach their postpetition financing covenants that were already approved over the UMWA's and UMWA Fund's objections. The Debtors' lenders would then be able to terminate the Debtors' financing, potentially sending the Debtors into a freefall, piecemeal liquidation or see the DIP Lenders exercise their remedies. And there is no evidence that delay would do any good. Rejection of the CBAs is necessary to close the sale of the Debtors' assets, and the Debtors therefore meet section 1113's necessity prong.

102.    In addition to eliminating the Successorship Provisions, the Debtors seek to implement a number of modifications to the CBAs that are necessary to reorganize, including (i) termination of contributions to the UMWA Funds, (ii) termination of employer-provided Retiree Benefits and other benefits for inactive mineworkers, and (iii) the right to hire sub-

---

Tex. 1993) (stating that the court must focus on "the total impact of the changes [o]n the debtor's ability to reorganize, not on whether any single proposed change will achieve that result").

[74] *See* UMWA Funds Obj. ¶ 25.

[75] *See* Supplemental Szlezinger Decl. ¶ 6–7.

[76] *In re Karykeion, Inc.*, 435 B.R. 663, 678 (Bankr. C.D. Cal. 2010) ("Just as section 1113 precludes a debtor from altering union contracts based on wishful thinking and speculation, a debtor facing imminent closure cannot base its rejection of its only suitor on a speculative white knight with greater riches.").

[77] *See* DIP Facility Credit Agreement Second Amendment, Schedule 6.26 (providing that, "in the event the 1113/1114 Motion is filed, the Bankruptcy Court shall have entered an order approving the 1113/1114 Motion not later than February 25, 2019," which, through agreement with the DIP Lenders, this date was later amended to March 15, 2019).

44

contractors to perform ongoing work required at Pinnacle.[78]  Because section 1113's necessity inquiry revolves around what is "necessary to permit the Debtors' reorganization,"[79] the Debtors must be able to meet their administrative obligations.  The Debtors provided undisputed evidence that they do not have the liquidity to continue to fund these obligations during the course of these chapter 11 cases, or after a sale is consummated.  *See* Hr'g Tr. 47:13–22, Feb. 20, 2019; *id.* at 206:3–207:5 (Szlezinger).  No party provided evidence to refute that, absent such modifications, the Debtors would be administratively insolvent and incapable of completing either a sale or their reorganization.

103.    The UMWA Funds' Objection questions the Debtors' choice to seek certain modifications, specifically the elimination of contributions to all of the UMWA Funds, rather than seeking modifications to a subset of the UMWA Funds.[80]  The UMWA, however, did not offer a counterproposal to the Debtors' several proposals.  The Debtors, therefore, had no way of knowing what types of modifications, if any, the UMWA may have accepted.  Further, the Debtors did encourage bidders to assume the CBA liabilities.[81]  Nevertheless, the testimony showed that bidders were, and are, unwilling to assume the Debtors' labor obligations in any capacity.

104.    Additionally, the evidence has clearly shown that the UMWA Funds' hypothetical strategy is unworkable in reality and would certainly leave the Debtors' estates administratively insolvent - a result incompatible with a successful reorganization.  Once the proposed sale is completed, the Debtors will be left without any ongoing operations and without the liquidity necessary to fund UMWA Funds Obligations or Retiree Benefits.  Thus, in addition to rejecting

---

[78] *See In re Allied Mechanical Services, Inc.*, 885 F.2d 837, 839 (11th Cir. 1989) ( "[A]dministrative expenses . . . must be paid in full before a Plan for Reorganization may be confirmed.").
[79] *Walter Energy*, 542 B.R. at 890.
[80] *See* UMWA Funds Obj. ¶¶ 3, 28–29.
[81] *See* Supplemental Szlezinger Decl. ¶ 4.

45

the CBAs for purposes of eliminating all Successorship Liability, the Debtors must also eliminate continuing UMWA Funds Obligations and the Retiree Benefits obligations.

105.    The Fourth Proposal "seek[s] only those modifications necessary to consummate the sale(s), thereby selling the [Assets] as a going-concern and preventing the Debtors' piecemeal liquidation and/or shut down of the coal mines"[82]  The proposed modifications are necessary for the Debtors to reorganize.[83]  As in *Walter Energy*, the modifications requested are necessary to sustain the Debtors' assets as a going concern.

106.    Based on the evidence presented, the Debtors will be unable to consummate a sale or confirm a plan of reorganization, and will thus face certain liquidation, absent the relief requested in the Section 1113/1114 Motion.  The modifications sought in the Fourth Proposal are therefore absolutely necessary to the Debtors' reorganization efforts and the third factor of *American Provisions* has been met.

### (4)    The Fourth and Final Proposal Assures That All Parties Are Treated Fairly and Equitably.

107.    Sections 1113 and 1114 also require that a debtor's proposed modifications affect all parties in a fair and equitable manner.[84]  This requirement "spread[s] the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree."[85]  "Courts take a flexible approach in considering what constitutes fair and equitable treatment due to the

---

[82] *Id.* at 889.

