# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| In re | ) Chapter 11 |
|  | ) |
|  | ) Case No. 18-04177-TOM11 |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) |
|  | ) (Jointly Administered) |
| Debtors. | ) |
|  | ) |

## ORDER (I) APPROVING THE SALES OF THE ACQUIRED ASSETS FREE AND CLEAR OF CLAIMS, LIENS, INTERESTS, AND ENCUMBRANCES, (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF[2]

Upon the Debtors' motion [Docket No. 393] (the "Motion"),[3] dated December 5, 2018, for, among other things, entry of an order (the "Order") (i) approving the sale of all, substantially all, or any combination of the Debtors' assets free and clear of all claims, liens, interests, and encumbrances, (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "Assumed Contracts") and the assumption of the Assumed Liabilities, each as more fully described and defined in the Motion and the applicable APA (as defined below), and (iii) granting related relief; and the Court having held a hearing that commenced on April 3, 2019[4] (the "Sale Hearing") to approve the sales of certain of the Debtors' assets (the "Sales") pursuant to those certain Asset Purchase Agreements, copies of which are attached hereto as Exhibit A (the

---

[1]  The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2]  This Order, originally submitted by Debtors' counsel, has been modified by this Court.

[3]  Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the applicable APA.  Capitalized terms are interpreted in accordance with the applicable APA's rules of construction.

[4]  The Sale Hearing continued for several days and concluded on April 10, 2019.

"Bluestone APA") and Exhibit B (the "Contura APA," and, together with the Bluestone APA, collectively, the "APAs," and each, an "APA"), respectively, and that certain Letter Agreement (as defined in the APAs) and attached hereto as Exhibit C, all of which are incorporated herein, free and clear of all liens, claims (as defined in section 101(5) of title 11 of the United States Code (the "Bankruptcy Code")), encumbrances, mortgages, pledges, charges, security interests, obligations, liabilities, contractual commitments or interests of any kind or nature except as expressly provided in the applicable APA and/or this Order, and the transactions (including, without limitation, the assumption and assignment of the Assumed Contracts), transaction documents, and other agreements contemplated thereby; and the Court having reviewed and considered the relief sought in the Motion, the testimony and evidence presented at the Sale Hearing, the declaration of Leon Szlezinger [Docket No. 1193] submitted in support of the Motion, all objections to the Motion, and the arguments of counsel made; and all parties in interest having been heard or having had the opportunity to be heard regarding the Sales and the relief requested in this Order; and due and sufficient notice of the Sale Hearing and the relief sought therein having been given under the particular circumstances and in accordance with the Bidding Procedures Order; and it appearing that no other or further notice need be provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest; and upon the record of the Sale Hearing and these Chapter 11 cases, the Court finds and concludes as follows:[5]

---

[5] The findings and conclusions set forth in this Order constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this contested matter pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. Furthermore, any findings of fact or conclusions of law made by the Court on the record at the close of the Sale Hearing are incorporated herein.

Case 18-04177-TOM11   Doc 1323   Filed 04/15/19   Entered 04/15/19 11:55:00   Desc
Main Document      Page 2 of 225

**Introduction**  As this Court previously noted on the record in a memorandum opinion on another matter, the Court recognizes the significant impact that its ruling on the Motion will have on multiple stake holders in these Chapter 11 cases.  When businesses as large as these file bankruptcy cases, the outcome of many issues in the cases will affect multiple parties including creditors, employees, and even the communities where the businesses are located.  This case, like many Chapter 11 cases, require the Court to hear testimony, review evidence, listen to arguments, consider the pleadings and evaluate the credibility of witnesses. There are often, as in this matter before the Court, multiple strenuous objections to the relief sought. The Court must view the totality of the facts and the circumstances and weigh the benefits and detriments of the relief sought and the objections.  In this case, as to this matter, the answer is neither simple nor easy, but the Court must find what is the best answer based on what has been presented to it at this time. During this lengthy hearing, counsel worked diligently to present the facts and evidence to the Court and, as also previously noted in this case, the remaining dilemma facing this Court is straightforward. The Court must decide whether to rule in a manner that results in the mines being shut down and closed, or rule in a manner that, in the hopes that a new owner, new management, the potential investment of capital, or other changes, will allow the mines to continue operating, the miners to keep valuable jobs, and the miners to benefit as the mines become more profitable.

      A.    **Jurisdiction and Venue**.  This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157, 1334 and 157(a) and the District Court's General Order of Reference Dated July 16, 1984, as Amended July 17, 1984[6] and may enter a final order on the

---

[6]   The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:
> The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

Case 18-04177-TOM11    Doc 1323    Filed 04/15/19    Entered 04/15/19 11:55:00    Desc
Main Document      Page 3 of 225

Motion consistent with Article III of the United States Constitution. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

        B.      **Statutory Predicates**.  The statutory predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 362, 363, and 365.  Such relief is also warranted pursuant to Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, and 9014.

        C.      **Bidding Procedures**.  On December 21, 2018, the Court entered an order [Docket No. 490] (the "Bidding Procedures Order"), which, among other things, (i) approved the Bidding Procedures for the Sales of the Debtors' assets, (ii) approved the Assumption and Assignment Procedures, (iii) approved the form and manner of notice thereof, and (iv) granted related relief.  The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair, and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Acquired Assets.  The Debtors and their professionals marketed the Acquired Assets and conducted the marketing and sale process in compliance with the Bidding Procedures and the Bidding Procedures Order.  In addition, the Consultation Parties acted at all times in good faith and in compliance with the Bidding Procedures and the Bidding Procedures Order.  Based upon the record of these proceedings, creditors and other parties in interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Acquired Assets.

        D.      **Business Justification**.

        1.      The Debtors have articulated good and sufficient business reasons for the Court to authorize (a) the Debtors' entry into the APAs and consummation of the Sales of the Acquired Assets (as defined in the applicable APA) to the applicable Buyer or any Buyer Designee

(each as defined in the APAs) and (b) the assumption and assignment of the Assumed Contracts and Assumed Liabilities as set forth herein and in the APAs.  Entry into the APAs, consummation of the Sales, and assumption and assignment of the Assumed Contracts and Assumed Liabilities constitute the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

2.     Additionally:  (a) the Debtors conducted a robust marketing process to sell the Assets, and the APAs constitute the highest or otherwise best offer for the Acquired Assets; (b) the Bidding Procedures utilized were designed to yield the highest or otherwise best bids for the Assets; (c) the APAs and the Closing of the Sales will present the best opportunity to realize the value of the Acquired Assets and avoid further decline and devaluation of the Acquired Assets; (d) there is risk of deterioration of the value of the Acquired Assets if the Sales are not consummated promptly; and (e) the APAs and the Sales of the Acquired Assets to the Buyer will provide greater value to the Debtors' estates than would be provided by any other presently available alternative.  Good and sufficient reasons for approval of the APAs and the Sales have been articulated by the Debtors.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose for the Sales pursuant to Bankruptcy Code section 363(b), in that, among other things, the immediate consummation of the Sales is necessary and appropriate to maximize the value of the Debtors' estates.  To maximize the value of the Acquired Assets and preserve the viability of the operations to which the Acquired Assets relate, it is essential that the Sales occur within the time constraints set forth in the APAs.

E.     **Notice**.  As evidenced by the affidavits of service [Docket Nos. 507, 528, 529, 544, 550, 554] and publication [Docket No. 520] previously filed with the Court, and based on the representations of counsel at the Sale Hearing, and except where this Order specifically

5

contemplates additional or subsequent notice, (i) proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Sales, and the assumption and assignment of the Assumed Contracts and the applicable Cure Costs has been provided in compliance with the Bidding Procedures Order and in accordance with Bankruptcy Code sections 102(1), 363, and 365, and Bankruptcy Rules 2002, 4001, 6004, 6006, 9006, 9007, and 9014, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing, the Sales, the assumption and assignment of the Assumed Contracts, or the Cure Costs is or shall be required. With respect to entities whose identities were not reasonably ascertained by the Debtors, publication of the Sale Notice was made in *USA Today* and *The Birmingham News* on December 27, 2018, and December 28, 2018, respectively. Such notice was sufficient and reasonably calculated under the circumstances to reach all known and unknown entities.

F.    **Operation of the Business as Debtors in Possession**.   The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

G.    **Trustee or Examiner**.   No trustee or examiner has been appointed in the Chapter 11 cases.

H.    **Auction**.   An Auction for the Acquired Assets began on February 27, 2019, at the offices of Kirkland & Ellis LLP, co-counsel to the Debtors, at 601 Lexington Avenue, New York, New York 10022, and continued telephonically on March 1, 2019. At the closing of the Auction on the Pinnacle assets, the Debtors tentatively identified the Buyers as the highest and best bids presented at the Auction of the Pinnacle assets. Following the Auction, the Debtors did not receive any other bids for the Pinnacle assets or any bids for the Debtors' combined assets that

6

the Debtors deemed higher and better than the partial bids submitted by the Buyers. On March 27, 2019, the Debtors docketed the *Notice of Successful Bids* [Docket No. 1120] pursuant to which they notified parties in interest that the Buyers were the highest and best bidders for the Acquired Assets. The Debtors and their professionals robustly marketed the Assets and conducted (i) the Auction and the sale process at arm's length and in compliance with the Bidding Procedures Order, and afforded potential purchasers a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer for the Acquired Assets than that reflected in the APAs, and (ii) the sale process (including the Auction) in good faith and without collusion, fair in substance and procedure, and in accordance with the Bidding Procedures. Based upon the record of these proceedings, all creditors, other parties in interest, and prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Acquired Assets. All bidders who participated in the Auction acted in good faith, did not engage in collusion, and acted in accordance with the Bidding Procedures. After the conclusion of the Auction, the Debtors determined in a valid and sound exercise of their business judgment that the highest or otherwise best Qualified Bid (as defined in the Bidding Procedures Order) for the Acquired Assets were those of the Buyers.

I.    **Acquired Assets Property of Debtors' Estates**. The Acquired Assets sought to be transferred and/or assigned, as applicable, by the Debtors to the Buyers pursuant to the APAs are property of the Debtors' estates and title thereto is vested in the Debtors' estates, including within the meaning of section 541(a) of the Bankruptcy Code. Subject to the entry of this Order, the Debtors: (i) have full power and authority to execute the APAs and all other documents contemplated thereby; (ii) have all of the power and authority necessary to consummate the transactions contemplated by the APAs; and (iii) have taken all corporate action necessary to authorize and approve the APAs, the Sales of the Acquired Assets, the assignment of the Assumed

7

Contracts and all other actions required to be performed by the Debtors in order to consummate the transactions contemplated in the APAs. No consents or approvals, other than those expressly provided for in the APAs or this Order, are required for the Debtors to consummate the Sales of the Acquired Assets.

J.     **Good Faith Purchaser**. The Debtors' marketing process with respect to the Sales afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer. The APAs constitute the highest and best offer. The consideration provided by the Buyers for the Acquired Assets under the APAs is fair and reasonable and constitutes reasonably equivalent value, fair saleable value, and fair value for the Debtors' assets and was not dictated by any agreement among potential bidders. The Debtors' determination that the APAs are the highest and best offer constitutes a valid and sound exercise of the Debtors' business judgment. Approval of the APAs and the consummation of the Sales is in the best interests of the Debtors' estates, their creditors, and other parties in interest. The APAs were not controlled by an agreement between potential or actual bidders within the meaning of section 363(n) of the Bankruptcy Code. Neither the Debtors nor the Buyers engaged in any conduct that would cause or permit the APAs or the consummation of the Sales to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code. The APAs were negotiated and are undertaken by the Debtors and the Buyers (and their respective affiliates or representatives) at arm's length without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m). The Buyers are not "insider[s]" or "affiliate[s]" of any of the Debtors as those terms are defined in section 101 of the Bankruptcy Code. The Buyers have not violated section 363(n) of the Bankruptcy Code by any action or inaction, and no common identity of incorporation, director or controlling stockholder exists between the Buyers and the Debtors. As

8

a result of the foregoing, the Buyers are entitled to all the protections of Bankruptcy Code section 363(m), including in the event this Order or any portion thereof is reversed or modified on appeal, and otherwise have proceeded in good faith in all respects in connection with the proceeding. Buyers will be acting in good faith in consummating the Sales at any time on or after entry of this Order, and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

        K.      **No Fraudulent Transfer**. The Sales of the Acquired Assets are not for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia. The Debtors and Buyers are not and will not be entering into the Sales fraudulently.

        L.      **Highest or Otherwise Best Offer**. The total consideration provided by the Buyers for the Acquired Assets is the highest or otherwise best offer received by the Debtors, and the purchase price constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable laws, and may not be avoided under Bankruptcy Code section 363(n) or under any other law of the United States, any state, territory, or possession thereof, or the District of Columbia, or any other applicable law. The cash consideration provided by the Buyers constitutes reasonably equivalent value and fair consideration for the assets that are being purchased with such cash consideration. No other person, entity, or group of persons or entities has offered to purchase the Acquired Assets for an amount that would provide greater economic value to the Debtors than the Buyers. The Debtors determined in a valid and sound exercise of their business judgment that the highest or otherwise best Qualified Bid for the Acquired Assets

9

was that of the Buyers. The Court's approval of the Motion, the Sales, and the APAs is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

M. **Assumption of Assumed Liabilities**. The assumption of the applicable Assumed Liabilities by the Buyers pursuant to the APAs is integral to the APAs and is in the best interests of the Debtors, their estates, and their creditors and represents the reasonable exercise of sound and prudent business judgment by the Debtors. Accordingly, such assumption by the Buyers is reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination. As among the Debtors and Buyers, nothing in this Order shall enlarge or restrict any obligations of the Debtors or Buyers under the APAs with respect to the applicable Assumed Liabilities.

N. **Free and Clear**.

1. The sales and assignments of the Acquired Assets to Buyers will be, as of the Closing, legal, valid and effective transfers of such assets, and each of such transfers and assignments shall, at Closing, vest Buyers with all right, title, and interest of the Debtors to the applicable Acquired Assets free and clear of all then existing or thereafter arising liens, claims, interests, encumbrances, and Liabilities, including Excluded Liabilities, other than the applicable Permitted Encumbrances and subject to the applicable Buyer's assumption of the applicable Assumed Liabilities, with any such liens, claims, interests, encumbrances, Liabilities, or Excluded Liabilities to attach to the consideration to be received by the Debtors in the same priority, validity, force, and effect and subject to the same defenses and avoidability, if any, as of the Closing. The Buyers would not have entered into the APAs and would not consummate the Sales if the sales of the Acquired Assets to the Buyers were not free and clear of all claims (as defined in Bankruptcy Code section 101(5)), liens, obligations, Liabilities, contractual commitments, interests, and

10

encumbrances (other than Permitted Encumbrances and subject to the applicable Buyer's assumption of the applicable Assumed Liabilities) pursuant to Bankruptcy Code section 363(f) or if the Buyers would, or in the future could, be liable for any of such claims, liens, obligations, Liabilities, contractual commitments, interests, and encumbrances. Without limiting the generality of the foregoing, unless expressly included in the Assumed Liabilities of a given Buyer, such Buyer shall not be responsible for any claims, liens, interests, Liabilities, and encumbrances, including in respect of the following: (a) any labor or employment agreements; (b) any mortgages, deeds of trust, and security interests; (c) any intercompany loans and receivables between one or more of the Sellers and any Debtor; (d) any pension, multiemployer plan (as such term is defined in section 3(37) or section 4001(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), health or welfare, compensation, or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (e) any other employee, worker's compensation, occupational disease or unemployment or temporary disability-related claim, including, without limitation, claims that might otherwise arise under or pursuant to (i) ERISA, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (vii) the Americans with Disabilities Act of 1990, (viii) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and section 4980B of the Code and of any similar state law (collectively, "COBRA"), (ix) state discrimination laws, (x) state unemployment compensation laws or any other similar state laws, (xi) the Coal Act, or

11

(xii) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (f) any liabilities arising under any Environmental, Health, and Safety Laws with respect to (i) any of the Debtors or any corporate predecessor of any of the Debtors and (ii) any of the assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors, with (i) and (ii) subject to any carve outs provided in the applicable APA; (g) any bulk sales or similar law; (h) any tax statutes or ordinances, including, without limitation, the Code, as amended; (i) the Coal Act; and (j) any Excluded Liabilities. There is no better available alternative for the Acquired Assets than the Sales to the Buyers.

2. The Debtors may sell the Acquired Assets free and clear of all claims, liens, claims, interests, encumbrances, and Liabilities, including Excluded Liabilities (other than Permitted Encumbrances and subject to the applicable Buyer's assumption of the applicable Assumed Liabilities) because, with respect to each creditor asserting a claim, lien, interest, encumbrance, or Liability, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)–(5) has been satisfied. Those creditors asserting such claims, liens, interests, encumbrances, or Liabilities who did not object or who withdrew their objections to the Sales of the Acquired Assets or the Motion are deemed to have consented to the Motion and the Sales free and clear of such claims, liens, interests, encumbrances, or Liabilities pursuant to Bankruptcy Code section 363(f)(2). Those creditors asserting such claims, liens, interests, encumbrances, or Liabilities who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f) and are adequately protected by having such claims, liens, interests, encumbrances, and Liabilities, if any, attach to the proceeds of the Sales of the Acquired Assets ultimately attributable to the Acquired Assets in which such creditors allege a claim, lien, interest, encumbrance, or Liabilities in the same order of priority, with the same validity, force and effect

12

that such holder had prior to the Sales, and subject to any claims and defenses the Debtors and their estates may possess with respect thereto. Notwithstanding the foregoing, the Acquired Assets are being sold subject to the applicable Permitted Encumbrances and subject to the applicable Buyer's assumption of the applicable Assumed Liabilities.

3. Neither the Debtors nor the Buyers engaged in any conduct that would cause or permit the APAs or the consummation of the Sales of the Acquired Assets to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n) or under any other law of the United States, any state, territory, or possession thereof, or the District of Columbia, or any other applicable law.

4. The APAs, which constitute reasonably equivalent value and fair consideration, were not entered into, and the Sales of the Acquired Assets will not be consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under any other law of the United States, any state, territory, or possession thereof, or the District of Columbia, or any other applicable law. The cash purchase price being paid by the Buyers is not being paid for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under any other law of the United States, any state, territory, or possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Buyers have entered into the APAs or are consummating the Sales of the Acquired Assets with any fraudulent or otherwise improper purpose.

5. Sales of the Acquired Assets other than free and clear of any claims, liens, interests, encumbrances, and Liabilities (other than the applicable Permitted Encumbrances and subject to the applicable Buyer's assumption of the applicable Assumed Liabilities) would adversely impact the Debtors' estates and would yield substantially less value for the Debtors'

13

estates, with less certainty than the Sales. Therefore, the Sales contemplated by the APAs are in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

O. **No Successor Liability**. Other than as expressly set forth in this Order, the Buyers and their affiliates and their respective predecessors, successors, assigns, members, partners, officers, principals, directors, and shareholders (or equivalent) shall have no obligations with respect to any Liabilities of the Debtors, whether known or unknown as of the Closing Date, whether fixed or contingent, whether arising prior to or after the Closing Date, including without limitation the Liabilities, other than the Assumed Liabilities, and will not and shall not be deemed or considered to (i) be legal successors to any of the Debtors or their estates; (ii) be the successor of or successor employer to the Debtors, including, with respect to any Collective Bargaining Agreements and any Benefit Plans, under the Coal Act, and any common law successor liability in relation to the UMWA Health and Retirement Funds, including the UMWA 1974 Pension Plan, including with respect to withdrawal liability; (iii) be a continuation, or substantial continuation, or hold themselves out as a mere continuation of the Debtors or their estates; (iv) have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors or their estates; (v) have a common identity with the Debtors, in each case, by any theory of law or equity; and (vi) other than as expressly set forth in the applicable APA, be liable for any acts or omissions of the Debtors in the current or former conduct of the business of the Pinnacle Complex or arising under or related to the Acquired Assets or any other assets. There is no continuity of enterprise with the Debtors by any theory of law or equity. Without limiting the generality of the foregoing, unless expressly provided in the applicable APA, the applicable Buyer and its affiliates and their respective predecessors, successors, assigns, members, partners, officers, principals, directors, shareholders (or equivalent), or the Acquired Assets shall have no (A) liability or responsibility with respect to

14

any claim against the Debtors and against an insider of the Debtors, (B) liability or responsibility for any obligations, liability or responsibility of the Debtors, including without limitation (except for the Assumed Liabilities) all "claims" (as defined in section 101(5) of the Bankruptcy Code), liens, Liabilities (including, without limitation, Excluded Liabilities), interests, rights and encumbrances, mortgages, restrictions, hypothecations, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, rights of offset, contract rights, recoupment rights, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims, labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations, decrees of any court or foreign or domestic governmental or quasi-governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts or failures to act, obligation claims, demands, guaranties, option rights or claims, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to, on, or subsequent to the Closing Date, and whether imposed by agreement, understanding, law, rule, equity or otherwise, and shall not be required to satisfy the same in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly; (C) liability or responsibility to the Debtors except as is expressly set forth in the applicable APA; or (D) successor, transferee, or vicarious liability of any kind or character whatsoever, including, without limitation, under any theory of foreign, federal,

15

state, or local antitrust, criminal, environmental, successor, tax, assignee, or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, regulation, or doctrine, whether known or unknown as of Closing, whether now existing or hereafter arising, whether asserted or unasserted, or whether fixed or contingent, liquidated or unliquidated with respect to the Business, the Acquired Assets, the Debtors, or any obligations of the Debtors arising prior to, on, or subsequent to Closing. Upon consummation of the Sales of the Acquired Assets, the applicable Buyer and its respective Affiliates, predecessors, successors, assigns, members, partners, directors, officers, principals and shareholders (or equivalent) will be released and discharged from any and all of the Debtors' claims, causes of action, obligations, Liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, assented or unassented, fixed or contingent, relating to the Sales of the Acquired Assets and assignment of the Assumed Contracts except as expressly provided in the applicable APA. For the avoidance of doubt, on the Closing Date, other than the applicable Permitted Encumbrances and subject to the applicable Buyer's assumption of the applicable Assumed Liabilities, the Acquired Assets shall be transferred to the Buyers pursuant to section 363(f) of the Bankruptcy Code, free and clear of all obligations, Liabilities, interests, liens, claims and encumbrances arising from any coal severance or ad valorem real property taxes, and all successor liability or successorship obligations under any Collective Bargaining Agreement and/or with respect to any Benefit Plan or the Coal Act. The Bankruptcy Court finds that Buyers would not have acquired the Acquired Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

      P. **Assumption and Assignment in Best Interests**. The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the

16

Assumed Contracts (as defined respectively in the APAs) to the Buyers in connection with the consummation of the Sales, and the assumption and assignment of the Assumed Contracts to the Buyers is in the best interests of the Debtors, their estates and creditors and all other parties in interest, and does not constitute unfair discrimination. The Assumed Contracts being assigned to the Buyers are an integral part of the Acquired Assets being purchased by the Buyers, and accordingly, such assumption and assignment of the Assumed Contracts is reasonable and enhances the value of the Debtors' estates.

Q.    **Cure Costs**.  The cure costs required to be paid pursuant to Bankruptcy Code section 365(b), whether agreed or judicially resolved (the "Cure Costs"), and as set forth in the Debtors' *Notice to Contract Parties to Potentially Assumed and Assigned Executory Contracts and Unexpired Leases* [Docket No. 547] and the *Notice of Filing of an Amendment to the List of Potentially Assumed and Assigned Executory Contracts and Unexpired Leases* [Docket No. 769] (collectively, the "Original Assumption List"), or any hereafter filed Supplemental Assumed Contracts Schedule and served Supplemental Cure Notice (both as defined herein), are deemed to be the entire cure obligation due and owing under the Assumed Contracts under Bankruptcy Code section 365(b). The non-Debtor counterparties to the Assumed Contracts were given notice and the opportunity to object to the Original Assumption List and to the extent that any non-Debtor counterparty to any of the Assumed Contracts failed to timely file an objection to any of the proposed Cure Costs filed with the Bankruptcy Court, or timely fails to file an objection to any Supplemental Cure Notice properly served hereafter pursuant to this Order, the cure cost listed in such Cure Notice or Supplemental Cure Notice shall be deemed to be the entire cure obligation due and owing under any of the applicable Assumed Contracts. Each provision of the Assumed Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could

17

be construed as prohibiting, restricting, or conditioning, assignment of any Assumed Contracts has been satisfied or is otherwise unenforceable under Bankruptcy Code section 365. Upon the assignment to the applicable Buyer and the payment of the relevant Cure Costs as set forth herein, each of the Assumed Contracts shall be deemed valid and binding and in full force and effect in accordance with its terms, and all defaults thereunder, if any, shall be deemed cured, subject to the provisions of this Order. Except as expressly set forth in the applicable APA, the transfer of the Assumed Contracts will not subject Buyer to any liability whatsoever prior to the Closing Date, or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, on any theory of law or equity.

R. **Adequate Assurance**. The Buyers have demonstrated adequate assurance of future performance of all Assumed Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code (including section 365(b)(3) to the extent applicable). All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Buyer of the Assumed Contracts and Assumed Leases have been satisfied.

S. **Compliance with Bankruptcy Code**. The consummation of the Sales is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including without limitation sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) of the Bankruptcy Code and all of the applicable requirements of such sections have been or will be complied with in respect of the Sales as of the Closing Date.

T. **No Sub Rosa Plan**. The Sales and the assignment of the Acquired Assets and Assumed Liabilities outside of a plan of reorganization pursuant to the APAs do not constitute

18

a *sub rosa* Chapter 11 plan. The Sales neither impermissibly restructure the rights of the Debtors' creditors nor impermissibly dictate a liquidating plan of reorganization for any of the Debtors.

U. **Opportunity to Object**. A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities, including the following: (i) the Office of the Bankruptcy Administrator for the Northern District of Alabama; (ii) counsel to the Committee; (iii) counsel to the agent under the Debtors' proposed debtor in possession credit agreement; (iv) counsel to the agent under the Debtors' prepetition first-lien credit agreement; (v) counsel to the lenders under the Debtors' debtor in possession credit agreement and prepetition first-lien credit agreement (vi) counsel to Mission Coal Funding, LLC, in its capacity as the lender under the Debtors' prepetition second-lien credit agreement; (vii) the United States Attorney's Office for the Northern District of Alabama; (viii) the Internal Revenue Service; (ix) the Environmental Protection Agency; (x) the office of the attorneys general for the states in which the Debtors operate; (xi) the Securities and Exchange Commission; (xii) the Pension Benefit Guarantee Corporation; (xiii) the United Mine Workers of America; (xiv) the United Mine Workers of America Pension Plan; (xv) all known holders of liens, encumbrances, and other claims secured by the Assets; (xvi) each governmental agency that is an interested party with respect to the Sales and transactions proposed thereunder; and (xvii) any party that has requested notice pursuant to Bankruptcy Rule 2002.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

1. **Relief Granted**. The relief requested in the Motion is GRANTED, to the extent set forth herein.

2. **Objections Overruled**. Any objection to the Motion, or any other relief granted in this Order, to the extent not settled, resolved, waived, or withdrawn or previously

overruled, and all reservations of rights included therein, is hereby overruled and denied on the merits with prejudice.

3. **Notice**. Notice of the Motion, including without limitation, the transactions set forth in the APAs and the assumption and assignment of the Assumed Contracts, the Auction, and the Sale Hearing was fair and reasonable under the circumstances and complied with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006, and 9007.

4. **Approval of Bidding Procedures**. The Bidding Procedures utilized by the Debtors related to the APAs and the Sales are hereby approved and ratified and were appropriate under the circumstances in order to maximize the value obtained from the Sales for the benefit of the estates.

5. **Approval of Buyers' APAs**. Pursuant to Bankruptcy Code sections 105, 363, and 365, and the APAs (and all ancillary documents related thereto), the Sales are hereby approved and the Debtors are authorized and empowered to enter into and perform under the APAs, the Letter Agreement among Contura, Bluestone, Mission Coal Company, LLC, and WPP LLC, and any other related documents. Pursuant to Bankruptcy Code sections 105, 363, and 365, each of the Debtors and the Buyers are hereby authorized and empowered to take any and all actions necessary or appropriate to: (a) consummate the Sales and the closing of the Sales in accordance with the Motion, the APAs, and this Order; (b) assume and assign the Assumed Contracts; and (c) perform, consummate, implement, and close fully the APAs together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APAs. The Buyers and the Debtors shall have no obligation to close the Sales except as is contemplated and provided for in the APAs, the Letter Agreement, and this Order.

20

6.    **Approval of the Letter Agreement**.  The Letter Agreement, entered into among Contura, Bluestone, Mission Coal Company, LLC, and WPP LLC, is hereby approved and ratified and was appropriate under the circumstances in order to maximize the value obtained from the Sales for the benefit of the estates.  Pursuant to Bankruptcy Code sections 105, 363, and 365, each of the Debtors and the Buyers are hereby authorized and empowered to take any and all actions necessary or appropriate to perform, consummate, implement, and close fully the Letter Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Letter Agreement.

7.    **Bluestone Operational Expenses Through Contura Sale Closing**.  Prior to the Bluestone Closing and the Contura Closing, Bluestone shall pay any and all reasonable, documented, and actually incurred operating expenses related to the Pinnacle Complex, as monitored by the Plan Administrator (as defined in the *Fourth Amended Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* [Docket No. 1209]), up to an aggregate amount of $1 million (such payments, the "Operational Payments").  Bluestone shall advance $100,000 of the Operational Payments upon execution of the Operator Agreement, which shall be executed and entered into prior to the Bluestone Closing Date, and any additional funds (up to $1,000,000) within 10 days of any request thereof from the Plan Administrator.  Following the Contura Closing, Bluestone shall be reimbursed for such Operational Payments by the Debtors from the Cash Consideration (as defined in the Contura APA) received by the Debtors from Contura.  For the avoidance of doubt, Contura has no liability or obligation to Bluestone with respect to the payment referred to in the preceding sentence; *provided, however*, that, in the event the Contura Closing does not occur, then (i) the Reorganized Debtors will assign to Bluestone their rights, if any, to the Remaining Deposit (as defined in the Contura APA) and (ii) the Reorganized

21

Debtors shall pay Bluestone proceeds of the Second Clarke Note (as defined in the Letter Agreement) (to be paid in quarterly installments for a period of four years) in an amount equal to (a) the total amount of the Operational Payments actually advanced by Bluestone, less (b) the amount of the Remaining Deposit. For the avoidance of doubt, Contura has no obligations or liability to Bluestone with respect to the payment referred to in the preceding sentence.

8. **Assumption and Assignment of Contracts**.

a. Pursuant to Bankruptcy Code section 365(f), notwithstanding any provision of any of the Assumed Contracts or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assumed Contracts, the Debtors are authorized to assume the Assumed Contracts and to assign the Assumed Contracts to the applicable Buyer, which assignment shall take place on and be effective as of the Closing or as otherwise provided by order of this Court. There shall be no accelerations, assignment fees, increases, or any other fees charged to any Buyer, its successors, or assigns, or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

b. If a Buyer seeks to assume any contract or unexpired lease not on the Debtors' Original Assumption List, exclude any contract or unexpired lease not on the Debtors' Original Assumption List, or otherwise modify the Cure Cost associated with any contract or unexpired lease previously on the Debtors' Original Assumption List, the Debtors, with the consent of the applicable Buyer shall: (a) supplement the Original Assumption List with previously omitted Assumed Contracts in accordance with the applicable APA; (b) remove any executory contracts and unexpired leases that the applicable Buyer proposes be an Excluded Contract; and/or (c) modify the previously stated Cure Cost associated with any Assumed Contracts (a "Supplemental Assumed Contracts Schedule"). In the event that the Debtors and

22

Buyer exercise any of the rights reserved above, the Debtors will serve a Supplemental Cure Notice by electronic transmission, hand delivery, or overnight mail on the applicable Contract Counterparty and its attorney, if known, to each impacted Assumed Contract at the last known address available to the Debtors as set forth in the Bidding Procedures Order. Any contract counterparty listed on a Supplemental Assumed Contracts Schedule may file an objection only if such objection is to the proposed assumption and assignment of the applicable Assumed Contract or the proposed Cure Costs, if any. All such objections must: (a) state with specificity the legal and factual basis thereof as well as what Cure Costs the objecting party believes are required, if any; (b) include appropriate documentation in support of the objection; and (c) be filed and served on the Objection Recipients (as defined in the Bidding Procedures Order) no later than 4:00 p.m. (prevailing Central Time) on the date that is (i) fourteen days from the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice (the "Supplemental Assigned Contract Objection Deadline").

c. The Debtors' assumption of the Assumed Contracts is subject to the consummation of the Sales. Upon the applicable Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the applicable Buyer shall be fully and irrevocably vested in all right, title, and interest of each applicable Assumed Contract. The Debtors shall cooperate with, and take all actions reasonably requested by, the Buyers to effectuate the foregoing, as further provided in the APAs.

d. If a Contract Counterparty files a timely objection to the Supplemental Assumed Contracts Schedule in a manner that is consistent with the requirements set forth herein, and the parties are unable to consensually resolve the dispute, the Debtors will seek a hearing to determine the Cure Costs, if any, and approve the assumption of the relevant Assumed Contracts.

If there is no such objection, then the Debtors will obtain entry of an order, including by filing a certification of no objection, fixing the Cure Costs and approving the assumption of any Assumed Contract listed on a Supplemental Cure Notice.

e. Some or all of Contura's Assumed Contracts will be the subject of a Supplemental Assumed Contracts Schedule. Pursuant to the terms of the Contura APA, Contura's obligation to consummate the Closing is subject to: (i) the objection deadline having passed for all counterparties to each of Contura's Assumed Contracts to object to assumption and assignment of the Assumed Contracts, including as to the Cure Costs contained in their respective Cure Notice, (ii) the Bankruptcy Court having entered an order approving and authorizing the assumption and assignment of each of Contura's Assumed Contracts pursuant to section 365 of the Bankruptcy Code, (iii) such order having become a Final Order, (iv) any objections to such assumption and assignment having been resolved by such Final Order, (v) the Debtors having paid all Excluded Cure Costs except to the extent such Excluded Cure Costs have been taken into account in the Adjusted Cash Consideration, and (vi) all such Assumed Contracts having been duly assigned to Contura at the Closing. Notwithstanding anything to the contrary in the Plan, to the extent the Contura Sale does not close by the Outside Date and the Contura APA is terminated, the Debtors reserve the right to reject such Assumed Contracts.

f. If a counterparty to an Assumed Contract to be assumed and assigned pursuant to the Bluestone APA timely objects to the Supplemental Assumed Contracts Schedule or objected to the Original Assumption List, and such objection is not resolved prior to the Closing Date to the mutual satisfaction of Bluestone and the Debtors, then the Debtors, at the direction of Bluestone and subject to the provisions of the Bluestone APA, shall elect either (i) not to assume such contract or (ii) to postpone the assumption of such contract until the

24

resolution of such objection pursuant to the terms of the Bluestone APA. The postponement of the assumption and assignment of such contract shall be no later than the earlier of (A) the date on which such dispute has been resolved to the mutual satisfaction of Bluestone and the Debtors, (B) four months after the Bluestone Closing Date, (C) the date on which such disputed contract is deemed rejected by operation of 11 U.S.C. § 365(d)(4), or (D) the date required by the Court and set forth in either the Bidding Procedures Order or this Order (the "Extended Contract Period"). If such disputed contract is not expressly assumed by the applicable Buyer in writing by the end of such Extended Contract Period, such disputed contract shall be automatically deemed an Excluded Contract under the relevant APA. Bluestone shall be responsible for any obligations or Liabilities arising during any Extended Contract Period relating to any disputed contract that has not been assumed or rejected as of the termination date as provided in the Bluestone APA.

g. Except as set forth in the APAs, (x) Buyers shall not assume or otherwise have any Liability with respect to any Excluded Contract, except as set forth herein and provided for in the Bluestone APA with respect to any obligations or Liabilities arising during any Extended Contract Period relating to any disputed contract that has not been assumed or rejected as of the termination date and (y) each Collective Bargaining Agreement to which any Debtor is bound or party to shall be an Excluded Contract.

h. Except as otherwise provided herein, the Cure Costs for Bluestone's Assumed Contracts are hereby fixed at the amounts set forth in the Debtors' Original Assumption List (or as otherwise agreed, in writing by the Debtors, the applicable Buyer, and the non-Debtor counterparties to such Assumed Contracts), and the non-Debtor counterparties to such Assumed Contracts are forever bound by such Cure Costs. Upon payment of such Cure Costs as provided for herein, the non-Debtor counterparties to such Assumed Contracts are hereby enjoined from

25

taking any action against the Buyers or the Acquired Assets with respect to any claim for cure under any Assumed Contract. To the extent that any non-Debtor counterparty to any of the Assumed Contracts failed to timely file an objection to any of the proposed Cure Costs filed with the Bankruptcy Court, the cure cost listed in the Cure Notice shall be deemed to be the entire cure obligation due and owing under any of the applicable Assumed Contracts.

i. Notwithstanding anything else in this Order or any of the provisions of the Contura APA, Contura's assumption of any given settlement agreement in the case of *Surratt et. al. v. Pinnacle Mining Company, LLC*, U.S.D.C. for the S.D. of W.V. (Beckley), Case #:5:15-cv-15444 (the "Surratt Agreements") and Contura's obligation to pay the Cure Costs scheduled to be paid by it under the Contura APA for such Surratt Agreement scheduled to be assumed under the Contura APA, is conditioned on simultaneous performance by the counterparty to such Surratt Agreement of such counterparty's obligations arising pursuant to the terms of the Surratt Agreement on or before such payment, including without limitation (1) the execution and delivery to Contura of the "full settlement and release agreement, including a confidentiality and non-disparagement agreement" (subject to the limitations therein), and (2) the deeding of the subject property to Contura (or its specified designee) as assignee. To the extent that such obligations are not performed by any counterparty to a Surratt Agreement, at Contura's election such Surratt Agreement shall either (i) be assumed and assigned to Contura pursuant to the order referenced in clause (ii) of paragraph 9(e) herein, subject to Contura's obligation to pay the cure Costs scheduled to be paid by Contura in respect of such Surratt Agreement under the Contura APA only upon receipt from such counterparty of the items described in the forgoing clauses (1) and (2); or (ii) be deemed rejected.

26

9.     **Adequate Assurance of Future Performance**.  The Buyers have provided adequate assurance of their future performance under the Assumed Contracts within the meaning of Bankruptcy Code sections 365(b)(l)(C) and 365(f)(2)(B).  All other requirements and conditions under the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyers of the Assumed Contracts have been satisfied for all Assumed Contracts where the counterparty did not timely file an adequate assurance objection.

10.     **Anti-Assignment Provisions Unenforceable**.  No sections or provisions of the Assumed Contracts that purport to (a) prohibit, restrict, or condition the Debtors' assignment of the Assumed Contracts, including, but not limited to, the conditioning of such assignment on the consent of the non-Debtor party to such Assumed Contracts, (b) authorize the termination, cancellation, or modification of the Assumed Contracts based on the filing of a bankruptcy case, the financial condition of the Debtors or similar circumstances, (c) declare a breach or default as a result of a change in control in respect of the Debtors, or (d) provide for additional payments, penalties, conditions, renewals, extensions, charges, or other financial accommodations in favor of the non-Debtor third party to the Assumed Contracts, or modification of any term or condition upon the assignment of an Assumed Contract or the occurrence of the conditions set forth in subsection (b) above, shall have any force or effect, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code.  The entry of this Order constitutes the consent of the non-Debtor parties to Bluestone's Assumed Contracts to the assumption and assignment of such Assumed Contracts. Each of such Assumed Contracts shall remain in full force and effect, without existing default(s), subject only to payment of the Cure Cost, if any, payable with respect to such Assumed Contract.

27

11. **No Fees for Assumption Assignment**. There shall be no rent accelerations, assignment fees, increases, or any other fees charged to any Buyer, its successors or assigns or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

12. **Consummation of the Sales**. Upon the Closing: (a) the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer, and assignment of all of the Debtors' right, title, and interest in the Acquired Assets to the applicable Buyer free and clear of all Liabilities and Encumbrances, other than the applicable Permitted Encumbrances;[7] and (b) except as otherwise expressly provided in the APAs, no Liabilities or Encumbrances shall be enforceable against the Acquired Assets or the Buyers, except the applicable Permitted Encumbrances against the Acquired Assets and the applicable Assumed Liabilities against the Buyers.

13. **Free and Clear**.

    a. Unless otherwise expressly included in the applicable Assumed Liabilities, the Buyers shall not be responsible for, and, unless expressly included in the applicable Permitted Encumbrances, the Acquired Assets shall be transferred and assigned free and clear of (subject to the applicable Buyer's assumption of the applicable Assumed Liabilities), any obligations, claims, liens, interests, encumbrances, or Liabilities, whether existing as of the Closing Date or thereafter arising, including, without limiting the generality of the foregoing, in respect of the following: (i) any labor or employment agreements; (ii) any mortgages, deeds of trust, and security interests;

---

[7] "Permitted Encumbrances" means (i) statutory liens for Taxes and assessments that are not yet due and payable and for which adequate reserves have been established in accordance with GAAP; (ii) landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's or repairmen's statutory liens, that, in each case, arise in the Ordinary Course of Business; or (iii) easements, covenants, conditions, restrictions and other similar Encumbrances on real property that arise in the Ordinary Course of Business and that do not materially detract from the value of the affected Real Property and do not materially interfere with the present or intended use of such Real Property. For the avoidance of doubt, no lien or encumbrance in respect of any severance, coal severance or similar Tax will be a Permitted Encumbrance.

28

(iii) any intercompany loans and receivables between one or more of the Sellers and any Debtor; (iv) any pension, multiemployer plan (as such term is defined in section 3(37) or section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (A) ERISA, (B) the Fair Labor Standards Act, (C) Title VII of the Civil Rights Act of 1964, (D) the Federal Rehabilitation Act of 1973, (E) the National Labor Relations Act, (F) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (G) the Americans with Disabilities Act of 1990, (H) COBRA, (I) state discrimination laws, (J) state unemployment compensation laws or any other similar state laws, (K) the Coal Act, or (L) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (vi) liabilities arising under any Environmental, Health, and Safety Laws with respect to (a) any of the Debtors or any corporate predecessor of any of the Debtors, and (b) any of the assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors, with (a) and (b) subject to any carve outs provided in the applicable APA; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the Code; (ix) the Coal Act; and (x) any Excluded Liabilities. A certified copy of this Order may be filed with the appropriate clerk and/or recorder to act to cancel any such lien, claim, interest, or encumbrance of record. Neither of the Buyers or their affiliates, successors, assigns, equity holders, employees, or professionals shall have or incur any liability to, or be subject to any action by any of the Debtors or any of their estates,

29

predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the APAs, and the entry into and consummation of the Sales of the Acquired Assets, except as expressly provided in the applicable APA and this Order.

                b.  Except as expressly provided in the APAs or by this Order, all persons and entities, including, but not limited to, the Debtors, employees, former employees, all debt security holders, equity holders, administrative agencies, governmental units (as defined in section 101(27) of the Bankruptcy Code), tax and regulatory authorities, secretaries of state, federal, state, and local officials, lenders, contract parties, bidders, lessors, warehousemen, customs brokers, freight forwarders, carriers, and other parties in possession of any of the Acquired Assets at any time, trade creditors and all other creditors, holding any claims, liens, interests, or encumbrances any kind or nature whatsoever against or in the Debtors or in the Debtors' interests in the Acquired Assets (whether secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown, liquidated or unliquidated, senior or subordinated, imposed by agreement, understanding, law, equity, or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets, the Assumed Contracts, the operation of the Debtors' business on or prior to the Closing Date, the Sales, or the transfers of the Acquired Assets or the Assumed Contracts to the Buyers shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting, commencing, continuing, or otherwise pursuing in any manner any action, claim, or other proceeding of any kind, directly or indirectly, against the Buyers or any of their affiliates, predecessors, successors, or assigns or any of their (including their affiliates, predecessors, successors, or assigns) respective current and former members, officers, directors, managed funds, investment advisors, attorneys, employees, partners, principals, affiliates, shareholders (or equivalent), financial advisors and representatives (each of the

foregoing in its individual capacity), their property or the Acquired Assets. Actions that are barred hereby include, without limitation: (i) the commencement or continuation of any action or other proceeding, (ii) the enforcement, attachment, collection or recovery of any judgment, award, decree or order, (iii) the creation, perfection or enforcement of any lien, claim, interest or encumbrance, (iv) the assertion of any right of setoff, subrogation or recoupment of any kind, (v) the commencement or continuation of any action that does not comply with, or is inconsistent with, the provisions of this Order, any actions contemplated or taken in respect hereof, or the APAs, and (vi) the revocation, termination or failure or refusal to renew any license, permit, registration or governmental authorization or approval to operate any of the Acquired Assets or conduct the businesses associated with such Acquired Assets.

        c. Following the Closing, no holder of a claim, lien, interest, or encumbrance against the Debtors shall interfere with the Buyers' title to or use and enjoyment of the Debtors' interests in the Acquired Assets based on or related to such claim, lien, interest, or encumbrance, and, except as otherwise provided in the applicable APA or this Order, all such claims, liens, interests, or encumbrances, if any, shall be, and hereby are transferred and attached to the proceeds from the Sales of the Acquired Assets in the order of their priority, with the same validity, force, and effect which they have against such Acquired Assets as of the Closing, subject to any rights, claims, and defenses that the Debtors' estate and Debtors, as applicable, may possess with respect thereto. All persons are hereby enjoined from taking action that would interfere with or adversely affect the ability of the Debtors to transfer the Acquired Assets in accordance with the terms of the APAs and this Order.

        d. On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the

Case 18-04177-TOM11    Doc 1323    Filed 04/15/19    Entered 04/15/19 11:55:00    Desc
Main Document      Page 31 of 225

Debtors' right, title, and interest in the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to the Buyers on the Closing Date pursuant to the terms of the applicable APA, free and clear of all claims, liens, interests, Liabilities, and encumbrances (other than Permitted Encumbrances and subject to the applicable Buyer's assumption of the applicable Assumed Liabilities).

        e.   This Order is, and shall be, (i) effective as a determination that other than Permitted Encumbrances, all claims, liens, interests, Liabilities, and encumbrances of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected and (ii) binding upon and shall authorize all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Acquired Assets conveyed to the Buyers. Other than applicable Permitted Encumbrances and subject to the applicable Buyer's assumption of the applicable Assumed Liabilities, all recorded claims, liens, interests, Liabilities, and encumbrances against the Acquired Assets from their records, official and otherwise, shall be deemed stricken.

        f.   The failure to have included in the applicable APA any of the specific provisions of this paragraph 14 or of paragraph N in the findings of fact and conclusions of law shall not diminish or impair the effectiveness of such provisions herein, it being the intent of the Court that those paragraphs provide the broadest possible free and clear treatment to the Acquired

Assets (except with respect to any applicable Permitted Encumbrances) and Buyers (except with respect to the applicable Assumed Liabilities).

g.   For the avoidance of doubt, not all Assumed Liabilities assumed by a Buyer are applicable Permitted Encumbrances, and, to the extent any Assumed Liability of a Buyer is not an applicable Permitted Encumbrance, such Assumed Liability does not encumber any of the applicable Acquired Assets.

14.   **Valid Transfer**.  The transfer to the Buyers of the Debtors' right, title, and interest in the Acquired Assets pursuant to the APAs shall be, and hereby is deemed to be, a legal, valid, and effective transfer of the Debtors' right, title, and interest in the Acquired Assets notwithstanding any requirement for approval or consent by any person, and vests with or will vest in the Buyers all right, title, and interest of the Debtors in the applicable Acquired Assets, free and clear of all claims, liens, interests, Liabilities, and encumbrances of any kind or nature whatsoever (other than the applicable Permitted Encumbrances and subject to the applicable  Buyer's assumption of the applicable Assumed Liabilities) pursuant to section 363(f) of the Bankruptcy Code, with any such claims, liens, interests, Liabilities, and encumbrances attaching to the sale proceeds in the same validity, extent, and priority as immediately prior to the Sales of the Acquired Assets, subject to the provisions of the APAs, and any rights, claims, and defenses of the Debtors and other parties in interest.

15.   **Good Faith**.  The APAs have been entered into by the Debtors and the Buyers in good faith and the Buyers are good faith purchasers of the Acquired Assets as that term is used in Bankruptcy Code section 363(m).  The Buyers are entitled to all of the protections afforded by Bankruptcy Code section 363(m).  Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter reversed, modified, or vacated by a

subsequent order of the Bankruptcy Court or any other court, such reversal, modification, or vacatur shall not affect the validity and enforceability of any sale, transfer, or assignment under the APAs or obligation or right granted pursuant to the terms of this Order (unless stayed pending appeal prior to the Closing Date), and notwithstanding any reversal, modification, or vacatur, any sale, transfer, or assignment shall be governed in all respects by the original provisions of this Order and the applicable APA, as the case may be.

16.     **No Liability**.  No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sales, and compliance with the legal requirements relating to bulk sales and transfers is not necessary or appropriate under the circumstances of the Sales. Except as otherwise provided in the APAs, no obligation or liability, contingent, or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment is due to any person in connection with the APAs, the other transaction documents or the transactions contemplated hereby or thereby for which the Buyers are or will become liable.

17.     **Consideration**.  The consideration provided by the Buyers for the Acquired Assets under the APAs (including the cash consideration), shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.  The Sales of the Acquired Assets are not for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.  The Debtors and Buyers are not and will not be entering into the Sales fraudulently.  The Sales of the Acquired Assets may not be avoided, or costs or damages imposed or awarded under Bankruptcy Code section 363(n) or any other provision of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform

34

Fraudulent Conveyance Act, and under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia.

18. **No Successor Liability**.

a. The Buyers and their affiliates and their respective predecessors, successors, assigns, members, partners, principals, directors, officers, and shareholders (or equivalent) shall have no obligations with respect to any liabilities of the Debtors, whether known or unknown, whether fixed or contingent, whether arising prior to or after the Closing Date, including without limitation any Liabilities, other than the Assumed Liabilities. Without limiting the generality of the foregoing, upon the Closing, except as specifically included in the Assumed Liabilities of the applicable APA, the applicable Buyer and its affiliates and their respective predecessors, successors, assigns, members, partners, officers, directors, principals, and shareholders (or equivalent) are not and shall not: (a) be the successor of or successor employer (as described under COBRA and applicable regulations thereunder) to the Debtors, including without limitation, with respect to any Collective Bargaining Agreement or Benefit Plan, under the Coal Act, and any common law successor liability in relation to the UMWA Health and Retirement Funds, including the UMWA 1974 Pension Plan, including with respect to withdrawal liability; (b) be the successor of or successor employer to the Debtors, and shall instead be, and be deemed to be, a new employer with respect to any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws; (c) have, *de facto*, or otherwise, merged or consolidated with or into Debtors; (d) be a mere continuation or substantial continuation of Debtors or the enterprise(s) of Debtors; or (e) be liable for any acts or omissions of Debtors in the conduct of the Business or arising under or related to the Acquired Assets other than as set forth in the APAs. Without limiting the generality of the

35

foregoing, and except as otherwise provided in the applicable APA, the parties intend and the Court hereby orders that each of the Buyers and its respective affiliates, predecessors, successors, assigns, members, partners, officers, directors, principals, and shareholders (or equivalent) shall (x) not be liable for any encumbrance or Liability (other than Assumed Liabilities) against any of the Debtors, or any of each Debtor's predecessors or Affiliates, and (y) have no successor or vicarious liability of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor, or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors, including, but not limited to, Liabilities on account of any taxes (including without limitation coal severance taxes or ad valorem real property taxes) due in connection with, or in any way relating to, the Acquired Assets or the Assumed Contracts. The consideration given by the Buyers shall constitute valid and valuable consideration for the release of any potential claims of successor liability against the Buyers, which releases shall be deemed to have been given in favor of the Buyers by all holders of any claims, liens, interest, encumbrances, or Liabilities against the Debtors or the Acquired Assets.

b. The failure to have included in the applicable APA any of the specific provisions of this paragraph 19 or of paragraph O in the findings of fact and conclusions of law shall not diminish or impair the effectiveness of such provisions herein, it being the intent of the Court that those paragraphs provide the broadest possible no successor liability treatment to the Acquired Assets (except with respect to any applicable Permitted Encumbrances) and Buyers (except with respect to the applicable Assumed Liabilities).

36

19.  **Release and Discharge**.  Other than the applicable Assumed Liabilities, the Buyers and their respective affiliates, successors, assigns, members, partners, officers, directors, principals, and shareholders (or equivalent) shall have no obligations with respect to any Liabilities, including, without limitation, the Excluded Liabilities, and, upon consummation of the Sales, the Debtors and their estates are deemed to release and forever discharge Buyers, and their respective affiliates, successors, assigns, members, partners, officers, directors, principals, and shareholders (or equivalent) from any and all claims, causes of action, obligations, Liabilities, demands, losses, costs, taxes, and expenses of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, relating to the Sales of the Acquired Assets or assignments of the Assumed Contracts, except for applicable Assumed Liabilities.

20.  **Creditors' Authorizations**.  On the Closing Date (as defined in the applicable APA), each of the Debtors' creditors is authorized to execute such documents and take all other actions as may be reasonably necessary to release its liens, interests, or encumbrances on, or claims in, the Acquired Assets, if any, as such liens, interests or encumbrances may otherwise exist.  If any person or entity which has filed financing statements, mortgages, mechanics liens, *lis pendens*, or other documents, instruments, notices or agreements evidencing liens, interests or encumbrances on, or claims in, the Acquired Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all claims, liens, interests or encumbrances (other than Permitted Encumbrances) which the person or entity has or may assert with respect to the Acquired Assets, the Debtors and the Buyers are hereby authorized to execute and file such

37

statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Acquired Assets.

21. **Further Assurances**. All counterparties to the Assumed Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the applicable Buyer, and shall not charge the Debtors or the Buyers for any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sales of the Acquired Assets.

22. **Direction to Federal, State and Governmental Agencies**. Each and every federal, state, and governmental agency or department, and any other person or entity who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Acquired Assets, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sales contemplated by the APAs. All such entities described above in this paragraph are authorized and specifically directed to strike all recorded liens against the Assets from their records.

23. **Licenses, Permits, Registrations**. To the extent provided in the APAs and available under applicable law, the Buyers shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and any other governmental authorization or approval of the Debtors with respect to the Acquired Assets and the Assumed Contracts, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyers as of the Closing Date. To the extent any license or permit necessary for the operation of the business is determined not to be an executory

38

contract assumable and assignable under section 365 of the Bankruptcy Code, and subject to the terms of the APAs, the Buyers shall apply for and obtain any necessary license or permit promptly after the Closing Date, and such licenses or permits of the Debtors shall remain in place for the Buyers' benefit until new licenses and permits are obtained. No governmental unit may revoke or suspend any right, license, trademark, or other permission relating to the use of the Acquired Assets sold, transferred, or conveyed to the Buyers on account of the filing or pendency of these Chapter 11 cases or the consummation of the Sales of the Acquired Assets.

24. **Debtors' Reservation of Rights**. Except as expressly provided in the APAs, nothing in this Order shall be deemed to waive, release, extinguish, or estop the Debtors or their estates from asserting, or otherwise impair or diminish, any right (including, without limitation, any right of recoupment), claim, cause of action, defense, offset, or counterclaim in respect of any asset that is not one of the Acquired Assets. Except as expressly provided in the APAs, the Debtors shall have no liability to Buyers, any governmental agency, surety, or any other person for any liabilities with respect to the Assumed Contracts and Assumed Liabilities (which shall, for the avoidance of doubt, include, among other things, all Assumed Liabilities arising under or relating to (x) any Environmental, Health, and Safety Laws (as defined in the applicable APA) and (y) the transferred permits and licenses, including such liabilities thereunder arising out of or relating to all reclamation liabilities). Further, the Sales shall be, and be treated for all purposes, as absolute sales, conveyances, and transfers of all applicable Assumed Liabilities.

25. **Use of Proceeds**. All proceeds and consideration received by the Debtors from the Sale shall be distributed pursuant to the terms of the *Fourth Amended Joint Chapter 11*

39

*Plan of Mission Coal Company, LLC and Certain of its Debtor Affiliates* (as may be amended or supplemented from time to time, the "Plan").

26.     **Surrender of Possession or Control**.  All entities that are presently, or on the Closing Date may be, in possession or control of some or all of the Acquired Assets are hereby directed to surrender possession and control of the Acquired Assets to the applicable Buyer on the Closing Date or at such time thereafter as Buyer may request.

27.     **No Modification by Plan**.  Nothing contained in any Chapter 11 plan confirmed in the Debtors' cases or any order confirming any such plan or any other order in the Debtors' cases (including any order entered after any conversion, if any, of these cases into cases under Chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the APAs or this Order and, to the extent of any such conflict, the terms of this Order and the APAs shall control.

28.     **Binding Order**.  This Order and the APAs shall be binding in all respects upon all creditors and interest holders of the Debtors, all non-Debtor parties to the Assumed Contracts, the Official Committee of Unsecured Creditors of Mission Coal Company, LLC, et al. (the "UCC"), their respective successors and permitted assigns, the Debtors and their affiliates and subsidiaries, their successors and assigns of and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Chapter 11 cases or upon a conversion of the Debtors' cases to those under Chapter 7 of the Bankruptcy Code, including a Chapter 7 trustee, and this Order and the APAs shall not be subject to rejection or avoidance under any circumstances.  If any order under Bankruptcy Code section 1112 is entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that this Order and the rights granted to the Buyers

40

hereunder shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest.

29. **Failure to Specify Provisions**. The failure specifically to include or make reference to any particular provisions of the APAs, Letter Agreement, or any related agreements in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APAs, Letter Agreement, and the related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order. The provisions of this order are non-severable and mutually dependent.

30. **Amendments to Sales Documents**. The APAs and any related agreements, documents, or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto, with the consent of the Required DIP Lenders, in accordance with the terms thereof without further order of the Court; *provided*, *however*, that any such modification, amendment or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby.

31. **Lift of Automatic Stay**. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the limited extent necessary, without further order of the Bankruptcy Court, to allow the Buyers to deliver any notice provided for in the APAs and allow the Buyers to take any and all actions permitted under the APAs, including, without limitation, terminating the APAs in accordance with the terms and conditions thereof.

32. **Retention of Jurisdiction**. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without

41

limitation, the authority to: (a) interpret, implement, and enforce the terms and provisions of this Order (including the injunctive relief provided in this Order) and the terms of the APAs (and all related agreements), all amendments thereto and any waivers and consents thereunder; (b) protect the Buyers, or the Acquired Assets, from and against any of the claims, liens, interests, Liabilities, or encumbrances; (c) compel delivery of all Acquired Assets to the Buyers; (d) compel the Buyers to perform all of their obligations under the APAs; and (e) resolve any disputes arising under or related to the APAs, any related disputes or the Sales of the Acquired Assets.

33. **Governing Terms**. To the extent this Order is inconsistent with any prior order or pleading filed in these Chapter 11 cases related to the Motion, the terms of this Order shall govern. To the extent there is any inconsistency between the terms of this Order and the terms of the APAs, the terms of the applicable APA shall govern, except where expressly indicated otherwise herein. The failure specifically to reference any particular provision of either APA in this Order shall not diminish or impair the efficacy of such provision.

34. **Single Order**. This Order is drafted as a single order for judicial economy and the convenience of the Debtors. For the avoidance of doubt, the Order covers both Buyers and APAs, but the rights and obligations under this Order and the applicable APA for each Buyer are not attributable to the other Buyer in any manner. For example, even if not specified as such, references to Closing, Liabilities, Permitted Encumbrances, Assumed Contracts, Assumed Liabilities, or Acquired Assets refer to the *applicable* Closing, Liabilities, Permitted Encumbrances, Assumed Contracts, Assumed Liabilities, or Acquired Assets relevant to the *applicable* Buyer pursuant to that Buyer's APA. Also for example, references to the Buyers collectively and/or the APAs collectively refer to each Buyer with respect only to the APA to which it is a party, except as the context may otherwise require.

Case 18-04177-TOM11    Doc 1323    Filed 04/15/19    Entered 04/15/19 11:55:00    Desc
Main Document      Page 42 of 225

35.  **Final Order**.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited to Bankruptcy Rule 6004(h), the Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly: (a) the terms of this Order shall be immediately effective and enforceable upon its entry; (b) the Debtors are not subject to any stay of this Order or in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

36.  **Certain Government Matters**.  Nothing in this Order or the APAs shall release, impair, nullify, enjoin, or otherwise preclude the enforcement of any liability or obligation to, or any claim or cause of action by, a Governmental Unit under police or regulatory statutes or regulations to which any entity is subject as and to the extent that they are the owner, lessor, lessee, permittee, controller, or operator of real property or a mining operation after the date of entry of this Order (whether or not such liability, obligation, claim or cause of action is based in whole or in part on acts or omissions prior to the entry of this Order), including, but not limited to, liability for reclamation or water treatment pursuant to SMCRA or the CWA and similar state or tribal laws, except to the extent the Plan, the Plan Supplement, or any document relating to the Plan releases, discharges, or exculpates any of the Debtors from, or precludes or enjoins a Governmental Unit from pursuing or enforcing against the Debtors (i) any claims, obligations, or liabilities for costs expended or paid before the entry of this Order, or any penalties or fines owed for days of violations of police or regulatory statutes or regulations before the date of entry of this Order (which shall be treated as otherwise provided in the Plan); or (ii) any claims, obligations, or liabilities by or to a party that are resolved in a written agreement with a Governmental Unit to

43

which that party has agreed and only as to that party; *provided*, however, (A) that the Court retains jurisdiction to determine whether any liability identified in clause (i) of this paragraph to a Governmental Unit is discharged or otherwise barred by the Plan, the Plan Supplement, or any document relating to the Plan, this Order, or the Bankruptcy Code, and (B) that nothing herein shall subject the Buyers to any liability to a Governmental Unit or other entity for penalties for days of violation prior to Closing, response costs incurred by a Governmental Unit prior to Closing, or any liability relating to offsite disposal that occurred prior to Closing. Nothing in this Order or the APAs authorize the transfer or assignment of any governmental (1) license, (2) permit, (3) registration, (4) authorization, or (5) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable non-bankruptcy legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to adjudicate any defense asserted under this Order.

Dated: April 15, 2019

/s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

**EXHIBIT A**

**TO**

ORDER (I) APPROVING THE SALES OF THE
ACQUIRED ASSETS FREE AND CLEAR OF CLAIMS,
LIENS, INTERESTS, AND ENCUMBRANCES, (II) APPROVING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF

(Bluestone APA)

**ASSET PURCHASE AGREEMENT**

**DATED AS OF APRIL 4, 2019**

**BY AND AMONG**

**BLUESTONE RESOURCES, INC., AS BUYER**

**AND**

**MISSION COAL COMPANY, LLC,**

**AND**

**CERTAIN SUBSIDIARIES OF MISSION COAL COMPANY, LLC, AS THE SELLERS**

KE 59650556

# TABLE OF CONTENTS

## ARTICLE 1

### DEFINITIONS

| | | |
|---|---|---|
| 1.1 | Definitions | 2 |
| 1.2 | Other Definitions and Interpretive Matters | 14 |

## ARTICLE 2

### PURCHASE AND SALE

| | | |
|---|---|---|
| 2.1 | Purchase and Sale | 15 |
| 2.2 | Excluded Assets | 17 |
| 2.3 | Assumed Liabilities | 18 |
| 2.4 | Excluded Liabilities | 19 |
| 2.5 | Assignment and Assumption of Contracts | 21 |
| 2.6 | Further Assurances | 22 |

## ARTICLE 3

### PURCHASE PRICE

| | | |
|---|---|---|
| 3.1 | Consideration | 23 |
| 3.2 | Allocation of Purchase Price | 23 |
| 3.3 | Withholding | 24 |

## ARTICLE 4

### CLOSING AND DELIVERIES

| | | |
|---|---|---|
| 4.1 | Closing Date | 24 |
| 4.2 | Buyer's Deliveries | 24 |
| 4.3 | Sellers' Deliveries | 25 |
| 4.4 | Buyer Designees | 26 |

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF THE SELLERS

| | | |
|---|---|---|
| 5.1 | Organization and Good Standing | 26 |
| 5.2 | Authority; Validity; Consents | 27 |
| 5.3 | No Conflict | 27 |
| 5.4 | Real Property | 28 |
| 5.5 | Environmental and Health and Safety Matters | 29 |
| 5.6 | Title to Acquired Assets | 30 |

i

| | | |
|---|---|---|
| 5.7 | Taxes | 31 |
| 5.8 | Legal Proceedings | 32 |
| 5.9 | Compliance with Legal Requirements; Permits | 32 |
| 5.10 | Labor Matters. | 33 |
| 5.11 | Employee Benefits | 35 |
| 5.12 | Sellers' Intellectual Property | 35 |
| 5.13 | Contracts | 36 |
| 5.14 | Insurance | 36 |
| 5.15 | Brokers or Finders | 37 |
| 5.16 | Affiliate Interests | 37 |
| 5.17 | [Reserved] | 37 |
| 5.18 | Undue Influence | 37 |
| 5.19 | Financial Statements | 37 |
| 5.20 | [Reserved] | 37 |
| 5.21 | Mining | 37 |
| 5.22 | MSHA; OSHA. | 38 |
| 5.23 | Coal Act; Black Lung Act | 38 |
| 5.24 | Warranties Exclusive | 39 |

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

| | | |
|---|---|---|
| 6.1 | Organization and Good Standing | 39 |
| 6.2 | Authority; Validity; Consents | 40 |
| 6.3 | No Conflict | 40 |
| 6.4 | Brokers or Finders | 40 |
| 6.5 | Legal Proceedings | 41 |
| 6.6 | Qualification | 41 |
| 6.7 | No Other Representations or Warranties; Condition of the Business; Buyer's Reliance | 41 |
| 6.8 | Information | 41 |

## ARTICLE 7

### ACTIONS PRIOR TO THE CLOSING DATE

| | | |
|---|---|---|
| 7.1 | Access and Reports; Confidentiality | 42 |
| 7.2 | Operations Prior to the Closing Date | 43 |
| 7.3 | Regulatory Matters; Cooperation | 44 |
| 7.4 | Tax Cooperation | 45 |
| 7.5 | Bankruptcy Court Matters | 45 |
| 7.6 | Updates | 45 |
| 7.7 | Surety Bonds; Permits | 46 |
| 7.8 | Fiduciary Obligations | 50 |
| 7.9 | Sale Free and Clear | 50 |

ii

## ARTICLE 8
### ADDITIONAL AGREEMENTS

| | | |
|---|---|---|
| 8.1 | Taxes | 50 |
| 8.2 | Bulk Sales | 52 |
| 8.3 | Payments Received | 52 |
| 8.4 | Assumed Contracts: Adequate Assurance and Performance | 52 |
| 8.5 | Employee Matters | 52 |
| 8.6 | Post-Closing Books and Records and Personnel | 53 |
| 8.7 | Casualty Loss | 54 |
| 8.8 | Change of Name | 54 |
| 8.9 | No Successor Liability | 55 |

## ARTICLE 9

### CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

| | | |
|---|---|---|
| 9.1 | Accuracy of Representations | 55 |
| 9.2 | Sellers' Performance | 55 |
| 9.3 | No Order | 56 |
| 9.4 | Governmental Authorizations | 56 |
| 9.5 | Sellers' Deliveries | 56 |
| 9.6 | Sale Order | 56 |
| 9.7 | Assumed Contracts | 56 |
| 9.8 | Material Adverse Effect | 56 |
| 9.9 | [Reserved] | 56 |
| 9.10 | Frustration of Conditions | 56 |

## ARTICLE 10

### CONDITIONS PRECEDENT TO THE OBLIGATIONS OF THE SELLERS TO CLOSE

| | | |
|---|---|---|
| 10.1 | Accuracy of Representations | 57 |
| 10.2 | Buyer's Performance | 57 |
| 10.3 | No Order | 57 |
| 10.4 | Sale Order | 57 |
| 10.5 | Buyer's Deliveries | 57 |
| 10.6 | Frustration of Conditions | 57 |

## ARTICLE 11

### TERMINATION

| | | |
|---|---|---|
| 11.1 | Termination Events | 58 |
| 11.2 | Effect of Termination | 59 |

Case 18-04177-TOM11    Doc 1323    Filed 04/15/19    Entered 04/15/19 11:55:00    Desc
Main Document        Page 49 of 225

# ARTICLE 12

## GENERAL PROVISIONS

| | | |
|---|---|---|
| 12.1 | Survival | 59 |
| 12.2 | Confidentiality | 60 |
| 12.3 | Public Announcements | 60 |
| 12.4 | Notices | 61 |
| 12.5 | Waiver | 62 |
| 12.6 | Entire Agreement; Amendment | 62 |
| 12.7 | Assignment | 63 |
| 12.8 | Severability | 63 |
| 12.9 | Expenses | 63 |
| 12.10 | Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver | 63 |
| 12.11 | Counterparts | 64 |
| 12.12 | Parties in Interest; No Third Party Beneficiaries; No Amendment | 64 |
| 12.13 | Remedies | 64 |
| 12.14 | Specific Performance | 64 |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of April 4, 2019 (the "Execution Date"), is made and entered into by and among Bluestone Resources, Inc., a Delaware corporation ("Buyer"), Mission Coal Company, LLC, a Delaware limited liability company (the "Company"), and the Additional Sellers (as defined below) (together with the Company, the "Sellers" and each entity individually a "Seller"). Capitalized terms used herein and not otherwise defined herein have the meanings set forth in Article 1.

## RECITALS

WHEREAS, the Sellers are engaged in the business of mining, processing, marketing and selling coal through the Pinnacle Business;

WHEREAS, on October 14, 2018, the Sellers filed voluntary petitions (the "Bankruptcy Cases") under chapter 11 of Title 11 §§101-1330 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court");

WHEREAS, in accordance with the Bidding Procedures and subject to the terms and conditions set forth in this Agreement and the entry of subsequent relevant Orders by a bankruptcy court exercising jurisdiction, the Sellers desire to sell to Buyer all of the Acquired Assets and to assign to Buyer all of the Assumed Liabilities, Buyer desires to purchase from the Sellers all of the Acquired Assets and assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated hereby, upon the terms and conditions hereinafter set forth;

WHEREAS, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Buyer pursuant to approval of the sale through a Chapter 11 bankruptcy reorganization plan, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to applicable sections of the Bankruptcy Code, and the Federal Rules of Bankruptcy Procedure;

WHEREAS, the Sellers and Buyer have entered into an operator agreement (the "Operator Agreement") pursuant to which Buyer agrees, among other things, to act as the operator of the Pinnacle Mining Complex beginning as of the date hereof and continuing until the Closing Date and (ii) Sellers grants Buyer a right of entry onto the Pinnacle Complex as necessary to complete its obligations under the Operator Agreement

WHEREAS, the Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of subsequent relevant Orders by a bankruptcy court exercising jurisdiction; and

WHEREAS, the board of managers (or similar governing body) of each Seller has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and each has approved the same.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

1

# ARTICLE 1

## DEFINITIONS

1.1    Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"Accounts Receivable" means, with respect to each Seller, specifically excluding any Excluded Asset (including the Maple Business and the Oak Grove Business), all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that has not been billed, chattel paper, notes and other rights to payment, including those consisting of all accounts receivable in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"Accrued Payroll" means all wages and other related obligations that have accrued since the end of the last payroll period immediately prior to the Closing Date.

"Acquired Assets" has the meaning set forth in Section 2.1.

"Action" means any action, suit, petition, plea, charge, claim, demand, hearing, inquiry, arbitration, complaint, grievance, summons, litigation, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, inquest, audit, examination, investigation or similar matter by or before any Governmental Authority.

"Additional Sellers" means: Beard Pinnacle, LLC, an Oklahoma limited liability company; and Pinnacle Land Company, LLC, Pinnacle Mining Company, LLC, Seneca Coal Resources, LLC and Seneca North American Coal, LLC, each a Delaware limited liability company.

"Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Exchange Act.

"Agreement" has the meaning set forth in the introductory paragraph.

"Allocation" has the meaning set forth in Section 3.2.

"Alternative Transaction" means (i) the filing of a plan of reorganization contemplating the sale or retention of all or any portion of the Acquired Assets that is inconsistent with the terms of this Agreement or (ii) a sale, lease or other disposition directly or indirectly by merger, consolidation, tender offer, share exchange or otherwise to one or more third parties of all or substantially all of the Acquired Assets, in each case excluding the transactions contemplated hereby.

"Antitrust Law" means, collectively, the HSR Act, Title 15 of the United States Code §§ 1-7, (the Sherman Act), Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, (the Clayton Act), the Federal Trade Commission Act (15 U.S.C.§ 41 et seq.) and the rules and regulations promulgated thereunder and any other Legal Requirements that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect

of monopolization or restraint of trade or lessening of competition through merger or acquisition, as such of the foregoing are enacted and in effect as of the date hereof.

"Applicant Violator System" has the meaning set forth in Section 5.9(f).

"Apportioned Taxes" has the meaning set forth in Section 8.1(b).

"Assumed Contracts" has the meaning set forth in Section 2.5(a)(i).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumption Agreement" means an Assignment and Assumption Agreement in customary form reasonably acceptable to the Parties.

"Avoidance Action" means any claim, right or cause of action of any Seller arising under Chapter 5 of the Bankruptcy Code and any analogous state law claims relating to the Acquired Assets or the Business.

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Benefit Plan" and "Benefit Plans" have the meanings set forth in Section 5.11(a).

"Bidding Procedures" means bid procedures in the form attached as Exhibit 2 to the Bidding Procedures Order, with such amendments, modifications or supplements as approved by Buyer and the Sellers.

"Bidding Procedures Motion" means the motion of the Sellers and their applicable Affiliates for entry by the Bankruptcy Court of the Bidding Procedures Order filed on December 5, 2018 [Docket No. 393].

"Bidding Procedures Order" means an *Order (I) Authorizing the Debtors to Utilize the Opening Bid and Opening Bidder's Proposed Agreement in Connection with the Sale, (II) Approving the Bidding Procedures for the Sale of the Debtors' Assets, (III) Scheduling Hearings and Objection Deadlines With Respect to the Sale, (IV) Schedules Bid Deadlines and an Auction, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Assumption and Assignment Procedures, and (VII) Granting Related Relief*, entered on December 21, 2018 [Docket No. 490], with such amendments, modifications or supplements as approved by Buyer and the Sellers and entered by the Bankruptcy Court.

"Bill of Sale" means a Bill of Sale in customary form reasonably acceptable to the Parties.

"Black Lung Act" means the Federal Coal Mine Safety and Health Act of 1969, the Black Lung Benefits Act of 1972, the MSHA, the Black Lung Benefits Reform Act of 1977, or and the Black Lung Benefits Amendments of 1981.

"Black Lung Liability" means any liability or benefit obligations related to black lung claims and benefits under the Black Lung Act, and liabilities and benefits related to pneumoconiosis, silicosis, exposure to isocyanates or other lung disease arising under any federal or state law.

3

"Business" means the business and operations of the Sellers (wherever such business and operations are situated or conducted) related to the Acquired Assets, including (i) the business and operations related to metallurgical coal, exploration and extraction and related operations at the Pinnacle Mine mining facilities and (ii) the selling, marketing, purchasing and blending of coal and related operations related to the Acquired Assets, in each case of the foregoing clauses (i) and (ii), other than with respect to such business and operations to the extent they relate to any Excluded Assets or Excluded Liabilities.

"Business Day" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required, unable to or authorized to close.

"Buyer" has the meaning set forth in the introductory paragraph and shall also include any Buyer Designee.

"Buyer Designee" has the meaning set forth in Section 4.4.

"Buyer Employees" has the meaning set forth in Section 8.5(a).

"Cash Consideration" means cash equal to $100,000.00.

"Claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, against any Seller.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Closing Required Permits" means all Governmental Authorizations (including Permits) necessary for the operation and conduct of the Business and Acquired Assets, including the Replacement Permits.

"Coal Act" means the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701, et seq.

"Coal Reserves" means any and all of the coal located upon or within the Leased Real Property to the extent owned by the Sellers at the Pinnacle Mine.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"Code" means the Internal Revenue Code of 1986.

"Collective Bargaining Agreement" has the meaning set forth in Section 5.10(a).

"Company" has the meaning set forth in the introductory paragraph.

"Confidential Information" has the meaning set forth in Section 12.2.

"Contract" means any legally binding agreement, contract, obligation, promise, undertaking, lease (including Leases, Lessor Leases and Occupancy Agreements), sublease, purchase order, arrangement, license, commitment, insurance policy or other binding arrangement or understanding (in each case whether written or oral), and any amendments, modifications or supplements thereto.

"Contura Assets" means the assets of the Sellers to be acquired by Contura Energy, Inc. pursuant to that certain Asset Purchase Agreement, dated the date hereof, by and among the Sellers and Contura Energy, Inc.

4

"Copyrights" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"Cure Costs" means all monetary liabilities, including pre-petition monetary liabilities, of the Sellers that must be paid or otherwise satisfied to cure all of the Sellers' monetary defaults under the Assumed Contracts pursuant to applicable sections of the Bankruptcy Code at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order.

"Cure Notice" means, with respect to each Assumed Contract, the notice submitted by the Sellers to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order setting forth, among other things, the Cure Cost amount with respect thereto as calculated by the Sellers.

"Data Room" means that certain SecureDocs virtual data room maintained under the name "Mustang" by or on behalf of the Company in connection with the Bankruptcy Cases at https://advantage.securedocs.com/.

"Deeds" means (i) unless otherwise provided in a Schedule to this Agreement with respect to conveyance of a particular parcel of Real Property, special (or limited) warranty deeds, or jurisdictional equivalents, as the case may be, in recordable form for the appropriate jurisdiction, reasonably acceptable to Buyer, transferring title to the Real Property other than Leased Real Property and Improvements thereon (subject only to Permitted Encumbrances), and (ii) if expressly provided in a Schedule to this Agreement with respect to conveyance of a particular parcel of Real Property, the type of deed or other instrument so specified.

"Disclosure Schedules" means the Disclosure Schedules attached hereto, dated as of the date hereof, delivered or made available by the Sellers to Buyer in connection with the execution of this Agreement, as the same may be supplemented and amended pursuant to Section 7.6.

"Documents" means all of the documents that are used in, held for use in, or that are related to the Business.

"Employees" means all of the employees of the Sellers on the Execution Date, as well as any additional persons who become employees of the Sellers in the Ordinary Course of Business of the Sellers during the period from the Execution Date through and including the Closing Date.

"Encumbrance" means any "interest", as that term is used in Section 363(f) of the Bankruptcy Code, charge, lien, Claim, right, demand, mortgage, lease, debt, losses, damage, demand, fine, judgment, penalty, liability, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, rights of others, easement, restrictive covenant, right of way, preemptive right, conditional sale, servitude, conditional sale agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition or otherwise), encroachment, encumbrance, third party interest or other restriction or limitation of any kind, whether imposed by Contract, Legal Requirement, equity or otherwise.

5

"Environmental, Health and Safety Laws" means any and all Legal Requirements concerning or relating to (a) public health and safety (to the extent relating to Release of or exposure to Hazardous Substances), (b) worker/occupational health and safety (to the extent relating to Release of or exposure to Hazardous Substances), (c) land use, zoning, odor or noise, or (d) pollution or protection of the environment, including those relating to (i) the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, storage, disposal, distribution, importing, labeling, testing, processing, discharge, Release, threatened Release, control, or cleanup involving Hazardous Substances, (ii) SMCRA (including its implementing regulations and any state analogs), (iii) MSHA, (iv) human health as affected by hazardous or toxic substances, (v) acid mine drainage, and (vi) mining operations and activities to the extent relating to Reclamation.

"Environmental Permit" means any and all permits, licenses, approvals, consents, waivers, franchises, filings, accreditations, registrations, certifications, notifications, exemptions, clearances and any other authorization required under any applicable Environmental, Health and Safety Law (including those required under any applicable Environmental, Health and Safety Laws for the construction, maintenance and operation of any coal mine or related processing facilities or Reclamation and restoration of land, water and any current, abandoned or former mines, and of any other environment affected by such mines, as required pursuant to any applicable Environmental, Health and Safety Law).

"Equipment" means all furniture, fixtures, equipment, computers, machinery, vehicles, apparatus, appliances, implements, telephone systems, signage, supplies and all other tangible personal property of every kind and description, and Improvements and tooling used, or held for use, in connection with the operation of the Business, wherever located, including communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any Person, trade or business that would be considered a single employer with any Seller or any Subsidiary of any Seller under Sections 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA or would be under "common control" with any Seller or any Subsidiary of any Seller within the meaning of Section 4001(a)(14) of ERISA. Any former ERISA Affiliate shall continue to be considered an ERISA Affiliate within the meaning of this definition with respect to the period such entity was an ERISA Affiliate and with respect to Liabilities arising during such period (but, for the avoidance of doubt, not after such period) for which such Person could be liable under the Code or ERISA.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Section 2.5(a)(i).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Execution Date" has the meaning set forth in the introductory paragraph.

"FASB 410" has the meaning set forth in Section 5.21(b).

"FCPA" has the meaning set forth in Section 5.18.

6

"<u>Final DIP Order</u>" means the *Final Order (I) Authorizing Postpetition Secured Financing Pursuant to <u>11 U.S.C. §§ 105(A)</u>, <u>361</u>, <u>362</u>, <u>363</u>, <u>364(C)(1)</u>, <u>364(C)(2)</u>, <u>364(C)(3)</u>, <u>364(D)(1)</u> and <u>364(E)</u>, <u>(II)</u> Authorizing the Debtors' Use of Cash Collateral Pursuant to <u>11 U.S.C. §363</u>, <u>(III)</u> Granting Adequate Protection Pursuant to <u>11 U.S.C. §§ 361</u>, <u>363</u> and <u>364</u> and <u>(IV)</u> Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and 4001(C)* [Docket No. 300].

"<u>Final Order</u>" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Buyer) and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which Action or Order shall have become final in accordance with Bankruptcy Rule 8002; <u>provided</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"<u>FLSA</u>" means Fair Labor Standards Act and any state or local laws governing wages, hours, and/or overtime pay.

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America, consistently applied.

"<u>Gas Well</u>" means any coal bed methane gas well operated by any Seller.

"<u>General Permits</u>" means those Permits held by the Sellers as of the date hereof that relate to both Acquired Assets and Excluded Assets, such Permits being listed on <u>Schedule 2.1(g)</u> under the heading "General Permits."

"<u>Governmental Authority</u>" means any United States federal, state or local or any foreign government, multi-national organization, quasi-governmental authority, or other similar recognized governmental authority or regulatory or administrative authority, agency or commission or any court, tribunal or judicial body having jurisdiction.

"<u>Governmental Authorization</u>" means any approval, consent, license, Permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"<u>Hazardous Substance</u>" means any "pollutant," "contaminant," "hazardous waste," "hazardous material" or "hazardous substance" under any Environmental, Health and Safety Laws or any other substance, pollutant, contaminant, waste or related material, or combination thereof, whether solid, liquid, or gaseous in nature, subject to regulation, investigation, remediation, control or corrective action under any Environmental, Health and Safety Laws, in each case due to its toxic, hazardous, dangerous or deleterious properties or characteristics.

"<u>Hearing</u>" means the hearing to consider approval of the transactions contemplated hereby.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, and the rules and regulations promulgated thereunder.

"Improvements" means the buildings, structures, fixtures, systems, facilities, easements, rights-of-way, privileges, improvements, PP&E, licenses, hereditaments, appurtenances and all other rights and benefits appurtenant to the Owned Real Property or Leased Real Property.

"Indebtedness" means, at any time and with respect to any Person: (a) all indebtedness of such Person for borrowed money; (b) all indebtedness of such Person for the deferred purchase price of property or services (other than Trade Payables, other expense accruals and deferred compensation items arising in the Ordinary Course of Business); (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (e) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, to the extent required to be so recorded; (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities; (g) all Indebtedness of others referred to in clauses (a) through (f) above guaranteed directly or indirectly by such Person; and (h) all Indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Encumbrance upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Intellectual Property" means all intellectual property, including all Copyrights, Patents, Trademarks and Trade Secrets, owned, used or licensed by the Sellers and used or held for use in the Business or the Acquired Assets.

"Interim Period" has the meaning set forth in Section 7.7(b)(iii)(1).

"Inventory" has the meaning set forth in Section 2.1(a).

"IRS" has the meaning set forth in Section 5.11(b).

"Knowledge" means, with respect to any matter in question, in the case of the Sellers, the actual knowledge of any of the individuals listed on Schedule 1.1(a) after due inquiry.

"Lease" has the meaning set forth in the definition of "Leased Real Property."

"Lease Assignments" means one or more assignment and assumption agreements to assign to Buyer any Leases that are to be assumed by Buyer pursuant to this Agreement, in customary form and reasonably acceptable to the Parties.

"Leased Real Property" means, specifically excluding any Excluded Asset (including the Maple Business and the Oak Grove Business), the interests in the real property and real property let, leased or subleased by the Sellers, as tenant, subtenant, lessee or sublessee, or in which a Seller has been granted a possessory interest or right to use or occupy all or any portion of the same including as the same are evidenced by any and all mining leases, coal leases, coal

8

mining leases, underground coal mining and gob gas leases, coal land leases, coal degasification leases, use agreements or other occupancy agreements and all short form leases, memoranda and amendments relating to the foregoing together with, in each case to the extent let, leased, used or occupied by the Sellers in connection with the Business or the Acquired Assets, any and all underground and surface coal reserves, mineral rights, oil and gas rights and interests, mining rights, surface rights, water rights, rights of way unrecouped minimum, advance or pre-paid production royalties, all buildings and other structures, facilities or Improvements located thereon, all fixtures, systems, Equipment and items of personal property of the Sellers attached or appurtenant thereto, and all easements, licenses, rights and appurtenances relating to the foregoing (and any present or future rights, title and interests arising from or related to the foregoing) (each such lease a "Lease," and collectively, the "Leases").

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, or multinational law (statutory, common or otherwise), constitution, treaty, convention, ordinance, equitable principle, code, rule, regulation or Order enacted, adopted, promulgated, issued or applied by any Governmental Authority or other similar authority, including for the avoidance of doubt MSHA, OSHA, and any Mining Law.

"Lessor Leases" has the meaning set forth in Section 5.4(b).

"Letter Agreement" means the agreement, dated as of the date hereof, by and among each of Buyer, the Company, Contura Energy, Inc. and WPP.

"Liability" means a Claim or Encumbrance of any kind or nature whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Maple Business" means the business and operations of the Sellers and/or the Sellers' Affiliates associated with the Maple Eagle Mine (West Virginia).

"Material Adverse Effect" means any change, event, state of facts or occurrence that individually or in the aggregate (taking into account all other such changes, events, states of fact or occurrences) has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (a) the Acquired Assets or the assets, properties, prospects, financial condition or results of operations of the Business (excluding the Excluded Assets and the Excluded Liabilities), in each case taken as a whole or (b) the ability of the Sellers to consummate the transactions contemplated hereby or to perform any of their obligations under this Agreement, but excluding any change or effect to the extent that it results from or arises out of (i) any reasonably anticipated effects of the filing, commencement or prosecution of the Bankruptcy Cases; (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the transactions contemplated hereby; (iii) changes in Legal Requirements or accounting regulations (including GAAP); (iv) any specific action required to be taken (or omitted) hereby or taken (or omitted) at the written request of Buyer; (v) general or technological changes in the industries in which the Sellers compete; (vi) any failure of the Business to achieve external or internal forecasts or financial projections; (vii) any breach of this Agreement by Buyer or actions take under the Operator Agreement; (viii) any changes in financial or securities markets or any change or effect of economic or political conditions (including acts of terrorism, hostilities, sabotage, military actions or war, or any material worsening of such acts of terrorism, hostilities, sabotage, military actions or war); or (ix) acts of nature (including earthquakes, storms, severe weather, fires, floods and natural catastrophes) in each case of clauses (iii), (v) and (viii) to the

extent that such conditions do not disproportionately affect the Sellers, taken as a whole, as compared to other companies that are principally engaged in the same Business as the Sellers.

"Material Contract" means any Contract pursuant to which (i) any Seller enters into a new, or a renewal of an existing, obligation or agreement having a term greater than or equal to one (1) year (as renewed, as applicable) or (ii) any Seller may be obligated to incur potential aggregate Liabilities greater than or equal to $100,000 per annum.

"Mining" has the meaning set forth in the definition of Mining Law.

"Mining Financial Assurances" has the meaning set forth in Section 5.21(a).

"Mining Law" means all Legal Requirements relating to the exploration, extraction, processing, storage and transportation of coal and non-coal minerals and to the Reclamation of lands used for such activities (collectively referred to as "Mining"), including (i) SMCRA and (ii) MSHA.

"Mining Permits" means all applicable Permits related to Mining or otherwise required by Mining Law.

"MSHA" means the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § § 801 et. seq., and state analogs.

"Multiemployer Plan" means a "multiemployer plan," within the meaning of Section 4001(a)(3) of ERISA.

"Neutral Accountant" shall mean a national independent accounting firm selected by the Sellers and reasonably acceptable to Buyer.

"Oak Grove Business" means the business and operations of the Sellers and/or Sellers' Affiliates associated with the Oak Grove Mine (Alabama).

"Occupancy Agreements" has the meaning set forth in Section 5.4(d).

"Order" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority or an arbitrator, mediator or other judicially sanctioned Person or body.

"Ordinary Course of Business" means, with respect to any Person, the ordinary and usual course of normal day-to-day operations of such Person and its business, consistent with its past practice.

"OSHA" means the Occupational Safety and Health Act and state analogs.

"Outside Date" has the meaning set forth in Section 11.1(b)(ii).

"Owned Real Property" means, specifically excluding any Excluded Asset (including the Maple Business and the Oak Grove Business), all real property owned by any Seller, and all right, title and interest of such Seller therein, together with all of such Seller's right, title and interest in and to the following: (i) all buildings, structures, systems, hereditaments and Improvements located on such real property owned by such Seller, (ii) all Improvements, fixtures, systems, mine infrastructure, preparation plant structures and Improvements, loadout structures and Improvements, storage facilities, rail sidings, machinery, apparatus, equipment and items of personal property affixed to such real property owned by such Seller, (iii) all rights of way,

10

easements, if any, in or upon such real property owned by such Seller, licenses and all rights-of-way, beneficial easements, licenses, and other rights, privileges and appurtenances belonging to or in any way pertaining to such real property interests owned by such Seller (including the right, title and interest of such Seller in and to any Coal Reserves, mineral rights, underground and surface coal and mining rights, royalty rights, support rights and waivers, subsidence rights, water and water rights relating or appurtenant to such real property owned by such Seller), (iv) all strips and gores and any land lying in the bed of any public road, highway or other access way, open or proposed, adjoining such real property owned by such Seller, and (v) any leases out to third parties affecting such real property owned by such Seller, subject to any consents as may be required.

"Party" or "Parties" means, individually or collectively, as applicable, Buyer and the Sellers.

"Patents" means United States and foreign patents and patent applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosures related thereto.

"Permits" means any and all permits (including Environmental Permits and Mining Permits), licenses, approvals, consents, waivers, franchises, filings, accreditations, registrations, certifications, certificates of occupancy, easements, rights of way, notifications, exemptions, clearances, and authorizations, together with all modifications, renewals, amendments, supplements and extensions thereof and applications therefor, of or from any Governmental Authority or issued or granted pursuant to any Legal Requirements, as amended, supplemented and modified through the Execution Date, used in the Pinnacle Mining Complex other than the Contura Assets.

"Permitted Encumbrances" means Encumbrances specifically permitted by the Sale Order.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group (as defined in Section 13(d)(3) of the Exchange Act,) or Governmental Authority.

"Petition Date" means October 14, 2018.

"Pinnacle Business" means the business and operations of the Sellers associated with the Pinnacle Mining Complex (as defined in the DIP Credit Agreement), other than the Contura Assets.

"Pinnacle Mine" means the Sellers' mining facility known as Pinnacle (West Virginia), as well as any and all coal reserves owned by the Sellers thereon or therein, and additionally includes the Pinnacle Preparation Plant and any and all other assets related thereto and listed in Section 2.1, but excluding the Contura Assets.

"Pinnacle Preparation Plant" has the meaning set forth in Section 2.1(b).

"Post-Closing Tax Period" has the meaning set forth in Section 8.1.

"Pre-Closing Tax Period" has the meaning set forth in Section 8.1.

"Pre-Paid Expenses" means any of the Sellers' rights with respect to all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise)

11

for rent, electricity, telephone or otherwise), advances, pre-paid expenses, prepayments, rights under warranties or guarantees, vendor rebates and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent) except that professional fee retainers and pre-paid deposits related thereto shall not be included in the definition of "Pre-Paid Expenses".

"Proceeding" means any Action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Professional" means any Person retained by the Sellers or a statutory committee of unsecured creditors in the Bankruptcy Cases pursuant to an Order of the Bankruptcy Court under Section 327, 363 or 1103 of the Bankruptcy Code, or any Person retained by the DIP Lenders (as defined in the Final DIP Order) or the Buyer in connection with the Bankruptcy Cases.

"Professional Fee Claims" means any administrative claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals in connection with the Bankruptcy Cases through and including the Closing Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

"Purchase Price" has the meaning set forth in Section 3.1.

"Real Property" and "Real Properties" means the Owned Real Property and the Leased Real Property.

"Real Property Taxes" means Taxes related to Real Property, including real property taxes, reclamation taxes and other similar property taxes.

"Reclamation" means reclamation, revegetation, recontouring, abatement, control, remediation, clean-up or prevention of adverse effects of mining activities.

"Release" means (a) any releasing, spilling, discharging, disposing, leaking, pumping, injecting, pouring, depositing, dispersing, emitting, leaching or migrating into the indoor or outdoor environment, including ambient air, surface water, groundwater and surface or subsurface strata, or into or out of any property, including the migration of Hazardous Substances through or in the air, soil, surface water, groundwater, surface or subsurface strata or property and (b) the abandonment or discarding of barrels, tanks, containers or receptacles, whether or not sealed or closed, containing Hazardous Substances.

"Replacement Permits" means Permits that relate to Acquired Assets that are currently subject to General Permits, but for which Buyer will seek in replacement of such General Permits in accordance with Section 7.7.

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Sale Order" means an order of the Bankruptcy Court, in form and substance satisfactory to Buyer and the Sellers, approving the consummation of the transactions contemplated hereby, which shall be within a plan of reorganization pursuant to Chapter 11 of the Bankruptcy Code, unless Buyer elects otherwise in its sole and absolute discretion.

12

"Sellers" has the meaning set forth in the introductory paragraph.

"SMCRA" means the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§1201 et seq.

"Straddle Period" has the meaning set forth in Section 8.1(b).

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, unclaimed property, escheat, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any liability for any items described in clause (i) payable by reason of contract, transferee liability or operation of law (including Treasury Regulation Section 1.1502-6) or otherwise.

"Tax Records" means all Tax Returns, schedules and work papers, and all material records and other documents relating to Tax matters.

"Tax Refund" means any Tax refund, credit or similar benefit (including any interest paid or credited with respect thereto).

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Taxing Authority" means any Governmental Authority having jurisdiction over the assessment, determination, collection or other imposition of any Taxes.

"Trade Payables" means accounts payable obligations of the Sellers incurred at any time, solely to the extent that such obligations relate to the Acquired Assets.

"Trade Secrets" means trade secrets and other confidential and proprietary information and know-how.

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names, Internet domain names and any other similar designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

13

"Transaction Documents" means this Agreement, the Assumption Agreement, the Bill of Sale, Lease Assignments, the Letter Agreement, the Operator Agreement and any other agreements, instruments or documents entered into at the Closing pursuant to this Agreement.

"Transfer Taxes" has the meaning set forth in Section 8.1(a).

"Transferred Permits" has the meaning set forth in Section 2.1(g).

"Treasury Regulations" means the Treasury regulations promulgated under the Code.

"UMWA" means the United Mine Workers of America.

"UMWA Collective Bargaining Agreements" means all Collective Bargaining Agreements between the UMWA and any Seller.

"Unaudited Financial Statements" has the meaning set forth in Section 5.19.

"Union" and "Unions" have the meanings set forth in Section 5.10(a).

"Waiver" means a written waiver in form and substance acceptable to Buyer and the Sellers signed by Buyer at the Closing waiving on behalf of Buyer certain potential and existing Avoidance Actions and any other causes of action available to the Sellers or their estates and other Persons as set forth therein.

"WARN Act" has the meaning set forth in Section 5.10(d).

"West Virginia Mining License" has the meaning set forth in Section 7.7(b)(i)(1).

"West Virginia Mining Permits" has the meaning set forth in Section 7.7(b)(ii)(1).

"WPP" means WPP LLC, a Delaware limited liability company.

1.2     Other Definitions and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Contracts, Agreements and Orders. Any reference in this Agreement to any contract, license, agreement or order means such contract, license, agreement or order as amended, supplemented or modified from time to time in accordance with the terms thereof.

(iii)     Day. Any reference in this Agreement to "days" (but not Business Days) means to calendar days.

(iv)     Dollars. Any reference in this Agreement to "$" means United States dollars.

(v)     Exhibits and Schedules. All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this

14

Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

(vi)     <u>Gender and Number</u>. Any reference in this Agreement to gender includes all genders, and any singular term shall be deemed to include the plural, and any plural term the singular.

(vii)     <u>Headings</u>. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section," "Article" or "Schedule" are to the corresponding Section, Article or Schedule of this Agreement unless otherwise specified.

(viii)     <u>Herein</u>. Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear.

(ix)     <u>Including</u>. The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)     <u>Law</u>. Any reference to any law in this Agreement means such law as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time.

(xi)     <u>Other</u>. The words "to the extent" shall be interpreted to mean "to the extent (but only to the extent)".

(xii)     <u>Person</u>. Any reference to a Person shall include such Person's successors and permitted assigns.

(xiii)     <u>Made Available</u>. Any reference in this Agreement to "made available" shall mean that such documents or information referenced shall have been provided in the Data Room prior to the Execution Date or shall have been provided to Buyer or its Representatives prior to the Execution Date.

(b)     <u>No Strict Construction</u>. Buyer, on the one hand, and the Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and the Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limiting the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE 2

### PURCHASE AND SALE

2.1     <u>Purchase and Sale</u>.

Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, the Sellers shall unconditionally sell, transfer,

Case 18-04177-TOM11    Doc 1323    Filed 04/15/19    Entered 04/15/19 11:55:00    Desc
Main Document     Page 65 of 225

assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer and/or a Buyer Designee, and Buyer shall purchase, acquire and accept from the Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances), all of the Sellers' direct or indirect right, title and interest in, to or under the following properties, rights, claims and assets (in each case, except for and to the extent related to the Excluded Assets or the Excluded Liabilities, as applicable) of every kind and description, wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased, licensed, to the extent used or held for use, in or relating to the Business, whether or not reflected on the books and records of the Sellers, as the same shall exist on the Closing Date (collectively, the "Acquired Assets"):

(a)      the Assumed Contracts, including any and all right, title and interest held by the Sellers in or to the Pinnacle Mine in West Virginia under leases with Berwind Land Company (or any affiliated or successor entity), Lasher, LLC (or any affiliated or successor entity), and the West Virginia Department of Highways (or any affiliated or successor entity), including any and all improvements and/or structures located on or within the leased premises;

(b)      the preparation plant (the "Pinnacle Preparation Plant") located at or near the Pinnacle Mine in West Virginia, including any and all equipment, improvements and/or structures located therein or thereon;

(c)      all (i) Leased Real Property (and any agreement and rights related thereto or under the applicable Lease to the extent that such agreement or Lease is an Assumed Contract), (ii) the Lessor Leases (to the extent that a Lessor Lease is an Assumed Contract) and (iii) Occupancy Agreements (to the extent that an Occupancy Agreement is an Assumed Contract), in each case, together with all interests in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(d)      all Coal Reserves to the extent of the Sellers' interest in such Coal Reserves;

(e)      all rights to subside lands associated with mining operations and all rights to the waiver of and release from subsidence liability and indemnity rights under any and all conveyances, representations and instruments or agreements of any kind and nature applicable to the Sellers' coal mining activities and interests;

(f)      except to the extent prohibited by law, any rights of the Sellers to the warranties and licenses received from manufacturers or Sellers of the Equipment, Improvements or any component thereof;

(g)      subject to Sections 2.5(b) and 7.7(b)and obtaining the consents set forth on Schedule 5.2, those Permits (including Environmental Permits and Mining Permits) held by the Sellers that relate to the Business or the Acquired Assets, to the extent assignable, designated as "Transferred Permits" on Schedule 2.1(g) (together with the Replacement Permits, the "Transferred Permits"); provided, that Schedule 2.1(g) and the definition of "Transferred Permits" shall be deemed updated and amended to exclude, without further action by any Party, any Permit that relates to an Excluded Asset;

(h)      all rights of the Sellers to use haul roads, utility easements and other rights of way and easements used in the operation of the Business at the Pinnacle Mine, as well as at the Pinnacle Preparation Plant; and

16

(i)     to the extent permitted by Legal Requirements and not subject to attorney-client privilege or other work product privilege, all Documents and other books and records (financial, accounting and other) except to the extent related to the Excluded Assets or the Excluded Liabilities, and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, that are used or useful in, held for use in or intended to be used in, or that arise in any way out of or are related to, the Acquired Assets or the Assumed Liabilities; provided, that the Sellers shall be permitted to keep copies of all of the foregoing to the extent necessary or required by the Bankruptcy Court or in connection with the Bankruptcy Cases, subject to Section 12.2.

2.2     Excluded Assets.

Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer, and the Sellers shall retain all right, title and interest to, in and under, and all Liabilities with respect to, the Excluded Assets. For all purposes of and under this Agreement, the term "Excluded Assets" shall consist of all assets that are not Acquired Assets, including the following items, assets and properties (whether or not such assets are otherwise described in Section 2.1):

(a)     the Contura Assets;

(b)     any and all Collective Bargaining Agreements;

(c)     (i) any Employee personnel files or records and (ii) any and all Benefit Plan, and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

(d)     any shares of capital stock or other equity interest in or issued by any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock of other equity interest in or issued by any Seller, and any shares of capital stock or other equity interest in or issued by any Subsidiary of any Seller (including, for the avoidance of doubt, any foreign Subsidiary) or other entity in which any Seller holds an equity interest, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Subsidiary of any Seller or other entity in which any Seller holds an equity interest, including the capital stock or equity interest set forth on Schedule 2.2(d).

(e)     subject to Section 2.1(i), the limited liability company, partnership and corporate books and records of internal limited liability company, partnership and corporate proceedings, minute books, organizational or governing documents, stock ledgers and other records of the Sellers as they pertain to ownership, organization, qualification to do business or existence of the Sellers; provided, however, that copies of the foregoing items shall be made available by the Sellers to Buyer;

(f)     Documents that the Sellers are required by Legal Requirements to retain;

(g)     any Contract that is not an Assumed Contract;

(h)     all rights under or arising out of insurance policies;

17

(i)      any prepaid deposits related to Professional fee retainers;

(j)      the Cash Consideration;

(k)      any rights, claims or causes of action of the Sellers under this Agreement or any other Transaction Document;

(l)      any deposits, escrows, surety bonds or other financial assurances and any cash or cash equivalents securing any surety bonds or financial assurances;

(m)      all Tax Returns of, or filed by, the Sellers or their Affiliates for any Tax that is an Excluded Liability;

(n)      all (1) Avoidance Actions and (2) other causes of action belonging or available to any of the Sellers or their estates against any of the Sellers or other Persons set forth in the Waiver;

(o)      all proceeds received from the sale or liquidation of any Excluded Assets;

(p)      all cash and cash equivalents (including related bank accounts) and all Accounts Receivable;

(q)      any Tax Refund of the Sellers; and

(r)      any intercompany receivables between one or more of the Sellers or their Subsidiaries.

2.3    <u>Assumed Liabilities</u>.

Subject to entry of the Sale Order, upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer and/or each relevant Buyer Designee shall, effective at the time of the Closing, assume and agree to discharge and perform when due, the Liabilities of the Sellers (and only those Liabilities of the Sellers) which are enumerated in this <u>Section 2.3</u> (the "<u>Assumed Liabilities</u>"). Except to the extent that any of the following are specified in <u>Section 2.4</u>, the following Liabilities of the Sellers (and only the following Liabilities) shall constitute, without duplication, the Assumed Liabilities:

(a)      all Liabilities under the Assumed Contracts;

(b)      all Cure Costs with respect to the Assumed Contracts;

(c)      all Liabilities for Reclamation pertaining to the Pinnacle Mine, other than Reclamation assumed by Contura;

(d)      outstanding Trade Payables related to the Acquired Assets incurred in the Ordinary Course of Business after the Petition Date and during the Bankruptcy Cases to the extent consistent with the Budget (as defined in the Final DIP Order);

(e)      all Liabilities of the Sellers with respect to the Transferred Permits or otherwise arising out of or relating to the Transferred Permits, including: (i) all Liabilities for Reclamation and, if applicable, post-mining and post-Gas Well operation Liabilities; (ii) compliance with performance obligations or standards under the Transferred Permits and associated Legal Requirements; and (iii) obligations to replace and/or increase bonds or other financial assurance instruments associated with the Transferred Permits;

18

(f)     accrued but unpaid Liabilities of the Sellers with respect to Real Property Taxes assessed with respect to the Acquired Assets;

(g)     all Liabilities resulting from or arising out of any action action taken prior to Closing by Buyer or its Affiliates under the Operator Agreement; and

(h)     all Accrued Payroll and payroll taxes related thereto.

The assumption by Buyer of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

2.4     <u>Excluded Liabilities</u>.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of, or Liability against, the Sellers, the Sellers' Subsidiaries, the Business or the Acquired Assets, of any kind or nature, whether absolute, accrued, contingent or otherwise, whether due or to become due and whether or not assets, and whether or not known or unknown or currently existing or hereafter arising or matured or unmatured, direct or indirect, and however arising, other than the Assumed Liabilities, and the Sellers shall be solely and exclusively liable with respect to all Liabilities of the Sellers, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "<u>Excluded Liabilities</u>"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include each of the following Liabilities of the Sellers and the Sellers' Subsidiaries other than the Assumed Liabilities (excluding, in each case, any Liability resulting from or arising out of any action action taken prior to Closing by Buyer or its Affiliates under the Operator Agreement):

(a)     (i) all Liabilities with respect to (x) any Taxes imposed on or with respect to the Business or the Acquired Assets that are attributable to any Pre-Closing Tax Period as determined pursuant to <u>Section 8.1</u>, or (y) any Taxes related to the Excluded Assets and (ii) all Liabilities for Taxes of any Seller or its stockholders or members, including any Liability of any Seller for the Taxes of any other Person under Section 1.1502-6 of the U.S. Treasury regulations (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise;

(b)     all Liabilities with respect to Actions and Proceedings pending before the Closing Date or to the extent arising or giving rise to Liability against the Business or the Acquired Assets prior to the Closing Date, even if instituted after the Closing Date;

(c)     all Liabilities to any owner or former owner of capital stock or warrants, holder of Indebtedness for borrowed money, or current or former officer or director of any Seller or Subsidiary of any Seller;

(d)     all Liabilities with respect to any Excluded Asset, including (i) any Benefit Plan, (ii) Contracts that are not Assumed Contracts, (iii) any and all Collective Bargaining Agreements, and (iv) Liabilities or other obligations in respect of any compensation or benefit plans, agreements, policies, practices, programs and arrangements of any ERISA Affiliate, including any Benefit Plan;

(e)     all Liabilities under any futures contracts, options on futures, swap agreements or forward sale agreements;

(f) drafts or checks outstanding at the Closing to the extent cash is retained by the Sellers pursuant to Section 2.2(p);

(g) any and all Liabilities for: (i) costs and expenses incurred or owed in connection with the administration of the Bankruptcy Cases (including all Professional Fee Claims); and (ii) all costs and expenses incurred in connection with the negotiation, execution and consummation of the transactions contemplated hereby;

(h) all workers' compensation claims and occupational health claims related to the Acquired Assets, including and with respect to Buyer Employees and former employees of the Sellers who worked or who were employed at the Acquired Assets;

(i) any Liability or other obligations of the Sellers, any of their Subsidiaries or any ERISA Affiliate (or any predecessor of any of the foregoing) arising under, relating to or with respect to any multiple employer pension plan, single employer pension plan or Multiemployer Plan and any Liability or other obligations of any ERISA Affiliate arising under, relating to or with respect to any compensation or benefits agreement, arrangement, plan, policy, practice or program, including any Benefit Plan;

(j) all Liabilities with respect to Employees, or former Employees, or both (or their representatives or beneficiaries, contractors or consultants of any Seller, and employees, contractors or consultants of any ERISA Affiliate, for any action or inaction of any Seller (or any predecessor of any Seller)) occurring prior to or on the Closing Date, including with respect to vacation, payroll, sick leave, unemployment benefits, retirement benefits, pension benefits, employee stock option, equity compensation, employee stock purchase, or profit sharing plans, health care and other welfare plans, policies, programs, agreements, arrangements, practices or benefits (including COBRA or the Coal Act), or any other employee plans, policies, programs, practices, agreements, arrangements or benefits or other compensation of any kind to any employee, including under any Benefit Plans of any Subsidiary or ERISA Affiliate, and Liabilities or other obligations of the Sellers and their predecessors pursuant to the WARN Act to the extent arising or accruing prior to or on the Closing Date;

(k) all Liabilities arising under the Black Lung Act and workers' compensation Liabilities related to the Acquired Assets, including and with respect to Buyer Employees with respect to pre-Closing periods and former employees of the Sellers who worked or who were employed at the Acquired Assets, including, but not limited to, any such Liabilities arising under the Black Lung Act and workers' compensation Liabilities of any Seller or any Seller's predecessors;

(l) any and all Liabilities or other obligations to any current or former Employee, consultant or contractor or any spouse, dependent and/or any beneficiary thereof, relating to any Benefit Plan and any and all Liabilities or other obligations relating to any benefits or compensation agreement, arrangement, plan, policy, practice or program of any ERISA Affiliate, including any Benefit Plans;

(m) any and all Liabilities or other obligations arising under any employment or consulting agreement, Collective Bargaining Agreement or arrangement, or

20

severance, retention or termination agreement, plan, policy, practice, program or arrangement with any employee, consultant or contractor (or its representatives) of any Seller;

(n)     other Liabilities relating to the conduct of the Business or to the Acquired Assets (and the use thereof) arising or accruing at any time on or prior to the Closing; and

(o)     all Liabilities (other than Assumed Liabilities) accruing, arising out of, or relating to any federal, state or local investigations of, or Claims or actions against, any Seller or any Employee, agents, vendors or representatives of any Seller, to the extent arising out of actions taken prior to the Closing.

2.5     Assignment and Assumption of Contracts.

(a)

(i)     Schedule 2.5(a) sets forth a list of all executory Contracts that Buyer will assume (the "Assumed Contracts") effective as of the Closing Date. All Contracts of the Sellers which Buyer does not designate in writing for assumption shall not be considered an Assumed Contract or Acquired Asset and shall automatically be deemed "Excluded Contracts" and, for the avoidance of doubt, Buyer shall not be responsible for any related Cure Costs of any Excluded Contracts. Notwithstanding the foregoing, at any time prior to the date that is ten Business Days prior to the Closing, Buyer may notify the Sellers in writing that any Contract listed on Schedule 2.5(a) will be an Excluded Contract, in which case such Contract shall become an Excluded Contract and an Excluded Asset.

(ii)     In addition to the payment of Cure Costs by Buyer, each of the Sellers and Buyer, as applicable, shall use commercially reasonable efforts to assign, or cause to be assigned, the Assumed Contracts to Buyer, or to the applicable Buyer Designee, including taking all actions required by the Bankruptcy Court to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code. Buyer shall use commercially reasonable efforts to comply with all of the requirements of Section 365 of the Bankruptcy Code necessary to permit such assumption and assignment.

(iii)     At the Closing, (x) the Sellers shall, pursuant to the Sale Order and the Assumption Agreement, assign, or cause to be assigned, to Buyer or the applicable Buyer Designee (the consideration for which is included in the Purchase Price) each of the Assumed Contracts that is capable of being assigned and (y) Buyer shall pay promptly all Cure Costs (if any) in connection with such assignment (as agreed to among Buyer and the Sellers or as determined by the Bankruptcy Court) and assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Sale Order and the Assumption Agreement.

(b)     Non-Assignment of Contracts and Permits. Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Contract or any Permit, if, after giving effect to applicable sections of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would in any way materially adversely affect any rights of Buyer, as the assignee or transferee, or constitute a violation of a Legal Requirement or a breach of such Contract or Permit (as the case may be). If, after giving

21

effect to applicable sections of the Bankruptcy Code and the commercially reasonable efforts of the Sellers, such consent or approval is required but not obtained with respect to an Assumed Contract or a Permit, neither the Sellers nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor (but subject to Buyer's termination right set forth in Section 11.1) shall the Closing be delayed in respect of the Assumed Contracts or the Permits; provided, however, if the Closing occurs, then, with respect to any Assumed Contract or Permit for which consent or approval is required but not obtained, from and after the Closing, for a period of no more than four (4) months, the Sellers shall reasonably cooperate, without further consideration, with Buyer in any reasonable arrangement Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Assumed Contract or applicable Permit, including enforcement for the benefit of Buyer of any and all rights of the Sellers against any party to the applicable Assumed Contract or applicable Permit arising out of the breach or cancellation thereof by such party; provided, however, to the extent that any such arrangement has been made to provide Buyer with the benefits of, or under, the applicable Assumed Contract or applicable Permit, from and after the Closing, Buyer shall be responsible for, and shall promptly pay and perform all payment and other obligations under such Assumed Contract or Permit (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Assumed Contract or Permit had been assigned or transferred at the Closing with respect to Assumed Contracts and Permits, and at such applicable later date specified in this Section 2.5(b) with respect to any additional Assumed Contracts. Any assignment to Buyer of any Assumed Contract or Permit that shall, after giving effect to applicable provisions of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained.

2.6     Further Assurances.

(a)     Except as otherwise provided herein and subject to the terms and conditions of this Agreement, the Bankruptcy Code and any orders of the Bankruptcy Court, from and after the Execution Date, the Sellers and Buyer shall use commercially reasonable efforts to take, or cause to be taken, all reasonable actions and to do, or cause to be done, all things necessary or desirable under applicable Legal Requirements to consummate the transactions contemplated hereby, including (i) preparing and filing as promptly as practicable with any Governmental Authority or other third party all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents and (ii) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other third party that are necessary, proper or advisable to consummate the transactions contemplated hereby, in each case, after giving effect to the Sale Order.

(b)     At and after the Closing, and without further consideration therefor, the Sellers shall execute and deliver to Buyer such further instruments and certificates as shall be necessary or desirable, to consummate the transactions contemplated hereby, it being specifically understood and agreed that, notwithstanding anything to the contrary herein, no Seller shall have any obligation to (A) record or pay any recording fees and Taxes in connection with the foregoing (except to the extent Buyer agrees to reimburse the Sellers for any out-of-pocket expenses incurred by the Sellers in connection with such recordation or payment), or (B) pay any title insurance fee or premium in connection with any title insurance commitment or policy Buyer may obtain, in

22

each case, including any related costs and expenses (except to the extent Buyer agrees to reimburse the Sellers for any out-of-pocket expenses incurred by the Sellers in connection with such commitment or policy).

## ARTICLE 3

### PURCHASE PRICE

3.1     Consideration.

The aggregate consideration (the "Purchase Price") for the purchase, sale, assignment and conveyance of the Sellers' right, title and interest in, to and under the Acquired Assets shall consist of:

(a)     the Cash Consideration; plus

(b)     the assumption by Buyer or a Buyer Designee, as applicable, of the Assumed Liabilities from the Sellers.

3.2     Allocation of Purchase Price.

The sum of the Purchase Price and the amount of the Assumed Liabilities (to the extent properly taken into account under the Code) shall be allocated among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "Allocation"). The Allocation shall be delivered by Buyer to the Sellers within sixty (60) days after the Closing Date. The Sellers will have the right to raise reasonable objections to the Allocation within thirty (30) days after Buyer's delivery thereof, in which event Buyer and the Sellers will negotiate in good faith to resolve such dispute. If Buyer and the Sellers cannot resolve such dispute within fifteen (15) days after the Sellers notify Buyer of such objections, such dispute with respect to the Allocation shall be resolved promptly by the Neutral Accountant, the costs of which shall be shared in equal amounts by Buyer, on the one hand, and the Sellers, on the other hand. The decision of the Neutral Accountant in respect of the Allocation shall be final and binding upon Buyer and the Sellers. Unless otherwise required by law, the IRS or any other taxing authority, the allocation of the Purchase Price pursuant to the Allocation shall be final and binding on the Parties, and the Parties shall follow the Allocation for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not take any position inconsistent therewith. If the IRS or any other taxation authority proposes a different allocation, the Sellers or Buyer, as the case may be, shall promptly notify the other party of such proposed allocation. The Sellers or Buyer, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this Section 3.2. Except as otherwise required by any Legal Requirement or pursuant to a "determination" under Section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by Article 2 of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this Section 3.2; and (ii) neither Party (nor any of their Affiliates) will take any position inconsistent with this Section 3.2 in any Tax Return, in any refund claim, in any litigation or otherwise. Notwithstanding the allocation of the Purchase Price set forth in the Allocation, nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any plan or reorganization or liquidation that may be proposed.

Case 18-04177-TOM11    Doc 1323    Filed 04/15/19    Entered 04/15/19 11:55:00    Desc
Main Document      Page 73 of 225

3.3    Withholding.

Buyer shall be entitled to deduct and withhold from the Purchase Price otherwise payable pursuant to this Agreement to the Sellers such amounts as Buyer is required to deduct and withhold under applicable Legal Requirements. To the extent that amounts are so deducted and withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to the Sellers.

## ARTICLE 4

### CLOSING AND DELIVERIES

4.1    Closing Date.

Upon the terms and subject to the conditions hereof and the Letter Agreement, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of Kirkland & Ellis LLP, 601 Lexington, Avenue, New York, NY 10022, two Business Days following the satisfaction or waiver of the conditions set forth in Article 9 and Article 10. The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date." Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of 12:01 a.m. (New York time) on the Closing Date.

4.2    Buyer's Deliveries.

Subject to satisfaction or (if permissible) waiver of the conditions set forth in Article 9 and Article 10, at the Closing, Buyer shall deliver (or cause one or more of its Affiliates or Buyer Designees to deliver) to the Sellers:

(a)    For the Acquired Assets, the Bills of Sale, Lease Assignments, the Assumption Agreement and each other Transaction Document to which Buyer or a Buyer Designee is a party, duly executed by Buyer and/or Buyer Designees, as applicable;

(b)    the Waiver, duly executed by Buyer and/or Buyer Designees, as applicable;

(c)    the certificates of Buyer to be received by the Sellers pursuant to Sections 10.1 and 10.2;

(d)    evidence, in form and substance reasonably acceptable to the Sellers, of receipt of the West Virginia Mining License;

(e)    the Cash Consideration in cash by wire transfer of immediately available funds to an account or accounts designated by the Sellers no later than one (1) Business Day prior to the Closing; and

(f)    such other documents as the Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated hereby.

24

4.3   <u>Sellers' Deliveries</u>.

At the Closing, the Sellers shall deliver to Buyer:

(a)   For the Acquired Assets, the Bills of Sale, Deeds, Lease Assignments and the Assumption Agreement, and each other Transaction Document to which any Seller is a party, duly executed by the applicable Sellers; <u>provided</u>, that in the event one or more of the Deeds is not delivered by the Sellers to Buyer on or before the Closing Date, the Sellers shall deliver such Deeds to Buyer as promptly as reasonably practicable following the Closing Date; <u>provided</u>, <u>further</u>, that, for the avoidance of doubt, the failure of the Sellers to deliver any Deeds to Buyer on or before the Closing Date shall not be deemed a failure to satisfy this delivery obligation;

(b)   with respect to the Real Property included in the Acquired Assets, possession of such Real Property, together with copies (and originals in the Sellers' possession) of all instruments, Leases and agreements evidencing the Sellers' interest in the same, and any existing surveys, legal descriptions and title policies concerning such Real Property that are in the possession of the Sellers which shall be deemed to be delivered to the extent located at any of the Real Property;

(c)   a certified copy of the Sale Order;

(d)   the certificates of the Sellers to be received by Buyer pursuant to <u>Sections 9.1</u> and <u>9.2</u>;

(e)   certificates executed by each Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(f)   releases and termination statements sufficient for Buyer to receive the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances);

(g)   such other bills of sale, Deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all of the right, title and interest of the Sellers in, to or under any or all the Acquired Assets, subject only to Permitted Encumbrances and Assumed Liabilities;

(h)   such ordinary and customary documents (including any factually accurate affidavits) as may be required by any title company or title insurance underwriter to enable Buyer to acquire, at Buyer's sole election and Buyer's sole cost and expense, one or more owner policies of title insurance issued by such title company covering any or all of the Real Property included in the Acquired Assets in form and substance reasonably acceptable to Buyer; and

(i)   such other documents as Buyer may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated hereby.

25

4.4     Buyer Designees.

At least ten (10) days prior to the Hearing, Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 4.4, one or more Affiliates of Buyer to (i) purchase specified Acquired Assets; (ii) assume specified Assumed Liabilities; and/or (iii) employ Buyer Employees, in each case, as of the Closing Date (any Person that shall be properly designated by Buyer in accordance with this clause, a "Buyer Designee"); it being understood and agreed, however, that any such right of Buyer to designate a Buyer Designee is conditioned upon (x) such Buyer Designee being able to perform the applicable covenants under this Agreement and, as applicable, any other transaction agreement to which Buyer is party and demonstrate satisfaction of the requirements of the Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance with respect to the Acquired Assets and Assumed Liabilities, (y) any such designation not creating any Liability (including any Liability relating to Taxes) for the Sellers or their Affiliates that would not have existed had Buyer purchased the Acquired Assets, assumed the Assumed Liabilities and/or employed Buyer Employees, and which Liability is not fully reimbursed by or on behalf of Buyer and (z) such designation not being reasonably expected to cause a delay, or prevent or hinder the consummation of the transactions contemplated hereby. As soon as reasonably practicable and in no event later than ten (10) days prior to the Hearing, Buyer shall make any such designations of Buyer Designees by way of a written notice to be delivered to the Sellers, and Buyer Designees shall deliver a signed counterpart to this Agreement or joinder agreement to this Agreement and each other Transaction Document to which Buyer is party. No such designation shall relieve Buyer of any of its obligations hereunder and any breach hereof by a Buyer Designee shall be deemed a breach by Buyer. Buyer and Buyer Designees shall be jointly and severally liable for any obligations of Buyer and such Buyer Designees hereunder. For the avoidance of doubt, and notwithstanding anything to the contrary herein, all Buyer Designees appointed in accordance with this Section 4.4 shall be included in the definition of "Buyer" for all purposes under this Agreement and all such Buyer Designees shall be deemed to have made all of the representations and warranties of Buyer set forth in this Agreement.

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers hereby jointly and severally represent and warrant to Buyer as follows, except as disclosed in the Disclosure Schedules:

5.1     Organization and Good Standing.

Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Subject to the applicable provisions of the Bankruptcy Code, each Seller has all requisite corporate or limited liability company power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted. The Sellers are duly qualified or licensed to do business and are in good standing in each jurisdiction where the character of their Business or the nature of their properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

26

5.2     Authority; Validity; Consents.

Each Seller has, subject to entry of the Sale Order, the requisite corporate or limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which such Seller is a party and to consummate the transactions contemplated hereby and thereby, and, subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and such other Transaction Documents by such Seller and the consummation by such Seller of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate or limited liability company action on the part of the Sellers. Subject to entry of the Sale Order, this Agreement has been duly and validly executed and delivered by each Seller and each other Transaction Document required to be executed and delivered by a Seller at the Closing will be duly and validly executed and delivered by such Seller at the Closing. Subject to entry of the Sale Order, this Agreement and the other Transaction Documents constitute, with respect to each Seller that is party thereto, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to entry of the Sale Order, and assuming the accuracy of the representations and warranties set forth in Article 6, except (a) as required to comply with the HSR Act and the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business, (b) for entry of the Sale Order, (c) for notices, filings and consents required in connection with the Bankruptcy Cases, including the requirements of the Bidding Procedures Order, and (d) for the notices, filings and consents set forth on Schedule 5.2, the Sellers are not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any Governmental Authority in connection with the execution and delivery of this Agreement and the other Transaction Documents to which a Seller is a Party or the consummation or performance of any of the transactions contemplated hereby and thereby.

5.3     No Conflict.

Except as a result of the Bankruptcy Cases, neither the execution and delivery by any Seller of this Agreement or any other Transaction Document to which it is (or will be) a party nor after giving effect to the Sale Order and the Bidding Procedures Order, the consummation of the transactions contemplated hereby or thereby nor, after giving effect to the Sale Order and the Bidding Procedures Order, compliance by it with any of the provisions hereof or thereof will (a) conflict with or result in a violation of (i) any provision of the certificate of incorporation or bylaws (or other organizational or governing documents) of such Seller or (ii) any material Order binding upon such Seller or by which the Business or any Acquired Assets are subject or bound, (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under any license, Permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority, or (c) result in the creation of any Encumbrance (other than a Permitted Encumbrance) upon the properties or assets of such Seller being sold or transferred hereunder except, in the case of clauses (a) and (b), as would not, individually or in the aggregate, have a Material Adverse Effect.

27

5.4    <u>Real Property</u>.

(a)    <u>Owned Real Property</u>. <u>Schedule 5.4(a)</u> sets forth an accurate and complete list of the Owned Real Property. Except for Permitted Encumbrances and except as set forth on <u>Schedule 5.4(a)(i)</u>, the Sellers have good and marketable title in the Owned Real Property set forth on <u>Schedule 5.4(a)</u>. Except for the Lessor Leases, none of the Owned Real Property is subject to any lease or grant to any third-party of any right to the use, purchase, occupancy or enjoyment of such Owned Real Property or any material portion thereof required to conduct the Business. Except for Permitted Encumbrances and the applicable terms of Permits held by the Sellers and their Affiliates, the Owned Real Property is not subject to any Encumbrances (other than liens that will be removed pursuant to the Sale Order, if one is entered), which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business of the Sellers. There are no pending or, to the Sellers' Knowledge, threatened condemnation proceedings relating to any of the Owned Real Property except those which do not materially impair or restrict the current use of the Owned Real Property subject thereto. Other than as set forth on <u>Schedule 5.4(a)(ii)</u> hereto, there are no outstanding options or rights of first refusal to purchase any of the Owned Real Property or any interest therein.

(b)    <u>Lessor Leases</u>. <u>Schedule 5.4(b)</u> lists, as of the Execution Date, all material unexpired leases, subleases, licenses, sublicenses, occupancy or other agreements whereby any Seller leases, subleases, licenses or grants an interest in any Owned Real Property or Leased Real Property to a third party (the "<u>Lessor Leases</u>"). The Sellers have made available, to the extent that they are in the Sellers' possession or control, true, complete and correct copies of the Lessor Leases to Buyer, including any amendments thereto through the date hereof. Other than as set forth on <u>Schedule 5.4(b)</u> or as a result of the Bankruptcy Cases, the Sellers are not in material breach of or in default under the Lessor Leases and, to the Sellers' Knowledge, no party to any Lessor Lease has given the Sellers written notice of or, to the Sellers' Knowledge, made a claim with respect to any material breach or material default by the Sellers thereunder (other than as a result of the Bankruptcy Cases).

(c)    <u>Leased Real Property</u>. <u>Schedule 5.4(c)</u> contains a list of all Leased Real Property leased by the Sellers and used or held for use in the operation of the Business. The Sellers have made available, to the extent that they are in the Sellers' possession or control, true and complete copies of all Leases to Buyer. Other than as a result of the Bankruptcy Cases, the Sellers are not in breach of any material term or in "default" under any Lease and, to the Sellers' Knowledge, no party to any Lease has given the Sellers written notice of or made a claim with respect to any breach or default thereunder. To the Sellers' Knowledge, there are no conditions that currently exist or with the passage of time will result in a default or breach of any material term by any party to a Lease. To the Sellers' Knowledge, none of the Leased Real Property is subject to any sublease or grant to any Person of any right to the use, occupancy or enjoyment of the Leased Real Property or any portion thereof that would materially impair the use of the Leased Real Property in the operation of the Business. To the Sellers' Knowledge, the Leased Real Property is not subject to any Encumbrances (other than Permitted Encumbrances) that were placed on the Leased Real Property through the action or inaction of the Sellers and materially impact the Business' use of the Leased Real Property. To the Sellers' Knowledge, the Leased Real Property is not subject to any use restrictions, exceptions, reservations or limitations which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business. To the Sellers' Knowledge, there are no pending or threatened condemnation

28

or other proceedings or claims relating to any of the Leased Real Property. To the Sellers' Knowledge, the Leases will continue to be legal, valid, binding, enforceable and in full force and effect on the same material terms immediately following the consummation of the transactions contemplated hereby. Schedule 5.4(c) designates the Permits relating to the Sellers' operations on the Leased Real Property set forth on such schedule.

(d)      Occupancy Agreements. Schedule 5.4(d) contains a list of easements, licenses, use agreements and other occupancy agreements, including agreements which relate to the production, sharing, sale, purchase, exchange or possession of coal, relating to real property and mineral interests granted by third parties to the Sellers that are used or expected to be used in the operation of the Business (the "Occupancy Agreements"). The Sellers have made available true and complete copies of all Occupancy Agreements to Buyer. To the Sellers' Knowledge, the Sellers are not in breach of or in default under the Occupancy Agreements and no party to any Occupancy Agreement has given the Sellers written notice of or made a claim with respect to any material breach or default thereunder, nor are the Sellers aware of any condition that currently exists or with the passage of time will result in a default or breach by any party to an Occupancy Agreement.

5.5      Environmental and Health and Safety Matters.

Except as set forth on Schedule 5.5:

(a)      The Sellers have at all times during the past three (3) years complied and are in compliance in all material respects with all applicable Environmental, Health and Safety Laws with respect to the Business and the Acquired Assets;

(b)      The Sellers have not received any written or, to the Sellers' Knowledge, oral notice or report regarding any actual or alleged material violation, non-compliance, liability or potential liability regarding Hazardous Substances or Environmental, Health and Safety Laws with regard to any of the Acquired Assets or the Business, or any prior business for which the Sellers have retained liability under any Contract, in each case the subject matter of which remains unresolved;

(c)      The Real Properties do not contain, and, to the Sellers' Knowledge, have not previously contained, any Hazardous Substances in amounts or concentrations which (i) constitute a material violation of, or (ii) could reasonably be expected to give rise to material liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, under any applicable Environmental, Health and Safety Laws;

(d)      With respect to the Business and the Acquired Assets, no Seller or, to the Sellers' Knowledge, any other Person to the extent reasonably expected to give rise to material liability of any Seller, has treated, recycled, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or Released any Hazardous Substances, or owned or operated any property or facility contaminated by any Hazardous Substance, in a manner that has given or could reasonably be expected to give rise to material liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, under any applicable Environmental, Health and Safety Laws, excluding matters that have been fully resolved;

(e)      No Action is pending or, to the Sellers' Knowledge, threatened under any Environmental, Health and Safety Laws against the Sellers or with respect to the Real

Properties or the Business, nor are there any Orders outstanding under any Environmental, Health and Safety Law with respect to the Acquired Assets or the Business;

(f)     The Sellers (i) hold all Environmental Permits (each of which is in full force and effect and is not subject to appeal, except as is being contested in good faith by the Sellers by appropriate proceedings diligently conducted) required for any of their current operations or for the current ownership, operation or use of the Acquired Assets, including all Environmental Permits required for the current coal mining-related operations of the Sellers or, to the extent currently required, any pending construction or expansion related thereto; (ii) are, and have for the last three (3) years been, in material compliance with all such Environmental Permits, except as is being contested in good faith by the Sellers by appropriate proceedings diligently conducted; and (iii) have not received any written notice that the Environmental Permits will not be renewed;

(g)     None of the Real Properties have any associated direct or indirect acid mine drainage which (i) to the Sellers' Knowledge constitutes a material violation of, or (ii) could reasonably be expected to give rise to material liability under, any applicable Environmental, Health and Safety Law;

(h)     With respect to the Business and the Acquired Assets, the Sellers have not contractually assumed any material liabilities, including any material obligation for corrective or remedial action, of any other Person relating to Environmental, Health and Safety Laws;

(i)     To the Sellers' Knowledge, none of the Acquired Assets contains underground storage tanks, above-ground storage tanks, transformers or other equipment containing PCBs, underground injection wells, septic tanks or waste disposal pits (to the extent such tanks or pits constitute Acquired Assets), in each case that has given or could reasonably be expected to give rise to material liability under any applicable Environmental, Health and Safety Law; and

(j)     The Sellers have made available or provided Buyer with copies of all material environmental assessments, audits (including compliance audits), evaluations, studies, and tests in their possession relating to the Business, the Owned Real Property or the Leased Real Property.

5.6     Title to Acquired Assets.

The Sellers have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and upon entry of the Sale Order, the Sellers will thereby transfer to Buyer and Buyer will (subject to Section 2.5(b)) be vested, to the maximum extent permitted by the Bankruptcy Code, with good, valid and marketable title to, or, in the case of property leased or licensed by the Sellers, a valid leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Encumbrances, except for (a) the Assumed Liabilities and (b) Permitted Encumbrances. No Acquired Asset is subject to any agreement, written or oral, for its sale or use by any Person other than the Sellers, other than as expressly contemplated under the Leases or the Lessor Leases.

Case 18-04177-TOM11     Doc 1323     Filed 04/15/19     Entered 04/15/19 11:55:00     Desc
Main Document     Page 80 of 225

5.7 <u>Taxes</u>.

(a) The Sellers have each timely filed all income Tax and other material Tax Returns required to be filed with the appropriate Governmental Authorities (taking into account any extension of time to file granted to the Sellers). All such Tax Returns are correct and complete in all material respects and were prepared in substantial compliance with all applicable law, all material Taxes, including those relating to the Business and/or the Acquired Assets, that are due and payable, whether or not shown to be payable on such Tax Returns, have been or will be timely paid before the Closing, except for any unpaid Taxes which are specified in <u>Section 8.1</u> to be paid at the Closing or expressly assumed by Buyer herein and paid after the Closing. No examination of any such Tax Return of the Sellers is currently in progress by any Taxing Authority and no Seller has received notice of any contemplated examination of any such Tax Return and no material adjustment has been proposed in writing with respect to any such Tax Returns for the last three (3) years by any Taxing Authority.

(b) The Sellers have not received written notice of any material Tax deficiency outstanding, proposed or assessed against or allocable to the Sellers and have not executed any waiver of any statute of limitations in respect of Taxes nor agreed to any extension of time with respect to a Tax assessment or deficiency with respect to the Acquired Assets. There are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other actions for or relating to any Liability for Taxes. There is no dispute or claim concerning any Tax liability of the Sellers claimed or raised by any Taxing Authority in writing.

(c) The Sellers are not in default under, nor to the Sellers' Knowledge does there exist any condition which, with the giving of notice or passage of time would constitute a default by the Sellers under, any agreement with any Governmental Authority that provides for or results in a reduction, rebate or exemption from Taxes or any other form of Tax incentive applicable to the Business, except for such defaults or conditions which would not, individually or in the aggregate, have a Material Adverse Effect.

(d) Each Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party and all IRS Forms W-2 and Forms 1099 (or any other applicable form) required with respect thereto have been properly and timely distributed.

(e) No Seller is a party to any Tax allocation or sharing agreement. No Seller (i) has been a member of an affiliated group filing a consolidated federal income Tax Return or (ii) has any liability for the Taxes of any Person (other than a Seller) under Treas. Reg. §1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract, or otherwise.

(f) No Seller is or has been a party to any "listed transaction," as defined in Section 6707A(c)(2) of the Code and Treas. Reg. §1.6011-4(b)(2).

(g) There are no Encumbrances (other than Permitted Encumbrances) on the Acquired Assets that arose in connection with any failure to pay any Tax.

(h) No claim has been made in writing by any Governmental Authority in a jurisdiction where the Sellers do not file Tax Returns that the Sellers are or may be subject to taxation by that jurisdiction.

31

(i)　　No power of attorney with respect to Taxes has been executed or filed with any Taxing Authority by or on behalf of any of the Sellers that will remain in effect after the Closing Date.

5.8　　Legal Proceedings.

Except for the Bankruptcy Cases (and proceedings related thereto), there is no material Proceeding or Order pending, outstanding or, to the Sellers' Knowledge, threatened against or related to the Acquired Assets, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor, to the Sellers' Knowledge, are there any investigations relating to the Acquired Assets pending or, to the Sellers' Knowledge, threatened by or before any arbitrator or any Governmental Authority, which, if determined adversely, would be material to the Acquired Assets, taken as a whole.

5.9　　Compliance with Legal Requirements; Permits.

(a)　　Other than with respect to Permits required under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which Permits are addressed in Section 5.5, the Sellers hold all of the material Permits necessary for the current operation and conduct of the Business and the Acquired Assets in compliance with Legal Requirements, the absence of which would be immaterial to the operation of the Business or the Acquired Assets from and after the Closing.

(b)　　Schedule 5.09(b) sets forth a true and complete list of (A) all Permits (including Environmental Permits and Mining Permits) held by the Sellers or any of their Affiliates in the operation of the Business and Acquired Assets in the State of West Virginia, together with a description of the permitted property, facility or operation, together with a true and complete list of all pending applications for additional Permits, renewals of existing Permits, or amendments to existing Permits held by the Sellers, which have been submitted to any Governmental Authority or other entity by any Seller or any of its Subsidiaries applicable to the operation of the Business and Acquired Assets in West Virginia, and (B) the applicable surety bonds (or other financial assurances) and the amount of the surety bonds (or other financial assurances) under such Permits, in each case, as amended, supplemented and modified through the Execution Date.

(c)　　The Permits set forth on Schedule 2.1(g) are all of the Permits held by the Sellers necessary for the current operation and conduct of the Business and the Acquired Assets, the absence of which would be reasonably expected to adversely affect the operation of the Business or the Acquired Assets from and after the Closing. Other than with respect to Permits required under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which Permits are addressed in Section 5.5, all such Permits are final, unappealed, valid, in good standing and in full force and effect and no Seller is in default under or in violation of any such Permit, except where such default, or failure to be final, unappealed, valid, in good standing and in full force and effect would not reasonably be expected to be material to the Business.

(d)　　Other than with respect to notices issued under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which matters are addressed in Section 5.5, the Sellers have conducted the Business for the past twelve (12) months and currently own and operate the Acquired Assets in accordance, in all material respects, with all Legal Requirements, Orders and Permits applicable to the Sellers and the Acquired Assets

32

during such period, and the Business is in compliance in all material respects with all applicable Legal Requirements, Orders and Permits (including any anti-bribery Legal Requirements) and has obtained all approvals necessary for owning and operating its assets and has made all necessary filings with all Governmental Authorities having jurisdiction necessary for owning and operating the Acquired Assets, and there are no Orders outstanding under any Mining Law or MSHA with respect to the Real Properties or the Business.

(e)     Other than with respect to notices issued under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which matters are addressed in Section 5.5, neither the Sellers, nor to the Sellers' Knowledge, any of their Representatives have received, within the past twelve (12) months, any written notice or other communication from any Governmental Authority that alleges that the Business is not in compliance with any Legal Requirement, Order or Permit applicable to the Business or the operations or properties of the Business or the Acquired Assets or that threatens or states the intention on the part of any issuing authority to revoke, cancel, suspend or modify any Permit necessary for the current operation and conduct of the Business and the Acquired Assets (except with respect to regular periodic expirations and renewals thereof). The Sellers are in material compliance with the Permits. No suspension, revocation or cancellation of any of the Permits is threatened or to the Knowledge of the Sellers contemplated, except with respect to regular periodic expirations and renewals thereof, which renewals no Seller or any Subsidiary of such Seller has reason to believe will not be granted.

(f)     Except as would not be material to the Business or the Acquired Assets or to the transfer of any Transferred Permit: (i) no Seller has had any Permits that are necessary for the operation and conduct of the Business and the Acquired Assets appealed, denied, revoked, restricted or suspended during the past twelve (12) months; (ii) no Seller is currently a party to any Proceeding involving the possible appeal, denial, revocation, restriction or suspension of any Permits that are necessary for the current operation and conduct of the Business and the Acquired Assets or any of the privileges granted thereunder (except where the obligation to hold such a Permit is being contested in good faith by appropriate proceedings diligently conducted or is excused by the Bankruptcy Court); and (iii) no Seller, nor any officer or director of any Seller, nor to the Sellers' Knowledge any other Person listed on or connected to a Permit is "permit blocked" on the Applicant Violator System established pursuant to the SMCRA (or any applicable state system) (the "Applicant Violator System") by any Governmental Authority.

5.10    Labor Matters.

(a)     None of the Sellers are party to or subject to any collective bargaining agreements, works council agreements, labor union contracts, trade union agreements, and other agreements (each a "Collective Bargaining Agreement") with any union, works council, or labor organization (each a "Union" and collectively "Unions").

(b)     (i) In the past three (3) years, no Union or group of Employees or former Employees has (A) to the Sellers' Knowledge, sought to organize any employees for purposes of collective bargaining, (B) made a demand for recognition or certification as an employee representative for purposes of collective bargaining, (C) sought to bargain collectively with any of the Sellers, or (D) filed a petition for recognition with any Governmental Authority; (ii) as of this date, no Collective Bargaining Agreement is being negotiated by any of the Sellers; and (iii) in the past three (3) years there have been no actual or, to Sellers' Knowledge, threatened

33

strikes, lockouts, material slowdowns or work stoppages, boycotts, handbilling, picketing, walkouts, demonstrations, leafleting, sit-ins, sick-outs, or other forms of organized labor disruption with respect to any of the Sellers.

(c)     Schedule 5.10(c) sets forth a true, complete and accurate list of the name, title, employment status, leave status, union affiliation (if any), wage rate and place of employment of all Employees.

(d)     (i) Within the past three (3) years, the Sellers have not failed to provide advance notice of layoffs or terminations as required by the Worker Adjustment and Retraining Notification Act of 1988, and including any similar state or local Legal Requirement (the "WARN Act"), or any applicable Legal Requirements for employees outside the United States, regarding the termination or layoff of employees or have incurred any material liability or material obligation under such Legal Requirements; (ii) within the past three (3) years, the Sellers have been in material compliance with all applicable Legal Requirements relating to labor and employment, including but not limited to all Legal Requirements relating to employment practices; the hiring, promotion, assignment, and termination of employees; discrimination; sexual harassment; equal employment opportunities; disability; labor relations; wages and hours; FLSA, classification of independent contractors, hours of work; payment of wages; immigration; workers' compensation; employee benefits; background and credit checks, working conditions; occupational safety and health; family and medical leave; data privacy and data protection; or employee terminations; (iii) except pursuant to procedures established in connection with the Bankruptcy Cases, there are no pending or, to the Sellers' Knowledge, threatened, lawsuits, grievances, unfair labor practice charges, arbitrations, charges, investigations, hearings, actions, claims, or proceedings (including any administrative investigations, charges, claims, actions, or proceedings), against the Sellers brought by or on behalf of any applicant for employment, any current or former Employee, representative, agents, consultant, independent contractor, subcontractor, or leased employee, volunteer, or "temp" of the Sellers, or any group or class of the foregoing, any Governmental Authority, any person alleging to be a current or former Employee, or any group or class of the foregoing, alleging violation of any labor or employment Legal Requirements, breach of any Collective Bargaining Agreement, breach of any express or implied contract of employment, wrongful termination of employment, or any other discriminatory, wrongful, or tortious conduct in connection with the employment relationship; (iv) to Sellers' Knowledge, no Employee of any Seller has in the past three (3) years been or is being investigated in connection with any misconduct, nor subject to any disciplinary action in connection with such misconduct, that could reasonably be expected to cause any material damage to the reputation or business of the Sellers or the Employees; (v) to the Sellers' Knowledge, no employee of any Seller has in the past three (3) years engaged in any conduct or cover-up of such conduct, or aided or assisted any other person or entity to engage in any conduct that could cause or has caused any material damage to the reputation or business of the Sellers or its Employees, including but not limited to any conduct constituting sexual misconduct, harassment (including sexual harassment), or discrimination; and (vi) each of the Employees has all work permits, immigration permits, visas, or other authorizations required by Legal Requirements for such Employee given the duties and nature of such employee's employment.

5.11    Employee Benefits.

(a)    Schedule 5.11(a) sets forth a true and complete list of each material Benefit Plan. For purposes of this Agreement, "Benefit Plan" shall mean any "employee benefit plan" within the meaning of Section 3(3) of ERISA (including any Multiemployer Plan) and any plan, program, policy, practice, arrangement, Contract or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, compensation, benefit, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change in control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller(s) is the owner, the beneficiary, or both), Section 125 of the Code "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, policy, practice, arrangement, Contract or agreement, whether written or oral, including any other employee benefit plan, agreement, program, policy, arrangement, Contract or practice, including any payroll practice, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated hereby or otherwise), in each case, (x) under which any current or former officer, director, employee, leased employee or consultant (or any of their respective beneficiaries) of any of the Sellers or any of their Subsidiaries has any present or future right to benefits, (y) which any of the Sellers or any of their Subsidiaries is a party to or any of the Sellers or any of their Subsidiaries sponsors, maintains, contributes to, or has any obligation to sponsor, maintain or contribute to, or (z) pursuant to, under or with respect to which any of the Sellers or any of their Subsidiaries has or has any direct or indirect Liability, whether contingent or otherwise, including by reason of their affiliation with any ERISA Affiliate.

(b)    (i) Each Benefit Plan has been established, operated and administered in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other Legal Requirements; (ii) with respect to each Benefit Plan, all reports, returns, notices and other documentation that are required to have been filed with or furnished to the Internal Revenue Service (the "IRS"), the United States Department of Labor or any other Governmental Authority, or to the participants or beneficiaries of such Benefit Plan have been filed or furnished on a timely basis in all material respects; and (iii) each Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Code is so qualified and has received a favorable determination letter from the IRS or may rely on a favorable opinion letter issued by the IRS.

5.12    Sellers' Intellectual Property.

(a)    Schedule 5.12(a) sets forth a true and complete list of all U.S. and foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; and (iii) registered Copyrights and pending applications for Copyrights, in each case which are owned by a Seller as of the Execution Date and which are material to the Acquired Assets. Except as set forth on Schedule 5.12(a), the Sellers are the sole owners of all of the applications and registrations set forth on Schedule 5.12(a), and all such applications and registrations are in effect and subsisting.

(b)    Except as disclosed on Schedule 5.12(b), and except as would not, individually or in the aggregate, have a Material Adverse Effect, to the Sellers' Knowledge, (i) the conduct of the Business by the Sellers as currently conducted (including the products and services

35

currently sold or provided by the Sellers) does not infringe or otherwise violate any Person's intellectual property rights, and no such claims are pending or threatened in writing against the Sellers, and (ii) no Person is infringing or otherwise violating any Intellectual Property owned by the Sellers, and no such claims are pending or threatened in writing against any Person by the Sellers.

(c)     To the Sellers' Knowledge, the Acquired Assets and any rights provided to Buyer pursuant to the Transaction Documents include all material third party intellectual property rights licensed to the Sellers that are required to conduct the Business in a substantially similar manner as it is presently being conducted by the Sellers, except such intellectual property rights as exist under the Excluded Contracts.

5.13    Contracts.

Schedule 5.13 sets forth a complete list, as of the date hereof, of all Material Contracts relating to the Business (including Leases, Lessor Leases and Occupancy Agreements) to which any Seller is a party and the Cure Costs with respect thereto. Except as set forth on Schedule 5.13, no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract. Each Contract is in full force and effect and is a valid and binding obligation of each Seller party thereto in accordance with its terms and conditions, in each case except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, (y) as set forth on Schedule 5.13 and (z) as would not, individually or in the aggregate, have a Material Adverse Effect. Except as arising as a consequence of the Bankruptcy Cases, upon entry of the Sale Order and payment of the Cure Costs, (i) no Seller will be in breach or default of its obligations under any Assumed Contract, (ii) no condition exists that with notice or lapse of time or both would constitute a default by any Seller under any Assumed Contract and (iii) to the Sellers' Knowledge, no other party to any Assumed Contract is in breach or default thereunder, except in the case of clauses (i), (ii) and (iii) for any breaches or defaults that would not, individually or in the aggregate, have a Material Adverse Effect. The Cure Cost amounts calculated by the Sellers and specified in the Cure Notices submitted by the Sellers with respect to each of the Assumed Contracts and each Contract listed or described on Schedule 5.13 to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order are, to the Sellers' Knowledge, true and correct.

5.14    Insurance.

Schedule 5.14 sets forth a true and complete list of all insurance policies held by the Sellers covering the property, assets, Employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage, but excluding any policies relating to any Benefit Plan that are set forth on Schedule 5.11(a)). Such policies are in full force and effect (subject to periodic renewals thereof). Except as set forth on Schedule 5.14, the Sellers have paid all premiums on such policies due and payable prior to the Execution Date, or, if not yet due, have properly accrued for such payables. Since the Petition Date, to the Sellers' Knowledge, the Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.

36

5.15    Brokers or Finders.

The Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

5.16    Affiliate Interests.

Other than travel advances entered into in the Ordinary Course of Business of the Sellers, all Contracts between any Seller and any Affiliate of any Seller (but not including another Seller) are listed on Schedule 5.16. Other than employment arrangements, compensation benefits and travel advances entered into in the Ordinary Course of Business of the Sellers, to the Sellers' Knowledge, no such Affiliate of any Seller has any direct or indirect interest in, or controls or is a director, officer, employee or partner of, or consultant to, or lender to or borrower from or has the right to participate in the profits of, (i) any Person which does business with any Seller or is competitive with the Business in any material respect, or (ii) any material property, asset or right which is used by any Seller. All Indebtedness of any such Affiliate to any Seller, and all Indebtedness of any Seller to any such Affiliate of any Seller, is listed on Schedule 5.16.

5.17    [Reserved].

5.18    Undue Influence.

In connection with the operation of the Business, no Seller or, to the Sellers' Knowledge, any director, officer, agent, employee or Affiliate of the Sellers, has taken any action, directly or indirectly, with respect to the Business that would result in a violation of the Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder (the "FCPA"). The Sellers, and, to the Sellers' Knowledge, their Affiliates, have conducted the Business in compliance with the FCPA in all material respects and maintain procedures which are reasonably expected to ensure compliance therewith.

5.19    Financial Statements.

The Sellers have made available to Buyer the unaudited consolidated balance sheet and cash flow statement of the Company and its Subsidiaries as of September 30, 2018, and the related unaudited consolidated statement of comprehensive income for the 9-months ended September 30, 2018 (the "Unaudited Financial Statements"). The Unaudited Financial Statements have been prepared in accordance with GAAP consistently applied in accordance with the Sellers' past practice except for the absence of footnotes and customary year-end adjustments. The Unaudited Financial Statements (i) are true, correct and complete in all material respects, (ii) are in accordance in all material respects with the books and records of the Sellers, and (iii) fairly present in all material respects the financial position of the Sellers at the dates specified and the results of their operations for the period covered. The copies of the Unaudited Financial Statements delivered to Buyer are true, correct and complete copies.

5.20    [Reserved] .

5.21    Mining.

37

(a)     The Sellers have, in the amounts and forms required pursuant to applicable Mining Laws and MSHA, obtained all performance bonds and surety bonds, or otherwise provided any financial assurance as (i) required under the applicable Mining Permits or Mining Laws and MSHA for Reclamation of land, water or other natural resources at any current mines, (ii) required pursuant to any applicable Mining Permit or Mining Laws and MSHA to mitigate any actual or potential environmental impact of such mines, or (iii) otherwise obtained in the Ordinary Course of Business of the Sellers (collectively, "Mining Financial Assurances"), except for such Mining Financial Assurances that do not exceed $1,000,000 in the aggregate. Schedule 5.21(a) sets forth a list of all such Mining Financial Assurances maintained by the Sellers. The Sellers have posted or otherwise provided all Mining Financial Assurances that have been requested in writing by the applicable Governmental Authorities in respect of any applicable Permits and Legal Requirements having to do with Reclamation in connection with the Sellers' mining operations as currently conducted, subject to the discretion of any applicable Governmental Authority to require additional or supplemental Mining Financial Assurances from time to time.

(b)     To the Sellers' Knowledge, all Reclamation performed by or on behalf of any Seller has been performed in a manner in compliance in all material respects with all Legal Requirements and meets in all material respects the requirements of the applicable Mining Permit and any associated mine Reclamation requirements of any applicable Governmental Authority. The liability for mine closing and Reclamation obligations recorded on the most recent balance sheet of the Sellers provided to Buyer has been properly accrued in accordance with the requirements of Financial Accounting Standards Board Codification Topic 410, Asset Retirement and Environmental Obligations, formerly known as Financial Accounting Standard No. 143 ("FASB 410"), and the amount of such liability is equal to or in excess of the amount of such obligations, determined on the basis of the Sellers' actual historic Reclamation and closure costs and currently planned mine life and escalated for inflation, in accordance with FASB 410 and applicable Legal Requirements. All Mining Financial Assurances have been approved as adequate by the required Governmental Authority to complete Reclamation in accordance with all applicable Permits and Legal Requirements.

5.22    MSHA; OSHA.

For the past eighteen (18) months, except for fully paid, discharged and settled citations and notices of violation by MSHA or other Governmental Authority, the Sellers, with respect to the Business and Acquired Assets, have conducted their respective business and operations, and their respective assets have been maintained, in compliance in all material respects with MSHA or OSHA, as applicable. There are no investigations pending or, to the Sellers' Knowledge, threatened by any Governmental Authority or other third Person that would result in the imposition of any material Liability on any Seller pursuant to MSHA or OSHA. The Sellers do not owe any material assessments, penalties, fines, liens, charges, surcharges, nor are there any other material amounts due or owing pursuant to MSHA or OSHA, and there have been no imminent danger orders, unwarrantable failure orders, failure to abate orders, or cessation orders, notices of a pattern of violations, or material assessments, under MSHA or OSHA during the previous eighteen (18) months with respect to the Business. Schedule 5.22 sets forth all reports of any MSHA or OSHA audits with respect to the Business performed within the previous eighteen (18) months by any Person (including the Seller).

5.23    Coal Act; Black Lung Act.

(a)     The Sellers, with respect to the Business and Acquired Assets, and their "related persons" (as defined in the Coal Act) are in compliance in all material respects with the Coal Act and any regulations promulgated thereunder except which compliance is being contested in good faith by appropriate proceedings diligently conducted or excused by the Bankruptcy Court or the Bankruptcy Code, and none of the Sellers or their "related persons" (as defined in the Coal Act) has any Liability under the Coal Act, except as disclosed in the Unaudited Financial Statements or which would not, individually or in the aggregate, have a Material Adverse Effect, or with respect to premiums or other material payments required thereunder which have been paid when due, or which Liability is being contested in good faith by appropriate proceedings diligently conducted or the current payment of which is excused by the Bankruptcy Court or the Bankruptcy Code.

(b)     The Sellers are in compliance in all material respects with the Black Lung Act except which compliance is being contested in good faith by appropriate proceedings diligently conducted or excused by the Bankruptcy Court or the Bankruptcy Code, and the Sellers have not incurred any Black Lung Liability or assumed any other Black Lung Liability, except as disclosed in the Unaudited Financial Statements or which would not, individually or in the aggregate, have a Material Adverse Effect, or with respect to premiums, contributions or other material payments required thereunder which have been paid when due or which Black Lung Liability is being contested in good faith by appropriate proceedings diligently conducted or the current payment of which is excused by the Bankruptcy Court.

5.24    Warranties Exclusive.

EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE 5 (AS MODIFIED BY THE DISCLOSURE SCHEDULES) OR IN THE BILL OF SALE AND THE ASSUMPTION AGREEMENT, THE SELLERS MAKE NO REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THEIR ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR THE BUSINESS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. NEITHER THE SELLERS NOR ANY OTHER PERSON, DIRECTLY OR INDIRECTLY, HAS MADE OR IS MAKING, ANY REPRESENTATION OR WARRANTY, WHETHER WRITTEN OR ORAL, REGARDING THE PRO-FORMA FINANCIAL INFORMATION, FINANCIAL PROJECTIONS OR OTHER FORWARD-LOOKING STATEMENTS OF THE SELLERS.

# ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Sellers as follows:

6.1     Organization and Good Standing.

Buyer is a corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

39

### 6.2 Authority; Validity; Consents.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the other Transaction Documents by Buyer and the consummation by Buyer of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Except as required to comply with the HSR Act or as set forth on <u>Schedule 6.2</u>, Buyer is not or will be required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, registrations, declarations or filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, materially affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

### 6.3 No Conflict.

Neither the execution and delivery by Buyer of this Agreement or the Transaction Documents to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof (a) conflict with or result in a violation of (i) any provision of the organizational documents of Buyer or (ii) any judgment, order, writ, injunction, decree, statute, law, ordinance, rule or regulation in any material respect binding upon Buyer or (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under, (A) any note, bond, mortgage, indenture, deed of trust, contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect and that, in each case, is material to the business of Buyer, or (B) any material license, permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority.

### 6.4 Brokers or Finders.

Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated hereby for which any Seller (or any affiliate of any Seller) is or will become liable, and Buyer shall hold harmless and indemnify the Sellers and their Affiliates from any claims with respect to any such fees or commissions.

6.5     Legal Proceedings.

There is no Proceeding or Order pending against, or to Buyer's Knowledge, threatened against or affecting, Buyer before any arbitrator or any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated hereby and the other Transaction Documents or which would or would reasonably be expected to impair Buyer's ability to consummate the transactions contemplated hereby and the other Transaction Documents.

6.6     Qualification.

(a)     To Buyer's Knowledge, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and/or its Affiliates not to qualify as a "good faith" purchaser under the Bankruptcy Code.

(b)     As of the Closing, Buyer and/or each relevant Buyer Designee, as applicable, will be capable of satisfying requisite conditions contained in the Bankruptcy Code with respect to the Assumed Contracts.

(c)     As of the Closing, Buyer and/or each relevant Buyer Designee, as applicable, (i) will be eligible to take transfer of, or obtain a replacement for, the Transferred Permits and the General Permits (ii) will not be listed or "permit blocked" on the Applicant Violator System and/or (iii) will not have been denied any application for any Mining Permit or other Governmental Authorization, other than any denial for violations that may reasonably be expected to be cured by the time of such transfer or obtaining of Permits as contemplated by Section 7.7.

6.7     No Other Representations or Warranties; Condition of the Business; Buyer's Reliance.

Buyer acknowledges that neither the Sellers nor any other Person is making, and Buyer is not relying on, any representations or warranties whatsoever, statutory, expressed or implied, written or oral, at law or in equity, beyond those expressly made by the Sellers in Article 5 hereof (as modified by the Disclosure Schedules). Buyer acknowledges that, except as expressly set forth in this Article 6 (as modified by the Disclosure Schedules), neither the Sellers nor any other Person has, directly or indirectly, made any representation or warranty, statutory, expressed or implied, written or oral, at law or in equity, as to the accuracy or completeness of any information that the Sellers furnished or made available to Buyer and its Representatives in respect of the Business, and the Sellers' operations, assets, stock, Liabilities, condition (financial or otherwise) or prospects. Buyer acknowledges that neither the Sellers nor any other Person, directly or indirectly, has made, and Buyer has not relied on, any representation or warranty, whether written or oral, regarding the pro-forma financial information, financial projections or other forward-looking statements of the Sellers, and Buyer will make no claim with respect thereto. Buyer acknowledges that the Acquired Assets are being transferred on an "AS IS, WHERE IS" basis.

6.8     Information.

Buyer has conducted such investigations of the Sellers, the Acquired Assets and the Assumed Liabilities as it deems necessary and appropriate in connection with the execution and delivery of this Agreement and the other Transaction Documents to which Buyer is a party and the consummation of the transaction contemplated hereby and thereby. None of the Sellers or

41

any other Person (including any officer, director, member or partner of the Sellers or any of their respective Affiliates) shall have or be subject to any liability to Buyer, or any other Person, resulting from Buyer's use of any information, documents or material made available to Buyer in any "data rooms," management presentations, due diligence or in any other form in expectation of the transactions contemplated hereby or by the other Transaction Documents.

## ARTICLE 7

### ACTIONS PRIOR TO THE CLOSING DATE

7.1     Access and Reports; Confidentiality.

(a)     During the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of Article 11 or entry into an agreement with respect to an Alternative Transaction, the Sellers shall (i) afford Buyer and its Representatives reasonable access, upon reasonable notice, to its personnel, properties, books, Permits, Contracts and records, and furnish promptly to Buyer all available information concerning the Acquired Assets, the Business, properties, any Benefit Plans and personnel as may be reasonably requested in connection with the transactions contemplated hereby; (ii) furnish to Buyer such financial and operating data and other information relating to the Sellers, the Business and the Acquired Assets as may be reasonably requested; (iii) permit Buyer to make such reasonable inspections and, at Buyer's sole cost and expense, copies thereof as Buyer may require and (iv) instruct the executive officers and senior business managers, employees, counsel, auditors and financing advisors of the Sellers to reasonably cooperate with Buyer and its Representatives regarding the same; provided, that any such access shall be conducted consistent with and not in violation of the Bidding Procedures Order and in a manner not to unreasonably interfere with the Business. All requests for information made pursuant to this Section 7.1 shall be directed to Kevin Nystrom, AlixPartners, 1114 Avenue of the Americas, 41st Floor, New York or other person as designated by such person or the Sellers. Notwithstanding the foregoing, (A) Buyer and its Representatives shall not have access to personnel records of the Sellers relating to individual performance or evaluation records, medical histories or other information which in the Sellers' good faith opinion is sensitive or the disclosure of which could subject a Seller to risk of liability and (B) Buyer and its Representatives shall not conduct or cause to be conducted any sampling, testing or otherwise surface or subsurface invasive investigation of the air, soil, surface water, groundwater, building materials or other environmental media related to the Real Property, the Acquired Assets or the Business. No investigation pursuant to this Section 7.1 or by Buyer or its Representatives at any time prior to or following the date hereof shall affect or be deemed to modify any representation or warranty made by the Sellers herein.

(b)     Notwithstanding the foregoing, but subject in all respects to the Bidding Procedures Order, this Section 7.1 shall not require the Sellers to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of the Company, is reasonably likely to result in any violation of any Legal Requirement or any Contract to which the Company or any Seller is a party or cause any privilege (including attorney-client privilege) or work product protection that the Sellers would be entitled to assert to be undermined or waived with respect to such information or (ii) if the Company or any Seller, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto;

42

provided, that, in the case of clause (i), the Parties shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Legal Requirement or Contract or be reasonably likely to cause such privilege or work product protection to be undermined with respect to such information or (B) could reasonably (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives of Buyer could be provided access to such information.

(c)     Buyer shall, and shall use its best efforts to cause its Affiliates and Representatives to, hold all confidential documents and information concerning the Business furnished to Buyer or its Affiliates in connection with the transactions contemplated hereby and the other Transaction Documents in accordance with the confidentiality provisions of the DIP Credit Agreement.

7.2     Operations Prior to the Closing Date.

The Sellers covenant and agree that, except (v) as expressly contemplated hereby, (w) as disclosed on Schedule 7.2, (x) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), (y) as otherwise required by Legal Requirements, or (z) in the Ordinary Course of Business, after the Execution Date and prior to the Operations Commencement Date:

(a)     The Sellers shall:

(i)     maintain their books, accounts and records in the Ordinary Course of Business of the Sellers;

(ii)     cause any of their current property or casualty insurance policies with respect to the Business or any of the other Acquired Assets not to be canceled or terminated or any of the coverage thereunder to lapse unless, simultaneously with such termination, cancellation or lapse, replacement, policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect; and

(iii)     except with respect to an Alternative Transaction, use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of the Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation.

(b)     The Sellers shall not:

(i)     assume, reject or assign any Material Contract other than pursuant to Section 2.5; or

(ii)     enter into or renew any Assumed Contract (other than automatic renewals of Assumed Contracts in the Ordinary Course of business in accordance with the terms thereof as in effect on the Execution Date) without the consent of Buyer and the approval of the Bankruptcy Court in accordance with applicable sections of the Bankruptcy Code.

Case 18-04177-TOM11     Doc 1323     Filed 04/15/19     Entered 04/15/19 11:55:00     Desc
Main Document     Page 93 of 225

7.3     Regulatory Matters; Cooperation.

(a)     [Reserved].

(b)     The Sellers, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to obtain (and Buyer shall cause its Subsidiaries to use commercially reasonable efforts to obtain), at the earliest practicable date, all necessary Governmental Authorizations and all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and take all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority. In addition to such actions and the actions to be taken under Section 7.3(a), the Sellers, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to take (and Buyer shall cause its Subsidiaries to use commercially reasonable efforts to obtain), or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using reasonable best efforts to accomplish the following: (i) taking all reasonable acts necessary to cause the conditions precedent set forth in Article 9 and Article 10 to be satisfied, (ii) defending of any Proceedings challenging this Agreement or the consummation of the transactions contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed, (iii) taking all acts reasonably necessary in connection with meeting with any Governmental Authority regarding the transferring of the Transferred Permits, and (iv) executing and delivering any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(c)     The Sellers, on the one hand, and Buyer, on the other hand, (i) shall promptly inform each other of any material communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto. In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to restrictions under any Legal Requirements, each of Buyer, on the one hand, and the Sellers, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Business) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

44

7.4    Tax Cooperation.

Prior to the Closing, the Sellers and Buyer agree to furnish or cause to be furnished to the other, upon request, as promptly as practicable, information and assistance relating to the Acquired Assets, including access to books and records (including any Tax Records), as is reasonably necessary in connection with (a) the preparation or filing of any Tax Return by Buyer or the Sellers, (b) the making of any Tax election by Buyer or the Sellers, (c) Buyer or the Sellers' claim for any Tax Refund, (d) the determination of liability for Taxes, and (e) any audit, examination or other proceeding in respect of Taxes related to the Acquired Assets. Sellers and their respective Affiliates shall (i) abide by all record retention agreements entered into with any Taxing Authority, and (ii) give Buyer thirty (30) days' written notice prior to transferring, destroying or discarding any Tax Records and, if Buyer so requests, shall allow Buyer to take possession of such Tax Records.

7.5    Bankruptcy Court Matters.

(a)    Filing of Sale Order. On or prior to April 1, 2019 at 12:00 p.m. prevailing Central Time (or such later date as agreed in writing by all of the Parties hereto), the Sellers shall have filed with the Bankruptcy Court a proposed form of Sale Order, in form and substance acceptable to the Sellers and Buyer.

(b)    Hearing. On or prior to April 3, 2019, the Bankruptcy Court shall have held a hearing to consider approval of the Sale Order, in form and substance acceptable to the Sellers and Buyer.

(c)    Sale Order. On or prior to April 5, 2019 (or such later date as agreed in writing by all of the Parties hereto), the Bankruptcy Court shall have entered the Sale Order, in form and substance acceptable to the Sellers and Buyer.

(d)    Bankruptcy Filings. From and after the Execution Date and until the Closing Date, the Sellers shall deliver to Buyer, at least two (2) Business Days in advance of the Sellers' filing or submission thereof, drafts of any and all material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement for Buyer's prior review and comment, including any Tax motions, and such filings shall be acceptable to Buyer in its reasonable discretion to the extent they relate to the Acquired Assets, any Assumed Liabilities or any of Buyer's obligations hereunder. The Sellers agree to diligently prosecute the entry of the Bidding Procedures Order and the Sale Order as provided herein. In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed, the Sellers shall use their best efforts to defend such appeal. The Sellers shall comply with all notice requirements (i) of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bidding Procedures Order or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

7.6    Updates. Until the Closing Date, the Sellers shall as promptly as reasonably practicable deliver any new schedules or supplement or amend the Disclosure Schedules with respect to any matter that, if existing, occurring or known at the Execution Date, would have been required to be set forth or described in the Disclosure Schedules. Any such supplement or amendment shall be deemed to modify the Disclosure Schedules for purposes of this Agreement except to the extent the matters set forth in such supplement or amendment are material to the Acquired Assets or the Business. Notwithstanding anything in this Section 7.6 to the contrary, in

45

no event will the Sellers be permitted to supplement or amend any Disclosure Schedules other than Disclosure Schedules required under Article 5 without the prior written consent of Buyer and any such supplements or amendments will not be deemed to modify any Schedules other than the Disclosure Schedules required under Article 5.

7.7     Surety Bonds; Permits.

(a)     [Reserved]

(b)     Acquired Assets in West Virginia.

(i)     Promptly after the Execution Date and by no later than the date required by Legal Requirements or the appropriate Governmental Authority:

(1)     Unless one already has been issued to Buyer, Buyer shall file an application with the West Virginia Surface Mine Board for a license to engage in coal mining operations in the State of West Virginia ("West Virginia Mining License"), in a format and manner acceptable to the West Virginia Surface Mine Board, along with all applicable fees, and shall have obtained such West Virginia Mining License, and continue to hold the same, on and as of the Closing Date and thereafter until the transfer to Buyer of all of the West Virginia Mining Permits (as hereinafter defined) is completed;

(2)     Buyer shall use commercially reasonable efforts to provide, not later than thirty (30) Business Days following the Execution Date, evidence of appropriate financial commitments, in form, manner and amount acceptable to the Sellers and the West Virginia Surface Mine Board, for replacement surety bonds or other financial assurances necessary to allow the transfer of the West Virginia Mining Permits from the Sellers to Buyer, and in any event, Buyer shall provide such evidence at or before the Closing; and

(3)     Buyer shall use commercially reasonable efforts to provide, no later than thirty (30) Business Days following the Execution Date, evidence of appropriate financial commitments, in form, manner and amount acceptable to the Sellers and the West Virginia Department of Environmental Protection, for replacement surety bonds or other financial assurances necessary to allow the transfer of the Permits for the Gas Wells from the Sellers to Buyer, and in any event, Buyer shall provide such evidence at or before the Closing.

(4)     Buyer will take all actions necessary to become compliant with the representations set forth in Section 6.6(c).

(ii)     As promptly as reasonably practicable after the Execution Date and by no later than the date required by Legal Requirements or the appropriate Governmental Authority:

(1)     Buyer and the Sellers (if applicable) shall file an application for (A) a transfer of all Transferred Permits and (B) obtaining all applicable Replacement Permits, in each case to engage in mining operations at particular locations in the State of West Virginia with the West Virginia Surface Mine Board (the "West Virginia Mining Permits"), in a format and manner acceptable to the West Virginia Surface

46

Mine Board, along with all applicable fees and shall publish notice of such applications in accordance with the applicable Legal Requirements;

(2)     Buyer and the Sellers (if applicable) shall file with the West Virginia Department of Environmental Protection an application for (A) a transfer of Transferred Permits issued to the Sellers by, and (B) obtaining all applicable Replacement Permits from, the West Virginia Department of Environmental Protection, in a format and manner acceptable to the West Virginia Department of Environmental Protection, along with all applicable fees;

(3)     Buyer and the Sellers (if applicable) shall file with the West Virginia Department of Environmental Protection an application for (A) a transfer of any Transferred Permits and (B) obtaining all applicable Replacement Permits, in each case relating to the emission of pollutants into the air, in a format and manner acceptable to the West Virginia Department of Environmental Protection, along with all applicable fees;

(4)     Buyer and the Sellers (if applicable) shall file with the West Virginia Department of Environmental Protection of West Virginia written notification of the execution of this Agreement for Buyer to become the new operator for any applicable well or wells, and all associated facilities and equipment, in a format and manner acceptable to the West Virginia Department of Environmental Protection, along with all applicable fees;

(5)     Buyer and the Sellers (if applicable) shall file with the Federal Explosives Licensing Center an application for each applicable Federal Explosives license or Permits, in a format and manner acceptable to the Federal Explosives Licensing Center, along with all applicable fees; and

(6)     The Sellers, on the one hand, and Buyer, on the other hand, shall use commercially reasonable efforts to properly file all documents or applications required to transfer, to amend, or to acquire all other Transferred Permits and Replacement Permits necessary for the operation and conduct of the Business or Acquired Assets in West Virginia, and Buyer and the Sellers shall reasonably cooperate in all actions necessary to seek and obtain approval for the transfer thereof.

(iii)     Buyer and the Sellers shall, and shall cause their Subsidiaries to, (A) take all actions and do, or cause to be done, all things necessary or desirable under the applicable Legal Requirements with the appropriate Governmental Authority to put in place, to transfer, to amend, or to acquire all Transferred Permits and Replacement Permits that are necessary for the operation and conduct of the Business or Acquired Assets in West Virginia by or on the Closing Date, unless the applicable Legal Requirements regarding such a Permit require certain actions to be taken upon or after the Closing, and, in that event, Buyer, at Buyer's sole cost and expense from and after the Closing, shall take, or cause its Subsidiaries to take, all actions and do, or cause to be done, all things necessary or desirable under the applicable Legal Requirements with the appropriate Governmental Authority which can only be taken or done after the Closing to put in place, to transfer, to amend, or to acquire such remaining Permits as promptly as reasonably

47

practicable after the Closing; and (B) take all actions and do, or cause to be done, all things necessary or desirable under the applicable Legal Requirements to put in place with the West Virginia Surface Mine Board as promptly as commercially reasonably possible after the Closing, financial assurances necessary to (I) transfer the West Virginia Mining Permits that relate to Transferred Permits from the Sellers or (II) obtain the West Virginia Mining Permits that relate to Replacement Permits, and to obtain the release of the Sellers of the financial assurances previously placed by the Sellers with respect thereto. The Sellers agree to provide, at Buyer's sole cost and expense from and after the Closing, any reasonable cooperation as reasonably requested by Buyer to bring about the transfer of the West Virginia Mining Permits or the issuance of new such permits (including Replacement Permits) to Buyer, as applicable. From and after the Closing, Buyer shall use commercially reasonable efforts to pursue the transfer of the West Virginia Mining Permits or issuances of new West Virginia Mining Permits (including the Replacement Permits) to Buyer as promptly as possible.

        (1)    Subject to operating the Acquired Assets during the Interim Period in accordance with this Section 7.7(b)(iii) and the Operator Agreement, on and after the Commencement Date (as defined in the Operator Agreement [(i.e., the date on which the West Virginia DEP grants approval of the DM-19 with respect to the Operator Agreement)], (A) Buyer shall operate under the West Virginia Mining Permits as the designated owner and/or operator and contract miner until the West Virginia Mining Permits are transferred or new Permits (including Replacement Permits) are issued to Buyer and (B) to the fullest extent allowed by and in accordance with the applicable Legal Requirements, the Sellers grant Buyer the right to conduct, at the sole cost and expense of Buyer, mining operations following the Closing on the Real Property under the West Virginia Mining Permits as the designated operator until such time as the West Virginia Mining Permits are transferred to, or new Permits (including Replacement Permits) are issued to, Buyer (the "Interim Period"). The Sellers shall take all steps that are reasonably necessary to maintain the West Virginia Mining Permits prior to transfer thereof to Buyer and shall have (and Buyer grants) all rights of entry onto the Real Property that are reasonably necessary therefor. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless the Sellers and/or their Affiliates from any and all Liabilities incurred by the Sellers and/or their Affiliates as a result of (I) activities or omissions of Buyer on the Real Property (or any other Acquired Asset) during the Interim Period or (II) any action taken by the Sellers at Buyer's or its Affiliates' request pursuant to this Section 7.7(b)(iii).

        (2)    During the Interim Period, Buyer, at all time prior to the transfer of the West Virginia Mining Permits and the obtaining of the Replacement Permits, shall (A) comply in all material respects with all Legal Requirements governing, and all conditions and requirements of, or pertaining to, any such West Virginia Mining Permits and (B) be solely responsible for all incidents of violation, non-compliance, and similar occurrences related to the West Virginia Mining Permits that arise during the Interim Period. Buyer shall promptly deliver to the Sellers written notice of any such incidents, violations or occurrences, which the Sellers and their Affiliates shall have the right, but not the obligation, to cure in the event Buyer fails to cure (including right of entry onto the applicable Real Property), and Buyer shall promptly reimburse the Sellers for the reasonable costs of any such cure.

48

(iv)     As promptly as practicable after the Execution Date, Buyer shall execute and deliver to the West Virginia Department of Environmental Protection one or more applications to change operator and such other forms that may be necessary or required by the West Virginia Department of Environmental Protection to change the operator of the Gas Wells to Buyer or Buyer Designee, and Buyer shall post replacement surety bonds or other financial assurances necessary to allow the transfer of the applicable Permits for the Gas Wells from the Sellers to Buyer or Buyer Designee. If required by the West Virginia Department of Environmental Protection, the Sellers shall leave in place any bonds or other financial assurances in connection with the applicable Permits for the Gas Wells, subject to the provisions of Section 7.7(b)(vi) below, until the transfer of the applicable Permits for the Gas Wells from the Sellers to Buyer or Buyer Designee (or Buyer's or Buyer Designee's obtaining of such Permits). Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless the Sellers and/or their Affiliates from any and all Liabilities incurred by the Sellers and/or their Affiliates as a result of any action taken by the Sellers at Buyer's or its Affiliates' request pursuant to this Section 7.7(b)(iv).

(v)     The Sellers shall use commercially reasonable efforts (at Buyer's sole cost and expense from and after the Closing) to cause any surety bonds (or other financial assurances) in place as of the Closing with respect to applicable Transferred Permits to remain in place and to maintain current levels of surety bond coverage with respect to their Permits that are not Transferred Permits until such time as the final approval for the transfer of such applicable Transferred Permits to Buyer is received (or until applicable Replacement Permits are obtained), in each case to the extent required by applicable Legal Requirements. At all times from and after the Closing and prior to the transfer to Buyer of the West Virginia Mining Permits and any other Permits not acquired by Buyer before the Closing Date (including the Permits relating to the Gas Wells in West Virginia), Buyer shall, and shall cause its Subsidiaries to, at Buyer's sole cost and expense comply with all of the applicable Legal Requirements governing, and all conditions and requirements of, or pertaining to, any such Permits. Buyer shall promptly deliver to the Sellers written notice of any incidents, violations or occurrences, which the Sellers shall have the right, but not the obligation, to cure (including right of entry onto the applicable Real Property), and Buyer shall promptly reimburse the Sellers for the reasonable costs of any such cure. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless the Sellers and/or their Affiliates from any and all Liabilities incurred by the Sellers and/or their Affiliates as a result of any action taken by the Sellers at Buyer's or its Affiliates' request pursuant to this Section 7.7(b)(v).

(vi)     Notwithstanding anything in this Agreement to the contrary, from and after the Closing, Buyer shall, at its sole cost and expense, (x) until such time as Buyer has posted replacement surety bonds or other required financial assurances, pay or reimburse the Sellers (within five (5) Business Days of receipt of notice from the Sellers' Representative, which such notice shall contain the applicable surety bond numbers and corresponding premium amounts, or other appropriate references as to other forms of financial assurance) for the cost of any premiums that become due after the Closing Date with respect to such surety bonds or the cost of other financial assurances, and (y) post any addition to the principal amount of any such surety bond or other financial assurance required by the West Virginia Surface Mine Board, the West Virginia Department of Environmental Protection or any Governmental Authority after the Closing Date as a result of any action taken by Buyer with respect to the Business and Acquired

49

Assets in West Virginia. Until such time as the West Virginia Mining Permits are transferred to Buyer, Buyer shall, and shall cause its Subsidiaries to, take all reasonable and necessary actions such that Buyer will not have been denied, or be made subject to denial of, any application for any Permit or other Governmental Authorization due to application of the Applicant Violator System established pursuant to the SMCRA or any similar applicable state system.

(vii)    From and after the date hereof, Buyer shall not engage in mining operations with respect to any of the Acquired Assets in West Virginia that requires a West Virginia Mining License unless and until it obtains a West Virginia Mining License. Buyer shall reimburse, indemnify and hold harmless the Sellers and/or their respective Affiliates from any and all Liabilities incurred by the Sellers and/or their respective Affiliates resulting from or arising out of Buyer's failure to obtain the West Virginia Mining License as contemplated by this Section 7.7(a) prior to conducting any mining operations following the Closing on the applicable Real Property.

(c)    All fees, bonds or financial assurances required to be paid or provided, or costs and expenses incurred, in connection with the actions to be taken under this Section 7.7 shall be paid or provided by Buyer.

7.8    Fiduciary Obligations. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective governing bodies, directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations.

7.9    Sale Free and Clear. The Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances (including, for the avoidance of doubt, all successor liability, including, any successorship obligations under any Collective Bargaining Agreement, and/or with respect to any Benefit Plan) of, against or created by the Sellers or their bankruptcy estate, shall be fully released from and with respect to the Acquired Assets. On the Closing Date, the Acquired Assets shall be transferred to Buyer and/or one or more Buyer Designees, as applicable, free and clear of all obligations, Liabilities and Encumbrances (including, for the avoidance of doubt, all successor liability, including any successorship obligations under any Collective Bargaining Agreement, and/or with respect to any Benefit Plan), other than the Permitted Encumbrances and the Assumed Liabilities.

## ARTICLE 8
### ADDITIONAL AGREEMENTS

8.1    Taxes.

(a)    Any transfer, real estate property transfer, documentary, sales, use, stamp, registration, value added, and other such taxes and fees (including any penalties and interest) incurred in connection with the transactions contemplated hereby and not exempted by Section 1146(c) of the Bankruptcy Code ("Transfer Taxes") shall be borne by Buyer. The Sellers and Buyer shall cooperate to (i) mitigate and/or eliminate the amount of Transfer Taxes resulting from the transactions contemplated herein and (ii) timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Buyer shall be responsible for preparing and filing all necessary

50

Tax Returns or other documents with respect to Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by the other Party, the Party responsible for preparing the Tax Return shall deliver it to the other Party not less than ten (10) days before the due date thereof, and the other Party shall promptly execute such Tax Return and return it to the Party responsible for filing it.

(b)     Subject to Article 2, all Liability for any ad valorem Taxes (including, for the avoidance of doubt, real or personal property Taxes) and unmined mineral Taxes (the "Apportioned Taxes") with respect to the Acquired Assets for a Tax period or year, or portion thereof, that ends on or before the Closing Date (a "Pre-Closing Tax Period") shall be borne by the Sellers. All Liability for any Apportioned Taxes with respect to the Acquired Assets for a Tax period or year, or portion thereof, that begins after the Closing Date (a "Post-Closing Tax Period") shall be borne by Buyer. The total amount of Apportioned Taxes allocable to the Pre-Closing Tax Period of any Tax period or year commencing on or before, and ending after, the Closing Date (a "Straddle Period") shall be the product of (i) such Tax for the entirety of such Straddle Period, multiplied by (ii) a fraction, the numerator of which is the number of days for such Straddle Period included in the Pre-Closing Tax Period and the denominator of which is the total number of days in such Straddle Period, and the balance of Apportioned Taxes shall be allocable to the Post-Closing Tax Period. At the Closing, Apportioned Taxes with respect to each Acquired Asset for the applicable Straddle Period shall be prorated in accordance with the foregoing provisions based on the Tax assessment for such Acquired Asset for such Straddle Period, if available, or if otherwise, based on the Apportioned Taxes paid with respect to such Acquired Asset during the preceding Tax year. With respect to any not yet delinquent Apportioned Taxes relating to a Straddle Period or Pre-Closing Tax Period, Buyer will assume responsibility for the actual payment of all such Taxes to the applicable Governmental Authority. With respect to any Apportioned Taxes relating to a Straddle Period or Pre-Closing Tax Period that are delinquent as of the Closing Date, the amount of which is known and not subject to dispute, Buyer shall either pay the delinquent amount of such Taxes directly to the applicable Governmental Authority at the Closing or, at Buyer's option, to such title company as designated by Buyer at the Closing, for further payment by it to the applicable Governmental Authority. In the event that Buyer or any Seller makes any payment of Apportioned Taxes for which it is entitled to reimbursement under this Section 8.1(b), the applicable party shall make such reimbursement no later than 10 days after the presentation of a statement setting forth the amount of the reimbursement to which the party presenting the statement is entitled along with such supporting evidence as is reasonably necessary to calculate the reimbursement amount. Any amounts which may become payable from any Seller to Buyer pursuant to Section 8.1 shall constitute a super priority administrative expense of the Sellers under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

(c)     Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Acquired Assets (including access to books and records and Tax Returns and related working papers dated before the Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state or local business tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Acquired Assets are located; provided, however, that neither Buyer nor any Seller shall be required to disclose the contents of

51

its income Tax Returns to any Person other than the Parties. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(c) shall be borne by the Party requesting it.

(d)    Any Tax Refund of the Sellers that is attributable to Buyer's payment of Apportioned Taxes pursuant to Section 8.1(b) shall be promptly paid to Buyer.

8.2    Bulk Sales.

The Sale Order shall provide either that (i) the Sellers have complied with the requirements of any Legal Requirement relating to bulk sales and transfer or (ii) compliance with the Legal Requirements relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

8.3    Payments Received.

The Sellers, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts.

8.4    Assumed Contracts: Adequate Assurance and Performance. Buyer shall, and shall cause its Affiliates to, use commercially reasonable efforts to provide adequate assurance of the future performance by Buyer of each Assumed Contract as required under applicable sections of the Bankruptcy Code. Buyer and the Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts pursuant to applicable sections of the Bankruptcy Code, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and the Sellers' Representatives available to testify before the Bankruptcy Court.

8.5    Employee Matters.

(a)    Employees. Prior to the Closing Date, Buyer shall set initial terms and conditions of employment, including wages, benefits, job duties and responsibilities and work assignment. Buyer shall determine which Employees, if any, to offer employment to, in its sole discretion. Only Employees who are offered and accept such offers of employment with Buyer based on the initial terms and conditions set by Buyer and further then actually commence employment with Buyer will become "Buyer Employees" after the Closing. The Sellers shall terminate, or shall cause to be terminated, on or prior to the Closing Date, the employment of all Employees who are offered and accept offers of employment with Buyer pursuant to this Section 8.5(a). Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on Buyer any obligation to retain any Buyer Employee in its employment for any amount of time or on any terms and conditions of employment. Except as described in the remaining sentences of this Section 8.5, the employment of each such Buyer Employee with Buyer will commence immediately after the Closing Date. In the case of any individual who is offered employment by Buyer and accepts such offer, but who is absent from active employment and receiving short-term

52

disability or workers' compensation benefits, the employment of any such individual with Buyer would commence upon his or her return to active work, and such individual would become a Buyer Employee as of such date. Except as otherwise required by Legal Requirement, specified in this Agreement, or otherwise agreed in writing by Buyer, Buyer shall not be obligated to provide any severance, separation pay, or other payments, rights or benefits, including any key employee retention payments, to any Employee on account of any termination of such Employee's employment before the Closing, and such payments, rights and/or benefits (if any) shall remain obligations of the Sellers.

(b)     <u>Access to Information</u>. After the Execution Date, the Sellers shall provide Buyer and its Affiliates with reasonable access to the Employees and with information, including employee records and Benefit Plan data, reasonably requested by Buyer and such Affiliates, except as otherwise prohibited by Legal Requirements.

(c)     <u>Payroll Taxes</u>. For purposes of payroll taxes with respect to Buyer Employees, the Sellers shall treat the transactions contemplated hereby, as a transaction described in Treasury Regulation Sections 31.3121(a)(1)-1(b)(2) and 31.3306(b)(1)-(b)(2) (i.e., Buyer shall be treated as a successor for payroll tax purposes); and as such, the Sellers and Buyer shall report on a predecessor/successor basis as set forth under the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320.

(d)     <u>No Third Party Beneficiaries; Employment Status</u>. All provisions contained in this Agreement with respect to employee benefit plans or compensation of Buyer Employees are included for the sole benefit of the respective Parties. Nothing contained herein (i) shall confer upon any former, current or future employee of the Sellers or Buyer or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future Employee to be other than terminable at will or (iii) shall confer any third party beneficiary rights upon any Buyer Employee or any dependent or beneficiary thereof or any heirs or assigns thereof.

(e)     <u>WARN Act</u>. With respect to Buyer Employees, Buyer will have full responsibility under the WARN Act relating to any act or omission of Buyer after the Closing Date. With respect to the Employees, the Sellers will have full responsibility under the WARN Act relating to any act or omission on or prior to the Closing Date, including responsibility for any WARN Act Liabilities that result from Employees' separation of employment from the Sellers and/or Employees not becoming Buyer Employees pursuant to this <u>Section 8.5</u>.

(f)     <u>Collective Bargaining Agreements</u>. Buyer does not accept or assume any Collective Bargaining Agreements to which any Seller is a party to or subject to, and expressly declines to be bound by or accept the terms of any such Collective Bargaining Agreements. Buyer is not and shall not be obligated to, and does not, accept or adopt any wage rates, employee benefits, employee policies, or any other terms and conditions of employment.

8.6     <u>Post-Closing Books and Records and Personnel</u>.

From and after the Closing Date for a period of one (1) year, each party shall provide the other Parties (and their respective Representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, to the assets, books, records, systems and other property and any employees of the other Parties so as to enable Buyer

and the Sellers to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions, and to enable the Sellers to wind down the Business. During such one (1) year period, each Party (and their respective Representatives) shall be permitted to make copies of any books and records described in this Section 8.6, subject to the confidentiality requirements set forth in Sections 7.1 and 12.2. If any Party desires to dispose of any such books and records, such Party shall, thirty (30) days prior to such disposal, provide the other Party with a reasonable opportunity to remove or copy such records to be disposed of at the removing Party's expense. Buyer shall retain such books and records for a period of six (6) years following the Closing.

8.7    Casualty Loss.

Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is condemned or taken by eminent domain, or is damaged or destroyed by fire, flood or other casualty, the Sellers shall notify Buyer promptly in writing of such fact, and (a) in the case of condemnation or taking, the Sellers shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing, and (b) in the case of fire, flood or other casualty, the Sellers shall assign the insurance proceeds therefrom to Buyer at the Closing. Notwithstanding the foregoing, the provisions of this Section 8.7 shall not in any way modify Buyer's other rights under this Agreement, including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect.

8.8    Change of Name.

Promptly following the Closing, each Seller shall, and shall cause its direct and indirect Subsidiaries to, discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) and shall not subsequently change its name to or otherwise use or employ any name which includes the word "Pinnacle," without the prior written consent of Buyer, and each Seller shall cause the names of the Sellers in the caption of the Bankruptcy Cases to be changed to the new names of each Seller as provided in the last sentence of this Section 8.8; provided, however, that each Seller and each of its direct and indirect Subsidiaries may use its current name (and any other trade name or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) included on any business cards, stationery and other similar materials following the Closing for a period of up to one hundred eighty (180) days solely for purposes of winding down the affairs of each Seller and the Pinnacle Business, provided that when utilizing such materials, other than in incidental respects, each Seller and each of its direct and indirect Subsidiaries shall use commercially reasonable efforts to indicate its new name and reference its current name (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct Subsidiaries) as "formally known as" or similar designation. From and after the Closing, except as otherwise set forth in this Agreement (including this Section 8.8), each Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, "d/b/a" names or any mark that is confusingly similar to the Intellectual Property rights utilized by the Sellers and the Sellers' Subsidiaries in the conduct of the Business or any Acquired Asset, which rights shall be included in the Acquired Assets purchased hereunder. Immediately following the Closing, the Sellers shall file, and shall cause their respective direct and indirect Subsidiaries to file, all necessary organizational amendments with the applicable

54

Secretary of State of each such entity's jurisdiction of formation and in each State in which each such Seller is qualified to do business and with the Bankruptcy Court to effectuate the foregoing.

8.9    No Successor Liability.

The Parties intend that, except as included in the Assumed Liabilities, upon the Closing, Buyer shall not be deemed to: (a) be the successor of or successor employer (as described under any applicable Legal Requirement) to the Sellers, including, with respect to any Collective Bargaining Agreements and any Benefit Plans, under the Coal Act, and any common law successor liability in relation to the UMWA 1974 Pension Plan, including with respect to withdrawal liability, (b) have, *de facto*, or otherwise, merged with or into the Sellers, (c) be a mere continuation or substantial continuation of the Sellers or the enterprise(s) of the Sellers, or (d) be liable for any acts or omissions of the Sellers in the conduct of the Business or arising under or related to the Acquired Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Buyer shall not be liable for any Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) against any Seller or any of its predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, or whether fixed or contingent, whether now existing or hereafter arising, with respect to the Business, the Acquired Assets or any Liabilities of the Sellers arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this Section 8.9 shall be reflected in the Sale Order.

# ARTICLE 9

## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Buyer, in its sole and absolute discretion:

9.1    Accuracy of Representations.

The representations and warranties of the Sellers set forth in this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as Material Adverse Effect shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date); provided, however, that in the event of a breach of a representation or warranty other than a representation or warranty qualified by Material Adverse Effect, the condition set forth in this Section 9.1 shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a Material Adverse Effect. Buyer shall have received a certificate of the Sellers to such effect signed by a duly authorized officer of each Seller.

9.2    Sellers' Performance.

The covenants and agreements that the Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied

Case 18-04177-TOM11    Doc 1323    Filed 04/15/19    Entered 04/15/19 11:55:00    Desc
Main Document    Page 105 of 225

with in all material respects and Buyer shall have received a certificate of the Sellers to such effect signed by a duly authorized officer of each Seller.

9.3     No Order.

No Governmental Authority shall have enacted, issued, promulgated, decreed or entered any Final Order from and after the Execution Date, which is in effect and has the effect of prohibiting (or delaying beyond the Outside Date) the consummation of or imposing material modifications on the transactions contemplated hereby.

9.4     Governmental Authorizations.

Subject to Section 2.5, (i) all of the Closing Required Permits shall have been transferred to, or obtained by, Buyer, (ii) all of the Replacement Permits shall have been obtained by Buyer or (iii) with respect to any Transferred Permits or Replacement Permits that have not been transferred or obtained, as applicable, at or prior to the Closing, Buyer shall have the right to conduct, pursuant to Section 7.7, mining operations following the Closing on the applicable Real Property.

9.5     Sellers' Deliveries.

Each of the deliveries required to be made to Buyer pursuant to Section 4.3(a)-(e) shall have been so delivered.

9.6     Sale Order.

The Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to the Sellers and Buyer, and the Sale Order shall have become a Final Order.

9.7     Assumed Contracts.

The Bankruptcy Court shall have approved and authorized, other than with respect to Cure Costs, the assumption and assignment of each Assumed Contract, except as would not have a material effect on the Business from and after the Closing.

9.8     Material Adverse Effect.

Since the Execution Date, no Material Adverse Effect shall have occurred.

9.9     [Reserved].

9.10     Frustration of Conditions.

Notwithstanding anything to the contrary herein, Buyer may not rely on the failure of any condition set forth in this Article 9 to be satisfied to excuse it from its obligation to effect the transactions contemplated hereby if such failure was cause by Buyer's breach of its obligations under this Agreement or any other agreement contemplated hereby.

56

# ARTICLE 10

## Conditions Precedent to the Obligations of the Sellers to Close

The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by the Sellers, in their sole and absolute discretion:

### 10.1    Accuracy of Representations.

The representations and warranties of Buyer set forth in Article 6 of this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as to Material Adverse Effect shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date); provided, however, that in the event of a breach of a representation or warranty, the condition set forth in this Section 10.1 shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereby. The Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer of Buyer.

### 10.2    Buyer's Performance.

The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects, and the Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer of Buyer.

### 10.3    No Order.

No Governmental Authority shall have enacted, issued, promulgated, decreed, or entered any Final Order from and after the Execution Date, which is in effect and has the effect of prohibiting (or delaying beyond the Outside Date) the consummation of the transactions contemplated hereby.

### 10.4    Sale Order.

The Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to the Sellers and Buyer, and the Sale Order shall have become a Final Order.

### 10.5    Buyer's Deliveries.

Each of the deliveries required to be made to the Sellers pursuant to Section 4.2(a)-(e) shall have been so delivered.

### 10.6    Frustration of Conditions.

Notwithstanding anything to the contrary herein, the Sellers may not rely on the failure of any condition set forth in this Article 10 to be satisfied to excuse them from their

obligation to effect the transactions contemplated hereby if such failure was cause by any Seller's breach of its obligations under this Agreement or any other agreement contemplated hereby.

# ARTICLE 11

## TERMINATION

11.1    Termination Events.

Notwithstanding anything to the contrary, this Agreement may be terminated at any time prior to the Closing only as follows:

(a)    by mutual written consent of the Sellers and Buyer;

(b)    by written notice from either the Sellers or Buyer:

(i)    if a Governmental Authority issues a final, non-appealable ruling or Order permanently restraining, enjoining or otherwise prohibiting consummation of the transactions contemplated hereby where such ruling or Order was not requested, encouraged or supported by any of the Sellers or Buyer; provided, that the right to terminate this Agreement under this Section 11.1(b)(i) shall not be available to any Party whose willful failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date;

(ii)    if the Closing shall not have occurred on or prior to the one year anniversary of the Effective Date (the "Outside Date"); provided, that the terminating party under this Section 11.1(b)(ii) is not (at such time of termination) in breach of any representation, warranty, covenant or other agreement in this Agreement so as to cause any conditions to the Closing not to be satisfied and shall not have been the proximate cause of the failure of the Closing to occur on or prior to the Outside Date; or

(iii)    if the Bankruptcy Court shall have entered an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by the Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases.

(c)    by written notice from Buyer:

(i)    other than as contemplated by the Bidding Procedures Motion or Bidding Procedures Order, if any Seller seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by the Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases, or if a trustee in the Bankruptcy Cases or a responsible officer or an examiner with enlarged powers is appointed (other than a fee examiner) relating to the operation of the Sellers' businesses pursuant to Section 1104 of the Bankruptcy Code, or such an order of dismissal, conversion or appointment is entered and is not reversed or vacated within fourteen (14) days after the entry thereof;

(ii)    in the event of any breach of, or failure to perform, by any Seller of any of their agreements, covenants, representations or warranties contained herein, which breach or failure to perform (A) would result in the Sellers being unable to satisfy a condition set forth in Article 9 by the then-applicable Outside Date and (B) cannot be cured within ten (10)

Business Days after Buyer notifies the Sellers of such breach in writing; provided, that Buyer shall not have a right of termination pursuant to this Section 11.1(c)(ii) if it is then in breach of any of its material agreements, covenants, representations or warranties contained herein or in the Sale Order; or

(iii) a Material Adverse Effect occurs and is continuing.

(d) by written notice from the Sellers in the event of any breach of, or failure to perform, by Buyer of any of its agreements, covenants, representations or warranties contained herein, which breach or failure to perform (A) would result in Buyer being unable to satisfy a condition set forth in Section 10.1 or Section 10.3 by the then-applicable Outside Date and (B) cannot be cured within ten (10) Business Days after such Seller notifies Buyer of such breach in writing; provided, that the Sellers shall not have a right of termination pursuant to this Section 11.1(d) if any Seller is then in breach of any of such Seller's agreements, covenants, representations or warranties contained herein or in the Sale Order.

Each condition set forth in this Section 11.1, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in this Section 11.1 are applicable, the applicable party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

11.2    Effect of Termination.

In the event of termination of this Agreement by Buyer or the Sellers pursuant to this Article 11, this Agreement shall become null and void and have no effect and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party except (i) nothing herein shall relieve any Party from Liability for any breach of this Agreement occurring prior to such termination and (ii) the provisions of Section 7.1(a) (Access and Reports; Confidentiality), Section 12.9 (Expenses), Section 12.10 (Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver) and this Section 11.2 (and, to the extent applicable to the interpretation or enforcement of such provisions, Article 1 and Article 12), shall expressly survive the termination of this Agreement.

## ARTICLE 12

### GENERAL PROVISIONS

12.1    Survival.

All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach thereof.

Case 18-04177-TOM11    Doc 1323    Filed 04/15/19    Entered 04/15/19 11:55:00    Desc
Main Document    Page 109 of 225

12.2    Confidentiality.

Following the Closing, the Sellers agree not to disclose any confidential or non-public information concerning the Acquired Assets or the business affairs of Buyer or the Assumed Liabilities ("Confidential Information") except disclosure of Confidential Information that (a) was or is lawfully obtained from a source that, to the knowledge of such Seller, was not under an obligation of confidentiality to Buyer with respect to such information, (b) is independently developed by such Seller without violating any of its obligations under this Agreement, (c) is or becomes available to the public without any breach by the Sellers of the terms of this Agreement, (d) is or may be necessary to wind down any of the Sellers' estates, or in connection with the enforcement of the rights of, or the defense of any Proceeding against or involving, any Seller provided that the Confidential Information is afforded confidential treatment, (e) relates to any Excluded Assets and/or Excluded Liabilities, (f) is or may be necessary in connection with the Bankruptcy Cases provided that the Confidential Information is afforded confidential treatment or (g) is disclosed to a bidder in connection with an Alternative Transaction; provided, that the bidder in such Alternative Transaction agrees for the benefit of Buyer to maintain the confidentiality of the Confidential Information. Notwithstanding the foregoing, a Seller may disclose Confidential Information if such Seller believes (after consultation with counsel) it is legally required to make such disclosure in order to comply with applicable law, regulation, rule or legal, judicial or administrative process (including any rule, regulation or policy statement of (i) any self-regulatory organization of which a party is a member) or (ii) in connection with the Bankruptcy Cases. If a Seller or any of its Representatives becomes required (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) or it becomes necessary in connection with the Bankruptcy Cases to disclose any of the Confidential Information, such Seller or Representative shall use reasonable efforts to provide Buyer with prompt notice, to the extent allowed by law, rule and regulation, of such requirement. Each Seller agrees to disclose only that portion of the Confidential Information which it believes it is necessary or required to disclose and to use commercially reasonable efforts to obtain confidential treatment of such Confidential Information.

12.3    Public Announcements.

Except as required in the Bankruptcy Cases, prior to the Closing, unless otherwise required by applicable Legal Requirement or by obligations of Buyer or the Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Buyer, on the one hand, and the Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed). From and after the Closing, the Parties may make public statements with respect to this Agreement or the transactions contemplated hereby so long as such announcements do not disclose the specific terms or conditions of this Agreement except where such terms and conditions have already been disclosed as required by Legal Requirement; provided, that the issuing party shall use its commercially reasonable efforts to consult with the other party with respect to the text thereof to the extent practicable.

12.4    Notices.

All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or sent by overnight courier or electronic mail, or facsimile transmission:

(i)    If to the Sellers, then to:

Mission Coal Company, Inc.
7 Sheridan Square, Suite 300
Kingsport, Tennessee 37660
Attn: Gary Broadbent
Facsimile: 423-212-2980
Email: gary.broadbent@missioncoal.com

with a copy (which shall not constitute notice) to:

Christian & Small LLP
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Attn:    Daniel D. Sparks
         Bill D. Bensinger
Facsimile: 205-328-7234
Email: ddsparks@csattorneys.com
        bdbensinger@csattorneys.com

and

Kirkland & Ellis LLP
Kirkland & Ellis International, LLP
300 North LaSalle
Chicago, Illinois 60654
Attn:    Melissa N. Koss
Facsimile: 312-862-2200
Email: melissa.koss@kirkland.com

and

Kirkland & Ellis LLP
Kirkland & Ellis International, LLP
601 Lexington Avenue
New York, New York 10022
Attn:    Stephen E. Hessler, P.C.
         Ciara Foster
Facsimile: 212-446-4900
Email: stephen.hessler@kirkland.com
        ciara.foster@kirkland.com

61

and

> Kirkland & Ellis LLP
> Kirkland & Ellis International, LLP
> 901 Main Street
> Dallas, Texas 75202
> Attn: Michael Considine, P.C.
> Facsimile: 214-972-1771
> Email: MPConsidine@kirkland.com

(ii) If to Buyer:

> Bluestone Resources, Inc.
> 302 S. Jefferson St.
> Roanoke, VA 24011
> Attn:   James C. Justice, III
>          Steven W. Ball, Esq.
> Email: jcj3@bluestoneindustries.com
> steve.ball@bluestoneinductries.com

or to such other person or address as any party shall specify by notice in writing to the other party. All such notices, requests, demands, waivers and communications shall be deemed to have been received on the date on which so personally-delivered or faxed or delivered by overnight courier.

12.5   Waiver.

Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by Legal Requirements, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

12.6   Entire Agreement; Amendment.

This Agreement (including the Disclosure Schedules), the Sale Order, the Bidding Procedures Order and the other Transaction Documents supersede all prior agreements between Buyer, on the one hand, and the Sellers, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and the Sellers, on the other hand, with respect to their subject matter. This Agreement may not be amended, modified or supplements except by a written agreement executed by each of the Parties.

62

12.7    Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of all of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party) and any assignment in contravention of this Section 12.7 shall be null and void ab initio; provided, however, that, subject to compliance with Section 4.4, Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Buyer Designees without the prior consent of the Sellers; provided, that no such assignment shall relieve Buyer from its liabilities or obligations hereunder; provided, further, that the Sellers shall be permitted to assign their rights hereunder in part to the acquirer of any Excluded Assets or Excluded Liabilities with the prior written consent of Buyer; provided, that no such assignment shall relieve the Sellers from their liabilities or obligations hereunder, other than with respect to such Excluded Assets or Excluded Liabilities.

12.8    Severability.

The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

12.9    Expenses.

Except as otherwise expressly provided in this Agreement or in the DIP Credit Agreement, whether or not the transactions contemplated hereby are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby. Any and all fees required by (i) any Governmental Authority or any Person to obtain or for the transfer of a Permit or (ii) incurred in connection with complying with any Antitrust Law, shall be the sole responsibility of Buyer.

12.10    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in

63

the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding; provided, however, that, if the Bankruptcy Cases have been closed pursuant to Section 350(a) of the Bankruptcy Code, all Actions and Proceedings arising out of or relating to this Agreement shall be heard and determined in a New York state court or a federal court sitting in the Borough of Manhattan, New York, New York, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding. The Parties consent to service of process by mail (in accordance with Section 12.4) or any other manner permitted by law.

(c)      THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF THE SELLERS, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

12.11   Counterparts.

This Agreement and any amendment hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument. Notwithstanding anything to the contrary in Section 12.4, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

12.12   Parties in Interest; No Third Party Beneficiaries; No Amendment.

This Agreement and the other Transaction Documents shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Except with respect to the parties released and/or exculpated pursuant to the Waiver, this Agreement and the other Transaction Documents are for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind. Notwithstanding anything to the contrary, nothing in this Agreement shall constitute an amendment to any Benefit Plan.

12.13   Remedies.

Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit the Sellers or Buyer in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

12.14   Specific Performance.

Each Party recognizes that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by them in accordance with the terms hereof or were otherwise breached, and that monetary damages alone would not be adequate to

64

compensate the non-breaching Party or Parties for their injuries. Accordingly, a non-breaching Party shall be entitled, in addition to any other remedies that may be available, to injunctive relief to specifically enforce the terms and provisions of this Agreement. If any Action or Proceeding is brought by the non-breaching Party or Parties to enforce any of the terms or provisions of this Agreement pursuant to this <u>Section 12.14</u>, the Party in breach shall waive the defense that there is an adequate remedy at law. Each Party agrees to waive any requirement for the security or posting of any bond in connection with any Action or Proceeding seeking specific performance of such terms or provisions and that the only permitted objection that it may raise in response to any action for specific performance of such terms or provisions is that it contests the existence of a breach or threatened breach of such provisions. The rights set forth in this <u>Section 12.14</u> shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

[<em>Signature pages follow.</em>]

Case 18-04177-TOM11    Doc 1323    Filed 04/15/19    Entered 04/15/19 11:55:00    Desc
Main Document      Page 115 of 225

**IN WITNESS WHEREOF,** the Parties have caused this Asset Purchase Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

<u>**SELLERS**</u>:

MISSION COAL COMPANY, LLC

By: _____
Name: Kevin Nystrom
Title: Chief Restructuring Officer

BEARD PINNACLE, LLC

By: _____
Name: Kevin Nystrom
Title: Chief Restructuring Officer

PINNACLE LAND COMPANY, LLC

By: _____
Name: Kevin Nystrom
Title: Chief Restructuring Officer

PINNACLE MINING COMPANY, LLC

By: _____
Name: Kevin Nystrom
Title: Chief Restructuring Officer

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

SENECA NORTH AMERICAN COAL, LLC

By: _____

Name: Kevin Nystrom

Title: Chief Restructuring Officer


SENECA COAL RESOURCES, LLC

By: _____

Name: Kevin Nystrom

Title: Chief Restructuring Officer

**BUYER**:

BLUESTONE RESOURCES, INC.

By: _____
Name: James C. Justice, III
Title: President

Case 18-04177-TOM11    Doc 1323    Filed 04/15/19    Entered 04/15/19 11:55:00    Desc
Main Document      Page 118 of 225

**EXHIBIT B**

**TO**

ORDER (I) APPROVING THE SALES OF THE
ACQUIRED ASSETS FREE AND CLEAR OF CLAIMS,
LIENS, INTERESTS, AND ENCUMBRANCES, (II) APPROVING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF
(Contura APA)

ASSET PURCHASE AGREEMENT

DATED AS OF APRIL 4, 2019

BY AND AMONG

CONTURA ENERGY, INC., AS BUYER

AND

MISSION COAL COMPANY, LLC,

AND

CERTAIN SUBSIDIARIES OF MISSION COAL COMPANY, LLC, AS THE SELLERS

KE 60158188

TABLE OF CONTENTS

# ARTICLE 1

## Definitions

1.1 Definitions.................................................................................................2
1.2 Other Definitions and Interpretive Matters.................................................16

# ARTICLE 2

## Purchase and Sale

2.1 Purchase and Sale .......................................................................................18
2.2 Excluded Assets...........................................................................................20
2.3 Assumed Liabilities .....................................................................................22
2.4 Excluded Liabilities .....................................................................................24
2.5 Assignment and Assumption of Contracts...................................................27
2.6 Further Assurances.......................................................................................28
2.7 Certain Payments or Instruments Received from Third Parties...................29

# ARTICLE 3

## Purchase Price

3.1 Consideration ...............................................................................................29
3.2 Allocation of Purchase Price........................................................................29
3.3 Withholding .................................................................................................29

# ARTICLE 4

## Closing and Deliveries

4.1 Closing Date.................................................................................................30
4.2 Buyer's Deliveries .......................................................................................30
4.3 Sellers' Deliveries .......................................................................................31
4.4 Buyer Designees ..........................................................................................32

# ARTICLE 5

## Representations and Warranties of the Sellers

5.1 Organization and Good Standing..................................................................33
5.2 Authority; Validity; Consents......................................................................33
5.3 No Conflict...................................................................................................34
5.4 Real Property ...............................................................................................34
5.5 Environmental and Health and Safety Matters ............................................36
5.6 Title to Acquired Assets...............................................................................37

i

| | | |
|---|---|---|
| 5.7 | Taxes. | 38 |
| 5.8 | Legal Proceedings | 39 |
| 5.9 | Compliance with Legal Requirements; Permits | 40 |
| 5.10 | Contracts | 41 |
| 5.11 | Insurance | 42 |
| 5.12 | Brokers or Finders | 42 |
| 5.13 | Undue Influence | 42 |
| 5.14 | No Undisclosed Material Liabilities. | 42 |
| 5.15 | Absence of Certain Changes | 43 |
| 5.16 | Mining. | 43 |
| 5.17 | MSHA; OSHA. | 44 |
| 5.18 | Coal Act; Black Lung Act | 45 |
| 5.19 | Warranties Exclusive | 45 |

# ARTICLE 6

## Representations and Warranties of Buyer

| | | |
|---|---|---|
| 6.1 | Organization and Good Standing | 46 |
| 6.2 | Authority; Validity; Consents | 46 |
| 6.3 | No Conflict. | 46 |
| 6.4 | Brokers or Finders | 47 |
| 6.5 | Legal Proceedings | 47 |
| 6.6 | Qualification | 47 |
| 6.7 | No Other Representations or Warranties; Condition of the Business; Buyer's Reliance. | 48 |
| 6.8 | Information | 48 |
| 6.9 | Warranties Exclusive | 48 |

# ARTICLE 7

## Actions Prior to the Closing Date

| | | |
|---|---|---|
| 7.1 | Access and Reports; Confidentiality. | 49 |
| 7.2 | Operations Prior to the Closing Date | 50 |
| 7.3 | Regulatory Matters; Cooperation. | 51 |
| 7.4 | Tax Cooperation. | 53 |
| 7.5 | Bankruptcy Court Matters. | 53 |
| 7.6 | Permits; Surety Bonds. | 54 |
| 7.7 | Sale Free and Clear | 55 |
| 7.8 | Transaction Order. | 55 |
| 7.9 | Brewster Estate Action Matters. | 55 |
| 7.10 | Broad Surface Rights. | 56 |
| 7.11 | Specific Sites Easement. | 56 |

# ARTICLE 8

## Additional Agreements

| | | |
|---|---|---|
| 8.1 | Taxes | 57 |
| 8.2 | Bulk Sales | 59 |
| 8.3 | Payments Received | 59 |
| 8.4 | Assumed Contracts: Adequate Assurance and Performance | 59 |
| 8.5 | Post-Closing Books and Records and Personnel | 59 |
| 8.6 | Casualty Loss | 60 |
| 8.7 | Release; Acknowledgements | 60 |
| 8.8 | No Successor Liability | 60 |
| 8.9 | Notification of Certain Events | 61 |
| 8.10 | Pinnacle Lease. | 61 |
| 8.11 | Letter Agreement. | 61 |
| 8.12 | Return of Portion of Deposit. | 61 |
| 8.13 | Sellers' Obligations. | 61 |
| 8.14 | Non-Solicit Termination. | 62 |
| 8.15 | Payment Pursuant to Consent Order. | 62 |

# ARTICLE 9

## Conditions Precedent to Obligations of Buyer to Close

| | | |
|---|---|---|
| 9.1 | Accuracy of Representations | 62 |
| 9.2 | Sellers' Performance | 63 |
| 9.3 | No Order | 63 |
| 9.4 | Governmental Authorizations | 63 |
| 9.5 | Sellers' Deliveries | 63 |
| 9.6 | Transaction Order | 63 |
| 9.7 | Assumed Contracts | 63 |
| 9.8 | Material Adverse Effect | 64 |
| 9.9 | UMWA | 64 |
| 9.10 | Effective Date | 64 |
| 9.11 | Pinnacle Lease. | 64 |
| 9.12 | Bluestone Closing. | 64 |
| 9.13 | Letter Agreement. | 65 |
| 9.14 | Contura/WPP Lease. | 65 |
| 9.15 | Brewster Estate Reserves. | 65 |
| 9.16 | No Consent Order Liability. | 65 |
| 9.17 | Frustration of Conditions. | 65 |

# ARTICLE 10

## Conditions Precedent to the Obligations of the Sellers to Close

| | | |
|---|---|---|
| 10.1 | Accuracy of Representations | 66 |

| 10.2 | Buyer's Performance | 66 |
| 10.3 | No Order | 66 |
| 10.4 | Transaction Order | 66 |
| 10.5 | Buyer's Deliveries | 66 |
| 10.6 | Frustration of Conditions. | 67 |

## ARTICLE 11

### Termination

| 11.1 | Termination Events | 67 |
| 11.2 | Effect of Termination | 68 |

## ARTICLE 12

### General Provisions

| 12.1 | Survival | 69 |
| 12.2 | Confidentiality | 69 |
| 12.3 | Public Announcements | 70 |
| 12.4 | Notices | 70 |
| 12.5 | Waiver | 72 |
| 12.6 | Entire Agreement; Amendment | 72 |
| 12.7 | Assignment | 72 |
| 12.8 | Severability | 73 |
| 12.9 | Expenses | 73 |
| 12.10 | Disclosure Schedules | 73 |
| 12.11 | Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver | 73 |
| 12.12 | Counterparts | 74 |
| 12.13 | Parties in Interest; No Third Party Beneficiaries; No Amendment | 74 |
| 12.14 | Remedies | 75 |
| 12.15 | Specific Performance | 75 |
| 12.16 | Sellers' Representative | 75 |

**ASSET PURCHASE AGREEMENT**

   **THIS ASSET PURCHASE AGREEMENT** (this "<u>Agreement</u>"), dated as of April 4, 2019 (the "<u>Execution Date</u>"), is made and entered into by and among Contura Energy, Inc., a Delaware corporation ("<u>Buyer</u>"), Mission Coal Company, LLC, a Delaware limited liability company (the "<u>Company</u>"), and the Additional Sellers (as defined below) (together with the Company, the "<u>Sellers</u>" and each entity individually a "<u>Seller</u>"). Capitalized terms used herein and not otherwise defined herein have the meanings set forth in <u>Article 1</u>.

<u>**RECITALS**</u>

   **WHEREAS**, the Sellers are engaged in the business of mining, processing, marketing and selling coal through certain mining complexes;

   **WHEREAS**, on October 14, 2018, the Sellers filed voluntary petitions (the "<u>Bankruptcy Cases</u>") under chapter 11 of Title 11 §§101-1330 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Northern District of Alabama (the "<u>Bankruptcy Court</u>");

   **WHEREAS**, in accordance with the Bidding Procedures and subject to the terms and conditions set forth in this Agreement and the entry of the Transaction Order, the Sellers desire to sell to Buyer all of the Acquired Assets and to assign to Buyer all of the Assumed Liabilities, Buyer desires to purchase from the Sellers all of the Acquired Assets and assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated hereby, upon the terms and conditions hereinafter set forth;

   **WHEREAS**, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Buyer pursuant to the Transaction Order, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to Sections 105, 363, 365 and, as applicable, 1123(a)(5)(D), 1129, 1141 and 1146, of the Bankruptcy Code, and Rules 4001, 6004, 6006 and, as applicable, 3020 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>");

   **WHEREAS**, the Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Transaction Order by the Bankruptcy Court;

   **WHEREAS**, concurrently with the execution and delivery of this Agreement, Buyer (or its Affiliate) and WPP LLC ("<u>WPP</u>") have entered into a lease (the "<u>Contura/WPP Lease</u>"), pursuant to which, among other things, WPP will lease to Buyer (or its Affiliate) the Contura/WPP Lease Properties, effective as of the Closing upon the terms and conditions set forth therein; and

   **WHEREAS**, the board of managers (or similar governing body) of each Seller has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Transaction Order, and each has approved the same.

1

**Now, Therefore**, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE 1

### DEFINITIONS

1.1     <u>Definitions</u>.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"<u>2015 Pinnacle Lease</u>" means that certain Lease 9850 by and between WPP LLC and Pinnacle Mining Company, LLC dated as of December 22, 2015.

"<u>Accounts Receivable</u>" means, with respect to each Seller, all accounts receivable in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"<u>Acquired Assets</u>" has the meaning set forth in <u>Section 2.1</u>.

"<u>Action</u>" means any action, suit, petition, plea, charge, claim, demand, hearing, inquiry, arbitration, complaint, grievance, summons, litigation, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, inquest, audit, examination, investigation or similar matter by or before any Governmental Authority or arbitrator.

"<u>Additional Sellers</u>" means: Beard Pinnacle, LLC, an Oklahoma limited liability company; and Pinnacle Land Company, LLC, Pinnacle Mining Company, LLC, Seneca Coal Resources, LLC, and Seneca North American Coal LLC, each a Delaware limited liability company.

"<u>Adjusted Cash Consideration</u>" means the Cash Consideration less (i) Apportioned Taxes attributable to a Pre-Closing Tax period as determined under <u>Section 8.1(b)</u>, (ii) Transfer Taxes for which Sellers are responsible under <u>Section 8.1(a)</u>, (iii) any amounts to be deducted from the Adjusted Cash Consideration pursuant to <u>Section 8.15</u>, (iv) the WPP Payment and (v) the aggregate amount of all Excluded Cure Costs (unless previously paid by the Sellers or to be paid by the Sellers at the Closing)

"<u>Affiliate</u>" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Exchange Act.

"<u>Agreement</u>" has the meaning set forth in the introductory paragraph.

2

"Allocation" has the meaning set forth in <u>Section 3.2</u>.

"Applicant Violator System" has the meaning set forth in <u>Section 5.9(g)</u>.

"Apportioned Taxes" has the meaning set forth in <u>Section 8.1(b)</u>.

"Assumed Contracts" has the meaning set forth in <u>Section 2.5</u>.

"Assumed Liabilities" has the meaning set forth in <u>Section 2.3</u>.

"Assumption Agreement" means an Assignment and Assumption Agreement in customary form reasonably acceptable to the Parties.

"Avoidance Action" means any avoidance, preference, recovery, claim, right or cause of action of any Seller arising under Chapter 5 of the Bankruptcy Code or under any analogous state or federal laws relating to the Designated Assets.

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" has the meaning set forth in the recitals.

"Benefit Plan" and "Benefit Plans" shall mean any "employee benefit plan" within the meaning of Section 3(3) of ERISA (including any Multiemployer Plan) and any other employee benefit plan, program, policy, practice, arrangement, Contract or agreement (including any Collective Bargaining Agreement), whether written or oral and whether or not subject to ERISA, in each case, (x) under which any current or former officer, director, employee, leased employee or consultant (or any of their respective beneficiaries) of any of the Sellers or any of their Subsidiaries has any present or future right to benefits, (y) which any of the Sellers or any of their Subsidiaries or ERISA Affiliates is a party to or any of the Sellers or any of their Subsidiaries or ERISA Affiliates sponsors, maintains, contributes to, or has any obligation to sponsor, maintain or contribute to, or (z) pursuant to, under or with respect to which any of the Sellers or any of their Subsidiaries has or has any direct or indirect Liability, whether contingent or otherwise, including by reason of their affiliation with any ERISA Affiliate.

"Bidding Procedures" means bid procedures in the form attached as Exhibit 2 to the Bidding Procedures Order, with such amendments, modifications or supplements as approved by Buyer and the Sellers.

"Bidding Procedures Order" means *the Order (I) Authorizing the Debtors to Utilize the Opening Bid and Opening Bidder's Proposed Agreement in Connection with the Sale, (II) Approving the Bidding Procedures for the Sale of the Debtors' Assets, (III) Scheduling Hearings and Objection Deadlines With Respect to the Sale, (IV) Schedules Bid Deadlines and an Auction, (V) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VII) Granting Related Relief, filed on December*

20, 2018 [Docket No. 487], with such amendments, modifications or supplements as approved by Buyer and the Sellers and entered by the Bankruptcy Court.

"Bill of Sale" means a Bill of Sale in customary form reasonably acceptable to the Parties.

"Black Lung Act" means the Federal Coal Mine Safety and Health Act of 1969, the Black Lung Benefits Act of 1972, the MSHA, the Black Lung Benefits Reform Act of 1977, or and the Black Lung Benefits Amendments of 1981.

"Black Lung Liability" means any liability or benefit obligations related to black lung claims and benefits under the Black Lung Act, and liabilities and benefits related to pneumoconiosis, silicosis, exposure to isocyanates or other lung disease arising under any federal or state law.

"Bluestone" means Bluestone Resources, Inc., a Delaware corporation.

"Bluestone APA" means that certain Asset Purchase Agreement dated as of the date hereof among Bluestone, the Company and certain Subsidiaries of the Company, a copy of which has been provided to Buyer prior to the date hereof.

"Bluestone Closing" means the consummation of the transactions contemplated by the Bluestone APA in accordance therewith.

"Bluestone Permits" means the Permits set forth on Exhibit E.

"Brewster Complaint" has the meaning set forth in Section 7.9.

"Broad Surface Rights" means rights across all surface property (whether owned or leased, and including easements) to be transferred to Bluestone pursuant to the Bluestone APA, including rights for the use of haul roads, access roads, other rights of way, rights to relocate surface facilities, construction of potential new roads and conduct of operations to manage water discharge operations.

"Broad Surface Rights Property" means the real property that is the subject of the Broad Surface Rights Reservation, but only to the extent relating to or affecting the Broad Surface Rights.

"Broad Surface Rights Reservation" has the meaning set forth in Section 7.10.

"Business Day" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required, unable to or authorized to close.

"Buyer" has the meaning set forth in the introductory paragraph and shall also include any Buyer Designee.

"Buyer Designee" has the meaning set forth in Section 4.4.

4

"Cash Consideration" means $3,750,000 in cash.

"Chapter 11 Plan" means the Sellers' First Amended Joint Chapter 11 Plan filed with the Bankruptcy Court on February 8, 2019 [Docket No. 771], as it may be amended, modified or supplemented, and including all exhibits thereto.

"Claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Closing Required Permits" means the Permits described on Exhibit C.

"Coal Act" means the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701, et seq.

"Coal Reserves" means, specifically excluding all Excluded Assets, any and all of the coal located upon or within the Owned Real Property or the adverse coal tracts located upon or within the Contura/WPP Lease Properties, in each case to the extent owned by the Sellers.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" means any collective bargaining agreements, works council agreements, labor union contracts, understandings and past practices, trade union agreements, and other agreements with any Union.

"Company" has the meaning set forth in the introductory paragraph.

"Confidential Information" has the meaning set forth in Section 12.2.

"Confidentiality Agreement" means the Confidentiality Agreement dated as of October 29, 2018 between the Company and the Buyer.

"Confirmation Order" means an order entered by the Bankruptcy Court confirming the Chapter 11 Plan pursuant to Section 1129 of the Bankruptcy Code and approving any transactions contemplated therein and the transactions described in this Agreement and in the other Transaction Documents pursuant to Sections 363, 365, 1123(a)(5)(D), 1141, and 1146, all being in form and substance acceptable to the Sellers and Buyer. References to the Confirmation Order refer also to the Chapter 11 Plan as if it were incorporated by reference in the Confirmation Order.

"Contract" means any legally binding agreement, contract, obligation, promise, undertaking, lease, sublease, purchase order, arrangement, license, commitment, insurance policy or other binding arrangement or understanding (in each case whether written or oral), and any amendments, modifications or supplements thereto.

"Consent Order" has the meaning set forth in Section 2.3(f).

"Contura/WPP Lease" has the meaning set forth in the recitals.

"Contura/WPP Lease Properties" means the areas referred to as Indian Creek/Pocahantas 3 (i.e., Retained Mineral Block A and Retained Mineral Block B) and the mine void areas as generally set forth on the map included in Exhibit A.

"Cure Costs" means all monetary liabilities, including pre-petition monetary liabilities, of the Sellers that must be paid or otherwise satisfied to cure all of the Sellers' monetary defaults under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order or herein.

"Cure Notice" means, with respect to each Assumed Contract, the notice submitted by the Sellers to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order setting forth, among other things, the Cure Cost amount with respect thereto as calculated by the Sellers.

"Data Room" means that certain SecureDocs virtual data room maintained under the name "Mustang" by or on behalf of the Company in connection with the Bankruptcy Cases at https://advantage.securedocs.com/.

"Deeds" means (i) unless otherwise provided in a Schedule to this Agreement with respect to conveyance of a particular parcel of Owned Real Property, special (or limited) warranty deeds, or jurisdictional equivalents, as the case may be, in recordable form for the appropriate jurisdiction, reasonably acceptable to Buyer, transferring title to the Owned Real Property and Improvements thereon (subject only to Permitted Encumbrances) and transferring the Broad Surface Rights Reservation, and (ii) if expressly provided in a Schedule to this Agreement with respect to conveyance of a particular parcel of Owned Real Property, the type of deed or other instrument so specified.

"DEP" means the West Virginia Department of Environmental Protection.

"Deposit" means $1,675,000 in cash deposited by Buyer prior to the date hereof in a separate interest-bearing escrow account established by the Sellers pursuant to the Bidding Procedures.

"Designated Assets" means, collectively, the Acquired Assets, the Contura/WPP Lease Properties, the Specific Sites Easement Property and the Broad Surface Rights Property.

"Designated Permits" means the Permits issued to the Company or its Subsidiaries identified as U-0204-83, O-4008-92 and O-4010-97.

"DIP Lenders" has the meaning set forth in the Final DIP Order.

"Disclosure Schedules" means the Disclosure Schedules attached hereto, dated as of the date hereof, delivered by the Sellers to Buyer in connection with the execution of this Agreement.

6

"Employees" means all of the current or former employees of the Sellers or any of their Subsidiaries on the Execution Date, as well as any additional persons who become employees of the Sellers or any of their Subsidiaries during the period from the Execution Date through and including the Closing Date.

"Encumbrance" means any "interest", as that term is used in Section 363(f) and, as applicable, Section 1141(c), of the Bankruptcy Code, charge, lien, Claim, right, demand, mortgage, lease, debt, losses, damage, demand, fine, judgment, penalty, liability, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, rights of others, easement, restrictive covenant, right of way, preemptive right, conditional sale, servitude, conditional sale agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition or otherwise), encroachment, encumbrance, third party interest or other restriction or limitation of any kind, whether imposed by Contract, Legal Requirement, equity or otherwise.

"Environmental, Health and Safety Laws" means any and all Legal Requirements concerning or relating to (a) public health and safety (to the extent relating to the actual or potential Release of or exposure to Hazardous Substances), (b) worker/occupational health and safety, (c) land use, zoning, odor or noise, or (d) pollution or protection of the environment, including those relating to (i) the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, storage, disposal, distribution, importing, labeling, testing, processing, discharge, Release, threatened Release, control, or cleanup involving Hazardous Substances, (ii) SMCRA (including its implementing regulations and any state analogues), (iii) MSHA, (iv) human health as affected by hazardous or toxic substances, (v) acid mine drainage, and (vi) mining operations and activities to the extent relating to Reclamation.

"Environmental Permit" means any and all permits, licenses, approvals, consents, waivers, franchises, filings, accreditations, registrations, certifications, notifications, exemptions, clearances and any other authorization required under any applicable Environmental, Health and Safety Law (including those required under any applicable Environmental, Health and Safety Laws for the construction, maintenance and operation of any coal mine or related processing facilities or Reclamation and restoration of land, water and any current, abandoned or former mines, and of any other environment affected by such mines, as required pursuant to any applicable Environmental, Health and Safety Law).

"Equipment" means, specifically excluding all Excluded Assets, all pumps, transformers, power poles, electric lines, water lines, ventilation fans, motors, furniture, fixtures, equipment, computers, machinery, vehicles, apparatus, appliances, implements, telephone systems, signage, supplies and all other tangible personal property of every kind and description, (including all mobile mining equipment, parts, supplies, tires and components), and all Improvements and tooling, in each case, located at the Owned Real Property or the Specific Sites and primarily related to the activities performed at the Owned Real Property or the Specific Sites, including pipes, communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties, indemnities, licenses and all similar rights from or against the vendor applicable thereto, and all other equipment, fixed assets and

7

tangible assets located at the Owned Real Property or the Specific Sites. Without limiting the foregoing, Equipment shall include, for the avoidance of doubt, the items set forth on <u>Exhibit A</u> attached hereto.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974.

"<u>ERISA Affiliate</u>" means any Person, trade or business that would be considered a single employer with any Seller or any Subsidiary of any Seller under Sections 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA or would be under "common control" with any Seller or any Subsidiary of any Seller within the meaning of Section 4001(a)(14) of ERISA. Any former ERISA Affiliate shall continue to be considered an ERISA Affiliate within the meaning of this definition with respect to the period such entity was an ERISA Affiliate and with respect to Liabilities arising during such period (but, for the avoidance of doubt, not after such period) for which such Person could be liable under the Code or ERISA.

"<u>Estate Liability Amounts</u>" has the meaning set forth in <u>Section 8.15</u>.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934.

"<u>Excluded Assets</u>" has the meaning set forth in <u>Section 2.2</u>.

"<u>Excluded Cure Costs</u>" means, with respect to any given Assumed Contract, all Cure Costs in excess of the amount set forth on <u>Exhibit B</u> in respect of such Assumed Contract.

"<u>Excluded Liabilities</u>" has the meaning set forth in <u>Section 2.4</u>.

"<u>Excluded Pre-Closing EHS Fines and Penalties</u>" has the meaning set forth in <u>Section 2.3(g)</u>.

"<u>Excluded Pre-Closing Permit Fines and Penalties</u>" has the meaning set forth in <u>Section 2.3(f)</u>.

"<u>Execution Date</u>" has the meaning set forth in the introductory paragraph.

"<u>FASB 410</u>" has the meaning set forth in <u>Section 5.16(b)</u>.

"<u>FCPA</u>" has the meaning set forth in <u>Section 5.13</u>.

"<u>Final DIP Order</u>" means the *Final Order (I) Authorizing Postpetition Secured Financing Pursuant to <u>11 U.S.C. §§ 105(A)</u>, <u>361</u>, <u>362</u>, <u>363</u>, <u>364(C)(1)</u>, <u>364(C)(2)</u>, <u>364(C)(3)</u>, <u>364(D)(1)</u> and <u>364(E)</u>, (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to <u>11 U.S.C. §363</u>, (III) Granting Adequate Protection Pursuant to <u>11 U.S.C. §§ 361</u>, <u>363</u> and <u>364</u> and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and 4001(C)* [Docket No. 300].

"<u>Final Order</u>" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which is in full

force and effect, which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Buyer) and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Order shall have become final in accordance with Bankruptcy Rule 8002; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"Fundamental Representations" means the representations and warranties set forth in Section 5.1, Section 5.2, Section 5.3, Section 5.6 and Section 5.12.

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied.

"Gas Well" means any coal bed methane gas well operated by any Seller.

"Governmental Authority" means any United States federal, state or local or any foreign government, multi-national organization, quasi-governmental authority, or other similar recognized governmental authority or regulatory or administrative authority, agency or commission or any court, tribunal or judicial body having jurisdiction.

"Governmental Authorization" means any approval, consent, license, Permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"Hazardous Substance" means any "pollutant," "contaminant," "hazardous waste," "hazardous material" or "hazardous substance" defined as such under any Environmental, Health and Safety Laws or any other substance, pollutant, contaminant, chemical, waste or related material, or combination thereof, whether solid, liquid, or gaseous in nature, subject to regulation, investigation, remediation, control or corrective action under any Environmental, Health and Safety Laws.

"Hearing" means the hearing to consider approval of the Transaction Order, the transactions contemplated thereby and the transactions contemplated hereby.

"Improvements" means the buildings, structures, fixtures, systems, facilities, easements, rights-of-way, privileges, improvements, PP&E, licenses, hereditaments, appurtenances and all other rights and benefits appurtenant to the Owned Real Property or the Specific Sites, as the case may be.

"Indebtedness" means, at any time and with respect to any Person: (a) all indebtedness of such Person for borrowed money; (b) all indebtedness of such Person for the deferred purchase price of property or services; (c) all obligations of such Person evidenced by

9

notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even if the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (e) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, to the extent required to be so recorded; (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities; (g) all Indebtedness of others referred to in clauses (a) through (f) above guaranteed directly or indirectly by such Person; and (h) all Indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Encumbrance upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"IRS" has the meaning set forth in Section 5.7(e).

"Knowledge" means, with respect to any matter in question, in the case of the Sellers, the actual knowledge of any of the individuals listed on Schedule 1.1(a) after due inquiry.

"Leased Real Property" has the meaning set forth in Section 5.4(c).

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, or multinational law (statutory, common or otherwise), constitution, treaty, convention, ordinance, equitable principle, code, rule, regulation or Order enacted, adopted, promulgated, issued or applied by any Governmental Authority or other similar authority, including for the avoidance of doubt MSHA, OSHA, and any Mining Law.

"Letter Agreement" means that certain Letter Agreement Regarding Pinnacle Transactions dated as of the date hereof among the Company, Buyer, WPP and Bluestone.

"Liability" means any liability, obligation, duty, debt, commitment, Claim or Encumbrance of any kind or nature whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), including those arising under any Legal Requirement, or imposed by any court or arbitrator of any kind.

"Material Adverse Effect" means any change, event, state of facts or occurrence that individually or in the aggregate (taking into account all other such changes, events, states of fact or occurrences) has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (a) the Designated Assets, taken as a whole or (b) the ability of the Sellers to consummate the transactions contemplated hereby or to perform any of their obligations under this Agreement, but excluding in the case of clause (a) any change or effect to the extent that it results from or arises out of (i) any reasonably anticipated effects of the filing, commencement or prosecution of the Bankruptcy Cases; (ii) the execution and delivery of this

10

Agreement or the announcement thereof or consummation of the transactions contemplated hereby (provided that this clause (ii) shall not apply to any representation or warranty that, by its terms, speaks specifically of the consequences arising out of the execution or performance of this Agreement or any of the Transaction Documents or the consummation of any of the transactions contemplated hereby or thereby); (iii) changes in Legal Requirements or accounting regulations (including GAAP) after the date hereof; (iv) any specific action required to be taken (or omitted) hereby or taken (or omitted) at the written request of Buyer; (v) general or technological changes in the industries in which the Sellers compete; (vi) any failure of the ownership and operation of the Designated Assets to achieve external or internal forecasts or financial projections (provided that this clause (vi) shall not prevent a determination that any event, circumstance, effect or change underlying such failure to meet projections or forecasts has resulted in a Material Adverse Effect); (vii) any breach of this Agreement by Buyer; (viii) any changes in financial or securities markets or any change or effect of economic or political conditions (including acts of terrorism, hostilities, sabotage, military actions or war, or any material worsening of such acts of terrorism, hostilities, sabotage, military actions or war); or (ix) acts of nature (including earthquakes, storms, severe weather, fires, floods and natural catastrophes), in each case of clauses (iii), (v), (viii) and (ix) to the extent that such conditions do not disproportionately affect the Sellers, taken as a whole, as compared to other companies that are principally engaged in the same business as the Sellers.

"Material Contract" means (i) any Assumed Contract or (ii) any Contract providing any Person with any right of access to the Designated Assets in connection with any matters relating to Reclamation, Environmental, Health and Safety Laws or permitting.

"Mining" has the meaning set forth in the definition of Mining Law.

"Mining Financial Assurances" has the meaning set forth in Section 5.16(a).

"Mining Law" means all Legal Requirements relating to the exploration, extraction, processing, storage and transportation of coal and non-coal minerals and to the Reclamation of lands used for such activities (collectively referred to as "Mining"), including (i) SMCRA and (ii) MSHA.

"Mining Permits" means all applicable Permits related to Mining or otherwise required by Mining Law.

"MSHA" means the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § § 801 et. seq., and state analogues.

"Multiemployer Plan" means a "multiemployer plan," within the meaning of Section 4001(a)(3) of ERISA.

"Neutral Accountant" shall mean a national independent accounting firm mutually acceptable to the Sellers and to Buyer.

"Order" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree or similar

determination, agreement or finding entered, issued, made or rendered by any Governmental Authority or an arbitrator, mediator or other judicially sanctioned Person or body.

"Ordinary Course of Business" means, with respect to any Person, the ordinary and usual course of normal day-to-day operations of such Person and its business, consistent with its past practice.

"OSHA" means the Occupational Safety and Health Act and state analogues.

"Other Owned Interests" means (i) all of the real property owned by the Sellers that relates to or is a part of the Subject Property and (ii) all of the real property that the Sellers acquire pursuant to the Assumed Contracts.

"Other Rights Owners" has the meaning set forth in Section 7.6(b).

"Outside Date" has the meaning set forth in Section 11.1(b)(ii).

"Owned Real Property" means, specifically excluding all Excluded Assets, the real property described on Schedule 5.4(a) and the Other Owned Interests, together with all of the Sellers' right, title and interest in, to or under the following: (i) all buildings, structures, systems, hereditaments and Improvements located on such real property, (ii) all Improvements relating to the Owned Real Property, fixtures, systems, mine infrastructure, preparation plant structures and Improvements related thereto, loadout structures and Improvements related thereto, storage facilities, rail sidings, machinery, apparatus, equipment and items of personal property affixed to such real property, (iii) all rights of way, easements, if any, in or upon such real property, licenses and all rights-of-way, beneficial easements, licenses, and other rights, privileges and appurtenances belonging or in any way pertaining to such real property interests (including the right, title and interest of any Seller in and to any Coal Reserves, mineral rights, underground and surface coal and mining rights, royalty rights, support rights and waivers, subsidence rights, water and water rights relating or appurtenant to such real property), and (iv) all strips and gores and any land lying in the bed of any public road, highway or other access way, open or proposed, adjoining such real property.

"Party" or "Parties" means, individually or collectively, as applicable, Buyer and the Sellers.

"Permits" means any and all permits (including Environmental Permits and Mining Permits), licenses, approvals, consents, waivers, franchises, filings, accreditations, registrations, certifications, certificates of occupancy, notifications, exemptions, clearances, and authorizations, together with all modifications, renewals, amendments, supplements and extensions thereof and applications therefor, of or from any Governmental Authority or issued or granted pursuant to Legal Requirements, as amended, supplemented and modified through the Execution Date, that are necessary or required for the Sellers to own and operate the Designated Assets.

"Permitted Encumbrances" means (i) statutory liens for Taxes and assessments that are not yet due and payable and for which adequate reserves have been established in accordance with GAAP; (ii) landlords', carriers', warehousemen's, mechanics', suppliers',

materialmen's or repairmen's statutory liens, that, in each case, arise in the Ordinary Course of Business; or (iii) easements, covenants, conditions, restrictions and other similar Encumbrances on real property that arise in the Ordinary Course of Business and that do not materially detract from the value of the affected Real Property and do not materially interfere with the present or intended use of such Real Property. For the avoidance of doubt, no lien or encumbrance in respect of any severance, coal severance or similar Tax will be a Permitted Encumbrance.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group (as defined in Section 13(d)(3) of the Exchange Act) or Governmental Authority.

"Petition Date" means October 14, 2018.

"Pinnacle Complex" means the mining complex commonly referred to as "Pinnacle" located primarily in Wyoming County, West Virginia.

"Pinnacle Lease Option" means the Option (as defined in the WPP Settlement Agreement) to have the 2015 Pinnacle Lease reinstated with respect to all of the premises covered thereby, except the Pocahontas No. 4 reserves shown on Exhibit B thereto.

"Post-Closing Tax Period" has the meaning set forth in Section 8.1.

"Pre-Closing Tax Period" has the meaning set forth in Section 8.1.

"Proceeding" means any Action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Professional" means any Person retained by the Sellers or a statutory committee of unsecured creditors in the Bankruptcy Cases pursuant to an Order of the Bankruptcy Court under Section 327, 363 or 1103 of the Bankruptcy Code, or any Person retained by the DIP Lenders (as defined in the Final DIP Order) or the Buyer in connection with the Bankruptcy Cases.

"Professional Fee Claims" means any administrative claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals in connection with the Bankruptcy Cases through and including the Closing Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

"Purchase Price" has the meaning set forth in Section 3.1.

"Real Property" means the Owned Real Property, the Specific Sites Easement Property and the Broad Surface Rights Property.

13

"Reclamation" means reclamation, revegetation, recontouring, abatement, control, remediation, clean-up or prevention of adverse effects of mining activities.

"Release" means (a) any releasing, spilling, discharging, disposing, leaking, pumping, injecting, pouring, depositing, dispersing, emitting, leaching or migrating into the indoor or outdoor environment, including ambient air, surface water, groundwater and surface or subsurface strata, or into or out of any property, including the migration of Hazardous Substances through or in the air, soil, surface water, groundwater, surface or subsurface strata or property and (b) the abandonment or discarding of barrels, tanks, containers or receptacles, whether or not sealed or closed, containing Hazardous Substances.

"Remaining Deposit" means the Deposit less the amount returned to Buyer prior to the Closing pursuant to Section 8.12.

"Remaining Interests" has the meaning set forth in Section 7.9.

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Sale Order" means an order of the Bankruptcy Court, in form and substance satisfactory to Buyer and the Sellers, approving the consummation of the transactions contemplated hereby and by the other Transaction Documents outside of a Chapter 11 plan and pursuant to Sections 363 and 365 of the Bankruptcy Code.

"Sellers" has the meaning set forth in the introductory paragraph.

"Sellers' Representative" has the meaning set forth in Section 12.16.

"Settlement and Release Agreements" has the meaning set forth on Exhibit B.

"SMCRA" means the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§1201 et seq.

"Specific Sites" means the Indian Creek power substation (including, for the avoidance of doubt, Indian Creek Substation 1 and Indian Creek Substation 2), ASCO Fan, Stanley Fork Mine Fan & S-Fork Pump Station and pump sites 5A, 8A, 8R, 8I and 9E, the general locations of which are set forth on the map attached hereto as Exhibit A.

"Specific Sites Easement" has the meaning set forth in Section 7.11.

"Specific Sites Easement Agreement" has the meaning set forth in Section 7.11.

"Specific Sites Easement Property" means the real property that is the subject of the Specific Sites Easement, but only to the extent relating to or affecting the Specific Sites Easement.

14

"Specified Records" means drill hole data, e-logs of the drill holes, quality analysis of the drill holes, geotechnical test results for any geotechnical work performed, grouting records for all de-gas holes, permit records for any portion of any Permit (Article III and NPDES), water augmentation records, pre-mine subsidence reports, all records affiliated with any Designated Permits, water quality analysis and reports, and discharge monitoring reports, in each case covering or relating to any Designated Assets.

"Straddle Period" has the meaning set forth in Section 8.1(b).

"Subject Property" means that certain 121.73 acres, more or less, located in Center District, Wyoming County, West Virginia (as described in Pinnacle Land Company, LLC v. Gregory Brewster a/k/a Gary Brewster, et al. (Civil Action No. 17-C-137)).

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more other Subsidiaries of such Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, unclaimed property, escheat, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, coal severance, environmental (including taxes under Section 59A of the Code), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any liability for any items described in clause (i) payable by reason of contract, transferee liability or operation of law (including Treasury Regulation Section 1.1502-6) or otherwise.

"Tax Records" means all Tax Returns, schedules and work papers, and all material records and other documents relating to Tax matters.

"Tax Refund" means any Tax refund, credit or similar benefit (including any interest paid or credited with respect thereto).

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination,

15

assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Taxing Authority" means any Governmental Authority having jurisdiction over the assessment, determination, collection or other imposition of any Taxes.

"Transaction Documents" means this Agreement, the Assumption Agreement, the Bill of Sale, the Specific Sites Easement Agreement and the Letter Agreement and any other agreements, instruments or documents entered into at the Closing pursuant to this Agreement.

"Transaction Order" means a Confirmation Order unless a Confirmation Order is not entered by the Bankruptcy Court on or before April 5, 2019, after which date and in such case Transaction Order shall mean either a Sale Order or a Confirmation Order, at Buyer's sole discretion, which election Buyer shall convey to the Sellers in writing.

"Transfer Taxes" has the meaning set forth in Section 8.1(a).

"Treasury Regulations" means the Treasury regulations promulgated under the Code.

"UMWA" means the United Mine Workers of America.

"UMWA Collective Bargaining Agreements" means all Collective Bargaining Agreements between the UMWA and any Seller.

"Union" and "Unions" have the meanings set forth in Section 7.2(b)(v).

"West Virginia Mining License" has the meaning set forth in Section 7.6(a).

"WPP" has the meaning set forth in the recitals.

"WPP Payment" means $500,000.

"WPP Settlement Agreement" means the *Agreed Order and Settlement Agreement Related to Motion to Assume Oak Grove Coal Mining Lease* [ECF No. 299].

1.2     Other Definitions and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Contracts, Agreements and Orders. Any reference in this Agreement to any contract, license, agreement or order means such contract, license, agreement or

16

order as amended, supplemented or modified from time to time in accordance with the terms thereof, so long as such amendment, supplement or modification has heretofore been made available to Buyer.

(iii)     Day. Any reference in this Agreement to "days" (but not Business Days) means to calendar days.

(iv)     Dollars. Any reference in this Agreement to "$" means United States dollars.

(v)     Exhibits and Schedules. All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

(vi)     Gender and Number. Any reference in this Agreement to gender includes all genders, and any singular term shall be deemed to include the plural, and any plural term the singular.

(vii)     Headings. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section," "Article" or "Schedule" are to the corresponding Section, Article or Schedule of this Agreement unless otherwise specified.

(viii)     Herein. Words such as "herein," "hereof," "hereby" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear.

(ix)     Including. The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)     Law. Any reference to any law in this Agreement means such law as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time.

(xi)     Other. The words "to the extent" shall be interpreted to mean "to the extent (but only to the extent)".

(xii)     Used or Held for Use. Any reference to "used or held for use" (or words of similar import) in relation to the Designated Assets shall be interpreted to mean "used or held for use in whole or in part."

(xiii)     Sole Cost and Expense. Any reference to "Buyer's sole cost and expense" (or words of similar import) in the context of paying the Sellers' costs shall be interpreted to include only reasonable third party costs incurred by the Sellers.

17

(xiv)     Person. Any reference to a Person shall include such Person's successors and permitted assigns.

(xv)     Made Available. Any reference in this Agreement to "made available" shall mean that such documents or information referenced shall have been provided in the Data Room prior to the Execution Date or shall have been provided to Buyer or its Representatives prior to the Execution Date.

(b)     No Strict Construction. Buyer, on the one hand, and the Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and the Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limiting the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE 2

### PURCHASE AND SALE

2.1     Purchase and Sale.

Subject to the entry of the Transaction Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, the Sellers shall unconditionally sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer and/or to one or more Buyer Designees, and Buyer (and/or such Buyer Designees) shall purchase, acquire and accept from the Sellers, free and clear of all Encumbrances (other than Permitted Encumbrances), all of the Sellers' right, title and interest in, to or under the following properties, rights, claims and assets (in each case, except for the Excluded Assets or the Excluded Liabilities, as applicable), wherever situated or located, whether real, personal or mixed, whether tangible or intangible, whether identifiable or contingent, whether owned, leased, licensed, and whether or not reflected on the books and records of the Sellers, as the same shall exist on the Closing Date (collectively, the "Acquired Assets"):

(a)     (i)     the Owned Real Property, together with all interests in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof, (ii) the Specific Sites Easement and (iii) the Broad Surface Rights Reservation;

(b)     all Equipment, including those specific assets set forth on Schedule 2.1(b);

(c)     subject to Section 2.4(c) and Section 2.5, all Assumed Contracts;

18

(d)    all Coal Reserves to the extent of the Sellers' interest in such Coal Reserves;

(e)    all rights to subside lands associated with mining operations, all relocation rights associated with utility easements, and all rights to the waiver of and release from subsidence liability and indemnity rights under any and all conveyances, representations and instruments or agreements of any kind and nature, in each case to the extent relating to the Owned Real Property, the Contura/WPP Lease Property or the Assumed Liabilities (including for the avoidance of doubt Buyer's obligations in respect of Reclamation pursuant to this Agreement);

(f)    except to the extent prohibited by law, all rights of the Sellers to the warranties and licenses received from manufacturers or sellers of the Equipment, Improvements or any component thereof;

(g)    to the extent not prohibited by Legal Requirements, all documents and other books and records (financial, accounting and other) except to the extent solely related to the Excluded Assets or the Excluded Liabilities, and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case, that are used or useful in, held for use in or intended to be used in, or that arise in any way out of or are related to, the Acquired Assets or the Contura/WPP Lease Properties or the Assumed Liabilities, including any Specified Records; <u>provided</u>, that (i) the Sellers shall be permitted to keep copies of all of the foregoing to the extent necessary or required by the Bankruptcy Court or in connection with the Bankruptcy Cases, subject to <u>Section 12.2</u> and (ii) to the extent any documents, books or records described in clause (i) are also required to be provided to Bluestone pursuant to the Bluestone APA, Sellers shall provide copies of such documents, books or records to Buyer;

(h)    all claims (other than Avoidance Actions, which shall be addressed solely by <u>Section 2.1(i)</u>), interests, rebates, abatements, remedies, recoveries, demands, reimbursements, indemnification rights, causes of action and rights of whatever nature, arising under or relating to any of the Acquired Assets or the Contura/WPP Lease Properties or the Assumed Liabilities, including those arising out of the Assumed Contracts, express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors or others or arising from the breach by third parties of their obligations under the Assumed Contracts, to the extent affecting the Equipment or other Acquired Assets or the Contura/WPP Lease Properties or ordered by the Sellers prior to the Closing Date (and in any case, any component thereof);

(i)    all Avoidance Actions with respect to counterparties to Assumed Contracts;

19

(j) all third party, business interruption, property or casualty insurance proceeds to the extent relating to Buyer or the Sellers in respect of the Acquired Assets, the Contura/WPP Lease Properties or the Assumed Liabilities;

(k) all assets, if any, listed on Schedule 2.1(k) (regardless of whether such assets are covered by any of the foregoing);

(l) all proceeds and products after the date of this Agreement of any and all of the foregoing Acquired Assets or the Contura/WPP Lease Properties;

(m) any plant licenses or certifications necessary for the continued operation of the electrical facilities, in each case to the extent related to any transformers included in the Acquired Assets;

(n) any Tax Refunds of the Sellers with respect to Apportioned Taxes that are paid by Buyer in accordance with Section 8.1(b) and any property or mineral tax credits relating exclusively to the Acquired Assets;

(o) Tax Returns relating solely to the Acquired Assets; and

(p) all rights of the Sellers under the Settlement and Release Agreements (as defined on Exhibit B) to the extent not otherwise included pursuant to Section 2.1(h).

If the addition of any non-Seller Affiliate of the Company as a Seller party hereto would result in any asset that is not an Acquired Asset becoming an Acquired Asset, the Company shall cause such Affiliate to become a Seller under this Agreement and comply with the related obligations hereunder. The preceding covenant is expressly intended to survive the Closing. For the avoidance of doubt, any asset that is physically located at the Owned Real Property or any Specific Site (or was as of October 14, 2018 physically located at the Owned Real Property or any Specific Site but has been transported off-site for repair, rebuilding, refurbishment or the like and has not been returned as of the Closing) shall be deemed to be an Acquired Asset.

2.2 Excluded Assets.

Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer, and the Sellers shall retain all right, title and interest to, in and under, and all Liabilities with respect to, the Excluded Assets. For all purposes of and under this Agreement, the term "Excluded Assets" shall consist of all assets of the Sellers and their Affiliates that are not Acquired Assets, including the following items, assets and properties (whether or not such assets are otherwise described in Section 2.1):

(a) the assets, if any, listed on Schedule 2.2(a);

20

(b)     any and all Collective Bargaining Agreements;

(c)     (i) any personnel files or records relating to Employees and (ii) any and all Benefit Plans, and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

(d)     any shares of capital stock or other equity interest in or issued by any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock of other equity interest in or issued by any Seller, and any shares of capital stock or other equity interest in or issued by any Subsidiary of any Seller (including, for the avoidance of doubt, any foreign Subsidiary) or other entity in which any Seller holds an equity interest, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Subsidiary of any Seller or other entity in which any Seller holds an equity interest, including the capital stock or equity interest set forth on Schedule 2.2(d);

(e)     subject to Section 2.1(g), the limited liability company, partnership and corporate books and records, partnership and corporate proceedings, minute books, organizational or governing documents, stock ledgers and other records of the Sellers as they pertain to ownership, organization, qualification to do business or existence of the Sellers; provided, however, that copies of the foregoing items shall be made available by the Sellers to Buyer;

(f)     Documents that the Sellers are required by Legal Requirements to retain; provided, however, that copies of such Documents shall be delivered by the Sellers to Buyer at Closing to the extent that such Documents would constitute Acquired Assets but for this Section 2.2(f);

(g)     any Contract that is not an Assumed Contract;

(h)     all rights under or arising out of insurance policies to the extent not set forth in Section 2.1(j);

(i)     any prepaid deposits related to Professional fee retainers;

(j)     all Accounts Receivable;

(k)     any rights, claims or causes of action of the Sellers under this Agreement or any other Transaction Document;

(l)     any deposits, escrows, surety bonds or other financial assurances and any cash or cash equivalents securing any surety bonds or financial assurances;

21

(m)     all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, including any cash collateral used to secure surety bonds or other transactional assurances;

(n)     all deposits and all prepaid or deferred charges and expenses;

(o)   all Tax Returns of, or filed by, the Sellers or their Affiliates in respect of a Pre-Closing Tax Period (except that Buyer shall receive copies of any such Tax Returns to the extent reasonably required by Buyer); provided that a Tax Return relating solely to any Designated Asset shall be an Acquired Asset;

(p)     all Avoidance Actions;

(q)     all proceeds received from the sale or liquidation of any Excluded Assets;

(r)     any Tax Refund of the Sellers that is not described in Section 2.1(n);

(s)     any intercompany receivables between one or more of the Sellers or their Subsidiaries;

(t)     all Permits held by the Sellers to the extent not set forth in Section 2.1(m);

(u)     the Specific Sites (subject to the Specific Sites Easement); and

(v)     the Contura/WPP Lease Properties.

Notwithstanding anything to the contrary in this Agreement, if any asset or property is specifically identified in any of Sections 2.1(a) through 2.1(o), a corresponding schedule or otherwise, such asset or property will be deemed for purposes of this Agreement to be an Acquired Asset.

2.3     Assumed Liabilities.

Subject to entry of the Transaction Order, upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer and/or each relevant Buyer Designee shall, effective at the time of the Closing, assume and agree to discharge and perform when due, the following Liabilities of the Sellers (and only the following Liabilities of the Sellers) (the "Assumed Liabilities"):

(a)     all Liabilities under the Assumed Contracts (other than Excluded Cure Costs);

22

(b)     all Cure Costs that are not Excluded Cure Costs;

(c)     Liabilities first arising out of the ownership or operation of the Acquired Assets for periods following the Closing Date;

(d)     Transfer Taxes for which Buyer is responsible under Section 8.1(a);

(e)     all Taxes with respect to the Acquired Assets (other than the Specific Sites Easement and the Broad Surface Rights Reservation) attributable to any Post-Closing Tax Period as determined in accordance with Section 8.1(a);

(f)     Liabilities of the Sellers with respect to the Closing Required Permits, including: (i) such Liabilities for Reclamation and, if applicable, post-mining operation Liabilities with respect to the Closing Required Permits; (ii) compliance with performance obligations or standards under the Closing Required Permits and associated Legal Requirements; and (iii) subject to Section 7.6, obligations under the Closing Required Permits to replace bonds or other financial assurance instruments associated with the Closing Required Permits, excluding, in each of the preceding cases (i)-(iii), any civil or administrative fines or penalties or criminal sanctions imposed by any Governmental Authority (including (x) any civil or administrative fines or penalties or criminal sanctions with respect to any Closing Required Permits or (y) any civil or administrative fines, penalties or criminal sanctions pursuant to that certain Proposed Consent Order Number M-19-252 dated January 14, 2019 (the "Consent Order") arising from facts, events or circumstances occurring, or for which Sellers or any of their Affiliates have received a written notice of violation or notice of claim (or other written notice of similar legal intent or meaning), on or prior to the Closing Date ("Excluded Pre-Closing Permit Fines and Penalties"));

(g)     all Liabilities to the extent arising out of or relating to compliance with Environmental, Health and Safety Laws, Mining Law, MSHA, OSHA and any mine operating or safety compliance matters, in each case, to the extent related to the Acquired Assets (other than the Specific Sites Easement and the Broad Surface Rights Reservation), but excluding any civil or administrative fines or penalties or criminal sanctions imposed by any Governmental Authority (including any civil or administrative fines or penalties or criminal sanctions with respect to any Environmental, Health and Safety Laws, Mining Law, MSHA, OSHA or any mine operating or safety compliance matters) arising from facts, events or circumstances occurring, or for which Sellers or any of their Affiliates have received a written notice of violation or notice of claim (or other written notice of similar legal intent or meaning), on or prior to the Closing Date ("Excluded Pre-Closing EHS Fines and Penalties"); and

(h)     solely to the extent provided in Section 8.1(b), payment for accrued but unpaid Liabilities of the Sellers with respect to Real

23

Property Taxes (excluding, for the avoidance of doubt, any coal severance Taxes payable by Sellers) assessed with respect to the Acquired Assets (other than the Specific Sites Easement and the Broad Surface Rights Reservation), solely to the extent necessary to transfer the Acquired Assets (other than the Specific Sites Easement and the Broad Surface Rights Reservation) free and clear of any statutory senior priority lien on such Acquired Assets.

The assumption by Buyer of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

2.4    Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of, or Liability against, the Sellers, the Sellers' Subsidiaries, the business of the Pinnacle Complex or the Acquired Assets, of any kind or nature, whether absolute, accrued, contingent or otherwise, whether due or to become due and whether or not assets, and whether or not known or unknown or currently existing or hereafter arising or matured or unmatured, direct or indirect, and however arising, other than the Assumed Liabilities, and, subject to any discharge under section 1141 of the Bankruptcy Code and any other terms of the Transaction Order as applicable, the Sellers (and any third party that may assume them, as applicable) shall be solely and exclusively liable with respect to all Liabilities of, or against, the Sellers, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include each of the following Liabilities of the Sellers:

(a)    (i) all Liabilities with respect to (x) any Taxes imposed on or with respect to the business of the Pinnacle Complex or the Designated Assets that are attributable to any Pre-Closing Tax Period, or (y) any Taxes related to the Excluded Assets, (ii) all Liabilities for Taxes of any Seller or its stockholders or members (including, for the avoidance of doubt, severance, coal severance and similar Taxes owed by Sellers, whether or not shown as due on Schedule 5.7), including any Liability of any Seller for the Taxes of any other Person under Section 1.1502-6 of the U.S. Treasury regulations (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise and (iii) any Taxes that are not expressly assumed by Buyer;

(b)    all Liabilities with respect to Actions and Proceedings arising out of or relating to the ownership or operation of the Pinnacle Complex or the Designated Assets prior to the Closing, even if instituted after the Closing Date;

(c)    all Excluded Cure Costs;

(d)    all Liabilities to any owner or former owner of capital stock, options or warrants or other securities, or to current or former officer or director of any Seller or Subsidiary of any Seller;

Case 18-04177-TOM11    Doc 1323    Filed 04/15/19    Entered 04/15/19 11:55:00    Desc
Main Document    Page 148 of 225

(e)     any Liability of the Sellers or their Affiliates under any Indebtedness, including Indebtedness owed by any Seller to any direct or indirect Affiliate of such Seller, and any obligations or liability under debtor in possession financing incurred by the Sellers or their Affiliates during the Bankruptcy Case;

(f)     all Liabilities with respect to any Excluded Asset, including (i) any Benefit Plan, (ii) Contracts that are not Assumed Contracts, (iii) any and all Collective Bargaining Agreements, and (iv) Liabilities or other obligations in respect of any compensation or benefit plans, agreements, policies, practices, programs and arrangements of any ERISA Affiliate, including any Benefit Plan;

(g)     all Liabilities under any futures contracts, options on futures, swap agreements or forward sale agreements;

(h)     all Liabilities arising from or related to any use, transportation, release, treatment, storage or disposal of, or human exposure to, Hazardous Substances at or relating to (i) the Acquired Assets occurring before the Closing Date, or (ii) any location not included in the Acquired Assets (including the Excluded Assets);

(i)     any Excluded Pre-Closing Permit Fines and Penalties or Excluded Pre-Closing EHS Fines and Penalties;

(j)     drafts or checks outstanding at Closing;

(k)     any and all Liabilities for: (i) costs and expenses incurred or owed in connection with the administration of the Bankruptcy Cases (including all Professional Fee Claims); and (ii) all costs and expenses incurred in connection with the negotiation, execution and consummation of the transactions contemplated hereby;

(l)     other than the Assumed Liabilities pursuant to Section 2.3(f) and Section 2.3(g), any Liabilities arising out of, in respect of or in connection with the failure by any Seller or any of its Affiliates to comply with any Legal Requirement or order by any Governmental Authority;

(m)     any Liability with respect to any coal sales, natural gas sales in any way related to the Pinnacle Complex or other goods sold or any service provided by the Sellers or their Affiliates, including any such Liability or obligation (i) pursuant to any express or implied representation, warranty, agreement, coal specification undertaking or guarantee made by any Seller or any Affiliate of such Seller, or alleged to have been made by any Seller or any Affiliate of such Seller, (ii) imposed or asserted to be imposed by operation of Legal Requirements or (iii) pursuant to any doctrine of product liability;

25

(n)     all trade payables, accounts payable, obligations relating to any earn-out or bonus payments, accrued expenses and all other current liabilities of the Sellers or any of their Subsidiaries;

(o)     all workers' compensation claims and occupational health claims related to the Acquired Assets, including and with respect to any Employees;

(p)     any Liability or other obligations of the Sellers, any of their Subsidiaries or any ERISA Affiliate (or any predecessor of any of the foregoing) arising under, relating to or with respect to any multiple employer pension plan, single employer pension plan or Multiemployer Plan, including any withdrawal liability under such plans, and any Liability or other obligations of any ERISA Affiliate arising under, relating to or with respect to any compensation or benefits agreement, arrangement, plan, policy, practice or program, including any Benefit Plan;

(q)     all Liabilities or other obligations with respect to Employees (or their representatives, dependents, spouses or beneficiaries), contractors or consultants of any Seller or any of their Subsidiaries, and current and former employees, contractors or consultants of any ERISA Affiliate, including with respect to the Coal Act and any and all Liabilities or other obligations relating to any Benefit Plan;

(r)     all Liabilities arising under the Worker Adjustment and Retraining Notification Act of 1988, and including any similar state or local Legal Requirement;

(s)     all Liabilities arising under the Black Lung Act and workers' compensation Liabilities related to the Acquired Assets, including with respect to any Employees, and further including, but not limited to, any such Liabilities arising under the Black Lung Act and workers' compensation Liabilities of any Seller or any of Seller's predecessors;

(t)     any and all Liabilities or other obligations arising under any employment or consulting agreement, Collective Bargaining Agreement or arrangement, or severance, retention or termination agreement, plan, policy, practice, program or arrangement with any Employee, consultant or contractor (or its representatives) of any Seller or its ERISA Affiliates or their predecessors, including UMWA successorship;

(u)     other Liabilities relating to the conduct of the business at the Pinnacle Complex or to the Acquired Assets (and the use thereof) arising or accruing at any time on or prior to the Closing;

(v)     all Liabilities (other than Assumed Liabilities) accruing, arising out of, or relating to any federal, state or local investigations of, or Claims or actions against, any Seller or any Employee, agents, vendors or

26

representatives of any Seller, to the extent arising out of actions taken prior to the Closing;

(w)      all Liabilities (including post-operation Liabilities) relating to Gas Wells; and

(x)      any Liability to the extent relating to or arising out of an Excluded Asset.

2.5      <u>Assignment and Assumption of Contracts</u>.

(a)      (i) <u>Schedule 2.5</u> sets forth a list of Contracts to which one or more Sellers are party and which Buyer wishes to "<u>Assume</u>" (the "<u>Assumed Contracts</u>"), which Assumed Contracts shall be deemed assumed and effective as of the Closing Date, subject to the next sentence. Notwithstanding anything in this Agreement to the contrary, Buyer may, from time to time in its discretion, at any time prior to the date that is two Business Days prior to the Closing Date, amend or revise, in writing, <u>Schedule 2.5</u> to remove any Assumed Contracts that Buyer does not wish to "Assume", and any Contracts so removed shall no longer be considered "Assumed Contracts" for purposes of this Agreement.

(ii) In addition to the payment of Cure Costs (other than Excluded Cure Costs) by Buyer and the payment of Excluded Cure Costs by Sellers, in each case as set forth in this Agreement, each of the Sellers and Buyer, as applicable, shall use commercially reasonable efforts to assign, or cause to be assigned, the Assumed Contracts to Buyer, or to the applicable Buyer Designee, including taking all actions required by the Bankruptcy Court to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code. Buyer shall use commercially reasonable efforts to comply with all of the requirements of Section 365 of the Bankruptcy Code necessary to permit such assumption and assignment.

(iii) At the Closing, (x) the Sellers shall, pursuant to the Transaction Order and the Assumption Agreement, assign, or cause to be assigned, to Buyer or the applicable Buyer Designee (the consideration for which is included in the Purchase Price) each of the Assumed Contracts and (y) Buyer shall pay all Cure Costs (other than the Excluded Cure Costs) and the Sellers shall pay all Excluded Cure Costs (except to the extent such Excluded Cure Costs shall be taken into account in the Adjusted Cash Consideration), in respect of such Assumed Contracts in connection with such assignment and assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Transaction Order and the Assumption Agreement.  For the avoidance of doubt, upon the assumption of the Assumed Contracts by Buyer, Buyer shall be entitled to acquire all real property described in each Assumed Contract in accordance with the terms thereof.

27

2.6    <u>Further Assurances</u>.

(a)    Except as otherwise provided herein and subject to the terms and conditions of this Agreement, the Bankruptcy Code and any orders of the Bankruptcy Court, from and after the Execution Date, the Sellers and Buyer shall use commercially reasonable efforts to take, or cause to be taken, all reasonable actions and to do, or cause to be done, all things necessary or desirable under applicable Legal Requirements to consummate the transactions contemplated hereby, including (i) preparing and filing as promptly as practicable with any Governmental Authority or other third party all documentation reasonably required to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents and (ii) using commercially reasonable efforts to obtain and maintain all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other third party that are necessary, proper or advisable to consummate the transactions contemplated hereby, in each case, after giving effect to the Transaction Order.

(b)    At and after the Closing, and without further consideration therefor, the Sellers shall execute and deliver to Buyer such further instruments and certificates as reasonably requested by Buyer, (i) to vest, perfect or confirm ownership (of record or otherwise) in Buyer and/or one or more Buyer Designees, the Sellers' right, title or interest in, to or under any or all of the Acquired Assets, including the Owned Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances) or (ii) to otherwise effectuate the purposes and intent of this Agreement and the other Transaction Documents or for aiding, assisting, collecting and reducing to possession any of the Acquired Assets and exercising rights with respect thereto. From and after the Closing Date, each of the Parties shall take, or cause to be taken, and cooperate with the other Parties to take, or cause to be taken, all reasonable actions, do or cause to be done all things as may be reasonably requested by Buyer in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer or one of more Buyer Designees or otherwise to carry out this Agreement, and shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances, and as may be required to consummate the transactions contemplated hereby, it being specifically understood and agreed that, notwithstanding anything to the contrary herein, no Seller shall have any obligation to (A) record or pay any recording fees and Taxes in connection with the foregoing (except to the extent provided in <u>Section 8.1(a)</u> or if Buyer agrees to reimburse the Sellers for any reasonable and documented out-of-pocket expenses incurred by the Sellers in connection with such recordation or payment), or (B) pay any title insurance fee or premium in connection with any title insurance commitment or policy Buyer may obtain, in each case, including any related costs and expenses (except to the extent Buyer agrees to reimburse the Sellers for any reasonable and documented out-of-pocket expenses incurred by the Sellers in connection with such commitment or policy).

28

2.7    <u>Certain Payments or Instruments Received from Third Parties</u>.

To the extent that, after the Closing Date, (i) Buyer receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document, Buyer shall promptly deliver such amount or instrument to the relevant Seller, and (ii) any of the Sellers or any of their Affiliates receives any payment or instrument that is for the account of Buyer according to the terms of any Transaction Document, the Sellers shall, and shall cause their Affiliates to, promptly deliver such amount or instrument to Buyer; <u>provided</u> that if this Agreement does not provide for whose account a payment or instrument referenced in this sentence is to be and such item relates to both the Acquired Assets and a business or business segment of the Sellers or their Affiliates other than the Acquired Assets, such item shall be apportioned between Buyer and the relevant Seller on the basis of the extent to which it relates to each. All amounts due and payable under this <u>Section 2.7</u> shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use its commercially reasonable efforts to direct or forward all bills, invoices or like instruments to the appropriate Party. Any payments received under this <u>Section 2.7</u> by the applicable Party will be treated by the other Party as being received by the applicable Party in its capacity as an agent for the other Party solely for U.S. federal income tax purposes.

## ARTICLE 3

### PURCHASE PRICE

3.1    <u>Consideration</u>.

The aggregate consideration (the "<u>Purchase Price</u>") for the purchase, sale, assignment and conveyance of the Sellers' right, title and interest in, to and under the Acquired Assets shall consist of:

(a)    the Adjusted Cash Consideration; plus

(b)    the assumption by Buyer or the Buyer Designee(s), as applicable, of the Assumed Liabilities.

3.2    <u>Allocation of Purchase Price</u>.

The sum of the Purchase Price and the amount of the Assumed Liabilities (to the extent properly taken into account under the Code) shall be allocated among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "<u>Allocation</u>"). The Allocation shall be delivered by Buyer to the Sellers within sixty (60) days after the Closing Date. The Sellers will have the right to raise reasonable objections to the Allocation within thirty (30) days after Buyer's delivery thereof, in which event Buyer and the Sellers will negotiate in good faith to resolve such dispute. If Buyer and the Sellers cannot resolve such dispute within fifteen (15) days after the Sellers notify Buyer of such objections, Sellers and Buyer shall be free to file their own Allocation statement.

3.3    <u>Withholding</u>.

29

Buyer shall be entitled to deduct and withhold from the Purchase Price otherwise payable pursuant to this Agreement to the Sellers such amounts as Buyer is required to deduct and withhold under applicable Legal Requirements. To the extent that amounts are so deducted and withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to the Sellers.

# ARTICLE 4

## CLOSING AND DELIVERIES

4.1     Closing Date.

Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of Kirkland & Ellis LLP, 601 Lexington, Avenue, New York, NY 10022, no later than two (2) Business Days following the date on which all the conditions set forth in Article 9 and Article 10 have been satisfied or (if permissible) waived by the Party entitled to waive such condition (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or on such other date and time as the Sellers and Buyer may mutually agree in writing. The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date." Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of 10:00 a.m. (New York time) on the Closing Date.

4.2     Buyer's Deliveries.

Subject to satisfaction or (if permissible) waiver of the conditions set forth in Article 9 and Article 10, at the Closing, Buyer shall deliver (or cause one or more of its Affiliates or Buyer Designees to deliver):

(a)     to the Sellers, the Bill of Sale, the Specific Sites Easement Agreement, the Assumption Agreement and each other Transaction Document to which Buyer or a Buyer Designee is a party, duly executed by Buyer and/or Buyer Designees, as applicable;

(b)     to the Sellers, the certificates of Buyer to be received by the Sellers pursuant to Sections 10.1 and 10.2;

(c)     to the Sellers, the Adjusted Cash Consideration less the Remaining Deposit (if such amount is a positive number, and if it is not, then no delivery shall be made under this clause (c)), in cash by wire transfer of immediately available funds to an account or accounts designated by the Sellers no later than three (3) Business Days prior to the Closing;

(d)     to the Sellers, such other documents as the Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated hereby; and

30

(e)    to WPP the WPP Payment, in cash by wire transfer of immediately available funds to an account or accounts designated by WPP no later than three (3) Business Days prior to the Closing.

4.3    Sellers' Deliveries.

At the Closing, the Sellers shall deliver to Buyer:

(a)    the Bill of Sale, the Specific Sites Easement Agreement, Deeds and the Assumption Agreement and each other Transaction Document to which any Seller is a party, duly executed by the applicable Sellers; provided, that in the event one or more of the motor vehicle titles is not delivered by the Sellers to Buyer on or before the Closing Date, the Sellers shall deliver such motor vehicle titles to Buyer as promptly as reasonably practicable following the Closing Date; provided, further, that, for the avoidance of doubt, the failure of the Sellers to deliver any motor vehicle titles to Buyer on or before the Closing Date shall not be deemed a failure to satisfy this delivery obligation;

(b)    with respect to the Owned Real Property included in the Acquired Assets, possession of such Owned Real Property, together with copies (and originals in the Sellers' possession) of all instruments and agreements evidencing the Sellers' interest in the same, and any existing surveys, legal descriptions and title policies concerning such Owned Real Property that are in the possession of the Sellers which shall be deemed to be delivered to the extent located at any of the Owned Real Property;

(c)    a certified copy of the Transaction Order;

(d)    the certificates of the Sellers to be received by Buyer pursuant to Sections 9.1 and 9.2;

(e)    certificates executed by each Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(f)    releases and termination statements sufficient for Buyer to receive the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances);

(g)    such other bills of sale, Deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all of the right, title and interest of the Sellers in, to or under any or all the Acquired Assets, including all Owned Real Property and the Broad Surface Rights, subject only to Permitted Encumbrances;

(h)    such ordinary and customary documents (including any factually accurate affidavits) as may be required by any title company or title

31

insurance underwriter to enable Buyer to acquire, at Buyer's sole election and Buyer's sole cost and expense, one or more owner policies of title insurance issued by such title company covering any or all of the Real Property included in the Acquired Assets in form and substance reasonably acceptable to Buyer;

(i)     if the Adjusted Cash Consideration minus the Remaining Deposit is a negative number, the Sellers shall pay to Buyer an amount in cash equal to the amount of the absolute value of the difference between the Adjusted Cash Consideration and the Remaining Deposit; and

(j)     such other documents as Buyer may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated hereby.

4.4     Buyer Designees.

At least ten (10) days prior to the Closing Date, Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 4.4, one or more Affiliates of Buyer to (i) purchase specified Acquired Assets and/or (ii) assume specified Assumed Liabilities, in each case, as of the Closing Date (any Person that shall be properly designated by Buyer in accordance with this clause, a "Buyer Designee"); it being understood and agreed, however, that any such right of Buyer to designate a Buyer Designee is conditioned upon (x) after taking into account any support that Buyer commits to provide, such Buyer Designee being able to perform the applicable covenants under this Agreement and, as applicable, any other transaction agreement to which Buyer is party and demonstrate satisfaction of the requirements of Section 365 of the Bankruptcy Code (to the extent applicable), including the provision of adequate assurance for future performance with respect to the Acquired Assets and Assumed Liabilities, (y) any such designation not creating any Liability (including any Liability relating to Taxes other than Taxes for which Buyer is liable pursuant to Section 2.3(d)) for the Sellers or their Affiliates that would not have existed had Buyer purchased the Acquired Assets and/or assumed the Assumed Liabilities, and which Liability is not fully reimbursed by or on behalf of Buyer and (z) such designation not being reasonably expected to cause a delay, or prevent or hinder the consummation of the transactions contemplated hereby. As soon as reasonably practicable and in no event later than ten (10) days prior to the Closing Date, Buyer shall make any such designations of Buyer Designees by way of a written notice to be delivered to the Sellers, and Buyer Designees shall deliver a signed counterpart to this Agreement or joinder agreement to this Agreement and each other Transaction Document to which Buyer is party. No such designation shall relieve Buyer of any of its obligations hereunder and any breach hereof by a Buyer Designee shall be deemed a breach by Buyer. Buyer and Buyer Designees shall be jointly and severally liable for any obligations of Buyer and such Buyer Designees hereunder.

32

# ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the Disclosure Schedules and subject to Section 12.10, each Seller represents and warrants, on a joint and several basis with the other Sellers, to Buyer, that:

### 5.1     Organization and Good Standing.

Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Subject to the applicable provisions of the Bankruptcy Code, each Seller has all requisite corporate or limited liability company power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted. The Sellers are duly qualified or licensed to do business and are in good standing in each jurisdiction where the character of their businesses or the nature of their properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

### 5.2     Authority; Validity; Consents.

Each Seller has, subject to entry of the Transaction Order, the requisite corporate or limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which such Seller is a party and to consummate the transactions contemplated hereby and thereby, and, subject to entry of the Transaction Order, the execution, delivery and performance of this Agreement and such other Transaction Documents by such Seller and the consummation by such Seller of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate or limited liability company action on the part of the Sellers. Subject to entry of the Transaction Order, this Agreement has been duly and validly executed and delivered by each Seller and each other Transaction Document required to be executed and delivered by a Seller at the Closing will be duly and validly executed and delivered by such Seller at the Closing. Subject to entry of the Transaction Order, this Agreement and the other Transaction Documents constitute, with respect to each Seller that is party thereto, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to entry of the Transaction Order, and assuming the accuracy of the representations and warranties set forth in Article 6, except (a) for entry of the Transaction Order, (b) for notices, filings and consents required in connection with the Bankruptcy Cases, including the requirements of the Bidding Procedures Order, and (c) for the notices, filings and consents set forth on Schedule 5.2, the Sellers are not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any Governmental Authority in connection with the execution and delivery of this Agreement and the other Transaction Documents to which a Seller is a Party or the consummation or performance of any of the transactions contemplated hereby and thereby.

33

5.3    <u>No Conflict</u>.

Except as a result of the Bankruptcy Cases, neither the execution and delivery by any Seller of this Agreement or any other Transaction Document to which it is (or will be) a party nor after giving effect to the Transaction Order and the Bidding Procedures Order, the consummation of the transactions contemplated hereby or thereby nor, after giving effect to the Transaction Order and the Bidding Procedures Order, compliance by it with any of the provisions hereof or thereof will (a) conflict with or result in a violation of (i) any provision of the certificate of incorporation or bylaws (or other organizational or governing documents) of such Seller or (ii) any material Order binding upon such Seller or by which any Designated Assets are subject or bound, (b) (i) violate, conflict with, or result in a material breach of any of the terms of, or constitute a material default under, or give rise to any right of termination, modification, cancellation or acceleration under any material license or Permit held by the Sellers, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority or (ii) result in a material breach of or constitute a material default under any Assumed Contract or, except for any such breaches or defaults as would not, individually or in the aggregate, be material in connection with the transactions contemplated hereby, any other Contract or (c) result in the creation of any Encumbrance (other than a Permitted Encumbrance) upon the properties or assets of such Seller being sold or transferred hereunder. No provision of this Agreement or the consummation of the transactions contemplated hereby conflicts with or is inconsistent with the Bluestone APA or the consummation of the transactions contemplated thereby.

5.4    <u>Real Property</u>.

(a)    Except for Permitted Encumbrances and except as set forth on <u>Schedule 5.4(a)(i)</u>, the Sellers have good and marketable title in the Owned Real Property set forth on <u>Schedule 5.4(a)</u>, the Specific Sites Easement Property and the Broad Surface Rights Property. Upon the execution of the Specific Sites Easement Agreement, the Specific Sites Easement shall be legal, valid, binding and enforceable and in full force and effect. Upon the conveyance of real property to Bluestone pursuant to the Bluestone APA, the Broad Surface Rights Reservation shall be legal, valid, binding and enforceable and in full force and effect.  None of the Owned Real Property, any of the Specific Sites Easement Property or any of the Broad Surface Rights Property is subject to any lease or grant to any third-party of any right to the use, purchase, occupancy or enjoyment of such Owned Real Property, any such Specific Sites Easement Property or any such Broad Surface Rights Property or any material portion thereof. Except for Permitted Encumbrances and the applicable terms of Permits held by the Sellers and their Affiliates, the Owned Real Property, the Specific Sites Easement Property and the Broad Surface Rights Property are not subject to any Encumbrances (other than liens that will be removed pursuant to the Transaction Order), which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business of the Sellers. There are no pending or, to the Sellers' Knowledge, threatened condemnation proceedings relating to any of the Owned Real Property, any of the Specific Sites Easement Property or any of the Broad Surface Rights Property except those which do not

34

materially impair or restrict the current use of the Owned Real Property, the Specific Sites Easement Property or the Broad Surface Rights Property subject thereto. Other than as set forth on Schedule 5.4(a)(ii) hereto, there are no outstanding options or rights of first refusal to purchase any of the Owned Real Property, any of the Specific Sites Easement Property or any of the Broad Surface Rights Property or any interest therein. The Sellers have made available to Buyer, to the extent that they are in the Sellers' possession or control, true, complete and correct copies of all deeds, instruments and agreements evidencing the Sellers' interest in the Owned Real Property, the Specific Sites Easement Property and the Broad Surface Rights Property set forth on Schedule 5.4(a), surveys, maps, legal descriptions, title insurance policies, title insurance commitments, title reports, title opinions, and title abstracts relating to such Owned Real Property, the Specific Sites Easement Property and the Broad Surface Rights Property, and all documents evidencing recorded and unrecorded Encumbrances upon such Owned Real Property, the Specific Sites Easement Property and the Broad Surface Rights Property.

(b)     Except as set forth in Schedule 5.4(b), the Sellers have conducted operations at the Contura/WPP Lease Properties for the past three (3) years in accordance, in all material respects, with all leases or subleases applicable to the Sellers and the Contura/WPP Lease Properties during such period, and no party to any such leases or subleases has given the Sellers written notice of or made a claim with respect to any breach or default thereunder during such period.

(c)     To the Sellers' Knowledge and except as set forth in the Letter Agreement, none of the real property subject to the Contura/WPP Lease (the "Leased Real Property") is subject to any sublease or grant to any Person of any right to the use, occupancy or enjoyment of the Leased Real Property or any portion thereof that would materially impair the use of the Leased Real Property for the purpose of coal mining and related operations. To the Sellers' Knowledge, the Leased Real Property is not subject to any Encumbrances (other than Permitted Encumbrances) that were placed on the Leased Real Property through the action or inaction of the Sellers and materially impact the use of the Leased Real Property for the purpose of coal mining and related operations. To the Sellers' Knowledge and except as set forth in the Letter Agreement, the Leased Real Property is not subject to any use restrictions, exceptions, reservations or limitations which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business. To the Sellers' Knowledge, there are no pending or threatened condemnation or other proceedings or claims relating to any of the Leased Real Property.

(d)     Assuming that (i) the 2015 Pinnacle Lease is presently in effect and (ii) the Sellers or WPP own 100% of the Remaining Interests, to the knowledge of the Sellers, the Sellers would have the right to extract and sell 100% of the coal reserves contained in the Contura/WPP Lease Properties with no obligation to pay any rent, royalty or other fee in respect thereof other than under

35

the 2015 Pinnacle Lease. To the knowledge of the Sellers, the coal reserves contained in the Contura/WPP Lease Properties are not subject to the mining rights of any other Person (other than WPP and the defendants identified in the Brewster Complaint) with respect to such coal reserves and no Seller has received a notice of claim to such effect.

5.5    Environmental and Health and Safety Matters.

Except as set forth on Schedule 5.5:

(a)    The Sellers have at all times complied and are in compliance in all material respects with all applicable Environmental, Health and Safety Laws with respect to the Designated Assets;

(b)    The Sellers have not received any written or oral notice, report or other communication regarding any actual or alleged material violation, non-compliance, liability or potential liability regarding Hazardous Substances or Environmental, Health and Safety Laws with regard to any of the Designated Assets, or any prior business for which the Sellers have retained liability under any Contract, in each case the subject matter of which remains unresolved (it being understood that any matters subject to a stay in connection with the Bankruptcy Cases shall not be considered resolved for the purposes of this Section 5.5(b));

(c)    The Designated Assets and any real property formerly owned, leased or operated by any Seller or any predecessor of any Seller, do not contain, and, to the Sellers' Knowledge, have not previously contained, any Hazardous Substances in amounts or concentrations which (i) constitute a material violation of, or (ii) could reasonably be expected to give rise to material liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, under any applicable Environmental, Health and Safety Laws;

(d)    With respect to the Designated Assets, no Seller or, to the Sellers' Knowledge, any other Person to the extent reasonably expected to give rise to material liability of any Seller, has treated, recycled, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or Released any Hazardous Substances, or owned or operated any property or facility contaminated by any Hazardous Substance, in a manner that has given or could reasonably be expected to give rise to material liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, under any applicable Environmental, Health and Safety Laws, excluding matters that have been fully resolved (it being understood that any matters subject to a stay in connection with the Bankruptcy Cases shall not be considered resolved for the purposes of this Section 5.5(d));

36

(e)     No Proceeding is pending or, to the Sellers' Knowledge, threatened under any Environmental, Health and Safety Laws against the Sellers or with respect to the Designated Assets, there are no Orders outstanding or pending under any Environmental, Health and Safety Law with respect to the Designated Assets nor, to the Sellers' Knowledge, are such Orders being proposed or negotiated between any Seller and any Governmental Authorities;

(f)     The Sellers (i) hold all Environmental Permits (each of which is in full force and effect and is not subject to appeal, except as is being contested in good faith by the Sellers by appropriate proceedings diligently conducted) required for any of their current operations or for the current ownership, operation or use of the Designated Assets, including all Environmental Permits required for the current coal mining-related operations of the Sellers or, to the extent currently required, any pending construction or expansion related thereto; (ii) are, and have been, in material compliance with all such Environmental Permits, except as is being contested in good faith by the Sellers by appropriate proceedings diligently conducted; and (iii) have not received any written notice that the Environmental Permits will not be renewed;

(g)     None of the Designated Assets have any associated direct or indirect acid mine drainage which (i) constitutes a material violation of, or (ii) could reasonably be expected to give rise to material liability under, any applicable Environmental, Health and Safety Law;

(h)     With respect to the Designated Assets, the Sellers have not contractually assumed any material liabilities, including any material obligation for corrective or remedial action, of any other Person relating to Environmental, Health and Safety Laws;

(i)     None of the Designated Assets contains underground storage tanks, above-ground storage tanks, transformers or other equipment containing PCBs, underground injection wells, septic tanks or waste disposal pits (to the extent such tanks or pits constitute Acquired Assets), in each case that has given or could reasonably be expected to give rise to material liability under any applicable Environmental, Health and Safety Law; and

(j)     The Sellers have made available or provided Buyer with copies of all material environmental assessments, audits (including compliance audits), evaluations, studies, reports and tests in their possession relating to the Designated Assets.

5.6     Title to Acquired Assets.

(a)     The Sellers have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and upon entry of the Transaction Order, the Sellers will thereby transfer to Buyer and

37

Buyer will (subject to Section 2.5(a)) be vested with good, valid and marketable title to, or, in the case of property leased or licensed by the Sellers, a valid leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Encumbrances, except for Permitted Encumbrances. No Acquired Asset is subject to any agreement, written or oral, for its sale or use by any Person other than the Sellers.

(b) There are no controlled Affiliates of the Company that are not Subsidiaries of the Company. No Subsidiary of the Company that is not a Seller owns any asset, property or right that would have been an Acquired Asset if such Subsidiary had been a Seller hereunder.

5.7 Taxes.

(a) All Tax Returns relating to the Acquired Assets and the business of the Pinnacle Complex that were required to be filed with an appropriate Governmental Authorities (taking into account any extension of time to file granted to the Sellers) have been duly and timely filed. All such Tax Returns are correct and complete in all material respects and were prepared in substantial compliance with all Legal Requirements, all material Taxes, including those relating to the business of the Pinnacle Complex and/or the Acquired Assets, that are due and payable, whether or not shown to be payable on such Tax Returns, have been or will be timely paid before the Closing, except for any unpaid Taxes which are specified in Section 8.1 to be paid at the Closing or expressly assumed by Buyer herein and paid after the Closing. No examination of any such Tax Return relating to the Acquired Assets or the business of the Pinnacle Complex is currently in progress by any Taxing Authority and no Seller has received notice of any contemplated examination of any such Tax Return and no material adjustment has been proposed in writing with respect to any such Tax Returns for the last three (3) years by any Taxing Authority.

(b) Sellers have established, in accordance with GAAP applied on a basis consistent with that of preceding periods, adequate reserves for the payment of, and will timely pay, all Taxes which arise from or with respect to the Acquired Assets or the operation of the business of the Pinnacle Complex and are incurred in or attributable to the Pre-Closing Tax Period, the non-payment of which would result in a lien on any Acquired Asset, would otherwise adversely affect the business of the Pinnacle Complex or would result in Buyer becoming liable therefor.

(c) The Sellers have not received written notice of any material Tax deficiency outstanding, proposed or assessed against or allocable to the Sellers and have not executed any waiver of any statute of limitations in respect of Taxes nor agreed to any extension of time with respect to a Tax assessment or deficiency with respect to the Acquired Assets or the business of the Pinnacle Complex. There are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other actions for or relating to any

38

Liability for Taxes. There is no dispute or claim concerning any Tax liability of the Sellers claimed or raised by any Taxing Authority in writing or, to the knowledge of Sellers, threatened by any Taxing Authority.

(d)     The Sellers are not in default under, nor to the Sellers' Knowledge does there exist any condition which, with the giving of notice or passage of time would constitute a default by the Sellers under, any agreement with any Governmental Authority that provides for or results in a reduction, rebate or exemption from Taxes or any other form of Tax incentive applicable to the business of the Pinnacle Complex, except for such defaults or conditions which would not, individually or in the aggregate, have a Material Adverse Effect.

(e)     Each Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party and all Internal Revenue Service (the "IRS") Forms W-2 and Forms 1099 (or any other applicable form) required with respect thereto have been properly and timely distributed.

(f)     No Seller is a party to any Tax allocation or sharing agreement. No Seller (i) has been a member of an affiliated group filing a consolidated federal income Tax Return or (ii) has any liability for the Taxes of any Person (other than a Seller) under Treas. Reg. §1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract, or otherwise.

(g)     No Seller is or has been a party to any "listed transaction," as defined in Section 6707A(c)(2) of the Code and Treas. Reg. §1.6011-4(b)(2).

(h)     There are no Encumbrances for Taxes (other than Permitted Encumbrances) on the Acquired Assets.

(i)     No claim has been made in writing by any Governmental Authority in a jurisdiction where the Sellers do not file Tax Returns that the Sellers are or may be subject to taxation by that jurisdiction.

(j)     No power of attorney with respect to Taxes has been executed or filed with any Taxing Authority by or on behalf of any of the Sellers that will remain in effect after the Closing Date.

5.8     Legal Proceedings.

Except for the Bankruptcy Cases (and proceedings related thereto), there is no Proceeding or Order pending, outstanding or, to the Sellers' Knowledge, threatened against or related to the Designated Assets, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor, to the Sellers' Knowledge, are there any investigations relating to the Designated Assets pending or, to the Sellers' Knowledge,

39

threatened by or before any arbitrator or any Governmental Authority, which, if determined adversely, would be material to the Designated Assets, taken as a whole.

5.9    Compliance with Legal Requirements; Permits.

(a)    Other than with respect to Permits required under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which Permits are addressed in Section 5.5, the Sellers hold all of the material Permits necessary for the current operation and conduct of the Designated Assets in compliance with Legal Requirements.

(b)    Schedule 5.9(b) sets forth a true and complete list of (A) all Permits (including Environmental Permits and Mining Permits) held by the Sellers in the operation of the Designated Assets in the State of West Virginia, together with a description of the permitted property, facility or operation, together with a true and complete list of all pending applications for additional Permits, renewals of existing Permits, or amendments to existing Permits held by the Sellers, which have been submitted to any Governmental Authority or other entity by any Seller or any of its Subsidiaries applicable to the operation of the Designated Assets in West Virginia, and (B) the applicable surety bonds (or other financial assurances) and the amount of the surety bonds (or other financial assurances) under such Permits, in each case, as amended, supplemented and modified through the Execution Date.

(c)    The Permits set forth on Schedule 5.9(c) are all of the material Permits necessary for the current operation and conduct of the Designated Assets. Other than with respect to Permits required under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which Permits are addressed in Section 5.5, all such Permits are final, unappealed, valid, in good standing and in full force and effect and no Seller is in material default under or in material violation of any such Permit.

(d)    Other than with respect to notices issued under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which matters are addressed in Section 5.5, the Sellers have conducted the ownership and operation of the Designated Assets for the past three (3) years and currently own and operate the Designated Assets in accordance, in all material respects, with all Legal Requirements, Orders and Permits applicable to the Sellers and the Designated Assets during such period, and the Sellers are in compliance in all material respects with all applicable Legal Requirements, Orders and Permits (including any anti-bribery Legal Requirements) and have obtained all approvals necessary for owning and operating its assets and has made all necessary filings with all Governmental Authorities having jurisdiction necessary for owning and operating the Designated Assets, and there are no Orders outstanding under any Mining Law or MSHA with respect to the Designated Assets.

40

(e)      Other than with respect to notices issued under any Environmental, Health and Safety Law or environmental provision of any Mining Law or MSHA, which matters are addressed in Section 5.5, neither the Sellers, nor to the Sellers' Knowledge, any of their Representatives have received, within the past three (3) years, any written notice or other communication from any Governmental Authority that alleges that the ownership and operation of the Designated Assets is not in compliance with any Legal Requirement, Order or Permit applicable thereto or that threatens or states the intention on the part of any issuing authority to revoke, cancel, suspend or modify any Permit necessary for the current operation and conduct of the Designated Assets (except with respect to regular periodic expirations and renewals thereof). The Sellers are in compliance with the Permits in all material respects. No suspension, revocation or cancellation of any of the Permits is threatened or to the Knowledge of the Sellers contemplated, except with respect to regular periodic expirations and renewals thereof, which renewals no Seller or any Subsidiary of such Seller has reason to believe will not be granted.

(f)      Except as would not be material to the Designated Assets: (i) no Seller has had any Permits that are necessary for the ownership and operation of the Designated Assets appealed, denied, revoked, restricted or suspended during the past three (3) years; and (ii) no Seller is currently a party to any Proceeding involving the possible appeal, denial, revocation, restriction or suspension of any Permits that are necessary for the current ownership and operation of the Designated Assets or any of the privileges granted thereunder (except where the obligation to hold such a Permit is being contested in good faith by appropriate proceedings diligently conducted);

(g)      No Seller, nor any officer or director of any Seller, nor to the Sellers' Knowledge any other Person listed on or connected to a Permit is "permit blocked" on the Applicant Violator System established pursuant to the SMCRA (or any applicable equivalent state system) (the "Applicant Violator System") and no other Person is listed on the Applicant Violator System that would result in, or would reasonably be expected to result in, any of the Sellers or any Designated Assets being permit blocked by any Governmental Authority.

5.10    Contracts.

Schedule 5.10 sets forth a complete list, as of the date hereof, of all Material Contracts to which any Seller is a party and, in the case of Assumed Contracts, the Cure Costs with respect thereto. Except as set forth on Schedule 5.10, no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract. Each Material Contract is in full force and effect and is a valid and binding obligation of each Seller party thereto in accordance with its terms and conditions, in each case except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, (y) as set forth on Schedule 5.10 and (z) as would not, individually or in the aggregate, have a Material Adverse Effect. Upon entry of the Transaction Order and payment of

41

the related Cure Costs, (i) no Seller will be in breach or default of its obligations under any Assumed Contract, (ii) no condition exists that with notice or lapse of time or both would constitute a default by any Seller under any Assumed Contract and (iii) to the Sellers' Knowledge, no other party to any Assumed Contract is in breach or default thereunder, except in the case of clauses (i), (ii) and (iii) for any breaches or defaults that would not, individually or in the aggregate, have a Material Adverse Effect. The Cure Cost amounts calculated by the Sellers and specified in the Cure Notices submitted by the Sellers with respect to each of the Assumed Contracts to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order are, to the Sellers' Knowledge, true and correct.

5.11    Insurance.

Schedule 5.11 sets forth a true and complete list of all insurance policies held by the Sellers covering any Designated Assets (including policies providing property, casualty, liability and workers' compensation coverage, but excluding any policies relating to any Benefit Plan that are set forth on Schedule 5.11(a)). Such policies are in full force and effect (subject to periodic renewals thereof). Except as set forth on Schedule 5.11, the Sellers have paid all premiums on such policies due and payable prior to the Execution Date, or, if not yet due, have properly accrued for such payables. Since the Petition Date, to the Sellers' Knowledge, the Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.

5.12    Brokers or Finders.

The Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

5.13    Undue Influence.

In connection with the ownership or operation of the Designated Assets, no Seller or, to the Sellers' Knowledge, any director, officer, agent, employee or Affiliate of the Sellers, has taken any action, directly or indirectly, with respect to the Designated Assets that would result in a violation of the Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder (the "FCPA"). The Sellers, and, to the Sellers' Knowledge, their Affiliates, have conducted their respective businesses in compliance with the FCPA in all material respects and maintain procedures which are reasonably expected to ensure compliance therewith.

5.14    No Undisclosed Material Liabilities.

To the Knowledge of the Sellers, there are no Liabilities of or relating to the Designated Assets, and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in any such Liabilities, other than:

(a)    Liabilities provided for in the balance sheet included in the Unaudited Financial Statements;

42

(b)　　Liabilities disclosed on Schedule 5.14(b); and

(c)　　other undisclosed Liabilities which, individually or in the aggregate, are not material to the Designated Assets.

5.15　　Absence of Certain Changes.

(a)　　Since January 1, 2018, the Designated Assets have been owned and operated in the Ordinary Course of Business and there has not been a Material Adverse Effect.

(b)　　Except as set forth on Schedule 5.15(b), or as expressly contemplated hereby or the Final DIP Order or any other orders entered in the Bankruptcy Cases from and after the Petition Date through the date hereof, the Sellers have not:

(i)　　terminated, modified or amended any Assumed Contract other than terminations due to the expiration of the term or automatic renewals, in each case, in accordance with the terms of any such Assumed Contract;

(ii)　　(A) purchased or otherwise acquired any material properties or assets (tangible or intangible) or sold, leased, transferred or otherwise disposed of any material Designated Assets, except for purchases of materials and sales of coal, coke and surplus equipment inventory in the Ordinary Course of Business, (B) permitted, allowed or suffered any of the Designated Assets to be subjected to any Encumbrance (other than Permitted Encumbrances), or (C) removed any Equipment or other material assets from any of the Owned Real Property or any of the Specific Sites other than in the Ordinary Course of Business;

(iii)　　suffered any material damage or destruction to or loss of any material assets or properties whether or not covered by insurance;

(iv)　　made any material Tax election, revoked or changed any material Tax accounting principle, method or practice, entered into any closing agreement within the meaning of Section 7121 of the Code or settled any Tax proceeding, in each case, with respect to the Designated Assets;

(v)　　changed in any material respect the Sellers' accounting methods, principles or practices other than required by changes in GAAP;

(vi)　　allowed any material Permit held by any Seller to terminate, expire or lapse; or

(vii)　　agreed or committed in writing to do any of the foregoing.

5.16　　Mining.

(a)　　The Sellers have, in the amounts and forms required pursuant to applicable Mining Laws and MSHA, obtained all performance bonds and surety bonds, or otherwise provided any financial assurance as (i) required

43

under the applicable Mining Permits or Mining Laws and MSHA for Reclamation of land, water or other natural resources at any current mines, (ii) required pursuant to any applicable Mining Permit or Mining Laws and MSHA to mitigate any actual or potential environmental impact of such mines, or (iii) otherwise obtained in the Ordinary Course of Business of the Sellers (collectively, "Mining Financial Assurances"), except for such Mining Financial Assurances that do not exceed $500,000 in the aggregate. Schedule 5.16(a) sets forth a list of all such Mining Financial Assurances maintained by the Sellers. The Sellers have posted or otherwise provided all Mining Financial Assurances that have been requested in writing by the applicable Governmental Authorities in respect of any applicable Permits and Legal Requirements having to do with Reclamation in connection with the Sellers' mining operations as currently conducted, subject to the discretion of any applicable Governmental Authority to require additional or supplemental Mining Financial Assurances from time to time.

(b)     To the Sellers' Knowledge, all Reclamation performed by or on behalf of any Seller has been performed in a manner in compliance in all material respects with all Legal Requirements and meets in all material respects the requirements of the applicable Mining Permit and any associated mine Reclamation requirements of any applicable Governmental Authority. The liability for mine closing and Reclamation obligations recorded on the most recent balance sheet of the Sellers made available Buyer has been properly accrued in accordance with the requirements of Financial Accounting Standards Board Codification Topic 410, Asset Retirement and Environmental Obligations, formerly known as Financial Accounting Standard No. 143 ("FASB 410"), and the amount of such liability is equal to or in excess of the amount of such obligations, determined on the basis of the Sellers' actual historic Reclamation and closure costs and currently planned mine life and escalated for inflation, in accordance with FASB 410 and applicable Legal Requirements. All Mining Financial Assurances have been approved as adequate by the required Governmental Authority to complete Reclamation in accordance with all applicable Permits and Legal Requirements.

5.17    MSHA; OSHA.

For the past three (3) years, except for fully paid, discharged and settled citations and notices of violation by MSHA or other Governmental Authority, the Sellers, with respect to the Designated Assets, have conducted their respective business and operations, and their respective assets have been maintained, in compliance in all material respects with MSHA or OSHA, as applicable. There are no investigations pending or, to the Sellers' Knowledge, threatened by any Governmental Authority or other third Person that would result in the imposition of any material Liability on any Seller pursuant to MSHA or OSHA. The Sellers do not owe any material assessments, penalties, fines, liens, charges, surcharges, nor are there any other material amounts due or owing pursuant to MSHA or OSHA, and there have been no imminent danger orders, unwarrantable failure orders, failure to abate orders, or cessation orders, notices of a pattern of violations, or material assessments, under MSHA or OSHA during the previous three (3) years with respect to the Designated Assets. Schedule 5.17 sets forth all reports of any MSHA or OSHA audits with respect to the Designated Assets performed within

44

the previous three (3) years by any Person (including the Seller). <u>Schedule 5.17</u> sets forth all orders issued under MSHA or OSHA, together with any appeals thereof, with respect to the Designated Assets within the past three (3) years by any Governmental Authority. The Sellers have made available to the Buyer copies of all orders and reports under MSHA or OSHA within their possession, together with the minutes of all joint health and safety committee meetings within their possession, with respect to the Sellers for the past three (3) years.

    5.18   <u>Coal Act; Black Lung Act</u>.

      (a)    The Sellers, with respect to the Designated Assets, and their "<u>related persons</u>" (as defined in the Coal Act) are in compliance in all material respects with the Coal Act and any regulations promulgated thereunder except which compliance is being contested in good faith by appropriate proceedings diligently conducted, and none of the Sellers or their "<u>related persons</u>" (as defined in the Coal Act) has any Liability under the Coal Act, except as disclosed in the Unaudited Financial Statements or which would not, individually or in the aggregate, have a Material Adverse Effect, or with respect to premiums or other material payments required thereunder which have been paid when due, or which Liability is being contested in good faith by appropriate proceedings diligently conducted.

      (b)    The Sellers are in compliance in all material respects with the Black Lung Act except which compliance is being contested in good faith by appropriate proceedings diligently conducted, and the Sellers have not incurred any Black Lung Liability or assumed any other Black Lung Liability, except as disclosed in the Unaudited Financial Statements or which would not, individually or in the aggregate, have a Material Adverse Effect, or with respect to premiums, contributions or other material payments required thereunder which have been paid when due or which Black Lung Liability is being contested in good faith by appropriate proceedings diligently conducted.

    5.19   <u>Warranties Exclusive</u>.

EXCEPT AS EXPRESSLY SET FORTH IN THIS <u>ARTICLE 5</u> (AS MODIFIED BY THE DISCLOSURE SCHEDULES) OR IN ANY TRANSACTION DOCUMENT, THE SELLERS MAKE NO REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THEIR ASSETS (INCLUDING THE DESIGNATED ASSETS) OR LIABILITIES (INCLUDING THE ASSUMED LIABILITIES), INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. NEITHER THE SELLERS NOR ANY OTHER PERSON, DIRECTLY OR INDIRECTLY, HAS MADE OR IS MAKING, ANY REPRESENTATION OR WARRANTY, WHETHER WRITTEN OR ORAL, REGARDING THE PRO-FORMA FINANCIAL INFORMATION OR FINANCIAL PROJECTIONS OF THE SELLERS.

45

# ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Sellers, that:

6.1     Organization and Good Standing.

Buyer is a corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2     Authority; Validity; Consents.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the other Transaction Documents by Buyer and the consummation by Buyer of the transactions contemplated herein and therein have been duly and validly authorized by all requisite limited liability company or corporate actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Except as set forth on Schedule 6.2, Buyer is not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, registrations, declarations or filings and consents, (i) the failure of which to provide, make or obtain, would not, individually or in the aggregate, materially affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby or (ii) as would be required by another buyer of the Acquired Assets.

6.3     No Conflict.

Neither the execution and delivery by Buyer of this Agreement or the Transaction Documents to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof (a) conflict with or result in a violation of (i) any provision of the organizational documents of Buyer or (ii) any judgment, order, writ, injunction, decree, statute, law, ordinance, rule or regulation in any material respect binding upon Buyer or (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under, (A) any note, bond, mortgage, indenture, deed of trust,

46

contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect and that, in each case, is material to the business of Buyer, or (B) any material license, permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority that has been made by or granted to Buyer.

6.4    Brokers or Finders.

Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated hereby for which any Seller (or any Affiliate of any Seller) is or will become liable, and Buyer shall hold harmless and indemnify the Sellers and their Affiliates from any claims with respect to any such fees or commissions.

6.5    Legal Proceedings.

There is no Proceeding or Order pending against, or to Buyer's Knowledge, threatened against or affecting, Buyer before any arbitrator or any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated hereby and the other Transaction Documents or which would or would reasonably be expected to impair Buyer's ability to consummate the transactions contemplated hereby and the other Transaction Documents.

6.6    Qualification.

(a)    To Buyer's Knowledge, there exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and/or its Affiliates not to qualify as a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)    As of the Closing, Buyer and/or each relevant Buyer Designee, as applicable, will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts.

(c)    As of the Closing, Buyer and/or each relevant Buyer Designee, as applicable, (i) will be eligible to obtain the Closing Required Permits and will not be listed or "permit blocked" on the Applicant Violator System and/or (ii) will not have been denied any application for any Mining Permit or other Governmental Authorization, other than any denial for violations that may reasonably be expected to be cured by the time of such transfer or obtaining of Permits as contemplated by Section 7.6.

47

6.7    No Other Representations or Warranties; Condition of the Business; Buyer's Reliance.

Buyer acknowledges that neither the Sellers nor any other Person is making, and Buyer is not relying on, any representations or warranties whatsoever, statutory, expressed or implied, written or oral, at law or in equity, beyond those expressly made by the Sellers in Article 5 hereof or in any Transaction Document (as modified by the Disclosure Schedules). Buyer acknowledges that, except as expressly set forth in Article 5 hereof or in any Transaction Document (as modified by the Disclosure Schedules), neither the Sellers nor any other Person has, directly or indirectly, made any representation or warranty, statutory, expressed or implied, written or oral, at law or in equity, as to the accuracy or completeness of any information that the Sellers furnished or made available to Buyer and its Representatives in respect of the business of the Pinnacle Complex, and the Sellers' operations, assets, stock, Liabilities, condition (financial or otherwise) or prospects. Except as set forth in Article 5 hereof or in any Transaction Document, Buyer acknowledges that neither the Sellers nor any other Person, directly or indirectly, has made, and Buyer has not relied on, any representation or warranty, whether written or oral, regarding the pro-forma financial information or financial projections of the Sellers, and Buyer will make no claim with respect thereto. Except as set forth in Article 5 hereof or in any Transaction Document, Buyer acknowledges that the Acquired Assets are being transferred on an "AS IS, WHERE IS" basis.

6.8    Information.

Buyer has conducted such investigations of the Sellers, the Acquired Assets and the Assumed Liabilities as it deems necessary and appropriate in connection with the execution and delivery of this Agreement and the other Transaction Documents to which Buyer is a party and the consummation of the transaction contemplated hereby and thereby. Except for rights under this Agreement or any Transaction Document none of the Sellers or any other Person (including any officer, director, member or partner of the Sellers or any of their respective Affiliates) shall have or be subject to any liability to Buyer, or any other Person, resulting from Buyer's use of any information, documents or material made available to Buyer in any "data rooms," management presentations, due diligence or in any other form in expectation of the transactions contemplated hereby or by the other Transaction Documents.

6.9    Warranties Exclusive.

EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE 6, BUYER MAKES NO REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS OR BUSINESS, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

48

# ARTICLE 7

## ACTIONS PRIOR TO THE CLOSING DATE

7.1    Access and Reports; Confidentiality.

(a)    During the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of Article 11, the Sellers shall (i) afford Buyer and its Representatives reasonable access, upon reasonable notice, to its personnel, properties, books, Permits, Contracts and records, and furnish promptly to Buyer all available information concerning the Designated Assets as may be reasonably requested in connection with the transactions contemplated hereby; (ii) furnish to Buyer such financial and operating data and other information relating to the Sellers and the Designated Assets (including documents and information with respect to any significant pending or threatened Proceedings or Orders or any liabilities or obligations arising under Environmental, Health and Safety Laws relating thereto) as may be reasonably requested; (iii) permit Buyer to make such reasonable inspections and, at Buyer's sole cost and expense, copies thereof as Buyer may require and (iv) instruct the executive officers and senior business managers, employees, counsel, auditors and financing advisors of the Sellers to reasonably cooperate with Buyer and its Representatives regarding the same; provided, that any such access shall be conducted consistent with and not in violation of the Bidding Procedures Order and in a manner not to unreasonably interfere with the business of the Pinnacle Complex. All requests for information made pursuant to this Section 7.1 shall be directed to Kevin Nystrom, AlixPartners, 1114 Avenue of the Americas, 41st Floor, New York or other person as designated by such person or the Sellers. Notwithstanding the foregoing, (A) Buyer and its Representatives shall not have access to personnel records of the Sellers relating to individual performance or evaluation records, medical histories or other personnel information which in the Sellers' good faith opinion could reasonably be expected to subject a Seller to risk of liability and (B) Buyer and its Representatives shall not conduct or cause to be conducted any sampling, testing or otherwise surface or subsurface invasive investigation of the air, soil, surface water, groundwater, building materials or other environmental media related to the Designated Assets, except with the prior written consent of the Sellers not to be unreasonably withheld or as required in order to determine or confirm the amount of any Reclamation Liabilities associated with the Acquired Assets. No investigation pursuant to this Section 7.1 or by Buyer or its Representatives at any time prior to or following the date hereof shall affect or be deemed to modify any representation or warranty made by the Sellers herein.

(b)    Notwithstanding the foregoing, but subject in all respects to the Bidding Procedures Order, this Section 7.1 shall not require the Sellers to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of the Company, is reasonably likely to result in any violation of

49

any Legal Requirement or any Contract to which the Company or any Seller is a party or cause any privilege (including attorney-client privilege) or work product protection that the Sellers would be entitled to assert to be undermined or waived with respect to such information or (ii) if the Company or any Seller, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto; provided, that, in the case of clause (i), the Parties shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not be reasonably likely to result in the violation of any such Legal Requirement or Contract or be reasonably likely to cause such privilege or work product protection to be undermined with respect to such information or (B) could reasonably be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives of Buyer could be provided access to such information.

(c)     Prior to Closing or the earlier termination of the Agreement, Buyer shall, and shall use commercially reasonable efforts to cause its Affiliates and Representatives to, hold all confidential documents and information concerning the Designated Assets furnished to Buyer or its Affiliates in connection with the transactions contemplated hereby and the other Transaction Documents in accordance with the confidentiality provisions of the Confidentiality Agreement.

7.2     Operations Prior to the Closing Date.

The Sellers covenant and agree that, except (a) as expressly contemplated hereby, (b) as disclosed on Schedule 7.2(a), (c) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed) or (d) as otherwise required by Legal Requirements after the Execution Date and prior to the Closing Date:

(a)     The Sellers shall:

(i)     own and operate the Designated Assets in the Ordinary Course of Business of the Sellers and use commercially reasonable efforts to maintain, preserve and protect the Designated Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business of the Sellers;

(ii)     maintain their books, accounts and records in the Ordinary Course of Business of the Sellers;

(iii)     (A) comply in all material respects with all Legal Requirements applicable to them or having jurisdiction over any Designated Asset, (B) use commercially reasonable efforts to comply in all material respects with contractual obligations applicable to or binding upon them pursuant to any Assumed Contracts (other than those obligations the compliance with which is excused during the Bankruptcy Cases) and (C) use commercially reasonable efforts to maintain in full force and effect all Permits and comply with the terms of each such Permit;

(iv)     cause any of their current property or casualty insurance policies that apply to any of the Designated Assets not to be canceled or terminated or any of the coverage

50

thereunder to lapse unless, simultaneously with such termination, cancellation or lapse, replacement, policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect; or

(v)     use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of the Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation.

(b)     The Sellers shall not:

(i)     take any action enumerated in Section 5.15(b) (other than Section 5.15(b)(iii)), except as set forth on Schedule 7.2(b);

(ii)     make, revoke or change any material election, file any amended Tax Return, or enter into or obtain any Tax ruling with or from a Taxing Authority, in each case, relating to Taxes of the Designated Assets;

(iii)     remove any Designated Asset from the Pinnacle Complex (or the Owned Real Property or any Specific Site, as applicable) such that the Designated Asset is no longer located within the Pinnacle Complex;

(iv)     waive, release, assign, settle or compromise any material rights or claims that constitute Acquired Assets, or any material litigation or arbitration that constitute Acquired Assets;

(v)     enter or commit to enter into any Collective Bargaining Agreement or other labor agreement with any union, works council, or labor organization (each a "Union" and collectively "Unions") or other labor organization; or

(i)     assume, reject or assign any Assumed Contract other than pursuant to Section 2.5.

7.3     Regulatory Matters; Cooperation.

(a)     Subject to the provisions of Section 7.6, including the limitations set forth therein, the Sellers, on the one hand, and Buyer, on the other hand, shall use commercially reasonable efforts to obtain (and Buyer shall cause its Subsidiaries to use commercially reasonable efforts to obtain), at the earliest practicable date, all necessary Governmental Authorizations and all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and take all commercially reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority. Subject to the provisions of Section 7.6, including the limitations set forth therein, in addition to such actions, the Sellers, on the one hand, and Buyer, on the other hand, shall use commercially reasonable efforts to take (and Buyer shall cause its Subsidiaries to use commercially reasonable efforts

51

to take), or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner reasonably practicable, the transactions contemplated hereby, including using commercially reasonable efforts to accomplish the following: (i) taking all reasonable acts necessary to cause the conditions precedent set forth in Article 9 and Article 10 to be satisfied, (ii) defending of any Proceedings challenging this Agreement or the consummation of the transactions contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed and (iii) executing and delivering any additional instruments reasonably necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(b)     The Sellers, on the one hand, and Buyer, on the other hand, (i) to the extent permissible, shall promptly inform each other of any material communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) to the extent permissible, shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto. In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless, to the extent permissible, such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent reasonably practicable. Subject to restrictions under any Legal Requirements, each of Buyer, on the one hand, and the Sellers, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Designated Assets) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

7.4    <u>Tax Cooperation</u>.

Prior to the Closing, the Sellers and Buyer agree to furnish or cause to be furnished to the other, upon request, as promptly as practicable, information and assistance relating to the Designated Assets, including access to books and records (including any Tax Records), as is reasonably necessary in connection with (a) the preparation or filing of any Tax Return by Buyer or the Sellers, (b) the making of any Tax election by Buyer or the Sellers, (c) Buyer or the Sellers' claim for any Tax Refund, (d) the determination of liability for Taxes, and (e) any audit, examination or other proceeding in respect of Taxes related to the Designated Assets or the business of the Pinnacle Complex. Sellers and their respective Affiliates shall (i) abide by all record retention agreements entered into with any Taxing Authority, and (ii) give Buyer thirty (30) days' written notice prior to transferring, destroying or discarding any Tax Records and, if Buyer so requests, shall allow Buyer to take possession of such Tax Records.

7.5    <u>Bankruptcy Court Matters</u>.

(a)    <u>Filing of Transaction Order</u>. On or prior to April 1, 2019 (or such later date as agreed in writing by all of the Parties hereto), the Sellers shall file with the Bankruptcy Court a proposed form of Transaction Order, in form and substance acceptable to the Sellers and Buyer.

(b)    <u>Hearing</u>. On or prior to April 3, 2019, the Bankruptcy Court shall hold a hearing to consider approval of the Transaction Order, in form and substance acceptable to the Sellers and Buyer. In connection therewith, Sellers shall take all commercially reasonable steps as may be necessary or appropriate to permit the Bankruptcy Court to approve the Transaction Order at the Hearing or as promptly as practicable thereafter.

(c)    <u>Transaction Order</u>. On or prior to April 5, 2019 (or such later date as agreed in writing by all of the Parties hereto), the Bankruptcy Court shall enter the Transaction Order, in form and substance acceptable to the Sellers and Buyer.

(d)    <u>Bankruptcy Filings</u>. From and after the Execution Date and until the Closing Date, the Sellers shall deliver to Buyer, at least two (2) Business Days in advance of the Sellers' filing or submission thereof, drafts of any and all material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement for Buyer's prior review and comment, including any Tax motions, and such filings shall be acceptable to Buyer in its reasonable discretion to the extent they relate to the Designated Assets, any Assumed Liabilities or the transactions contemplated hereby, including any of Buyer's rights or obligations hereunder. The Sellers shall make reasonable efforts to consult and cooperate with Buyer regarding any discovery taken in connection with seeking entry of the Transaction Order (including any depositions) and any hearing relating to the Transaction Order, including the submission of any evidence, including witness testimony, in connection with such hearing. The Sellers agree to diligently prosecute the entry of

53

the Transaction Order as provided herein. In the event the entry of the Transaction Order shall be appealed, the Sellers shall use their best efforts to defend such appeal. The Sellers shall comply with all notice requirements (i) of the Bankruptcy Code, the Bankruptcy Rules and the Bidding Procedures Order or (ii) imposed by the Transaction Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

(e)    <u>Contracts</u>. Prior to the date hereof, the Sellers served on all non-Seller counterparties to all of their Assumed Contracts a Cure Notice stating that the Sellers are or may be seeking the assumption and assignment of such Assumed Contracts and notified such non-Seller counterparties of the deadline for objecting to the Cure Costs, which was February 11, 2019 at 4:00 p.m. (Central Time), as provided for in the Bidding Procedures Order.  To the extent Sellers have not served such Cure Notice to any non-Seller counterparties to any of their Assumed Contracts prior to the date hereof, Sellers shall promptly, and in any event not more than two (2) Business Days following the date hereof, serve such non-Seller counterparties with a Cure Notice stating (i) that the Sellers are seeking the assumption and assignment of such Assumed Contracts, (ii) the proposed Cure Costs to be paid for such Assumed Contracts, and (iii) any other information reasonably necessary for such non-Seller counterparties to respond or object to Sellers regarding such proposed Cure Costs.

7.6    <u>Permits; Surety Bonds.</u>

(a)    Promptly after the Execution Date and by no later than the date required by Legal Requirements or the appropriate Governmental Authority, if required and to the extent necessary (as reasonably determined by Buyer) under applicable Environmental, Health and Safety Laws, Buyer shall file an application with the West Virginia Surface Mine Board for a license to engage in coal mining operations in the State of West Virginia ("<u>West Virginia Mining License</u>"), in a format and manner acceptable to Buyer, along with all applicable fees, and shall use commercially reasonable efforts to obtain such West Virginia Mining License.

(b)    As promptly as reasonably practicable after the Execution Date, Buyer shall, and shall cause its Subsidiaries to, use commercially reasonable efforts to obtain the issuance of the Closing Required Permits from the DEP; provided that notwithstanding anything in this Agreement to the contrary, Buyer shall not be required to make any payments to the DEP or any other Person (including Other Rights Owners) or agree to any obligations, conditions, commitments or undertakings to the DEP or any other Person (including Other Rights Owners), or take any actions that would be adverse to Buyer or any of its Subsidiaries, in each case in order to obtain the Closing Required Permits, other than (i) the payment of customary filing and other administrative fees, (ii) obtaining, and paying the reasonable and necessary costs for, customary surveys and other related reports, or (iii) posting customary surety bonds as required by the DEP in amounts not in excess of 110% of the respective amounts set forth on

54

Exhibit D attached hereto. The Sellers acknowledge that in connection with obtaining the Closing Required Permits, Buyer may require the cooperation of third parties that possess rights to the surface properties and/or mineral properties (collectively, "Other Rights Owners") within the scope of, or that are otherwise impacted by Buyer's obligations in respect of, the Closing Required Permits.

(c)     The Sellers shall provide any reasonable cooperation as reasonably requested by Buyer in connection with the obtaining of the Closing Required Permits, provided Buyer shall pay for any out-of-pocket costs of the Sellers reasonably incurred by the Sellers in connection therewith.

(d)     Prior to the Closing, the Sellers shall cause the Designated Permits to remain in place and shall maintain current levels of surety bond coverage (including the payment of bond premiums when due) with respect to the Designated Permits.

7.7     Sale Free and Clear.

The Sellers shall use commercially reasonable efforts to cause the Transaction Order to provide, pursuant to Section 363(f) of the Bankruptcy Code, that on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances (including, for the avoidance of doubt, all obligations, Liabilities and Encumbrances arising from any coal severance or ad valorem real property taxes, and all successor liability, including any successorship obligations under any Collective Bargaining Agreement, and/or with respect to any Benefit Plan or the Coal Act) of, against or created by the Sellers or their bankruptcy estate, shall be fully released from and with respect to the Acquired Assets. On the Closing Date, the Designated Assets shall be transferred to Buyer and/or one or more Buyer Designees, as applicable, pursuant to Section 363(f) of the Bankruptcy Code, free and clear of all obligations, Liabilities and Encumbrances (including, for the avoidance of doubt, all obligations, Liabilities and Encumbrances arising from any coal severance or ad valorem real property taxes, and all successor liability, including any successorship obligations under any Collective Bargaining Agreement, and/or with respect to any Benefit Plan or the Coal Act), other than the Permitted Encumbrances.

7.8     Transaction Order.

The Sellers shall use commercially reasonable efforts to cause the Bankruptcy Court to enter a Transaction Order, in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to the Sellers and Buyer, on or prior to April 5, 2019. Such efforts shall include, as appropriate, the preparation and filing of both a Confirmation Order and Sale Order on or prior to April 5, 2019, to be presented at the Hearing and considered by the Bankruptcy Court in parallel, and the Sellers' exercise of commercially reasonable efforts to prosecute entry of each such order.

7.9     Brewster Estate Action Matters.

Promptly after the Execution Date, the Sellers shall, at the Sellers' cost and expense, reinstate and prosecute the action entitled Pinnacle Land Company, LLC v. Gregory

55

Brewster a/k/a Gary Brewster, et al. (Civil Action No. 17-C-137) (the "Brewster Complaint") (or institute and prosecute a new action seeking the relief sought in the Brewster Complaint) and use commercially reasonable efforts to obtain the relief sought therein such that Sellers shall own prior to the Closing 100% of the coal interests in the Subject Property that are not owned by WPP (the "Remaining Interests") (and in such case all Remaining Interests shall be deemed Acquired Assets for purposes of this Agreement); provided, that Sellers and WPP may agree that WPP shall acquire the Remaining Interests prior to Closing, in which case the Remaining Interests shall be deemed to constitute part of the Contura/WPP Lease Properties.

7.10    Broad Surface Rights.

In connection with the transfer of the real property (including leased real property and easements) to be transferred to Bluestone pursuant to the Bluestone APA, Sellers shall ensure that the deeds, assignments and other conveyance instruments effecting such transfer contain (i) a reservation in favor of the Sellers and their successors and assigns of the Broad Surface Rights in form and substance reasonably acceptable to Buyer and (ii) a restriction on the ability of the grantee and its successors and assigns under such deeds to take any action that would reasonably be expected to impact or disturb any of the mine void areas that are part of the Contura/WPP Lease Properties or the water contained therein (collectively, the "Broad Surface Rights Reservation").

7.11    Specific Sites Easement.

Promptly after the Execution Date, the Sellers and Buyer shall negotiate a definitive agreement (the "Specific Sites Easement Agreement") pursuant to which Buyer shall receive an easement (the "Specific Sites Easement") that includes, but is not limited to: (i) the right of ingress, egress and regress in, to, over, through, under and upon the Specific Sites and Sellers' property, including the right to construct new or use existing haulage or access roads, ponds, ventilation holes or shafts, drainage of mine water; (ii) the right to enter upon and construct, install, use, maintain and operate related surface facilities on the Specific Sites and Sellers' property; (iii) the right to construct, install, use and maintain electric lines, cable lines, gas lines, water lines, and any other utility line or pipe incidental to or in connection with operations to be conducted on the Specific Sites, or any building, structure or facility used or installed in connection therewith; (iv) the right to take any action required by any law, rule, regulation, permit or governmental authority in connection with or related to any mining, removal, preparation or reclamation operation; and (v) such other rights as Buyer may reasonably request that are related to Buyer's obligations under the Assumed Liabilities. The form and substance of the Specific Sites Easement Agreement shall be satisfactory to Buyer.

56

## ARTICLE 8

### ADDITIONAL AGREEMENTS

8.1 <u>Taxes</u>.

(a) If the Transaction Order is a Confirmation Order, then by virtue of Section 1146 of the Bankruptcy Code, no transfer, real estate property transfer, documentary, sales, use, stamp, registration, value added, and other such taxes and fees (including any penalties and interest) (collectively "<u>Transfer Taxes</u>") shall be incurred or payable in connection with the transactions contemplated hereby and the Transaction Order shall provide as such. If the Transaction Order is a Sale Order or, notwithstanding the foregoing, a court of competent jurisdiction determines that any Transfer Taxes are due on the transfer of the Acquired Assets contemplated hereby, such Transfer Taxes shall be borne by Buyer. The Sellers and Buyer shall cooperate to (i) mitigate and/or eliminate the amount of Transfer Taxes resulting from the transactions contemplated herein and (ii) timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Buyer shall be responsible for preparing and filing all necessary Tax Returns or other documents with respect to Transfer Taxes; <u>provided</u>, <u>however</u>, that in the event any such Tax Return requires execution by the other Party, the Party responsible for preparing the Tax Return shall deliver it to the other Party not less than ten (10) days before the due date thereof, and the other Party shall promptly execute such Tax Return and return it to the Party responsible for filing it.

(b) (i) All Liability for any ad valorem Taxes (including, for the avoidance of doubt, real or personal property Taxes) and unmined mineral Taxes (the "<u>Apportioned Taxes</u>") with respect to the Acquired Assets for a Tax period or year, or portion thereof, that ends on or before the Closing Date (a "<u>Pre-Closing Tax Period</u>") shall be borne by the Sellers. All Liability for any Apportioned Taxes with respect to the Acquired Assets (other than the Specific Sites Easement and the Broad Surface Rights Reservation, which shall be the responsibility of the Sellers) for a Tax period or year, or portion thereof, that begins after the Closing Date (a "<u>Post-Closing Tax Period</u>") shall be borne by Buyer. The total amount of Apportioned Taxes allocable to the Pre-Closing Tax Period of any Tax period or year commencing on or before, and ending after, the Closing Date (a "<u>Straddle Period</u>") shall be the product of (i) such Tax for the entirety of such Straddle Period, multiplied by (ii) a fraction, the numerator of which is the number of days for such Straddle Period included in the Pre-Closing Tax Period and the denominator of which is the total number of days in such Straddle Period, and the balance of Apportioned Taxes shall be allocable to the Post-Closing Tax Period. As soon as reasonably practicable, but in no event later than fifteen (15) days prior to the Closing, Sellers shall deliver to Buyer a schedule ("<u>Apportioned Taxes Schedule</u>") showing, in reasonable detail with supporting workpapers, the estimated amount of Apportioned Taxes attributable to any Pre-

57

Closing Tax Period, calculated, with respect to each Acquired Asset for the applicable Straddle Period, in accordance with the foregoing provisions based on the Tax assessment for such Acquired Asset for such Straddle Period, if available, or if otherwise, based on the Apportioned Taxes paid with respect to such Acquired Asset during the preceding Tax year. Buyer shall review and comment on the Apportioned Taxes Schedule within five (5) days of receipt. If Buyer and the Sellers cannot resolve any disputes within three (3) days after the Buyer notifies Sellers of its objections, such dispute with respect to the Apportioned Taxes Schedule shall be resolved promptly (and in any event, prior to the Closing) by the Neutral Accountant. The Apportioned Taxes attributable to any Pre-Closing Tax Period shown on the agreed Apportioned Taxes Schedule shall be deducted from the Purchase Price in accordance with Section 3.1(a).

(ii)      With respect to any not yet delinquent Apportioned Taxes relating to a Straddle Period or Pre-Closing Tax Period, Buyer will assume responsibility for the actual payment of all such Taxes to the applicable Governmental Authority in the Post-Closing Tax Period. With respect to any Apportioned Taxes relating to a Straddle Period or Pre-Closing Tax Period that are delinquent as of the Closing Date, the amount of which is known and not subject to dispute, Buyer shall either pay the delinquent amount of such Taxes directly to the applicable Governmental Authority at the Closing or, at Buyer's option, to such title company as designated by Buyer at the Closing, for further payment by it to the applicable Governmental Authority. In the event that Buyer or any Seller makes any payment of Apportioned Taxes or Transfer Taxes for which it is entitled to reimbursement under this Section 8.1, the applicable party shall make such reimbursement no later than 10 days after the presentation of a statement setting forth the amount of the reimbursement to which the party presenting the statement is entitled along with such supporting evidence as is reasonably necessary to calculate the reimbursement amount; provided that no such reimbursement shall be required to the extent that such Taxes were taken into consideration in the determination of the Purchase Price at Closing. To the extent that the Taxes required to be borne by Sellers under this Section 8.1(b) exceed the amount of Taxes that were taken into consideration in the determination of the Adjusted Cash Consideration at Closing, such amounts shall constitute a super priority administrative expense of the Sellers under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

(c)      Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the business of the Pinnacle Complex and the Acquired Assets (including access to books and records and Tax Returns and related working papers dated before the Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state or local business tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Acquired Assets are located; provided, however, that Buyer shall not be required to disclose the contents of its income Tax Returns to any Person. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(c) shall be borne by the Party requesting it.

58

(d)     Any Tax Refund of the Sellers (as described in Section 2.1(n)) that is attributable to Buyer's payment of Apportioned Taxes pursuant to Section 8.1(a) shall be promptly paid to Buyer.

8.2     Bulk Sales.

The Transaction Order shall provide either that (i) the Sellers have complied with the requirements of any Legal Requirement relating to bulk sales and transfer or (ii) compliance with the Legal Requirements relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

8.3     Payments Received.

The Sellers, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts.

8.4     Assumed Contracts: Adequate Assurance and Performance.

Buyer shall, and shall cause its Affiliates to, use commercially reasonable efforts to provide adequate assurance of the future performance by Buyer of each Assumed Contract as required under Section 365 of the Bankruptcy Code (except that, for the avoidance of doubt, Buyer shall not be responsible for any Excluded Cure Costs). Buyer and the Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and the Sellers' Representatives available to testify before the Bankruptcy Court.

8.5     Post-Closing Books and Records and Personnel.

From and after the Closing Date for a period of one (1) year, each party shall provide the other Parties (and their respective Representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, to the assets, books, records, systems and other property and any employees of the other Parties so as to enable Buyer and the Sellers to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions, and to enable the Buyer to own and operate the Designated Assets. During such one (1) year period, each Party (and their respective Representatives) shall be permitted to make copies of any books and records described in this Section 8.5, subject to the confidentiality requirements set forth in Sections 7.1 and 12.2. If any Party desires to dispose of any such books and records, such Party shall, thirty (30) days prior to such disposal, provide the

59

other Party with a reasonable opportunity to remove or copy such records to be disposed of at the removing Party's expense. Buyer and the Sellers shall retain such books and records for a period of six (6) years following the Closing.

8.6     Casualty Loss.

Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Designated Assets is condemned or taken by eminent domain, or is damaged or destroyed by fire, flood or other casualty, the Sellers shall notify Buyer promptly in writing of such fact, and (a) in the case of condemnation or taking, the Sellers shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing, and (b) in the case of fire, flood or other casualty, the Sellers shall assign the insurance proceeds therefrom to Buyer at the Closing. Notwithstanding the foregoing, the provisions of this Section 8.6 shall not in any way modify Buyer's other rights under this Agreement, including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect.

8.7     Release; Acknowledgements.

Notwithstanding anything to the contrary contained herein, effective as of the Closing, each Seller (individually and on behalf of its respective Affiliates) hereby releases and forever discharges Buyer and each of its Affiliates and their respective successors and assigns and all officers, directors, partners, members, shareholders, employees and agents of each of them from any and all actual or potential claims, causes of action, proceedings, Liabilities, damages, expenses and/or losses of whatever kind or nature (including attorneys' fees and costs), in law or equity, known or unknown, suspected or unsuspected, now existing or hereafter arising, whether contractual, in tort or otherwise, which such Person had, has, or may have in the future to the extent relating to the Excluded Assets or the Excluded Liabilities; provided that nothing in this Agreement (including this Section 8.7) shall (x) constitute a release of any Person arising from conduct of such Person that is determined by a Final Order of a court of competent jurisdiction to have constituted fraud, willful breach, knowing and intentional misrepresentation or criminal act by such Person, and (y) be construed to release any Person from any of its contractual obligations under this Agreement and the Transaction Documents, including its obligations in respect of the Designated Assets, Assumed Liabilities, Excluded Assets and Excluded Liabilities, each of which shall remain fully effective and enforceable from and after the Closing Date.

8.8     No Successor Liability.

The Parties intend that, upon the Closing, Buyer shall not be deemed to: (a) be the successor of or successor employer (as described under any applicable Legal Requirement) to the Sellers, including, with respect to any Collective Bargaining Agreements and any Benefit Plans, under the Coal Act, and any common law successor liability in relation to the UMWA Health and Retirement Funds, including the UMWA 1974 Pension Plan, including with respect to withdrawal liability, (b) have, de facto, or otherwise, merged with or into the Sellers, (c) be a mere continuation or substantial continuation of the Sellers or the enterprise(s) of the Sellers, or (d) other than as expressly set forth in this Agreement, be liable for any acts or omissions of the

60

Sellers in the current or former conduct of the business of the Pinnacle Complex or arising under or related to the Designated Assets or any other assets. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Buyer shall not be liable for any Encumbrances (other than Assumed Liabilities) against any Seller or any of its predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, or whether fixed or contingent, whether now existing or hereafter arising, with respect to the business of the Pinnacle Complex, the Designated Assets or any Liabilities of the Sellers arising prior to or after the Closing Date. The Parties agree that the provisions substantially in the form of this <u>Section 8.8</u> shall be reflected in the Transaction Order.

8.9     <u>Notification of Certain Events</u>

Each Party shall promptly notify the other Parties of any event, condition or circumstance of which such Party becomes aware prior to the Closing Date that would cause, or would reasonably be expected to cause, a material violation or breach of this Agreement by such Party (or a breach of any representation or warranty of such Party contained in this Agreement) or prevent any condition in Article 9 (in the case of notice by Sellers) or Article 10 (in the case of notice by Buyer) from being satisfied by the Outside Date. During the period prior to the Closing Date, each Party will promptly advise the other Parties in writing of any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement and the Transaction Documents. A Party's receipt of information pursuant to this <u>Section 8.9</u> shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by the other Parties in this Agreement and shall not be deemed to amend or supplement the Disclosure Schedules.

8.10     <u>Pinnacle Lease.</u>

The Company shall cause the Pinnacle Lease Option to be terminated in full as of immediately prior to the Closing.

8.11     <u>Letter Agreement.</u>

The Company shall comply with all of its obligations under the Letter Agreement.

8.12     <u>Return of Portion of Deposit.</u>

No later than April 10, 2019, the Sellers shall pay, or cause to be paid, to Buyer an amount equal to the Deposit (plus all interest accrued thereon) less $375,000 by wire transfer of immediately available funds to an account designated in writing by Buyer for such purpose.

8.13     <u>Sellers' Obligations.</u>

The Company shall cause each other Seller to comply with such Seller's obligations under this Agreement.

61

8.14    Non-Solicit Termination.

Effective as of Closing, Section 8 (*Non-solicitation*) of the Confidentiality Agreement shall be of no further force or effect.

8.15    Payment Pursuant to Consent Order.

Sellers shall pay or cause to be paid, prior to the Closing, all amounts required to be paid to the DEP pursuant to the Consent Order; provided that if as of two (2) Business Days prior to the Closing the Sellers have not provided written evidence reasonably satisfactory to Buyer that either (i) such amounts have been paid to the DEP or (ii) such amounts will remain as a liability of the estate of the debtors in the Bankruptcy Cases and Buyer and its Affiliates will have no liability in respect thereof (the amounts referred to in this clause (ii), the "Estate Liability Amounts"), then (A) the amounts not so paid (to the extent they are not Estate Liability Amounts) shall be deducted from the Adjusted Cash Consideration otherwise payable pursuant to Section 4.2(c) and (B) Buyer shall assume the obligation to pay the amounts deducted pursuant to the preceding clause (A) (but only such amounts) to the DEP pursuant to the Consent Order notwithstanding anything to the contrary in this Agreement.

# ARTICLE 9

## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Buyer, in its sole and absolute discretion:

9.1    Accuracy of Representations.

(a)    Each of the Fundamental Representations of the Sellers contained in this Agreement shall be true and correct in all material respects on and as of the date hereof and on and as of the Closing Date, as if made at and as of such date.

(b)    Each of the representations and warranties of the Sellers contained in this Agreement (without giving effect to any qualification as to materiality, Material Adverse Effect or words of similar import included therein), other than Fundamental Representations of the Sellers, shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date, as if made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure to be so true and correct (without giving effect to any qualifications as to materiality, Material Adverse Effect or words of similar import included therein) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

62

(c)     Buyer shall have received a certificate of the Sellers to the foregoing effect signed by a duly authorized officer of each Seller.

9.2     <u>Sellers' Performance</u>.

The covenants and agreements that the Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects and Buyer shall have received a certificate of the Sellers to such effect signed by a duly authorized officer of each Seller.

9.3     <u>No Order</u>.

No Governmental Authority shall have enacted, issued, promulgated, decreed or entered any Final Order from and after the Execution Date, which is in effect and has the effect of prohibiting (or delaying beyond the Outside Date) the consummation of or imposing material modifications on the transactions contemplated hereby.

9.4     <u>Governmental Authorizations</u>.  All of the Closing Required Permits shall have been obtained by Buyer in form and substance reasonably satisfactory to Buyer.

9.5     <u>Sellers' Deliveries</u>.

Each of the deliveries required to be made to Buyer pursuant to <u>Section 4.3(a)-(j)</u> shall have been so delivered.

9.6     <u>Transaction Order</u>.

The Bankruptcy Court shall have entered the Transaction Order in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to the Sellers and Buyer, and, without limitation to the generality of the foregoing, such Transaction Order shall provide that the transfer of the Acquired Assets to Buyer and/or one or more Buyer Designees, as applicable, shall be, pursuant to Section 363(f) of the Bankruptcy Code, free and clear of all obligations, Liabilities and Encumbrances (including, for the avoidance of doubt, all obligations, Liabilities and Encumbrances arising from any coal severance or ad valorem real property taxes, and all successor liability, including any successorship obligations under any Collective Bargaining Agreement, and/or with respect to any Benefit Plan or the Coal Act), other than the Permitted Encumbrances, and the Transaction Order shall have become a Final Order.

9.7     <u>Assumed Contracts</u>.

The Bankruptcy Court shall have approved and authorized the assumption and assignment of each Assumed Contract pursuant to section 365 of the Bankruptcy Code through entry of an order that shall have become a Final Order, and all such Assumed Contracts shall have been duly assigned to Buyer at the Closing.  Without limiting the generality of the foregoing, (i) the objection deadline shall have passed for all counterparties to the Assumed Contracts to object to assumption and assignment of the Assumed Contracts, including as to the Cure Costs contained in their respective Cure Notice, (ii) any objections to such assumption and assignment shall have been resolved by the above-referenced Final Order, and (iii) all Excluded

63

Cure Costs shall have been paid, except to the extent such Excluded Cure Costs shall be taken into account in the Adjusted Cash Consideration.

9.8 <u>Material Adverse Effect</u>.

Since the Execution Date, no Material Adverse Effect (or any development that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect) shall have occurred.

9.9 <u>UMWA</u>.

The Bankruptcy Court shall have entered an Order, which is acceptable to Buyer, pursuant to Sections 1113(c) and 1114(g) of the Bankruptcy Code authorizing the applicable Sellers to reject their respective Collective Bargaining Agreements and modify their retiree benefit obligations, and such order shall have become a Final Order and pursuant to such Final Order Seller or its Affiliates shall have rejected all Collective Bargaining Agreements that apply or pertain to the Designated Assets or any Employees or former employees who have performed services on or in connection with the Designated Assets, including the UMWA Collective Bargaining Agreements, and Seller or its Affiliates shall have terminated all obligations with respect to retiree benefits (as defined in Section 1114 of the Bankruptcy Code) insofar as such obligations apply or pertain to the Designated Assets or any Employees or former employees of Seller, its Affiliates or their predecessors, including any Liability or obligations to contribute to any of the UMWA Health and Retirement Funds, including the UMWA 1974 Pension Plan.

9.10 <u>Effective Date</u>.

If the Transaction Order is a Confirmation Order, then each of the conditions to the effective date of the Chapter 11 Plan as established in the Transaction Order or by other Order of the Bankruptcy Court shall have been satisfied or waived.

9.11 <u>Pinnacle Lease</u>.

The Company shall have caused the Pinnacle Lease Option to be terminated in full at or before Closing.

9.12 <u>Bluestone Closing</u>.

(a) The Company and Bluestone shall have notified (which notice shall be in full force and effect and shall not have been rescinded or otherwise repudiated) the Buyer in writing (email being sufficient) that (i) all conditions to consummation of the Bluestone Closing set forth in the Bluestone APA have been satisfied (or if permissible, waived) (other than conditions which by their nature are to be satisfied at the Bluestone Closing, in which case the Company and Bluestone shall have notified the Buyer in writing that such conditions will be satisfied at the Bluestone Closing), and (ii) the Bluestone Permits shall be transferred to or obtained by (as applicable) Bluestone effective as of the Bluestone Closing.

64

(b)     The Bluestone Closing shall be consummated immediately prior to or concurrently with the consummation of the Closing hereunder and at the Bluestone Closing the Bluestone Permits shall be transferred to or obtained by (as applicable) Bluestone effective as of the Bluestone Closing. For the avoidance of doubt, the Closing hereunder shall be deemed not to have occurred unless the Bluestone Closing (and the effectiveness of the related transfer of Bluestone Permits (or the obtaining of new Bluestone Permits, as applicable) thereunder) occurs immediately prior to or concurrently with the Closing hereunder.

9.13    Letter Agreement.

The Letter Agreement shall be in full force and effect (and not repudiated by any party thereto) and each party thereto (other than Buyer) shall have performed and complied with in all material respects all covenants and agreements required to be performed by such party at or prior to the Closing.

9.14    Contura/WPP Lease.

The Contura/WPP Lease shall be in full force and effect and shall not have been rescinded or otherwise repudiated by WPP.

9.15    Brewster Estate Reserves.

Buyer shall be satisfied in its sole discretion that as of the Closing, subject to the terms of the Contura/WPP Lease, Buyer shall have the sole legal right to mine and sell 100% of the coal reserves located within and underlying the Subject Property directly and/or indirectly through the Contura/WPP Lease, with no obligation to pay any rent, royalty or other fee in respect thereof other than pursuant to the Contura/WPP Lease.

9.16    No Consent Order Liability.

Buyer shall be reasonably satisfied that neither Buyer nor any of its Subsidiaries will have any financial liability or other obligation under or in respect of the Consent Order, other than (if applicable) to the extent set forth in clause (B) in Section 8.15.

9.17    Frustration of Conditions.

Notwithstanding anything to the contrary herein, Buyer may not rely on the failure of any condition set forth in this Article 9 to be satisfied to excuse it from its obligation to effect the transactions contemplated hereby if such failure was caused by Buyer's breach of its obligations under this Agreement or any other agreement contemplated hereby.

65

# ARTICLE 10

## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF THE SELLERS TO CLOSE

The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by the Sellers, in their sole and absolute discretion:

10.1    Accuracy of Representations.

The representations and warranties of Buyer set forth in Article 6 of this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as to Material Adverse Effect shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date); provided, however, that in the event of a breach of a representation or warranty, the condition set forth in this Section 10.1 shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereby. The Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer of Buyer.

10.2    Buyer's Performance.

The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects, and the Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer of Buyer.

10.3    No Order.

No Governmental Authority shall have enacted, issued, promulgated, decreed, or entered any Final Order from and after the Execution Date, which is in effect and has the effect of prohibiting (or delaying beyond the Outside Date) the consummation of the transactions contemplated hereby.

10.4    Transaction Order.

The Bankruptcy Court shall have entered the Transaction Order in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to the Sellers and Buyer, and such Transaction Order shall be in full force and effect.

10.5    Buyer's Deliveries.

Each of the deliveries required to be made to the Sellers pursuant to Section 4.2(a)-(e) shall have been so delivered.

Case 18-04177-TOM11    Doc 1323    Filed 04/15/19    Entered 04/15/19 11:55:00    Desc
Main Document    Page 190 of 225

10.6    Frustration of Conditions.

Notwithstanding anything to the contrary herein, the Sellers may not rely on the failure of any condition set forth in this Article 10 to be satisfied to excuse them from their obligation to effect the transactions contemplated hereby if such failure was caused by the Sellers' breach of their obligations under this Agreement or any other agreement contemplated hereby.

# ARTICLE 11

## TERMINATION

11.1    Termination Events.

Notwithstanding anything to the contrary, this Agreement may be terminated at any time prior to the Closing only as follows:

(a)    by mutual written consent of the Sellers and Buyer;

(b)    by written notice from either the Sellers or Buyer:

(i)    if a Governmental Authority issues a final, non-appealable ruling or Order permanently restraining, enjoining or otherwise prohibiting consummation of the transactions contemplated hereby; provided, that the right to terminate this Agreement under this Section 11.1(b)(i) shall not be available to any Party whose willful failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date;

(ii)    if the Closing shall not have occurred on or prior to the 9-month anniversary of the Execution Date (the "Outside Date"); provided, that the terminating party under this Section 11.1(b)(ii) is not (at such time of termination) in breach of any representation, warranty, covenant or other agreement in this Agreement so as to cause any conditions to the Closing not to be satisfied and shall not have been the proximate cause of the failure of the Closing to occur on or prior to the Outside Date;

(iii)    if the Bankruptcy Court shall have entered an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by the Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases; or

(iv)    upon the final, non-appealable ruling or denial of one or more of the Governmental Authorizations the absence of which, individually or in the aggregate, would cause any of the conditions described in Section 9.4, not to be satisfied.

(c)    by written notice from Buyer:

(i)    if any of the milestones set forth in Section 7.5 (Bankruptcy Court Matters) fail to be met;

Case 18-04177-TOM11    Doc 1323    Filed 04/15/19    Entered 04/15/19 11:55:00    Desc
Main Document        Page 191 of 225

(ii)     if any Seller seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by the Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases, or if a trustee in the Bankruptcy Cases or a responsible officer or an examiner with enlarged powers is appointed (other than a fee examiner) relating to the operation of the Sellers' businesses pursuant to Section 1104 of the Bankruptcy Code, or such an order of dismissal, conversion or appointment is entered and is not reversed or vacated within fourteen (14) days after the entry thereof;

(iii)     in the event of any breach of, or failure to perform, by any Seller of any of their agreements, covenants, representations or warranties contained herein, which breach or failure to perform (A) would result in the Sellers being unable to satisfy a condition set forth in Article 9 by the then-applicable Outside Date and (B) cannot be cured within ten (10) Business Days after Buyer notifies the Sellers of such breach in writing; provided, that Buyer shall not have a right of termination pursuant to this Section 11.1(c)(iii) if it is then in material breach of any of its material agreements, covenants, representations or warranties contained herein or in the Transaction Order;

(iv)     if a Material Adverse Effect occurs and is continuing; or

(v)     upon the valid termination of the Bluestone APA.

(d)     by written notice from the Sellers in the event of any breach of, or failure to perform, by Buyer of any of its agreements, covenants, representations or warranties contained herein, which breach or failure to perform (A) would result in Buyer being unable to satisfy a condition set forth in Section 10.1 or Section 10.3 by the then-applicable Outside Date and (B) cannot be cured within ten (10) Business Days after such Seller notifies Buyer of such breach in writing; provided, that the Sellers shall not have a right of termination pursuant to this Section 11.1(d) if any Seller is then in material breach of any of such Seller's agreements, covenants, representations or warranties contained herein or in the Transaction Order.

Each condition set forth in this Section 11.1, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in this Section 11.1 are applicable, the applicable party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

Sellers shall notify Buyer in writing within one (1) Business Day of the valid termination of the Bluestone APA.

11.2     Effect of Termination.

In the event of termination of this Agreement by Buyer or the Sellers pursuant to this Article 11 hereof, subject to the next sentence, this Agreement shall become null and void and have no effect and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party except (i) nothing herein shall relieve any Party from Liability for any willful and knowing breach of this Agreement occurring

68

prior to such termination and (ii) the provisions of Section 7.1(a) (Access and Reports; Confidentiality), Section 12.9 (Expenses), Section 12.11 (Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver) and this Section 11.2 (and, to the extent applicable to the interpretation or enforcement of such provisions, Article 1 and Article 12), shall expressly survive the termination of this Agreement. In the event of a termination of this Agreement pursuant to Section 11.1 (i) by Buyer, the Sellers shall cause the Remaining Deposit (plus all interest accrued thereon) to be paid to Buyer no later than the second Business Day after the date of termination, or (ii) by the Sellers or by mutual agreement of the Buyer and the Sellers, the Sellers shall cause the Remaining Deposit (plus all interest accrued thereon) to be paid to Buyer concurrently with such termination (except solely to the extent the Sellers are entitled to retain the Remaining Deposit in connection with a termination by the Sellers pursuant to the last sentence of Section 11 of the Bidding Procedures). Payment of the Remaining Deposit (plus all interest accrued thereon) pursuant to the preceding sentence shall be made by wire transfer of immediately available funds to an account designated in writing by Buyer for such purpose.

# ARTICLE 12

## GENERAL PROVISIONS

12.1    Survival.

All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach thereof.

12.2    Confidentiality.

Following the Closing, the Sellers agree not to, and to cause their Representatives not to, use or disclose any confidential or non-public information concerning the Designated Assets, or the business affairs of Buyer and its Subsidiaries or the Assumed Liabilities, ("Confidential Information") except disclosure of Confidential Information that (a) is lawfully obtained after Closing from a source that, to the knowledge of such Seller, was not under an obligation of confidentiality to Buyer with respect to such information, (b) is independently developed by such Seller without violating any of its obligations under this Agreement, (c) is or becomes available to the public without any breach by the Sellers of the terms of this Agreement, (d) is or may be necessary to wind down any of the Sellers' estates, or in connection with the enforcement of the rights of, or the defense of any Proceeding against or involving, any Seller provided that, in each case, the Confidential Information is afforded confidential treatment, (e) to the extent it relates to any Excluded Assets and/or Excluded Liabilities, or (f) is or may be necessary in connection with the Bankruptcy Cases provided that the Confidential Information is afforded confidential treatment. Notwithstanding the foregoing, a Seller may disclose Confidential Information if such Seller believes (after consultation with counsel) it is legally

69

required to make such disclosure in order to comply with Legal Requirements, regulation, rule or legal, judicial or administrative process (including any rule, regulation or policy statement of (i) any self-regulatory organization of which a party is a member) or (ii) in connection with the Bankruptcy Cases. If a Seller or any of its Representatives becomes required (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) or it becomes necessary in connection with the Bankruptcy Cases to disclose any of the Confidential Information, such Seller or Representative shall use reasonable efforts to provide Buyer with prompt notice, to the extent allowed by law, rule and regulation, of such requirement, and, to the extent reasonably practicable, cooperate with Buyer, at the Buyer's expense, to obtain a protective order or similar remedy to cause such information not to be disclosed, including interposing all available objections thereto, such as objections based on settlement privilege; provided, that, in the event that such protective order or other similar remedy is not obtained, such Seller shall, or shall cause such Representative to, furnish only that portion of such information that has been legally compelled, and shall, or shall cause its Representative (as applicable) to, exercise its commercially reasonable efforts, at the Buyer's expense, to obtain assurance that confidential treatment will be accorded such disclosed information.

12.3    Public Announcements

Except as required in the Bankruptcy Cases, unless otherwise required by applicable Legal Requirement or by obligations of Buyer or the Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Buyer, on the one hand, and the Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement prior to such consultation.

12.4    Notices.

All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or sent by overnight courier or electronic mail, or facsimile transmission:

       (i)    If to the Sellers or to Sellers' Representative, then to:

          Mission Coal Company, Inc.
          7 Sheridan Square, Suite 300
          Kingsport, Tennessee 37660
          Attn: Gary Broadbent
          Facsimile: 423-212-2980
          Email: gary.broadbent@missioncoal.com

         with a copy (which shall not constitute notice) to:

Christian & Small LLP
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Attn:     Daniel D. Sparks
          Bill D. Bensinger
Facsimile: 205-328-7234
Email:     ddsparks@csattorneys.com
          bdbensinger@csattorneys.com

and

Kirkland & Ellis LLP
Kirkland & Ellis International, LLP
300 North LaSalle
Chicago, Illinois 60654
Attn:     Melissa N. Koss
Facsimile: 312-862-2200
Email:     melissa.koss@kirkland.com

and

Kirkland & Ellis LLP
Kirkland & Ellis International, LLP
601 Lexington Avenue
New York, New York 10022
Attn:     Stephen E. Hessler, P.C.
          Ciara Foster
Facsimile: 212-446-4900
Email:     stephen.hessler@kirkland.com
          ciara.foster@kirkland.com

and

Kirkland & Ellis LLP

Kirkland & Ellis International, LLP
901 Main Street
Dallas, Texas 75202
Attn: Michael Considine, P.C.
Facsimile: 214-972-1771
Email: MPConsidine@kirkland.com

(ii)     If to Buyer:

Contura Energy, Inc.
P.O. Box 848, Bristol, TN 37621-0848 (U.S. mail)
340 Martin Luther King Jr. Blvd., Bristol, TN 37620
(physical address)
Attn:        Mark M. Manno, Chief Legal Officer
Email:       mark.manno@conturaenergy.com

with a copy (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Ave.
New York, NY 10017
Attn:        William L. Taylor
             Damian S. Schaible
Email:       william.taylor@davispolk.com
             damian.schaible@davispolk.com

or to such other person or address as any party shall specify by notice in writing to the other party. All such notices, requests, demands, waivers and communications shall be deemed to have been received on the date on which so personally-delivered or faxed or delivered by overnight courier.

12.5    Waiver.

Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by Legal Requirements, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

12.6    Entire Agreement; Amendment.

This Agreement (including the Disclosure Schedules), the Transaction Order and the Exhibits, the Bidding Procedures Order and the other Transaction Documents supersede all prior agreements between Buyer, on the one hand, and the Sellers, on the other hand, with respect to their subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and the Sellers, on the other hand, with respect to their subject matter. This Agreement may not be amended, modified or supplements except by a written agreement executed by each of the Parties.

12.7    Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of all

72

of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party) and any assignment in contravention of this <u>Section 12.7</u> shall be null and void ab initio; <u>provided</u>, <u>however</u>, that, subject to compliance with <u>Section 4.4</u>, Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Buyer Designees without the prior consent of the Sellers; <u>provided</u>, that no such assignment shall relieve Buyer from its liabilities or obligations hereunder; <u>provided</u>, <u>further</u>, that the Sellers shall be permitted to assign their rights hereunder in part to the acquirer of any Excluded Assets or Excluded Liabilities with the prior written consent of Buyer; <u>provided</u>, that no such assignment shall relieve the Sellers from their liabilities or obligations hereunder, other than with respect to such Excluded Assets or Excluded Liabilities.

12.8    <u>Severability</u>.

The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

12.9    <u>Expenses</u>.

Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated hereby are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby. Subject to <u>Section 7.6</u>, any and all fees required by any Governmental Authority or any Person to obtain a Permit shall be the sole responsibility of Buyer.

12.10    <u>Disclosure Schedules</u>.

The Sellers have set forth information on the Disclosure Schedules in a section thereof that corresponds to the section of this Agreement to which it relates. A matter set forth in one section of a Schedule need not be set forth in any other section so long as its relevance to such other section of the Schedule or section of the Agreement would be reasonably apparent on the face of the information disclosed therein to a Person with no independent knowledge of the relevant subject matter.

12.11    <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made

73

and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding; provided, however, that, if the Bankruptcy Cases have been closed pursuant to Section 350(a) of the Bankruptcy Code, all Actions and Proceedings arising out of or relating to this Agreement shall be heard and determined in a New York state court or a federal court sitting in the Borough of Manhattan, New York, New York, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding. The Parties consent to service of process by mail (in accordance with Section 12.4) or any other manner permitted by law.

(c)    THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF THE SELLERS, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

12.12    Counterparts.

This Agreement and any amendment hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument. Notwithstanding anything to the contrary in Section 12.4, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

12.13    Parties in Interest; No Third Party Beneficiaries; No Amendment.

This Agreement and the other Transaction Documents shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Agreement and the other Transaction Documents are for the sole benefit of the Parties and their

Case 18-04177-TOM11    Doc 1323    Filed 04/15/19    Entered 04/15/19 11:55:00    Desc
Main Document    Page 198 of 225

permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind. Notwithstanding anything to the contrary, nothing in this Agreement shall constitute an amendment to any Benefit Plan.

12.14   Remedies.

Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit the Sellers or Buyer in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

12.15   Specific Performance.

Each Party recognizes that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by them in accordance with the terms hereof or were otherwise breached, and that monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries. Accordingly, a non-breaching Party shall be entitled, in addition to any other remedies that may be available, to injunctive relief to specifically enforce the terms and provisions of this Agreement. If any Action or Proceeding is brought by the non-breaching Party or Parties to enforce any of the terms or provisions of this Agreement pursuant to this Section 12.15, the Party in breach shall waive the defense that there is an adequate remedy at law. Each Party agrees to waive any requirement for the security or posting of any bond in connection with any Action or Proceeding seeking specific performance of such terms or provisions and that the only permitted objection that it may raise in response to any action for specific performance of such terms or provisions is that it contests the existence of a breach or threatened breach of such provisions. The rights set forth in this Section 12.15 shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

12.16   Sellers' Representative.

(a)   Each Seller designates the Company as its representative (the "Sellers' Representative") and attorney-in-fact of such Seller with full power and authority, including power of substitution, acting in the name of and on behalf of such Seller, for all purposes under this Agreement, including receipt of disclosures, granting and/or executing consents or waivers, receiving notices, settling disputes with respect to indemnification claims and the calculation of the Purchase Price and agreeing to and executing amendments and/or modifications to this Agreement. Any notice given to the Sellers' Representative shall be deemed to be a notice given to all of the Sellers.

(b)   By executing this Agreement under the heading of "Sellers' Representative," the Company hereby (i) accepts its appointment and authorization to act as Sellers' Representative as attorney-in-fact and agent on behalf of the Sellers in accordance with the terms of this Agreement and (ii) agrees to perform its obligations under, and otherwise comply with, this Section 12.16.

75

(c)     In the performance of its duties hereunder, Sellers' Representative shall be entitled to rely upon any document or instrument reasonably believed by it to be genuine and accurate. Sellers' Representative may assume that any Person purporting to give any notice in accordance with the provisions hereof has been duly authorized to do so. In the absence of proven willful misconduct, (i) Sellers' Representative shall not be liable to the Sellers with respect to its performance of the functions specified in this Agreement, and (ii) no Seller shall commence, prosecute or maintain any actions or proceedings against Sellers' Representative with respect to its performance of the functions specified in this Agreement. In determining the occurrence of any fact, event or contingency, Sellers' Representative may request from any of the Sellers such reasonable additional evidence as Sellers' Representative in its sole discretion may deem necessary, and may at any time inquire of and consult with others, including any of the Sellers, and shall not be liable to any Seller for any damages resulting from any delay in acting hereunder pending receipt and examination of additional evidence requested.

[*Signature pages follow.*]

76

**IN WITNESS WHEREOF,** the Parties have caused this Asset Purchase Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

<u>**SELLERS**</u>:

MISSION COAL COMPANY, LLC

By:_____
Name: Kevin Nystrom
Title: Chief Restructuring Officer

BEARD PINNACLE, LLC

By:_____
Name: Kevin Nystrom
Title: Chief Restructuring Officer

PINNACLE LAND COMPANY, LLC

By:_____
Name: Kevin Nystrom
Title: Chief Restructuring Officer

PINNACLE MINING COMPANY, LLC

By:_____
Name: Kevin Nystrom
Title: Chief Restructuring Officer

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

SENECA NORTH AMERICAN COAL, LLC

By: _____

Name: Kevin Nystrom

Title: Chief Restructuring Officer

SENECA COAL RESOURCES, LLC

By: _____

Name: Kevin Nystrom

Title: Chief Restructuring Officer

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**BUYER**:

CONTURA ENERGY, INC.

By: _____

Name: Andy Eidson

Title: Executive Vice President and Chief Financial Officer

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

## **Exhibit A**

Specified Equipment

1. Two Transformers located at Fan Site 8A, bearing serial numbers SEB3043 0002 and SEB3043 0001 and all associated wiring, power poles and switch gear;

2. Two Mine Fans located at Fan Site 8A (Robinson Type AF0925, bearing serial numbers 34297A and 34297B);

3. Two 2300 HP motors driving the 2 Robinson Type Fans located at Fan Site 8A;

4. Back up 2300 HP motors located in the Pinnacle warehouse; and

5. Water Pumps located at sites 1 Right (and any replacement pump for the 1 Right pump, wherever located), 9e, 5a, 8a, 8i, 8r, ASCO Fan and Stanley Fork Mine Fan & S-Fork Pump Station (and the water lines associated with each of the foregoing sites, whether or not located at such sites), the general locations of which are set forth on the attached map.

## Map of Contura Acquired Assets



## Exhibit B

Assumed Contracts & Cure Costs

| Seller Entity | Counter Party | Agreement | Additional Information | Contract Date |
|---|---|---|---|---|
| Pinnacle Mining Company, LLC | Nelson Bailey, Jr. and Mary Bailey | Mediation Settlement Agreement (assumption by Contura subject to a maximum cure payment of $19,700) | Original settlement amount was for $98,500, $78,800 of which Debtors report has been paid, leaving a balance of $19,700 | Filed under seal on 5/18/2017 in *Surratt et. al. v. Pinnacle Mining Company, LLC*, U.S.D.C. for the S.D. of W.V. (Beckley), Case #: 5:15-cv-15444 |
| Pinnacle Mining Company, LLC | Morris and Claudette Blankenship | Mediation Settlement Agreement (assumption by Contura subject to a maximum cure payment of $33,900) | Original settlement amount was for $169,500, $135,600 of which Debtors report has been paid, leaving a balance of $33,900 | Filed under seal on 5/18/2017 in *Surratt et. al. v. Pinnacle Mining Company, LLC*, U.S.D.C. for the S.D. of W.V. (Beckley), Case #: 5:15-cv-15444 |
| Pinnacle Mining Company, LLC | Gregory and Sharon Chafin | Mediation Settlement Agreement (assumption by Contura subject to a maximum cure payment of $42,000) | Original settlement amount was for $210,000, $168,000 of which Debtors report has been paid, leaving a balance of $42,000 | Filed under seal on 5/18/2017 in *Surratt et. al. v. Pinnacle Mining Company, LLC*, U.S.D.C. for the S.D. of W.V. (Beckley), Case #: 5:15-cv-15444 |
| Pinnacle Mining Company, LLC | Michael and Mary Estep | Mediation Settlement Agreement (assumption by Contura subject to a maximum cure payment of $31,000) | Original settlement amount was for $155,000, $124,000 of which Debtors report has been paid, leaving a balance of $31,000 | Filed under seal on 5/18/2017 in *Surratt et. al. v. Pinnacle Mining Company, LLC*, U.S.D.C. for the S.D. of W.V. (Beckley), Case #: 5:15-cv-15444 |
| Pinnacle Mining Company, LLC | Elmer and Violet Green | Mediation Settlement Agreement (assumption by Contura subject to a maximum cure payment of $27,000) | Original settlement amount was for $135,000, $108,000 of which Debtors report has been paid, leaving a balance of $27,000 | Filed under seal on 5/18/2017 in *Surratt et. al. v. Pinnacle Mining Company, LLC*, U.S.D.C. for the S.D. of W.V. (Beckley), Case #: 5:15-cv-15444 |
| Pinnacle Mining Company, LLC | James and Kristin Hatfield | Mediation Settlement Agreement (assumption by Contura subject to a maximum cure payment of $25,600) | Original settlement amount was for $128,000, $102,400 of which Debtors report has been paid, leaving a balance of $25,600 | Filed under seal on 5/18/2017 in *Surratt et. al. v. Pinnacle Mining Company, LLC*, U.S.D.C. for the S.D. of W.V. (Beckley), Case #: 5:15-cv-15444 |
| Pinnacle Mining Company, LLC | William and Drema Lester | Mediation Settlement | Original settlement amount was for | Filed under seal on 5/18/2017 in *Surratt* |

| Seller Entity | Counter Party | Agreement | Additional Information | Contract Date |
|---|---|---|---|---|
| | | Agreement (assumption by Contura subject to a maximum cure payment of $33,000) | $165,000, $132,000 of which Debtors report has been paid, leaving a balance of $33,000 | *et. al. v. Pinnacle Mining Company, LLC*, U.S.D.C. for the S.D. of W.V. (Beckley), Case #: 5:15-cv-15444 |
| Pinnacle Mining Company, LLC | Bessie Morgan | Mediation Settlement Agreement (assumption by Contura subject to a maximum cure payment of $35,000) | Original settlement amount was for $175,000, $140,000 of which Debtors report has been paid, leaving a balance of $35,000 | Filed under seal on 5/18/2017 in *Surratt et. al. v. Pinnacle Mining Company, LLC*, U.S.D.C. for the S.D. of W.V. (Beckley), Case #: 5:15-cv-15444 |
| Pinnacle Mining Company, LLC | Mary Ricketts | Mediation Settlement Agreement (assumption by Contura subject to a maximum cure payment of $27,000) | Original settlement amount was for $135,000, $108,000 of which Debtors report has been paid, leaving a balance of $27,000 | Filed under seal on 5/18/2017 in *Surratt et. al. v. Pinnacle Mining Company, LLC*, U.S.D.C. for the S.D. of W.V. (Beckley), Case #: 5:15-cv-15444 |
| Pinnacle Mining Company, LLC | James and Rose Surratt | Mediation Settlement Agreement (assumption by Contura subject to a maximum cure payment of $53,000) | Original settlement amount was for $265,000, $212,000 of which Debtors report has been paid, leaving a balance of $53,000 | Filed under seal on 5/18/2017 in *Surratt et. al. v. Pinnacle Mining Company, LLC*, U.S.D.C. for the S.D. of W.V. (Beckley), Case #: 5:15-cv-15444 |
| All settlement and release agreements entered into pursuant to (and as contemplated by) the foregoing Mediation Settlement Agreements (the "Settlement and Release Agreements") to the extent such Settlement and Release Agreements are eligible to be Assumed Contracts under Section 365 of the Bankruptcy Code. Contura maximum cure payment for each Settlement and Release Agreement is $0. | | | | |

- $327,200 remains unpaid in the aggregate.

## Exhibit C

Closing Required Permits

**Fan Site 8A**
- County: Wyoming
- Surface Owner: Pinnacle Land Company LLC, Pocahontas Land Corporation
- Mineral Owner: WPP LLC, Berwind Land Company
- Permits:
  - U-0204-83 – 24.8 AC
  - O-4010-97 – 3.7 AC
  - O-4008-92 – 3.9 AC
- Over bonded Area: TBD
- Possible Discharge Locations: TBD

**Dewater Site 8A**
- County: Wyoming
- Surface Owner: Pinnacle Land Company LLC
- Mineral Owner: WPP LLC
- Permits:
  - O-4010-97 – 4.4 AC
  - O-4008-92 – 0.27 AC
- Over bonded Area: TBD
- Possible Discharge Locations: TBD

**Dewater Site 8I**
- County: Wyoming
- Surface Owner: Pinnacle Land Company LLC
- Mineral Owner: WPP LLC
- Permits:
  - O-4010-97 – TBD, Less than 1 AC
  - Not Permitted - TBD
- Possible Discharge Locations: TBD

**Dewater Site 8R**
- County: Wyoming
- Surface Owner: Berwind Land Company, Pinnacle Land Company LLC
- Mineral Owner: Berwind Land Company, WPP LLC
- Permits:
  - O-4010-97 – 4.4 AC
  - O-4008-92 – 0.27 AC
- Over bonded Area: TBD
- Possible Discharge Locations: TBD
- Easement Area (O-4010-97): 0.41 AC

**Dewater Site 9E**
- <u>County:</u> Wyoming
- <u>Surface Owner:</u> Hartwood Forest Land, McDowell County Economic Development Authority, Berwind Land Company, Pocahontas Land Corporation, Pinnacle Land Company LLC
- <u>Mineral Owner:</u> Lasher LLC, Berwind Land Company, WPP LLC
- <u>Permits</u>:
  - O-4010-97 – 10.70 AC
  - O-4008-92 – 1.7 AC
  - Unknown – 3.50 AC
- <u>Over bonded Area:</u> 0.11 AC
- <u>Possible Discharge Locations:</u> TBD

**ASCO Fan**
- <u>County:</u> McDowell
- <u>Surface Owner:</u> Hartwood Forest Land, Pinnacle Land Company, Marianna Coal company
- <u>Mineral Owner:</u> Lasher LLC, WPP LLC
- <u>Permits</u>:
  - U-0204-83 – 8.4 AC
  - O-4008-92 – 1.9 AC
- <u>Over bonded Area:</u> 1.9 AC
- <u>Possible Discharge Locations:</u> 084

**Stanley Fork Mine Fan & S-Fork Pump Station**
- <u>County:</u> Wyoming
- <u>Surface Owner:</u> Pinnacle Land Company LLC
- <u>Mineral Owner:</u> WPP LLC
- <u>Permits</u>:
  - U-0204-83 – 30.6 AC
  - O-4008-92 – 30.1 AC
- <u>Over bonded Area:</u> 30.1 AC
- <u>Possible Discharge Locations:</u> 054, 055, 057, 061, U<u>IC 0492-02-109</u>
- <u>Easement Area (E-0025-00):</u> 7.5 AC

**5A Pump Site**
- <u>County:</u> Wyoming
- <u>Surface Owner:</u> Pinnacle Land Company LLC
- <u>Mineral Owner:</u> WPP LLC
- <u>Permits</u>:
  - U-0204-83 – 3.74 AC
  - O-4008-92 – 1.1 AC
- <u>Over bonded Area:</u> 1.1 AC

- <u>Possible Discharge Locations:</u> 047, 064

For the avoidance of doubt, the Closing Required Permits will cover only the Acquired Assets as determined by Buyer in its reasonable discretion.

## Exhibit D

Surety Bonds

| Surety Bonds in respect of the applicable Closing Required Permit that will replace the relevant portions of the following Designated Permits | Bond Amount | Premium |
|---|---|---|
| O-4010-97 | $ 520,000 | $ 14,300 |
| U-0204-83 | $ 811,200 | $ 22,308 |
| O-4008-92 | $ 145,000 | $ 3,988 |

## <u>Exhibit E</u>

Bluestone Permits

1. Transferred Permits
   a. Article 3 Permits:
      i. O-0138-83
      ii. O-4022-92
      iii. EM-002500
      iv. UO-0220-83
      v. UO-707-00
   b. NPDES Permits (All NPDES Permits)
      i. WV0052531
      ii. WV0090000[1]

2. Designated Permits (subject to the next sentence)
   a. O-4010-97
   b. U-0204-83
   c. O-4008-92

Either (i) the Designated Permits will be transferred to Bluestone after the Designated Permits have been modified to remove any portions that are part of the Closing Required Permits or (ii) Bluestone will acquire new permits that reflect the modified scope of the Designated Permits after removal of portions that are part of the Closing Required Permits.

---

[1] <u>Note to Draft</u>: List of Bluestone permits being confirmed.

**EXHIBIT C**

**TO**

ORDER (I) APPROVING THE SALES OF THE
ACQUIRED ASSETS FREE AND CLEAR OF CLAIMS,
LIENS, INTERESTS, AND ENCUMBRANCES, (II) APPROVING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF

(Letter Agreement)

Contura Energy, Inc.  Mission Coal Company, Inc.
340 Martin Luther King Jr. Blvd.  7 Sheridan Square Suite 300
Bristol, TN 37620  Kingsport, TN 37660

WPP LLC  Bluestone Resources, Inc.
5260 Irwin Road  302 S. Jefferson St.
Huntington, WV 25705  Roanoke, VA 24011

April 4, 2019

<u>Letter Agreement Regarding Pinnacle Transactions</u> (this "**Agreement**")

<u>Recitals</u>

WHEREAS, on October 14, 2018, Mission Coal Company, LLC, a Delaware limited liability company ("**Mission**"), and certain of its affiliates filed voluntary petitions (the "**Bankruptcy Cases**") under chapter 11 of Title 11 §§101-1532 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Alabama (the "**Bankruptcy Court**");

WHEREAS, on the date hereof, Contura Energy, Inc., a Delaware corporation ("**Contura**"), Mission and the other parties thereto entered into an Asset Purchase Agreement (the "**Contura APA**") pursuant to which, among other things, at the Closing (as defined in the Contura APA) (the "**Contura APA Closing**"), (a) Contura shall acquire the Acquired Assets (as defined in the Contura APA) from Mission and (b) Contura, Mission and certain subsidiaries of Mission shall enter into the Specific Sites Easement Agreement (as defined in the Contura APA) containing the easements, rights-of-way, privileges, and other rights and benefits set forth therein;

WHEREAS, on the date hereof, Bluestone Resources, Inc., a Delaware corporation ("**Bluestone**"), Mission and the other parties thereto entered into an Asset Purchase Agreement (the "**Bluestone APA**") pursuant to which, among other things, at the Closing (as defined in the Bluestone APA) (the "**Bluestone APA Closing**"), Bluestone shall acquire the Acquired Assets (as defined in the Bluestone APA) from Mission subject to the Broad Surface Rights Reservation (as defined in the Contura APA);

WHEREAS, Bluestone and Mission shall enter into a Contract Operator Agreement (the "**Operator Agreement**"), whereby (i) Bluestone shall agree, among other things, to act as the operator of Mission's Pinnacle mining complex (the "**Pinnacle Complex**"), with respect to the assets Bluestone shall acquire under the Bluestone APA, beginning as of the date of the Operating Agreement and continuing until the Bluestone APA Closing and (ii) Mission grants Bluestone a right of entry onto the Pinnacle Complex as necessary to complete its obligations under the Operator Agreement;

WHEREAS, in connection with an agreement dated April 3, 2019 between Bluestone and WPP LLC, a Delaware limited liability company ("**WPP**"), WPP and Bluestone shall enter into a lease agreement ("**Bluestone/WPP Lease Agreement**");

WHEREAS, on the date hereof, WPP and Contura (or its affiliate) entered into a lease agreement (the "**Contura/WPP Lease Agreement**"), pursuant to which, among other things, WPP shall lease the Leased Premises (as defined in the Contura/WPP Lease Agreement) to Contura (or its affiliate) as set forth therein;

WHEREAS, Mission, Contura, Bluestone and WPP (each, a "**Party**" and collectively, the "**Parties**") desire to set forth certain agreements relating to the consummation of the Contura APA Closing and the Bluestone APA Closing and the consummation of the other transactions described in this Agreement, all as set forth herein;

WHEREAS, WPP is neither a party to nor bound by the terms of either the Contura APA or the Bluestone APA or any agreement to which it is not a party; and

WHEREAS, the Parties acknowledge that this Agreement shall bind the Plan Administrator as defined in the Third Amended Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates [Docket No. 1209] (as amended or modified, the "**Plan**").

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties (and with respect to WPP, solely with respect to Sections 1(b)(i), 1(b)(iii), 1(c), 2(a), 7 and 8), intending to be legally bound hereby, agree as follows:

1.  Consummation of Pinnacle Transactions.

    (a)    The consummation of the Contura APA Closing shall occur subject to the terms of the Contura APA and is subject to the satisfaction (or if permissible, waiver) of the conditions set forth in Articles 9 and 10 of the Contura APA.  The consummation of the Bluestone APA Closing shall occur subject to the terms of the Bluestone APA and is subject to the satisfaction (or if permissible, waiver) of the conditions set forth in Articles 9 and 10 of the Bluestone APA.

    (b)    On the date of the Bluestone APA Closing:

        (i)    the Option (as defined in the *Agreed Order and Settlement Agreement Related to Motion to Assume Oak Grove Coal Mining Lease* [ECF No. 299] (the "**WPP Settlement Agreement**")) shall be terminated, other than with respect to the areas that are the subject of the Contura/WPP Lease Agreement;

        (ii)    Bluestone and Mission shall consummate (and/or shall cause their applicable subsidiaries to consummate) the Bluestone APA Closing pursuant to and in accordance with the Bluestone APA; and

        (iii)    In the event WPP and Bluestone have not yet entered into the Bluestone/WPP Lease Agreement, Bluestone shall notify WPP within two business days of the Bluestone APA Closing and WPP and Bluestone shall enter into the Bluestone/WPP Lease Agreement pursuant to the terms of the Bluestone/WPP Agreement dated April 3, 2019.

2

(c)     Subsequent to the Bluestone APA Closing, on the date of the Contura APA Closing (which, for the avoidance of doubt, may be on the same day as the Bluestone APA Closing and in such event the Contura APA Closing shall occur after the Bluestone APA Closing):

(i)   Contura shall provide written notice to WPP of the Contura APA Closing within two Business Days of the same.

(ii)   (A) Contura and Mission shall consummate (and/or shall cause their applicable subsidiaries to consummate) the Contura APA Closing pursuant to and in accordance with the Contura APA (the consummation of the Contura APA Closing, the "**Lease Effective Time**"), (B) the lease under the Contura/WPP Lease Agreement shall become effective as set forth therein, (C) Contura shall pay or cause to be paid to WPP the Advance Payment (as defined and set forth in the Contura/WPP Lease Agreement) as set forth in the Contura/WPP Lease Agreement and (D) Contura, on behalf of Mission, shall pay or cause to be paid to WPP $500,000 in cash by wire transfer of immediately available funds to such account or accounts as designated by WPP prior to the Contura APA Closing as consideration for the release set forth in Section 1(c)(iii) immediately below, and such amount shall be deducted from the purchase price under the Contura APA.

(iii)   In addition, (A) WPP shall irrevocably withdraw, waive and release in all respects the *Objection of WPP LLC and Reservation of Rights to Debtors' Proposed Cure Amounts* [ECF No. 745] and any and all other claims WPP may have against Mission and any of its affiliates relating to the WPP Leases (as defined in the *Objection of WPP LLC and Reservation of Rights to Debtors' Proposed Cure Amounts* [ECF No. 745]) and (B) the Option shall terminate in full and be of no further force or effect.

(d)     For the avoidance of doubt, it is understood and agreed that the assets acquired by Bluestone (and its applicable subsidiaries) pursuant to the Bluestone APA are being acquired subject to the rights of Contura pursuant to the Specific Sites Easement Agreement and the Broad Surface Rights Reservation (each as defined in the Contura APA).

2.     Certain Payments.

(a)     The April 1, 2019 option payment in the amount of $600,000 (the "**April Deferred Amount**") shall be deferred until the Contura APA Closing.  In addition, under the Operator Agreement, starting on July 1, 2019, Bluestone shall pay WPP a quarterly minimum of $200,000 that it would otherwise owe under the Bluestone/WPP Lease Agreement directly to WPP.  The remaining $400,000 of quarterly payments under the Option (the "**Quarterly Deferred Payment**") shall be deferred until the Contura APA Closing.  Upon the Bluestone APA Closing, the quarterly minimum under the Option shall be reduced from $600,000 per quarter to $400,000 and shall continued to accrue as the Quarterly Deferred Payment.  For the avoidance of doubt, as between the Operator Agreement and the Bluestone/WPP Lease Agreement, Bluestone shall be obligated to pay only one $200,000 quarterly minimum payment to WPP.  Upon the Contura APA Closing, WPP shall be entitled to an amount of the proceeds equal to the April Deferred Amount plus the aggregate amount of all Quarterly Deferred Payments, which shall be paid by Mission to WPP following the Contura APA Closing out of the Cash Consideration (as defined in the Contura

APA).  For the avoidance of doubt, Contura has no liability or obligation to WPP with respect to the payment referred to in the preceding sentence.

(i)     In the event that the Bluestone APA Closing is  consummated prior to April 15, 2019 and no Operator Agreement is required (i.e., the West Virginia Department of Environmental Protection ("**WV DEP**") has issued the required permits on an expedited basis and the closing conditions have been satisfied) then the forgoing payment structure shall continue to apply, *mutatis mutandis*, such that the upfront payment pursuant to the Bluestone/WPP Lease shall count toward the Upfront Shortfall and the quarterly minimum payment shall be reduced to $400,000 and accrue accordingly.

(b)     Prior to the Bluestone APA Closing and the Contura APA Closing, Bluestone shall pay any and all reasonable, documented and actually incurred operating expenses related to the Pinnacle Complex, as monitored by the Plan Administrator (as defined in the *Third Amended Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* [Docket No. 1209]), up to an aggregate amount of $1 million (such payments, the "**Operational Payments**").  Bluestone shall advance $100,000 of the Operational Payments upon execution of the Operator Agreement and any additional funds (up to $1,000,000) within 10 days of any request thereof from the Plan Administrator.  Following the Contura APA Closing, Bluestone shall be reimbursed for such Operational Payments by Mission from the Cash Consideration (as defined in the Contura APA) received by Mission from Contura.  For the avoidance of doubt, Contura has no liability or obligation to Bluestone with respect to the payment referred to in the preceding sentence.

(c)     Pursuant to the Sale Order (as defined in the Plan), the Cash Consideration under the Contura APA shall be used first to reimburse Bluestone pursuant to Section 2(b) above and to reimburse WPP pursuant to Section 2(a) above before the DIP Lenders (as defined in the Plan) shall have any claim or rights to such proceeds.  As between WPP and Bluestone, they agree that payment shall be made first to Bluestone under Section 2(b) above and then to WPP under Section 2(a) above.

3.     Contingency Planning.  In the event the Contura APA Closing does not occur, then (i) Mission hereby assigns to Bluestone its rights, if any, to the Remaining Deposit (as defined in the Contura APA) and (ii) Mission shall pay Bluestone proceeds of the Second Clarke Note (to be paid in quarterly installments for a period of four years) in an amount equal to (a) the total amount of the Operational Payments actually advanced by Bluestone, less (b) the amount of the Remaining Deposit.

4.     Amendments to Contura APA or Bluestone APA.  Contura and Mission shall not amend, modify or supplement the Contura APA, or waive any provision thereof, if such amendment, modification, supplement or waiver would reasonably be expected to impair or delay the ability of the Parties to consummate, or otherwise be inconsistent with, the transactions contemplated by this Agreement.  Mission and Bluestone shall not amend, modify or supplement the Bluestone APA, or waive any provision thereof, if such amendment, modification, supplement or waiver would reasonably be expected to impair or delay the ability of the Parties to consummate, or otherwise be inconsistent with, the transactions contemplated by this Agreement.

4

5. <u>Permit Task Force</u>. Each of Parties shall designate two individuals to participate in regularly scheduled conference calls every other week to discuss the status of permit transfers or the obtaining of new permits, as applicable, and progress towards the anticipated Contura APA Closing and Bluestone APA Closing. Subject to the covenants and limitations set forth in the Contura APA and the Bluestone APA, the Parties shall work collaboratively with each other and the WV DEP to issue new permits with respect to the Pinnacle Complex, with Bluestone receiving permits (and related reclamation liabilities) with respect to the assets acquired by Bluestone under the Bluestone APA and Contura receiving permits (and related reclamation liabilities) with respect to the assets acquired by Contura under the Contura APA. For the avoidance of doubt, following the issuance of new permits and (if applicable) the transfer of existing permits, all reclamation liabilities shall be assumed by Bluestone, except for the specific reclamation liabilities assumed by Contura under the Contura APA.

6. <u>Agreements between Contura and Bluestone</u>. Bluestone and Contura agree as follows:

(a) Promptly after the Contura APA Closing and the Bluestone APA Closing, Bluestone and Contura shall cooperate to obtain surveys (to the extent determined to be necessary) for the pump sites/de-water sites located at ASCO Fan, Stanley Fork Mine Fan & S-Fork Pump Station and pump sites 5A, 8A, 8R, 8I and 9E, the general locations of which are set forth on the map attached as <u>Exhibit A</u>, and for those certain surface properties identified on the attached map on <u>Exhibit A</u> as "Fan Site 8A", "Future Pumping Station 1", "Future Pumping Station 2" and "Future Pumping Station 3", and shall execute correction deeds with the surveyed property descriptions.

(b) From and after the Contura APA Closing, each of Bluestone and Contura shall provide the other party (and its respective representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with the providing party's normal business, to the books and records of the providing party to the extent such items relate to assets and/or liabilities acquired or assumed by the other party pursuant to the Contura APA or the Bluestone APA, as applicable. In furtherance of the foregoing, Contura and Bluestone shall enter into customary non-disclosure agreements with respect to information provided to each such party.

(c) After the Contura APA Closing and the Bluestone APA Closing, Bluestone and Contura shall cooperate regarding the supply and transmission of power to their respective acquired assets.

7. <u>Termination</u>. This Agreement may be terminated and the transactions contemplated by this Agreement abandoned (i) at any time by mutual written consent of the Parties, (ii) solely with respect to each of the parties thereto at each such party's election, immediately upon the valid termination of either the Contura APA or the Bluestone APA or (iii) at the election of any Party in the event that either the Bluestone APA Closing or the Contura APA Closing have not occurred within one year from the date of this Agreement.

8. <u>Miscellaneous</u>.

5

(a)     *Amendment; Waiver; Entire Agreement*.  This Agreement may not be amended, modified or supplemented except by a written agreement executed by each of the Parties; provided that any amendment, modification or supplement to Section 6 shall require the written agreement only of Contura and Bluestone.  No provision of this Agreement may be waived unless such waiver is signed by each Party against whom the waiver is to be effective.  No waiver that may be given by a Party hereunder shall be applicable except in the specific instance for which it is given, and no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.  Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.  This Agreement supersedes all prior agreements (other than the other Transaction Documents (as defined in the Contura APA), the Contura/WPP Lease Agreement, the Bluestone/WPP Agreement dated April 3, 2019, and the other Transaction Documents (as defined in the Bluestone APA)) between the Parties with respect to its subject matter and constitutes a complete and exclusive statement of the terms of the agreements between the Parties with respect to its subject matter.  In the event of any discrepancy or inconsistency between the terms of this Agreement and the Option, the Option shall control and govern, except, and only to the extent, expressly modified by this Agreement.

(b)     *No Partnership or Similar Arrangement; No Liability as Between Contura and Bluestone*.  Nothing in this Agreement and no action taken by the Parties under this Agreement, the Contura APA, the Bluestone APA or the agreements referred to in the Contura APA or the Bluestone APA is intended to, or shall be deemed to, establish any partnership, joint venture, agency or similar relationship between or among any of the Parties.  For the avoidance of doubt, (i) Contura shall not be liable for any breaches of this Agreement or the Bluestone APA (or any agreements referred to therein) by Bluestone or any other party thereto (other than Contura), and (ii) Bluestone shall not be liable for any breaches of this Agreement or the Contura APA (or any agreements referred to therein) by Contura or any other party thereto (other than Bluestone).

(c)     *Assignment*.  This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of all of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party) and any assignment in contravention of the foregoing shall be null and void ab initio.

(d)     *Severability*.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible and (b) the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected by such invalidity or unenforceability.

6

(e)     *Expenses*.  Except as otherwise expressly provided in this Agreement, in any of the other Transaction Documents (as defined in the Contura APA) or in any of the other Transaction Documents (as defined in the Bluestone APA), whether or not the transactions contemplated hereby or thereby are consummated, the Parties each shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement, the other Transaction Documents (as defined in the Contura APA) and the other Transaction Documents (as defined in the Bluestone APA) and the transactions contemplated hereby and thereby.

(f)     *Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver*.

(i)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(ii)     Without limitation of any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding; provided, however, that, if the Bankruptcy Cases have been closed pursuant to Section 350(a) of the Bankruptcy Code, all actions and proceedings arising out of or relating to this Agreement shall be heard and determined in a New York state court or a federal court sitting in the Borough of Manhattan, New York, New York, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding.  The Parties consent to service of process by mail (in accordance with the address for notices set forth on the signature page hereto or any other manner permitted by law).

(iii)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF THE PARTIES OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

(g)     *Counterparts*.  This Agreement and any amendment hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document

7

format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

(h) *Parties in Interest; No Third Party Beneficiaries*. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

(i) *Remedies*. Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement shall constitute an election of remedies or limit the Parties in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

(j) *Specific Performance*. Each Party recognizes that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by them in accordance with the terms hereof or were otherwise breached, and that monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries. Accordingly, a non-breaching Party shall be entitled, in addition to any other remedies that may be available, to injunctive relief to specifically enforce the terms and provisions of this Agreement. If any action or proceeding is brought by the non-breaching Party or Parties to enforce any of the terms or provisions of this Agreement pursuant to this Section 8(j), the Party in breach shall waive the defense that there is an adequate remedy at law. Each Party agrees to waive any requirement for the security or posting of any bond in connection with any action or proceeding seeking specific performance of such terms or provisions and that the only permitted objection that it may raise in response to any action for specific performance of such terms or provisions is that it contests the existence of a breach or threatened breach of such provisions. The rights set forth in this Section 8(j) shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(k) *Definitions; Other*. Unless otherwise expressly set forth herein, references to Sections shall be to Sections of this Agreement. The Recitals are incorporated herein by reference. When used in this Agreement, the following terms have the following meanings (other defined terms may be found elsewhere in this Agreement):

(i) "**Business Day**" means any day other than a Saturday, a Sunday or a day on which national banking associations located in New York, New York are required or authorized by applicable law to remain closed.

(ii) "**Calendar Quarter**" means each of the time periods in a calendar year beginning on January 1, April 1, July 1 and October 1 and ending on March 31, June 30, September 30 and December 31, respectively.

*[Signature page follows.]*

8

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement as of the date first above written.

Address for Notices

**CONTURA ENERGY, INC.**

By: _____

Name: Andy Eidson
Title: Executive Vice President and Chief Financial Officer

Contura Energy, Inc.
P.O. Box 848, Bristol, TN 37621-0848
(U.S. mail)
340 Martin Luther King Jr. Blvd., Bristol, TN 37620 (physical address)
Attn:   Mark M. Manno, Chief Legal Officer
Email: mark.manno@conturaenergy.com

**MISSION COAL COMPANY, LLC**

By: _____

Name:
Title:

Mission Coal Company, Inc.
7 Sheridan Square, Suite 300
Kingsport, Tennessee 37660
Attn: Gary Broadbent
Email: gary.broadbent@missioncoal.com

**BLUESTONE RESOURCES, INC.**

By: _____

Name:
Title:

Bluestone Resources, Inc.
302 S. Jefferson St.
Roanoke, VA 24011
**Attn: Steve Ball**
Email: steve.ball@bluestoneindustries.com

Solely with respect to Sections 1(b)(i), 1(b)(iii), 1(c), 2(a), 7 and 8:

**WPP LLC**

By: NRP (OPERATING) LLC, its sole member:

By: _____

Name:
Title:

WPP LLC
5260 Irwin Road
Huntington, WV 25705
Attn: Greg Wooten
Email: gwooten@wpplp.com

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement as of the date first above written.

Address for Notices

**CONTURA ENERGY, INC.**

By: _____

Name:
Title:

Contura Energy, Inc.
P.O. Box 848, Bristol, TN 37621-0848
(U.S. mail)
340 Martin Luther King Jr. Blvd., Bristol,
TN 37620 (physical address)
Attn:   Mark M. Manno, Chief Legal
Officer
Email:  mark.manno@conturaenergy.com

**MISSION COAL COMPANY, LLC**

By: _____

Name: *Kevin Nystrom*
Title: *Chief Restructuring Officer*

Mission Coal Company, Inc.
7 Sheridan Square, Suite 300
Kingsport, Tennessee 37660
Attn: Gary Broadbent
Email: gary.broadbent@missioncoal.com

**BLUESTONE RESOURCES, INC.**

By: _____

Name:
Title:

Bluestone Resources, Inc.
302 S. Jefferson St.
Roanoke, VA 24011
Attn: Steve Ball
Email: steve.ball@bluestoneindustries.com

Solely with respect to Sections 1(b)(i), 1(b)(iii), 1(c), 2(a), 7 and 8:

**WPP LLC**

By: NRP (OPERATING) LLC, its sole member:

By: _____

Name:
Title:

WPP LLC
5260 Irwin Road
Huntington, WV 25705
Attn: Greg Wooten
Email: gwooten@wpplp.com

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement as of the date first above written.

Address for Notices

**CONTURA ENERGY, INC.**

By: _____

Name:
Title:

Contura Energy, Inc.
P.O. Box 848, Bristol, TN 37621-0848
(U.S. mail)
340 Martin Luther King Jr. Blvd., Bristol,
TN 37620 (physical address)
Attn:  Mark M. Manno, Chief Legal
Officer
Email: mark.manno@conturaenergy.com

**MISSION COAL COMPANY, LLC**

By: _____

Name:
Title:

Mission Coal Company, Inc.
7 Sheridan Square, Suite 300
Kingsport, Tennessee 37660
Attn: Gary Broadbent
Email: gary.broadbent@missioncoal.com

**BLUESTONE RESOURCES, INC.**

By: _____

Name: James C. Justice III
Title: Pres & CEO

Bluestone Resources, Inc.
302 S. Jefferson St.
Roanoke, VA 24011
Attn: Steve Ball
Email: steve.ball@bluestoneindustries.com

Solely with respect to Sections 1(b)(i), 1(b)(iii), 1(c), 2(a), 7 and 8:

**WPP LLC**

By: NRP (OPERATING) LLC, its sole member:

By: _____

Name: GREG WOOTEN
Title: VICE PRESIDENT & CHIEF ENGINEER

WPP LLC
5260 Irwin Road
Huntington, WV 25705
Attn: Greg Wooten
Email: gwooten@wpplp.com

SIGNATURE PAGE TO LETTER AGREEMENT REGARDING PINNACLE TRANSACTIONS

# Exhibit A

## Map of Contura Acquired Assets

