# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## ORDER CONFIRMING THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF MISSION COAL COMPANY, LLC AND CERTAIN OF ITS DEBTOR AFFILIATES

Upon the filing by the Debtors[2] of the Plan, which is attached hereto as Exhibit A; and the Court previously having approved the Disclosure Statement and the solicitation procedures related to the Disclosure Statement and the solicitation of acceptances and rejections of the Plan, in each case pursuant to the Disclosure Statement Order; and the Debtors having served (a) the Solicitation Packages (as defined in the Disclosure Statement Order) on the Holders of Claims in the Voting Classes and (b) the Non-Voting Status Notices (as defined in the Disclosure Statement Order) on the Holders of Claims and Interests in the Non-Voting Classes, pursuant to the Disclosure Statement Order, *see Amended Certificate of Service* [Docket No. 864]; and the Court having considered the record in these Chapter 11 Cases, the compromises and settlements embodied in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the *Fourth Amended Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* attached hereto as Exhibit A, the "Plan") [Docket No. [1310] or in the *Third Amended Disclosure Statement for Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* [Docket No. 758] (the "Disclosure Statement")

1

and contemplated by the Plan, the briefs and arguments regarding Confirmation of the Plan, the evidence regarding Confirmation of the Plan, and the Confirmation Hearing having been held on April 3 to April 5, 2019, and April 9 to 10, 2019; and after due deliberation, the Court hereby makes and issues the following findings of fact and conclusions of law:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      The findings and conclusions set forth herein and on the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**A.      Jurisdiction, Venue, Core Proceeding (28 U.S.C. §§ 157(b)(2) and 1334(a)).**

2.      The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. § 1334 and the District Court's General Order of Reference Dated July 16, 1984, as Amended July 17, 1984[3] and may enter a final order on this matter. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court has jurisdiction to enter a Final Order determining that the Plan, including the Investigation Settlement, the Committee Settlement, the Robindale Settlement, and all other settlements contained therein, complies with the applicable provisions of the Bankruptcy Code and should be confirmed and approved.  Venue is proper before the Court pursuant to 28 U.S.C. § 1408.

---

[3]   The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:

> The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

Case 18-04177-TOM11    Doc 1324    Filed 04/15/19    Entered 04/15/19 12:02:00    Desc
Main Document      Page 2 of 112

**B.** **Eligibility for Relief.**

3.    The Debtors are Entities eligible for relief under section 109 of the Bankruptcy Code.

**C.** **Judicial Notice.**

4.    The Court takes judicial notice of (and deems admitted into evidence for Confirmation) the docket of the Chapter 11 Cases maintained by the Clerk of the Court and/or Omni Management Group, the Debtors' duly appointed notice, claims, and solicitation agent, including all pleadings and other documents filed, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered or adduced at, the hearings held before the Court during the pendency of the Chapter 11 Cases, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing.  Any resolutions of any objections explained on the record at the Confirmation Hearing are incorporated herein by reference.

**D.** **Notice and Transmittal of Solicitation Materials; Adequacy of Solicitation Notices.**

5.    The Plan, the Disclosure Statement, the Disclosure Statement Order, the ballots for voting on the Plan (the "Ballots"), the notice of Confirmation Hearing, and the other materials distributed by the Debtors in connection with Confirmation of the Plan (collectively, the "Confirmation Materials") were transmitted and served in compliance with the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, with the Local Bankruptcy Rules for the Northern District of Alabama (the "Local Rules"), and with the procedures set forth in the Disclosure Statement Order.  Notice of the Confirmation Hearing was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases.  The transmittal and service of the Confirmation Materials complied with the approved Solicitation Procedures, were appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, were conducted in good faith,

3

and were in compliance with the provisions of this Court's orders, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable rules, laws, and regulations. Because such transmittal and service were adequate and sufficient, no other or further notice is necessary or shall be required.

**E.     Voting.**

6.      On April 2, 2019, the Debtors filed the *Declaration of Paul H. Deutch Regarding the Solicitation of Votes and Analysis of Ballots for Accepting or Rejecting the Second Amended Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of its Debtor Affiliates* [Docket No. 1192] (the "Voting Report"). As evidenced by the Voting Report and based upon the record before the Court, the votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with this Court's orders, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Solicitation Procedures, and any other applicable rules, laws, and regulations.

7.      Ballots were transmitted to holders of Claims in Classes 3, 4, and 5 (the "Voting Classes") in accordance with the Disclosure Statement Order. As evidenced by the Voting Report, upon receipt and tabulation of the Ballots, 100% of holders and 100% in dollar amount of the Claims of holders of Class 3 Claims, 100% of holders and 100% in dollar amount of the Claims of holders of Class 4 Claims, and 22.54% of holders and 0.04% in dollar amount of the Claims of holders of Class 5 Claims who voted on the Plan accepted the Plan.

**F.     Good-Faith Solicitation (11 U.S.C. § 1125(e)).**

8.      Based on the record before the Court in the Chapter 11 Cases, the Debtors, the DIP Lenders, and each of their respective current and former Affiliates, and such Entity's and its current and former Affiliates' current and former Interest Holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members,

4

employees, agents, advisory board members, financial advisors, partners, controlling persons, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, together with their respective successors and assigns, have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Solicitation Procedures, and any other applicable rules, laws, and regulations in connection with all of their respective activities relating to the solicitation of acceptances to the Plan, their participation in the Chapter 11 Cases, and the activities described in section 1125 of the Bankruptcy Code and therefore are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

**G.     Plan Supplement.**

9.     The filing and notice of the Plan Supplement, and any modifications or supplements thereto, were proper and in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and any other applicable rules, laws, and regulations, and no other or further notice is or shall be required.  The Plan Supplement may be modified or supplemented prior to the Effective Date in order to update any information or documents contained therein, without any further order of this Court, but solely to the extent contemplated by the Plan or with the consent of the applicable parties to such document, and any and all such modifications or supplements shall be proper and in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and any other applicable rules, laws, and regulations, and no other or further notice is or shall be required.

**H.     Modifications to the Plan.**

10.     Pursuant to section 1127 of the Bankruptcy Code, any modifications to the Plan since the commencement of its solicitation described or set forth therein, including the

5

Investigation Settlement, the Committee Settlement, the Robindale Settlement, and all other settlements contained therein, constitute technical changes or changes with respect to particular Claims or Interests made pursuant to the agreement of the Holders of such Claims or Interests and do not materially and adversely affect or change the treatment of any other Claims or Interests. Pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

11.     In addition, this Confirmation Order contains modifications to the Plan that were made to address objections and informal comments received from various parties-in-interest. Modifications to the Plan since the solicitation thereof are consistent with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable rules, laws, and regulations.  The disclosure of any Plan modifications prior to or on the record at the Confirmation Hearing constitutes due and sufficient notice of any and all Plan modifications.  The Plan as modified shall constitute the Plan submitted for Confirmation.

**I.**     **Burden of Proof.**

12.     The Debtors, as the proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

**J.**     **Bankruptcy Rule 3016.**

13.     The Plan is dated and identifies the Debtors as the Plan proponents, thereby satisfying Bankruptcy Rule 3016(a).   The filing of the Disclosure Statement satisfied Bankruptcy Rule 3016(b).

6

**K.**     **Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**

14.     The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

    a.     <u>Proper Classification (11 U.S.C. §§ 1122 and 1123(a)(1))</u>. As required by section 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates Classes of Claims and Interests. As required by section 1122(a) of the Bankruptcy Code, the Claims and Interests placed in each Class are substantially similar to other Claims and Interests, as applicable, in each such Class. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Interests. Thus, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

    b.     <u>Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>. Article III of the Plan specifies that Classes 1 and 2 are Unimpaired under the Plan, Class 7 is either deemed Unimpaired or Impaired under the Plan, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

    c.     <u>Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))</u>. Article III of the Plan specifies that Classes 3, 4, 5, 6, 8 and 9 are Impaired under the Plan, and that Class 7 is either deemed Unimpaired or Impaired under the Plan, and explains the treatment of such Claims and Interests, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

    d.     <u>No Discrimination (11 U.S.C. § 1123(a)(4))</u>. Article III of the Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class except to the extent that a Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

    e.     <u>Implementation of the Plan (11 U.S.C. § 1123(a)(5))</u>. The Plan and the various documents included in the Plan Supplement provide adequate and proper means for implementation of the Plan, including, without limitation: (i) the establishment of the Liquidating Trust funded with the Liquidating Trust Assets; (ii) the execution and delivery of the Sale Transaction Documentation, as applicable, including those agreements or other documents of merger, amalgamation, consolidation, contribution, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (iii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Sale Transaction Documentation, the Plan, and the Plan Supplement (as may be modified pursuant to the terms of the Plan); (iv) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, contribution,

7

conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or local law; (v) the cancellation of certain existing agreements, obligations, instruments, and Interests; (vi) the transfer of certain assets to the Successful Bidder(s), (vii) the vesting of certain assets of the Debtors' Estates,; (viii) the Debtors' entry into the Clarke/McCoy Notes; (ix) the Debtors' entry into the Clarke Note and the Jason McCoy Note, (x) issuance of the Non-Cash Consideration, and the grant of the liens by the applicable Successful Bidder for the Oak Grove Mining Complex and Maple Eagle Mining Complex securing any such Non-Cash Consideration, (xi) the creation of the corporate structure of the applicable Successful Bidder for the Oak Grove Mining Complex and Maple Eagle Mining Complex, (xii) funding of the Estate Retained Professional Fee Claim Escrow Account, (xiii) the distribution of the Settlement Proceeds, (xiv) the distribution of the Robindale Settlement proceeds, and (xv) all other actions that the Debtors determine, with the consent of the Required Lenders or applicable Successful Bidder, as applicable, not to be unreasonably withheld, conditioned, or delayed, to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code.

f.  <u>Non-Voting Equity Securities (11 U.S.C. §1123(a)(6))</u>.  This section is not applicable to the Plan.

g.  <u>Designation of Directors and Officers (11 U.S.C. § 1123(a)(7))</u>.  The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.  The Plan and Plan Supplement disclose the process for selecting the Plan Administrator and Liquidating Trustee, including that the Plan Administrator and the Liquidating Trustee will be named prior to the Effective Date.  The selection of the Plan Administrator and the Liquidating Trustee is consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the Plan Administrator and the Liquidating Trustee.  Accordingly, the Debtors have satisfied section 1129(a)(5) of the Bankruptcy Code.

h.  <u>Additional Plan Provisions (11 U.S.C. § 1123(b))</u>.  The additional provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code and, therefore, are consistent with section 1123(b) of the Bankruptcy Code.

i.  <u>Impairment/Unimpairment of Any Class of Claims or Interests (11 U.S.C. § 1123(b)(1))</u>.  As contemplated by section 1123(b)(1) of the Bankruptcy Code, pursuant to the Plan, Classes 1 and 2 are Unimpaired, Classes 3, 4, 5, 6, 8 and 9 are Impaired, and Class 7 is either deemed Unimpaired or Impaired.

ii.  <u>Assumption and Rejection of Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2))</u>.  Article V of the Plan provides that the Debtors shall assume or assign to the applicable Successful Bidder, as part of the Sale Transaction, the Executory Contracts and Unexpired Leases that are

8

required to be assigned to such Successful Bidder pursuant to the Sale Transaction Documentation. Except as otherwise provided in the Plan or the Sale Transaction Documentation, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and/or assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected on the Plan Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan, the Plan Supplement or the Sale Transaction Documentation; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Plan Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to the applicable Successful Bidder or another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (5) is a D&O Policy; or (6) is the Sale Transaction Documentation.

iii.  <u>Compromise and Settlement (11 U.S.C. § 1123(b)(3)(A))</u>.  In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan, including the Investigation Settlement, the Committee Settlement, the Robindale Settlement, and all other settlements contained therein, constitute a good-faith compromise of all Claims, Causes of Action, Interests, and controversies relating to the contractual, legal, and subordination rights that all Holders of Claims or Interests may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The compromise and settlement of such Claims and Interests embodied in the Plan and reinstatement and unimpairment of other Classes identified in the Plan are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable.

iv.  <u>Retention of Claims (11 U.S.C. § 1123(b)(3)(B))</u>.  In accordance with section 1123(b)(3)(B) of the Bankruptcy Code, Article IV, Section O, of the Plan provides that the Debtors shall assign and transfer to the applicable Successful Bidder all of the applicable Transferred Causes of Action pursuant to the Sale Transaction Documentation on the applicable Closing Date.  The Transferred Causes of Action shall be set forth and described in the Plan Supplement, the description of which shall be subject to the consent of such Successful Bidder.  Any Causes of Action held by the Debtors on the applicable Closing Date that are not Transferred Causes of Action shall vest in the Debtors on the Plan Effective Date.

Case 18-04177-TOM11    Doc 1324    Filed 04/15/19    Entered 04/15/19 12:02:00    Desc
Main Document      Page 9 of 112

v.      Other Appropriate Provisions (11 U.S.C. § 1123(b)(5)–(6)). The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including, without limitation, provisions for (1) distributions to Holders of Claims and Interests, (2) resolution of Disputed Claims and Interests, (3) allowance of certain Claims, (4) releases by the Debtors of certain parties, (5) releases by certain third parties, (6) exculpation of certain parties, (7) the injunction of certain Claims and causes of action in order to implement the discharge, release and exculpation provisions, and (8) retention of this Court's jurisdiction, thereby satisfying the requirements of sections 1123(b)(5) and (6) of the Bankruptcy Code.

i.      Cure of Defaults (11 U.S.C. § 1123(d)). Article V, Section C, of the Plan, provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed (or assumed and assigned) pursuant to the Plan or the Sale Transaction Documentation. The Debtors have provided or will provide notice of such assumption (or assumption and assignment) and proposed cure amounts to the applicable third parties. As such, the Plan provides that the Debtors or the applicable Successful Bidder, as applicable, will cure, or provide adequate assurance that the Debtors or such Successful Bidder, as applicable, will promptly cure, defaults with respect to assumed Executory Contracts and Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code. Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

**L.    The Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2)).**

15.    The Debtors have complied with the applicable provisions of the Bankruptcy Code,

as required by section 1129(a)(2) of the Bankruptcy Code. Specifically:

a.      the Debtors are eligible debtors under section 109 of the Bankruptcy Code and are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code;

b.      the Debtors have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court; and

c.      the Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, this Court's orders, and any other applicable rules, laws, and regulations in transmitting the Confirmation Materials and related notices and in soliciting and tabulating the votes on the Plan.

**M.    Good Faith Proposal of the Plan (11 U.S.C. § 1129(a)(3)).**

16.    The Debtors have proposed the Plan in good faith and not by any means forbidden

by law. In determining that the Plan has been proposed in good faith, the Court has examined the

totality of the circumstances surrounding the filing of the Chapter 11 Cases and the formulation of the Plan. The Debtors' good faith is evident from the facts and record of the Chapter 11 Cases, the Disclosure Statement, the Confirmation declarations, and the record of the Confirmation Hearing. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates and to effectuate a successful sale of the Debtors' assets. The Plan was the product of extensive negotiations conducted at arm's length among the Debtors and their key stakeholders, including the DIP Lenders, the Second Lien Lenders, the Committee, and the Settling Parties, among others. Further, the Plan's classification, indemnification, settlement, discharge, exculpation, release, and injunction provisions have been negotiated in good faith and at arm's length, are consistent with sections 105, 1122, 1123(b)(6), 1129, and 1142 of the Bankruptcy Code, and are each necessary for the Debtors to consummate their value-maximizing Plan. Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

**N.**     **Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**

17.     Payments made or to be made by the Debtors for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

**O.**     **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**

18.     The Debtors have disclosed the process for selecting the Plan Administrator at or prior to the Confirmation Hearing and will file an updated Plan Supplement prior to the Effective Date identifying the person to serve as the Plan Administrator. The Plan complies with section 1129(a)(5)(A)(ii) of the Bankruptcy Code because the process for the appointment of the Plan Administrator and the Liquidating Trustee is consistent with the interests of the creditors and with public policy. Accordingly, the Debtors have satisfied section 1129(a)(5) of the Bankruptcy Code.

11

**P.      No Rate Changes (11 U.S.C. § 1129(a)(6)).**

19.      Section 1129(a)(6) of the Bankruptcy Code is not applicable to the Chapter 11 Cases.  The Plan proposes no rate change subject to the jurisdiction of any governmental regulatory commission.

**Q.      Best Interests of Holders of Claims and Interests (11 U.S.C. § 1129(a)(7)).**

20.      Each Holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

21.      The evidence in support of the Plan that was proffered or adduced at or prior to the Confirmation Hearing and in the Nystrom Declaration, including the liquidation analysis:  (a) is reasonable, persuasive, credible, and accurate as of the dates such analyses or evidence was prepared, presented, or proffered; (b) utilizes reasonable and appropriate methodologies and assumptions; and (c) establishes that Holders of Allowed Claims and Allowed Interests in every Class will recover as much or more under the Plan on account of such Claim or Interest, as of the Effective Date, than the amount such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Accordingly, the Plan satisfies the "best interest of creditors" test under section 1129(a)(7) of the Bankruptcy Code.

**R.      Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).**

22.      Classes 1 and 2 are Unimpaired by the Plan pursuant to section 1124 of the Bankruptcy Code and, accordingly, Holders of Claims in such Classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  As reflected in the Voting Certification, Classes 3, 4, 5, 6, 8 and 9 are Impaired by the Plan.  Classes 3 and 4 at each Debtor have voted to accept the Plan. Class 7 is deemed Impaired or Unimpaired by the Plan

12

pursuant to section 1124 of the Bankruptcy Code and, accordingly, Holders of Claims in Class 7 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Claims in Classes 6, 8, and 9 (if any) will not receive or retain any property on account of their Claims or Interests and, accordingly, such Claims or Interests are Impaired and such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Class 5 Claims have voted to reject the Plan. Accordingly, the Plan satisfies the requirements of section 1129(a)(8) of the Bankruptcy Code with respect to Classes 3, 4, and 7, and to the extent that the Plan does not satisfy section 1129(a)(8) of the Bankruptcy with respect to Classes 5, 6, 8, or 9, the Plan otherwise satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

S. **Treatment of Administrative Claims, Estate Retained Professional Fee Claims, Priority Tax Claims, Other Secured Claims, and Other Priority Claims (11 U.S.C. § 1129(a)(9)).**

23. The treatment of Administrative Claims, Estate Retained Professional Fee Claims, Other Secured Claims, and Other Priority Claims pursuant to Articles II and III of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code. Accordingly, the Debtors have satisfied the requirements of section 1129(a)(9) of the Bankruptcy Code.

T. **Priority Tax Claims.**

24. The treatment of Priority Tax Claims pursuant to Article II of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9)(C) of the Bankruptcy Code. Accordingly, the Debtors have satisfied the requirements of section 1129(a)(9)(C) of the Bankruptcy Code.

13

## U.  Acceptance By at Least One Impaired Class of Claims (11 U.S.C. § 1129(a)(10)).

25.     Claims in Classes 3, 4 and 5 are Impaired and entitled to vote under the Plan. Classes 3 and 4 at each Debtor have voted to accept the Plan, as established by the Voting Report. Accordingly, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

## V.  Feasibility (11 U.S.C. § 1129(a)(11)).

26.     The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code. The evidence supporting the feasibility of the Plan proffered or adduced by the Debtors at or before the Confirmation Hearing, including the declarations filed by the Debtors in support of Confirmation:  (a) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, and/or proffered; (b) utilizes reasonable and appropriate methodologies and assumptions; (c) establishes that the Plan is feasible and Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors; and (d) establishes the Debtors or the Reorganized Debtors, as applicable, will have sufficient funds to meet their obligations under the Plan.

## W.  Payment of Statutory Fees (11 U.S.C. § 1129(a)(12)).

27.     As set forth in Article II, Section D of the Plan, the Debtors or the Plan Administrator, as applicable, shall timely pay all Bankruptcy Administrator Fees for each quarter under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' businesses, until the entry of a Final Order dismissing or closing the Chapter 11 Cases, or converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  Following Confirmation, the Debtors shall file with the Court quarterly operating reports in a form reasonably acceptable to the Bankruptcy Administrator.  Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

14

## X.    Retiree Benefits (11 U.S.C. § 1129(a)(13)).

28.    The Debtors have satisfied 11 U.S.C. § 1129(a)(13).  Certain of the Debtors were party to collective bargaining agreements, each dated April 27, 2018, between Oak Grove Resources, LLC, and the United Mine Workers of America (the "UMWA") and between Pinnacle Mining Company, LLC, and the UMWA, respectively (collectively, the "CBAs"), and were contributing employers to The United Mine Workers of America 1974 Pension Plan and Trust (the "1974 Pension Plan"), The United Mine Workers of America 1993 Benefit Plan and Trust (the "1993 Benefit Plan"), and the Union Savings Plan. In accordance with the *Memorandum Opinion and Order Granting Debtors' Motion for Entry of an Order (I) Authorizing, but Not Directing, the Debtors to (A) Reject Their Collective Bargaining Agreements, (B) Modify Certain Union-Related Retiree Benefits, and (C) Implement Terms of Their Section 1113 and Section 1114 Proposal, and (II) Granting Related Relief* [Docket No. 902] (the "1113/1114 Order"), the Debtors have been authorized to reject their CBAs and to modify all retiree benefits (as defined in 11 U.S.C. § 1114) as provided in the 1113/1114 Order, and accordingly, on the Plan Effective Date (unless the Closing Date shall occur prior to the Plan Effective Date, in such case, on the Closing Date), the Debtors shall be deemed to have rejected the CBAs and to have modified all retiree benefits (as defined in 11 U.S.C. § 1114) as provided in the 1113/1114 Order, effectuating a complete withdrawal from the 1974 Pension Plan and the 1993 Benefit Plan, and have no further contribution obligations to any pension plans or retiree benefits under the CBAs.  Any sale of assets shall be free and clear of any encumbrances, liabilities, including any successor liability or obligations under or related to the CBAs, pension plans, or retiree benefits.  For the avoidance of doubt, nothing herein or in the 1113/1114 Order shall or shall be deemed to invalidate, validate, or otherwise affect the rights of the 1974 Pension Plan and the 1993 Benefit Plan with respect to the prepetition proofs of claim filed in these Chapter 11 Cases by the 1974 Pension Plan or the 1993

15

Benefit Plan, including with respect to priority, provided, that the withdrawal liability claims to be incurred as a result of the Debtors' withdrawal from the 1974 Pension Plan (if and to the extent allowed) shall be treated as general unsecured claims pursuant to this Plan

**Y.** **Non-Applicability of Certain Sections (Sections 1129(a)(14), (15), and (16)).**

29. Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases. The Debtors owe no domestic support obligations, are not individuals, and are moneyed, business, or commercial corporations or trusts.

**Z.** **Confirmation of Plan Over Non-Acceptance of Impaired Classes (11 U.S.C. § 1129(b)).**

30. The Plan may be confirmed as to Classes 5, 6, 8, and 9 (collectively, the "Rejecting Classes") pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding that the requirements of section 1129(a)(8) have not been met with respect to the Rejecting Classes, because the Debtors have demonstrated by a preponderance of the evidence that the Plan (a) satisfies all of the other requirements of section 1129(a) of the Bankruptcy Code and (b) does not "discriminate unfairly" and is "fair and equitable" with respect to the Holders of Claims and Interests in the Rejecting Classes.

31. The Plan does not "discriminate unfairly" against any Holders of Claims and Interests in the Rejecting Classes. The treatment of such Holders is proper because all similarly situated Holders of Claims and Interests will receive substantially similar treatment, and the Debtors have a valid rationale, including for the rationales articulated in the Confirmation Brief, for the Plan's classification scheme and the treatment provided for different Classes.

32. The Plan is also "fair and equitable" with respect to the Rejecting Classes. Specifically, no Holder of any Claim or Interest that is junior to the Class 5 General Unsecured Claims, the Class 6 Intercompany Claims, the Class 7 Intercompany Interests, to the extent not

Case 18-04177-TOM11    Doc 1324    Filed 04/15/19    Entered 04/15/19 12:02:00    Desc
Main Document      Page 16 of 112

Reinstated under the Plan, the Class 8 510(b) Claims, or the Class 9 Interests is receiving a distribution under the Plan, and no Holder of any Claims or Interests senior to the Rejecting Classes is receiving more than full recovery on account of its Claims or Interests.