[83] *See, e.g., In re Nw. Airlines Corp.*, 346 B.R. 307, 321 (Bankr. S.D.N.Y. 2006) ("[A] debtor need only make a showing as to the overall necessity of the proposal, rather than prove that each element of the proposal is necessary to reorganization."); *In re Appletree Mkts.*, 155 B.R. 431, 441 (S.D. Tex. 1993) (stating that the court must focus on "the total impact of the changes [o]n the debtor's ability to reorganize, not on whether any single proposed change will achieve that result"); *In re Falcon Prods., Inc.*, 354 B.R. 889, 894–98 (E.D. Mo. 2006) (holding that a debtor's request for distress modification of multiple pension plans must be evaluated in the aggregate and not on a plan-by-plan basis).

[84] 11 U.S.C. §§ 1113(b)(1)(A); 1114(g)(3).

[85] *See In re AMR Corp.*, 477 B.R. 384, 408 (Bankr. S.D.N.Y. 2012) (quoting *Carey Transp. II*, 816 F.2d 82, 90 (2d Cir. 1987)); *see also In re Elec. Contracting Servs. Co.*, 305 B.R. 22, 28 (Bankr. D. Colo. 2003) ("A debtor will not be allowed to reject a union contract where it has demanded sacrifices of its union without shareholders, non-union employees and creditors also making sacrifices."); *In re Century Brass Prods. Inc.*, 795 F.2d 265, 273 (2d Cir. 1986).

46

difficulty in comparing the differing sacrifices of the parties in interest."[86]  A debtor can meet the requirement "by showing that its proposal treats the union fairly when compared with the burden imposed on other parties by the debtor's additional cost-cutting measures and the Chapter 11 process generally."[87]

108.    Bankruptcy courts display significant discretion with respect to this part of the *American Provision* test.[88]  The Bankruptcy Code requires that the Court look to how "all of the affected parties" are treated.[89]  The affected parties in this case include those who have intangible interests, such as the cities, the states, the vendors who supply the Debtors' businesses, and, most importantly, the employees who depend on the going-concern sale as the best chance for future employment.

109.    Here, all constituents are bearing a heavy burden to keep the Mines open and operating in the future.  Beyond the UMWA and retirees, other creditors are also either not getting paid or are receiving far less than the debt owed.  The relief requested by the Debtors represents the only viable means of maximizing distributions for the Debtors' stakeholders.

110.    The UMWA Funds' primary argument regarding equitable and fair treatment is that the Debtors' Fourth Proposal fails to spread the burden equally among stakeholders, leaving the Funds with a large withdrawal-liability claim and diminished contributions.[90]  However, the UMWA Funds' constituency is not the only stakeholder suffering in these chapter 11 cases.  To the contrary, all of the creditors in this case are impaired.[91]  The Debtors currently anticipate that

---

[86] *AMR Corp.*, 477 B.R. at 408.
[87] *In re Nw. Airlines Corp.*, 346 B.R. 307, 326 (Bankr. S.D.N.Y. 2006) (citing *Carey Transp. II*, 816 F.2d at 90).
[88] *See Walter Energy*, 542 B.R. at 892.
[89] *Id.* (quoting *In re Am. Provision Co.*, 44 B.R. 907, 909 (Bankr. D. Minn. 1984)); 11 U.S.C. § 1113(b)(1)(A).
[90] UMWA Funds Obj. ¶¶ 33–34.
[91] *See Third Amended Disclosure Statement for Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* [Docket No. 762, Sched. 1], Art. II.E; *Order Approving Stipulation and Agreed Order Among the Official Committee of Unsecured Creditors and the DIP Lenders* [Docket No. 780].

47

general unsecured creditors will receive, at best, de minimis returns on their claims.[92]  While the Court appreciates and acknowledges the difficulty and potential financial challenges facing the UMWA Funds, the remedy that the UMWA Funds implicitly request is decidedly beyond the Debtors' control; that is, the Debtors cannot force a buyer to undertake the UMWA Funds' massive withdrawal liability under the 1974 Pension Plan and the UMWA Funds' untenable pension and retiree obligations.  Where, as here, the Debtors must consummate a sale or face certain liquidation, the UMWA Funds are seeking to preserve their interests to the detriment of all other stakeholders, including the Debtors' employees, on whom a liquidation will have the greatest, most tangible impact.[93]

111.    The UMWA and UMWA Funds also argue that the Debtors' proposed key employee retention plan (the "KERP") evidences that the UMWA represented parties and retirees shoulder a disproportionate share of the Debtors' financial distress.[94]  They argue that the existence of the KERP renders the Fourth Proposal inherently unfair and inequitable.[95]  However, the mere fact that the Debtors sought and obtained this Court's approval of the KERP does not mean that the Fourth Proposal is not fair and equitable with respect to employees and retirees.  How the Fourth Proposal affects employees and retirees and whether any constituent unfairly shoulders the burden of their impact under sections 1113 and 1114 presents a separate and distinct inquiry from whether the KERP is justified under the facts and circumstances of these chapter 11 cases under section 503(c)(3).  The Court addressed the KERP on its own merits in the context of adjudicating

---

[92] *See Third Amended Disclosure Statement for Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* [Docket No. 762, Sched. 1], Art. II.E; *Order Approving Stipulation and Agreed Order Among the Official Committee of Unsecured Creditors and the DIP Lenders* [Docket No. 780].
[93] If the Mines are shut down, the UMWA Funds will likely receive no distribution from a liquidation of these cases.
[94] *See* UMWA Obj. ¶ 10; UMWA Funds Obj. ¶ 35.
[95] *See* UMWA Obj. ¶ 10; UMWA Funds Obj. ¶ 35.