33.     The Plan, therefore, satisfies the requirements of section 1129(b) of the Bankruptcy Code and may be confirmed despite the fact that the Rejecting Classes are deemed to reject the Plan.

**AA.     Only One Plan (11 U.S.C. § 1129(c)).**

34.     The Plan is the only plan filed in the Chapter 11 Cases, and, accordingly, satisfies section 1129(c) of the Bankruptcy Code.

**BB.     Principal Purpose of the Plan (11 U.S.C. § 1129(d)).**

35.     The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933, and there has been no filing by any Governmental Unit asserting any such attempted avoidance.   The Plan, therefore, satisfies section 1129(d) of the Bankruptcy Code.

**CC.     Not Small Business Cases (11 U.S.C. § 1129(e)).**

36.     None of the Chapter 11 Cases are small business cases, as that term is defined in the Bankruptcy Code, and accordingly, section 1129(e) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

**DD.     Satisfaction of Confirmation Requirements.**

37.     Based on the foregoing and all other pleadings and evidence proffered or adduced at or prior to the Confirmation Hearing, the Plan and the Debtors, as applicable, satisfy all of the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

Case 18-04177-TOM11    Doc 1324    Filed 04/15/19    Entered 04/15/19 12:02:00    Desc
Main Document    Page 17 of 112

**EE.** __Executory Contracts and Unexpired Leases.__

38.     The Debtors have exercised sound business judgment in determining whether to reject, assume, or assume and assign each of their Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, Article V of the Plan, and as set forth in the Plan Supplement or the Sale Transaction Documentation.  Except as set forth herein, the Sale Transaction Documentation, and/or in separate orders entered by the Court relating to assumption of Executory Contracts or Unexpired Leases, including the applicable Sale Order, consistent with the Plan Supplement, the Debtors and/or the applicable Successful Bidder have Cured or provided adequate assurances that the Debtors and/or such Successful Bidder will Cure defaults (if any) under or relating to each applicable Executory Contract or Unexpired Lease assumed under the Plan or Sale Transaction Documentation and, for each such Executory Contract or Unexpired Lease being assumed and assigned under the Plan or the Sale Transaction Documentation, such Successful Bidder has provided or will provide adequate assurance of future performance as required under section 365(f)(2)(B).

**FF.** __Approval of the Investigation Settlement.__

39.     The Debtors' independent directors conducted an extensive, good faith investigation into potential estate claims and causes of action (the "Potential Claims") arising out of prepetition transactions involving the Settling Parties.  The Debtors' independent directors completed their investigation in late February 2019 and thereafter began engaging in extensive, good-faith negotiations with the Settling Parties and the Committee regarding a potential settlement of the Potential Claims.  These negotiations culminated in the Investigation Settlement as set forth in the Plan.  The Investigation Settlement was entered into in good faith, is fair, reasonable, and clearly and unambiguously in the best interests of the Estates.  The releases set forth in the Plan and granted in connection with the Investigation Settlement are:  (a) in exchange

18

for the good and valuable consideration and reasonably equivalent value provided by the Settling Released Parties in connection with the Investigation Settlement; (b) a good faith settlement and compromise of the Claims and/or Causes of Action against the Settling Released Parties; (c) not subject to avoidance in any manner whatsoever, (d) in the best interests of the Debtors and all Holders of Claims and Interests; (e) fair, equitable and reasonable; (f) given and made after notice and opportunity for hearing; and (g) a bar to any Entity from asserting any and all Claims and/or Causes of Action released herein against any of the Settling Released Parties.

40.     The Claims asserted in the Cliffs Litigation are hereby determined to be property of the Estates and pursuant to the Plan injunction, all parties are enjoined from pursuing anything related to such Claims against the Settling Released Parties; *provided, however,* that nothing herein shall or shall be deemed to invalidate or validate or release the general unsecured proofs of claim filed in these Chapter 11 Cases by Cliff's Natural Resources, Inc.

41.     The note (the "Castlelake Bridge Note") to be issued by Ken McCoy and Jason McCoy (the "Co-Issuers") to MC Southwork LLC (the "McCoy Note Lender"), the guarantee of such note provided by Iron Management V, LLC and Iron Management, LLC (the "Guarantors") and all other terms of the McCoy Note, which shall be consistent in all respects with Exhibit C of the Investigation Settlement Term Sheet, if issued, shall be and is binding and fully enforceable against the Co-Issuers and Guarantors, on a joint and several basis, without any defense of any kind. Further, (a) the escrow account to be established to hold the two unpledged shares (*i.e.,* physical stock certificates) of Conuma Coal Resources Limited (the "Conuma Stock") held by ERP Steel Works, LLC, which Conuma Stock shall be placed in such escrow account on the Effective Date, in a manner satisfactory to the McCoy Note Lender, and any escrow agreements and other definitive agreements with respect thereto, are binding and fully enforceable by the McCoy Note

19

Lender, (b) immediately upon the occurrence of any Event of Default (as set forth in the Castlelake Bridge Note), (i) title to any and all assets (including the Conuma Stock) held in escrow shall pass to the McCoy Note Lender without any defense or counterclaim of any kind and (ii) upon the occurrence of any Event of Default, this Order shall serve as a springing default judgment against the Co-Issuers and the Guarantors, and shall automatically, and without further order of any court, grant the McCoy Note Lender a judgment lien as of the date of issuance of the Castlelake Bridge Note on any and all assets of the Co-Issuers and the Guarantors subject to execution (including the Conuma Stock to be held in escrow); *provided* that the McCoy Note Lender shall only be entitled to exercise its rights and remedies in respect of such judgment lien against the assets of the Co-Issuers and the Guarantors other than the Conuma Stock in the event that the McCoy Note Lender does not receive the Conuma Stock (or the proceeds thereof in the event of the exercise of the right of first refusal governing such Conuma Stock (the "ROFR") on the terms and conditions set forth in the Castlelake Bridge Note. For avoidance of doubt, this paragraph shall only be applicable if the Castlelake Bridge Note is issued by the McCoy Note Lender in connection with the obligation of Ken McCoy and Jason McCoy to fund payments on the Plan Effective Date in respect of the Investigation Settlement. This paragraph shall not be applicable if Ken McCoy and Jason McCoy fund the Investigation Settlement from other sources and no Castlelake Bridge Note is issued.

**GG.    Approval of the Committee Settlement**

42.    The Plan incorporates a settlement between the Debtors, the Committee, the DIP Lenders, and the Settling Parties with respect to (i) the resolution of the Committee's objections to the Plan and the Sale Transactions, (ii) the Committee's withdrawal of the Standing Motion with prejudice and (iii) the resolution of any disputes between the DIP Lenders and the Committee regarding the application of the DIP Lenders and Committee Stipulation. The Committee

20

Settlement, the terms of which are set forth in the Plan, and incorporated by reference herein, was entered into in good faith, is fair, reasonable, and clearly and unambiguously in the best interests of the Estates.

## Vesting of Assets

43.     Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated therein, or agreed upon in connection therewith, and in accordance with the Sale Transaction Documentation, on the Plan Effective Date: (a) the Acquired Assets shall be preserved and shall vest in the applicable Successful Bidder, free and clear of all Liens, Claims, charges, and other encumbrances (other than the Assumed Liabilities); and (b) the Excluded Assets and any Sale Transaction Proceeds shall vest in the Debtors or the Reorganized Debtors, as applicable, and the Plan Administrator solely for the purpose of making distributions under the Plan and liquidating the Estates, free and clear of all Liens, Claims, charges, and other encumbrances and (c) the Liquidating Trust Assets shall vest in the Liquidating Trust for the purpose of distributing the Liquidating Trust Assets. For the avoidance of doubt, all Remaining Sale Transaction Proceeds shall be distributed by the Debtors, the Plan Administrator or the Liquidating Trustee, as applicable, to the DIP Lenders (x) on the Effective Date with respect to any Sale Transaction that closes on or prior to the Effective Date and (y) within one day of closing of any Sale Transaction that closes after the Effective Date.

## Plan Distributions Consistent with the DIP Lenders and Committee Stipulation.

44.     As part of the Committee Settlement, Holders of General Unsecured Claims shall not receive any recovery on account of, and the DIP Lenders shall have no liability under, the DIP Lenders and Committee Stipulation.

21

**HH.** **Corporate Structure of the Successful Bidder for the Oak Grove Mining Complex and Maple Eagle Mining Complex and Consideration Provided by Such Successful Bidder.**

45.     The corporate structure of the Successful Bidder for the Oak Grove Mining Complex and the Maple Eagle Mining Complex (the "Maple/Oak Grove Buyer"), its two direct subsidiary holding companies, Murray Alabama Coal, LLC and Murray Eagle Mining, LLC, and their three direct operating subsidiaries, Murray Oak Grove, LLC, Murray Maple Eagle Coal, LLC and Murray Alabama Minerals (the "Winning Bidder Corporate Structure") has been structured in good faith, and the Winning Bidder Corporate Structure and all steps taken by the Maple/Oak Grove Buyer and the DIP Lenders in furtherance thereof, is in compliance with the Bankruptcy Code and all applicable law.  Upon the closing of the Sale Transaction to the Maple/Oak Grove Buyer (i) the corporate governance terms of the Winning Bidder Corporate Structure, (ii) the liens securing the Non-Cash Consideration and (iii) all other steps taken by the Maple/Oak Grove Buyer and the DIP Lenders in furtherance thereof and the Sale Transaction are valid, binding, enforceable, and in full force and effect.

46.     The consideration provided by the Maple/Oak Grove Buyer (including the cash consideration and the equity interests purchased by such cash consideration, and the Non-Cash Consideration being issued by the Maple/Oak Grove Buyer), shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and all other applicable law, and the Sale Transaction with Maple/Oak Grove Buyer may not be avoided, or costs or damages imposed or awarded under Bankruptcy Code section 363(n) or any other provision of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar federal or state laws. The Non-Cash Consideration is valid, binding and enforceable, and the obligations, guarantees, mortgages, pledges, liens, other security interests and claims granted pursuant to or in connection with the Non-Cash Consideration are (i)

22

valid, binding, perfected and enforceable on the collateral as set forth in the documents governing the Non-Cash Consideration, with the priority set forth in such documents and the holders of the Non-Cash Consideration and by the Maple/Oak Grove Buyer are hereby authorized to make any and all filings and recordings necessary or desirable in connection with such liens and security interests, (ii) granted in good faith, for good and valuable consideration, and for legitimate business purposes and (iii) shall not be deemed to constitute a fraudulent conveyance, and may not be avoided under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and any other applicable laws

II.   **Approval of the Robindale Settlement.**

47.   Robindale is making a payment of $7,500,000 to the Debtors, on the Effective Date, in full and final satisfaction of the amounts owing by Robindale pursuant to and under the Agency Agreements (the "Robindale Settlement"), which payment shall be distributed to the DIP Agent for distribution to the DIP Lenders immediately thereafter on the Effective Date. In addition, and in order to address (i) any and all Claims and Causes of Action relating to or in any manner arising from, in whole or in part, the Agency Agreements, and (ii) any and all Claims and Causes of Action Filed or asserted, or that could have been Filed or asserted, in the Chapter 11 Cases, the Debtors and Robindale entered into the Robindale Settlement, the terms of which are set forth in the Plan. The Robindale Settlement is fair, reasonable, and clearly and unambiguously in the best interests of the Estates.

JJ.   **Settlement, Compromise, and Release of Claims and Interests.**

48.   The Court has jurisdiction under sections 1334(a) and (b) of title 28 of the United States Code to approve the discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article IX of the Plan. Sections 105(a) and 1123(b) of the Bankruptcy Code permit the issuance of the injunctions and approval of the releases, exculpations, and

23

injunctions set forth in Article IX of the Plan. Based upon the record of the Chapter 11 Cases and the evidence proffered or adduced at the Confirmation Hearing, the Court finds that the discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article IX of the Plan are consistent with the Bankruptcy Code and applicable law. Further, the discharge, compromises, settlements, releases, exculpations, and injunctions contained in Article IX of the Plan are integral components of the Plan. The discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article IX of the Plan are hereby approved and authorized in their entirety.

**KK.** **Debtor Release.**

49. The releases of claims and causes of action by the Debtors described in Article IV, Section S of the Plan and in Article IX, Section D of the Plan, in accordance with section 1123(b) of the Bankruptcy Code (collectively, the "Debtor Release"), represent a valid exercise of the Debtors' business judgment under Bankruptcy Rule 9019. The Debtors' pursuit of any such claims against the Released Parties is not in the best interest of the Estates' various constituencies because the costs involved would likely outweigh any potential benefit from pursuing such claims. The Debtor Release is fair and equitable and complies with the absolute priority rule.

50. The Debtor Release is furthermore an integral part of the Plan and is in the best interests of the Debtors' Estates as a component of the comprehensive settlement implemented under the Plan. The Plan, including the Debtor Release, was negotiated by sophisticated parties represented by able counsel and financial advisors. The Debtor Release is therefore the result of an arm's-length negotiation process.

51. The Debtor Release appropriately offers protection to parties that participated in the Debtors' restructuring process. Specifically, the Released Parties under the Plan made significant concessions and contributions to the Chapter 11 Cases, including, as applicable, providing postpetition financing, actively supporting the Plan and the Chapter 11 Cases, and

24

waiving substantial rights and Claims against the Debtors under the Plan. The Debtor Release for the Debtors' directors and officers is appropriate because the Debtors' directors and officers share an identity of interest with the Debtors, supported the Plan and the Chapter 11 Cases, actively participated in meetings, negotiations, and implementation during the Chapter 11 Cases, or have provided other valuable consideration to the Debtors to facilitate the Plan, including consideration provided for pursuant to the Investigation Settlement.

52. The scope of the Debtor Release is appropriately tailored to the facts and circumstances of the Chapter 11 Cases. In light of, among other things, the value provided by the Released Parties to the Debtors' Estates and the critical nature of the Debtor Release to the Plan, the Debtor Release is appropriate.

## LL. **Third Party Release.**

53. The release by the Holders of Claims and Interests (the "Third Party Release"), set forth in Article IX Section E of the Plan is an essential provision of the Plan. The Third Party Release is: (a) consensual; (b) essential to the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good-faith settlement and compromise of the claims and causes of action released by the Third Party Release; (e) materially beneficial to, and in the best interests of, the Debtors, their Estates and their stakeholders, and important to the overall objectives of the Plan; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for a hearing; (h) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third Party Release against any of the Released Parties; and (i) consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code.

54. The Third Party Release is an integral part of the Plan. Like the Debtor Release, the Third Party Release facilitated participation in both the Plan and the Debtors' chapter 11

25

process generally. The Third Party Release was instrumental in developing a Plan that maximizes value for all of the Debtors' stakeholders, and was critical in incentivizing the parties to support the Plan and preventing potentially significant and time-consuming litigation regarding the parties' respective rights and interests. As such, the Third Party Release appropriately offers certain protections to parties who constructively participated in the Debtors' restructuring process by, among other things, supporting the Plan. Furthermore, the Third Party Release is consensual under controlling law.

55. The scope of the Third Party Release is appropriately tailored to the facts and circumstances of the Chapter 11 Cases, and parties in interest received due and adequate notice of the Third Party Release. Among other things, the Plan provides appropriate and specific disclosure and notice with respect to the claims and causes of action that are subject to the Third Party Release, and no other disclosure or notice is necessary. The Third Party Release is specific in language, integral to the Plan, and given for adequate consideration. In light of, among other things, the value provided by the Released Parties to the Debtors' Estates and the critical nature of the Third Party Release to the Plan, the Third Party Release is appropriate.

56. The Third Party Release does not provide a release to any party for any action that occurs after the Confirmation Date, including relating to any actions in connection with implementing the Plan, implementing the Equity Settlement, enforcing rights related to the Equity Settlement (including any related agreements), and taking actions in connection with any of the Plan or the Equity Settlement.

**MM. Exculpation.**

57. The exculpation provisions set forth in Article IX, Section F of the Plan were proposed in good faith and are essential to the Plan. The record in the Chapter 11 Cases fully supports the exculpation provisions, and such provisions are appropriately tailored to protect the

26

Exculpated Parties from inappropriate litigation and to exclude actions determined by Final Order to have constituted actual fraud, gross negligence or willful misconduct.

**NN.** **Injunction.**

58.     The injunction provisions set forth in Article IX, Section G of the Plan (a) are essential to the Plan; (b) are necessary to preserve and enforce the discharge and releases set forth in Article IV, Section S, Article IX, Sections C, D, and E of the Plan, the exculpation provisions in Section F of the Plan, and the compromises and settlements implemented under the Plan; and (c) are appropriately tailored to achieve that purpose.

59.     The injunction provisions set forth in Article IX, Section G of the Plan:  (a) are within the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) are an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (c) are an integral element of the transactions incorporated into the Plan; (d) confer material benefits on, and are in the best interests of, the Debtors, the Estates, and their creditors and other stakeholders; (e) are important to the overall objectives of the Plan, the intent of which is to finally resolve all claims or causes of action among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; and (f) are consistent with sections 105, 1123, and 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, and other applicable law.  The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the injunction provisions set forth in Article IX, Section G of the Plan.

**OO.** **Retention of Jurisdiction.**

60.     Except as otherwise provided in any of the Plan, the Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases, the Plan, and the Sale Transactions, including, but not limited to, (a) the matters set forth in Article XI

27

of the Plan, and (b) the enforcement of this Order and all documents and agreements authorized herein.

**ORDER**

IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

## I.    **Confirmation of the Plan.**

61.    The Plan is confirmed pursuant to section 1129 of the Bankruptcy Code. Any and all objections to the Confirmation of the Plan that have not been withdrawn or resolved as of the entry of this Confirmation Order are hereby overruled on the merits.

62.    The documents contained in (a) the Plan Supplement (including any documents in form and substance satisfactory to the Debtors and the DIP Lenders that may be filed prior to the Effective Date), including for the avoidance of doubt: (i) the Assumed Contracts List; (ii) the Rejected Contracts List; (iii) the method of selection of the Plan Administrator and the compensation of the Plan Administrator; (iv) the Wind-Down Budget; (v) the Description of Restructuring Transaction; (vi) the Sale Transaction Documentation; (vii) those Transferred Causes of Action that shall be transferred to the Maple/Oak Grove Buyer; (viii) a list of Retained Causes of Action; (ix) the Plan Administrator Agreement; (x) the Clarke/McCoy Notes; and (xi) the Investigation Settlement Term Sheet (and all of the Exhibits related thereto, and any agreements contemplated to be entered into related thereto); (xi) the Clarke Note; (xiii) the Non-Cash Consideration (xiv) the Jason McCoy Note, the (xv) the Liquidating Trust Agreement, (xvi) the Castlelake Bridge Note, (xvii) the identity of the Liquidating Trustee, and (xviii) any exhibits or agreements thereto are incorporated herein by reference (collectively, the "Plan Documents") are approved. The Debtors, the Plan Administrator, and any other applicable party thereto are authorized to take any and all actions required or appropriate under the Plan Documents.

28

63.     The terms of the Plan Documents are an integral part of this Confirmation Order. The terms of the Plan Documents shall be effective and binding as of the Plan Effective Date (unless different date(s) is/are specified in the applicable foregoing documents, in which case the applicable terms shall be effective and binding on such date(s)). The failure to specifically include or refer to any particular article, section, or provision of the Plan Documents in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision.

64.     The compromises and settlements, including the Investigation Settlement, the Committee Settlement, and the Robindale Settlement, set forth in the Plan (including any exhibits or agreements related thereto or provided for in the Plan Documents) are approved, and will be effective immediately and binding on all parties in interest on the Plan Effective Date (unless different date(s) is/are specified in the applicable foregoing documents, in which case the applicable terms shall be effective and binding on such date(s)).

## II.    <u>Governing Terms.</u>

65.     In the event of any conflict between this Order or the Plan and any Sale Order, the applicable Sale Order shall control with respect to the applicable Sale Transaction Documentation and all agreements related thereto, and the applicable Sale Transaction.

## III.    <u>Discharge of the Debtors.</u>

66.     Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including any Claims resolved or compromised after the Plan Effective Date by the Plan Administrator), Interests, and Causes of Action of any nature whatsoever, including any interest

accrued on Claims or Interests from and after the Commencement Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has voted to accept the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date with respect to a Claim that is Unimpaired by the Plan. This Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Plan Effective Date occurring.

## IV.  **Releases by Debtors, Releases by Holders of Claims and Interests, Exculpation, Injunction, and Related Provisions.**

67.     Article IX of the Plan is approved in its entirety pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. In addition, the releases set forth in Article IV, Section S of the Plan are approved in their entirety pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. For the avoidance of doubt, the releases by the Debtors set forth in Article IV, Section S of the Plan, Article IX.D of the Plan, the Third Party Release set forth in

Article IX.E of the Plan, the exculpation provision set forth in Article IX.F of the Plan, and the injunction set forth in Article IX.G of the Plan are approved.

**V.** **Debtors' Release of Claims and Causes of Action Subject to the Debtors' Independent Investigation.**

68. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in addition to any other releases granted to the Settling Released Parties under the Plan, any and all Claims and/or Causes of Action, including any derivative Claims, asserted or which could be asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or arising, in tort, contract, law, equity, or otherwise, that the Debtors, their Estates, or their Affiliates would have been legally entitled to assert against any of the Settling Released Parties, including, without limitation, (a) any and all Claims and/or Causes of Action related to any and all transfers of funds by and between the Debtors and any Settling Released Party, including Avoidance Actions, (b) all "D&O claims," including Claims for breach of fiduciary duty and corporate waste, (c) any and all Claims and/or Causes of Action related to or arising from allegations of fraud or any actual, willful misconduct and/or gross negligence, (d) any and all Claims and/or Causes of Action asserted in the proposed complaint attached to the *Motion of the Official Committee of Unsecured Creditors Seeking the Entry of an Order Granting it Standing and Authorizing it to Prosecute and Settle Certain Claims and Causes of Action on Behalf of the Debtors' Estates* [Docket No. 964] and (e) all claims asserted against the Settling Released Parties in the Cliffs Litigation that belong to the Debtors, shall be and hereby are forever released and extinguished pursuant to the Plan. The Debtors' release of the Settling Released Parties and all consideration received by the Debtors are deemed to be for reasonably equivalent value and not subject to avoidance in any manner whatsoever.

31

69.     Notwithstanding the foregoing (and for the avoidance of doubt), nothing in the Plan or the Confirmation Order (including the releases set forth herein and therein) shall release (a) any Claims and/or Causes of Action as between or among the Settling Parties and/or the Settling Released Parties, (b) any rights of the Settling Parties and/or Settling Released Parties under the Plan or the Investigation Settlement, (c) except as expressly modified by the Investigation Settlement Term Sheet and the Plan, any rights of CCL or Bay Point under the CCL Lease, including, without limitation, the right to file UCC-1 financing statements on and after the Plan Effective Date, (d) except as expressly modified by the Investigation Settlement and the Plan, any rights of Bay Point under the Loan and Security Agreement between CCL, as borrower, and Bay Point, as lender, dated as of May 21, 2018, and any other Loan Documents (as defined in such Loan and Security Agreement), except to the extent any such rights could be asserted at any time against the Debtors or the Reorganized Debtors, which rights shall be forever released pursuant to the Plan, Confirmation Order, and Investigation Settlement, and (e) any rights of third parties that have properly opted out of the releases in the Plan.

70.     For the avoidance of doubt, notwithstanding anything to the contrary in the Plan, this Order, the Sale Orders or the Sale Transaction Documentation, no Claim or Causes of Action released under the Plan (if any), pursuant to the Investigation Settlement or otherwise, shall be a Transferred Cause of Action.

**VI.     <u>Notice.</u>**

71.     The Debtors shall cause to be served a notice of the entry of this Confirmation Order and occurrence of the Plan Effective Date, substantially in form attached hereto as Exhibit B (the "<u>Confirmation Notice</u>"), upon (a) all parties listed in the creditor matrix maintained by Omni Management Group and (b) such additional persons and entities as deemed appropriate by the Debtors, no later than five (5) business days after the Plan Effective Date.  The Debtors shall cause

32

the Confirmation Notice to be published in the following local and national publications: *Birmingham News*, *Alabama Messenger*, *Kingsport Times-News*, *Charleston Gazette-Mail*, and *USA Today* (national edition).