48

the KERP motion.[96]  The Court noted that the evidence established that the overriding purpose of

the KERP is to ensure the retention of forty employees (not senior management generally) who

the Debtors believe are critically necessary to preserve the Debtors' operations as a safe and

functioning operation that can be sold as a going concern.[97]  These objectives are consistent with

those of the Fourth Proposal, and the existence of the KERP on its own therefore does not

demonstrate that the Fourth Proposal is not fair and equitable.  Again, the goal of the KERP is

completely consistent with the Fourth Proposal and promotes fair and equitable treatment insofar

as it further ensures Debtors continue to operate as required and necessary to accomplish the sale.[98]

112.    In addition, the UMWA and UMWA Funds assert that the Fourth Proposal cannot

be fair and equitable where the Debtors paid prepetition bonus payments to certain members of

the management team, suggesting that these payments represent disparity in treatment and

augment the sacrifices of the retirees.[99]  No evidence was presented, however, to demonstrate or

show that any such payments changed the Debtors' financial circumstances or hastened the

Debtors' inevitable path to filing these chapter 11 cases.  Furthermore, the testimony reflected that

any alleged equity that management held in the company is now worthless.  *See* Hr'g Tr. 154:1–

12, Feb. 20, 2019 (Zervos).

---

[96] *See Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 509] (the "KERP Order").

[97] *See id.* at p. 7 ("It is clear to this Court that, based on the declarations and testimony offered in support of the Motion, this KERP is a reasonable exercise of the Debtors' business judgement.").

[98] The UMWA and UMWA Funds argued strenuously at the hearing about benefits being given to non-union employees and management pursuant to the KERP and not having been similarly provided to union employees.  *See also Proposed Joint Findings of Fact and Conclusions of Law of (1) the United Mine Workers of America and (2)(X) The United Mine Workers of America 1974 Pension Plan and Trust and (Y) the United Mine Workers of America 1993 Benefit Plan, with Respect to the Bebtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Reject their Collective Bargaining Agreements, (B) Modify Certain Union-Related Retiree Benefits and (C) Implement Terms of their Section 1113 and Section 1114 Proposal , and (II) Granting Related Relief* [Docket No. 881], ¶¶ 94-95.  This argument fails to note or recognize a likely reality that some non-union employees, current management especially, will likely lose their jobs if a sale is consummated.  In fact, the testimony made clear that, in all similar chapter 11 coal cases, a new CBA has been reached after a rejection and sale, keeping union miners on the job.  No such opportunity is necessarily available for non-union employees.

[99] UMWA Obj. ¶ 10; UMWA Funds Obj. ¶¶ 35-36.

113.    It seems clear to the Court that, absent the rejection, the operations would be closed, all employees would lose their jobs, and the assets would either be sold on a piecemeal basis or claimed by the secured lenders.  On the other hand, if the sale(s) are consummated and the Debtors' operations are sold as a going-concern, the Debtors' employees have the best chance of future employment.  In particular, the UMWA members will be in the best position to retain their jobs so that the buyer will have the workforce needed to keep the mines open.  Consummating the sale(s) is also necessary to achieve fairness to creditors including the unsecured creditors (trade vendors and other businesses that provided goods and/or services to the Debtors), the secured and administrative creditors who would receive considerably less as a result of a piecemeal chapter 7 liquidation.  Finally, consummating the sale(s) also serves the public interest, represented here by the local communities in which the Mines operate, by ensuring continued operation and support for businesses in the communities, and assumption of liabilities related to reclamation and other public safety matters.[100]

114.    In this case, all of the Debtors' constituents are burdened by the need to support the Debtors' efforts to maximize value for their estates.  The Debtors' maintain that their chapter 11 plan is designed to treat all parties fairly and equitably and maximize the potential return to all of their constituencies, but the Debtors' assets are simply not valuable enough to satisfy all of their creditors in full.  The Debtors' general unsecured creditors, in particular, will be heavily impacted by these chapter 11 cases.  The relief requested in the Section 1113/1114 Motion represents the best path toward maximizing distributions for the Debtors' stakeholders.  It appears to the Court that all of the Debtors' constituents are burdened by Debtors' efforts to seek maximum value of the assets.  Under the specter of administrative insolvency, every dollar earned or saved today,

---

[100] *See generally Walter Energy*, 542 B.R. at 893–94.

50

whether through a sale of the assets or the reduction of liabilities and employee obligations, is a dollar that will fund creditor recoveries in these chapter 11 cases.

115.     Based on the foregoing, the Debtors have shown that the Fourth Proposal treats all affected parties fairly and equitably, without placing a disproportionate burden on the UMWA or the UMWA Funds.  The Debtors have accordingly satisfied the fourth factor of the *American Provision* test.