**VII.  Reservation of Rights for Governmental Units, and Environmental Matters.**

72.     Notwithstanding anything contained in the Plan Documents or this Confirmation Order to the contrary, with respect to any Entity other than the Successful Bidders and their Affiliates, nothing in the Plan, Documents or this Confirmation Order shall discharge, release, impair, enjoin, exculpate or otherwise preclude or diminish or transfer free and clear of: (a) any liability to any Governmental Unit that is a "claim" within the meaning of section 101(5) of the Bankruptcy Code, irrespective of whether the claim arose on, after, or before the Confirmation Date; (b) any liability to any Governmental Unit or under any environmental law, including any obligation to clean up, remediate, or otherwise address environmental impacts, that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code (irrespective of whether the liability arises on, after, or before the Confirmation Date); (c) any valid right of setoff or recoupment of any Governmental Unit against any of the Debtors; (d) any liability or obligation to, or any Claim or Cause of Action by, a Governmental Unit under police or regulatory statutes or regulations or environmental law to which any entity is subject as the owner, lessor, lessee, permittee, controller, or operator of real property or a mining operation after the Plan Effective Date (whether or not such liability, obligation, claim or cause of action is based in whole or in part on acts or omissions prior to the Plan Effective Date), including, but not limited to, liability for reclamation or water treatment pursuant to the Surface Mining Control and Reclamation Act of 1977 (the "SMCRA") or the Clean Water Act (the "CWA") and similar state laws; or (e) any liability to any Governmental Unit of any entity that is not a Debtor; *provided*, however that the Third Party Release does not apply to any pre-existing liabilities of the Successful Bidders and their Affiliates

33

to any Governmental Unit. For the sake of clarity, any matter not released, discharged, or excepted pursuant to the foregoing can be enforced by either (a) applicable Governmental Units, or (b) any persons or entities authorized to bring actions under enabling statutes.

73. Notwithstanding anything contained in the Plan, the Plan Supplement, the Sale Transaction Documentation, or this Confirmation Order to the contrary, and in accordance with the Sale Order, with respect to the Successful Bidders and their Affiliates, nothing shall discharge, release, impair, enjoin, or otherwise preclude the enforcement of any liability or obligation to, any claim or cause of action by, a Governmental Unit under police or regulatory statutes or regulations to which any entity is subject as the owner, lessor, lessee, permittee, controller, or operator of real property or a mining operation after the Plan Effective Date (whether or not such liability, obligation, claim or cause of action is based in whole or in part on acts or omissions prior to the Plan Effective Date), including, but not limited to, liability for reclamation or water treatment pursuant to the SMCRA or the CWA and similar state laws; *provided*, *however*, that nothing herein shall subject the Successful Bidders to any liability to a Governmental Unit for penalties for days of violation prior to the closing of the applicable Sale Transaction, response costs incurred by a Governmental Unit prior to the such closing, or any liability relating to offsite disposal that occurred prior to such closing.

74. Nor shall anything in this Confirmation Order, the Plan, the Sale Transaction Documentation, or the Plan Supplement: (a) enjoin or otherwise bar any Governmental Unit or other entity with standing to do so under an enabling statute from asserting or enforcing, outside the Court, any liability or obligation described in this section, and for the avoidance of doubt, any liabilities or obligations related to or arising under environmental laws, to the extent such rights are reserved pursuant to this section, or (b) divest any court, commission, or tribunal of jurisdiction

34

from resolving any matters relating to the liabilities and/or claims set forth in this section related to or arising under environmental laws, to the extent such rights are reserved pursuant to this section, or (c) confer in the Court jurisdiction over any matter as to which it would not have jurisdiction under the Bankruptcy Code, (d) authorize the transfer or assignment of any governmental or tribal (i) license, (ii) permit, (iii) registration, (iv) authorization, or (v) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under non- bankruptcy laws and regulations (including police or regulatory law, environmental law, or otherwise), or (e) authorize the transfer or assignment of any governmental contracts, leases, licenses, registrations, authorizations, permits, covenants, operating rights agreements, rights-of-use, easements, and rights-of-way or other interests or agreements involving governmental land or minerals without compliance with all applicable legal requirements under non-bankruptcy laws and regulations.; *provided*, *however*, that notwithstanding the foregoing, the applicable Governmental Units (other than the West Virginia Department of Environmental Protection ("WVDEP")) have consented to the Successful Bidders exercising any and all of their rights as the assignee of such interests or agreements (but have not provided such consent for permits, licenses, registrations or authorizations) solely during (a) ten (10) business days after the Plan Effective Date, and (b) thereafter, the period that the applicable consent is pending, and the Successful Bidders shall be prevented from exercising such rights only if the applicable Governmental Unit expressly provides the Successful Bidders with written notice of disapproval of an application for approval of an assignment of the interest or agreement,(c) the WVDEP has consented to the Successful Bidders exercising their rights as the assignee of the relevant permits (pending final approval of the permit transfers) (i) to apply for operator reassignments from the Debtors and (ii) to apply for advance approval of permit transfers from the permittee as allowed

35

Case 18-04177-TOM11    Doc 1324    Filed 04/15/19    Entered 04/15/19 12:02:00    Desc
Main Document    Page 35 of 112

by applicable law or regulations, in each case subject to the submission of appropriate applications and approval in accordance with applicable law and rules. For the avoidance of doubt, the United States and the States of West Virginia and Alabama are not Releasing Parties under the Plan.

## VIII. Treatment of Intercompany Interests.

75.     Each Intercompany Interests shall either be (at the election of the Debtors): (a) reinstated; or (b) canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect.

## IX. Treatment of Labor Obligations.

76.     The treatment of the Debtors' collectively bargained obligations, including their obligation to contribute to the 1974 Pension Plan, the 1993 Benefit Plan and the Union Savings Plan under the CBAs, shall be in accordance with the 1113/1114 Order.  On the Plan Effective Date (unless the Closing Date shall occur prior to the Plan Effective Date, in such case, on the Closing Date), the Debtors shall be deemed to have rejected the CBAs and to have modified all retiree benefits (as defined in 11 U.S.C. § 1114) as provided in the 1113/1114 Order, effectuating a complete withdrawal from the 1974 Pension Plan and the 1993 Benefit Plan, and have no further contribution obligations to any pension plans or retiree benefits under the CBAs.  Any sale of assets shall be free and clear of any encumbrances, liabilities, including any successor liability or obligations under or related to the CBAs, pension plans, or retiree benefits.  For the avoidance of doubt, nothing herein or in the 1113/1114 Order shall or shall be deemed to invalidate, validate, or otherwise affect the rights of the 1974 Pension Plan and the 1993 Benefit Plan with respect to the prepetition proofs of claim filed in these Chapter 11 Cases by the 1974 Pension Plan or the 1993 Benefit Plan, including with respect to priority, provided, that the withdrawal liability claims to be incurred as a result of the Debtors' withdrawal from the 1974 Pension Plan (if and to the extent allowed) shall be treated as general unsecured claims pursuant to this Plan.

36

77.     Notwithstanding anything to the contrary in this Order or in the Plan, the Plan Administrator Agreement, the Plan Supplement, or any related document (in each case, as amended), including without limitation the release and exculpation clauses set forth in Article IX of the Plan, nothing shall or shall be deemed to release, discharge or exculpate any of Cleveland-Cliffs Inc. (f/k/a Cliffs Natural Resources, Inc.), CLF PinnOak LLC, their current and former Affiliates (including without limitation any member of their "controlled group," as defined in the Employee Retirement Income Security Act of 1974, as amended), or any of their and their current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, or other professionals (all of the foregoing, collectively, "Cliffs"), from any Causes of Action that have or may be asserted against Cliffs by the United Mine Workers of America 1974 Pension Plan and Trust.

X.     **Treatment of the Jefferson County Department of Health Obligations.**

78.     Any Claims held by the Jefferson County Department of Health (the "JCDH") in connection with air permit fees for year 2018 and for the period extending to the date of entry of this Confirmation Order shall be timely paid in full as an administrative expense pursuant to the Plan and without further orders of the Court.

XI.     **Treatment of Surety Bonds and Collateral Escrow.**

79.     Existing Surety Bonds. Indemnity National Insurance Company ("Surety") has issued commercial surety bonds (collectively the "Existing Surety Bonds") on behalf of the Debtors in favor of the West Virginia Department of Environmental Protection ("WVDEP"), the Alabama Surface Mining Commission, and the Alabama Oil & Gas Board (collectively, the "Regulatory Authorities").

37

80.    Bond Agreement.  Surety issued the Existing Surety Bonds in accordance with the terms of that certain Agreement for Coal Reclamation Bond and Performance Bonds, entered into by and among Surety and the Debtors (the "Bond Agreement"), pursuant to which the Debtors agreed to indemnify Surety for all fees and costs incurred in connection with the Existing Surety Bonds.

81.    Collateral Escrow.  The Debtors' indemnity obligations to Surety are secured by $6,770,084.18 deposited in an escrow account titled to and controlled by Surety (the "Collateral Escrow").   The Collateral Escrow secures all of the Debtors' obligations under the Bond Agreement and no portion of the Collateral Escrow relates to any particular Existing Surety Bond. Surety has a perfected security interest in the Collateral Escrow and the Debtors have no current right of possession of the Collateral Escrow or any funds therein.

82.    Maple / Oak Grove Replacement Surety Bonds. To the extent that any of the Existing Surety Bonds relate to assets, obligations, or liabilities of Maple Eagle or Oak Grove or otherwise relate to any other assets acquired by the Maple/Oak Grove Buyer pursuant to that certain Asset Purchase Agreement by and between certain of the Debtors and the Maple/Oak Grove Buyer (the "Maple/Oak Grove APA"), which include, without limitation, mining permits, surface and coal leases and mine related facilities and other contract obligations (collectively, the "Maple / Oak Grove Existing Surety Bonds"), such Maple / Oak Grove Existing Surety Bonds shall be replaced by Maple/Oak Grove Buyer (collectively, the "Maple / Oak Grove Replacement Surety Bonds").  Applications for the transfer of permits from the Debtors to Maple/Oak Grove Buyer or the issuance of new permits to Maple/Oak Grove Buyer as required by applicable law (in either case, collectively, the "Maple / Oak Grove Replacement Permits") will be made by Maple/Oak Grove Buyer promptly after the Closing of the Maple / Oak Grove sale transaction, and the Maple

38

/ Oak Grove Replacement Surety Bonds shall be timely submitted as required by the permit transfer and bonding regulations of the applicable Regulatory Authority.

83. <u>Pinnacle – Bluestone Replacement Surety Bonds</u>. To the extent that any of the Existing Surety Bonds relate to assets, obligations, or liabilities of Pinnacle acquired by Bluestone Resources, Inc. ("Bluestone"), which include, without limitation, mining permits, surface and coal leases and mine related facilities and other contract obligations (collectively, the "Bluestone Existing Surety Bonds"), such Bluestone Existing Surety Bonds shall be replaced by Bluestone (collectively the "Bluestone Replacement Surety Bonds"). Applications for the transfer of permits from the Debtors to Bluestone or the issuance of new permits to Bluestone as required by either law (in either case, collectively, the "Bluestone Replacement Permits") will be made by Bluestone promptly after the closing of the Bluestone sale transaction and the Bluestone Replacement Surety Bonds shall be timely submitted as required by the permit transfer and bonding regulations of WVDEP.

84. <u>Pinnacle-Contura Replacement Surety Bonds</u>. To the extent that any of the Existing Surety Bonds relate to assets, obligations, or liabilities of Pinnacle acquired by Contura Energy, Inc., which include, without limitation, surface and coal leases and mine related facilities and other contract obligations (such Existing Surety Bonds, collectively with the Bluestone Existing Surety Bonds, the "Pinnacle Existing Surety Bonds"), such Existing Surety Bonds shall, in accordance with the terms of the applicable Sale Transaction Documents, become subject to possible release by WVDEP upon the issuance of the New Contura Permits (as defined below) and the submission of surety and/or collateral as required by WVDEP in connection with the issuance of the New Contura Permits (the "Contura Replacement Surety Bonds," and collectively with the Bluestone Existing Surety Bonds, the "Pinnacle Replacement Surety Bonds"). Subject to the terms and

39

limitations set forth in the applicable Sale Transaction Document, Contura will use commercially reasonable efforts to obtain, from WVDEP, the issuance of the Closing Required Permits (as that term is defined in the applicable Sale Transaction Document (collectively, the "New Contura Permits" and collectively with the Bluestone Replacement Permits, the "Replacement Permits") and the Contura Replacement Surety Bonds shall be timely submitted in connection therewith as required by the permit transfer and bonding regulations of WVDEP. It is the responsibility of the Surety to obtain the release of the Existing Surety Bonds to the extent they relate to Pinnacle from WVDEP.

85. <u>Debtor Bonded Obligations</u>. Except as otherwise provided in paragraph 87 below regarding the Collateral Escrow Transfer, nothing in the Plan, this Order, the Sale Transaction Documentation, or the Sale Orders shall release, discharge, preclude or enjoin any obligation of the Debtors to Surety on account of the Existing Surety Bonds, the Bond Agreement, or obligations under the common law of suretyship and such obligations to Surety are not being released, discharged, precluded or enjoined by the Plan, this Order, the Sale Transaction Documentation, the Sale Orders or agreements with third parties in connection therewith.

86. <u>Treatment of Collateral Escrow</u>. Except as otherwise provided in paragraph 87 below regarding the Collateral Escrow Transfer and notwithstanding any other provisions of the Plan, or this Order, and in accordance with the Sale Transaction Documentation and the Sale Orders, the Collateral Escrow shall remain in place, and subject to the control of Surety, to secure all payment and performance obligations under the Existing Surety Bonds, the Bond Agreement or the common law of suretyship until such time as all of the Existing Surety Bonds are replaced and all obligations of the Debtors to Surety are satisfied. Nothing in the Plan, this Order, the Sale Transaction Documentation or the Sale Orders, shall be deemed to limit Surety's right to draw on

40

the Collateral Escrow as authorized by the Bond Agreement and, for the avoidance of doubt, Surety is hereby expressly authorized to draw on the Collateral Escrow to pay all loss adjustment expenses, attorneys' fees, bond premiums and bond inspection fees payable pursuant to the Bond Agreement without prior notice to the Debtors (the "Authorized Draws").

  87. <u>Collateral Escrow Transfer</u>.

  (a) The Debtors, pursuant to that certain Asset Purchase Agreement by and between certain of the Debtors and Maple/Oak Grove Buyer, have transferred certain of their rights and interests in the Collateral Escrow to the extent relating to the Maple/Oak Grove Existing Surety Bonds to the Maple/Oak Grove Buyer. Except as otherwise provided below, the transfer of some or all of the Debtors' right and interest in such Collateral Escrow shall not diminish, alter, or in any way impair the rights of Surety under the Bond Agreement and the common law of suretyship, including, but not limited to, Surety's right to retain control of the Collateral Escrow and to draw upon the Collateral Escrow in accordance with the Bond Agreement. Surety agrees, however, that upon the issuance of the Maple / Oak Grove Replacement Permits and Maple / Oak Grove Replacement Surety Bonds and the release to Surety of all of the Maple / Oak Grove Existing Surety Bonds by the applicable Regulatory Authority, (i) Surety shall release the funds in the Collateral Escrow less (A) the amount of any actual or intended Authorized Draws and (B) the face amount of the Pinnacle Existing Surety Bonds to Maple/Oak Grove Buyer. Unless and until the Pinnacle Existing Surety Bonds are released to Surety, Surety shall be entitled to retain the remaining funds in the Collateral Escrow (the "Pinnacle Holdback"), and to utilize those funds in any manner authorized by the Bond Agreement as limited in section (b) below without prior notice to any party. Notwithstanding the terms of the Bond Agreement, however, Surety shall not be

41

entitled to demand additional collateral security from the Debtors to secure the Pinnacle Existing Surety Bonds.

(b)     Upon the issuance of the Bluestone Replacement Permits and the Bluestone Replacement Surety Bonds and the release to Surety of all of the Bluestone Existing Surety Bonds by WVDEP, the Debtors and Surety agree that the Pinnacle Holdback attributable to the Bluestone Existing Surety Bonds (the "Additional Security") shall stand as additional security for the Existing Surety Bonds to the extentsuch Existing Surety Bonds relate to the assets, obligations or liabilities of Pinnacle to be acquired by Contura.  In the event that the New Contura Permits are not issued and WVDEP obtains a forfeiture of such Existing Surety Bonds or Surety substitutes the Contura Existing Surety Bonds for cash, Surety shall, in addition to paying the face amount of said forfeited bonds, distribute the Additional Security, less the amount of any Authorized Draws, which shall not exceed $37,500.00 to WVDEP or its designee.  In the event that the New Contura Permits are issued and such Existing Surety Bonds are released to Surety by WVDEP, Surety shall distribute the Pinnacle Holdback, less the amount of any Authorized Draws, to the Plan Administrator for immediate distribution to the DIP Lenders.  For the avoidance of doubt, so long as the Pinnacle Holdback remains in the Collateral Escrow, Surety shall be entitled to utilize those funds in excess of the Additional Security in any manner authorized by the Bond Agreement without prior notice to any party, subject to the $37,500.00 cap on Authorized Draws.  At no time, shall Surety's liability to WVDEP on account of such Existing Surety Bonds exceed the sum of the face amount of such Existing Surety Bonds and the then current amount of the Additional Security.

(c)     No party other than Maple/Oak Grove Buyer (solely to the extent set forth above) has acquired any interest in the Collateral Escrow and no party other than the Debtors, Maple/Oak Grove Buyer (solely to the extent set forth above), WDEP (solely to the extent set forth above),

and Surety shall be entitled to claim any right, interest, or entitlement to the Collateral Escrow or the funds contained therein, with such claims, rights, interests and entitlements to be dictated by the terms of the Bond Agreement, as modified by this Order.

88. <u>Premiums</u>. Consistent with prior orders of the Bankruptcy Court, the Debtors will pay premiums on the Existing Surety Bonds until the Existing Surety Bonds are released. The Debtors' obligation to pay such premiums, whether arising before or after the Plan Effective Date, shall be entitled to administrative expense treatment under section 503(b) of the Bankruptcy Code.

89. <u>Interim Operations at Pinnacle</u>. To the extent that the Debtors and Bluestone and/or Contura determine that the Closing of the Bluestone sale transaction or the Contura sale transaction may occur prior to the issuance of the Pinnacle Replacement Permits and release of the Pinnacle Replacement Surety Bonds by the WVDEP, the Debtor and Bluestone and/or Contura shall consult with Surety prior to entering into any agreement that would allow Bluestone and/or Contura to conduct operations at Pinnacle prior to the issuance of the Pinnacle Replacement Permits and the release of the Pinnacle Replacement Surety Bonds by WVDEP (the "Interim Agreement"). The Debtors and Contura and Bluestone respectively agree to negotiate in good faith the terms of any Interim Agreement.

90. <u>Third Parties and No Waiver</u>. Nothing in the Plan, this Order, the Sale Transaction Documentation, or the Sale Orders, except as provided for in paragraph 87(b) herein, shall be interpreted to alter, diminish or enlarge the rights or obligations of Surety under the Existing Surety Bonds or the Bond Agreement in regards to any third party, including, but not limited to the Regulatory Authorities, nor shall any of the foregoing be deemed to enjoin Surety from asserting any rights, claims or defenses, in regard to or against any state and federal agencies, third parties

Case 18-04177-TOM11    Doc 1324    Filed 04/15/19    Entered 04/15/19 12:02:00    Desc
Main Document    Page 43 of 112

or otherwise, including but not limited to the Regulatory Authorities, related to the Existing Surety Bonds or the Bond Agreement.

**XII.**     **Treatment of IBNR Claims.**

91.     Notwithstanding anything to the contrary in this Order, the Plan, the Plan Supplement, or any other Sale Transaction Documentation, and in addition to any other Claims payable under the Maple/Oak Grove APA, the Buyer under the Maple/Oak Grove APA shall assume all IBNR Claims[4] (not to exceed, in the aggregate, $3,000,000 net of (*i.e.*, in excess of) any collateral posted in respect of IBNR Claims, and with respect to Pinnacle, not to exceed, in the aggregate, $2,300,000 net of (*i.e.*, in excess of) any collateral posted in respect of IBNR Claims associated with the Pinnacle Business (as defined in the revised proposed Murray/Javelin Sale Order [Docket No. 1271, Exhibit A]) without a further purchase price reduction) and any other Claims owing under the Self-Funded Health Plans to the extent (i) such claims are due and payable pursuant to the terms of the applicable Self-Funded Health Plan, (ii) the proper documentation is provided, and (iii) such claims are not otherwise payable by stop loss insurance or Medicaid, Medicare, or any other payor.  For the avoidance of doubt, the payment of such claims as described herein shall take place notwithstanding any limits imposed by the Plan or otherwise.

**XIII.**     **Treatment of Obligations under the First Lien Credit Agreement and First Lien Credit Documents.**

92.     Any and all obligations of the Debtors or any other party owing under the First Lien Credit Agreement or any First Lien Credit Documents were satisfied entirely and paid in full by

---

4     "IBNR Claims" means all incurred but not reported Claims relating to the Debtors' self-funded medical plan, vision plan, or dental plan (collectively, the "Self-Funded Health Plan(s)"), to the extent (a) the services giving rise to such IBNR Claims were performed (i) on or after the commencement of these Chapter 11 Cases and (ii) before the Plan Effective Date, and (b) such IBNR Claims were timely filed under the terms of the applicable Self-Funded Health Plan.

44

the DIP Facility. No Debtor or any other party owes any further obligation of any kind whatsoever relating to the First Lien Credit Agreement or the First Lien Credit Documents.

XIV. **Assumption, Assignment and Rejection of Executory Contracts and Unexpired Leases.**

93. The Debtors are authorized to assume and assign to the applicable Successful Bidder, as part of the applicable Sale Transaction, the Executory Contracts and Unexpired Leases that are required to be assigned to such Successful Bidder pursuant to the applicable Sale Transaction Documentation. Entry of this Confirmation Order shall constitute approval of all assumptions, assignments, and rejections provided for under the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan or Sale Transaction Documentation are effective as of the Plan Effective Date or applicable Closing Date, as applicable, without the need for any further action or consents that may otherwise be required under applicable non-bankruptcy law. Any motions to assume Executory Contracts or Unexpired Leases pending on or filed after the Plan Effective Date shall be subject to approval by a Final Order of the Court on or after the Plan Effective Date, the entry of which shall result in such assumptions becoming effective without the need for any further action that may otherwise be required under applicable non-bankruptcy law.

94. Notwithstanding anything set forth in the Debtors' Proposed Settlement Term Sheet (the "Settlement Term Sheet") [Docket 1121], the Debtors shall not assume and assign to the Maple/Oak Grove Buyer the Master Equipment Lease Agreement, dated as of May 21, 2018, by and between Coking Coal Leasing, LLC ("CCL") and Oak Grove Resources, LLC with respect to certain shields set forth in the schedules thereto (the "Shields"), which shall be an Excluded Contract under the Maple/Oak Grove APA. Subsequent to the filing of the Settlement Term Sheet,

45

CCL sold all of its right, title and interest in and to the Shields to Bay Point in a true sale. Bay Point is the sole and exclusive owner of the Shields as stipulated to by CCL and the Debtors. On or before closing of the Sale, the Buyer shall enter into a new Master Equipment Lease Agreement with Bay Point Capital Partners, L.P., in form and substance acceptable to the parties in their sole discretion (the "Bay Point Lease"), provided, that, the economic terms of the Bay Point Lease shall be the same as set forth in the Settlement Term Sheet.

95. In the event of a conflict between the Plan and the Sale Transaction Documentation with respect to assumption or rejection of Executory Contracts or Unexpired Leases, the Sale Transaction Documentation shall apply. Entry of this Confirmation Order or the applicable Sale Order, as applicable, shall constitute approval of such assumptions, assignments, and rejections, including the assumption and assignment of the Executory Contracts or Unexpired Leases as provided in the Sale Transaction Documentation and the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Plan Effective Date, and assumptions or rejections pursuant to Sale Transaction Documentation are effective as to the applicable Closing Date pursuant to the terms thereof.

## XV. **Exemption from Certain Transfer Taxes.**

96. Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition of assets contemplated by the Plan, including the sale of the Transferred Assets to the applicable Successful Bidders under the applicable Sale Transaction Documentation, shall not be subject to any stamp, real estate transfer, mortgage

46

recording, or other similar tax, or any transfer or other tax related filings that might otherwise be required under applicable non-bankruptcy law.