### (5)     The Debtors Met With the UMWA at Reasonable Times and Conferred in Good Faith.

116.     Sections 1113 and 1114 require that a debtor "meet, at reasonable times" to confer "in good faith in attempting to reach mutually satisfactory modifications to [their collective] bargaining agreement."[101]   "[O]nce a debtor has shown that it has met with the Union representatives, it is incumbent upon the Union to produce evidence that the debtor did not confer in good faith."[102]   A failure to reach agreement may be "the result of the difficultness of the task, rather than the lack of 'good faith' of either party."[103]   Determining what amounts to "reasonable times" to meet depends on the circumstances of the situation.[104]

117.     Here, the negotiation process started with a multi-hour meeting and a detailed presentation to the UMWA.  Following the initial meeting, the Debtors actively engaged in negotiations with the UMWA, including four additional formal meetings, numerous e-mail exchanges, and continual responses to UMWA and its advisors.  These contacts, between and among the Debtors, the UMWA, and their respective advisors, took place regularly over a period of months.  The Debtors consistently agreed to meeting requests and repeatedly communicated

---

[101] 11 U.S.C. §§ 1113(b)(2), 1114(f)(2).
[102] *Carey Transp. I*, 50 B.R. 203, 211(Bankr. S.D.N.Y. 1985) (quoting *In re Am. Provision Co.*, 44 B.R. 907, 910 (Bankr. D. Minn. 1984)).
[103] *Id.* (quoting *In re Salt Creek Freightways*, 47 B.R. 835, 840 (Bankr. D. Wyo. 1985)).
[104] *See In re Karykeion, Inc.*, 435 B.R. 663, 681 (Bankr. C.D. Cal. 2010); *see also, e.g.*, *Walter Energy*, 542 B.R. at 894.

51

that they stood willing to meet at any time and in any location.  *See* Hr'g Tr. 50:12–51:4, Feb. 21, 2019 (Sanson).

118.    The good faith requirement under section 1113 has been interpreted to mean that the debtor must make a serious effort to negotiate.[105]  Here, the evidence establishes that the Debtors were sincere about their efforts to plow some middle ground before resorting to the measures allowed by section 1113.  Indeed, the Debtors' willingness to meet frequently with the UMWA is itself compelling evidence of the Debtors' good faith.[106]

119.    The UMWA challenges the Debtors' good faith by asserting that the Debtors implemented a "take it or leave it approach" to their negotiations.[107]  Yet, the unrebutted evidence shows that the Debtors met with the UMWA "at reasonable times" and that they "confer[red] in good faith" in an attempt to reach agreement, taking part in five formal negotiation sessions and engaging in further correspondence both before and after the Section 1113/1114 Motion was filed. Moreover, the Debtors agreed to each of the UMWA's meeting requests and repeatedly told the UMWA that they would meet at times and locations convenient to the UMWA.  The UMWA rejected each of the Debtors' proposals and never offered a written counterproposal.  The UMWA had multiple opportunities to explain its desire to somehow modify or replace these benefits.  The UMWA could have actively engaged in negotiations and helped the Debtors by making counterproposals, but they made no offers or suggestions.

120.    Additionally, the UMWA continues to argue that the Debtors could not have negotiated in good faith because they bound themselves to the DIP Milestones, New Coal, and the

---

[105] *See In re Ala. Symphony*, 155 B.R. 556, 576 (Bankr. N.D. Ala. 1993) (citing *In re Ky. Truck Sales, Inc.*, 52 B.R. 797 (Bankr. W.D. Ky. 1985)).

[106] *See In re Sol Sieff Produce Co.*, 82 B.R. 787, 795 (Bankr. W.D. Pa. 1988) (concluding that the debtor negotiated in good faith where the "Debtor ha[d] at all times been ready, willing, and able to negotiate" with its union).

[107] UMWA Obj. ¶ 11.

Proposed APA before beginning negotiations.[108]  Although seeking relief pursuant to sections 1113 and 1114 was required under the DIP Milestones, no alternative financing existed at the time of entry into the DIP Facility and no alternative exists now.  *See* Hr'g Tr. 169:18–19, Feb. 20, 2019 (Szlezinger); *id.* at 172:7–17 (Szlezinger).  Further, the Debtors did not bind themselves to New Coal or the Proposed APA, as evidenced by the competitive bidding process that the Debtors facilitated and the fact that the Debtors have not signed the Proposed APA.  In fact, it is entirely possible that New Coal will not be the successful bidder of the Debtors' assets, and yet every other viable bidder has required the exact same relief required by the Proposed APA - rejection of the CBAs.

121.    The UMWA's reliance on *In re Lady H Coal Co., Inc.*,[109] is misplaced.[110]  In that case, the debtors failed to meet the requirements of section 1113 where they "were, prior to any negotiations with the union, locked into [] an agreement where the purchaser [of the majority of the debtors' assets] was not assuming the [CBA]" and "did not pursue a possible sale to another buyer who was willing to assume the [CBA]."[111]  In *Lady H Coal*, the court found good faith lacking where the debtors had already obligated themselves prior to initiating modification negotiations.[112]  Here, the Debtors were not, and are not, "locked in" to the Proposed APA.  The Debtors approached the UMWA to discuss labor cost reduction and potential modifications shortly after commencing these chapter 11 cases and met with the UMWA repeatedly through this process, remaining open to continuing to engage in discussions both before and after filing the Section 1113/1114 Motion.  Instead the Debtors are trying to satisfy the conditions necessary to close a

---

[108] *See* UMWA Obj. ¶¶ 42–45.
[109] 193 B.R. 233 (Bankr. S.D.W. Va. 1996).
[110] *See* UMWA Obj. ¶ 42.
[111] *In re Lady H Coal Co., Inc.*, 193 B.R. 233, 242 (Bankr. S.D.W. Va. 1996).
[112] *Id.* at 242 ("[T]he Debtors could not have bargained in good faith as the Debtors were, prior to any negotiations with the union, locked into at [sic] an agreement where the purchase was not assuming the [CBA].").