**XVI.** **Implementation of Other Necessary Documents and Agreements.**

97. The Debtors, the Plan Administrator, the Liquidating Trustee, and each of the Successful Bidders, as applicable, are authorized, without further notice to, or action, order or approval of this Court or any other Person, to execute and deliver all agreements, documents, instruments and certificates relating to such documents and agreements and to perform their obligations thereunder, including, without limitation, to pay all fees, costs and expenses thereunder in accordance with the Plan and the Plan Documents (but, in the case of the Plan Administrator, only out of the Wind Down Amount, Amount, and in the case of the Successful Bidders, only as provided in the applicable Sale Transaction Documentation). The Plan Administrator is further authorized and directed to take any and all actions to enforce the Plan, the Sale Transaction, and the Sale Transaction Documentation, and any and all documents, agreements related thereto and entered into in connection therewith. The terms and conditions of such documents and agreements are reaffirmed or approved, as applicable, and shall, upon completion of documentation and execution, be valid, binding and enforceable.

98. On and after the Effective Date, the Plan Administrator shall owe fiduciary duties to the DIP Lenders, as the residual interest holders of the Debtors with respect to any Sale Transaction Proceeds or other proceeds that may be received by the Plan Administrator on or after the Effective Date and the use and distribution of the Wind-Down Amount.

**XVII.** **Confirmation Order as Springing Default Judgment under Castlelake Bridge Note.**

99. Upon the occurrence of any Event of Default under the Castlelake Bridge Note, this Order shall serve as a springing default judgment against the Co-Issuers and the Guarantors of the Castlelake Bridge Note, and shall automatically, and without further order of any court, grant the

47

McCoy Note Lender a judgment lien as of the date of issuance of the Castlelake Bridge Note on any and all assets of the Co-Issuers and the Guarantors subject to execution (including the Conuma Stock to be held in escrow); *provided* that the McCoy Note Lender shall only be entitled to exercise its rights and remedies in respect of such judgment lien against the assets of the Co-Issuers and the Guarantors other than the Conuma Stock in the event that the McCoy Note Lender does not receive the Conuma Stock (or the proceeds thereof in the event of the exercise of the ROFR) on the terms and conditions set forth in the Castlelake Bridge Note. For avoidance of doubt, this paragraph shall only be applicable if the Castlelake Bridge Note is issued by the McCoy Note Lender in connection with the obligation of Ken McCoy and Jason McCoy to fund payments on the Plan Effective Date in respect of the Investigation Settlement. This paragraph shall not be applicable if Ken McCoy and Jason McCoy fund the Investigation Settlement from other sources and no Castlelake Bridge Note is issued.

## XVIII.    No Action Required.

100.    Under section 1142(b) of the Bankruptcy Code and applicable non-bankruptcy law, no action of the directors or stockholders of the Debtors or the Successful Bidders is required to authorize the Debtors and the Successful Bidders to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan (it being understood that the consent of the Required DIP Lenders shall be required as applicable pursuant to the applicable documentation).

## XIX.    Enforceability of Plan Documents.

101.    Pursuant to Sections 1123(a) and 1142(a) of the Bankruptcy Code and the provisions of this Confirmation Order, the Plan and all Plan Documents shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

48

**XX.  Miscellaneous.**

102.  Notwithstanding Bankruptcy Rule 3020(e), the terms and conditions of this Confirmation Order will be effective and enforceable immediately upon its entry.

Dated:  April 15, 2019                                     /s/ Tamara O. Mitchell
                                                           TAMARA O. MITCHELL
                                                           United States Bankruptcy Judge

## Exhibit A

**Fourth Amended Joint Plan of Reorganization**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**FOURTH AMENDED JOINT CHAPTER 11 PLAN OF**
**MISSION COAL COMPANY, LLC AND CERTAIN OF ITS DEBTOR AFFILIATES**

Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:            stephen.hessler@kirkland.com
                    ciara.foster@kirkland.com


-and-

James H.M. Sprayregen, P.C.
Melissa N. Koss (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:            james.sprayregen@kirkland.com
                    melissa.koss@kirkland.com

Daniel D. Sparks
Bill D. Bensinger
**CHRISTIAN & SMALL LLP**
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Telephone:     (205) 795-6588
Facsimile:     (205) 328-7234
Email:            ddsparks@csattorneys.com
                    bdbensinger@csattorneys.com

*Co-Counsel to the Debtors and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

KE 60753446

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................................5

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
      AND GOVERNING LAW........................................................................................................5
A.     Defined Terms...............................................................................................................5
B.     Rules of Interpretation................................................................................................19
C.     Computation of Time..................................................................................................20
D.     Governing Law...........................................................................................................20
E.     Reference to Monetary Figures...................................................................................20
F.     Controlling Document.................................................................................................20

ARTICLE II ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, DIP FACILITY
      CLAIMS, AND PRIORITY TAX CLAIMS..........................................................................20
A.     Administrative Claims.................................................................................................20
B.     Professional Compensation.........................................................................................21
C.     Priority Tax Claims....................................................................................................22
D.     Bankruptcy Administrator...........................................................................................22

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS................23
A.     Summary of Classification..........................................................................................23
B.     Treatment of Claims and Interests. .............................................................................23
C.     Special Provision Governing Unimpaired Claims.........................................................26
D.     Elimination of Vacant Classes....................................................................................26
E.     Voting Classes; Presumed Acceptance by Non-Voting Classes.....................................26
F.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code....26
G.     Subordinated Claims...................................................................................................27

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN.........................................................27
A.     General Settlement of Claims. .....................................................................................27
B.     Sources of Plan Consideration.....................................................................................27
C.     Sale Transaction and Restructuring Transactions.........................................................27
D.     Vesting of Assets........................................................................................................28
E.     The Settlement Proceeds and Clarke Note...................................................................28
F.     The Second Clarke Note and the McCoy Note ............................................................29
G.     The Liquidating Trust.................................................................................................29
H.     The General Unsecured Claims Amount ......................................................................29
I.     Wind-Down................................................................................................................29
J.     Wind-Down Amount...................................................................................................30
K.     Plan Administrator......................................................................................................30
L.     Cancellation of Notes, Instruments, Certificates, and Other Documents........................30
M.     Corporate Action........................................................................................................31
N.     Dissolution of the Boards of the Debtors.....................................................................31
O.     Release of Liens.........................................................................................................32
P.     Effectuating Documents; Further Transactions.............................................................32
Q.     Exemption from Certain Taxes and Fees.....................................................................32
R.     Causes of Action........................................................................................................32
S.     Debtors' Release of Claims and Causes of Action Subject to the Debtors' Independent
      Investigation..............................................................................................................32
T.     Robindale Settlement..................................................................................................33
U.     Committee Settlement.................................................................................................34
V.     Closing the Chapter 11 Cases......................................................................................34

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .........35
A.     Assumption and Rejection of Executory Contracts and Unexpired Leases.....................35

Case 18-04177-TOM11    Doc 1324    Filed 04/15/19    Entered 04/15/19 12:02:00    Desc
Main Document    Page 52 of 112

| | | |
|---|---|---|
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 35 |
| C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 36 |
| D. | D&O Policies. | 36 |
| E. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 36 |
| F. | Reservation of Rights. | 37 |
| G. | Nonoccurrence of the Plan Effective Date. | 37 |

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ........................ 37**
| | | |
|---|---|---|
| A. | Timing and Calculation of Amounts to Be Distributed. | 37 |
| B. | Rights and Powers of the Plan Administrator. | 37 |
| C. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 38 |
| D. | Compliance with Tax Requirements/Allocations. | 39 |
| E. | Allocation of Plan Distributions Between Principal and Interest. | 39 |
| F. | Setoffs and Recoupment. | 40 |
| G. | Claims Paid or Payable by Third Parties. | 40 |
| H. | Indefeasible Distributions. | 40 |

**ARTICLE VII THE PLAN ADMINISTRATOR .......................................... 40**
| | | |
|---|---|---|
| A. | The Plan Administrator. | 40 |
| B. | Wind-Down. | 41 |
| C. | Exculpation; Indemnification; Insurance; Liability Limitation. | 42 |
| D. | Tax Returns. | 42 |
| E. | Dissolution of the Debtors. | 42 |

**ARTICLE VIII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ................................................................ 43**
| | | |
|---|---|---|
| A. | Allowance of Claims and Interests. | 43 |
| B. | Claims and Interests Administration Responsibilities. | 43 |
| C. | Estimation of Claims. | 43 |
| D. | Adjustment to Claims or Interests without Objection. | 44 |
| E. | Time to File Objections to Claims. | 44 |
| F. | Disallowance of Claims. | 44 |
| G. | Amendments to Claims. | 44 |
| H. | No Distributions Pending Allowance. | 44 |
| I. | Distributions After Allowance. | 44 |
| J. | Undeliverable Distribution Reserve. | 45 |
| K. | Single Satisfaction of Claims. | 45 |

**ARTICLE IX SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .......... 45**
| | | |
|---|---|---|
| A. | Settlement, Compromise, and Release of Claims and Interests. | 45 |
| B. | Discharge of Claims and Termination of Interests. | 46 |
| C. | Release of Liens. | 46 |
| D. | Releases by the Debtors. | 46 |
| E. | Releases by Holders of Claims and Interests. | 47 |
| F. | Exculpation. | 47 |
| G. | Injunction. | 48 |
| H. | Recoupment. | 48 |
| I. | Subordination Rights. | 49 |
| J. | Reimbursement or Contribution. | 49 |
| K. | Reservation of the United States. | 49 |
| L. | No Successor Liability. | 50 |

**ARTICLE X CONDITIONS PRECEDENT TO CONFIRMATION AND THE PLAN EFFECTIVE DATE ................................................................ 50**
| | | |
|---|---|---|
| A. | Conditions Precedent to Confirmation. | 50 |
| B. | Conditions Precedent to the Plan Effective Date. | 50 |

C.  Waiver of Conditions. ...................................................................................................51
D.  Substantial Consummation. ..........................................................................................51
E.  Effect of Non-Occurrence of Conditions to the Plan Effective Date. ..........................51

**ARTICLE XI MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** .................**52**
A.  Modification and Amendments. .....................................................................................52
B.  Effect of Confirmation on Modifications. .......................................................................52
C.  Revocation or Withdrawal of the Plan. .........................................................................52

**ARTICLE XII RETENTION OF JURISDICTION** ............................................................................**52**

**ARTICLE XIII MISCELLANEOUS PROVISIONS** ...........................................................................**55**
A.  Immediate Binding Effect. .............................................................................................55
B.  Additional Documents. ..................................................................................................55
C.  Dissolution of Statutory Committees. ............................................................................55
D.  Reservation of Rights. ...................................................................................................55
E.  Successors and Assigns. ..............................................................................................55
F.  Service of Documents. ..................................................................................................55
G.  Enforcement of Confirmation Order. .............................................................................56
H.  Term of Injunctions or Stays. ........................................................................................56
I.  Entire Agreement. ..........................................................................................................56
J.  Exhibits. .........................................................................................................................56
K.  Nonseverability of Plan Provisions. ..............................................................................57
L.  Waiver. ...........................................................................................................................57

Case 18-04177-TOM11    Doc 1324    Filed 04/15/19    Entered 04/15/19 12:02:00    Desc
Main Document    Page 54 of 112

**INTRODUCTION**

Capitalized terms used in this chapter 11 plan shall have the meanings set forth in Article IA. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. The Debtors seek to consummate the Restructuring Transactions commencing on the Plan Effective Date. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement, the *Notice of Successful Bids* [Docket No. 1120] and the *Notice of Filing of Debtors' Proposed Independent Investigation Settlement and Amended Plan Summary* [Docket No. 1121] for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan, the Restructuring Transactions, and certain related matters.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

**A.    Defined Terms.**

As used in this Plan, capitalized terms have the meanings and effect as set forth below.

1.      "*Acquired Assets*" has the meaning set forth in the Sale Transaction Documentation (or such other similar term as may be used in the Sale Transaction Documentation).

2.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Commencement Date until and including the Plan Effective Date of preserving the Estates; (b) Allowed Estate Retained Professional Fee Claims; (c) DIP Facility Claims; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

3.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Estate Retained Professional Fee Claims, shall be the Voting Deadline; and (b) with respect to Estate Retained Professional Fee Claims, shall be 30 days after the Plan Effective Date.

4.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

5.      "*Agency Agreements*" means (i) that certain Coal Sales and Agency Agreement between Robindale Energy Services, Inc. and Seminole Coal Resources, effective as of December 30, 2016, relating to coal sales from the Maple Mining Complex, (ii) that certain Coal Sales and Agency Agreement between Robindale Energy Services, Inc. and Seneca Coal Resources, LLC, effective as of December 30, 2016, relating to coal sales from the Oak Grove Mining Complex, and (iii) that certain Coal Sales and Agency Agreement between Robindale Energy Services, Inc. and Seneca Coal Resources, LLC, relating to coal sales from the Debtors' Pinnacle Mining Complex.

6.      "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or such other date as agreed by the Debtors pursuant to the Bar Date Order) or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim a Proof of Claim or request for payment of Administrative Claim is not or shall not be required to be Filed under the Plan, the Bankruptcy Code, the Bar Date Order, or pursuant to a Final Order); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no contrary or superseding Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim

shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor. For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim. "*Allow*" and "*Allowing*" shall have correlative meanings.

7. "*Allowed Priority Tax Claims*" means the final Allowed Priority Claims for prepetition Federal Excise Tax, Alabama Severance Tax, Alabama Sales & Use Tax, West Virginia Severance Tax, and West Virginia Sales & Use Tax.

8. "*Assumed Contracts*" means those Executory Contracts and Unexpired Leases that are to be assumed and assigned by the Debtors to the Successful Bidder pursuant to the Plan, as set forth in the Plan Supplement.

9. "*Assumed Contracts List*" means the list of those Executory Contracts and Unexpired Leases to be assumed by the Debtors or assumed and/or assigned by the Debtors to the applicable Successful Bidder (*i.e.*, the Assumed Contracts) pursuant to the Plan, as set forth in the Plan Supplement, which (with respect to the Assumed Contracts) shall be in form and substance acceptable to the applicable Successful Bidder, subject to amendment by the Debtors with the consent of the applicable Successful Bidder (with respect to the Assumed Contracts) from time to time in accordance with the Sale Transaction Documentation and this Plan.

10. "*Assumed Liabilities*" has the meaning set forth in the Sale Transaction Documentation (or such other similar term as may be used in the Sale Transaction Documentation).=

11. "*Auction*" has the meaning set forth in the Bidding Procedures Order.

12. "*Avoidance Actions*" means any and all causes of action to avoid a transfer of property or an obligation incurred by any of the Debtors arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code or other similar or related state or federal statutes and common law.

13. "*Bankruptcy Administrator*" means the Bankruptcy Administrator for the Northern District of Alabama.

14. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

15. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Alabama, Southern Division or such other court having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of reference under 28 U.S.C. § 157, the United States District Court for the Northern District of Alabama.

16. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

17. "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(B)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(B)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 482], as such order may be amended, supplemented, or modified from time to time.

18. "*Bay Point*" means Bay Point Capital Partners, LP.

6

19.     "*Benefit Plan*" has the meaning set forth in the Sale Transaction Documentation (or such other similar term as may be used in the Sale Transaction Documentation).

20.     "*Bidding Procedures*" means the bidding procedures attached as **Exhibit 1** to the Bidding Procedures Order, as such bidding procedures may be amended from time to time in accordance with its terms.

21.     "*Bidding Procedures Order*" means the *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Hearings and Objection Deadlines with Respect to the Sale, (III) Scheduling Bid Deadlines and an Auction, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief* [Docket No. 490], as such order may be amended, supplemented, or modified from time to time.

22.     "*Bluestone Obligations*" means any obligations to Bluestone as outlined in the settlement terms read into the record during the Bankruptcy Court's Confirmation Hearing and reflected in the Sale Transaction Documentation and Sale Order approving the sale of the Pinnacle Mining Complex.

23.     "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

24.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

25.     "*Castlelake Bridge Note*" means the loan agreement (and any related documentation), if any, by and among Castlelake LP, Kenneth McCoy, and Jason McCoy, in the amount of $4 million, the proceeds of which shall be payable to the Debtors or the Reorganized Debtors on the Plan Effective Date in satisfaction of Kenneth McCoy and Jason McCoy's obligations under the McCoy's Cash Consideration, and pursuant to the terms outlined as Exhibit C to the Settlement Term Sheet.

26.     "*Causes of Action*" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "*Cause of Action*" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to Claims or Interests; (d) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign law fraudulent transfer or similar claim.

27.     "*CCL*" means Coking Coal Leasing, LLC.

28.     "*CCL Lease*" means the Master Equipment Lease Agreement dated as of May 21, 2018 by and between CCL and Oak Grove Resources, LLC and all related schedules.

29.     "*Chapter 11 Cases*" means the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court pursuant to the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 63], as such order may be amended, supplemented, or modified from time to time.

30.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

31.     "*Claims Bar Date*" means the applicable bar date by which Proofs of Claim must be Filed, as established by:  (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

32.     "*Claims Register*" means the official register of Claims against the Debtors maintained by the Clerk of the Bankruptcy Court.

33.     "*Clarke Note*" means a note in the amount of $1 million, to be issued by Thomas Clarke on the Plan Effective Date, payable to the Reorganized Debtors but conveyed to the Liquidating Trust, in equal quarterly installments commencing on the last day of the calendar quarter following the Plan Effective Date and terminating on the third anniversary of the Plan Effective Date.  The Clarke Note shall bear a 5% interest rate payable quarterly in cash.

34.     "*Clarke/McCoy Notes*" means collectively the Second Clarke Note and the McCoy Note.

35.     "*Class*" means a category of holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

36.     "*Cliffs Litigation*" means the following matters: (a) the United States District Court for the District of Delaware matter styled *Cliffs Natural Resources Inc., et al. v. Seneca Coal Resources, LLC, et al.*, Case No. 17-00567; (b) the Third Circuit appeal styled *Cliffs Natural Resources Inc., et al. v. Seneca Coal Resources, LLC, et al.*, Case No. 18-02041; (c) the Delaware Superior Court matter styled *Cleveland-Cliffs Inc. f/k/a Cliffs Natural Resources Inc., et al. v. Seneca Coal Resources, LLC, et al.*, C.A. No. N18C-05-058-CCLD; and (d) the Delaware Court of Chancery matter styled *Cleveland-Cliffs Inc. f/k/a Cliffs Natural Resources Inc., et al. v. Seneca Coal Resources, LLC, et al.*, C.A. No. 2018-0478-SG.

37.     "*Closing Date*" means the date and time at which the applicable Closing (as defined in the applicable Sale Transaction Documentation) actually occurs.  The use of the term "Closing Date" herein may be read as "Closing Dates".  With respect to the Maple Eagle Mining Complex and the Oak Grove Mining Complex, the Closing Date shall be on the same date as the Plan Effective Date.

38.     "*Collateral*" means any property or interest in property of the Estate of any Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to a Final Order ordering the remedy of avoidance of any such Lien, charge, or other encumbrance under the Bankruptcy Code.

39.     "*Collective Bargaining Agreement*" has the meaning set forth in the Sale Transaction Documentation (or such other similar term as may be used in the Sale Transaction Documentation).

40.     "*Commencement Date*" means October 14, 2018, the date on which the Chapter 11 Cases were commenced.

41.     "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to the *Bankruptcy Administrator Report to Court of Appointment of Unsecured Creditors Committee* [Docket No. 147], as may be reconstituted from time to time.

42.     "*Committee Settlement*" means the settlement by and among the Debtors, the Committee, the DIP Lenders, and the Settling Parties and effectuated through the Plan, which provides for, among other things,  (i) the resolution of the Committee's objections to the Plan and the Sale Transactions, (ii) the Committee's withdrawal of the Standing Motion with prejudice and (iii) resolution of any disputes between the DIP Lenders and the Committee regarding the DIP Lenders and Committee Stipulation, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the material terms of which are included in the Plan.

43.     "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases.

8

44. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

45. "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

46. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code, which order shall be in form and substance reasonably acceptable to the Debtors, the Required Lenders, and, with respect to matters relating to the Investigation Settlement, the Settling Parties.

47. "*Consummation*" or "*Consummated*" means the occurrence of the Plan Effective Date.

48. "*Contract Counterparties*" means the counterparties to any executory contract or unexpired lease to which a Debtor is a party.

49. "*Cure Costs*" means all monetary liabilities, including pre-petition monetary liabilities, of the Debtors that must be paid or otherwise satisfied to cure all of the Debtors' monetary defaults under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment to Successful Bidder as provided hereunder as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order.

50. "*Cure Notice*" means, with respect to each Executory Contract or Unexpired Lease, the notice submitted by the Sellers to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order setting forth, among other things, the Cure Cost amount with respect thereto as calculated by the Sellers.

51. "*D&O Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for directors, members, trustees, officers, and managers' liability.

52. "*Debtors*" means, collectively, Mission Coal Company, LLC; Beard Pinnacle, LLC; Oak Grove Land Company, LLC; Oak Grove Resources, LLC; Pinnacle Land Company, LLC; Pinnacle Mining Company, LLC; Seminole Alabama Mining Complex, LLC; Seminole Coal Resources, LLC; Seminole West Virginia Mining Complex, LLC; Seneca Coal Resources, LLC; and Seneca North American Coal, LLC, the debtors and debtors in possession in the Chapter 11 Cases.

53. "*Description of Transaction Steps*" means the description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement, which description shall be in form and substance reasonably acceptable to the Debtors and the Required Lenders.

54. "*DIP Agent*" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent under the DIP Facility.

55. "*DIP Facility Deficiency Claims*" means the unsecured portion of any DIP Facility Claim to the extent that the value of the Collateral securing such DIP Facility Claim is less than the amount of the interest of such DIP Facility Claim in such Collateral. The Allowed amount of the DIP Facility Deficiency Claims, in the aggregate, shall be $15,000,000. DIP Facility Deficiency Claims, if any, shall be General Unsecured Claims.

56. "*DIP Documents*" has the meaning set forth in the Final DIP Order.

57. "*DIP Facility*" has the meaning set forth in the Final DIP Order.

58. "*DIP Facility Claims*" means any Claims arising under the DIP Facility or the Final DIP Order, including Claims for all principal amounts outstanding, interest (including default interest, if applicable), fees, expenses, costs, and other charges and obligations, which Claims include the full roll up of the Prepetition First Lien Obligations Amount, including the Prepayment Premium, plus the First Lien Accrued Adequate Protection Payments (each as defined in the Final DIP Order), and which Claims as of March 31, 2019 were no less than $217,551,093.

59.     "*DIP Lenders*" means the lenders from time to time party to the DIP Facility.

60.     "*DIP Lenders and Committee Stipulation*" means the *Stipulation and Agreed Order Among the Official Committee of Unsecured Creditors and the DIP Lenders* [Docket No. 611].

61.     "*Disclosure Statement*" means the *Third Amended Disclosure Statement for the Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates*, dated as of February 8, 2019 [Docket No. 758], which was approved pursuant to the Disclosure Statement Order.

62.     "*Disclosure Statement Order*" means the order of the Bankruptcy Court approving the Disclosure Statement and solicitation procedures with respect to the Plan [Docket No. 762], as such order may be amended, supplemented, or modified from time to time, which Order shall be in form and substance reasonably acceptable to the Debtors and the Required Lenders.

63.     "*Disputed*" means a Claim or an Interest or any portion thereof:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

64.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date, or such other date as designated in a Final Order.

65.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

66.     "*ERP Federal Mining Sale*" means the sale of real property owned by non-Debtor ERP Federal Mining Complex, LLC.

67.     "*ERP Federal Note*" means that certain promissory note dated as of December 31, 2016 issued by ERP Federal Mining Complex, LLC to Seminole Coal Resources, LLC and Seneca Coal Resources, LLC in an amount of up to $21,500,000.

68.     "*ERP Mineral Note*" means that certain promissory note dated as of June 30, 2017 issued by ERP Mineral Reserves, LLC to Seminole Coal Resources, LLC and Seneca Coal Resources, LLC in an amount of up to $11,805,000.