53

sale with one of the several viable bidders, each of whom requires rejection of the CBAs. While the UMWA understandably objects to the Debtors' insistence on the elimination of the Successorship Provisions, as provided for in the Proposed APA and relevant to any viable bids, the relevant inquiry for purposes of the Section 1113/1114 Motion is the good faith of the Debtors and the UMWA, not New Coal's negotiation of the Proposed APA.

122. The UMWA's assertion that the Debtors created a "false sense of necessity" to sell the assets to New Coal is also inaccurate.[113] Without the requested relief, the Debtors cannot comply with their DIP Facility financing covenants, cannot sell their assets, and will be forced into liquidation. The UMWA does not dispute any of these facts. Nor does the UMWA provide any alternatives that would permit the Debtors to restructure.[114]

123. Unfortunately, the Debtors could not reach agreement with the UMWA and must now take the steps necessary to close a sale of the Debtors' assets. The Court finds that the testimony and evidence at the hearing demonstrated that the Debtors met on multiple occasions and at reasonable times with the UMWA. Further, the Debtors have shown that they negotiated in good faith and no evidence was offered to show a lack of good faith by the Debtors. Thus, the sixth and seventh factors of the *American Provision* test have been met.

### (6)   The UMWA Rejected the Fourth Proposal without Good Cause.

124. Sections 1113 and 1114 also require a debtor to demonstrate that its unions have "refused to accept [its] proposal without good cause."[115] Once the debtor establishes that its proposal is necessary, fair, and made in good faith, the unions must produce sufficient evidence to

---

[113] *See* UMWA Obj. ¶ 43.

[114] The only alternative suggested by the UMWA was a delay of the sale in the hope that a better offer would be available. However, as noted by Debtors' counsel in closing, the evidence reflects time is short and the Debtors will be out of money soon; thus, the Debtors cannot wait with the hope that a "white knight" will come along. *See supra* notes 42 and 75.

[115] 11 U.S.C. §§ 1113(c)(2), 1114(g)(2).

justify their refusal to accept the proposal.[116]  "[A]lmost invariably, if a debtor-in-possession goes through the procedural prerequisites for its motion, and if the substance of the proposal ultimately passes muster . . . , its union(s) will not have good cause to have rejected the proposal."[117]

125.    Where a proposal is necessary for the debtor's viability and the other requirements under sections 1113 and 1114 are met, no good causes exists to reject the proposal, even if the proposal requires sacrifices by the union or retirees.[118]  "Good cause" does not include demands that are not economically feasible or alternatives that would not permit the debtor to reorganize successfully.[119]

126.    The evidence shows that the Debtors shared significant data and delivered several proposals to the UMWA during their negotiations.  Additionally, the Debtors repeatedly explained to the UMWA that a sale to New Coal or some other successful bidder at the auction is currently the only viable option to operate the Debtors' assets as a going concern.  Nevertheless, the UMWA refused to give any concessions with respect to the CBAs, concessions which are not only fair and equitable given the alternative of a wholesale liquidation and loss of jobs, but that are ultimately required by the potential bidders as a condition to a sale.  The UMWA's refusal to provide any concessions or make any counterproposal, and instead insisting that any prospective buyer agree to assume a CBA that includes Successor Liability and the UMWA Funds Obligations, and does

---

[116] *In re Nw. Airlines Corp.*, 346 B.R. 307, 328 (Bankr. S.D.N.Y. 2006) (citing *Carey Transp. II*, 816 F.2d 82, 92 (2d Cir. 1987)); *see also Walter Energy*, 542 B.R. at 894.

[117] *Mesaba II*, 350 B.R. 435, 461 (D. Minn. 2006) (internal citation omitted).

[118] *Mesaba II*, 350 B.R. at 462 ("While the low wages imposed by the Proposals understandably motivated the Unions to reject the Proposal, they do not constitute good cause under the Bankruptcy Code."); *see also Walter Energy*, 542 B.R. at 895; *In re Valley Steel Products Co., Inc.*, 142 B.R. 337, 342 (Bankr. E.D. Mo. 1992) ("It is clear that the Proposals would have a negative impact on the Teamster Drivers' incomes. It is equally clear that if the Debtors do not receive these concessions they will be forced to liquidate and the Teamsters will be unemployed.").