69.     "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

70.     "*Estate Retained Professional Fee Escrow Account*" means an escrow account established pursuant an escrow agreement in form and substance satisfactory to the Debtors and the Required Lenders, which shall be funded on the Closing Date, *first*, with any and all of the Settlement Proceeds until, if necessary, utilized in full, and, *second*, and only to the extent the Settlement Proceeds are insufficient to fund in full the Estate Retained Professional Fee Escrow Account, with the Sale Transaction Proceeds, in an amount equal to the Estate Retained Professional Fee Escrow Amount.

71.     "*Estate Retained Professional Fee Escrow Amount*" means an amount equal to the sum of (i) Estate Retained Professional Fee Claims and other unpaid fees and expenses the Professionals have incurred in rendering services to the Debtors or the Committee in the Chapter 11 Cases through and including the Plan Effective Date, and (ii) the fees and expenses associated with the administration of the Estate Retained Professional Fee Escrow Account; *provided, however*, that in each case all contractual fee arrangements will remain in effect and be accounted for in such negotiated amount, subject to (x) any modifications agreed upon between the Debtors and the Required Lenders (including any that may be filed with the Bankruptcy Court), and (y) a 5% reduction of any Committee Professional fees above the cap provided for in the Final DIP Order (other than with respect to the fees and expenses of Baker Donelson, which shall not be subject to such reduction).

10

72.     "*Estate Retained Professional Fee Claims*" means any administrative claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals in connection with the Chapter 11 Cases through and including the Plan Effective Date solely to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court, and as reduced per the proviso of the definition of "Estate Retained Professional Fee Escrow Amount". To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Estate Retained Estate Retained Professional Fee Claim.

73.     "*Excluded Assets*" has the meaning set forth in the Sale Transaction Documentation (or such other similar term as may be used in the Sale Transaction Documentation).

74.     "*Excluded Liabilities*" has the meaning set forth in the Sale Transaction Documentation (or such other similar term as may be used in the Sale Transaction Documentation).

75.     "*Exculpated Party*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Successful Bidder; (c) the DIP Lenders; (d) the DIP Agent; (e) the First Lien Lenders; (f) the First Lien Agent; (g) the Committee and its members; (h) the Second Lien Lender; (i) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (j) with respect to each Debtor, each such Debtor's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

76.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code.

77.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Notice and Claims Agent or the Bankruptcy Court.

78.     "*Filed Priority Tax Claim*" means any Proof of Claim asserting a Priority Claim for Federal Excise Tax, Alabama Severance Tax, Alabama Sales & Use Tax, West Virginia Severance Tax, and West Virginia Sales & Use Tax.

79.     "*Final DIP Order*" means the *Final Order (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(A), 361 362, 363, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364 and (IV) Granting Related Relief* [Docket No. 300], as such order may be amended, supplemented, or modified from time to time.

80.     "*Final Order*" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Action or Order shall have become final in accordance with Bankruptcy Rule 8002; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

81.     "*First Lien Agent*" means Delaware Trust Company, in its capacity as administrative agent under the First Lien Credit Agreement, or any of its successors.

82.     "*First Lien Credit Agreement*" means that certain Credit Agreement, dated as of January 31, 2018, by and among Mission Coal Company, LLC, as borrower, the guarantors party thereto, the First Lien Agent, and the other lender parties thereto, as may be amended, restated, or otherwise supplemented from time to time.

83.     "*First Lien Credit Documents*" has the meaning set forth in the Final DIP Order.

84.     "*General Unsecured Claim*" means any unsecured Claim against a Debtor that is not:  (a) paid in full prior to the Plan Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Claim; (c) a DIP Facility Claim other than any DIP Facility Deficiency Claim; (d) a Second Lien Claim; (e) an Intercompany Claim; (f) a Section 510(b) Claim; (g) an Other Priority Claim; (h) an Other Secured Claim; (i) a Priority Tax Claim; (j) an Estate Retained Professional Fee Claim; or (k) a Secured Tax Claim.

85.     "*General Unsecured Claims Amount*" means (i) any and all proceeds from the Clarke Note and the Jason McCoy Note to be distributed from the Liquidating Trust to Holders of General Unsecured Claims pursuant to the Liquidating Trust Agreement, (ii) proceeds from the Clarke/McCoy Notes, to the extent applicable pursuant to the terms of the Plan, to be distributed from the Liquidating Trust to Holders of General Unsecured Claims pursuant to the Liquidating Trust Agreement, and (iii) 50% of any and all cash proceeds from the Sale Transaction Proceeds in excess of $200,000,000 actually received by the DIP Lenders from the sale of the Oak Grove Mining Complex, Maple Eagle Mining Complex, and Pinnacle Mining Complex.   For the avoidance of doubt, cash proceeds from the Sale Transaction Proceeds only relates to cash proceeds from the Successful Bidder and cash received from the Non-Cash Consideration, and does not include any cash proceeds or amounts from the Robindale Settlement, return of surety collateral, or any other disposition or return of the DIP Lenders' collateral outside of the sale of the Oak Grove Mining Complex, Maple Eagle Mining Complex, and Pinnacle Mining Complex.  Further, the DIP Facility Deficiency Claims shall not participate or receive any distribution from the (iii) above.

86.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

87.     "*Holder*" means an Entity holding a Claim against or Interest in a Debtor, as applicable.

88.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

89.     "*Initial Distribution Date*" means the date on which the Debtors or the Plan Administrator make initial distributions to Holders of Allowed Claims pursuant to the Plan.

90.     "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor or an Affiliate of a Debtor.

91.     "*Intercompany Interest*" means any Interest in one Debtor held by another Debtor or an Affiliate of a Debtor.

92.     "*Interest*" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, including options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement).

93.     "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 480], as such order may be amended, supplemented, or modified from time to time.

12

94. "*Interests*" means the Interests in Mission Coal Company, LLC outstanding immediately prior to the Plan Effective Date.

95. "*Investigation Settlement*" means the settlement by and among the Debtors and the Settling Parties effectuated through the Plan, which provides for, among other things, the settlement of all Causes of Action against the Settling Parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the material terms of which are set forth in the Investigation Settlement Term Sheet filed as part of to the Plan Supplement, and which are included in the Plan.

96. "*Investigation Settlement Term Sheet*" means the executed term sheet setting forth the material terms of the Investigation Settlement and filed as part of the Plan Supplement [Docket No. 1190].

97. "*Jason McCoy Note*" means a note in the amount of $1.25 million, to be issued by Jason McCoy on the Plan Effective Date, payable to the Reorganized Debtors but conveyed to the Liquidating Trust, in equal quarterly installments commencing on the last day of the calendar quarter following the Plan Effective Date and terminating on the third anniversary of the Plan Effective Date. The Jason McCoy Note shall bear a 5% interest rate payable quarterly in cash.

98. "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

99. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

100. "*Liquidating Trust*" means that certain trust to be created on the Plan Effective Date, solely for the purposes of receiving and distributing, as applicable, the Liquidating Trust Assets and not for any other purposes, as described in Article IV.G.

101. "*Liquidating Trust Agreement*" means the agreement to be executed as of the Plan Effective Date, establishing the Liquidating Trust pursuant to this Plan, substantially in the form Filed with the Plan Supplement. The Liquidating Trust Agreement shall be in form and substance reasonably satisfactory to the Debtors, the Required Lenders, and the Committee.

102. "*Liquidating Trust Assets*" means (i) the funds payable to the Reorganized Debtors pursuant to the Plan, including (A) the Clarke/McCoy Notes to be held in trust by the Liquidating Trustee for payment of certain Allowed Priority Claims, and to the extent applicable under the Committee Settlement, distributions to Holders of General Unsecured Claims, and (B) the Jason McCoy Note and the Clarke Note to be held in trust by the Liquidating Trustee for distributions to Holders of General Unsecured Claims;(ii) 100% of the new equity interests in each of the Reorganized Debtors to be held in trust by the Liquidating Trustee for the DIP Lenders; and (iii) $125,000 to be held in trust by the Liquidating Trustee to fund any costs and expenses of the Liquidating Trust.

103. "*Liquidating Trustee*" means the trustee of the Liquidating Trust appointed to administer the Liquidating Trust pursuant to the Liquidating Trust Agreement. The identity and compensation of the Liquidating Trustee shall be chosen by the Committee and shall be set forth in the Plan Supplement. The Liquidating Trustee may be the same person as the Plan Administrator.

104. "*Maple Eagle Mining Complex*" refers to the Maple Eagle mining assets being acquired pursuant to the applicable Sale Transaction Documentation and the applicable Sale Order.

105. "*McCoys Cash Consideration*" means the $4 million of cash consideration to be funded by Jason McCoy and Kenneth McCoy pursuant to the Investigation Settlement, for the avoidance of doubt, this amount does not include the $574,354.76 of cash consideration to be funded by Kenneth McCoy in his sole capacity.

106. "*McCoy Note*" means a note in the amount of $6 million, to be issued by Kenneth McCoy and Jason McCoy on the Plan Effective Date, payable to the Reorganized Debtors in equal quarterly installments commencing

on the last day of the calendar quarter following the Plan Effective Date and terminating on the fifth anniversary of the Plan Effective Date. The McCoy Note shall bear interest at five percent (5%) payable in cash.

107. "*Murray*" means Murray Metallurgical Coal Holdings, LLC.

108. "*Notice and Claims Agent*" means Omni Management Group, the notice, claims, and solicitation agent for the Debtors in the Chapter 11 Cases [Docket No. 66].

109. "*Non-Cash Consideration*" means the $160 million first lien senior secured loan issued by the Successful Bidder to the DIP Lenders on terms and conditions set forth in the Sale Transaction Documentation approving the sale of the Oak Grove Mining Complex and Maple Eagle Mining Complex, which shall be in form and substance satisfactory to the Debtors, the DIP Lender, and Murray.

110. "*Oak Grove Mining Complex*" refers to the Oak Grove and Seminole Alabama mining assets being acquired pursuant to the applicable Sale Transaction Documentation and the applicable Sale Order.

111. "*Ordinary Course Professional*" means an Entity (other than a Professional) retained and compensated by the Debtors in accordance with the Ordinary Course Professionals Order.

112. "*Ordinary Course Professionals Order*" means the *Order Authorizing the Retention and Employment of Professionals Utilized in the Ordinary Course of Business* [Docket No. 351], as such order may be amended, supplemented, or modified from time to time.

113. "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

114. "*Other Secured Claim*" means any Secured Claim against any of the Debtors, other than a DIP Facility Claim or a Second Lien Secured Claim.

115. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

116. "*Pinnacle Mining Complex*" refers to the Pinnacle mining assets being acquired pursuant to the applicable Sale Transaction Documentation and the applicable Sale Order.

117. "*Plan*" means this chapter 11 plan, including all exhibits, supplements (including the Plan Supplement), appendices, and schedules, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof.

118. "*Plan Administrator*" means an individual that shall be the representative of the Reorganized Debtors on and after the Plan Effective Date and shall have the rights, powers, and duties set forth in this Plan. The identity and compensation of the Plan Administrator shall be agreed to by the Debtors and the Required Lenders, in consultation with the Committee, and shall be set forth in the Plan Supplement. The Plan Administrator may be the same person as the Liquidating Trustee.

119. "*Plan Administrator Agreement*" means that certain agreement entered into no later than the Plan Effective Date setting forth, among other things, the Plan Administrator's rights, powers, obligations, and compensation, all of which shall be consistent with the applicable provisions of the Plan; and which shall be in form and substance satisfactory to the Debtors and the Required Lenders.

120. "*Plan Effective Date*" means, with respect to the Plan, the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Plan Effective Date set forth in Article X of the Plan have been satisfied or waived in accordance with Article XC of the Plan, for the avoidance of doubt, the Plan Effective Date shall be the same date as the Closing Date.

14

121.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, each of which shall be in form and substance reasonably acceptable to the Required Lenders (to the extent that the Required Lenders are not the Successful Bidder, then only to the extent directly related to effectuating a distribution on account of their Claims) and the Successful Bidder (solely to the extent directly related to the Sale Transaction), substantially final forms of which shall be Filed at least 7 days prior to the Voting Deadline, or, if related to the Fourth Amended Plan, prior to the Plan Effective Date or as soon as reasonably practicable thereafter, or such later date as may be approved by the Bankruptcy Court, including:  (a) the Assumed Contracts List; (b) the Rejected Contracts List; (c) the identity of the Plan Administrator and the compensation of the Plan Administrator; (d) the Wind-Down Budget; (e) the Description of Restructuring Transaction; (f) the Sale Transaction Documentation; (g) those Transferred Causes of Action that shall be transferred to the Successful Bidder pursuant to the Sale Transaction; (h) a list of Retained Causes of Action; (i) the Plan Administrator Agreement; (j) the McCoy Note; (k) the Clarke Note; (l) the Second Clarke Note; (m) the Jason McCoy Note; (n) the identity of the Liquidating Trustee; (o) the Liquidating Trust Agreement; (p) the Castlelake Bridge Note; (q) the Investigation Settlement Term Sheet; and (r) the Operating Agreement (as defined in the Sale Order); *provided* that, through the Plan Effective Date, the Plan Supplement, and the exhibits thereto may be amended or modified in accordance with the Plan and the Confirmation Order.

122.    "*Priority Claims*" means, collectively, Administrative Claims, Priority Tax Claims, and Other Priority Claims.

123.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

124.    "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

125.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

126.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

127.    "*Reduction Amount*" means the difference between (a) $12 million and (b) the final amount of the Allowed Priority Tax Claims owed to the Internal Revenue Service, the Alabama Department of Revenue, and the West Virginia State Tax Despartment.

128.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

129.    "*Rejected Contracts*" means those Executory Contracts and Unexpired Leases that are to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement.

130.    "*Rejected Contracts List*" means the list of those Executory Contracts and Unexpired Leases to be rejected by the Debtors (*i.e.*, the Rejected Contracts) pursuant to the Plan, as set forth in the Plan Supplement, which (with respect to the Rejected Contracts) shall be in form and substance acceptable to the Successful Bidder, subject to amendment by the Debtors with the consent of the Successful Bidder (with respect to the Rejected Contracts) from time to time in accordance with the Sale Transaction Documentation and this Plan.

131.    "*Released Party*" means, collectively, and in each case in its capacity as such: (a) the Successful Bidder; (b) the DIP Agent; (c) the DIP Lenders; (d) the First Lien Agent; (e) the First Lien Lenders; (f) the Second Lien Lender; (g) the Settling Released Parties, (h) the Committee and its members, (i) each current and former Affiliate of each Entity in clause (a) through (h); (j) with respect to each Entity in clause (a) through (h), each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents,

15

advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (i) with respect to each Debtor, each such Debtor's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

132. "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) the Successful Bidder; (b) all holders of Claims and Interests that are deemed to accept the Plan; (c) all Holders of Claims and Interests who vote to accept the Plan; (d) all Holders of Claims or Interests that (i) abstain from voting on the Plan *and* who do not opt out of the releases in the Plan, (ii) vote to reject the Plan *and* who do not opt out of the releases in the Plan, or (iii) are deemed to reject or presumed to accept the Plan *and* who do not opt out of the releases in the Plan; (e) the Settling Parties, (f) each current and former Affiliate of each Entity in clause (a) through (e); (f) with respect to each Entity in clause (a) through (f) each such Entity's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; and (g) with respect to each Debtor, each such Debtor's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

133. "*Remaining Sale Transaction Proceeds*" means any Sale Transaction Proceeds remaining after funding (i) any amounts included in the Estate Retained Professional Fee Escrow Account not previously funded by the Settlement Proceeds (which shall be exhausted in full), (ii) any amount other than Sale Transaction Proceeds required to be funded pursuant to the Sale Transactions and the Sale Transaction Documentation, including the Sale Orders, and (iii) the Wind-Down Amount.

134. "*Reorganized Debtors*: means on or after the Plan Effective Date, each of the Debtors as reorganized pursuant to the Plan or any successor thereto.

135. "*Required Lenders*" has the meaning ascribed to it in the DIP Documents; to the extent there is a reference to the "Required Lenders" after the Plan Effective Date, "Required Lenders" shall mean the Required Lenders under the Non-Cash Consideration documents.

136. "*Restructuring Transactions*" means the transactions described in <u>Article IV</u>.

137. "*Retained Causes of Action*" means the list of Causes of Action retained in connection with the Plan, to be included in the Plan Supplement.

138. "*Robindale*" means Robindale Energy Services, Inc., Robindale Coal Sales, LLC, Robindale Export, LLC, AMCI Group, and each of their Affiliates.

139. "*Robindale Settlement*" means the settlement described in <u>Article IV.T</u>.

140. "*Sale Order*" means one or more orders of the Bankruptcy Court, in form satisfactory to the Debtors, the Required Lenders and the respective Successful Bidder approving the consummation of the applicable Sale Transaction.

141. "*Sale Transaction*" means the transfer, in one or more transactions, of the Acquired Assets to the Successful Bidder and the assumption by the Successful Bidder of the Assumed Liabilities free and clear of all Liens, Claims, charges, and other encumbrances (other than the Assumed Liabilities) pursuant to section 363 and 1123 of the Bankruptcy Code on the terms and conditions set forth in the Sale Transaction Documentation. For the avoidance of doubt, the Sale Transaction is comprised of several sales to separate Successful Bidders on the terms of the Successful Bidder's respective Sale Transaction Documentation and respective Sale Order, including the combined sale of the Oak Grove Mining Complex and the Maple Eagle Mining Complex together, and the sale of the Pinnacle Mining Complex. The use of the term "Sale Transaction" herein may be read as "Sale Transactions".

16

142. "*Sale Transaction Documentation*" means one or more other asset purchase agreements or purchase and sale agreements and related documents (which shall be in form and substance reasonably acceptable to the Debtors and the Required Lenders), pursuant to which the Debtors will effectuate the Sale Transaction. For the avoidance of doubt, the Sale Transaction Documentation shall govern the rights and responsibilities of each respective Successful Bidder under such Successful Bidder's respective Sale Transaction Documentation, and any Successful Bidder not party to a specific Sale Transaction Documentation shall have no rights, responsibilities, or liabilities thereunder.

143. "*Sale Transaction Proceeds*" means any Cash or Cash equivalents that are proceeds from the Sale Transaction.

144. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

145. "*Second Clarke Note*" means a note in the amount of $6 million, to be issued by Thomas Clarke on the Plan Effective Date, payable to the Reorganized Debtors but conveyed to the Liquidating Trust, in equal quarterly installments commencing on the last day of the calendar quarter following the Plan Effective Date and terminating on the fifth anniversary of the Plan Effective Date. The Second Clarke Note shall bear interest at five percent (5%) payable in cash.

146. "*Second Lien Credit Agreement*" means that certain Amended and Restated Secured Loan Agreement, dated as of January 31, 2018, by and among Mission Coal Company, LLC, Seminole Coal Resources, LLC, Seneca Coal Resources, LLC, collectively as borrowers, the guarantors party thereto, and Mission Coal Funding, LLC, as lender, as may be amended, restated, amended and restated, waived, supplemented, or otherwise modified from time to time.

147. "*Second Lien Claim*" means any Secured or unsecured Claim on account of the Second Lien Credit Agreement, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations.

148. "*Section 510(b) Claims*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

149. "*Secured*" or "*Secured Claim*" means, when referring to a Claim, a Claim that is: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code to the extent of the value of such right of setoff.

150. "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

151. "*Securities Act*" means the U.S. Securities Act of 1933.

152. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

153. "*Settlement Proceeds*" means Cash in the amount of $15 million cash consideration payable on the Plan Effective Date, as set forth in the Investigation Settlement Term Sheet.

154. "*Settling Parties*" means, collectively, Thomas Clarke, Ana Clarke, Kenneth McCoy, Jason McCoy, Charles Ebetino, David Fortner, Robert McAtee, Michael Zervos, Mark Bartkoski, Bay Point, Mission Coal Financing, LLC, ENCECo Inc, Iron Management, LLC, Iron Management II, LLC, Iron Management III, LLC, Iron Management IV, LLC, Iron Management V, LLC, Iron Group, Inc., Lara Natural Resources, LLC, Blue Ridge Natural Mineral Resources, LLC, Merida Natural Reserves, LLC, CCL, ERP Environmental Fund, Inc., ERP Federal Mining Complex, LLC, ERP Mineral Reserves, LLC, ERP Compliant Fuels, LLC, ERP Compliant Coke, LLC, ERP Steel

17

Works, LLC, ERP Aviation, LLC, King Aire, Inc., Cedar Creek Aviation, LLC, Monterey Coal Resources, LLC, Virginia Conservation Legacy Fund, Inc., and VCLF Land Trust, Inc.

155.     "*Settling Released Parties*" means, collectively, Kenneth McCoy, Jason McCoy, Thomas Clarke, Ana Clarke, Charles Ebetino, Jr., Elisabeth Ebetino, ERP Mineral Reserves, LLC, ERP Federal Mining Complex, LLC, Mission Coal Funding, LLC, ENCECo Inc., Bay Point, David Fortner, Robert McAtee, Michael Zervos, Mark Bartkoski,  Blue Ridge Natural Mineral Resources, LLC, Iron Management, LLC, Iron Management II, LLC, Iron Management III, LLC, Iron Management IV, LLC, Iron Management V, LLC, Iron Group, Inc., Lara Natural Resources LLC, ERP Compliant Fuels, LLC, ERP Steel Works LLC, ERP Coking Coal LLC, ERP Compliant Coke LLC, ERP Settlement, LLC, CCL, Coking Coal Financing, LLC, ERP Aviation, LLC, ERP Steel Funding, LLC, Virginia Conservation Legacy Fund, Inc., VCLF Land Trust, Inc., Merida Natural Resources, LLC, Monterey Coal Resources, LLC, ERP Environmental Fund, Inc., VCLF Holdings, LLC, King Aire, Inc., Cedar Creek Aviation, LLC, and each such Entity's current and former equity holders, subsidiaries, affiliates and other related entities, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

156.     "*Standing Motion*" means the *Motion of the Official Committee of Unsecured Creditors Seeking the Entry of an Order Granting it Standing and Authorizing it to Prosecute and Settle Certain Claims and Causes of Action on Behalf of the Debtors' Estates* [Docket No. 964].

157.     "*Subsequent Distribution Date*" means a date following the Initial Distribution Date on which the Plan Administrator or Liquidating Trustee, as applicable, in its reasonable discretion elects to make distributions to Holders of certain Allowed Claims pursuant to the Plan.

158.     "*Successful Bidder*" means the Entity or Entities whose bid for some or all of the Debtors' assets is selected by the Debtors and approved by the Bankruptcy Court as the highest and otherwise best bid pursuant to the Bidding Procedures. For the avoidance of doubt the Successful Bidder may be more than one Entity, comprised of one or more bids, and, if applicable, use of the term "Successful Bidder" herein may be read as "Successful Bidders". Where a Successful Bidder has consent rights (or is referenced) under the Plan, such consent rights (or reference) only apply to the extent such consent right (or reference) relates to the respective Successful Bidder's Sale Transaction.

159.     "*Taxing Authorities*" means the Internal Revenue Service and/or applicable state tax agencies owed priority taxes including West Virginia State Tax Department and the Alabama Department of Revenue.

160.     "*Transferred Causes of Action*" means any and all non-Insider claims arising under chapter 5 of the Bankruptcy Code not otherwise released pursuant to the Plan to be transferred to Murray pursuant to the Sale Transaction Documentation.

161.     "*Undeliverable Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

162.     "*Undeliverable Distribution Reserve*" means a segregated account established by the Plan Administrator established in accordance with Article VIII.J.

163.     "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

164.     "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

165.     "*Voting Deadline*" means 12:00 p.m. (prevailing Central Time) on April 1, 2019.

18

166.     "*Voting Report*" means the report certifying the methodology for the tabulation of votes and results of voting under the Plan, prepared and filed by the Notice and Claims Agent.

167.     "*Wages Order*" means the *Final Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* [Docket No. 315], as such order may be amended, supplemented, or modified from time to time.

168.     "*Wind Down*" means the wind down and dissolution of the Debtors' Estates as set forth in Article VIIB.

169.     "*Wind-Down Amount*" means an amount agreed upon between the Required Lenders and the Debtors to fund (a) the payment of Allowed Priority and Administrative Claims to the extent not otherwise assumed under the Sale Transaction Documentation as Assumed Liabilities, and (b) the costs to wind-down the Bankruptcy Cases in accordance with the Wind-Down Budget. The Wind-Down Amount shall be funded *first* from Settlement Proceeds, but solely in the event any Settlement Proceeds remain after payment of the Estate Retained Professional Fees Escrow Amount, and *second* from the Sale Transaction Proceeds, in an amount to be agreed upon by the Debtors and the Required Lenders.