[119] *See Nw. Airlines*, 346 B.R. at 328; *see also In re Ala. Symphony Ass'n*, 155 B.R. 556, 577 (Bankr. N.D. Ala. 1993) (union rejected the proposal without good cause where it merely insisted that the debtor comply with the terms of the CBA before beginning negotiations because the union "knew that the [debtor] did not have the funds to pay them"); *In re Salt Creek Freightways*, 47 B.R. 835, 840 (Bankr. D. Wyo. 1985) ("[T]he court must view the Union's rejection utilizing an objective standard which narrowly construes the phrase 'without good cause' in light of the main purpose of Chapter 11, namely reorganization of financially distressed businesses.").

not modify Retiree Benefit obligations, places a demand on the Debtors that is beyond their control and impossible for them to satisfy. Thus, the refusal constitutes a lack of good cause.[120] Further, the UMWA cannot claim "good cause" in rejecting a proposal when (1) the proposal is necessary to the reorganization and (2) the proposal treats the parties fairly and equitably.[121]

127.    This Court has previously held that the statutory language "without good cause" is not the same as nor synonymous with "in bad faith."[122] In *Walter Energy*, the Court further explained that a union "must indicate a willingness to work with the debtor in its attempts to reorganize," and held that "for the UMWA to make a counterproposal requiring a deal with the Proposed Buyer, which was and is completely beyond the control of the Debtors, is not a sufficient effort to work with the Debtors, and without good cause."[123] Here, not only has the UMWA failed to ask the Debtors to modify terms that are within their control, the UMWA has offered no counterproposals whatsoever, the latter of which, standing alone, has been held to evidence a lack of good cause.[124] Given that no entity is willing to buy the Debtors' assets with the terms of the existing CBAs in effect, the proposals were (and the Fourth Proposal is) essential to realizing any value for such assets. In this regard, "a union will not have good cause to reject an employer's proposal that contains only those modifications essential for the debtor's reorganization."[125]

---

[120] *See In re Nat'l Forge Co.*, 289 B.R. 803, 812 (Bankr. W.D. Pa. 2003) ("[T]he Union's insistence that the Debtor provide something which was not within its control indicates that the Union's refusal to accept Debtor's proposal was without good cause.").

[121] *See In re Bruno's Supermarkets, LLC*, Case No. 09-00634-BGC-11 (N.D. Ala. Apr. 27, 2009) (noting that "once a debtor establishes that its proposal is necessary, fair and in good faith, the union must produce sufficient evidence to justify its refusal to accept the debtors' proposal . . . If a union demands provisions that are not economically feasible and offers no alternatives that would permit the debtor to reorganize, the court will find that the union acted without good cause." (quoting *In re Nw. Airlines Corp.*, 346 B.R. 307, 328 (Bankr. S.D.N.Y. 2006)).

[122] *See Ala. Symphony*, 155 B.R. at 577 ("'Without good cause' is not synonymous with 'in bad faith.'") (citing *Salt Creek Freightways*, 47 B.R. 835).

[123] *Walter Energy*, 542 B.R. at 897.

[124] *See N.Y. Typographical Union No. 6 v. Royal Composing Room, Inc. (In re Royal Composing Room, Inc.)*, 848 F.2d 345, 351 (2d Cir. 1988), *cert. denied*, 489 U.S. 1078 (1989) ("At least where the union has refused to bargain over particular elements of the proposal, it cannot attack any specific element in seeking to show the proposal is not 'necessary.'"); *In re Horsehead Indus., Inc.*, 300 B.R. 573, 585 (Bankr. S.D.N.Y. 2003) ("Where the union rejects a proposal that is necessary, fair, and equitable, it must explain the reasons for its opposition.").

[125] *See In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 90 (2d Cir. 1992).

56

128.     The UMWA argues that the Debtors "have offered nothing to replace the legacy pension benefits it seeks to reject wholesale,"[126] thus rendering the Fourth Proposal inequitable. No case law supports the UMWA's implicit assertion that the Debtors were obligated to provide "[something] to replace the legacy pension benefits."[127]  More importantly, the UMWA and the Debtors may continue negotiations even after the Court grants the Section 1113/1114 Motion.  In other instances, debtors and unions have successfully negotiated and modified collective bargaining agreements following a court's granting of those debtors' section 1113 motions, and the Court hopes that the parties here follow that same path.[128]

129.     The UMWA's continuous refusal to implement the changes necessary to effectuate the Debtors' successful restructuring was based on its belief that a purchaser would appear that would be willing to assume the Debtors' CBAs in whole.  However, the market has spoken and there is no viable bidder willing to assume the CBA obligations.  The UMWA's belief is thus insufficient to satisfy the good-cause standard under sections 1113 and 1114.[129]

130.     In the end, the Debtors and the UMWA reached a stalemate in their negotiations. "The existence of a stalemate, however, does not constitute 'cause' to reject the Debtors' proposal, especially when the Debtors have no other options . . . .  As a result, the Debtors have demonstrated that the UMWA lacked good cause to reject the Debtors' proposal."[130]

### (7)     The Balance of the Equities Clearly Favors Rejection.

131.     The Court must consider whether the balance of the equities favors rejection of the UMWA CBAs and termination of the Retiree Benefits, as required for approval of a motion under

---

[126] *See* UMWA Obj. ¶ 48.
[127] *Id*.
     [128] *See, e.g.*, *In re Alpha Nat. Res., Inc.*, 552 B.R. 314 (Bankr. E.D. Va. 2016); *Walter Energy*, 542 B.R. 859; *In re Patriot Coal Corp.*, 493 B.R. 65 (Bankr. E.D. Mo. 2013).
     [129] *See Maxwell Newspapers*, 981 F.2d at 90 (stating that section 1113 protects a debtor from a union's refusal to accept changes "without a good reason").
     [130] *See Walter Energy*, 542 B.R. at 897.