170.     "*Wind-Down Budget*" means a budget for the reasonable activities and expenses to be incurred in winding down the Chapter 11 Cases, which budget, activities, and reasonable expenses shall be in form and substance reasonably acceptable to the Debtors and the Required Lenders.

## B.    Rules of Interpretation.

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (11) any immaterial effectuating provisions may be interpreted by the Debtors or the Plan Administrator in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control; *provided* that no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any party.

## C.    Computation of Time.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Plan Effective Date may be taken on or as soon as reasonably practicable after the Plan Effective Date.

19

D. **Governing Law.**

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

E. **Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to the legal tender of the United States, unless otherwise expressly provided.

F. **Controlling Document.**

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan, the Disclosure Statement, the Plan Supplement, and the Sale Transaction Documentation, the Sale Transaction Documentation shall control. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

**ARTICLE II
ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE
CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Estate Retained Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

A. **Administrative Claims.**

Except with respect to Estate Retained Professional Fee Claims, or as otherwise set forth herein, and except to the extent that a Holder of an Allowed Administrative Claim and, as applicable, the Debtors or the Plan Administrator, agree to less favorable treatment, such Allowed Administrative Claim is an Assumed Liability, or such Holder has been paid by any applicable Debtor prior to the Plan Effective Date, the Debtors or the Plan Administrator shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash, which payment shall be made (x) in the ordinary course of business; or (y) on the later of (i) the Plan Effective Date and (ii) the date on which such Administrative Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter) with a Cash distribution; *provided* that any Allowed Administrative Claim that has been expressly assumed by the Successful Bidder under the Sale Transaction Documentation shall not be an obligation of the Debtors.

Except as otherwise provided by Article IIA or by a Final Order entered by the Bankruptcy Court (including the Bar Date Order) on or prior to the Administrative Claims Bar Date, unless previously Filed, requests for payment of Administrative Claims, other than requests for payment of Estate Retained Professional Fee Claims, must be Filed and served on the Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the motion seeking approval of the Disclosure Statement and the notice of entry of the Disclosure Statement Order. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, the Successful Bidder, or the Plan Administrator, and such Administrative Claims shall be deemed compromised, settled, and released as of the Plan Effective Date.

20

B.      **Professional Compensation.**

1.      **Final Fee Applications and Payment of Estate Retained Professional Fee Claims.**

All final requests for payment of Estate Retained Professional Fee Claims incurred during the period from the Commencement Date through the Plan Effective Date shall be Filed no later than 30 days after the Plan Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Estate Retained Professional Fee Escrow Account up to the full Allowed amount.  To the extent that funds held in the Estate Retained Professional Fee Escrow Account are insufficient to satisfy the amount of Estate Retained Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article IIA of the Plan.

2.      **Estate Retained Professional Fee Escrow Amount.**

As soon as possible after Confirmation and not later than the Plan Effective Date, the Debtors shall establish and fund the Estate Retained Professional Fee Escrow Account with Cash equal to the Estate Retained Professional Fee Escrow Amount.  On the Plan Effective Date, the Estate Retained Professional Fee Escrow Account will be funded first from the Settlement Proceeds and second, but only after exhaustion of all Settlement Proceeds (which, for the avoidance of doubt, must be used to fund the Estate Retained Professional Fee Escrow Account first, and second, must be used to fund other Allowed Administrative Claims and Priority Claims) from the Sale Transaction Proceeds.  The Estate Retained Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the Debtors' Estates.  The amount of Estate Retained Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Estate Retained Professional Fee Escrow Account as soon as reasonably practicable after such Claims are Allowed by a Final Order.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Estate Retained Professional Fee Escrow Account shall promptly be transferred to the Debtors and used in accordance with the Wind-Down Budget.  To the extent there are any proceeds remaining after payment of all Allowed Administrative Claims and Priority Claims in the Wind-Down Budget, such proceeds will be distributed to the DIP Lenders.  For the avoidance of doubt, such proceeds shall not constitute the Sale Transaction Proceeds.

3.      **Estimation of Fees and Expenses.**

Professionals shall reasonably estimate their unpaid Estate Retained Professional Fee Claims and other unpaid fees and expenses incurred before and as of the Plan Effective Date and shall deliver such estimate to the Debtors and the Required Lenders five (5) days before the Plan Effective Date.  If a Professional does not provide an estimate, the Debtors, in consultation with the Required Lenders may estimate the unbilled fees and expenses of such Professional.

4.      **Post-Plan Effective Date Fees and Expenses.**

Except as otherwise specifically provided in the Plan, from and after the Plan Effective Date, the Debtors will, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Plan Administrator, subject to, and from the proceeds of, the Wind-Down Budget.  Upon the Plan Effective Date, any requirement that Professionals and Ordinary Course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order, in seeking retention or compensation for services rendered after such date shall terminate, and the Plan Administrator may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, that such amounts shall only be paid from the Wind-Down Amount in accordance with the Wind-Down Budget.

5.    **Substantial Contribution.**

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules, on or before the Voting Deadline.  The Debtors and the Required Lenders will object to any and all requests for substantial contribution.

C.    **Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim and, as applicable, the Debtors, the Plan Administrator, or the Liquidating Trustee, agree to a less favorable treatment, such Allowed Priority Tax Claim, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of such Allowed Priority Tax Claim shall receive, at the option of the Debtors, the Plan Administrator, or the Liquidating Trustee, as applicable, either (a) the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Plan Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter), or (b) equal semi-annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Effective Date with interest paid at a rate of 5 percent (5%); *provided* that any Allowed Priority Tax Claim that has been expressly assumed by the Successful Bidder under the Sale Transaction Documentation, shall not be an obligation of the Debtors.  In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.  On the Plan Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization, or approval of any Person.

Notwithstanding the forgoing, the Reorganized Debtors, the Liquidating Trustee, and the Plan Administrator reserve all rights to object to and settle any Filed Priority Tax Claim, and Jason McCoy and Kenneth McCoy shall each have standing and the right to object to all Filed Priority Tax Claims.  The Reorganized Debtors, the Liquidating Trustee, the Plan Administrator, Jason McCoy and Kenneth McCoy shall each have the right to settle any Priority Tax Claims, but shall only do so after consulting with each of the other parties identified in this paragraph and approval of the Court.

It shall be the responsibility of the Liquidating Trustee to make payments of all Priority Tax Claims.

D.    **Bankruptcy Administrator.**

The Debtors or the Plan Administrator, as applicable, shall timely pay all Bankruptcy Administrator Fees for each quarter under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' businesses, until the entry of a Final Order dismissing or closing the Chapter 11 Cases, or converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  Following Confirmation, the Debtors shall file with the Bankruptcy Court quarterly operating reports in a form reasonably acceptable to the Bankruptcy Administrator.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    **Summary of Classification.**

This Plan constitutes a separate chapter 11 plan for each Debtor.  Except for the Claims addressed in Article II (or as otherwise set forth herein), all Claims against and Interests in a particular Debtor are placed in Classes for each of the Debtors.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Priority Tax Claims, and Estate Retained Professional Fee Claims as described in Article II.

22

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Plan Effective Date.

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | DIP Facility Claims | Impaired | Entitled to Vote |
| Class 4 | Second Lien Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 7 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.    Treatment of Claims and Interests.**

Except to the extent that the Debtors and a Holder of an Allowed Claim or Interest, as applicable, agrees to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest. Unless otherwise indicated, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Plan Effective Date (or, if payment is not then due, in accordance with its terms in the ordinary course) or as soon as reasonably practicable thereafter, the timing of which shall be subject to the reasonable discretion of the Debtors.

    1.    **Class 1—Other Priority Claims.**

        (a)    *Classification*: Class 1 consists of all Other Priority Claims.

        (b)    *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired.

        (c)    *Voting*: Class 1 is Unimpaired under the Plan. Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Other Priority Claim is not entitled to vote to accept or reject the Plan.

23

**2. Class 2—Other Secured Claims.**

    (a)    *Classification*: Class 2 consists of all Other Secured Claims, including all Secured Tax Claims.

    (b)    *Treatment*: Each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors:

        (i)    payment in full in Cash of such Allowed Other Secured Claim;

        (ii)    the Collateral securing such Allowed Other Secured Claim;

        (iii)    Reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; or

        (iv)    such other treatment rendering such Allowed Other Secured Claim Unimpaired.

    (c)    *Voting*: Class 2 is Unimpaired under the Plan. Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan.

**3. Class 3—DIP Facility Claims.**

    (a)    *Classification*: Class 3 consists of all DIP Facility Claims.

    (b)    *Allowance*: The DIP Facility Claims shall be Allowed in the amount of approximately $217,551,093, as of March 31, 2019, plus interests, fees and other expenses and amounts provided for in the DIP Documents, both prior to and incurred after such date, through the Effective Date.

    (c)    *Treatment*: Each Holder of an Allowed DIP Facility Claim will receive its pro rata share of (i) the Remaining Sale Transaction Proceeds, (ii) the Non-Cash Consideration, and (iii) any other proceeds of the DIP Lenders' Collateral, such as, *inter alia*, the proceeds of the Robindale Settlement, proceeds from any Excluded Assets, residual cash remaining from any unused escrowed professional fees, and any return of surety bonds.

    (d)    *Voting*: Class 3 is Impaired under the Plan. Each Holder of an Allowed DIP Facility Claim is entitled to vote to accept or reject the Plan.

**4. Class 4—Second Lien Claims.**

    (a)    *Classification*: Class 4 consists of all Second Lien Claims.

    (b)    *Treatment*: Pursuant to the Investigation Settlement, Holders of Second Lien Claims shall not receive any distributions on account of their Second Lien Claims and such Claims shall be cancelled and discharged as set forth herein.

    (c)    *Voting*: Class 4 is Impaired under the Plan. Each Holder of an Allowed Second Lien Claim is entitled to vote to accept or reject the Plan.

5. **Class 5—General Unsecured Claims.**

    (a)    *Classification*: Class 5 consists of all General Unsecured Claims.

    (b)    *Treatment*: Each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the General Unsecured Claims Amount as provided in <u>Article IV.H</u>.

    (c)    *Voting*: Class 5 is Impaired. Each Holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

6. **Class 6—Intercompany Claims.**

    (a)    *Classification*: Class 6 consists of all Intercompany Claims.

    (b)    *Treatment*: Each Intercompany Claim will be canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect.

    (c)    *Voting*: Class 6 is Impaired, and not receiving any distribution under the Plan, and the Holders of Allowed Intercompany Claims in Class 6 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

        Therefore, each Holder of an Allowed Intercompany Claim in Class 6 will not be entitled to vote to accept or reject the Plan.

7. **Class 7—Intercompany Interests.**

    (a)    *Classification*: Class 7 consists of all Intercompany Interests.

    (b)    *Treatment*: Intercompany Interests will, at the election of the Debtors, be:

        (i)    Reinstated; or

        (ii)    canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect.

    (c)    *Voting*: Class 7 is either:

        (i)    Unimpaired, in which case the Holders of Allowed Intercompany Interests in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; or

        (ii)    Impaired, and not receiving any distribution under the Plan, in which case the Holders of Allowed Intercompany Interests in Class 7 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

        Therefore, each Holder of an Allowed Intercompany Interest in Class 7 will not be entitled to vote to accept or reject the Plan.

8. **Class 8—Section 510(b) Claims.**

    (a)    *Classification:* Class 8 consists of all Section 510(b) Claims.

    (b)    *Treatment:* Section 510(b) Claims will be canceled, released, and extinguished as of the Plan Effective Date, and will be of no further force or effect, and each Holder of a

Case 18-04177-TOM11   Doc 1324   Filed 04/15/19   Entered 04/15/19 12:02:00   Desc
Main Document   Page 75 of 112

Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim.

(c)    *Voting:*  Class 8 is Impaired and not receiving any distribution under the Plan.  Each Holder of a Section 510(b) Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

**9.    Class 9—Interests.**

(a)    *Classification:*  Class 9 consists of all Interests.

(b)    *Treatment*:  Interests will be canceled, released, and extinguished, and will be of no further force or effect.  Each Holder of an Interest will not receive any distribution on account of such Interest.

(c)    *Voting*:  Class 9 is Impaired and not receiving any distribution under the Plan.  Each Holder of an Interest is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

**C.    Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect, diminish, or impair the rights of the Debtors with respect to any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.  The Debtors reserve the right, with the consent of the Required Lenders, to exercise any and all such rights, or to settle any such claims, with the consent of the Required Lenders.

**D.    Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**E.    Voting Classes; Presumed Acceptance by Non-Voting Classes.**

If a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

**F.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.**

Acceptance of the Plan by Classes 3, 4 or 5 will satisfy section 1129(a)(10) of the Bankruptcy Code. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XI to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**G.    Subordinated Claims.**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed

26

Claim (except for any DIP Facility Claims) or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

# ARTICLE IV
# MEANS FOR IMPLEMENTATION OF THE PLAN

**A.** **General Settlement of Claims.**

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Plan Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan also incorporates and implements the Investigation Settlement, which comprises a settlement of all Claims and Causes of Action held by the Debtors against each of the Settling Released Parties. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, including the Investigation Settlement, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise, including the Investigation Settlement, is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Distributions made to Holders of Allowed Claims in any Class are intended to be final.

**B.** **Sources of Plan Consideration.**

The Sale Transaction Proceeds, the Non-Cash Consideration, the Settlement Proceeds, the Clarke Note, the Jason McCoy Note, the Clarke/McCoy Notes, the Liquidating Trust Assets, the Estate Retained Professional Fees Escrow Amount, the Wind-Down Amount, the General Unsecured Claims Amount, the Debtors' rights under the Sale Transaction Documentation, payments made directly by the Successful Bidder on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Successful Bidder pursuant to sections 365 or 1123 of the Bankruptcy Code, and/or all Causes of Action not previously settled, released, or exculpated under the Plan, if any, shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided herein. Unless otherwise agreed in writing by the Debtors and the Successful Bidder, distributions required by this Plan on account of Allowed Claims that are Assumed Liabilities shall be the sole responsibility of the Successful Bidder to the extent such Claim is Allowed against the Debtors.

**C.** **Sale Transaction and Restructuring Transactions.**

    **1.** **Sale Transaction.**

Upon entry of the applicable Sale Order, the Debtors shall be authorized to consummate the applicable Sale Transaction to the applicable Successful Bidder pursuant to the terms of the applicable Sale Transaction Documentation, the Plan, and the Confirmation Order.

    **2.** **Restructuring Transactions.**

Upon the entry of the Confirmation Order, the Debtors, the Plan Administrator, the Liquidating Trustee, and the Successful Bidder are authorized, without further order of the Bankruptcy Court, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions and the Sale Transaction under or in connection with the Plan, including: (1) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) rejection, assumption, or assumption and assignment, as applicable,

of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) any transaction described in the Description of Transaction Steps; and (6) subject to the occurrence of the Plan Effective Date, the consummation of the transactions contemplated by the Sale Transaction Documentation.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

### 3. Payment of Cure Costs and Other Amounts.

At the Plan Effective Date, the Successful Bidder shall pay all Cure Costs that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases that are assumed by the Debtors and assigned to the Successful Bidder pursuant to the Sale Transaction Documentation and this Plan. The Debtors shall not have any obligation to make any payment or other distribution on account of any Cure Costs.

### D.   Vesting of Assets.

Except as otherwise provided in the Plan, the Sale Transaction Documentation, or any agreement, instrument, or other document incorporated herein or therein, on the Plan Effective Date:  (a) the Acquired Assets shall be preserved and shall vest in the Successful Bidder, free and clear of all Liens, Claims, charges, and other encumbrances (other than the Assumed Liabilities); and (b) the Excluded Assets shall vest in the Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, and other encumbrances. For the avoidance of doubt, all Transferred Causes of Action shall be transferred to the Successful Bidder on the Plan Effective Date, and any Causes of Action held by the Debtors on the Plan Effective Date that are not Transferred Causes of Action shall vest in the Debtors on the Plan Effective Date.

On and after the Plan Effective Date, except as otherwise provided in the Plan and subject in all respects to the Sale Transaction Documentation and the Plan, the Debtors may operate their businesses and use, acquire, or dispose of property and, as applicable, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, but subject, in all respects, to the consent of the Required Lenders. For the avoidance of doubt, following the Plan Effective Date, the applicable Successful Bidder may operate its businesses and use, acquire, or dispose of property, including the Acquired Assets, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, but subject in all respects to the applicable Sale Order and the applicable Sale Transaction Documentation.

### E.   The Settlement Proceeds and Clarke Note

On the Plan Effective Date, the Settling Parties shall make a payment of Cash consideration totaling $15 million. The Settling Parties, other than Bay Point, shall provide a Cash payment of $9 million, and Bay Point shall provide a Cash payment of $6 million, such payment shall include an advance of the $4 million "holdback" under the CCL Lease.

In addition, on the Plan Effective Date, Thomas Clarke shall issue the Clarke Note to the Reorganized Debtors and Jason McCoy shall issue the Jason McCoy Note to the Reorganized Debtors and such notes shall be contributed to the Liquidating Trust.

### F.   The Second Clarke Note and the McCoy Note

On the Plan Effective Date, Thomas Clarke, and Kenneth McCoy and Jason McCoy, together, shall each issue the Second Clarke Note and the McCoy Note, respectively, to the Reorganized Debtors on the terms and conditions set forth herein and the Plan Supplement and otherwise in form and substance reasonably to the Debtors. Unless otherwise set forth in the Plan, (i) the payments made pursuant to the Second Clarke Note shall be held in the

28

Liquidating Trust and used to satisfy certain Allowed Priority Claims and (ii) the payments made pursuant to the McCoy Note shall be held in the Liquidating Trust and used to satisfy certain Allowed Priority Tax Claims. Notwithstanding anything set forth above, the principal amount of the McCoy Note shall be reduced in an amount equal to the difference between (i) the Reduction Amount and (ii) $500,000. Any payments made in respect of the McCoy Note not needed to pay Allowed Priority Tax Claims shall be payable to the Holders of General Unsecured Claims until such Holders have received an aggregate amount of $500,000. To the extent any proceeds from the Second Clarke Note remain unused after the full satisfaction of (a) Allowed Priority Tax Claims, and (b) the Bluestone Obligations, such proceeds shall be payable to the Holders of General Unsecured Claims

## G.  The Liquidating Trust

On the Plan Effective Date, the Liquidating Trust will be formed to implement distributions of the Liquidating Trust Assets. The Liquidating Trust will have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Upon the transfer of the Liquidating Trust Assets as more fully set forth in the Liquidating Trust Agreement, the Debtors will have no reversionary or further interest in or with respect to the Liquidating Trust Assets. For all federal income tax purposes, the beneficiaries of the Liquidating Trust will be treated as grantors and owners thereof and it is intended that the Liquidating Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations. Accordingly, for federal income tax purposes, it is intended that the beneficiaries of the Liquidating Trust, the Taxing Authorities, be treated as if they had received an interest in the Liquidating Trust's assets and then contributed such interests to the Liquidating Trust. The Liquidating Trust will, in an expeditious but orderly manner, make timely distributions to the beneficiaries of the Liquidating Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration. The Liquidating Trust shall be deemed a successor in interest to the Debtors. For the avoidance of doubt, the Liquidating Trust shall perform no actions other than receiving and distributing the Liquidating Trust Assets, and not for any other purpose (including conducting any claims reconciliation), and the Wind-Down Budget shall only allocate funds reasonably necessary to perform such limited actions. The Liquidating Trustee shall coordinate with the Plan Administrator to ensure no duplication of efforts.

The Liquidating Trust shall continue to have all of the rights and powers granted to the Reorganized Debtors and the Plan Administrator as set forth in this Plan and applicable non-bankruptcy law, and the Liquidating Trustee shall also have the rights, powers, and obligations set forth in the Liquidating Trust Agreement, including standing to enforce the terms of the Clarke/McCoy Notes, the Clarke Note, and the Jason McCoy Note.

## H.  The General Unsecured Claims Amount

The General Unsecured Claims Amount shall be used to make distributions on account of Allowed General Unsecured Claims from the Liquidating Trust on a Pro Rata basis as set forth in Article III.B.5. The General Unsecured Claims Amount shall be funded by the Liquidating Trust as set forth herein. If all or any portion of a General Unsecured Claim shall become a Disallowed Claim, then the amount attributable to such Disallowed Claim shall be distributed to Holders of Allowed General Unsecured Claims in accordance with the Plan.

## I.  Wind-Down.

On and after the Plan Effective Date, in accordance with the Wind-Down Budget, the Debtors, in consultation with the Required Lenders, shall (1) continue in existence for purposes of (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible, including taking all necessary steps to close the Sale Transaction in respect of the Pinnacle Mining Complex and distributing the Sale Transaction Proceeds in respect of such Sale Transaction to the DIP Lenders pursuant to Article III.B.3 of the Plan, (b) resolving Disputed Claims as provided hereunder, (c) paying Allowed Claims not assumed by the Successful Bidder as provided hereunder, (d) filing appropriate tax returns, (e) complying with their continuing obligations under the Sale Transaction Documentation (including with respect to the transfer of permits to the Successful Bidder as contemplated therein), and (f) administering the Plan in an efficacious manner; and (2) thereafter liquidate as set forth in the Plan. The Plan Administrator shall carry out these actions for the Debtors.

Case 18-04177-TOM11    Doc 1324    Filed 04/15/19    Entered 04/15/19 12:02:00    Desc
Main Document    Page 79 of 112

### J. Wind-Down Amount.

On the Plan Effective Date, the Debtors shall retain proceeds from the Wind-Down Amount in accordance with the terms of the Wind-Down Budget. Any remaining amounts in the Wind-Down Amount following all required distributions therefrom in accordance with the terms of the Wind-Down Budget shall promptly be transferred to the DIP Lenders in accordance with the terms of the Wind-Down Budget.

### K. Plan Administrator.

On and after the Plan Effective Date, the Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Plan Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Debtors shall be deemed to have resigned, and a representative of the Plan Administrator shall be appointed as the sole manager and sole officer of the Debtors, and shall succeed to the powers of the Debtors' managers, directors, and officers. From and after the Plan Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Debtors as further described in Article VII. The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget and shall coordinate with the Liquidating Trustee to ensure no duplication of efforts. The Plan Administrator shall have standing to enforce the terms of the Clarke/McCoy Notes, the Clarke Note, and the Jason McCoy Note. The Plan Administrator shall carry out any necessary functions required by the Sale Transaction Documentation.

### L. Cancellation of Notes, Instruments, Certificates, and Other Documents.

On the Plan Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of any Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be cancelled and deemed surrendered as to the Debtors and shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; *provided*, however, that notwithstanding anything to the contrary contained herein, any agreement that governs the rights of the DIP Agent shall continue in effect to allow the DIP Agent to (A) enforce its rights, Claims and interests (and those of any predecessor or successor thereto) vis à vis any parties other than the Debtors, (B) receive distributions under the Plan and to distribute them to Holders of Allowed DIP Facility Claims in accordance with the terms of the DIP Documents, and (C) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agent, under the Plan; *provided further*, however, to the extent the DIP Facility and the Allowed DIP Facility Claims are assumed by the Successful Bidder, nothing herein shall affect the enforceability of the rights, Claims and interests of the DIP Agent against such Successful Bidder under the agreements relating to the DIP Facility.

Notwithstanding anything contained herein to the contrary, in lieu of cancellation of the notes and instruments evidencing the Second Lien Claims, Holders of the Second Lien Claims may (a) direct the Debtors that the Second Lien Claims be satisfied (as opposed to cancelled and deemed surrendered) in exchange for the releases provided under the Plan or (b) provide for the assumption of the Second Lien Claims (and related notes and instruments) from the Debtors to another entity not affiliated with the Debtors; provided, that notwithstanding the satisfaction and/or assumption of the Second Lien Claims, such Claims shall receive no distribution or recovery from the Debtors or their Estates. The Settling Parties (other than Bay Point) shall direct the Debtors to provide such treatment of the ERP Federal Note and the ERP Mineral Note as may be reasonable and appropriate to mitigate tax exposure to such Settling Parties, including by providing for the assignment, release or transfer of any such notes on terms reasonably acceptable to such Settling Parties.