57

sections 1113 and 1114.[131]  When applying this test, "bankruptcy courts 'must focus on the ultimate goal of chapter 11 . . . [as the] Bankruptcy Code does not authorize freewheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization.'"[132]  This is a fact-specific inquiry, and courts consider the following six factors:

> (a) the likelihood and consequences of liquidation if rejection is not permitted;
>
> (b) the likely reduction in the value of creditors' claims if the bargaining agreement remains in force;
>
> (c) the likelihood and consequences of a strike if the bargaining agreement is voided;
>
> (d) the possibility and likely effect of any employee claims for breach of contract if rejection is approved;
>
> (e) the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry; and
>
> (f) the good or bad faith of the parties in dealing with the debtor's financial dilemma.[133]

132.  In addition, "[t]he balance of the equities . . . clearly favors rejection when it is apparent that a debtor is in need of substantial relief under a union contract and the bargaining process has failed to produce any results and is unlikely to produce results in the foreseeable future."[134]

---

[131] *See* 11 U.S.C. §§ 1113(c)(3), 1114(g)(3).

[132] *In re Nw. Airlines Corp.*, 346 B.R. 307, 329 (Bankr. S.D.N.Y. 2006) (ellipses in original) (quoting *NLRB* v. *Bildisco & Bildisco*, 465 U.S. 513, 527 (1984)); *see also Walter Energy*, 542 B.R. at 897; *In re Ky. Truck Sales, Inc.*, 52 B.R. 797, 806 (Bankr. W.D. Ky. 1985) ("[T]he primary question in a balancing test is the effect the rejection of the agreement will have on the debtor's prospects for reorganization.").

[133] *Carey Transp. II*, 816 F.2d 82, 93 (2d Cir. 1987); *see also Walter Energy*, 542 B.R. at 898.

[134] *In re Royal Composing Room, Inc.*, 62 B.R. 403, 408 (Bankr. S.D.N.Y. 1986); *see also Walter Energy*, 542 B.R. at 898.

133. Here, the Debtors' liquidation and closure of the Mines is almost certain if this Court does not approve the rejection of the CBAs; the testimony on this point was clear, convincing, and credible.

134. Based on the testimony at the hearing, the alternative to the requested modifications presents a worst-case scenario for all stakeholders: (1) the Debtors would be unable to satisfy the closing conditions under any proposed asset purchase agreement received by the Debtors and would be unable to consummate any sale; (2) the Debtors would trip the DIP Milestones and run out of cash; (3) the Debtors would be forced to shut down their operations and terminate their employees; and (4) the value of these chapter 11 estates would plummet, causing all of the Debtors' creditors to suffer, all of the Debtors' employees to lose their jobs, all of the Debtors' retirees to lose their healthcare, and the potential of a multiplier effect across the regions in which the Debtors operate.

135. As was the case in *Walter Energy*:

> The alternative to the Debtors' requested relief will be far worse for all constituencies: the Debtors will soon run out of cash with no ability to attract additional financing. Under such a scenario, the evidence establishes that the value of the Debtors' estates will plummet, all of the Debtors' stakeholders will suffer, all of the Debtors' employees will lose their jobs, all of the Debtors' key vendors will lose a business partner, and the [local] community will lose a valuable contributor to its economy and corporate life.[135]

136. As in *In re Patriot Coal Corp.*, "without relief from Debtors' current Retiree Benefit costs and CBA requirements, Debtors will be forced into liquidation. This, by all accounts, is the worst scenario. . . . If Debtors liquidate, the overwhelming majority of Debtors' current employees, which includes UMWA-represented employees, will be unemployed."[136] Where the

---

[135] *Walter Energy*, 542 B.R. at 898.
[136] *In re Patriot Coal Corp.*, 493 B.R. 65, 137 (Bankr. E.D. Mo. 2013).

59

Case 18-04177-TOM11    Doc 902    Filed 03/01/19    Entered 03/01/19 15:49:32    Desc
Main Document    Page 59 of 63

alternative is liquidation and termination of all employees, the balance of the equities weighs in the Debtors' favor.[137]

137.    All of the remaining factors also favor granting the requested relief. As described above, the recoveries of all parties in these chapter 11 cases, including unsecured creditors, administrative creditors, and the Debtors' secured creditors, are at significant risk. Finally, for the reasons discussed above, the Debtors have acted in good faith and requested only those savings and changes that they truly need, with the burden of those savings spread equitably among the Debtors' various constituencies.