**M.  Corporate Action.**

Upon the Plan Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan and the Sale Transaction Documentation (including any action to be undertaken by the Debtors or the Plan Administrator, as applicable) shall be deemed authorized, approved, and, to the extent taken prior to the Plan Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Plan Administrator, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, the creation of the Successful Bidder (and the corporate structure and governance structure of the Successful Bidder), the consummation of the Sale Transaction, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in full force and effect, without any requirement of further action by the Debtors or the Debtors' Estates; *provided, however,* that for the avoidance of doubt, the Successful Bidder may be formed by a person or entity other than the Debtors, as set forth in the Description of Transaction Steps.

Upon the Plan Effective Date or as soon as reasonably practicable thereafter, after making all distributions provided for under the Plan, the Debtors shall be deemed to have been dissolved and terminated, except as necessary to satisfy their obligations under the Sale Transaction Documentation.  The directors, managers, and officers of the Debtors and the Plan Administrator, as applicable, shall be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate to implement the provisions of this Article IVM.

The authorizations and approvals contemplated by this Article IVM shall be effective notwithstanding any requirements under applicable nonbankruptcy law.

**N.  Dissolution of the Boards of the Debtors.**

As of the Plan Effective Date, the existing boards of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.

As of the Plan Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Debtors with respect to their affairs other than matters substantially related to the transactions described in Article IVC.1-2 of the Plan.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of the applicable state(s) of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of any of the Debtors or any of their affiliates.

**O.  Release of Liens.**

Except as otherwise expressly provided herein, on the Plan Effective Date, all Liens on any property of any Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors shall automatically be discharged and released.

31

**P.      Effectuating Documents; Further Transactions.**

The Debtors and the officers and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

**Q.      Exemption from Certain Taxes and Fees.**

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan, the Sale Transaction or the Sale Transaction Documentation or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**R.      Causes of Action.**

As of the Plan Effective Date, except where such Causes of Action have been waived, relinquished, exculpated, released, compromised, or settled, the Debtors shall assign and transfer to the Successful Bidder all of the Transferred Causes of Action pursuant to the Sale Transaction Documentation on the Plan Effective Date.  The Transferred Causes of Action shall be set forth and described in the Plan Supplement, the description of which shall be subject to the consent of the Successful Bidder and the Required Lenders.  Any Causes of Action held by the Debtors on the Plan Effective Date that are not Transferred Causes of Action and have not been waived, relinquished, exculpated, released, compromised, or settled, shall vest in the Debtors on the Plan Effective Date.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any such Cause of Action against them as any indication that the Successful Bidder or the Debtors will not pursue any and all available Causes of Actions against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

**S.      Debtors' Release of Claims and Causes of Action Subject to the Debtors' Independent Investigation**

In addition to any other releases granted to the Settling Released Parties under the Plan, any and all Claims and/or Causes of Action, including any derivative Claims, asserted or which could be asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or arising, in tort, contract, law, equity, or otherwise, that the Debtors, their Estates, or their Affiliates would have been legally entitled to assert against any of the Settling Released Parties, including, without limitation, (a) any and all Claims and/or Causes of Action related to any and all transfers of funds by and between the Debtors and any Settling Released Party, including Avoidance Actions, (b) all "D&O claims," including Claims for breach of fiduciary duty and corporate waste, (c) any and all Claims and/or Causes of Action related to or arising from allegations of fraud or any actual, willful misconduct and/or gross negligence, (d) any and all Claims and/or Causes of Action asserted in the proposed complaint attached to the Standing Motion and (e) all claims asserted against the Settling Released Parties in the Cliffs Litigation that belong to the Debtors, shall be forever released and extinguished pursuant to the Plan.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019 and section 1123(b) of the Bankruptcy Code of the releases set forth herein, and further, shall constitute the Bankruptcy Court's finding that the releases herein are:  (1) in exchange for the good and valuable consideration provided by the Settling Released Parties in connection with the Investigation Settlement; (2) a good faith settlement and compromise of the Claims and/or Causes

32

of Action against the Settling Released Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any Entity from asserting any and all Claims and/or Causes of Action released herein against any of the Settling Released Parties.

Notwithstanding the foregoing (and for the avoidance of doubt), nothing in the Plan or the Confirmation Order (including the releases set forth herein and therein) shall release (a) any Claims and/or Causes of Action as between or among the Settling Parties and/or the Settling Released Parties, (b) any rights of the Settling Parties and/or Settling Released Parties under the Plan or the Investigation Settlement, unless such rights constitute a release of a Claim and/or Cause of Action that violates or contradicts the terms and conditions contained, (c) except as expressly modified by the Investigation Settlement Term Sheet and the Plan, any rights of CCL or Bay Point under the CCL Lease, including, without limitation, the right to file UCC-1 financing statements on and after the Plan Effective Date, (d) except as expressly modified by the Investigation Settlement and the Plan, any rights of Bay Point under the Loan and Security Agreement between CCL, as borrower, and Bay Point, as lender, dated as of May 21, 2018, and any other Loan Documents (as defined in such Loan and Security Agreement), except to the extent any such rights could be asserted at any time against the Debtors or the Reorganized Debtors, which rights shall be forever released pursuant to the Plan, Confirmation Order, and Investigation Settlement, and (e) any rights of third parties that have properly opted out of the releases in the Plan.

The Settling Released Parties shall release all Claims asserted or filed against the Debtors in their Chapter 11 Cases, including any asserted Priority or Administrative Claims. The release of the Debtors set forth herein shall not affect any defenses of the Settling Parties against any person or any applicable insurance policies in favor of the Settling Released Parties.

## T.    Robindale Settlement.

On the Plan Effective Date, the Agency Agreements shall be deemed to be terminated and of no further force and effect. Robindale shall pay $7,500,000.00 to the Debtors in Cash in immediately available funds on the later of (i) the Plan Effective Date and (ii) April 12, 2019, in satisfaction of the amounts due and owing under the Agency Agreements. Such Cash shall be immediately paid to the DIP Lenders other than Robindale, as such Cash is the DIP Lenders' cash collateral. Effective as of the Plan Effective Date, (a) the Debtors and their Estates hereby release and discharge Robindale and each of Robindale's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, from any and all Claims and Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, including, without limitation, (i) any and all Claims and Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Agency Agreements, and (ii) any and all Claims and Causes of Action Filed or asserted, or that could have been Filed or asserted, in the Chapter 11 Cases; and (b) Robindale hereby releases and discharges the Debtors and each such Debtor's current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such from any and all Claims and Causes of Action, including, without limitation, (i) any and all Claims and Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Agency Agreements, and (ii) any and all Claims and Causes of Action Filed or asserted, or that could have been Filed or asserted, in the Chapter 11 Cases. Robindale shall have title (pending sale to third parties) to, and be entitled to receive and retain all amounts due or coming due from third parties as a result of the sale of, all coal shipped under the Agency Agreements on or before March 26, 2019, and each of the Debtors shall take any and all such actions as may be reasonably requested by Robindale to ensure that such amounts are remitted promptly to Robindale. Except as otherwise set forth in this paragraph, (i) Robindale shall have no further obligation under the Agency Agreements or otherwise to pay any amounts to the Debtors or their Estates on account of any coal marketed and sold under the Agency Agreements, and (ii) the Debtors or their Estates shall have no further obligation to perform under the Agency Agreements or otherwise to pay any amount to Robindale on account the Agency Agreements. From and after the Confirmation Date, Robindale shall take such actions as may be reasonably requested by the Successful Bidder of the Oak Grove Mining Complex and Maple Mining Complex, to assist with the transition of the marketing and sale of coal from Robindale to the Successful Bidder (or its designee).

**U.    Committee Settlement.**

Pursuant to the Committee Settlement, in addition to proceeds of the Clarke Note, Holders of General Unsecured Claims shall receive the following: (i) proceeds of the Jason McCoy Note, (ii) the first $500,000 realized as a result of the reduction in the McCoy Note as set forth in Article IV.F of the Plan; (iii) any proceeds remaining from the Second Clarke Note after the full satisfaction of (a) Allowed Priority Tax Claims, and (b) the Bluestone Obligations, as applicable and as set forth in Article IV.F of the Plan; and (iv) 50% of any and all cash proceeds from the Sale Transaction Proceeds in excess of $200,000,000 actually received by the DIP Lenders from the sale of the Oak Grove Mining Complex, Maple Eagle Mining Complex, and Pinnacle Mining Complex.   The interest rate of the Clarke/McCoy Notes shall be increased to five percent (5%).  The guarantee of Jason McCoy purportedly transferred to the Committee pursuant to the Committee Stipulation shall be and hereby is released in all respects.

Any disputes between the DIP Lenders and the Committee regarding the DIP Lenders and Committee Stipulation shall be fully and conclusively resolved as stated herein and pursuant to the terms of the Plan.  For the avoidance of doubt, cash proceeds from the Sale Transaction Proceeds only relates to cash proceeds from the Successful Bidder and the Non-Cash Consideration, and does not include any cash proceeds or amounts from the Robindale settlement, return of surety collateral, or any other disposition or return of the DIP Lenders' collateral outside of the sale of the Oak Grove Mining Complex, Maple Eagle Mining Complex, and Pinnacle Mining Complex.

All non-Insider claims arising under chapter 5 of the Bankruptcy Code not otherwise released pursuant to the Plan shall be transferred to Murray pursuant to the Sale Transaction Documentation, without any change to the purchase price of the Maple Eagle and Oak Grove Mining Complexes, and Murray agrees not to pursue any such actions.

All proceeds allocated to Holders of General Unsecured Claims shall be placed into the Liquidating Trust, which shall be funded on the Plan Effective Date with $125,000, to fund any costs and expenses necessary to administer the Liquidating Trust.   The Liquidating Trustee shall be chosen by the Committee and shall have standing to challenge and settle any Priority Tax Claims as provided in the Plan, and the Liquidating Trustee and the Plan Administrator shall both have standing to enforce the terms of the Clarke/McCoy Notes. The identity of the Plan Administrator shall be agreed to by the Debtors and the Required Lenders, in consultation with the Committee.

The DIP Facility Deficiency Claims shall not receive  the 50% recovery on account of the cash proceeds from the Sale Transaction Proceeds in excess of $200,000,000 actually received by the DIP Lenders from the sale of the Oak Grove Mining Complex, Maple Eagle Mining Complex, and Pinnacle Mining Complex allocated to Holders of General Unsecured Claims, but shall participate in any other recovery to Holders of General Unsecured Claims.  The DIP Facility Deficiency Claim shall be $15 million.

The Committee Professionals (other than Baker Donelson) have agreed to a five percent (5%) reduction of any and all fees incurred over the cap provided for in in the Final DIP Order.

On the Plan Effective Date, the Committee will withdraw with prejudice its Standing Motion.

**V.    Closing the Chapter 11 Cases.**

Upon the occurrence of the Plan Effective Date, the Plan Administrator shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Mission Coal Company, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Mission Coal Company.

When all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close any remaining Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

# ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.      Assumption and Rejection of Executory Contracts and Unexpired Leases.**

On the Closing Date, the Debtors shall assume or assign to the Successful Bidder, as part of the Sale Transaction, the Executory Contracts and Unexpired Leases that are required to be assigned to the Successful Bidder pursuant to the Sale Transaction Documentation. The Debtors shall assume and assign to the purchaser of the Oak Grove Mining Complex (as a true lease) the CCL Lease with the following modifications: (a) the total amount owing under the CCL Lease shall be adjusted by $341,823.17 to account for the $4 million purchase price holdback when the CCL Lease was consummated, (b) no payments shall be due in respect of the CCL Lease until the 15th of the month following the Plan Effective Date, (c) the term of the CCL Lease shall run for a period of 43 months from the month following the Plan Effective Date, and (d) the monthly payments in respect of the CCL Lease shall be adjusted to reflect (i) the advance of the $4 million holdback, (ii) the revised maturity of the CCL Lease, and (iii) a rate of return of 10% per annum. The monthly payments under the assumed and assigned CCL Lease are set forth on **Exhibit B** to the Investigation Settlement Term Sheet. Except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and/or assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected on the Plan Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan, the Plan Supplement or the Sale Transaction Documentation; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Plan Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to the Successful Bidder or another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (5) is a D&O Policy; or (6) is the Sale Transaction Documentation. In the event of a conflict between the Plan and the Sale Transaction Documentation with respect to assumption or rejection of Executory Contracts or Unexpired Leases, the Sale transaction Documentation shall apply. Entry of the Sale Order and/or Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption and assignment of the Executory Contracts or Unexpired Leases as provided in the Sale Transaction Documentation and the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Plan Effective Date, and assumptions or rejections pursuant to Sale Transaction Documentation are effective as to the Closing Date pursuant to the terms thereof.

**B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or Sale Transaction Documentation, must be Filed with the Bankruptcy Court and served on the Debtors or, after the Plan Effective Date, the Plan Administrator as applicable no later than 30 days following the entry of an Order of the Court (including the Confirmation Order or Sale Order) approving such rejection. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served on the Debtors no later than the Plan Objection Deadline set forth in the Disclosure Statement Order.

**Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claim were not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim. Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, or the property for any of the foregoing without the need for any objection by the Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or

prepetition Unexpired Leases shall be classified as General Unsecured Claims against the appropriate Debtor, except as otherwise provided by order of the Bankruptcy Court.

**C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed or assumed and assigned by the Debtors as set forth in Article V.A, as reflected on the Cure Notice shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of such Cure Costs in Cash on or about the Closing Date, subject to the limitations described below and set forth in the Sale Transaction Documentation and Article IV.C herein, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the Cure Costs, (2) the ability of the Successful Bidder or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

In any case, if the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or, with respect to the Assumed Contracts, the Successful Bidder (in accordance with the Sale Transaction Documentation) will have the right to remove such Executory Contract or Unexpired Lease from the Assumed Contracts and Leases List, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Closing Date or Plan Effective Date, whichever is earlier.

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed (or assumed and assigned) Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. **All liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court**.

**D.      D&O Policies.**

The D&O Policies shall be assumed by the Debtors on behalf of the applicable Debtor effective as of the Plan Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such insurance policy previously was rejected by the Debtors or the Debtors' Estates pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Plan Effective Date, and coverage for defense and indemnity under any of the D&O Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Policies.

**E.      Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Final Order of the Bankruptcy Court to the contrary.

F.       **Reservation of Rights.**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed Contracts and Leases List, nor anything contained in the Plan or Sale Transaction Documentation, shall constitute an admission by the Debtors or any other Entity, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that either any Debtor or any other Entity, as applicable, has any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have 90 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

G.       **Nonoccurrence of the Plan Effective Date.**

In the event that the Plan Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI
## PROVISIONS GOVERNING DISTRIBUTIONS

A.       **Timing and Calculation of Amounts to Be Distributed.**

Unless otherwise provided in the Plan, on the Plan Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Plan Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class from the Debtors, the Plan Administrator or the Liquidating Trustee, on behalf of the Debtors, as applicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

B.       **Rights and Powers of the Plan Administrator.**

   1.   **Powers of the Debtors and the Plan Administrator.**

Except as otherwise set forth herein, all distributions under the Plan shall be made on the Plan Effective Date or as soon as reasonably practicable thereafter by the Debtors or the Plan Administrator (or its designee(s)), the timing of which shall be subject to the reasonable discretion of the Debtors or the Plan Administrator, as applicable.

On and after the Plan Effective Date, the Plan Administrator and its designees or representatives shall have the right to object to, Allow, or otherwise resolve any General Unsecured Claim, Priority Claim, Administrative Claim, or Other Secured Claim, subject to the terms hereof, and in the use case of any claim other than a General Unsecured Claim, subject to the consent of the Required Lenders.  The Reorganized Debtors, the Liquidating Trustee, the Plan Administrator Jason McCoy and Kenneth McCoy shall each have standing and the right to object to and settle any Priority Tax Claims, but shall only do so after consulting with each of the other parties identified in this sentence and approval of the Court.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court.  However, in the event that the Plan Administrator is so ordered after the Plan Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash by the Debtors.

Case 18-04177-TOM11    Doc 1324    Filed 04/15/19    Entered 04/15/19 12:02:00    Desc
Main Document    Page 87 of 112

### 2. Fees of Plan Administrator and Expenses Incurred On or After the Plan Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Plan Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to or action, order, or approval of the Bankruptcy Court in Cash by the Debtors if such amounts relate to any actions taken hereunder, but solely from the Wind-Down Budget and the Wind-Down Amount.

### C. Delivery of Distributions and Undeliverable or Unclaimed Distributions.

### 1. Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and the Debtors, the Plan Administrator, the Liquidating Trustee, or any other party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

### 2. Delivery of Distributions on DIP Facility Claims

Notwithstanding any provision of the Plan to the contrary, all distributions on account of Allowed DIP Facility Claims shall be governed by DIP Documents and such distributions shall be deemed complete when made to the DIP Agent, which shall be deemed the Holder of its respective portion of the Allowed DIP Facility Claims for purposes of distributions to be made hereunder. The DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed DIP Facility Claims. As soon as practicable following compliance with the requirements set forth in this Article VI, the DIP Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed DIP Facility Claims.

### 3. Delivery of Distributions in General.

(a)     Payments and Distributions on Disputed Claims.

Distributions made after the Plan Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Plan Effective Date but which later become Allowed Claims shall, in the reasonable discretion of the Plan Administrator or the Liquidating Trustee, as applicable, be deemed to have been made by the Plan Administrator or the Liquidating Trustee, as applicable, on the Plan Effective Date unless the Plan Administrator or the the Liquidating Trustee, as applicable, and the Holder of such Claim agree otherwise.

(b)     Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by, as applicable, the Debtors, the Plan Administrator, or the Liquidating Trustee, as applicable, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim, other than with respect to Estate Retained Professional Fee Claims, until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

(c)     Distributions.

On and after the Plan Effective Date, the Debtors shall make the distributions required to be made on account of Allowed Claims under the Plan. Any distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date, shall be held by the Debtors in reserve in accordance with the Plan, as applicable, and distributed on the next Subsequent Distribution Date that occurs after such Claim is Allowed. Subject to Article VI.E, no interest shall accrue or be paid on the unpaid amount of any distribution paid pursuant to the Plan.

4. **Minimum;** *De Minimis* **Distributions.**

No Cash payment of less than $100, in the reasonable discretion of the Plan Administrator or the Liquidating Trustee, as applicable, shall be made to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest.   If after administering all Liquidating Trust Assets and collecting all amounts which may be payable to and for the benefit of Holders of General Unsecured Claims, the amount held by the Liquidating Trust for the benefit of Holders of General Unsecured Claims is less than $10,000, the Liquidating Trustee, in his sole discretion, may donate the remaining funds.

5. **Undeliverable Distributions and Unclaimed Property.**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Plan Administrator or the Liquidating Trustee, as applicable, has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date the distribution is made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Debtors, automatically and without need for a further order by the Bankruptcy Court and the Claim of any holder to such property or interest in property shall be released, settled, compromised, and forever barred.

6. **Manner of Payment Pursuant to the Plan.**

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Plan Administrator or the Liquidating Trustee, as applicable, by check or by wire transfer, at the sole and exclusive discretion of the Plan Administrator or the Liquidating Trustee, as applicable.

D. **Compliance with Tax Requirements/Allocations.**

In connection with the Plan, to the extent applicable, the Plan Administrator or the Liquidating Trustee, as applicable, shall request distributees to provide appropriate documentation that may be required for an exemption from withholding or reporting, and shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements unless an exception applies.  Notwithstanding any provision in the Plan to the contrary, the Plan Administrator or the Liquidating Trustee, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes is reasonable and appropriate.  The Plan Administrator and the Liquidating Trustee, as applicable, each reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.  All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

E. **Allocation of Plan Distributions Between Principal and Interest.**

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed therein.

F.  **Setoffs and Recoupment.**

Except as otherwise expressly provided herein, the Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim it may have against the Holder of such Claim.  At any time after the Confirmation Date, without the need for Bankruptcy Court approval, but with the consent of the Required Lenders, the Debtors may exercise, litigate or settle any rights of setoff or recoupment that they or any creditor may have.

G.  **Claims Paid or Payable by Third Parties.**

1.  **Claims Paid by Third Parties.**

The Debtors shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.  **Claims Payable by Insurance, Third Parties.**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable.  To the extent that one or more of the Debtors' insurers, sureties, or non-Debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.  **Applicability of Insurance Policies.**

Notwithstanding anything to the contrary in the Plan or Confirmation Order, Confirmation and Consummation of the Plan shall not limit or affect the rights of any third-party beneficiary or other covered party of any of the Debtor's insurance policies with respect to such policies, including the D&O Policies.

H.  **Indefeasible Distributions.**

Any and all distributions made under the Plan shall be indefeasible and not subject to clawback.

### ARTICLE VII
### THE PLAN ADMINISTRATOR

A.  **The Plan Administrator.**

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Wind-Down Amount and the proceeds from the ERP Federal Mining Sale (if any), and wind down the businesses and affairs of the Debtors, including with the consent of the Required Lenders (where applicable):  (1) liquidating, receiving, holding, and investing, supervising, and protecting the Excluded Assets; (2)

40

taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Wind-Down Amount, and the proceeds from the ERP Federal Mining Sale (if any) and to the extent applicable; (3) making distributions from the Wind-Down Amount, the General Unsecured Claims Amount (if any), and the Sale Transaction Proceeds, if any and to the extent applicable, as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying reasonable fees, expenses, debts, charges, and liabilities of the Debtors on and after the Plan Effective Date; (7) administering and paying taxes of the Debtors on and after the Plan Effective Date, including filing tax returns; (8) representing the interests of the Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator in accordance with the Plan Administrator Agreement.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the Debtors in the Plan Administrator Agreement shall be terminated.

### 4.  Plan Administrator Rights and Powers.

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan, and as otherwise provided in the Confirmation Order.  The Plan Administrator shall be the exclusive trustee of the Excluded Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code § 1123(b)(3)(B).

### 5.  Retention of Professionals.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the Debtors upon the monthly submission of statements to the Plan Administrator, but solely out of the Wind-Down Budget and the Wind-Down Amount.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business by the Debtors and shall not be subject to the approval of the Bankruptcy Court, but shall be subject to the Wind-Down Budget and the Wind-Down Amount.

### 6.  Compensation and Expenses of the Plan Administrator.

The Plan Administrator's post-Plan Effective Date compensation will be set forth in the Plan Supplement and paid out of the Wind-Down Budget and the Wind-Down Amount.  All costs, expenses and obligations incurred by the Plan Administrator shall be paid from the Wind-Down Amount as they are incurred and without the need for Bankruptcy Court approval.

### 7.  Liquidating Trustee Compensation and Expenses.

The Liquidating Trustee may retain and pay professionals and all costs, expenses and obligations incurred by the Liquidating Trustee on behalf of a Liquidating Trust beneficiary shall be paid as they are incurred without the need for Bankruptcy Court approval, but solely from the funds held in trust for the Liquidating Trust beneficiary for which such costs, expenses and obligations were incurred.

## B.  Wind-Down.

On and after the Plan Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take

any action necessary to wind down and dissolve the Debtors' Estates, and, if necessary, in consultation with the Required Lenders.

As soon as practicable after the Plan Effective Date, the Plan Administrator shall: (1) cause the Debtors to comply with, and abide by, the terms of the Sale Transaction Documentation and any other documents contemplated thereby; (2) take any actions necessary to wind down the Debtors' Estates; *provided* that the Debtors shall not be dissolved until the satisfaction of the conditions precedent to such dissolution in Article VIII; (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. From and after the Plan Effective Date, except as set forth herein, the Debtors (x) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (y) shall be deemed to have cancelled pursuant to this Plan all Interests, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Plan Effective Date.

The filing of the final monthly operating report (for the month in which the Plan Effective Date occurs) and all subsequent quarterly operating reports shall be the responsibility of the Plan Administrator.

## C. Exculpation; Indemnification; Insurance; Liability Limitation.

On and after the Effective Date, the Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Debtors. The Plan Administrator may obtain, at the expense of the Debtors, but solely from the Wind-Down Amount and pursuant to the Wind-Down Budget, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

## D. Tax Returns.

After the Plan Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws. Within 30 days following the Plan Effective Date, the Debtors or the Plan Administrator, as the case may be, shall provide all holders of Interests in any Debtor reasonable access to any and all documents or instruments reasonably necessary to calculate the taxes, if any, due by the holders of Interests to any Taxing Authorities. The holders of Interests shall reimburse the Plan Administrator for any reasonable fees and expenses incurred, if any, in providing such information to the extent such fees and expenses would not have otherwise been incurred in preparing the Debtors' tax returns. The Plan Administrator shall cooperate and consult with the holders of Interests with respect to the filing of any tax returns. For avoidance of doubt, the holders of Interests shall have standing to (a) object to the claims filed by any Taxing Authorities, and (b) determine any tax liability of any Taxing Authority under section 505 of the Bankruptcy Code.

## E. Dissolution of the Debtors.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator that all distributions have been made, completion of all its duties under the Plan, and entry of a final decree closing the last of the Debtors' Chapter 11 Cases, the Debtors shall be deemed to be dissolved without any further action by the Debtors, the Plan Administrator, or the Bankruptcy Court, including the filing of any documents with the secretary of state for each state in which each of the Debtors is formed or any other jurisdiction. The Plan shall constitute a plan of distribution as contemplated in the Delaware General Corporation Law. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Debtors in and withdraw the Debtors from applicable state(s). Upon dissolution, all remaining cash shall be distributed to the DIP Lenders.

# ARTICLE VIII
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

**A.      Allowance of Claims and Interests.**

**1.      General.**

On and after the Plan Effective Date, the Debtors shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest immediately before the Plan Effective Date, and, to the extent that any Claim or Interest constitutes an Acquired Asset, the Successful Bidder shall have and retain any and all rights and defenses that the applicable Debtor had with respect to any Claim or any Interest immediately before the Plan Effective Date.  The Liquidating Trustee shall have standing to object to all Priority Tax Claims and General Unsecured Claims.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Plan Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

**B.      Claims and Interests Administration Responsibilities.**

Except as otherwise specifically provided in the Plan (including any provisions related to Priority Tax Claims) and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Plan Effective Date, the Plan Administrator, by order of the Bankruptcy Court, shall have the sole authority (but, as it relates to Priority Claims or Administrative Claims, only with the consent of the Required Lenders): (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

**C.      Estimation of Claims.**

On and after the Plan Effective Date, the Plan Administrator may (but are not required to), at any time, request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012, for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions) and may be used as evidence in any supplemental proceedings, and the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**D.      Adjustment to Claims or Interests without Objection.**

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Plan Administrator without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**E.      Time to File Objections to Claims.**

Any objections to Claims shall be Filed on or before the later of (1) 180 days after the Plan Effective Date and (2) such other period of limitation as may be specifically fixed by the Debtors or by a Final Order for objecting to such claims.

**F.      Disallowance of Claims.**

Other than with respect to Claims Allowed under the Plan, to the maximum extent provided by section 502(d) of the Bankruptcy Code, any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall automatically be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Plan Administrator. All Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall automatically be deemed satisfied and expunged from the Claims Register as of the Plan Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**G.      Amendments to Claims.**

On or after the Plan Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Interest may not be Filed or amended without the prior authorization of the Debtors or the Plan Administrator, as applicable, and any such new or amended Claim or Interest Filed shall automatically be deemed disallowed in full and expunged without any further action.

**H.      No Distributions Pending Allowance.**

If an objection to a Claim or Interest or portion thereof is Filed as set forth in Article VIII of the Plan, or if such Claim or Interest is scheduled as Disputed, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof unless and until such Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest.

**I.      Distributions After Allowance.**

To the extent that a Disputed Claim or Disputed Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Plan Administrator or the Liquidating Trustee, as applicable, shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Plan Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim or Interest, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law or as otherwise provided in Article III.B of the Plan.

### J. Undeliverable Distribution Reserve.

#### 1. Deposits.

If a distribution under the Plan to any Holder of an Allowed Claim is returned to the Plan Administrator or the Liquidating Trustee, as applicable, as undeliverable or is otherwise unclaimed or is an Undeliverable Distribution, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Article VI.C.7.

#### 2. Disclaimer.

The Plan Administrator or the Liquidating Trustee, as applicable, and his or her respective agents and attorneys are under no duty to take any action to either (i) attempt to locate any Holder of a Claim, or (ii) obtain an executed Internal Revenue Service Form W-9 from any Holder of a Claim; *provided* that in his or her sole discretion, the Plan Administrator or the Liquidating Trustee, as applicable, may periodically publish notices of unclaimed distributions.

#### 3. Distribution from Reserve.

Within fifteen (15) Business Days after the Holder of an Allowed Claim satisfies the requirements of this Plan, such that the distribution(s) attributable to its Claim is no longer an unclaimed or undeliverable distribution (*provided* that satisfaction occurs within the time limits set forth in Article VI.C.7), the Plan Administrator or the Liquidating Trustee, as applicable, shall distribute out of the Undeliverable Distribution Reserve the amount of the unclaimed or undeliverable distribution attributable to such Claim, including the interest that has accrued on such unclaimed or undeliverable distribution while in the Undeliverable Distribution Reserve, to such Holder.

### K. Single Satisfaction of Claims.

Holders of Allowed Claims may assert such Claims against the Debtors obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the Debtors based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

## ARTICLE IX
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A. Settlement, Compromise, and Release of Claims and Interests.

Pursuant to the Confirmation Order, and pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, on the Plan Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The Plan also incorporates and implements the Investigation Settlement, which comprises a settlement of all Claims and Causes of Action held by the Debtors against each of the Settling Released Parties. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Plan Effective Date, the Plan Administrator or the Liquidating Trustee, as applicable, may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

Case 18-04177-TOM11   Doc 1324   Filed 04/15/19   Entered 04/15/19 12:02:00   Desc
Main Document   Page 95 of 112

**B.**    **Discharge of Claims and Termination of Interests.**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Plan Effective Date by the Plan Administrator), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Commencement Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has voted to accept the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date with respect to a Claim that is Unimpaired by the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Plan Effective Date occurring.

**C.**    **Release of Liens.**

**Except as otherwise specifically provided in the Plan, the Sale Transaction Documentation or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Plan Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the Sale Transaction Documentation, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert either (i) to the Debtors and their successors and assigns or (ii) the Successful Bidder, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. In addition, the DIP Agent shall execute and deliver all documents reasonably requested by the Debtors or Plan Administrator to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

**D.**    **Releases by the Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Plan Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.**

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, the Investigation Settlement and the agreements related thereto, any Restructuring Transaction, the Sale Transaction Documentation and the related transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases herein are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases herein; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors asserting any claim released by the releases herein against any of the Released Parties.

E.     Releases by Holders of Claims and Interests.

As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged, except as otherwise provided in the Plan, each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Plan Effective Date obligations of any party or Entity under the Plan, the Investigation Settlement and the agreements related thereto, any Restructuring Transaction, the Sale Transaction Documentation, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the release herein is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release herein against any of the Released Parties.

F.     Exculpation.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or

47

omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, the DIP Facility or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Sale Transaction, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of commercially sensitive confidential information for competitive purposes that causes damages, or ultra vires acts as determined by a Final Order.

G.      Injunction.

Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

H.      Recoupment.

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment. The Debtors reserve all rights to settle any and all setoff or recoupment claims that may be asserted by any Holder after the Confirmation Date without the necessity of Bankruptcy Court approval, but solely with the consent of the Required Lenders.

48

## I. Subordination Rights.

Any distributions under the Plan to Holders shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

## J. Reimbursement or Contribution.

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

## K. Reservation of the United States.

As to the United States, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall expand the scope of discharge, release, or injunction to which the Debtors are entitled under the Bankruptcy Code, if any. The discharge, release, and injunction provisions contained in the Plan, the Plan Supplement, and the Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any actions, including but not limited to any police or regulatory action, against anyone.

Notwithstanding anything contained in the Plan, the Plan Supplement, or the Confirmation Order to the contrary, nothing in the Plan, the Plan Supplement, or the Confirmation Order shall discharge, release, impair, or otherwise preclude: (a) any liability to the United States that is a "claim" within the meaning of section 101(5) of the Bankruptcy Code, irrespective of whether the claim arose on, after, or before the Confirmation Date; (b) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (c) any valid right of setoff or recoupment of the United States against any of the Debtors; or (d) any liability of the Debtors under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee, or operator of property that such entity owns, operates, or leases on, before, and/or after the Confirmation Date. Nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement: (a) enjoin or otherwise bar the United States and/or any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in this paragraph, or (b) divest any court, commission, or tribunal of jurisdiction from resolving any matters relating to the liabilities and/or claims set forth in this paragraph, or (c) confer in the Bankruptcy Court jurisdiction over any matter as to which it would not have jurisdiction under the Bankruptcy Code.

Moreover, nothing in the Confirmation Order, the Plan, or the Plan Supplement shall release or exculpate any non-Debtor, including any Released Parties and/or Exculpated Parties, from any liability to the United States, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties and/or Exculpated Parties, nor shall anything in the Confirmation Order, the Plan, or the Plan Supplement enjoin the United States from bringing any claim, suit, action, or other proceeding against the Released Parties and/or Exculpated Parties for any liability whatsoever.

Nothing contained in the Plan, the Plan Supplement, or the Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors, nor shall the Plan, the Plan Supplement, or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in the Plan, the Plan Supplement, or the Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

49

**L.      No Successor Liability.**

Except as otherwise expressly provided in the Plan or Sale Transaction Documentation, the Successful Bidder does not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other party relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on, or after the Plan Effective Date.  The Successful Bidder is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity, and shall not have any successor or transferee liability of any kind or character, except that the Successful Bidder shall assume the obligations specified in the Sale Transaction Documentation.  Notwithstanding the forgoing, the sale of the Debtors' assets free and clear of any successorship obligations under any Collective Bargaining Agreement and/or with respect to any Benefit Plan will occur as a result of the Debtors' obtaining relief from such obligations under sections 1113 and 1114 of the Bankruptcy Code [Docket No. 902].

**ARTICLE X**
**CONDITIONS PRECEDENT TO**
**CONFIRMATION AND THE PLAN EFFECTIVE DATE**

**A.      Conditions Precedent to Confirmation.**

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of the Plan:  (1) the Bankruptcy Court shall have entered the Confirmation Order, and (2) the Sale Transaction Documentation shall not have been terminated in accordance with its terms.

**B.      Conditions Precedent to the Plan Effective Date.**

It shall be a condition to Consummation that the following conditions shall have been satisfied or waived pursuant to the provisions of the Plan:

1.      the Bankruptcy Court shall have entered the Confirmation Order; *provided* that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry;

2.      the occurrence of the Closing Date with respect to the Oak Grove Mining Complex and the Maple Mining Complex and the finalization of the Operating Agreement (as defined in the Sale Order) which shall occur on the Plan Effective Date;

3.      the establishment of the Liquidating Trust and entry into the Liquidating Trust Agreement;

4.      the Disclosure Statement Order and the Confirmation Order shall have been entered and shall not have been stayed, modified, or vacated on appeal;

5.      the Debtors have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring Transactions;

6.      the establishment of an Estate Retained Professional Fee Escrow Account funded in the amount equal to the Estate Retained Professional Fee Escrow Amount;

7.      the Wind-Down Amount shall have been funded;

8.      the Settlement Proceeds shall have been funded;

9.      the Clarke Note shall have been issued;

10.      the Second Clarke Note shall have been issued;

50

11.    the McCoy Note shall have been issued;

12.    the Jason McCoy Note shall have been issued;

13.    the McCoy's Cash Consideration shall have been funded, or to the extent that Kenneth McCoy and Jason McCoy are unable to satisfy their obligations pursuant to the McCoy's Cash Consideration, the Castlelake Bridge Note shall be have been funded and the Conuma Stock (as defined in the Confirmation Order) shall be placed in escrow on terms and conditions satisfactory to the McCoy Note Lender;

14.    ERP Federal Mining Complex, LLC shall have assigned all proceeds from the sale of real property owned to the Reorganized Debtors;

15.    all fees and expenses of the DIP Agent, the First Lien Agent, and DIP Lenders payable pursuant to the Final DIP Order, including all fees and expenses of the legal advisors, financial advisors and other consultants of the First Lien Agent, the DIP Agent and the DIP Lenders (including without limitation the fees of Akin Gump Strauss Hauer & Feld LLP, Burr & Forman LLP, Jackson Kelly, PLLC, Houlihan Lokey Capital, Inc., including any Transaction Fee payable pursuant to that certain Agreement dated as of July 31, 2018 between, among others, Houlihan Lokey Capital, Inc. and Mission Coal Company, LLC, and Seward & Kissel LLP), including any estimates of such fees and expenses through and including the Plan Effective Date, shall have been paid in full in Cash;

16.    any and all requisite governmental, regulatory and third-party approvals and consents shall have been obtained;

17.    to extent required by the Successful Bidder, the Debtors shall have (a) reached an agreement with the applicable authorized representatives of the employees and retirees regarding modifications to the Debtors' collective bargaining agreements and retiree benefits, respectively, which shall include the removal of the successorship clause or waiver of the successorship clause with respect to the Sale Transaction in form and substance acceptable to the Required Lenders or the Successful Bidder (to the extent the Required Lenders are not the Successful Bidder), or (b) absent such agreement, the Bankruptcy Court shall have entered an order authorizing the rejection of the Debtors' collective bargaining agreements under section 1113 of the Bankruptcy Code and the modification of the Debtors' retiree benefits under section 1114 of the Bankruptcy Code and such order shall have become a Final Order;

18.    on the Plan Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**C.    Waiver of Conditions.**

The conditions to Consummation of the Plan set forth in Article X.B may be waived by the Debtors, with the consent of the Required Lenders and the Committee (limited only to the provisions that impact Holders of General Unsecured Claims); *provided* that the condition set forth in Article X.B.14 may not be waived without the consent of the parties named therein.

**D.    Substantial Consummation.**

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Plan Effective Date.

**E.    Effect of Non-Occurrence of Conditions to the Plan Effective Date.**

If the Plan Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, the Debtors' Estates, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, the Debtors' Estates, any Holders, or any other Entity in any respect.

## ARTICLE XI
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.      Modification and Amendments.**

Subject to the limitations contained in the Plan and the Sale Transaction Documentation, the Debtors, with the consent of the Required Lenders and the Successful Bidder (but solely to the extent directly related to the applicable Sale Transaction Documentation or the Sale Transaction), reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the Sale Transaction Documentation, the Debtors, with the consent of the Required Lenders and the Successful Bidder (but solely to the extent directly related to the Sale Transaction Documentation or the Sale Transaction), expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.

**B.      Effect of Confirmation on Modifications.**

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and before the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.      Revocation or Withdrawal of the Plan.**

Subject to the terms of the Sale Transaction Documentation, and with the consent of the Required Lenders and the Successful Bidder (but solely to the extent directly related to the Sale Transaction Documentation or the Sale Transaction), the Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan with respect to any Debtor, or if Confirmation or Consummation does not occur with respect to any Debtor, then: (1) the Plan with respect to such Debtor shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan with respect to such Debtor (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan with respect to such Debtor, and any document or agreement executed pursuant to the Plan with respect to such Debtor, shall be deemed null and void; and (3) nothing contained in the Plan with respect to such Debtor shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

## ARTICLE XII
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, on and after the Plan Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

Case 18-04177-TOM11    Doc 1324    Filed 04/15/19    Entered 04/15/19 12:02:00    Desc
Main Document    Page 102 of 112

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and/or assigned; (c) the Debtors amending, modifying, or supplementing, after the Plan Effective Date, pursuant to Article V of the Plan, any Executory Contracts or Unexpired Leases to the Assumed Contracts and Leases List or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Plan Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article IX of the Plan and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.G.1 of the Plan;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     Determine (including adjudicating any disputes arising from or relating to) any other matters that may arise in connection with or relate to the Plan, the Sale Transaction Documentation (including, without limitation, the documents governing the Non-Cash Consideration and the governance structure of the Successful Bidder and its subsidiaries), the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     Hear and determine matters concerning section 1145 of the Bankruptcy Code;

23.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' release, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Plan Effective Date;

24.     Enforce all orders previously entered by the Bankruptcy Court;

25.     To resolve any disputes arising under the Sale Transaction Documentation or other documents related to the Sale Transaction;

26.     Hear any other matter not inconsistent with the Bankruptcy Code; and

27.     Enter an order concluding or closing the Chapter 11 Cases.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

**A.      Immediate Binding Effect.**

Subject to <u>Article VIII</u> of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Plan Effective Date, the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunction described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

**B.      Additional Documents.**

On or before the Plan Effective Date, the Debtors, with the consent of the Required Lenders, may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, and such agreements and documents shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.  The Debtors, all Holders of Claims or Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.      Dissolution of Statutory Committees.**

On the Plan Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases on the Plan Effective Date.  After the Confirmation Date, but prior to the Plan Effective Date, the professionals for the Committee shall not incur any fees or expenses other than in connection with their final fee applications.

**D.      Reservation of Rights.**

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the Debtors or any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or any Debtor with respect to the Holders of Claims or Interests prior to the Plan Effective Date.

**E.      Successors and Assigns.**

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, Affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**F.      Service of Documents.**

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors shall be served on:

    **1.      the Debtors:**

        Mission Coal Company, LLC
        7 Sheridan Square, Suite 300
        Kingsport, Tennessee 37660

Attention: Gary M. Broadbent

with copies to:

Christian & Small LLP
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Attn: Daniel D. Sparks, and Bill D. Bensinger

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attn.: Melissa Koss

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: Stephen E. Hessler, P.C. and Ciara Foster

After the Plan Effective Date, the Debtors shall have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Plan Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

## G.    Enforcement of Confirmation Order.

On and after the Plan Effective Date, the Debtors, the Plan Administrator, the Liquidating Trustee, the Successful Bidder, and the DIP Lenders, as applicable, shall be entitled to enforce the terms of the Confirmation Order and the Plan.

## H.    Term of Injunctions or Stays.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Plan Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order (including the injunction set forth in Article IX.G) shall remain in full force and effect in accordance with their terms.

## I.    Entire Agreement.

Except as otherwise indicated, the Plan, the Confirmation Order, the Sale Transaction Documentation, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## J.    Exhibits.

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits

56

and documents from the Debtors' restructuring website at *www.omnimgt.com/missioncoal* or the Bankruptcy Court's website at http://www.alnb.uscourts.gov.

**K.** **Nonseverability of Plan Provisions.**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall not alter or interpret such term or provision to make it valid or enforceable, *provided* that at the request of the Debtors, which request shall be made with the consent of the Required Lenders and the Successful Bidder (but solely to the extent directly related to the applicable Sale Transaction Documentation or Sale Transaction), such consent not to be unreasonably withheld, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted, *provided, further,* that any such alteration or interpretation shall be acceptable to the Debtors. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

**L.** **Waiver.**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

Respectfully submitted,

Dated:  April 12, 2019

MISSION COAL COMPANY, LLC
on behalf of itself and all other Debtors

*/s/ Kevin Nystrom*
Name: Kevin Nystrom
Title: Chief Restructuring Officer
Company: Mission Coal Company, LLC

57

**<u>Exhibit B</u>**

**Confirmation Notice**

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MISSION COAL COMPANY, LLC, *et al.*,[1] | ) | Case No. 18-04177-TOM11 |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No. __** |

## NOTICE OF (A) ENTRY OF CONFIRMATION ORDER
## (I) CONFIRMING THE FOURTH AMENDED JOINT CHAPTER 11
## PLAN OF REORGANIZATION OF MISSION COAL COMPANY
## AND CERTAIN OF ITS DEBTOR AFFILIATES AND (II) GRANTING
## RELATED RELIEF AND (B) OCCURRENCE OF THE PLAN EFFECTIVE DATE

**TO ALL CREDITORS, INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that on [?], 2019, the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court"), entered an order [Docket No. [?]] (the "Confirmation Order") confirming the *Fourth Amended Joint Chapter 11 Plan of Mission Coal Company, LLC and Certain of Its Debtor Affiliates* [Docket No. [1310] (with all supplements and exhibits thereto, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE** that the Plan Effective Date of the Plan and the Closing Date with respect to the Maple Eagle Mining Complex and the Oak Grove Mining Complex occurred on [●]. Further notice shall be sent to all creditors, Interest Holders, and other parties in interest upon the occurrence of the Closing Date with respect to the Pinnacle Mining Complex.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Article V.B of the Plan, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Bankruptcy Court and served on the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Mission Coal Company, LLC (8465); Beard Pinnacle, LLC (0637); Oak Grove Land Company, LLC (6068); Oak Grove Resources, LLC (0300); Pinnacle Land Company, LLC (6070); Pinnacle Mining Company, LLC (7780); Seminole Alabama Mining Complex, LLC (6631); Seminole Coal Resources, LLC (1795); Seminole West Virginia Mining Complex, LLC (7858); Seneca Coal Resources, LLC (1816); and Seneca North American Coal, LLC (5102). The location of the Debtors' service address is: 7 Sheridan Square, Suite 300, Kingsport, Tennessee 37660.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan and the Confirmation Order.

Debtors or, after the Plan Effective Date, the Plan Administrator, as applicable, no later than 30 days following the entry of an Order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served on the Debtors no later than the Plan Objection Deadline set forth in the Disclosure Statement Order. **Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claim were not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim. Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, or the property for any of the foregoing without the need for any objection by the Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served and **actually received no later than [?] days after service of the Debtors' proposed rejection of such Executory Contract or Unexpired Lease** by the Bankruptcy Court and the following parties (the "Notice Parties"): (a) counsel for the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn.: Melissa Koss and 601 Lexington Avenue, New York, New York 10022, Attn: Ciara Foster; (b) counsel for the DIP Lenders, Akin Gump Strauss Hauer & Feld LLP, Attn.: Arik Preis and Jason Rubin; (c) counsel for the Official Committee of Unsecured Creditors, Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020, Attn.: Jennifer Kimble and Jeffrey Cohen; and (d) the Bankruptcy Administrator for the Northern District of Alabama, Robert S. Vance Courthouse, 1800 Fifth Avenue North, Suite 326, Birmingham, Alabama 35203, Attn: Jon Dudeck and Thomas Corbett.

  **PLEASE TAKE FURTHER NOTICE** that, except as otherwise provided by Article IIA or by a Final Order entered by the Bankruptcy Court (including the Bar Date Order) on or prior to the Administrative Claims Bar Date, unless previously Filed, requests for payment of Administrative Claims, other than requests for payment of Estate Retained Professional Fee Claims, must be Filed and served on the Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the motion seeking approval of the Disclosure Statement [Docket No. 524] and the Disclosure Statement Order [Docket No. 762]. **HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS THAT DO NOT FILE AND SERVE SUCH A REQUEST BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THEIR ESTATES, THE SUCCESSFUL BIDDERS, OR THE PLAN ADMINISTRATOR, AND**

**SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED COMPROMISED, SETTLED, AND RELEASED AS OF THE PLAN EFFECTIVE DATE**

**PLEASE TAKE FURTHER NOTICE** that, unless otherwise ordered by the Bankruptcy Court, all final requests for payment of Estate Retained Professional Fee Claims must be filed with the Bankruptcy Court no later than thirty (30) days after the Plan Effective Date.

**PLEASE TAKE FURTHER NOTICE** that the terms of the Plan, the Plan Supplement, and this Confirmation Order are immediately effective and enforceable and deemed binding upon the Debtors, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, this Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**PLEASE TAKE FURTHER NOTICE** that the Plan, the Plan Supplement, this Confirmation Order, and copies of all documents filed in these chapter 11 cases are available free of charge by visiting www.omnimgt.com/missioncoal or by calling the Debtors' restructuring hotline at 888-585-6494 (U.S.) or 818-906-8300 (International). You may also obtain copies of any pleadings for a fee by visiting the Bankruptcy Court's website at https://ecf.alnb.uscourts.gov.

3

Birmingham, Alabama
Dated: [●], 2019

/s/ Daniel D. Sparks

Daniel D. Sparks
Bill D. Bensinger
**CHRISTIAN & SMALL LLP**
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
Telephone:     (205) 795-6588
Facsimile:      (205) 328-7234
Email:          ddsparks@csattorneys.com
                bdbensinger@csattorneys.com

- and -

James H.M. Sprayregen, P.C.
Brad Weiland (admitted *pro hac vice*)
Melissa N. Koss (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                brad.weiland@kirkland.com
                melissa.koss@kirkland.com

- and -

Stephen E. Hessler, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          stephen.hessler@kirkland.com
                ciara.foster@kirkland.com

*Co-Counsel to the Debtors*

---

**IF YOU HAVE ANY QUESTIONS ABOUT THIS NOTICE, PLEASE CONTACT OMNI MANAGEMENT GROUP BY CALLING 888-585-6494 (U.S.) OR 818-906-8300 (INTERNATIONAL).**

---

4