138.    The balance of the equities clearly favors rejecting the CBAs or implementing the Fourth Proposal.

**E.      The Debtors Did Not Unilaterally Breach the Pinnacle CBA**

139.    The UMWA's final argument[138] alleged that the Debtors unilaterally breached the terms of the Pinnacle CBA based on a settlement agreement (the "Settlement Agreement") that constituted an alleged "conveyance" of "coal lands" without UMWA approval. The Court entered the NRP Settlement Order over the UMWA's objection approving the Settlement Agreement on November 20, 2018. The time to appeal the Settlement Order ran on December 4, 2018.[139] The Settlement Order has been binding on all parties since that date.[140]

---

[137] *Id.*; *see also Walter Energy*, 542 B.R. at 898 (stating that "[t]he balance of the equities . . . clearly favors rejection when it is apparent that a debtor is in need of substantial relief under a union contract and the bargaining process has failed to produce any results and is unlikely to produce results in the foreseeable future" (internal quotation marks omitted) (quoting *In re Royal Composing Room, Inc.*, 62 B.R. 403, 408 (Bankr. S.D.N.Y. 1986))).
[138] Although the final argument was raised after the deadline to object to the Section 1113/1114 Motion had passed and was therefore untimely, the Court will nonetheless address the argument.
[139] *See* Fed. R. Bankr. P. 8002.
[140] *See In re Williams v. EMC Mortgage Corp.*, 216 F.3d 1295, 1298 (11th Cir. 2000) (finding that failure to file an appeal within the time limits imposed by the Federal Rules of Bankruptcy Procedure leaves an appellate court without jurisdiction to hear the appeal); *In re Gibraltar Res., Inc.*, 210 F.3d 573, 576 (5th Cir. 2000) ("A bankruptcy court's approval of a settlement order that brings to an end litigation between parties is a final order.").

60

140.     Additionally, there was no "conveyance" as alleged by the UMWA.  Rather the Settlement Agreement provides that "the Debtors shall have an option . . . to have NRP reinstate the [Pinnacle Lease] with respect to all of the premises covered thereby, except the Pocahontas No. 4 reserves."[141]  The Debtors have not yet exercised, and may never exercise, the option provided for in the Settlement Agreement and, therefore, remain in the same position as they did prior to and upon approval of the Settlement Agreement.  Further, the Settlement Agreement resolved a dispute in which NRP claimed the Debtors' leasehold interests had been terminated prepetition in full.  The resolution of that disputed issue reflected in the Settlement Agreement cannot possibly be a conveyance.  Indeed, NRP had taken the position that the Debtors had no leasehold interest to convey.  Accordingly, the approval of the Settlement Agreement was not a unilateral modification of the Pinnacle CBAs.

## CONCLUSION

141.     It appears to this Court that the sale of the Mines is necessary to preserve jobs and avoids value-destructive liquidation for all creditors, and in order to consummate a sale, it is necessary that the Debtors receive authority to reject and modify their CBAs and other Retiree Benefits.  Even though this Court fully appreciates the enormous potential hardship on many, the Court must follow the law and, in doing so, must decide what is best for all creditors and parties, including union and non-union employees, vendors, administrative expense claimants, and the community.  While the UMWA appears willing to risk any sale by insisting that the Court deny the Section 1113/1114 Motion, the Court is not in a position to do so.  This Court must assume the terms of the proposed bids are firm and that if any condition is not met, there will be no sale.  This court finds that maintaining the coal operations as a going concern, keeping the Mines open,

---

[141] *See* Settlement Agreement, p.6.

offering future job opportunities, and continuing to be a productive member of the business community all require this Court to overrule the UMWA and the UMWA Funds' objections.

142.     This result is based on the Court's conclusion that the (1) Debtors are out of time to close a sale; (2) any potential buyer will not close the sale unless all the conditions are met, including rejection of the CBAs and elimination of any liability for the UMWA Funds; and (3) based on the statutory and substantial case law cited:  (a) the elimination of collective bargaining agreement obligations is not new or novel in bankruptcy cases; and (b) there is substantial and persuasive case law to support a potential buyer's conditions regarding the collective bargaining agreements and related obligations.  The relief sought in the Debtors' Section 1113/1114 Motion pursuant to 11 U.S.C. §§ 1113 and 1114 is due to be granted.  Accordingly, it is hereby

**ORDERED, ADJUDGED, and DECREED** that the objections by the UMWA and UMWA Funds are **OVERRULED**.  It is further

**ORDERED, ADJUDGED, and DECREED** that the Section 1113/1114 Motion filed by the Debtors is **GRANTED**, and (A) the Debtors are authorized, but not directed, to reject the collective bargaining agreements and terminate the related memoranda of understanding as set forth in the Fourth Proposal; (B) the terms of the Fourth Proposal are approved in their entirety, and the Debtors are authorized, but not directed, to take all actions necessary to implement the Fourth Proposal attached to the Section 1113/1114 Motion as Exhibit B; (C) upon rejection of the CBAs, the Debtors shall have no obligations with respect to, and shall not be held responsible for, any payments arising under or related to any pension plans or retiree benefits provided under the CBAs, including but not limited to:  (i) the 1974 Pension Plan, regardless of whether such obligations are set forth in any document or agreement other than the CBAs; (ii) the 1993 Benefit Plan, regardless of whether such obligations are set forth in any document or agreement other than the CBAs; (iii) the Union Savings Plan, regardless of whether such obligations are set forth in any

document or agreement other than the CBAs; and (iv) the administration thereunder, regardless of which agreement or document contains such obligations; and (D) any sale of assets shall be free and clear of any encumbrances and liabilities under either the CBAs or with respect to any UMWA Funds.

Dated:  March 1, 2019

/s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge